# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Böwe Systec, Inc., et al.,[1] | ) Case No. 11-_____ (____) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |
| | ) **Proposed Bid Procedures Hearing Date:** |
| | ) **TBD** |
| | ) **Proposed Bid Procedures Objection Deadline:** |
| | ) **TBD** |

**DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 365, AND BANKRUPTCY RULES 2002, 6004, AND 6006 FOR (I) ENTRY OF AN ORDER (A) ESTABLISHING BIDDING AND AUCTION PROCEDURES RELATED TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) APPROVING RELATED BID PROTECTIONS; (C) SCHEDULING AN AUCTION AND SALE HEARING; (D) ESTABLISHING CERTAIN NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSIGNED; AND (E) GRANTING CERTAIN RELATED RELIEF; AND (II) ENTRY OF AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) ESTABLISHING ASSUMPTION AND REJECTION PROCEDURES FOR CERTAIN ADDITIONAL EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (D) EXTENDING THE DEADLINE TO ASSUME OR REJECT UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY PURSUANT TO 11 U.S.C. § 365(d)(4)**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby move, pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11

U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order (the "Bidding

Procedures Order"), substantially in the form attached hereto as Exhibit A, (A) establishing

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Böwe Systec, Inc. (1423), Böwe Bell + Howell Holdings, Inc. (9926), BBH, Inc. (9928), Böwe Bell + Howell Company (0100), Böwe Bell + Howell Postal Systems Company (4944), BCC Software, Inc. (3481) and Böwe Bell + Howell International Ltd. (0001). The debtors' corporate offices are located at 760 S. Wolf Road, Wheeling, IL 60090.

bidding and auction procedures (the "Bidding Procedures") in connection with the potential sale of substantially all of the Debtors' assets (the "Assets") free and clear of all claims and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the "Interests"), except to the extent identified in a Highest and Best Bidder's (as defined below) asset purchase agreement; (B) approving the proposed bid protections, including the break-up fee (the "Break-Up Fee") and expense reimbursement (the "Expense Reimbursement") and the Minimum Bid Amount (as defined in the Bidding Procedures) (the Break-Up Fee, Expense Reimbursement and Minimum Bid Amount together, the "Bid Protections"), to Contrado BBH Funding, LLC (the "US Purchaser") and a Canadian corporation to be formed prior to closing (the "Foreign Purchaser" and together with the US Purchaser, the "Purchasers" or the "Stalking Horse Bidders") in accordance with that certain Asset Purchase Agreement dated April 18, 2011 (the "Stalking Horse Agreement") for the purchase of the Assets, a copy of which is attached hereto as Exhibit B; (C) scheduling an auction (the "Auction") and setting a date and time for a sale hearing (the "Sale Hearing") for the sale of Assets (the "Sale"), and approving the form and manner of notice thereof; (D) establishing procedures for noticing and determining cure amounts for executory contracts ("Executory Contracts") and unexpired nonresidential real property leases ("Facility Leases") to be assigned in connection with the Sale (the "Cure Procedures"); and (E) granting certain related relief. The Debtors further request that at the Sale Hearing, subject to the results of the Auction and the Bidding Procedures set forth herein, this Court enter an order (the "Sale Order"), substantially in the form attached hereto as Exhibit E, (A) approving and authorizing the Sale, free and clear of all Interests, except to the extent set forth in the Highest and Best Bidder's asset purchase agreement; (B) authorizing the assumption and assignment of certain

2

Executory Contracts and Facility Leases; (C) establishing assumption and assignment procedures (the "Assumption Procedures") and rejection procedures (the "Rejection Procedures") with respect to Executory Contracts and Facility Leases to be assigned or rejected after closing; and (D) extending the deadline to assume or reject the Facility Leases pursuant to section 365(d)(4) of the Bankruptcy Code. In support hereof, the Debtors respectfully represent:

## JURISDICTION

This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.     The Chapter 11 Cases

1.      On April 18, 2011, the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by each filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors continue to operate their business and manage their properties as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

### B.     Overview of the Debtors' Business

3.      The Debtors are one of two leaders nationally in high volume production mail solutions, offering a combination of hardware, services and software to high volume mailers worldwide including financial and insurance firms, government agencies, services bureaus, utilities, and direct-mail firms and others. As a result of the Debtors' unique offering of products and services, the Debtors are well-positioned to satisfy a broad range of complex mailing needs for its global customer base. Due to the large base of installed equipment, a significant

3

percentage of the Debtors' revenues are derived from the sale of recurring, high margin services and software.

4.     The Debtors' offerings can be broken into three key segments: (i) hardware; (ii) services; and (iii) software.  In most instances, the company provides its client base with a combination of all three segments as part of an overall mail solution.

i.     Hardware.  The Debtors offer high end, fully integrated inserting and sorting solutions.  With over 9,000 machines installed, the Debtors are the second largest installer of such equipment in the industry.  The inserter line is designed for large mailers who need to customize mass mailings to clients or prospects.  The inserter line allows clients to take printed statements, bills or other updates and insert them along with various flyers, mailers and product promotions to be mailed to targeted recipients.  The Debtors also offer product reconditioning services whereby the company is able to leverage a client's existing equipment or procure other machines to be reconditioned from third parties.  The Debtors analyze and implement the installed solutions, upgrading the performance of a client's operations to the Debtors' product standards.  Additionally, the Debtors are the leader in the U.S. presort market, whereby service bureaus and other large corporate mailers purchase the Debtors' sorters to meet the requirements of the U.S. Postal Service (the "USPS") for postage discounts.  Mailers receive these discounts by preparing mail with current and correct addresses in the form of a barcode, or modified address and providing the USPS with sorted trays that can be injected directly into the USPS' delivery network.

ii.     Services. The Debtors provide a wide variety of on-site services designed to ensure that a client's mail operations run efficiently.  The Debtors' service revenues are generated by Preventative Maintenance Agreements (a "PMA"), field change orders, part sales,

and time and material billings. The Debtors' service contracts are purchased periodically by customers of installed hardware for product support after the warranty support period expires. These contracts are typically structured as PMAs, annual maintenance agreements that entitle a client to a set level of services. These renewable maintenance and service agreements provide a steady source of revenue for the Debtors and represent approximately $160 million of the company's $248 million in annual revenue. The Debtors' business model depends on the revenues, mostly prepaid, from these annual maintenance agreements. The Debtors' customer base includes numerous utility and credit card companies, governmental agencies, banks and others that depend on the Debtors' equipment to generate billions of dollars worth of accounts receivable (through the issuance of billing statements) on a daily basis. Accordingly, customers need the Debtors' equipment to function properly at all times, which requires the Debtors to respond quickly and responsibly when maintenance issues arise.

iii. <u>Software</u>. The Debtors also provide a number of software offerings which help clients manage their mail operations as well as offer specific solutions that improve the accuracy of customers' mailing lists, ensuring data integrity and accuracy and lowering postage costs.

5. The Debtors are headquartered in Wheeling, Illinois and also have major U.S. manufacturing and service locations in Durham, North Carolina and Bethlehem, Pennsylvania. Additionally, the Debtors have one of the industries' largest nationwide service networks of strategically located service technicians, operating in almost every state and allowing the Debtors to rapidly respond to client service demands.

## C. The Debtors' Corporate Structure

6. The Debtors' history dates back to 1936 when the founder of what would later become Bell + Howell invented, patented and produced the first automated mail inserting

5

machine.  In 2003, Bell + Howell was acquired by Böwe Systec, a German competitor of Bell + Howell, thereby combining their North American mailing operations and changing the name of Bell + Howell to "Böwe Bell + Howell".  The Debtors are each direct or indirect subsidiaries of Böwe Systec.

7.      In May 2010, Böwe Systec commenced an insolvency proceeding in Germany and, as a consequence, Böwe Systec's North American distribution agreements with the Debtors were voided (the significance of which is discussed herein).  On September 2, 2010, the administrator appointed in the German insolvency proceeding agreed to sell substantially all of Böwe Systec's assets to a Swiss private equity firm, Axentum Capital AG.  When Axentum Capital AG was unable to complete the transaction, the administrator regained control of the assets (forming BS GmbH) and subsequently sold the assets to the Possehl Group.  The Debtors were not parties to the German insolvency proceeding, nor were they involved in the transaction with the Possehl Group.

**D.      The Canadian Ancillary Proceeding**

8.      Following the filing of the Debtors' chapter 11 cases, Debtor Böwe Bell + Howell International Ltd. ("BBH Canada"), BBH's Canadian subsidiary, intends to commence an ancillary proceeding (the "Ancillary Proceeding") under Part IV of the Companies' Creditors Arrangement Act in the Ontario Superior Court of Justice (Commercial List) (the "Ontario Court").  BBH Canada, as the proposed foreign representative for the Debtors in the Canadian Proceeding, intends to seek recognition of the Chapter 11 Cases and certain orders, including the Bidding Procedures Order and Sale Order, entered in the Chapter 11 Cases. PricewaterhouseCoopers Inc. is the proposed court-appointed Information Officer in the Canadian Proceeding.

## E.    The Debtors' Capital and Debt Structure

9.    As of the Petition Date, Debtor BBH, Inc. ("BBH") was a borrower under that certain Credit Agreement dated as of September 25, 2003 (the "Original Credit Agreement") by and between BBH, Harris N.A., a national banking association ("Harris" or the "Agent"), as Issuing Lender and Agent (as defined in the Original Credit Agreement), and the financial institutions that were or became lenders thereunder (the "Prepetition Lenders"). The Original Credit Agreement provided BBH with (i) a term loan in the maximum principal amount of $50 million (the "Prepetition Term Loan"); and (ii) a revolving loan in the maximum principal amount of $50 million (the "Prepetition Revolving Loan", and together with the Prepetition Term Loan, the "Prepetition Facility"), subject to borrowing base limitations, and less the amount outstanding under any Letters of Credit and the outstanding principal amount of any Swing Loans (as defined under the Original Credit Agreement). The aggregate amount of the Prepetition Term Loan was subsequently increased in July 2004 to $150 million so that approximately $45 million could be paid to Böwe Systec on account of a preferred stock redemption. BBH's obligations under the Prepetition Facility are secured by substantially all of its assets, with each of the other Debtors (other than Böwe Bell + Howell International Ltd., the Debtors' Canadian affiliate) guarantying BBH's obligations thereunder.

10.    Pursuant to the terms of the Original Credit Agreement, the Prepetition Revolving Loan was to expire by its terms on September 30, 2009. All other obligations under the Prepetition Facility, including the Prepetition Term Loan, were to become due and owing on September 30, 2010. The parties initially entered into discussions regarding an amendment that would have extended the maturity date for the Prepetition Revolving Loan to September 30, 2010, consistent with the balance of the Prepetition Facility, but were unable to obtain the unanimous consent of all lenders under the Prepetition Term Loan to such an extension. As a

7

result, the parties entered into that certain Amended and Restated Credit Agreement dated as of November 23, 2009 (the "Amended and Restated Credit Agreement"), which, inter alia, (i) restated the Original Credit Agreement, as amended, in its entirety, (ii) increased the interest rate provided thereunder, (iii) fixed the stated maturity date for all obligations under the Prepetition Facility as June 30, 2010 (thereby extending the term of the Prepetition Revolving Loan by nine months, but accelerating the maturity date for all other obligations under the Original Credit Agreement), (iv) reduced the Prepetition Revolving Loan to $35 million and (v) imposed certain additional affirmative covenants on the company relating to the raising of additional capital.

11.     For the reasons discussed below, BBH was unable to repay or refinance the Prepetition Facility on or before the June 30, 2010 maturity date. While this constituted an event of default under the terms of the Amended and Restated Credit Agreement, the Prepetition Lenders have permitted the company to continue using cash collateral since such time. While the parties attempted to negotiate a standard forbearance agreement, such efforts have been unsuccessful. Accordingly, there is no forbearance agreement currently in place and the Debtors remain subject to immediate remedial action by the Prepetition Lenders.

12.     In March, 2011, Versa Capital Management, Inc. ("Versa"), a private equity firm with an interest in acquiring the Debtors or their assets, began purchasing the secured claims of certain of the Prepetition Lenders. As of the Petition Date, Versa had control over approximately sixty (60) percent of the outstanding debt under the Prepetition Facility and had acquired the balance of the Prepetition Facility subject to confirmed trades which are in the process of closing. As of the Petition Date, there was an aggregate amount of not less than $121 million outstanding under the Prepetition Facility.

RLF1 3771614v. 9

**F.    Events Leading to Chapter 11 Cases**

13.    Following its acquisition of Bell + Howell (the predecessor to BBH) in 2003, Böwe Systec replaced the then current Chief Executive Officer of Bell + Howell, George Marton, with a new Chief Executive Officer designated by Böwe Systec and directed BBH to implement a product strategy that ultimately proved flawed, because it misaligned the BBH product offerings with the requirements of Bell + Howell's diverse customer base. The new product strategy moved BBH away from its broad, market driven product offering, to a model by which BBH became a distribution channel for Böwe Systec's high-end product offering that was engineered with the more highly regulated European mail standards in mind and manufactured in the higher cost environment of Augsburg, Germany. This new strategy resulted in, among other things, (i) BBH being largely limited to the distribution of Böwe Systec manufactured inserting products, which increased Böwe Systec's manufacturing production in Germany but inhibited BBH's ability to compete in the U.S. market; (ii) a loss of lucrative PMA renewals and margins; (iii) new BBH technology such as Gemini (a mid-range inserter) to be discontinued and the Combo and Mercury (a high speed inserter) to be shelved; and (iv) the integration of costly Böwe Systec technology in all new products developed by BBH at the expense of user acceptance and margin. This overall strategy proved ineffective at meeting the needs of BBH's customers, and the company found its dominant market share eroding to competitors. Moreover, as discussed below, this new reliance on Böwe Systec manufactured products and parts made BBH (and its ability to maintain customers) even more susceptible to the effects of Böwe Systec's insolvency proceeding. Further, the global recession that began in 2008 caused a number of high volume mailers to defer capital expenditure projects resulting in a decline in hardware sales for BBH.

RLF1 3771614v. 9

14. In early 2009, Böwe Systec brought Oliver Bialowons, the current Chairman of the Board of Directors for each of the Debtors, in to replace their current Chief Executive Officer. One of Mr. Bialowons' first actions was to bring back George Marton, as Chief Executive Officer of BBH, to help stabilize the business and refocus BBH on its core long-term strategy of providing comprehensive mailing solutions composing of mailing equipment, services and software as well as capitalizing on BBH's large installed base of equipment. Acting together, Mr. Marton and Mr. Bialowons were able to initiate a number of cost cutting measures to right size the company's cost structure, consolidate operations and enhance its product line to better satisfy current market needs. Indeed, these efforts enabled the Debtors to (i) reduce the principal amount outstanding under the Prepetition Facility from $122 million at the end of 2008 to $100 million on June 30, 2010 (when the Amended and Restated Credit Agreement expired);[2] (ii) raise 2009 EBIDTA to $19.7 million from $14.7 million in 2008; (iii) reduce support costs structure by $15 million in 2009; and (iv) reduce inventories from $56 million to $49 million. Indeed, by August 2009, the Debtors began to experience an increase in incoming orders when compared to the same time periods for the previous year. Notwithstanding these results, numerous factors, including the commencement of the Böwe Systec insolvency proceeding, impeded the Debtors' ability to refinance the Prepetition Facility, in a manner acceptable to the Agent, in advance of the June 30, 2010 maturity date.

G.     **Efforts to Refinance the Prepetition Facility/Market the Debtors' Assets**

15. As discussed above, the Amended and Restated Credit Agreement fixed the maturity date as June 30, 2010 and imposed certain affirmative covenants upon the company relating to a refinancing of the Prepetition Facility. Among other things, Section 2.9 of the Amended and Restated Credit Agreement required the company to select and engage an

---

[2] In total, the Debtors have paid down approximately $50 million under the Prepetition Facility since the Original Credit Agreement was amended in July 2004 to increase the amount of the facility to $150 million.

investment banker acceptable to the Agent to raise capital (in the form of equity, debt or a combination thereof) with the proceeds thereof going to pay off the outstanding obligations under the Prepetition Facility. Moreover, Section 2.8 of the Amended and Restated Credit Agreement provided that, in the event that BBH failed to deliver one or more written letters of intent for capital by April 30, 2010, the company retain a Chief Restructuring Officer acceptable to the Agent to review the company's business plan and capital raising efforts.

16.     In accordance with the Amended and Restated Credit Agreement, the Debtors retained Lazard Middle Market LLC ("LMM") to, among other things, assist the company in identifying prospective financing sources to refinance the Prepetition Facility, including either through a private placement/issuance of debt or equities securities of the company or through loans from banks or other ordinary course lenders. At approximately the same time, Mr. Bialowons engaged bankers in Europe to seek a refinancing or sale of the entire Böwe Systec group, including the Debtors. Management for the Debtors also undertook a concerted effort to identify and encourage potential strategic buyers to invest in BBH or to buy its stock, assets or debt.

17.     LMM's initial efforts focused on a refinancing of the debt or equity contribution which would not result in a change in control. By April 2010, LMM notified the Debtors' Board that it would be unable to refinance the secured debt without offering at least a majority of the equity and providing more assurance to potential buyers of management continuity. The Board then authorized LMM to expand its efforts to include a search for refinancing options which would include an equity contribution that would shift the majority ownership in the company. In addition, the Board authorized BBH to amend the Services Agreement with Mr. Marton to provide for a longer term and to enter into the Services Agreement dated as of May 17, 2010 to

11

assure potential purchasers of Mr. Bialowons' continuing help and support. LMM then sent out a teaser and related materials to over 340 parties, including potential lenders and debt and equity investors, inviting them to purchase a control position in BBH (which could include the sale of up to 100% of the stock).

18.     Several events, however, transpired during this period that thwarted the company's efforts to refinance the Prepetition Facility. The primary factor was the commencement of Böwe Systec's European insolvency, which resulted in an immediate cessation in the sale of Böwe Systec products and the loss of certain distribution arrangements between the Debtors and their German parent. As discussed above, the Debtors' renewable maintenance and service agreements represent approximately 65 percent of the company's annual revenue. The Debtors' high-speed inserter line consists entirely of Böwe Systec manufactured products and their other product lines all contain Böwe Systec modules. Accordingly, the Debtors rely on the provision of Böwe Systec parts to comply with their service obligations under the annual maintenance agreements, and thereby avoid the large penalties contemplated thereunder. Although Böwe Systec has resumed providing parts, after a 2-3 month lapse when parts were not available, to the Debtors (including after the sale to the Possehl Group), the absence of any agreement has created customer and investor confidence issues as parties began to question the long-term viability of the Debtors and assume that they would commence their own bankruptcy cases. Given the renewable nature of the PMAs, this loss in consumer confidence has significantly affected the Debtors' business and thereby created uncertainty amongst potential investors and purchasers.

19.     Second, the company also found itself in the midst of a global recession that resulted in a tightening of the credit markets during the first quarter of 2009. Third, the

Postmaster General issued a forecast in March 2010 that predicted a decline in mail volume, thereby causing many prospective investors to take a "wait and see" approach to a potential investment. Fourth, the maturity date under the Amended and Restated Credit Agreement caused the Debtors to conduct their refinancing efforts during a period when their working capital needs (and therefore borrowings under the Prepetition Revolving Loan) were at their greatest. The Debtors' business is cyclical in nature with a large part of their revenues being received in the first quarter as customers renew their annual maintenance agreements. Accordingly, an examination of the Debtors' business in the second quarter (and closer to the June 30, 2010 termination date) would lead to an analysis during a period of low cash generation, thereby causing investors to overestimate the going-forward capital needs of the business. Notwithstanding these impediments, by late May 2010, BBH had received several offers to purchase substantially all (but less than 100%) of the equity in the company through the infusion of new capital. None of these proposals were sufficient to pay the amounts outstanding under the Prepetition Facility in full and therefore were not acceptable to the Prepetition Lenders.

20.    Beginning on July 1, 2010, following the maturity date under the Amended and Restated Credit Agreement, the Prepetition Lenders began placing greater oversight on the Debtors' use of cash collateral, and caused the Debtors to abandon all efforts to refinance the Prepetition Facility and to focus on a sale of the Debtors' assets. In furtherance of such strategy, the Debtors and LMM entered into a revised engagement letter expanding LMM's retention to include the provision of general restructuring advice, including advising the company in connection with any restructuring and/or sale of the Debtors' assets. In addition, the company independently contacted a number of prospective purchasers, including parties which had at one

time engaged Böwe Systec, either before or after the commencement of the German proceeding, in connection with the European process to sell its assets.

21.     As a result of their prepetition marketing efforts, the Debtors identified four prospective purchasers of the Debtors' assets. Since early October, the Agent was involved in direct negotiations with one of these parties, a strategic purchaser known to management to the Debtors for many years and with whom management commenced a dialogue with in November 2009, with the goal of negotiating a binding asset purchase agreement. While the Agent assumed the lead role in negotiating with this strategic purchaser, the Debtors made every effort to involve themselves in the process and remained informed regarding the status of the negotiations and the terms of the proposed transaction. Likewise, the Debtors remained responsive to all due diligence/informational requests and did everything possible to support a transaction with this potential purchaser. The Debtors, however, became frustrated with these negotiations as several months passed with little progress on certain outstanding deal issues (many of which are basic to any transaction) that prevented an agreement from being finalized.

22.     While remaining supportive of a potential transaction with this strategic purchaser, the Debtors determined that it was necessary to reopen discussions with other interested parties with the goal of entering into a definitive stalking horse agreement with the best available bid for the Debtors' assets and initiating a full, fair and open competitive auction process under the supervision of this Court. Indeed, given the uncertainty caused by Böwe Systec's insolvency proceeding, the general state of the economy and the Debtors' poor liquidity situation, the Debtors believe that the value of their business may likely continue to decline until a sale is consummated. Accordingly, in early January 2011, the Debtors reopened discussions

14

with several prospective purchasers, including extensive negotiations with Versa and another interested financial buyer, regarding a potential sale of substantially all of the Debtors' assets.

## BACKGROUND ON THE SALE

### A.    The Stalking Horse Agreement

23.    As discussed above, beginning in March, 2011, Versa began acquiring secured debt under the Prepetition Facility from certain of the Prepetition Lenders.  As of the Petition Date, Versa had acquired approximately sixty (60) percent of the secured debt under the Prepetition Facility and had acquired the balance of the Prepetition Facility subject to confirmed trades which are in the process of closing with the intention of submitting a credit bid for the Debtors' assets pursuant to section 363(k) of the Bankruptcy Code.

24.    On April 18, 2011, the Debtors and the Purchasers entered into the Stalking Horse Agreement whereby the Purchasers, each wholly owned subsidiaries of Versa, agreed to submit a credit bid for substantially all of the Debtors' assets (the purchase price includes cash consideration for certain assets of BBH Canada, which is not a borrower or guarantor under the Prepetition Facility). The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids through an auction process.

25.    The Stalking Horse Agreement also provides certain additional benefits that will assist in conducting an orderly and efficient sale process.  First, the agreement provides that the Purchasers will offer employment to no less than eighty-five (85) percent of active employees of the Debtors (and all employees of BBH Canada) effective as of the closing date.  In addition to the obvious benefit of keeping the Debtors' workforce employed, the proposed transaction will help avoid WARN and other related liabilities that could impose significant administrative

15

obligations upon the Debtors' estates. The Stalking Horse Bidders have also agreed to pay all cure obligations in connection with the assumption and assignment of Executory Contracts and Facility Leases and all taxes and/or fees resulting from the transfer of the Debtors' assets. Additionally, the Stalking Horse Bidders have agreed to assume certain unpaid ordinary course of business postpetition obligations (and not otherwise paid by the Debtors with the funds made available under the DIP Facility(as defined herein)) thereby ensuring that all administrative obligations incurred by the Debtors in these Chapter 11 Cases will be satisfied.

**B.     The DIP Financing**

26.     In connection with the Chapter 11 Cases, BBH (the "U.S. Borrower") and BBH Canada (the "Canadian Borrower"), as borrowers, and each of the other Debtors, as guarantors, and Contrado BBH Investments, LLC ("Contrado"), a wholly-owned subsidiary of Versa, and one or more additional lenders party from time to time (together with Contrado, the "DIP Facility Lenders") have entered into that certain Senior Secured, Super-Priority Debtor-in-Possession Credit and Guaranty Agreement (the "DIP Facility Agreement"). Pursuant to the DIP Facility Agreement, the DIP Facility Lenders have agreed to provide postpetition financing up to the aggregate principal amount of $127.2 million (inclusive of up to $1.3 million for postpetition financing by the Canadian Borrower) (the "DIP Facility").[3] The DIP Facility will be used to, among other things, provide the Debtors with adequate working capital and to cover any administrative obligations incurred during the course of the Chapter 11 Cases. As discussed above, the Purchasers shall have the ability to credit bid all amounts outstanding under the DIP Facility in accordance with the terms of the Stalking Horse Agreement.

---

[3] Subject to entry of a final DIP financing order, the Debtors propose to use a portion of the DIP Facility to pay in full, in cash, the remaining balance outstanding under the Prepetition Facility.

16

## C. Proposed Timeline for Sale of Assets

27.     Pursuant to Section 6.7 of the Stalking Horse Agreement, the Debtors are required to seek (i) the Bidding Procedures Hearing be held within sixteen (16) days of the Petition Date and (ii) the Sale Hearing be held within forty-five (45) days of the Petition Date. Consistent with this requirement, the Debtors propose the following timeline for conducting the sale process:

| Action | Deadline |
|---|---|
| Bidding Procedures Hearing | May 4, 2011 |
| Proposed Bid Deadline | May 26, 2011 |
| Auction | May 31, 2011 |
| Sale Hearing | June 2, 2011 |
| Consummation of Sale | June 8, 2011 |

28.     Given their prepetition marketing efforts, the Debtors believe that the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the Debtors' assets. The proposed timeline will provide the Debtors and LMM with sufficient time to solicit (or re-solicit) prospective purchasers in advance of the Proposed Bid Deadline, while respecting the necessity to consummate a sale as quickly as possible in order to maximize the value received for the Debtors' Assets.

## D. The Stalking Horse Agreement

29.     A summary of the pertinent terms of the Stalking Horse Agreement is as follows:[4]

- Purchase Price. As set forth more fully in Section 3.1 of the Stalking Horse Agreement, the aggregate consideration for the Acquired Assets (the "Purchase Price") shall equal the following, as calculated on the Closing Date: (i) an amount (the "Credit Bid Amount") equal to the sum of (x) $80,000,000 (the "US Bid Amount"), plus (y) the Canadian Credit Bid Amount; plus (ii) an amount in cash equal to $302,000 (Canadian currency) (the "Canadian Cash Bid Amount"); plus (iii) all Cure Amounts

---

[4] The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Agreement and the terms herein, the terms of the Stalking Horse Agreement shall control. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Stalking Horse Agreement.

paid or to be paid by the Purchasers; plus (iv) the Assumed Liabilities. The aggregate purchase price for the German Assets shall be $20,000 (the "German Assets Consideration") plus the assumption of the Assumed German Obligations.[5]

- Acquired Assets. Section 2.1 of the Stalking Horse Agreement lists the Acquired Assets, and provides that at the Closing the Sellers shall sell, transfer, grant, assign, deliver and convey to the Purchasers free and clear of all Liens, Claims and Interests, and the Purchasers shall purchase, acquire and take assignment and delivery of, all of the Sellers' right, title and interest of every kind and nature (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) of such Seller as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed, certain enumerated properties, rights, and assets, but excluding the Excluded Assets (collectively, the "Acquired Assets").

- Assumed Liabilities. Pursuant to Section 2.4 of the Stalking Horse Agreement, at the Closing, the Purchasers shall not assume any obligations or Liabilities from Sellers other than those obligations and Liabilities expressly listed in Section 2.4 of the Stalking Horse Agreement (all such liabilities and obligations assumed pursuant to Section 2.4 of the Stalking Horse Agreement, the "Assumed Liabilities"). For purposes of the Stalking Horse Agreement, Assumed Liabilities means only the following Liabilities: (a) all obligations under the Acquired Contracts arising after the Closing Date with respect to the post-Closing period; (b) the sponsorship of and all Liabilities attributable to the Assumed Plans, other than any Liabilities arising from any breach of any representations, warranty, or covenant under the Stalking Horse Agreement; (c) (i) ordinary accruals existing on the Closing Date for the wages, commissions, vacation days and sick days and expense reimbursements of the employees ("Employee Accruals") of the Sellers, but solely to the extent set forth on Schedule 2.4(c)(i) (with it being understood that Schedule 2.4(c)(i) may be updated as of the Closing solely to reflect additional Employee Accruals incurred in the ordinary course of business consistent with past practice between the date of the Stalking Horse Agreement and the Closing Date, to the extent such updated amounts are reasonably acceptable to the Purchasers), (ii) retention payment obligations to be paid to those employees of the Sellers and in the amounts set forth on Schedule 2.4(c)(ii), (iii) unpaid severance obligations to those former employees of the Sellers and in the amounts listed on Schedule 2.4(c)(iii) and (iv) incurred but not reported claims expenses for the Sellers' health benefit plan but solely to the extent set forth on Schedule 2.4(c)(iv); (d) to the extent set forth (i) on Schedule 2.4(d)(i), current liabilities consisting of accounts payables arising in the ordinary

---

[5] The German Assets are listed on Schedule 1.1 of the Stalking Horse Agreement.

course of business from the Petition Date through Closing and (ii) on Schedule 2.4(d)(ii), current liabilities consisting of accounts payable for goods received by Sellers within twenty (20) days prior to the Petition Date which were purchased by Sellers in the ordinary course of business, to the extent they become allowed claims in the Bankruptcy Case (but excluding (x) all Liabilities and obligations relating to any notes, accounts payable, Contract, commitment or transaction required to be set forth on Schedule 5.1(t) and (y) Liabilities arising from a breach of Contract, breach of warranty, tort, infringement, lawsuits, or violation of Law) with it being understood that Schedules 2.4(d)(i) and/or (ii) may be updated as of the day prior to the Closing Date to reflect changes in such accounts payable between the date hereof and the Closing Date to the extent incurred in the ordinary course of business and to the extent reasonably acceptable to the Purchaser; and (e) in addition to the other Assumed Liabilities of the Foreign Seller set forth in Section 2.4 of the Stalking Horse Agreement, but without duplication, all liabilities of the Foreign Seller which have accrued prior to the Closing Date (whether due before or after the Closing Date), including the liabilities described on Schedule 2.4(e) and excluding, for the avoidance of doubt, any unknown, unasserted or contingent liability, and any liability associated or in any way related to any Employee Benefit Plan that is subject to Title IV of ERISA, including, without limitation, any liabilities of any kind associated with the Bell + Howell MMT Legacy Pension Plan whether asserted by the Pension Benefit Guaranty Corporation or any other Person.

- <u>Break-Up Fee and Expense Reimbursement</u>.[6] Pursuant to Section 9.3 of the Stalking Horse Agreement, if the Stalking Horse Agreement is terminated pursuant to Section 9.1 thereof, other than by mutual consent of the Parties under Section 9.1(a) or by the Sellers pursuant to Section 9.1(f) as a result of the Purchasers' breach of the Stalking Horse Agreement, then the Purchasers shall be entitled to (a) the Expense Reimbursement with such amount being payable upon termination of the Stalking Horse Agreement and (b) in the event that the Sellers obtain Bankruptcy Court approval of an Alternative Transaction on or prior to the date that is fifteen (15) months after the date of such termination, the Break-Up Fee with such amount being payable upon the closing or consummation of such Alternative Transaction. The Break-Up Fee and the Expense Reimbursement shall be entitled to administrative priority (which shall be a super-priority administrative expense Claim senior to all other administrative expense Claims) under section 364(c)(1) of the Bankruptcy Code. The obligation to pay in full in cash when due any amount owed by any Seller to the Purchasers under the Stalking Horse Agreement, including the Break-Up Fee and the Expense Reimbursement,

---

[6] Section 6.7(c)(v) of the Stalking Horse Agreement defines the Break-Up Fee and Expense Reimbursement. As outlined in the Stalking Horse Agreement, the Break-Up Fee equals $1,500,000 and the Expense Reimbursement would not exceed $1,750,000.

shall not be discharged, modified or otherwise affected by any plan of reorganization or liquidation for any Seller or by any other Order of the Bankruptcy Court or the Canadian Court.

30.     The Stalking Horse Agreement contemplates a going concern sale of the Debtors' Assets with certain Executory Contracts and Facility Leases being assumed and assigned to the Purchasers on the Closing Date. Those Executory Contracts and Facility Leases that are not assumed and assigned on the Closing Date (and not otherwise rejected) will be subject to a designation period (210 days from the Petition Date for Facility Leases and 210 days from the Closing Date for Executory Contracts) during which such contracts and leases may be assumed or rejected pursuant to proposed Assumption Procedures or Rejection Procedures, as discussed more fully below.

## RELIEF REQUESTED

31.     By this Motion, the Debtors seek entry of the Bidding Procedures Order: (A) approving the Bidding Procedures; (B) approving the Break-Up Fee and Expense Reimbursement to the Stalking Horse Bidders in accordance with the Stalking Horse Agreement and related Bid Protections; (C) scheduling the Auction and a Sale Hearing with respect to any bid accepted by the Debtors, and approving the form and manner of notice thereof; and (D) establishing the Cure Procedures.

32.     The Debtors also request that this Court set a Sale Hearing on or about June 2, 2011. At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bidding Procedures, the Debtors intend to seek entry of a Sale Order (A) approving the Sale, free and clear of all Interests; (B) authorizing the assumption and assignment of certain Executory Contracts and Facility Leases; (C) establishing Assumption Procedures and Rejection Procedures for those Executory Contracts and Facility Leases not assumed and assigned on the Closing

RLF1 3771614v. 9

Date; and (D) extending the deadline to assume or reject Facility Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## BASIS FOR RELIEF

### A. Necessity for Sale

33. The Debtors have been in default under the Amended and Restated Credit Agreement since June 30, 2010. Since such date, there has been no additional lending available and the Debtors' cash situation is continuing to deteriorate. Moreover, the Debtors are subject to immediate remedial action by the Prepetition Lenders (with such debt now being owned by Versa and/or its affiliates), as there is currently no forbearance agreement in place. Accordingly, the Debtors are facing severe liquidity constraints and, as detailed above, have exhausted their options for addressing this issue through a refinancing or other investment in the company.

34. The Debtors' liquidity situation has been exasperated by the commencement of Böwe Systec's European insolvency proceeding. The Debtors' high speed inserter line consists entirely of Böwe Systec manufactured products and their other product lines all contain Böwe Systec modules. The Debtors therefore rely on the provision of Böwe Systec parts to comply with their servicing obligations under their renewable maintenance and service agreements with their customers (and thereby avoid the large penalties contemplated thereunder). The commencement of the European proceeding resulted in a voiding of the distribution agreements between Böwe Systec and the Debtors. While Böwe Systec has continued providing product to the Debtors, the absence of any formal agreement has created customer confidence issues leading to the non-renewal of certain customer agreements -- thereby affecting the Debtors' revenue stream and reducing the value of the business.

35. The Debtors submit that a Sale of the Assets, along the timeframe proposed herein, will address their liquidity issues by transferring ownership of the business to a

financially stable buyer that will be able to satisfy the company's capital needs moving forward. Addressing the Debtors' capital concerns will also restore confidence amongst their customer base, thereby stemming any further loss of customers. Moreover, Böwe Systec is likely to be much more amenable to entering into long-term distribution arrangements with a financially stable buyer that is not subject to the liquidity constraints currently facing the Debtors. Accordingly, the Debtors have decided to pursue the Sale of the Assets and believe that they must be permitted to conduct the process in the manner and on the timetable set forth herein and in the Bidding Procedures. In the absence of a sale transaction conducted in accordance with such timeline, the Debtors may not have sufficient liquidity to maintain operations going forward and will likely face further deterioration in the value of the business resulting from additional customer migration.

**B.    The Bidding Procedures**[7]

36.    In order to maximize the value of the Assets for the benefit of the Debtors' estates and their respective creditors, the Debtors seek to implement a competitive bidding process that is designed to generate maximum recovery. As described more fully in the Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order attached hereto as Exhibit A, the Debtors may sell all of the Assets to a Qualified Bidder that makes the highest or otherwise best offer for the Assets.

37.    As described more fully in the Bidding Procedures, the Debtors propose that competing bids for the Assets be governed by the following:[8]

---

[7] Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.

[8] The following description of the Bidding Procedures is only a summary of the terms set forth in the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order. The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall control.

22

- Bid Deadline. A Bidder that desires to make a bid shall deliver written copies of its bid and the Required Bid Materials not later than 5:00 p.m. (prevailing Eastern Time) on May 26, 2011 (the "Bid Deadline").

- Required Bid Materials. All bids, other than the Stalking Horse Bid, must include the following, among other things (the "Required Bid Materials"):

    (i)    Acquired Assets. Any Qualifying Bid must seek to acquire substantially all of the Acquired Assets;

    (ii)   Same or Better Terms. The Bid must be on terms that, in the Debtors' business judgment and with the Purchasers' approval, are substantially the same or better than the terms of the Stalking Horse Agreement. A Bid must include executed transaction documents (the "Competing Transaction Documents") pursuant to which the Bidder proposes to effectuate a competing transaction (a "Competing Transaction"). A Bid shall include a copy of the Stalking Horse Agreement marked to show all changes requested by the Bidder (including those related to the Purchase Price);

    (iii)  Identity. All Bids must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid and the complete terms of any such participation;

    (iv)   Confidentiality Agreement. Prior to receipt by a Bidder of any information (including business and financial information and access to representatives of the Debtors) from the Debtors, each Bidder will be required to execute a confidentiality agreement on terms and conditions no less favorable than those set forth in the confidentiality agreement executed by the Purchasers in connection with the Sale;

    (v)    Contingencies. A Bid may not be conditioned on (i) obtaining financing or any internal approval or (ii) on the outcome or review of due diligence;

    (vi)   Proof of Financial Ability to Perform. A Bid (other than the Stalking Horse Agreement) must provide written evidence that the Debtors reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all Acquired Contracts to be assumed and assigned in the Competing Transaction. Such information should include, among other things, the following:

        (a)    contact names and telephone numbers for verification of financing sources;

(b)     evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Competing Transaction;

(c)     the Bidder's current financial statements (audited if they exist); and

(d)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the Competing Transaction;

(vii)     No Fees. A Bid made by any Bidder other than the Purchasers must disclaim any right of the Bidder to receive a fee analogous to the Break-Up Fee and the Expense Reimbursement or to compensation under section 503(b) of the Bankruptcy Code for making a substantial contribution;

(viii)     Irrevocable. A Bid made by any Bidder other than the Purchasers must be irrevocable through the Auction; provided that if such Bid is accepted as the Highest and Best Bid or the Backup Bid (as defined in the Bidding Procedures), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures;

(ix)     Bid Deposit. The cash deposit in the amount of $5,000,000 (the "Bid Deposit") by wire transfer, certified or cashier's check, which amount shall be paid to or deposited with an escrow agent to be held pursuant to an escrow agreement to be entered into by such Bidder, the Debtors and such escrow agent;

(x)     Identification of Executory Contracts and Unexpired Real Property Leases. The Bid shall identify with particularity the Debtors' executory contracts and unexpired leases with respect to which the Bidder seeks to receive an assignment and any designation rights;

(xi)     Corporate Authority. Written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Competing Transaction; provided that if the Bidder is an entity specially formed for the purpose of effectuating the Competing Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors and the Purchasers of the approval of the Competing Transaction by the equity holder(s) of such Bidder; and

(xii)     Adequate Assurance Information. The Bid shall include sufficient financial or other information (the "Adequate Assurance Information") to establish adequate assurance of future

24

performance with respect to any lease or contract to be assumed and assigned to the Bidder in connection with the proposed transaction and Bidder's agreement that such Adequate Assurance Information can be faxed or emailed to any counterparties to such contracts or leases (or their counsel) within 24 hours of submission of the Bid; provided, however, that the counterparties to such contracts and leases must keep any information marked in the Adequate Information as confidential (the "Confidential Information") provided that the Confidential Information may be referred to and quoted in any hearing before the Bankruptcy Court held to consider the assumption and assignment of such contract or lease and further provided, however, that to the extent that any party desires to introduce the Confidential Information as an exhibit at any hearing, such party shall request that the Bankruptcy Court treat the Confidential Information as confidential, unless the Debtors and the applicable Bidder have agreed that such confidential treatment by the Bankruptcy Court is not necessary. The Bid shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information.

A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "Qualified Bid," and such Bidder shall constitute a "Qualified Bidder." The Debtors shall provide notice of any Qualified Bid to the Purchasers within two (2) Business Days of qualifying a Bid. For the avoidance of doubt, the Stalking Horse Agreement shall constitute a Qualified Bid by the Purchasers and the Purchasers shall be deemed a Qualified Bidder. The Purchasers shall have standing to contest the Debtors' determination of each Qualified Bid and Qualified Bidder.

In the event that any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors shall cause such Bidder to be refunded its Bid Deposit and all accumulated interest thereon within three (3) business days after the Bid Deadline or as soon as reasonably practicable thereafter.

- Minimum Bid Amount. Any Qualifying Bid (other than the Stalking Horse Agreement) at the Auction must be higher and better than the offer of the Purchasers under the Stalking Horse Agreement and that is not less than the sum of (A) the Credit Bid Amount and the Cure Amounts in cash; (B) the dollar value of the Break-Up Fee in cash; (C) the dollar value of the Expense Reimbursement in cash; and (D) $250,000 in cash (the "Minimum Bid Amount"), and must provide for the immediate payment of the Break-Up Fee and Expense Reimbursement to the Purchasers from the first proceeds of the cash portion of the purchase price of such Bid.

- Auction. If a Qualified Bid, other than that submitted by the Stalking Horse Bidder, has been received by the Debtors, the Debtors may conduct an auction (the "Auction") with respect to all or some of the Assets. The Auction shall be conducted at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801 (the "Auction Site") at 10:00 a.m. (prevailing Eastern Time) on May 31, 2011 (the "Auction Date"), or such other place and time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids and expressed their intent to participate in the Auction as set forth above. Prior to moving the Auction Date, the Debtors shall consult with the Stalking Horse Bidders and the Committee.

- Break Up Fee and Expense Reimbursement. To provide an incentive and to compensate the Stalking Horse Bidders for performing the substantial due diligence and incurring the expenses necessary and entering into the Stalking Horse Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to provide certain bid protections to the Stalking Horse Bidders, under the conditions outlined herein and in the Stalking Horse Agreement, including (i) a break-up fee in an amount of $1,500,000 (the "Break-Up Fee") and (ii) reimbursement of reasonably documented actual out-of-pocket expenses in an amount not to exceed $1,750,000 (such maximum amount, the "Expense Reimbursement"), both of which if approved by the Bankruptcy Court, shall be paid in accordance with the Stalking Horse Agreement.

## C. Stalking Horse Agreement, Break-Up Fee and Expense Reimbursement

38. In order to provide an incentive and to compensate the Stalking Horse Bidders for entering into the Stalking Horse Agreement, the Debtors have agreed to the Bid Protections, including the Break-Up Fee and Expense Reimbursement.

39. The Debtors believe that offering the Bid Protections to the Stalking Horse Bidders will benefit the Debtors' estates by establishing a floor and promoting more competitive bidding. The availability of the Bid Protections is necessary in order to provide the Stalking Horse Bidders with some assurance that it will be compensated for the time and expense it has spent in putting together its offer for the Assets and the risk that arises from participating in the bidding and subsequent Auction process.

**D.** **Notice of Bidding Procedures, Auction and Sale**

40.     <u>Notice of Sale Hearing</u>. On the date the notice of motion and hearing with respect to this Motion is filed, the Debtors (or their agents) shall serve this Motion and all exhibits hereto, including the Stalking Horse Agreement, the Bidding Procedures and a copy of the proposed Bidding Procedures Order, by first-class mail, postage prepaid, upon (a) the United States Trustee for the District of Delaware; (b) counsel to the Agent (c) the creditors listed on the Debtors' consolidated list of 20 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (d) counsel to the Stalking Horse Bidders; (e) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (f) each of the Debtors' landlords and each of the notice parties identified in the Facility Leases, to the extent possible; (g) various federal, state, county and city tax and regulatory authorities; (h) all entities known to have expressed an interest in a transaction with respect to the Assets or that has been indentified by the Debtors or their advisors as a potential purchaser of the Assets; (i) the Federal Trade Commission; (j) the United States Attorney General/Antitrust Division of the Department of Justice; (k) local and state environmental authorities and the federal Environmental Protection Agency; and (l) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Sale Notice Parties</u>").

41.     <u>Sale Notice</u>. Within two (2) business days of the entry of the Bidding Procedures Order (the "<u>Mailing Date</u>") or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, a sale notice (the "<u>Sale Notice</u>") setting forth the dates established for submission of Qualified Bids, the Auction and the Sale Hearing, substantially in the form attached hereto as <u>Exhibit C</u>, and the Bidding Procedures Order upon the Sale Notice Parties.

42.     <u>Publication Notice</u>. The Debtors also propose, pursuant to Bankruptcy Rules

2002(l) and 2002(d), that the publication of the Sale Notice in the form attached hereto as Exhibit D, once in the Wall Street Journal, on the Mailing Date or as soon as practicable thereafter, be deemed proper notice to any other interested parties whose identities are unknown to the Debtors.

43.     Post Auction Notice.  As soon as possible after the conclusion of the Auction, the Debtors shall file, but not serve, a notice (the "Post Auction Notice") identifying any successful bidder (the "Highest and Best Bidder").

**E.     Designation Rights Under Stalking Horse Agreement and Extension of Time to Assume/Reject Nonresidential Real Property Leases[9]**

44.     The Stalking Horse Bidders have not yet determined exactly which Executory Contracts and Facility Leases they will assume and the Stalking Horse Agreement provides for certain deadlines pursuant to which the Stalking Horse Bidders must select which Executory Contracts and Facility Leases to assume and assign or reject.  Pursuant to Section 2.6 of the Stalking Horse Agreement, subject to Section 2.8 of the Stalking Horse Agreement, on or before the Closing, the Purchasers may update Schedule 2.1(e), Schedule 2.3(a), Schedule 2.8(a)(1) or Schedule 2.8(a)(ii) to add or remove a Contract or Facility Lease to or from such schedules.  Any Contract added to Schedule 2.1(e) shall become an Acquired Contract, shall be deemed an Acquired Asset for all purposes of the Stalking Horse Agreement, and all obligations arising under such Contract which would have been Assumed Liabilities if such Contract had been an Acquired Contract as of the date of the Stalking Horse Agreement shall be Assumed Liabilities for all purposes of the Stalking Horse Agreement subject to the provisions of Section 2.4(a). Any Contract removed from Schedule 2.1(e) and/or added to Schedule 2.3(a), and not added to Schedule 2.8(a)(1) or Schedule 2.8(a)(ii), shall become an Excluded Asset and shall not be an

---

[9] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Stalking Horse Agreement.

Acquired Contract for purposes of the Stalking Horse Agreement and all liabilities and obligations under such Contract shall be Excluded Liabilities for all purposes of the Stalking Horse Agreement, and the Sellers agree to give required notice to the parties to any such Contract or as otherwise reasonably requested by the Purchasers; provided that, if the Sellers have moved for the assumption of any such Contract with Purchasers' prior written consent and an Order relating to the assumption of such Contract has been granted by the Bankruptcy Court and, if necessary as determined by the Purchasers in their sole and absolute discretion, the Canadian Court, the Purchasers shall have the obligations under Section 2.7 of the Stalking Horse Agreement as if such Contract was an Acquired Contract.

45.     With respect to any Executory Contract or Facility Lease not assumed and assigned on the Closing Date, the Stalking Horse Bidders shall have an additional period of time post-closing in which to designate such Executory Contracts and Facility Leases for assumption and assignment or rejection.   Specifically, pursuant to Section 2.8 of the Stalking Horse Agreement, pursuant to the written notice of the Purchasers to the Sellers (and the Sellers providing such notice to the landlords of the affected premises) no later than the 210th day after the Petition Date, each Facility Lease designated on Schedule 2.8(a)(i) (the "Designated Remaining Leases") shall either be assumed by the applicable Sellers and assigned to the applicable Purchaser on the Assignment Effective Date, or rejected by the applicable Sellers on the Rejection Effective Date, subject to the procedures outlined in Sections 2.8(a)(iv) and 2.8(a)(v) of the Stalking Horse Agreement.

46.     Similarly, pursuant to the written notice of the Purchasers to the Sellers (and the Sellers providing such notice to the counterparties to the affected Contract) no later than the 210th day after the Closing Date (the "Designation Deadline"), each Contract designated on

Schedule 2.8(a)(ii) (the "Designated Remaining Executory Contracts" and, together with the Designated Remaining Leases, the "Designated Remaining Contracts") shall be either assumed by the applicable Sellers and assigned to the applicable Purchaser on the Assignment Effective Date, or rejected by the applicable Sellers on the Rejection Effective Date, subject to the procedures outlined in Sections 2.8(a)(iv) and 2.8(a)(v) of the Stalking Horse Agreement.

47.     Accordingly, to ensure that none of the Facility Leases are rejected prior to the 210th day after the Petition Date in contravention of the Stalking Horse Agreement, pursuant to section 365(d)(4) of the Bankruptcy Code, the Debtors request authority to extend the period to assume or reject the Facility Leases, which currently expires on the date that is 120 days from the Petition Date, through the date which is 210 days from the Petition Date. Such an extension would be without prejudice to the rights of the Debtors to seek further extensions of the time to assume or reject the Facility Leases with the consent of the affected lessors as contemplated by section 365(d)(4)(B)(ii) of the Bankruptcy Code.

**F.      The Cure Notice Procedures**

48.     The Debtors propose the following procedures for notifying counterparties to Executory Contracts and Facility Leases of potential Cure Amounts (as defined below) with respect to those Executory Contracts and Facility Leases that the Debtors may seek to assume and assign on the Closing Date.

49.     Within seven (7) business days of the filing of this Motion, the Debtors will file a notice identifying all Executory Contracts and Facility Leases that may be assumed and assigned in connection with the Sale (the "Cure Notice"), and serve the Cure Notice on all non-debtor parties to the Executory Contracts and Facility Leases (the "Contract Notice Parties").

50.     The Cure Notice shall state the cure amounts that the Debtors believe are necessary to assume such Executory Contracts and Facility Leases pursuant to section 365 of the

30

Bankruptcy Code (the "Cure Amount") and notify the non-debtor party that such party's Executory Contract or Facility Lease may be assumed and assigned to a purchaser of the Assets to be identified at the conclusion of the Auction. The Cure Notice shall also contain information with respect to the Stalking Horse Bidders' proposed adequate assurance of future performance and information regarding how a non-debtor party to an Executory Contract or Facility Lease may obtain additional information regarding the Stalking Horse Bidders (the "Stalking Horse Adequate Assurance Information"). The Cure Notice shall set a deadline by which the non-debtor party may file an objection to the Cure Amount or the Stalking Horse Adequate Assurance Information. The Debtors request that this Court set the deadline to object to any Cure Amount or to the Stalking Horse Adequate Assurance Information as fourteen (14) days after service of the Cure Notice. The Debtors propose that if they file an amended Cure Notice setting forth amended Cure Amounts, any parties affected by the amendment shall have fourteen (14) days after service of the amended Cure Notice to object to the amended Cure Amount. The Cure Notice shall also provide that objections to any Cure Amount or to the Stalking Horse Adequate Assurance Information will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors in consultation with the Court. In the event that the Highest and Best Bidder is not the Stalking Horse Bidders, the Debtors propose that any objections regarding adequate assurance of future performance may be raised at the Sale Hearing.

51.    At the Sale Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of future performance by any Highest and Best Bidder and (ii) request entry of an order requesting approval of the assumption and assignment of any or all Executory Contracts and Facility Leases to be assumed and assigned on the Closing Date to any

31

Highest and Best Bidder. For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

52. As soon as possible after the Closing Date, the Debtors shall file with this Court a post-closing notice that identifies the Executory Contracts and Facility Leases which were assumed and assigned to the Highest and Best Bidder as of the Closing Date.

## G. Assumption and Assignment Procedures

53. In the case of any Executory Contract and Facility Lease that the Debtors seek to assume and assign after the Closing Date pursuant to Section 2.8 of the Stalking Horse Agreement, the Debtors request that the Court authorize the following expedited assumption and assignment procedures:

    i. The Debtors shall file with the Court a written notice (an "Assumption Notice") of the Debtors' intent to assume and assign any Executory Contract or Facility Lease and will serve such Assumption Notice via overnight delivery on (i) each counterparty or landlord to any contract or lease to be assume or assigned by the Debtors, (ii) any other interested parties with respect to such contract or lease, (iii) the U.S. Trustee, (iv) counsel to the Committee, if any, (v) counsel to the Highest and Best Bidder, (vi) counsel to the Agent, and (vii) counsel to the proposed assignee, if applicable (the "Proposed Assignee").

    ii. The Assumption Notice will set forth the following information, to the best of the Debtors' knowledge: (i) the street address of the real property that is the subject of any Facility Lease that the Debtors seek to assume and assign or a description of the Executory Contract that the Debtors seek to assume and assign, (ii) the name and address of the affected counterparties or landlords (and their counsel, if known), (iii) a description of the deadlines and procedures for filing objections to the Assumption Notice (as set forth below), (iv) the name of the Proposed Assignee, (v) if the Proposed Assignee is not the Purchaser, information with respect to the Proposed Assignee's proposed adequate assurance of future performance and information regarding how a non-debtor party to an Executory Contract or Facility Lease may obtain additional information regarding the Proposed Assignee, and (vi) the proposed order approving the assumption and assignment (the "Assumption Order").

    iii. Should a party in interest object to the proposed assumption and assignment by the Debtors of an Executory Contract or Facility Lease,

32

such party must file and serve a written objection so that such objection is filed with the Court and actually received by the Debtors and the Assumption Notice Parties (as defined in and set forth in the Assumption Notice) no later than ten (10) days after the date that the Debtors served the Assumption Notice for the Executory Contract or Facility Lease at issue.

iv.  If no timely objection is filed and served with respect to the Assumption Notice, the Debtors shall file with the Court a certificate of no objection with the Assumption Order. The Assumption Order shall provide, *inter alia*, (1) that the assumption and assignment of such Executory Contract or Facility Lease is approved, final and effective, pursuant to section 365 of the Bankruptcy Code as of the date of the Assumption Order and (2) the Proposed Assignee provided adequate assurance of future performance under the applicable Executory Contract or Facility Lease in accordance with section 365(f)(2)(B), and, if applicable, section 365(b)(3).

v.  If a timely objection is properly filed and served on the Assumption Notice Parties in the manner specified above, unless the parties agree otherwise in writing, a hearing will be scheduled to consider that objection provided, however, that the Highest and Best Bidder may, in its sole and absolute discretion, provide written notice to the Debtors that the Debtors must instead reject the applicable Contract or Facility Lease that is subject to an objection at any time after such objection is filed and the Debtors shall move within two (2) Business Days of receipt of such written notice to reject the applicable Contract or Facility Lease. If that objection is overruled by the Court or withdrawn, the assumption and assignment of the affected Executory Contract or Facility Lease shall be deemed effective as of the date of the Assumption Order.

54.  Given that all parties to Executory Contracts and Facility Leases will receive the Cure Notice as set forth above and have an opportunity to object to the assumption and assignment of their particular Executory Contract and Facility Lease and the applicable Cure Amount in connection with the Sale Hearing, the Debtors respectfully submit that the proposed Assumption Procedures will streamline the Debtors' ability to transfer such Executory Contracts and Facility Leases to the Highest and Best Bidder or its designee. Upon receipt of the Cure Notice, parties will know that their respective Executory Contract or Facility Lease is subject to being assumed and assigned and the proposed Cure Amount with respect thereto (and the identity of the Stalking Horse Bidder). In the event that such Executory Contract or Facility

Lease is not assumed and assigned on the Closing Date, the Assumption Notice will alert any counterparties as to the timing of any post-closing assignment and the identity of the Proposed Assignee. Accordingly, the Assumption Notice affords parties-in-interest full notice of the transfer of the applicable Executory Contracts and Facility Leases and affords parties-in-interest their due process rights with respect to notice and the opportunity to be heard in the event of objections. For the foregoing reasons, the assumption procedures set forth herein should be approved and the Debtors should be authorized to assume and assign the Executory Contracts and Facility Leases consistent with the terms of such procedures, pursuant to section 365 of the Bankruptcy Code.[10]

## H.    **Rejection Procedures**

55.    As set forth more fully in Section 2.6 of the Stalking Horse Agreement, subject to Section 2.8 of the Stalking Horse Agreement, on or before the Closing, the Purchasers may update Schedule 2.1(e), Schedule 2.3(a), Schedule 2.8(a)(1) or Schedule 2.8(a)(ii) to add or remove a Contract or Facility Lease to or from such schedules. Any Contract added to Schedule 2.1(e) shall become an Acquired Contract, shall be deemed an Acquired Asset for all purposes of the Stalking Horse Agreement, and all obligations arising under such Contract which would have been Assumed Liabilities if such Contract had been an Acquired Contract as of the date of the Stalking Horse Agreement shall be Assumed Liabilities for all purposes of the Stalking Horse Agreement subject to the provisions of Section 2.4 (a). Any Contract removed from Schedule 2.1(e) and/or added to Schedule 2.3(a), and not added to Schedule 2.8(a)(1) or Schedule 2.8(a)(ii), shall become an Excluded Asset and shall not be an Acquired Contract for purposes of the Stalking Horse Agreement and all liabilities and obligations under such Contract

---

[10] Certain of the leases and contracts may contain provisions that restrict, prohibit, condition or limit the assumption and/or assignment of a lease or contract. The Debtors reserve the right to argue that such clauses are unenforceable anti-assignment or ipso facto clauses under section 365 of the Bankruptcy Code.

shall be Excluded Liabilities for all purposes of the Stalking Horse Agreement, and the Sellers agree to give required notice to the parties to any such Contract or as otherwise reasonably requested by the Purchasers; provided that, if the Sellers have moved for the assumption of any such Contract with Purchasers' prior written consent and an Order relating to the assumption of such Contract has been granted by the Bankruptcy Court and, if necessary as determined by the Purchasers in their sole discretion and absolute discretion, the Canadian Court, the Purchasers shall have the obligations under Section 2.7 of the Stalking Horse Agreement as if such Contract was an Acquired Contract. Additionally, as outlined in Section 2.8 of the Stalking Horse Agreement, pursuant to the written notice of the Purchasers to the Sellers (and the Sellers providing such notice to the landlords of the affected premises) no later the 210th day after the Petition Date, each Designated Remaining Lease shall either be assumed by the Sellers and assigned to the applicable Purchaser on the Assignment Effective Date, or rejected by the Sellers on the Rejection Effective Date, subject to the procedures outlined in Sections 2.8(a)(iv) and 2.8(a)(v) of the Stalking Horse Agreement. Further, pursuant to the written notice of the Purchasers to the Sellers (and the Sellers providing such notice to the counterparties to the affected Contract) no later than the Designation Deadline, each Designated Remaining Executory Contract shall either be assumed by the Sellers and assigned to the applicable Purchaser on the Assignment Effective Date, or rejected by the Sellers on the Rejection Effective Date, subject to the procedures outlined in Sections 2.8(a)(iv) and 2.8(a)(v) of the Stalking Horse Agreement. Accordingly, the Debtors request that the Court authorize the following expedited Rejection Procedures:

> i.  The Debtors will file with the Court a written notice (the "Rejection Notice") of the Debtors' intent to reject any contract or lease, and will serve the Rejection Notice via overnight delivery service upon the following parties (collectively, the "Rejection Notice Parties"): (i) the

counterparties or landlords affected by the Rejection Notice and any parties to any subleases, (ii) the U.S. Trustee, (iii) counsel to the Committee, (iv) counsel to the Highest and Best Bidder, (v) counsel to the Agent, and (vi) any other interested parties with respect to such contract or lease reasonably known to the Debtors. The affected contract or lease which is the subject of a Rejection Notice shall be deemed to be subject to a motion to reject such contract or lease pursuant to section 365 of the Bankruptcy Code.

ii.     The Rejection Notice will set forth the following information, to the best of the Debtors' knowledge: (i) the street address of the real property that is the subject of any Facility Lease that the Debtors seek to reject or a description of the Executory Contract that the Debtors seek to reject, (ii) the name and address of the affected counterparties or landlords (and their counsel, if known), (iii) a description of the deadlines and procedures for filing objections to the Rejection Notice (as set forth below), and (iv) the proposed order approving the rejection (the "Rejection Order").

iii.    Should a party in interest object to the proposed rejection by the Debtors of an Executory Contract or Facility Lease, such party must file and serve a written objection so that such objection is filed with the Court and actually received by the Debtors and the Rejection Notice Parties as set forth in the Rejection Notice no later than ten (10) days after the date that the Debtors served the Rejection Notice to reject the Executory Contract or Facility Lease at issue.

iv.     If no timely objection is filed and served with respect to the rejection of a contract or lease, the Debtors shall file with the Court a certificate of no objection with the Rejection Order. The Rejection Order shall provide, *inter alia*, that the rejection of such contract or lease shall become effective on the later of (i) ten (10) days from the date the applicable Rejection Notice was served on the affected counterparty or landlord (notwithstanding any extension of the objection deadline beyond such date pursuant to Bankruptcy Rule 9006), or (ii) if a Facility Lease, the date that the Debtors vacated the premises, evidenced by actions such as turning over the keys or "key codes" to the affected landlord.

v.      If a timely objection is properly filed and served on the Rejection Notice Parties as specified above, unless the parties agree otherwise in writing, a hearing will be scheduled to consider that objection. If that objection is overruled by the Court or withdrawn, the rejection of the affected Executory Contract or Facility Lease shall be deemed effective on the later of (i) ten (10) days from the date the applicable Rejection Notice was served on the affected counterparty or landlord, or (ii) if a lease, the date that the Debtors vacated the premises to the affected landlord, evidenced by actions such as turning over keys or "key codes" to the affected landlord.

36

vi.    In connection with the rejection of a Facility Lease, if the Debtors have deposited monies with a lessor as a security deposit or other arrangement, such lessor may not set off or recoup or otherwise use such deposit without the prior approval of the Court.

vii.    In connection with the rejection of a Facility Lease, with respect to any personal property of the Debtors located at any of the premises subject to any Rejection Notice, the Debtors shall remove such property prior to the later of (i) the expiration of the period within which a party must file and serve a written objection to the Rejection Notice, and (ii) the date of rejection of the underlying Facility Lease. If the Debtors determine that the property at a particular location has no value or the cost of removing the property exceeds the value of such property, the Debtors shall generally describe the property in the Rejection Notice and their intent to abandon such property. Absent a timely objection, the property will be deemed abandoned pursuant to section 554 of the Bankruptcy Code, as is, where is, effective as of the date of the rejection of the underlying Facility Lease. Upon abandonment, the landlord may dispose of such property without further notice or court order and free of liability for such action. The right of any party in interest to assert a claim against the Debtors' estate for costs associated with such abandoned property is fully preserved, provided that such claim must be made in accordance with the procedures established below for the filing of proofs of claim. The Debtors' rights to contest any such claims are fully preserved.

viii.    If an affected landlord or counterparty or any other party in interest (the "Rejection Claimant") asserts a claim or claims against the Debtors arising from the rejection of an Executory Contract or Facility Lease, such Rejection Claimant shall submit a proof of claim to BBH Bankruptcy Administration, c/o The Garden City Group, Inc., PO Box 9749, Dublin, OH 43017-5649, on or before the later of (i) the date that is 30 days after the effective date of rejection of the Executory Contract or Facility Lease, or (ii) the bar date established by the Court for filing proofs of claim against the Debtors. If a Rejection Claimant does not timely file such proof of claim, such claimant shall be forever barred from asserting a claim for such rejection damages.

56.    The above proposed Rejection Procedures will streamline the Debtors' ability to reject burdensome Executory Contracts and Facility Leases that provide no benefit to the Debtors' estates, and thereby minimize unnecessary post-petition obligations, while also providing landlords and other affected parties with adequate notice of rejection of any such leases and contracts and an opportunity to object to such rejection within a reasonable time

period. Accordingly, at the Sale Hearing, the Debtors respectfully submit that the Rejection Procedures should be approved as they balance the respective interests of the parties, are an appropriate exercise of the Debtors' business judgment and constitute a common form of relief in many recent bankruptcy cases in this and other jurisdictions.

## APPLICABLE AUTHORITY

57.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore. See In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

58.     As discussed above, the Debtors have sound business justifications for selling the Assets at this time. The Debtors remain in default under the terms of the Amended and Restated Credit Agreement and have exhausted all efforts to address their liquidity issues through a refinancing and/or further investment in the company. Moreover, the uncertainty caused by the commencement of the Böwe Systec insolvency proceeding, and the resulting termination of the distribution agreements, has threatened the stability of the Debtors' customer base. A sale of the Debtors' assets will result in the transfer of the business to a financially stable buyer that will be able to satisfy the Debtors' going-forward capital requirements. Additionally, Böwe Systec is more likely to enter into a long-term distribution arrangement with a financial stable buyer that is not subject to the liquidity constraints currently facing the Debtors. Accordingly, the Debtors

38

submit that the proposed sale will enable them to both address their liquidity issues and restore customer confidence in the marketplace. Until these issues are addressed, however, the Debtors believe that the value of the business will continue to erode. Accordingly, a sale consistent with the timeframe proposed herein is necessary to maximize the value of their Debtors' assets for the benefit of all creditors in these Chapter 11 Cases.

**A.** **The Bidding Procedures are Fair and are Designed to Maximize the Value Received for the Assets**

59. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). The Debtors believe that the Bidding Procedures are appropriate under sections 105 and 363 of the Bankruptcy Code to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors. The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids. The Bidding Procedures will then provide the Debtors with the opportunity to consider all competing offers and to select the highest and best offer for the sale of substantially all of the Assets.

60. The Debtors request this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing. Accordingly, the Debtors and all parties-in-interest can be assured that the consideration for the Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

RLF1 3771614v. 9

**B.** **The Break-Up Fee Is Necessary to Preserve the Value of the Debtors' Estates**

61.     Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction.  The Debtors believe that having the ability to offer the Bid Protections to the Stalking Horse Bidders will likely maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.

62.     Approval of the Bid Protections to the Stalking Horse Bidders is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien"); see also Reliant Energy Channelview LP v. Kelson Channelview LLC, 594 F.3d 200, 206-07 (3d Cir. 2010) (hereinafter, "Reliant").  Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  Reliant, 594 F.3d at 206-07; O'Brien, 181 F.3d at 537.

63.     In O'Brien, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee.  Such factors are as follows:

> A.     the presence of self-dealing or manipulation in negotiating the break-up fee;

B.   whether the fee harms, rather than encourages, bidding;

C.   the reasonableness of the break-up fee relative to the purchase price;

D.   whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

E.   the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

F.   the correlation of the fee to a maximum of value of the debtor's estate;

G.   the support of the principal secured creditors and creditors committee of the break-up fee;

H.   the benefits of the safeguards to the debtor's estate; and

I.   the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

64.   The Break-Up Fee set forth in the Bidding Procedures will enable the Debtors to secure an adequate floor for the Assets and, thus, insist that competing bids be materially higher or otherwise better than the Stalking Horse Agreement — a clear benefit to the Debtors' estates. Moreover, the Stalking Horse Bidders would not agree to act as a stalking horse without the Break-Up Fee. Without the Break-Up Fee, the Debtors might lose the opportunity to obtain the highest or best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidders. Furthermore, without the benefit of the Stalking Horse Bidders, the bids received at Auction for the Assets could be substantially lower than that offered by the Stalking Horse Bidders.

65.   "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 660 (S.D.N.Y. 1992). As is customary, the Bid Protections are compensation for the Stalking Horse Bidders' investment of

considerable time and expense in negotiating and entering into the Stalking Horse Agreement. The Debtors do not believe the Bid Protections will stifle bidding. To the contrary, the Debtors believe that, should an auction be held, the Bid Protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." Id. at 662. If the Assets are sold to a competing bidder, the sale likely will be the result of Stalking Horse Bidders' crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

66.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id. The Break-Up Fee is equal to $1,500,000. When considered together with the Expense Reimbursement up to $1,750,000, such amounts represent approximately four (4) percent of the Credit Bid Amount (without even taking into consideration the Canadian Cash Bid Amount, the Cure Amounts to be paid and the amount of the Assumed Liabilities), which is within the range of bid protections typically paid in sales transactions that have been approved by this Court. Given the size of the Purchase Price, the Debtors believe the amount of the Bid Protections are appropriate.

C.     **Approval of the Sale is Warranted Under Bankruptcy Code 363(b)**

67.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale

or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. See, e.g., In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at ¶ 3 (Banter. S.D. Ohio 2005); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983). Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bonier. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

68.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action"). The Debtors have a sound business justification for selling the Assets at this time. Based on a careful view of the Debtors' liquidity constraints and their ongoing and future business prospects, the Debtors' management and team of financial advisors have concluded that an expedited Sale of all of the Assets in accordance with the procedures set forth in the Bidding Procedures may be the best method to maximize recoveries to the estates. Maximization of the Assets' value is a sound business purpose warranting authorization of any

43

proposed Sale. For the reasons discussed herein, the Debtors believe that an expedited sale of the Assets is the best way to maximize value for the benefit of creditors and stem any further deterioration of the going concern value of the company.

69.     The Debtors have proposed a fair and open process for achieving the objective of obtaining the highest or best offer and sale of their business for the benefit of the Debtors' estates and their creditors. The Sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the fairness and reasonableness of the consideration to be received by the Debtors will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

70.     In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above. Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these Chapter 11 Cases, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by a proposed Sale. Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtors and their creditors and parties-in-interest.

**D.     The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Interests**

71.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets). As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet

44

one of the five conditions of section 363(f). Citicorp Homeowners Servs., Inc. v. Elliot, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that if any of the five conditions of section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens).

72.    In the event the Stalking Horse Bidders are the Highest and Best Bidders, they will have credit bid amounts outstanding under the Prepetition Facility and DIP Facility and released their liens at Closing. In the event that the Stalking Horse Bidders are not the Highest and Best Bidders, the Prepetition Lenders (Versa or its designee) will be paid from the cash proceeds of the Sale to the Highest and Best Bidder. With respect to any other bona fide and allowed Interests, the Debtors believe they will be able to demonstrate at the Sale Hearing that they have satisfied one or more of the conditions under section 363(f) of the Bankruptcy Code.

**E.    A Successful Bidder Should be Entitled to the Protections of Section 363(m)**

73.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. See In re Abbotts Dairies, 788 F.2d at 147; In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re Willemain V. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985).

74.    The Stalking Horse Agreement was negotiated at arm's length, with both parties represented by their own counsel. Additionally, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating that any bidder who is deemed a Highest and Best Bidder for all of the Assets had negotiated at arm's length, with all parties represented by their own counsel.

75.    Accordingly, the Sale Order will include a provision that the Highest and Best Bidder for the Assets, is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing any Highest and Best Bidder with such

45

protection will ensure that the maximum price will be received by the Debtors for the Assets and that closing of the same will occur promptly.

**F.**     **The Assumption and Assignment of Executory Contracts and Unexpired Leases**

      76.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3rd. Cir. 1989). The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)). Any more exacting scrutiny would slow the administration of a debtors' estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

46

77. Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

78. Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc., 103 B. R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

79. Additionally, information will be included in the Cure Notice as part of the Stalking Horse Adequate Assurance Information, which will include contact information on where additional adequate assurance information can be obtained. Adequate assurance of future performance with respect to any Highest and Best Bidder who is not the Stalking Horse Bidders shall be presented at the Sale Hearing. Upon closing, the Stalking Horse Bidders will have

47

financial resources that are more than sufficient to perform under any Executory Contracts or Facility Leases they seek to have assumed by the Debtors. Moreover, if necessary, the Debtors will adduce facts at the Sale Hearing on any objection demonstrating the financial wherewithal of the Stalking Horse Bidders or any Highest and Best Bidder, and their willingness and ability to perform under the Executory Contracts and Facility Leases to be assumed and assigned to them. The Sale Hearing therefore will provide this Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of any Highest and Best Bidder to provide adequate assurance of future performance under the Executory Contracts and Facility Leases that it seeks to assume.

80.     With respect to any Executory Contracts and Facility Leases not assumed and assigned to the Stalking Horse Bidders or other Highest and Best Bidder on the Closing Date, such Executory Contracts and Facility Leases may be subject to the designation procedures set forth herein and in Section 2.8 of the Stalking Horse Agreement. Pursuant to the designation procedures, upon receiving written direction from the Stalking Horse Bidder, the Debtors shall seek to assume and assign the designated Executory Contracts or Facility Leases to the Stalking Horse Bidders pursuant to the Assumption Procedures described herein. Pursuant to the proposed Assumption Procedures, the notices filed with the Bankruptcy Court and served on the counterparties to the Executory Contracts and Facility Leases shall contain adequate assurance information with regards to the proposed assignee and/or contact information as to where adequate assurance information can be obtained.

81.     Accordingly, the Debtors respectfully submit that the procedures proposed herein (both for Executory Contracts and Facility Leases being assumed and assigned on the Closing Date or subject to the post-closing designation procedures) are appropriate and reasonably

48

tailored to provide Contract Notice Parties with adequate notice in the form of the Assumption Notice and Cure Notice, as applicable, of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.

82.     Furthermore, to the extent that any defaults exist under any Executory Contract or Facility Lease that is to be assumed and assigned in connection with the Sale of the Assets, the Highest and Best Bidders will cure any such default contemporaneously with or as soon as practicable after consummation of an assumption and assignment of such Executory Contract or Facility Lease.[11]

83.     Accordingly, this Court therefore should have a sufficient basis to authorize the Debtors to assume and assign Executory Contracts and Facility Leases as may be set forth in any Highest and Best Bidder's asset purchase agreement.

## G.     Extension of Time Under Section 365(d)(4) of the Bankruptcy Code is Appropriate

84.     Section 365(d)(4) of the Bankruptcy Code provides as follows:

(A)     Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of -

(i)     the date that is 120 days after the date of the order for relief; or

(ii)     the date of the entry of an order confirming a plan.

(B)

(i)     The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

---

[11] Section 2.7(b) of the Stalking Horse Agreement provides that Purchasers "shall (i) be responsible for any Cure Amounts related to such Acquired Contract and such Assigned Designated Remaining Contracts, as applicable, as a condition to the assumption and assignment of such Acquired Contract and such Assigned Designated Remaining Contracts..."

> (ii)     If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

11 U.S.C. § 365(d)(4). Accordingly, if a court finds that cause exists, the court may grant an extension up to 90 days after the initial 120-day period allotted to debtors under the Bankruptcy Code to assume or reject nonresidential real property leases.

85.     Courts have recognized the benefits to granting additional time under section 365(d)(4) of the Bankruptcy Code. See, e.g., In re Channel Home Ctrs., Inc., 989 F.2d 682, 687-88 (3d Cir. 1993), cert. denied, 510 U.S. 865 (1993); In re GST Telecom, Inc., No. 00-1982-GMS, 2001 WL 686971 (D. Del. June 8, 2001). As the Third Circuit Court of Appeals has stated, "nothing prevents a bankruptcy court from granting an extension because a particular debtor needs additional time to determine whether the assumption or rejection of particular leases is called for by the plan of reorganization that it is attempting to develop." Channel Home Ctrs., 989 F.2d at 689; see also Coleman Oil Co. v. Circle K Corp. (In re Circle K Corp.), 127 F.3d 904, 909 (9th Cir. 1997), cert. denied, 522 U.S. 1148 (1998) (noting that bankruptcy courts often grant debtor's request for an extension).

86.     The term "cause," as used in section 365(d)(4) of the Bankruptcy Code, is not defined in the Bankruptcy Code. In determining whether cause exists for an extension of the initial 120-day period, courts have relied on a non-exhaustive list of factors, including the following:

> (1)     whether the debtor was paying for the use of the property;
>
> (2)     whether the debtor's continued occupation could damage the lessor beyond the compensation available under the Bankruptcy Code;
>
> (3)     whether the lease is the debtor's primary asset;
>
> (4)     whether the debtor has had sufficient time to formulate a plan of reorganization; and

(5)     the complexity of the case facing the debtor.

South St. Seaport L.P. v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 760-61 (2d Cir. 1996); see also In re Wedtech Corp., 72 B.R. 464, 471-72 (Bankr. S.D.N.Y. 1987); Channel Home Ctrs., 989 F.2d at 689 ("[I]t is permissible for a bankruptcy court to consider a particular debtor's need for more time in order to analyze leases in light of the plan it is formulating.").

87.     In this case, the foregoing factors weigh heavily in favor of granting the requested extension.  As discussed herein, the Debtors anticipate that many of the Debtors' Facility Leases will be assumed and assigned to the Stalking Horse Bidders or other Highest and Best Bidder on the Closing Date.  The Facility Leases that are not assumed and assigned on the Closing Date, however, shall be subject to the Stalking Horse Bidders' designation rights under the Stalking Horse Agreement.  Pursuant to such rights, the Stalking Horse Bidders shall have 210 days from the Petition Date in which to decide whether the remaining Facility Leases should be assumed and assigned to the Stalking Horse Bidders, or rejected pursuant to section 365 of the Bankruptcy Code -- well beyond the initial 120 day period afforded under section 365(d)(4) of the Bankruptcy Code.

88.     Accordingly, the Debtors respectfully submit that this Court should grant the Debtors an extension of time within which the Debtors must assume or reject their Facility Leases, through the date that is 210 days from the Petition Date, without prejudice to the Debtors' rights to seek further extensions of such deadline with the consent of the affected lessors as provided in section 365(d)(4)(B)(ii) of the Bankruptcy Code.

**H.** **Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

89.     Bankruptcy Rule 6006(h) provides that an "order authorizing the use, sale or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## NOTICE

90.     No trustee, examiner or official committee of unsecured creditors has been appointed in these Chapter 11 Cases. The Debtors shall serve a copy of this Motion by first class mail upon: (a) the United States Trustee for the District of Delaware; (b) counsel to the Agent; (c) the creditors listed on the Debtors' consolidated list of 20 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (d) counsel to the Stalking Horse Bidders; (e) all parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (f) each of the Debtors' landlords and each of the notice parties identified in the real property leases, to the extent possible; (g) various federal, state, county and city tax and regulatory authorities; (h) all entities known to have expressed an interest in a transaction with respect to the Assets or that has been indentified by the Debtors or their advisors as a potential purchaser of the Assets; (i) the Federal Trade Commission; (j) the United States Attorney General/Antitrust Division of the Department of Justice; (k) local and state environmental authorities and the federal Environmental Protection Agency and (l) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors submit that no further notice is required or needed under the circumstances.

## NO PRIOR REQUEST

91.     No prior motion for the relief requested herein has been made to this Court or any other Court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, (A) approving the Bidding Procedures; (B) approving the Break-Up Fee and Expense Reimbursement; (C) scheduling an Auction and a Sale Hearing to approve such sale, and approving the form and manner of notice thereof; (D) approving the Cure Procedures; and (E) granting such other and further relief as this Court deems appropriate. Additionally, the Debtors request that at the Sale Hearing this Court enter a Sale Order, subject to the result of the Auction and to the Bidding Procedures, (A) approving and authorizing the Sale; (B) authorizing the assumption and assignment of certain Executory Contracts and Facility Leases; (C) authorizing the Assumption Procedures and the Rejection Procedures; (D) extending the deadline to reject Facility Leases pursuant to section 365(d)(4) of the Bankruptcy Code until the date that is 210 days from the Petition Date; and (E) granting such other and further relief as this Court deems appropriate.

Dated: April 18, 2011
      Wilmington, Delaware

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Lee E. Kaufman (No. 4877)
Drew G. Sloan (No. 5069)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Proposed Attorneys for Debtors and Debtors in Possession*