# Exhibit B

**Stalking Horse Agreement**

ASSET PURCHASE AGREEMENT

AMONG

BBH, INC.,

CONTRADO BBH FUNDING, LLC

AND

THE OTHER PARTIES NAMED HEREIN

DATED AS OF APRIL 18, 2011

# TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ...................................................................................2

**ARTICLE II SALE OF ACQUIRED ASSETS** ..................................................16
   2.1   Sale of Acquired Assets ...........................................................................16
   2.2   Sale of the German Assets .......................................................................18
   2.3   Excluded Assets ......................................................................................19
   2.4   Assumption of Liabilities.........................................................................19
   2.5   Excluded Liabilities ................................................................................20
   2.6   Identification of Additional and Excluded Contracts; Excluded Assets;
        Assumed Plans...........................................................................21
   2.7   Assumption of Acquired Contracts; Deemed Consents...........................22
   2.8   Disposition of Designated Remaining Contracts and Designated
        Remaining Assets.......................................................................23

**ARTICLE III CONSIDERATION** .....................................................................25
   3.1   Consideration ..........................................................................................25
   3.2   Payment of the Credit Bid Amount, Canadian Cash Bid Amount and the
        German Assets Consideration at Closing ..................................26

**ARTICLE IV CLOSING** ...................................................................................27
   4.1   Closing ....................................................................................................27
   4.2   Sellers' Deliveries ...................................................................................27
   4.3   Purchasers' Deliveries .............................................................................27
   4.4   BBH, GmbH Deliveries ..........................................................................28

**ARTICLE V REPRESENTATIONS AND WARRANTIES**................................28
   5.1   Representations and Warranties of the Sellers........................................28
   5.2   Representations and Warranties of Purchasers .......................................34
   5.3   Brokerage and Finder's Fees ...................................................................35

**ARTICLE VI COVENANTS AND OTHER AGREEMENTS** ............................36
   6.1   Pre-Closing Covenants of the Sellers .....................................................36
   6.2   Pre-Closing Covenants of Purchasers.....................................................38
   6.3   Other Covenants of Sellers and Purchasers ............................................39
   6.4   D&O Tail Policy ......................................................................................40
   6.5   Employment Covenants and Other Undertakings....................................40
   6.6   Sellers' Names ........................................................................................42
   6.7   Bankruptcy Actions ................................................................................43
   6.8   Confidentiality ........................................................................................47
   6.9   Non-Seller Affiliates...............................................................................48

**ARTICLE VII TAXES**.......................................................................................48
   7.1   Taxes Related to Purchase of Acquired Assets........................................48
   7.2   Allocation of Purchase Price....................................................................49

| | | |
|---|---|---|
| 7.3 | Goods and Services Tax and Harmonized Sales Tax Election | 49 |
| 7.4 | Canadian Income Tax Elections | 50 |

**ARTICLE VIII CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ........50**

| | | |
|---|---|---|
| 8.1 | Conditions Precedent to Performance by Sellers | 50 |
| 8.2 | Conditions Precedent to the Performance by Purchasers | 51 |
| 8.3 | Conditions Precedent to the Performance of Sellers and Purchasers | 52 |

**ARTICLE IX TERMINATION ..........53**

| | | |
|---|---|---|
| 9.1 | Conditions of Termination | 53 |
| 9.2 | Effect of Termination | 55 |
| 9.3 | Break-Up Fee and Expense Reimbursement | 55 |

**ARTICLE X SURVIVAL..........55**

| | | |
|---|---|---|
| 10.1 | Survival | 55 |
| 10.2 | Obligations and Liabilities of the Foreign Seller and the Foreign Purchaser | 55 |

**ARTICLE XI MISCELLANEOUS..........56**

| | | |
|---|---|---|
| 11.1 | Joint Drafting | 56 |
| 11.2 | Further Assurances | 56 |
| 11.3 | Successors and Assigns | 56 |
| 11.4 | Governing Law; Jurisdiction | 56 |
| 11.5 | Expenses | 57 |
| 11.6 | Severability | 57 |
| 11.7 | Notices | 57 |
| 11.8 | Amendments; Waivers | 59 |
| 11.9 | Public Announcements | 59 |
| 11.10 | Entire Agreement | 59 |
| 11.11 | No Third Party Beneficiaries | 59 |
| 11.12 | Headings | 60 |
| 11.13 | Counterparts, Facsimile and PDF Signatures | 60 |
| 11.14 | Construction | 60 |
| 11.15 | Closing Actions | 60 |
| 11.16 | Conflict between Transaction Documents | 60 |
| 11.17 | Final Schedules | 60 |
| 11.18 | Bulk Sales Compliance Waiver | 60 |

## SCHEDULES

Schedule 1.1 - German Assets
Schedule 2.1(b) - Personal Property
Schedule 2.1(e) - Acquired Contracts
Schedule 2.1(g) - Intellectual Property
Schedule 2.1(h) - Permits and Licenses
Schedule 2.1(o) - Other Acquired Assets
Schedule 2.1(q) - Financial Assets
Schedule 2.3(a) - Excluded Contracts
Schedule 2.3(c) - Sellers' Equity Interests
Schedule 2.3(e) - Other Excluded Assets
Schedule 2.4(c)(i) - Accruals of Rehired Employees
Schedule 2.4(c)(ii) - Employees of the Sellers: Retention Payment Obligations
Schedule 2.4(c)(iii) - Unpaid Severance Obligations
Schedule 2.4(c)(iv) - Expenses for the Sellers' Health Benefit Plan
Schedule 2.4(d)(i) - Post-Petition Date Accounts Payable
Schedule 2.4(d)(ii) - Section 503(b)(9) Accounts Payable
Schedule 2.4(e) - Liabilities of the Foreign Seller
Schedule 2.7(b) - Cure Amounts
Schedule 2.8(a)(i) - Designated Remaining Leases
Schedule 2.8(a)(ii) - Designated Remaining Executory Contracts
Schedule 2.8(a)(iii) - Designated Remaining Assets
Schedule 5.1(d)(i) - Financial Statements
Schedule 5.1(d)(iii) - Accounts Receivable
Schedule 5.1(f) - Consents
Schedule 5.1(g) - Litigation
Schedule 5.1(i) - Intellectual Property
Schedule 5.1(j) - Permits and Licenses; Compliance with Laws
Schedule 5.1(k) - Real Property
Schedule 5.1(l) - Contracts
Schedule 5.1(m) - Labor and Employment Matters
Schedule 5.1(n)(i) - Employee Benefit Plans
Schedule 5.1(n)(ii) - Employee Benefit Plans: Payments
Schedule 5.1(n)(iii) - Employee Benefit Plans: Post-Termination Benefits
Schedule 5.1(o) - Assets and Liabilities of BBH, GmbH
Schedule 5.1(p) - Subsidiaries
Schedule 5.1(q) - Tax Matters
Schedule 5.1(r) - Insurance Polices
Schedule 5.1(s) - Environmental Matters
Schedule 5.1(t) - Affiliated Transactions
Schedule 5.1(u) - Customers and Suppliers
Schedule 5.1(w) - Absence of Certain Developments
Schedule 5.1(x) - Absence of Undisclosed Liabilities
Schedule 6.1(g) - German Restructuring
Schedule 6.5(a) - Employees Receiving Disability

Schedule 6.5(b)(i) - Assumed Plans
Schedule 6.5(b)(ii) - Replicated Plans
Schedule 8.1(h) - Purchasers' Other Deliveries
Schedule 8.2(g) - Required Consents
Schedule 8.2(j) - Sellers' Other Deliveries

## **EXHIBITS**

Exhibit A - German Asset Transfer Agreement
Exhibit B - Form of Final Order of the Bankruptcy Court
Exhibit C-1 - Form of US Bill of Sale
Exhibit C-2 - Form of Canadian Bill of Sale
Exhibit D - Form of Intellectual Property Assignment

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of the 18th day of April, 2011 (the "Execution Date") by and among (1) BBH, INC., a Delaware corporation ("BBH"), (2) BOWE BELL + HOWELL COMPANY, a Delaware corporation ("BBHC"), (3) BOWE BELL + HOWELL POSTAL SYSTEMS COMPANY, a Delaware corporation ("Postal Systems"), (4) BOWE SYSTEC INC., a New York corporation ("Bowe"), (5) BCC SOFTWARE, INC., an Illinois corporation ("BCC"), (6) BOWE BELL + HOWELL HOLDINGS, INC. , a Delaware corporation ("BBH Holdings"), (7) Bowe Bell + Howell International Ltd., a Canadian corporation ("Foreign Seller"), (8) BOWE BELL + HOWELL, GMBH, a German company ("BBH, GmbH"), (9) CONTRADO BBH FUNDING, LLC, a Delaware limited liability company (the "US Purchaser") and (10) a Canadian corporation to be formed prior to the Closing (the "Foreign Purchaser" and together with the US Purchaser, the "Purchasers") (Each of BBH, BBHC, Postal Systems, Bowe, BCC, Foreign Seller and BBH Holdings shall be referred to individually herein as a "Seller" and, collectively, as the "Sellers". Each of the parties listed (1) through (10) above shall be referred to individually as a "Party" and, collectively, as the "Parties".)

RECITALS

A.      The Sellers and BBH, GmbH are engaged in the business of manufacturing, distributing, servicing and maintaining of mail processing equipment, developing, licensing and servicing of software technologies related to mailing operations and the provision of printing and mailing services and solutions (the "Business");

B.      The Purchasers desire to purchase the Acquired Assets (as defined below) and assume the Assumed Liabilities (as defined below) from the Sellers, and the Sellers desire to sell, convey, assign and transfer to the Purchasers (or their designee(s)) the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with sections 105, 363 and 365 and other applicable provisions of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101-1532 (the "Bankruptcy Code") and the Companies' Creditors Arrangement Act (Canada) (the "CCAA");

C.      The US Purchaser desires to purchase (or to have its designee(s) purchase) the German Assets from BBH, GmbH and BBH, GmbH desires to sell, convey, assign and transfer to the US Purchaser (or its designee(s)) the German Assets all in a manner and subject to the terms and conditions set forth in this Agreement; and

D.      The Acquired Assets and Assumed Liabilities shall be purchased and assumed by the Purchasers (or their designee(s)) pursuant to a Sale Order (as defined below), approving such sale, free and clear of all Liens (as defined below), Claims (as defined below), and Interests (as defined below), pursuant to sections 105 and 363 of the Bankruptcy Code, which order will include the authorization for the assumption by the Sellers and assignment to the Purchasers (or their designee(s)) of the Acquired Contracts thereunder in accordance with section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

E.     The Sale Order will be recognized and given full effect by the Canadian Court (as defined below) pursuant to the Sale Recognition Order (as defined below) in accordance with the CCAA.

NOW, THEREFORE, in consideration of the mutual agreements, covenants, representations and warranties contained herein, the receipt of sufficiency of which is hereby acknowledged by the Parties, the Sellers and the Purchasers hereby agree as follows:

ARTICLE I

DEFINITIONS

As used herein, the following terms shall have the following meanings:

Accounts Receivable means as of any date any and all accounts and notes receivable (whether current or non-current) as of such date, including in respect of goods shipped, products sold, licenses granted, services rendered or otherwise associated with the Business.

Accrued Liabilities means those Liabilities of the Foreign Seller which (i) become Assumed Liabilities pursuant to the terms hereof and (ii) in respect of which, as of the Closing Date, (x) the Foreign Seller has a legal and unconditional, though not necessarily immediate, obligation to pay a determined amount and (y) no contingency exists.

Acquired Assets is defined in Section 2.1.

Acquired Contracts is defined in Section 2.1(e).

Affiliate means any Person which controls, is controlled by or is under common control with the designated Person. A Person shall be deemed to control another Person for purposes of this definition if such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the other Person, whether through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise.

Agreement means this Asset Purchase Agreement and the Schedules and Exhibits thereto, as may be amended from time to time in accordance with its terms.

Allocation is defined in Section 7.2.

Alternative Transaction means any transaction relating to the sale, transfer or other disposition of all or any substantial portion of the Business or the consolidated assets of the Company Group or successor thereto to one or more Persons (other than Purchasers or their designee(s)), whether proposed to be effected pursuant to a merger, consolidation, share exchange, amalgamation, foreclosure, compromise, sale, issuance, transfer or redemption of any assets or securities of any member of the Company Group or any successor thereto, or any similar transaction or business combination, or a plan of reorganization or liquidation pursuant to chapter 11 of the Bankruptcy Code and/or the CCAA whereby the Sellers' (or successors thereto) business emerges as a going concern or all or substantially all the assets of the Sellers or

2

successors thereto are sold, in each case, whether or not proposed or advanced by any Seller or successor thereto.

Ancillary Agreements means any and all contracts, bills of sale, intellectual property assignments, acknowledgements and other documents executed and delivered in connection with this Agreement.

Assigned Designated Remaining Asset is defined in Section 2.8(a)(iv).

Assigned Designated Remaining Contract is defined in Section 2.8(a)(iv).

Assignment and Assumption is defined in Section 8.1(f).

Assignment Effective Date means, with respect to any Assigned Designated Remaining Contract or any Assigned Designated Remaining Asset, the twelfth (12th) Business Day after the date on which the Purchasers provide written notice to the Sellers that the Purchasers elect to have the Sellers assume and assign to the Purchasers such Assigned Designated Remaining Contract or assign to the Purchasers such Assigned Designated Remaining Asset, or such later date as may be ordered by the Bankruptcy Court or the Canadian Court.

Assignment Motion is defined in Section 6.7(d).

Assignment Order is defined in Section 6.7(d).

Assignment Recognition Order means an Order of the Canadian Court which shall be in form and substance acceptable to the Purchasers recognizing and giving full force and effect to the Assignment Order in all provinces and territories of Canada pursuant to section 49 of the CCAA.

Assumed German Obligations is defined in Section 2.2.

Assumed Liabilities is defined in Section 2.4.

Assumed Plans is defined in Section 6.5(b)(i).

Auction is defined in Section 6.7(c)(ii).

Auction Deadline Date means May 31, 2011.

Avoidance Actions means any Causes of Action arising under chapter 5 of the Bankruptcy Code.

Bankruptcy Case is defined in Section 6.7(a).

Bankruptcy Code is defined in Recital B.

Bankruptcy Court is defined in Section 6.7(a).

Bankruptcy Orders mean the Sale Order, the Bidding Procedures Order and the Assignment Order.

Bankruptcy Rules is defined in Recital D.

BBH is defined in the first paragraph of this Agreement.

BBHC is defined in the first paragraph of this Agreement.

BBH, GmbH is defined in the first paragraph of this Agreement.

BBH KG is defined in Section 6.1(g).

BCC is defined in the first paragraph of this Agreement.

Bid Deadline is defined in Section 6.7(c)(iii).

Bidding Procedures Hearing is defined in Section 6.7(c).

Bidding Procedures Order is defined in Section 6.7(c).

Bidding Procedures Recognition Order means an Order of the Canadian Court which shall be in form and substance acceptable to the Purchasers, recognizing and giving full force and effect to the Bidding Procedures Order in all provinces and territories of Canada pursuant to section 49 of the CCAA.

Books and Records means all books, records and lists of the Business including, (i) all files, catalogs, brochures, inventory, merchandise, analysis reports, marketing reports, safety reports and documents research and development materials, test results, product specifications, plans, studies, drawings, diagrams, safety reports, maintenance schedules, operating and production records, training manuals, engineering data and creative material pertaining to the Acquired Assets, the Facilities or the Business, (ii) all records relating to customers, suppliers or personnel of the Sellers or of the Business (including customer lists, mailing lists, e-mail address lists, recipient lists, sales records and data, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers), (iii) all records relating to all product, business, advertising, promotion and marketing plans of any member of the Company Group, (iv) all accounting and Tax records and Tax Returns and (v) all books, ledgers, files, reports, plans, drawings and operating records of every kind.

Bowe is defined in the first paragraph of this Agreement.

Break-Up Fee is defined in Section 6.7(c)(v).

Business is defined in Recital A.

Business Day means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

Canadian Credit Bid Amount means the Canadian DIP Amount.

Canadian Cash Bid Amount is defined in Section 3.1(a)(ii).

Canadian DIP Amount means the sum of all outstanding obligations of any kind in respect of the Canadian Revolving Credit Commitment and the Canadian Revolving Credit Advance (each as defined in the DIP Credit Agreement) and all other obligations ancillary thereto under the DIP Facility as of the Closing Date.

Canadian Court is defined in Section 6.7(e)(i)(A).

Canadian Purchase Price means the total of the Canadian Credit Bid Amount, the Canadian Cash Bid Amount and the amount of the Accrued Liabilities of the Foreign Seller to be assumed by the Foreign Purchaser under this Agreement.

Cash means cash and cash equivalents (including marketable securities and short-term investments, treasury bills, money orders, undeposited checks, checking account balances, instruments for the payment of money, certificates of deposit and other time deposits and petty cash) calculated in accordance with GAAP.

Causes of Action means all claims, causes of action, chose in actions, lawsuits, demands, or judgments in law or equity, of every kind and nature, that the Sellers have or may have against any other Person, including, without limitation, all rights of the Sellers under or pursuant to all Avoidance Actions, but excluding Excluded Avoidance Actions.

CCAA is defined in Recital B.

CCAA Proceedings is defined in Section 6.7(e)(i).

CERCLA means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) and any Laws promulgated thereunder.

Claim has the meaning given that term in section 101(5) of the Bankruptcy Code and shall expressly include claims arising under any theory of successor liability.

Closing is defined in Section 4.1.

Closing Date is defined in Section 4.1.

Code means the United States Internal Revenue Code of 1986, as amended.

Company Group means collectively, BBHC, BBH and their respective Subsidiaries.

Company Group IP Rights is defined in Section 5.1(i).

Consents is defined in Section 5.1(f).

Contract means any written or oral contract, agreement, lease or sublease, license or sublicense, instrument, indenture, commitment or undertaking or other binding arrangement or understanding, and with respect to any contract to which any Seller is a party, such contract which any Seller is permitted under the Bankruptcy Code to assume and assign.

Contract Claims is defined in Section 2.1(e).

Copyrights means all United States, and foreign copyrights, mask works and copyrightable works, whether registered or unregistered, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor including, without limitation, the registrations and applications referred to in Schedule 5.1(i) hereto, (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto throughout the world in all forms or mediums now or hereafter known or devised, and (iv) all rights to sue for past, present and future infringements thereof.

Credit Bid Amount is defined in Section 3.1(a)(i).

Cure Amounts means any costs of cure pursuant to section 365(b) of the Bankruptcy Code with respect to the Acquired Contracts and the Assigned Designated Remaining Contracts.

Designated Remaining Assets is defined in Section 2.8(a)(iii).

Designated Remaining Contracts is defined in Section 2.8(a)(ii).

Designated Remaining Executory Contracts is defined in Section 2.8(a)(ii).

Designated Remaining Leases is defined in Section 2.8(a)(i).

DIP Amount means the difference of (i) the sum of all outstanding obligations of any kind under the DIP Facility as of the Closing Date, minus (ii) $2,000,000.

DIP Credit Agreement means that certain Senior Secured, Superpriority Priority Debtor-in Possession Credit and Guaranty Agreement, dated as of the date thereof, by and among BBH and the Foreign Seller, as the borrowers, the guarantors party thereto and the US Purchaser, as lender.

DIP Facility means the credit facility governed by the DIP Credit Agreement and the DIP Order.

DIP Order means, collectively, those certain interim or final orders entered by the Bankruptcy Court approving the DIP Facility.

Dollar and the sign "$" mean the lawful money of the United States.

Employee Accruals is defined in Section 2.4(c).

Employee Benefit Plans means all employee benefit plans as defined in section 3(3) of ERISA, all compensation, pay, severance pay, salary continuation, vacation, bonus, incentive,

stock option, stock purchase, stock ownership, stock appreciation right, retirement, pension, profit sharing, deferred compensation, group benefits or health and welfare plans (including any post-retirement benefits and all disability, hospital, medical, dental and vision care benefits), contracts, programs, funds or arrangements of any kind and all other employee benefit or compensation plans, programs, funds, agreements or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated, and whether or not subject to ERISA) and any insurance contract, trust, escrow or similar agreement related thereto, whether or not funded sponsored, maintained or contributed to by any Seller or to which any Seller has any Liability.

Environmental Law means whenever in effect, all federal, state, provincial, local and foreign, statutes, Laws, rules, ordinances, directives, regulations and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations and all common Law, in each case concerning public or worker health and safety, pollution, contamination or protection of the environment (including, without limitation, ambient air, surface water, ground water, solid waste, land surface, subsurface strata, inland wetlands, watercourses or navigable waters), including, without limitation, those relating to actual or threatened emissions, spills, discharges, deposits or depositions, migration or Releases of or exposure to Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, control, cleanup, treatment, storage, disposal, recycling, reclamation, transport or handling of Materials of Environmental Concern (including under CERCLA and analogous Laws).

Environmental Permits is defined in Section 5.1(s).

ERISA means the Employee Retirement Income Security Act of 1974, as amended and all Laws issued thereunder.

Excluded Assets is defined in Section 2.3.

Excluded Avoidance Actions means all Avoidance Actions except those (i) against or otherwise involving any counterparty to any Acquired Contract or Assigned Designated Remaining Contract, any post-Closing employees, officers or directors of the Business, including any Rehired Employees, lenders, landlords or vendors and/or (ii) relating to the ongoing or future operations of the Business.

Excluded Liabilities is defined in Section 2.5.

Execution Date is defined in the first paragraph of this Agreement.

Executive Officer of a Person means its chairman, director, chief executive officer, chief financial officer, president, officer, any vice president, secretary, controller, treasurer or general counsel.

Expense Reimbursement is defined in Section 6.7(c)(v).

Facility or Facilities means collectively the premises at which each Seller operates.

Facility Leases means all right, title and interest of the Sellers in all leases, subleases, licenses, concessions and other agreements (written or oral) and all amendments, modifications, extensions, renewals, guaranties and other agreements with respect thereto, including the right to all security deposits and other amounts and instruments deposited by or on behalf of any Seller thereunder, pursuant to which a Seller holds a leasehold or subleasehold estate in, or is granted the right to use or occupy a Facility.

Final Order means an Order or judgment of the Bankruptcy Court, the Canadian Court or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which order (or any revision, modification or amendment thereof) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

Financial Statements is defined in Section 5.1(d)(i).

Foreign Purchaser is defined in the first paragraph of this Agreement.

Foreign Seller is defined in the first paragraph of this Agreement.

FTC is defined in Section 6.3(a).

GAAP means generally, at a given time, United States generally accepted accounting principles, consistently applied using the same methodologies provided that with respect to the Foreign Seller, GAAP means specifically, at a given time, Canadian generally accepted accounting principles, consistently applied using the same methodologies.

General Partner is defined in Section 6.1(g).

German Assets means those assets set forth on Schedule 1.1, along with all income, royalties, damages and payments due or payable to BBH, GmbH as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof, or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof, or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such assets in the Company Group's possession or control.

German Asset Transfer Agreement means the German Asset Transfer Agreement, dated as of the Closing Date, by and between the US Purchaser and BBH, GmbH, and attached hereto as Exhibit A.

German Assets Consideration is defined in Section 3.1(b).

Governmental Authority means any federal, state, provincial, local, municipal, foreign, supranational or other the governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau commission, department, official or entity and any court or other tribunal) or any executive, legislative, judicial, regulatory, administrative, police, or taxing authority or arbitral body.

Governmental Filings and Approvals is defined in Section 6.3(a).

Highest and Best Bid is defined in Section 6.7(c)(x).

HSR Act means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder, and the rules and Laws thereunder.

Indebtedness of any Person means, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations or liabilities of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lenders under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all indebtedness secured by any Lien on property owned or acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not the obligations secured thereby have been assumed, but limited to the lower of (i) the fair market value of such property and (ii) the amount of the Indebtedness secured; (f) all capital lease obligations of such Person; (g) any commitment by which such Person assures a creditor against loss (including all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions) or other indebtedness guaranteed in any manner by such Person; (h) all uncashed checks issued by such Person that are outstanding as of the Closing Date and obligations arising from cash/book overdrafts; and (i) all contingent obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (h) above. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such Person is not liable therefor.

Information Officer is defined in Section 3.2(b).

Initial Recognition Order means the Orders of the Canadian Court which shall be in form and substance acceptable to the Purchasers, *inter alia*, recognizing the Bankruptcy Case as a foreign main proceeding pursuant to section 47 of the CCAA, and appointing PricewaterhouseCoopers Inc. as Information Officer and recognizing and giving full force and effect to certain "first day" Bankruptcy Court Orders issued in the Bankruptcy Case in all provinces and territories of Canada pursuant to section 49 of the CCAA.

Insider means, without duplication, (i) Bowe Systec AG and its successors and any of its or their Affiliates and (ii) any Executive Officer, director, governing body member, stockholder, partner or Affiliate, as applicable, of any Seller or any predecessor or Affiliate of any Seller or any individual related by marriage or adoption to any such individual or any entity in which any such Person owns any beneficial interest.

Insurance Policies is defined in Section 5.1(r).

Intellectual Property means all (i) Copyrights, (ii) Patents, (iii) Trademarks, (iv) Trade Secrets, (v) Software, (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium and (vii) all other proprietary and intellectual property and rights therein in any jurisdiction in the world, together with all rights to sue and collect for past, present or future infringement, misappropriation or other unauthorized use thereof, and all rights to income, royalties, payments, proceeds, claims, rights and remedies in connection therewith.

Interest has the meaning ascribed to such term under section 363(f) of the Bankruptcy Code.

Interim Initial Order means an Order of the Canadian Court which shall be in form and substance acceptable to the Purchasers providing for a temporary stay of proceedings and enforcement processes against the Sellers and/or their directors and officers pursuant to the CCAA.

Inventory means all the inventory of the Sellers of any kind or nature, whether or not prepaid, and wherever located, held or owned, including all raw materials, supplies, work in process, semi-finished and finished goods, replacement and spare parts, packaging materials, operating supplies, in-transit or consigned inventory, and fuels and other and similar items.

Knowledge - an individual will be deemed to have "Knowledge" of a particular fact or other matter only if such individual is actually aware of such fact. A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter only if an individual who is an Executive Officer, partner, executor, or trustee of such Person (or in any similar capacity) has actual Knowledge of such fact or other matter.

Latest Balance Sheet is defined in Section 5.1(d)(i).

Law means any law, statute, regulation, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

Leased Facility means any land, buildings, structures, improvements, fixtures or other interest in real property which is used or intended to be used by any Seller pursuant to a Facility Lease.

Leasehold Improvements means all buildings, structures, improvements and fixtures located on any Leased Facility which are owned by any Seller, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Facility Lease for such Leased Facility.

Liability means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes, product liability or infringement liability.

Lien has the meaning ascribed to such term under section 101(37) of the Bankruptcy Code and also includes, without limitation, any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, pledge, restriction, charge (including a charge created under a court order as part of the CCAA Proceedings), instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other third party right, Tax (including foreign, federal, state and local Tax), Order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any Claim based on any theory that any Purchaser is a successor, transferee or continuation of Sellers or the Business, and (iv) any leasehold interest, license or other right, in favor of a third party or a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

Life Insurance Plan is defined in Section 6.5(d).

Material Adverse Effect means an event, change, occurrence or development with respect to the Acquired Assets or the Assumed Liabilities, that is materially adverse to the results of operations or financial condition of the Acquired Assets or the Assumed Liabilities, or the Business, in each case, taken as a whole, other than an event, change, occurrence or development concomitant with the commencement of the Bankruptcy Case or the CCAA Proceedings; provided, however, that none of the following shall be or be considered in determining the existence of any "Material Adverse Effect": (a) changes in general economic conditions in the United States or any other country or region in the world, or changes in conditions in the global economy generally; (b) changes in conditions in the financial markets, credit markets or capital markets in the United States or any other country or region in the world, including, but not limited to, changes in interest rates in the United States or any other country and changes in exchange rates for the currencies of any countries; (c) changes in conditions in the industries in which the Sellers conduct business; (d) changes in political conditions in the United States or any other country or region in the world; (e) acts of war, sabotage or terrorism (including any escalation or general worsening of any such acts of war, sabotage or terrorism) in the United States or any other country or region in the world; (f) earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters, weather conditions and other force majeure events in the United States or any other country or region in the world; (g) any change in Law; (h) compliance with the terms of, or the taking of any action required or contemplated by, this Agreement or any Ancillary Agreement, or the failure to take any action prohibited by this Agreement or any Ancillary Agreement; (i) any actions taken, or failure to take action, in each case, to which the Purchasers have in writing expressly approved, consented to or requested; or (j) effects disclosed by or resulting from facts or circumstances disclosed by the Sellers herein or in the Ancillary Agreements (including without limitation disclosures contained in the Schedules hereto or thereto).

Material Contract is defined in Section 5.1(l).

Materials of Environmental Concern means any and all dangerous, hazardous, toxic, prohibited or regulated substances, materials, pollutants, contaminants, special waste, radioactive or source material, hazardous waste or wastes as defined in or regulated by any Environmental Laws, including, without limitation, petroleum, petroleum byproducts, PCBs, mercury, lead, asbestos and radioactive materials or any other element, compound, mixture, solution or substance that might reasonably be expected to pose a present or potential hazard to human health or the environment.

Motor Vehicles is defined in Section 2.1(m).

Orders means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

Party and Parties are defined in the first paragraph of this Agreement.

Patents means all United States, Patent Cooperation Treaty and foreign patents and certificates of invention, or similar industrial property rights, and applications and disclosures for any of the foregoing, including, but not limited to (i) each patent and patent application referred to in Schedule 5.1(i) hereto, (ii) all reissues, divisions, continuations, continuations-in-part, extensions, supplementary protection certificates, renewals, and reexaminations thereof, (iii) all rights corresponding thereto throughout the world, (iv) all inventions and improvements described therein, (v) all rights to sue for past, present and future infringements thereof, and (vi) all licenses, claims, damages, and proceeds of suit arising therefrom.

PDF is defined in Section 11.13.

Permits and Licenses and Licenses is defined in Section 2.1(h).

Person means a person or entity, whether an individual, trustee, corporation, limited liability company, general partnership, limited partnership, trust, unincorporated organization, business association, firm, joint venture, Governmental Authority or any similar entity.

Petition Date is defined in Section 6.7(a).

Petition for Relief is defined in Section 6.7(a).

Postal Systems is defined in the first paragraph of this Agreement.

Pre-Petition Credit Agreement means that certain Amended and Restated Credit Agreement, dated as of November 23, 2009, among BBH, the administrative agent identified therein and the lenders party thereto from time to time, as amended, modified, or supplemented from time to time.

Pre-Petition Credit Facility means the credit facility governed by the Pre-Petition Credit Agreement.

Pre-Petition Secured Amount means certain obligations due and owing under the Pre-Petition Credit Agreement in an amount equal to the difference between the Credit Bid Amount

and the DIP Amount, which amount, for the avoidance of doubt, does not represent all of the Purchasers' and/or their Affiliates' Claims under the Pre-Petition Credit Facility as of the Closing Date.

Proceeding means any claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, suit in equity or at Law, administrative, regulatory or quasi-judicial proceeding, account, cost, expense, setoff, contribution, attorney's fee or Causes of Action of whatever kind or character.

Purchase Price is defined in Section 3.1(a).

Purchasers is defined in the first paragraph of this Agreement.

Qualifying Bid is defined in Section 6.7(c)(viii).

Recognition Orders mean, collectively, the Initial Interim Order, the Initial Recognition Orders, the Sale Recognition Order, the Bidding Procedures Recognition Order and the Assignment Recognition Order.

Rehired Employees is defined in Section 6.5(a).

Rejection Effective Date means, with respect to any Designated Remaining Contract which is not an Assigned Designated Remaining Contract or any Designated Remaining Asset which is not an Assigned Designated Remaining Asset, the fifth (5th) Business Day after the date on which the Purchasers provide written notice to the Sellers that the Purchasers elect to not have such Designated Remaining Contract assumed by the Sellers and assigned to the Purchasers or such Designated Remaining Asset assigned to the Purchasers.

Release has the meaning set forth in CERCLA.

Replicated Plan is defined in Section 6.5(b)(ii) and the Replicated Plans are listed on Schedule 6.5(b)(ii).

Replicated 401(k) Plan is defined in Section 6.5(g).

Restricted Cash means (i) Cash held by a third party as a security deposit or other form of collateral or security in respect of a payment or performance obligation of a US Seller or the Foreign Seller, as applicable, to which the Sellers do not have unrestricted access, and (ii) Cash in a deposit, securities or other account of a US Seller or the Foreign Seller, as applicable, to the extent that checks, drafts or other instruments have been issued by a US Seller or the Foreign Seller, as applicable, against that account but have not been debited against that account.

Restricted Names is defined in Section 6.6.

Retiree Medical Plan is defined in Section 5.1(n).

Sale Hearing is defined in Section 6.7(b)(i).

Sale Motion is defined in Section 6.7(b)(i).

Sale Order means an Order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit B and acceptable to the Sellers and the Purchasers, entered pursuant to sections 105, 363 and 365 of the Bankruptcy Code (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale and transfer of the Acquired Assets to the Purchasers free and clear of all Liens, Claims and Interests, pursuant to section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to the Purchasers of the Acquired Contracts; (iv) finding that the Purchasers are good-faith purchasers entitled to the protections of section 363(m) of the Bankruptcy Code; (v) confirming that the Purchasers are acquiring the Acquired Assets free and clear of the Excluded Assets and the Excluded Liabilities; and (vi) providing that the provisions of Bankruptcy Rules 6004(g) and 6006(d) are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure.

Sale Recognition Order means an Order of the Canadian Court in form and substance acceptable to the Sellers and the Purchasers recognizing and giving full force and effect to the Sale Order in all provinces and territories of Canada pursuant to section 49 of the CCAA.

Seller and Sellers are defined in the first paragraph of this Agreement.

Software is defined in Section 2.1(l).

Subsidiary of a Person means any corporation, association, partnership, limited liability company, joint venture or other business entity of which more than 25% of the voting stock, membership interests or other equity interests (in the case of Persons other than corporations), is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof.

Supplies means all supplies, items and materials (including spare parts) owned by the Sellers on the Closing Date.

Taxes means (i) any and all taxes, duties, charges, fees, levies or other assessments imposed by any taxing authority including, without limitation, income, gross receipts, value-added, excise, withholding, personal property, real estate, sale, use, ad valorem, license, lease, service, severance, stamp, transfer, payroll, employment, customs, duties, alternative, add-on, minimum, estimated and franchise taxes (including any and all interest, penalties or additions attributable to or imposed on or with respect to any such amounts), (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

Tax Return means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Person relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

Termination Date is defined in Section 9.1(c).

Trade Secrets means all trade secrets and all other confidential or proprietary information and know-how (including formulations, ideas, research and development, know how, inventions (whether or not patentable and whether or not reduced to practice), invention disclosures, formulas, compositions, manufacturing and production processes and techniques, technical data, customer and supplier lists, designs, drawings, plans and specifications) whether or not any of the foregoing has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such Trade Secret, including but not limited to the right to sue for past, present and future misappropriation or other violation of any Trade Secret.

Trademarks means all United States, and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, designs, trade dress, slogans, other source or business identifiers, designs and general intangibles of a like nature, all registrations and applications for any of the foregoing including, but not limited to: (i) the registrations and applications referred to in Schedule 5.1(i) hereto, (ii) all extensions or renewals of any of the foregoing, (iii) the unregistered marks referred to in Schedule 5.1(i) hereto, (iv) all translations, adaptations, derivations and combinations of the foregoing, (v) all of the goodwill of the business connected with the use of and symbolized by the foregoing, and (vi) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill.

Transaction Taxes is defined in Section 7.1(a).

US Bid Amount is defined in Section 3.1(a)(i).

US DIP Amount means the difference of (i) the DIP Amount, minus (ii) the Canadian DIP Amount.

US Purchaser is defined in the first paragraph of this Agreement.

US Sellers means, collectively, BBH, BBHC, Postal Systems, Bowe, BCC and BBH Holdings, with each, a "US Seller."

WARN Act means the Worker Adjustment and Retraining Notification Act of 1988 and any similar applicable foreign, state or local Law.

Unless otherwise specified, all terms defined in this Agreement in the singular shall have comparable meanings when used in the plural, and vice versa.

ARTICLE II

SALE OF ACQUIRED ASSETS

2.1     Sale of Acquired Assets.  At the Closing, and upon the terms and conditions set forth in this Agreement, the US Sellers and the Foreign Seller shall sell, transfer, grant, assign, deliver and convey to the US Purchaser and the Foreign Purchaser, respectively, free and clear of all Liens, Claims and Interests, and the US Purchaser and the Foreign Purchaser shall purchase, acquire and take assignment and delivery of, all of the US Sellers' and the Foreign Seller's, respectively, right, title and interest of every kind and nature (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) of such Seller as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed, including all of the following properties, rights, and assets, but excluding the Excluded Assets (collectively, the "Acquired Assets"):

(a)     all Cash maintained or held by any of the US Sellers or the Foreign Seller including, without limitation, cash proceeds of accounts receivable received on or prior to the Closing Date, cash proceeds of inventory sold and received on or prior to the Closing Date, deposit accounts (including any deposits made with the Sellers' workers' compensation insurance carrier), Restricted Cash and pledged cash collateral accounts;

(b)     all tangible personal property, including all machinery, equipment (including transportation and office equipment), Leasehold Improvements, supplies, materials, office furniture and office equipment, computers, mobile phones and devices, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, computing and telecommunications equipment, systems and networks, production supplies, spare parts, other miscellaneous supplies and other items of personal property that are owned or leased by any of the US Sellers or the Foreign Seller, as applicable, wherever located, including, but not limited to, those described in Schedule 2.1(b) hereto;

(c)     all Accounts Receivable existing on the Closing Date;

(d)     all deposits, advances, prepayments, rights in respect of promotional allowances, vendor rebates and to other refunds, claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail, Accounts Receivable payments and other communications of the US Sellers and the Foreign Seller, as applicable, and the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(e)     all of the rights and benefits under the Contracts, Facility Leases, leases, vehicle leases and other written agreements of the US Sellers and the Foreign Seller, as applicable, (to the extent such Contracts, leases, and agreements are transferrable pursuant to Bankruptcy Code section 365) or otherwise at law identified in Schedule 2.1(e) hereto and specifically all Intellectual Property licenses of the US Sellers and Foreign Seller (the "Acquired Contracts"), other than those excluded by the Purchasers from the Acquired Assets pursuant to

Section 2.3(a) hereof, but including all contractual rights (including rights to indemnification, exculpation, advancement or reimbursement of expenses) claims, causes of action, choses in action, lawsuits, demands and judgments in law or in equity, of every kind and nature, that any of the US Sellers or the Foreign Seller, as applicable, has or may have against any other Person and that are related to the Acquired Contracts (the "Contract Claims");

(f)     the Books and Records (in whatever format they exist, whether in hard copy or electronic format);

(g)     all Intellectual Property and technology that are owned by, used or held for use in the Business by any of the US Sellers or the Foreign Seller and each of their past or present Affiliates, as applicable, or licensed to any of the US Sellers or the Foreign Seller, as applicable, pursuant to an Acquired Contract, including, without limitation, all the Intellectual Property and technology listed on Schedule 2.1(g) along with all income, royalties, damages and payments due or payable to any of the US Sellers or the Foreign Seller, as applicable, as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof, or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof, or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments in all forms or mediums now or hereafter owned or devised of any such Intellectual Property in Company Group's possession or control;

(h)     the governmental and other third party permits, licenses, registrations, orders, authorizations, operating permits, certificates of occupancy and approvals, Environmental Permits and all other permits required to operate the Business (collectively, the "Permits and Licenses") held by any of the US Sellers or the Foreign Seller, as applicable, including without limitation those identified in Schedule 2.1(h) hereto, but only to the extent the above-described assets are legally transferable to the Purchasers;

(i)     all goodwill as a going concern and all other right, title and interest of any of the US Sellers or the Foreign Seller, as applicable, in and to the general intangibles incident to their respective businesses;

(j)     all Inventory of any of the US Sellers or the Foreign Seller, as applicable, except for Inventory sold on or before the Closing Date for which payment has been made by the purchaser thereof and received by any of the US Sellers or the Foreign Seller, as applicable;

(k)     all Supplies of any of the US Sellers or the Foreign Seller, as applicable;

(l)     any and all computer programs, applications, software, middleware, libraries, tools, firmware and all software implementations of algorithms, models and methodologies, owned or licensed, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis, etc.) or specific, unique-to-the-business usage, all computer operating, security or programming software, owned or licensed by any of the US Sellers or the Foreign Seller, as applicable, and, in each case, in any form (including all source code and executable code), data, databases and related documentation of any of the foregoing

and copies and tangible embodiments of any of the foregoing in whatever form or medium and all rights arising out of or associated with any of the foregoing (the "Software");

(m)     all industrial and motor vehicles owned by any of the US Sellers or the Foreign Seller, as applicable (collectively, "Motor Vehicles");

(n)     all telephone numbers, fax numbers, email addresses, websites, URLs and internet domain names;

(o)     those assets identified on Schedule 2.1(o);

(p)     all obligations of BBH, GmbH owed to any of the US Sellers or the Foreign Seller;

(q)     all financial contracts, investment securities and other financial assets, including each of the foregoing identified on Schedule 2.1(q);

(r)     all assets (including insurance and administrative service contracts) maintained pursuant to or in connection with the Assumed Plans;

(s)     all (or the benefit of all to the extent not assignable) Tax refunds, rebates, credits and similar items of any of the US Sellers or the Foreign Seller, in each case relating to any period, or portion of any period, on or prior to the Closing Date or any Tax Return;

(t)     all rights under all insurance policies and all rights of every nature and description under or arising out of such policies, except to the extent relating exclusively to any Excluded Asset or Excluded Liability and except to the extent such insurance policies are non-assignable of a matter of law;

(u)     any and all Causes of Action; and

(v)     all such other properties, assets and rights (contractual or otherwise) of any of the US Sellers or the Foreign Seller as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed which are not otherwise expressly set forth above as Acquired Assets and are not Excluded Assets.

For the avoidance of doubt, the Purchasers shall be entitled to assign all or any portion of their rights and/or obligations under this Agreement, including under this Section 2.1 and/or Section 4.4, to one or more Affiliates of each of the Purchasers.

2.2     Sale of the German Assets.  At the Closing, upon the terms and conditions set forth in this Agreement, BBH, GmbH shall sell, transfer, grant, assign, deliver and convey to the US Purchaser, free and clear of all Liens, Claims and Interests, and the US Purchaser shall purchase, acquire and take assignment and delivery from BBH, GmbH of, all of BBH, GmbH's right, title and interest of every kind and nature (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) as of the Closing Date in the German Assets and shall assume the obligations of BBH, GmbH under that certain License Agreement by and between BBH, GmbH and Siemens AG, dated November 13,

2007, to the extent such obligations (i) arise after the Closing Date and (ii) relate to the post-Closing period (the "Assumed German Obligations").

2.3     Excluded Assets.  Notwithstanding Sections 2.1 and 2.2, the following assets (collectively, the "Excluded Assets") of Sellers shall be retained by Sellers and are excluded from this Agreement, and shall not be transferred, assigned or conveyed to the Purchasers:

(a)     all Contracts that are not Acquired Contracts, including the Contracts set forth on Schedule 2.3(a);

(b)     originals of the Sellers' corporate minute books, organizational documents, stock books, and tax returns;

(c)     the Sellers' ownership and equity interests (whether in the form of stock, joint venture interest, partnership interest, limited liability company interest or otherwise) in any of the Sellers or Affiliates of the Sellers, which interests are identified on Schedule 2.3(c);

(d)     except as provided in Section 2.1(r), all assets maintained pursuant to or in connection with any Employee Benefit Plan, including, without limitation, all assets and properties of the Bell + Howell MMT Legacy Pension Plan and any predecessor thereof or successor thereto;

(e)     all of the assets identified on Schedule 2.3(e); and

(f)     the Sellers' and BBH, GmbH's rights under this Agreement and any Ancillary Agreement.

2.4     Assumption of Liabilities.  At the Closing, the Purchasers shall not assume any obligations or Liabilities from the Sellers other than those obligations and Liabilities expressly listed below (all such liabilities and obligations assumed pursuant to this Section 2.4, the "Assumed Liabilities"):

(a)     all obligations under the Acquired Contracts arising after the Closing Date with respect to the post-Closing period;

(b)     the sponsorship of and all Liabilities attributable to the Assumed Plans, other than any Liabilities arising from any breach of any representations, warranty, or covenant hereunder;

(c)     (i) ordinary accruals existing on the Closing Date for the wages, commissions, vacation days and sick days and expense reimbursements of the employees ("Employee Accruals") of the Sellers, but solely to the extent set forth on Schedule 2.4(c)(i) (with it being understood that Schedule 2.4(c)(i) may be updated as of the Closing solely to reflect additional Employee Accruals incurred in the ordinary course of business consistent with past practice between the date hereof and the Closing Date, to the extent such updated amounts are reasonably acceptable to the Purchasers), (ii) retention payment obligations to be paid to those employees of the Sellers and in the amounts set forth on Schedule 2.4(c)(ii), (iii) unpaid severance obligations to those former employees of the Sellers and in the amounts listed on

Schedule 2.4(c)(iii) and (iv) incurred but not reported claims expenses for the Sellers' health benefit plan but solely to the extent set forth on Schedule 2.4(c)(iv);

(d) to the extent set forth (i) on Schedule 2.4(d)(i), current liabilities consisting of accounts payables arising in the ordinary course of business from the Petition Date through Closing and (ii) on Schedule 2.4(d)(ii), current liabilities consisting of accounts payable for goods received by Sellers within twenty (20) days prior to the Petition Date which were purchased by Sellers in the ordinary course of business, to the extent they become allowed claims in the Bankruptcy Case (but excluding (x) all Liabilities and obligations relating to any notes, accounts payable, Contract, commitment or transaction required to be set forth on Schedule 5.1(t) and (y) Liabilities arising from a breach of Contract, breach of warranty, tort, infringement, lawsuits, or violation of Law) with it being understood that Schedules 2.4(d)(i) and/or (ii) may be updated as of the day prior to the Closing Date to reflect changes in such accounts payable between the date hereof and the Closing Date to the extent incurred in the ordinary course of business and to the extent reasonably acceptable to the Purchaser; and

(e) in addition to the other Assumed Liabilities of the Foreign Seller set forth in this Section 2.4, but without duplication, all liabilities of the Foreign Seller which have accrued prior to the Closing Date (whether due before or after the Closing Date), including the liabilities described on Schedule 2.4(e) and excluding, for the avoidance of doubt, any unknown, unasserted or contingent liability, and any liability associated or in any way related to any Employee Benefit Plan that is subject to Title IV of ERISA, including, without limitation, any liabilities of any kind associated with the Bell + Howell MMT Legacy Pension Plan whether asserted by the Pension Benefit Guaranty Corporation or any other Person.

For the avoidance of doubt, all Assumed Liabilities of the Foreign Seller to be assumed pursuant to this Section 2.4 or otherwise pursuant to this Agreement shall be assumed by the Foreign Purchaser under the Assignment and Assumption. The Foreign Seller shall assume no other Assumed Liabilities. This Section 2.4 shall not limit any claims or defenses the Purchasers may have against any party other than the Sellers. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against the Purchasers, the Sellers or BBH, GmbH as compared to the rights and remedies which such third party would have had against the Sellers or BBH, GmbH had the Purchasers not assumed such Assumed Liabilities.

2.5 Excluded Liabilities. The Purchasers are assuming only the Assumed Liabilities and are not assuming, and shall not be the successor to, any other Liability or obligation of the Sellers or any predecessor or Affiliate of any Seller whatsoever, or any Liability or obligation related to the Sellers' respective businesses of any nature (either pre-petition or post-petition), including, without limitation, any direct or indirect Indebtedness, guaranty, endorsement, claim, loss, damage, deficiency, cost, expense, obligation or responsibility, whether fixed or unfixed, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, due or to become due, choate or inchoate, liquidated or unliquidated, secured or unsecured. All such other liabilities and obligations (including without limitation all such liabilities and obligations arising under CERCLA or any other Environmental Laws and any Employee Benefit Plan that is not an Assumed Plan (including, without limitation, liabilities of any kind associated with the Bell + Howell MMT Legacy Pension Plan)) shall be retained by, and remain Liabilities and

obligations of, the Sellers (all such liabilities are, collectively, the "Excluded Liabilities"). For the avoidance of doubt and without limiting the generality of the foregoing, Excluded Liabilities shall include, without limitation, (A) any obligation or Liability arising out of or relating to products and/or services of any predecessor or Affiliate of any Seller to the extent provided, developed, made, manufactured, marketed, sold or distributed prior to the Closing, including any obligation or Liability for (i) infringement or misappropriation of Intellectual Property of any Person including without limitation those actions (whether or not filed) set forth on Schedule 5.1(i), (ii) product Liabilities and (iii) product recalls or similar actions; and (B) any obligation or Liability arising out of or relating to the investigation and/or inspection by the Ontario Ministry of Labour, including payments required under any resulting or related offences, orders, charges or audits.

The Sellers and the Purchasers acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or otherwise shall not create an Assumed Liability or other Liability of the Purchasers, except where such disclosed Liability or obligation has been expressly assumed by the Purchasers as an Assumed Liability.

2.6    Identification of Additional and Excluded Contracts; Excluded Assets; Assumed Plans.

(a)    Subject to Section 2.8 below, on or before the Closing, the Purchasers may, from time to time, update Schedule 2.1(e), Schedule 2.3(a), Schedule 2.8(a)(i) or Schedule 2.8(a)(ii) to add or remove a Contract or Facility Lease to or from such Schedules. Any Contract added to Schedule 2.1(e) shall become an Acquired Contract, shall be deemed an Acquired Asset for all purposes of this Agreement, and all obligations arising under such Contract which would have been Assumed Liabilities if such Contract had been an Acquired Contract as of the date of this Agreement shall be Assumed Liabilities for all purposes of this Agreement subject to the provisions of Section 2.4(a). Any Contract removed from Schedule 2.1(e) and/or added to Schedule 2.3(a), and not added to Schedule 2.8(a)(i) or Schedule 2.8(a)(ii), shall become an Excluded Asset and shall not be an Acquired Contract for purposes of this Agreement and all liabilities and obligations under such Contract shall be Excluded Liabilities for all purposes of this Agreement, and the Sellers agree to give required notice to the parties to any such Contract or as otherwise reasonably requested by the Purchasers; provided that, if the Sellers have moved for the assumption of any such Contract with the Purchasers' prior written consent and an Order relating to the assumption of such Contract has been granted by the Bankruptcy Court and, if necessary as determined by the Purchaser in its sole and absolute discretion, the Canadian Court, the Purchasers shall have the obligations under Section 2.7 hereof as if such Contract was an Acquired Contract. For the avoidance of doubt, and subject to Section 2.8, no Contract shall be deemed an Acquired Contract until the Assignment Order and Assignment Recognition Order or a prior Order authorizing the assumption of such Contract has been entered by the Bankruptcy Court and, if necessary as determined by the Purchaser in its sole and absolute discretion, issued by the Canadian Court, and the Purchasers may remove any such Contract prior to entry of such Order, and the Purchasers shall not be liable for any cure costs with respect to any Contract until such Order is entered.

(b)    Subject to Section 2.8 below, on or before the Closing Date, the Purchasers may, from time to time, include or exclude any assets of the Sellers from the

Acquired Assets, including by updating Schedule 2.1(b), Schedule 2.1(g), Schedule 2.1(h), Schedule 2.1(o), Schedule 2.1(q), Schedule 2.3(e) or any other Schedule provided for in Section 2.1 and Schedule 2.8(a)(iii). Any such assets removed from Schedule 2.1(b), Schedule 2.1(g), Schedule 2.1(h), Schedule 2.1(o), Schedule 2.1(q) or any other Schedule provided for in Section 2.1 and/or added to Schedule 2.3(e), and not added to Schedule 2.8(a)(iii), shall become Excluded Assets and shall not be Acquired Assets for purposes of this Agreement.

(c)     On or before the Closing, the Purchasers may, from time to time, update Schedule 6.5(b)(i) and Schedule 6.5(b)(ii) by changing the status of a particular Employee Benefit Plan from an Assumed Plan to a Replicated Plan, or vice versa, with a corresponding change to the applicable Schedules. Any Employee Benefit Plan added to Schedule 6.5(b)(i) shall become an Assumed Liability, so that the sponsorship of and all liabilities and obligations arising under such Assumed Plan (other than any Liabilities arising from any breach of any representation, warranty, or covenant hereunder) shall be Assumed Liabilities for all purposes of this Agreement subject to the provisions of Section 2.4. Any Employee Benefit Plan removed from Schedule 6.5(b)(i) shall become an Excluded Liability for purposes of this Agreement and all Liabilities at any time arising under or in connection with such Employee Benefit Plan shall be Excluded Liabilities for all purposes of this Agreement.

2.7     Assumption of Acquired Contracts; Deemed Consents.

(a)     As of the Closing or the Assignment Effective Date, the Sellers shall assume pursuant to section 365(a) of the Bankruptcy Code and sell and assign to the Purchasers pursuant to sections 363(b), (f), and (m) and 365(f) of the Bankruptcy Code each of the Acquired Contracts and the Assigned Designated Remaining Contracts, as applicable. The Purchasers shall assume and thereafter in due course pay, fully satisfy, discharge and perform all of the obligations arising after such assignment under the Acquired Contracts and Assigned Designated Remaining Contracts, as applicable, pursuant to section 365 of the Bankruptcy Code.

(b)     If any default related to an Acquired Contract or any Assigned Designated Remaining Contracts exists on the Closing Date or the Assignment Effective Date, as applicable, the Purchasers shall (i) be responsible for any Cure Amounts related to such Acquired Contract and such Assigned Designated Remaining Contracts, as applicable, as a condition to the assumption and assignment of such Acquired Contract and such Assigned Designated Remaining Contracts and (ii) pay such amounts on the Closing Date or the Assignment Effective Date, as applicable, with respect to those Contracts and Assigned Designated Remaining Contracts assumed by the Sellers and assigned to the Purchasers on the Closing Date or the Assignment Effective Date, as applicable. Schedule 2.7(b) sets forth the Sellers' good faith estimate of the amounts necessary to cure, pursuant to section 365(b) of the Bankruptcy Code, each of the Contracts. For the avoidance of doubt, the Purchasers shall be responsible for all Cure Amounts in accordance with this Section 2.7(b) in the amounts determined by the Bankruptcy Court and such obligations shall not be limited to the estimated Cure Amounts set forth on Schedule 2.7(b).

(c)     If the consent required to effectuate the assignment of any Acquired Contract or Assigned Designated Remaining Contract, as applicable, to the Purchasers cannot be obtained pursuant to the Sale Order, the Assignment Order or other Order of the Bankruptcy

Court prior to the Assignment Effective Date in the case of an Assigned Designated Remaining Contract, then the Parties shall endeavor to obtain such consent pursuant to Section 6.1(a).

2.8     Disposition of Designated Remaining Contracts and Designated Remaining Assets.

(a)     Notwithstanding anything to the contrary in this Agreement:

(i)     Pursuant to the written notice of the Purchasers to the Sellers (and the Sellers providing such notice to the landlords of the affected premises, which notice the Sellers agree to so provide), which notice may be given from time to time, but not later than the 210th day after the Petition Date, each Facility Lease designated on Schedule 2.8(a)(i) (the "Designated Remaining Leases") shall either be assumed by the applicable Sellers and assigned to the applicable Purchaser on the Assignment Effective Date, or rejected by the applicable Sellers on the Rejection Effective Date, subject to Sections 2.8(a)(iv) and 2.8(a)(v) below.

(ii)    Pursuant to the written notice of the Purchasers to the Sellers (and the Sellers providing such notice to the counterparties to the affected Contract, which notice the Sellers agree to so provide), which notice may be given from time to time, but not later than the 210th day after the Closing Date, each Contract designated on Schedule 2.8(a)(ii) (the "Designated Remaining Executory Contracts" and, together with the Designated Remaining Leases, the "Designated Remaining Contracts") shall be either assumed by the applicable Sellers and assigned to the applicable Purchaser on the Assignment Effective Date, or rejected by the applicable Sellers on the Rejection Effective Date, subject to Sections 2.8(a)(iv) and 2.8(a)(v) below.

(iii)   Pursuant to the written notice of the Purchasers to the Sellers, which notice may be given from time to time, but not later than the 210th day after the Closing Date, each asset designated on Schedule 2.8(a)(iii) (the "Designated Remaining Assets") shall be either assigned to the applicable Purchaser as of the Assignment Effective Date or retained by the Sellers on the Rejection Effective Date, in each case, without further Order of the Bankruptcy Court or the Canadian Court.

(iv)    Upon delivery of any written notice by the Purchasers to the Sellers with respect to the assumption and assignment of any Designated Remaining Contract under Sections 2.8(a)(i) or 2.8(a)(ii) (each, an "Assigned Designated Remaining Contract"), the Sellers shall move within two (2) Business Days of receipt of such written notice to assume and assign such Designated Remaining Contract to the applicable Purchaser as set forth in the applicable notice and shall assume and assign to, and the applicable Purchaser shall accept the assignment of, and to assume, such Designated Remaining Contract on the Assignment Effective Date. Upon delivery of any written notice by the Purchasers with respect to the rejection of any Designated Remaining Contract under Sections 2.8(a)(i) or 2.8(a)(ii), the Sellers shall move within two (2) Business Days of receipt of such written notice to reject such Designated Remaining Contract. Furthermore, if the Purchasers give the Sellers written notice of the Purchasers' intention to take an assignment of any of the Designated Remaining Assets, each Designated Remaining Asset with respect to which such notice is given (each, an "Assigned Designated Remaining Asset") shall be assigned to the applicable Purchaser on the Assignment

Effective Date. In addition, in the event that the Purchasers have not provided a written notice to assume and assign or reject any Designated Remaining Contract pursuant to this Section 2.8(a) at least ten (10) Business Days prior to the 210th day after (i) the Petition Date with respect to any Designated Remaining Leases and (ii) the Closing Date with respect to any Designated Remaining Executory Contracts, then the Sellers may move to reject such Designated Remaining Contracts as of the 210th day after (i) the Petition Date with respect to any Designated Remaining Leases and (ii) the Closing Date with respect to any Designated Remaining Executory Contracts, and none of the Sellers shall have any obligation to assign any such Designated Remaining Contract to the Purchasers.

(v)     The Sellers shall request that by virtue of a Seller providing ten (10) Business Days notice of its intent to assume and assign or reject any Designated Remaining Contract, as applicable, the Bankruptcy Court deem any non-debtor party to such Designated Remaining Contract that does not file a timely objection with the Bankruptcy Court during such notice period to have given any required consent to the assumption and assignment or rejection, as applicable, of the Designated Remaining Contract by the Sellers, and the Sellers shall request that the Bankruptcy Court enter an order approving such assumption and assignment or rejection, as applicable, and that, if necessary as determined by the Purchaser in its sole discretion and absolute discretion, the Canadian Court recognize such Bankruptcy Court order. If a timely objection is properly filed and served in connection with the assignment and assumption or rejection of such Designated Remaining Contract, unless the parties agree otherwise in writing, a hearing will be scheduled at the convenience of the Bankruptcy Court to consider that objection; provided, however, that the Purchasers may, in their sole and absolute discretion, provide written notice to the Sellers that the Sellers must instead reject such Designated Remaining Contract that is subject to an objection at any time after such objection is filed and the Sellers shall move within two (2) Business Days of receipt of such written notice to reject such Designated Remaining Contract.

(b)     On the Assignment Effective Date for each Assigned Designated Remaining Contract and each Assigned Designated Remaining Asset, such Assigned Designated Remaining Contract and such Assigned Designated Remaining Asset shall be deemed an Acquired Contract and deemed scheduled on Schedule 2.1(e) and an Acquired Asset and deemed scheduled on Schedule 2.1(o), respectively, for all purposes under this Agreement. On the Rejection Effective Date for each non-Assigned Designated Remaining Contract and each non-Assigned Designated Remaining Asset, such non-Assigned Designated Remaining Contract and each non-Assigned Designated Remaining Asset shall be deemed an Excluded Asset for purposes of this Agreement.

(c)     From the Closing Date through the Assignment Effective Date or the Rejection Effective Date for each Designated Remaining Lease, the Sellers shall provide the Purchasers with full and complete access to the premises of such Designated Remaining Lease. Following the Closing Date and through the Assignment Effective Date or the Rejection Effective Date for each Designated Remaining Contract and each Designated Remaining Asset, the Purchasers shall (i) pay, and shall be solely responsible for, any and all liabilities associated with each Designated Remaining Contract and each Designated Remaining Asset, provided, however, subject to the Purchasers' obligations and limitations under Section 2.7(b), the Purchasers shall not be responsible for any Liabilities relating to or arising out of such

Designated Remaining Contracts and such Designated Remaining Assets as a result of (A) any breach by the Sellers of such Designated Remaining Contracts and Designated Remaining Assets occurring on or prior to the Closing Date or from the Closing Date through the Assignment Effective Date or the Rejection Effective Date (provided that such breach is not caused by the breach by the Purchasers of its obligations under this Section 2.8), (B) any violation of Law, breach of warranty, tort or infringement, in each case by the Sellers, occurring on or prior to the Closing Date or from the Closing Date through the Assignment Effective Date or the Rejection Effective Date (provided that such violation is not caused by any act or omission of the Purchasers after the Closing), or (C) any charge, complaint, action, suit, proceeding, hearing, investigation, Claim or demand against the Sellers (provided that such matters do not arise from the act or omission of the Purchasers after the Closing), and (ii) pay to the Sellers an amount equal to the costs and expenses required to be paid by the Sellers after the Closing in performing obligations under the Designated Remaining Contracts and the Designated Remaining Asset, if any, through the Assignment Effective Date or Rejection Effective Date, as the case may be, as and when such amounts become due. In addition, the Purchasers shall perform, or shall cause to be performed, any and all obligations of the Sellers under each Designated Remaining Contract and each Designated Remaining Asset relating to the period from and after the Closing until such each Designated Remaining Contract and each Designated Remaining Asset has been, in accordance with this Section 2.8, (i) assumed and assigned to the Purchasers or (ii) rejected by the applicable Seller, as applicable.

(d)     With respect to any Designated Remaining Contract and Designated Remaining Asset, upon written notice(s) from the Purchasers, as soon as practicable, the Sellers shall take all actions reasonably necessary to assume and assign any Designated Remaining Contract to the applicable Purchaser pursuant to section 365 of the Bankruptcy Code (provided that any applicable cure cost shall be satisfied in accordance with Section 2.7 hereof) and assign any Designated Remaining Asset to the applicable Purchaser, in each case, as set forth in the Purchasers' notice(s).

(e)     The Sellers agree and acknowledge that (i) after the Execution Date and prior to the 210th day after (A) the Petition Date with respect to any Designated Remaining Lease and (B) the Closing Date with respect to any Designated Remaining Executory Contract or Designated Remaining Asset, the Sellers shall not terminate, assume, reject, amend, supplement, modify any Designated Remaining Contract or Designated Remaining Asset, or take any affirmative action not required by the terms thereof by any of the Sellers, without the prior written consent of the Purchasers and (ii) the covenants set forth in this Section 2.8(e) shall survive the Closing.

ARTICLE III

CONSIDERATION

3.1     Consideration.

(a)     Acquired Assets.  The aggregate consideration for the Acquired Assets (the "Purchase Price") shall be equal to the following, as calculated on the Closing Date:

(i)	an amount (the "Credit Bid Amount") equal to the sum of (x) $80,000,000 (the "US Bid Amount"), plus (y) the Canadian Credit Bid Amount; plus

(ii)	an amount in cash equal to $302,000 (Canadian currency) (the "Canadian Cash Bid Amount"); plus

(iii)	all Cure Amounts paid or to be paid hereunder by the Purchasers; plus

(iv)	the Assumed Liabilities.

(b)	German Assets. The aggregate purchase price for the German Assets shall be $20,000 (the "German Assets Consideration") plus the assumption of the Assumed German Obligations.

3.2	Payment of the Credit Bid Amount, Canadian Cash Bid Amount and the German Assets Consideration at Closing. At the Closing:

(a)	The portion of the Purchase Price constituting the Credit Bid Amount shall be payable, in the Purchasers' sole discretion, as follows:

(i)	first, with respect to obligations of any kind outstanding under the DIP Credit Agreement in an aggregate amount equal to the DIP Amount, by (x) delivering to (A) the Sellers (other than the Foreign Seller) fully executed releases and waivers from the lender under the DIP Credit Agreement of the aggregate amount of the US DIP Amount and (B) the Foreign Seller fully executed releases and waivers from the lender under the DIP Credit Agreement of the aggregate amount of the Canadian DIP Amount and/or (y) with the written consent of the lenders under the DIP Credit Agreement, assuming the Sellers' obligations with respect to the DIP Amount on terms reasonably acceptable to the Purchasers; and

(ii)	second, with respect to the remainder of the Credit Bid Amount (and without duplication), by (x) delivering to the Sellers fully executed releases and waivers from the lenders under the Pre-Petition Credit Agreement with respect to obligations thereunder in an aggregate amount equal to the Pre-Petition Secured Amount and/or (y) with the written consent of the lenders under the Pre-Petition Credit Agreement, assuming the Sellers' obligations under the Pre-Petition Credit Agreement with respect to obligations thereunder in an aggregate amount equal to the Pre-Petition Secured Amount on terms reasonably acceptable to the Purchasers.

(b)	The Foreign Purchaser shall deliver or cause to be delivered the Canadian Cash Bid Amount to PricewaterhouseCoopers Inc., in its capacity as Information Officer appointed pursuant to the Order of the Canadian Court ("Information Officer"), to be held in a segregated trust account to fund the cost of administering the bankruptcy estate of the Foreign Seller in the event of a bankruptcy of the Foreign Seller or to distribute to creditors only under an Order of the Canadian Court or pursuant to the *Bankruptcy and Insolvency Act* (Canada). For greater certainty, the Foreign Purchaser shall not have any obligation to fund additional costs of administering the bankruptcy estate of the Foreign Seller.

(c)     The US Purchaser shall deliver or cause to be delivered to BBH, GmbH the German Assets Consideration, plus any value added tax, to the extent required under applicable Law.

ARTICLE IV

CLOSING

4.1     Closing.  The consummation of the transactions contemplated hereby (the "Closing") shall take place at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, or such other location that is acceptable to the Purchasers and the Sellers, on the first Business Day following the satisfaction or waiver by the Sellers or the Purchasers, as applicable, of all the conditions contained in Article VIII or on such other date or at such other place and time as may be mutually agreed to by the Parties (the "Closing Date").  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.  The Parties shall use their commercially reasonable efforts to consummate the transactions contemplated hereby within twenty-two (22) calendar days after (i) the Bankruptcy Court enters the Sale Order approving the sale to the Purchasers, and (ii) the Canadian Court issues the Sale Recognition Order.  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

4.2     Sellers' Deliveries.  At the Closing and the Assignment Effective Date, the Sellers shall (a) sell, transfer, assign, convey and deliver the Acquired Assets to the Purchasers (or their respective designees) by bills of sale, endorsements, assignments and other instruments of transfer and conveyance reasonably satisfactory in form and substance to counsel for the Purchasers (or their respective designees) and (b) deliver to the Purchasers the various certificates, consents, and documents referenced in Section 8.2 hereof.

4.3     Purchasers' Deliveries.  At the Closing, the Purchasers (or their respective designees) shall deliver to (a) the Sellers (i) the Assignment and Assumption and the German Asset Transfer Agreement each duly executed by the Purchasers, (ii) the various certificates, consents, and documents referenced in Section 8.1 hereof and (iii) any releases or waivers required to be delivered pursuant to Section 3.2 of this Agreement (to the extent the Purchasers elect to pay any portion of the Purchase Price pursuant to subclause (x) of Sections 3.2(a)(i) and/or 3.2(a)(ii)) (b) the Foreign Seller, the Canadian Cash Bid Amount and, if applicable (to the extent the Foreign Purchaser elects to pay any portion of the Canadian Credit Bid Amount pursuant to clause (x) of Section 3.2(a)(i)), any and all releases or waivers of the Canadian DIP Amount and (c) BBH, GmbH, the German Assets Consideration, plus any value added tax, to the extent required under applicable Law.

4.4     BBH, GmbH Deliveries.  At the Closing, BBH, GmbH shall sell, transfer, assign, convey and deliver the German Assets to the US Purchaser pursuant to German Asset Transfer Agreement and shall deliver to US Purchaser the German Asset Transfer Agreement.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

5.1     Representations and Warranties of the Sellers.  The US Sellers hereby jointly and severally represent and warrant to the Purchasers with respect to the matters set forth below that relate to such US Sellers, and the Foreign Seller hereby represents and warrants to the Purchasers, the matters set forth below that relate to the Foreign Seller:

(a)     Corporate Organization.  Each Seller is a corporation, limited liability company or other applicable business entity, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its formation.  Each Seller has all requisite corporate or company power and authority to own its properties and assets and to conduct its businesses as now conducted.

(b)     Qualification to Conduct Business.  Each Seller is duly qualified or licensed to do business and is in good standing (if applicable) in every jurisdiction in which the character of the properties owned or leased by it or the nature of the businesses conducted by it makes such qualification necessary except where the failure to be so qualified would not reasonably be expected to result in a Material Adverse Effect.

(c)     Authorization and Validity.  Each Seller has, or on the Closing Date will have, as applicable, all requisite corporate or company power and authority to enter into this Agreement and any Ancillary Agreements to which such Seller is or will become a party and to consummate the transactions contemplated hereby or thereby and, subject to the (i) Bankruptcy Court's entry of the Bankruptcy Orders, (ii) the Canadian Court's entry of the Recognition Orders and (iii) receipt of all Consents to perform its obligations hereunder and thereunder, the execution and delivery of this Agreement and each Ancillary Agreement to which such Seller is or will become a party and the performance of such Seller's obligations hereunder and thereunder, have been, or on the Closing Date will be, duly authorized by all necessary corporate or company action of such Seller, and no other corporate or company proceedings on the part of such Seller are necessary to authorize such execution, delivery and performance.  This Agreement and each Ancillary Agreement to which such Seller is or will become a party have been, or on the Closing Date will be, duly executed by such Seller, and, subject to the Bankruptcy Court's entry of the Bankruptcy Orders and the Canadian Court's entry of the Recognition Orders, constitute, or will when executed and delivered constitute, such Seller's valid and binding obligation, enforceable against such Seller in accordance with their respective terms.

(d)     Reports; Financial Statements; Inventory.

(i)     Attached hereto as Schedule 5.1(d)(i) are true and complete copies of the following financial statements (such financial statements, the "Financial Statements"):

28

(A) the audited consolidated and consolidating balance sheets of the Company Group as of December 31, 2008, and the related audited consolidated and consolidating statements of income for the fiscal year then ended; (B) the audited consolidated and consolidating balance sheets of the Company Group as of December 31, 2009 (the "Latest Balance Sheet"), and the related audited consolidated and consolidating statements of income for the fiscal year then ended; (C) the unaudited consolidated and consolidating balance sheets of the Company Group as of December 31, 2010, and the related unaudited consolidated and consolidating statements of income for the fiscal year then ended; (D) the unaudited consolidated and consolidating balance sheets of the Company Group as of January 31, 2011, and the related unaudited consolidated and consolidating statements of income for the one-month period then ended; and (E) the unaudited balance sheets of the Foreign Seller as of December 31, 2010 and March 31, 2011, and the related unaudited statements of income for the twelve month period ended December 31, 2010 and the three-month period ended March 31, 2011. Except as set forth on Schedule 5.1(d)(i), the Financial Statements (i) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, except as may be indicated in the notes thereto and subject, in the case of unaudited Financial Statements, to the absence of footnotes and normal year-end adjustments and (ii) presents fairly, in all material respects, the consolidated financial position and results of operations and cash flows of, as applicable, the Company Group or the Foreign Seller as of the respective dates or for the respective periods set forth therein and have been prepared on a consistent basis.

(ii)    The Inventory of the Sellers (A) has been disposed of subsequent to the Latest Balance Sheet only in the ordinary course of business, (B) consists in all material respects of materials and goods useable and saleable in the ordinary course of business (taking into account the quantity and quality of the Inventory) and (C) is valued at lower of cost or market less applicable valuation reserves all in accordance with GAAP.

(iii)    Except as set forth on Schedule 5.1(d)(iii), all Accounts Receivable of the Sellers constitutes a bona fide receivable resulting from a bona fide sale or service performed to or for a customer in the ordinary course of business.

(e)    No Conflict or Violation. Subject to the receipt of, and based upon, the Bankruptcy Court's entry of the Bankruptcy Orders and the Canadian Court's entry of the Recognition Orders, the execution, delivery and performance by the Sellers of this Agreement and each Ancillary Agreement to which any of them is or will become a party does not and will not (A) violate or conflict with any provision of the organizational documents of the Sellers or (B) violate any provision of Law, or any Order, judgment or decree of any Governmental Authority applicable to any Seller.

(f)    Consents and Approvals. With the exception of any notices, filings, consents, waivers, authorization or approvals relating to Contracts other than the Material Contracts, Schedule 5.1(f) sets forth a true and complete list of each notice to, filings with, consent, waiver, authorization, or approval of any Governmental Authority or any other Person that is required to be obtained or given by any Seller in connection with the execution and delivery by it of this Agreement and each Ancillary Agreement to which it is or will become a party or the performance by it of its obligations hereunder or thereunder (any of the foregoing, a "Consent" and collectively, the "Consents").

(g)     Litigation. Except as set forth on Schedule 5.1(g) and any objections, proofs of claim, contested matters, or adversary Proceedings pending in the Bankruptcy Case and the CCAA Proceedings, there are no Claims, Proceedings or orders pending, or, to the Knowledge of the Sellers, threatened, by or before (or that could come before) any Governmental Authority against any member of the Company Group or that, if adversely determined, could reasonably be expected to be material to the Sellers or affect the ability of the Sellers to consummate the transactions contemplated by this Agreement and each Ancillary Agreement or otherwise materially affect the Business.

(h)     Title to Acquired Assets. Subject to the entry of the Sale Order and the Sale Recognition Order, at the Closing, the Purchasers will obtain good and marketable title to or a valid and enforceable right by Contract to use, the Acquired Assets which shall be transferred to the Purchasers free and clear of all Liens, Claims and Interests. Except as otherwise provided herein, THE SELLERS ARE SELLING THE ACQUIRED ASSETS ON AN "AS IS" "WHERE IS" BASIS AND THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES CONCERNING THE ACQUIRED ASSETS OF ANY NATURE OR KIND WHATSOEVER, AND DISCLAIM ALL EXPRESS AND IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(i)     Intellectual Property. To the Knowledge of the Sellers, Schedule 5.1(i) sets forth a true and complete list of all material registered or applied for Intellectual Property, including Patents, Trademarks and Copyrights, owned, licensed or used by the Sellers and separately identifies all of the Intellectual Property owned, licensed or used by BBH, GmbH. Except as set forth on Schedule 5.1(i), the Sellers own, free and clear of all Liens, license or otherwise have a right to use the Intellectual Property used or necessary for the conduct of the Business of the Company Group as currently conducted (collectively, the "Company Group IP Rights") and immediately subsequent to the Closing the Purchasers shall own or have the right to use, free and clear of all Liens, all Intellectual Property owned, licensed or used by the Sellers and BBH, GmbH including without limitation the Company Group IP Rights. The Company Group IP Rights owned by any Seller or BBH, GmbH are in full force and effect and have not been used or enforced or failed to be used or enforced in a manner that would result in the abandonment, cancellation or unenforceability of any of such Company Group IP Rights. Except as set forth on Schedule 5.1(i), (A) there is not currently pending against any Seller or BBH, GmbH any Proceeding brought by any third party before any Governmental Authority (X) contesting the validity, enforceability, use or ownership of any material Company Group IP Right owned by any Seller or BBH, GmbH or (Y) alleging that any Seller or BBH, GmbH is infringing, misappropriating, diluting or otherwise conflicting with any Intellectual Property of any third party and to the Knowledge of Sellers, there are no facts that indicate a likelihood of any of the foregoing and no Seller has received any notice or other communication regarding any of the foregoing (including any demands or offers to license any Intellectual Property from any third party) and (B) no third party is infringing, misappropriating or diluting any Company Group IP Rights owned by the Sellers or BBH, GmbH. To the Knowledge of Sellers, no third party has infringed, misappropriated, diluted or otherwise conflicted with any of the Company Intellectual Property and, to the Knowledge of Sellers, there are no facts that indicate a likelihood of any of the foregoing. Immediately subsequent to the Closing, the Company Group IP Rights will be owned by or available for use by the Purchasers on terms and conditions

identical to those under which the Sellers owned or used the Company Intellectual Property immediately prior to the Closing. Except as set forth on Schedule 5.1(i), no Seller is a party to, or bound by, whether written or oral, any agreement relating to the licensing of Intellectual Property by any Seller to a third party or by a third party to any Seller (other than unmodified off-the-shelf software) or any other agreements affecting Sellers' ability to use or disclose any Intellectual Property, or any contract which prohibits it from freely engaging in business anywhere in the world.

(j)     Permits and Licenses; Compliance with Laws.  Schedule 5.1(j) sets forth a true and complete list of all material Permits and Licenses, and all pending applications therefor held by any Seller.  Except as set forth on Schedule 5.1(j), all material Permits and Licenses are legally transferrable to the Purchasers (including pursuant to the Bankruptcy Orders and the Recognition Orders).  Except as set forth on Schedule 5.1(j), each Seller has, in all material respects, complied with and is in material compliance with, and are not in default in any respect with, all applicable material Laws, and no claims have been filed against any Seller alleging a violation of any such Laws, and no Seller has received written notice of any such violations.

(k)     Real Property. Schedule 5.1(k) lists all of the Facilities of the Sellers and a description of the real property leased thereby.  No Seller owns any real property.  BBH, GmbH does not own or lease any real property or own any real property interest in the United States within the meaning of section 897 of the Code.  No Seller has leased or granted to any Person any interest in or the right to use or occupy any Leased Facility that will not otherwise be terminated on or prior to the Closing Date.

(l)     Contracts.  Except as set forth on Schedule 5.1(l), as of the date of this Agreement, no Seller is a party to or bound by any (A) employment Contracts, (B) collective bargaining agreements or other agreements with any union or other collective bargaining representative or (C) any Contract involving more than $500,000 in annual obligations of, or receipts to, any Seller (the "Material Contracts").  The Facility Leases shall also be deemed a Material Contract for the purposes of this Agreement.

Except as set forth on Schedule 5.1(l), each Material Contract is valid and binding on the applicable Seller and enforceable in accordance with its terms against such Seller and, to the Knowledge of the Sellers, each other party thereto (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting generally the enforcement of creditors' rights and subject to general principles of equity).  Except as set forth on Schedule 5.1(l), no Seller is in default in any material respect under any Material Contract and to the Knowledge of the Sellers, the other party to each of the Material Contracts in not in material breach thereunder.

(m)     Labor and Employment Matters.  Except as set forth on Schedule 5.1(m), with respect to the Business: (i) there are no pending, or to the Knowledge of the Sellers threatened, labor or employment Proceedings that, if adversely determined, would be material to the Business; (ii) none of the Sellers is a party to any collective bargaining agreement; (iii) to the Knowledge of the Sellers, no union organizing efforts are underway or threatened; (iv) there is no strike, slowdown, work stoppage, lockout or other material labor dispute underway, or to the Knowledge of the Sellers, threatened, and no such job action has occurred in the past five (5) years; (v) with respect to this transaction, any notice required under any Law or Contract has

been given, and all bargaining obligations with any employee representative have been, or prior to the Closing will be, satisfied; and, (vi) within the past three (3) years, the Sellers have not implemented any plant closing or layoff of employees that could implicate the WARN Act or similar Law in Canada.

(n)     Employee Benefit Plans.  Schedule 5.1(n)(i) lists all of the Employee Benefit Plans.  The Sellers have provided to the Purchasers access to true and correct copies of the Employee Benefit Plans and all material documents pursuant to which such plans are maintained, funded and administered.  Each Employee Benefit Plan has been maintained, funded and administered in accordance with its terms and the requirements of ERISA and the Code and all applicable Laws, and except as set forth on Schedule 5.1(n)(ii), with respect to each Employee Benefit Plan all employee and employer contributions, distributions, reimbursements, and all premium payments for all periods ending prior to or on the Closing shall have been made or paid.  The Sellers and their Affiliates have complied and are in compliance with the requirements of COBRA.  Except as set forth on Schedule 5.1(n)(iii), no Seller has any obligation to provide any post-employment or post-termination welfare or welfare-type benefits (including any post retirement medical, dental or life insurance benefits) to any Person (each a "Retiree Medical Plan") and the Sellers have retained the right under each Retiree Medical Plan to amend, modify or terminate such Retiree Medical Plan in their sole discretion.  No Seller has any Liability with respect to any "multiemployer plan" (as defined in section 3(37) of ERISA) or any "multi-employer pension plan" as defined in the *Pension Benefits Act* (Ontario) or other applicable Laws in Canada.  None of the Employee Benefit Plans applicable to the Foreign Seller or its employees is a defined benefit pension plan.

(o)     BBH, GmbH.  Except for those Liabilities, assets and Contracts set forth on Schedule 5.1(o), BBH, GmbH (i) does not have any Liabilities (contingent or otherwise), (ii) is not a party to any Contract and (iii) does not own, license or lease any assets.

(p)     Subsidiaries.  Schedule 5.1(p) sets forth for each Subsidiary of BBH Holdings, its name and jurisdiction of organization.  No Subsidiary of BBH Holdings controls directly or indirectly or has any direct or indirect equity participation, or right to acquire any equity participation, in any Person that is not a Subsidiary of BBH Holdings.

(q)     Tax Matters.  Except as set forth on Schedule 5.1(q): (i) each Seller has prepared and duly filed with the appropriate domestic federal, state, provincial, local and foreign taxing authorities all material Tax Returns required to be filed with respect to such Seller and each such Tax Return is true, correct, and complete in all material respects, and each Seller has timely paid all material Taxes, including all installments of account of Taxes for the current year, owed or payable by such Seller; (ii) no Seller is currently the subject of a Tax audit or examination; (iii) no Seller has consented to extend the time, or is the beneficiary of any extension of time, in which any Tax may be assessed or collected by any taxing authority; (iv) no Seller has received from any taxing authority any written notice of proposed adjustment, deficiency, underpayment of Taxes or any other such written notice which has not been satisfied by payment or been withdrawn; (v) no written claim has been received within the past two (2) years by any Seller from such any taxing authority in a jurisdiction where any Seller does not file Tax Returns that such Seller is or may be subject to taxation by that jurisdiction; (vi) there are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of any Seller;

(vii) each Seller has duly and timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any Person; (viii) each Seller has duly and timely paid, collected and remitted all amounts on account of any sales or transfer taxes, including goods and services, harmonized sales and state, provincial and territorial sales taxes, required by Law to be paid, collected or remitted by it; (ix) no Seller has been a member or an affiliated group filing a consolidated federal Income Tax Return (other than a group the common parent of which was the BBH Holdings); and (x) no Seller is nor has been a party to any "listed transaction," as defined in section 6707A(c)(2) of the Code and Treasury Regulation 1.6011-4(b)(2).

(r) <u>Insurance</u>. The Company Group's assets are insured under insurance policies and bond and surety arrangements ("<u>Insurance Policies</u>") that, taken together, shall provide adequate insurance coverage to such assets through the Closing consistent with industry standards. All such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date will have been paid, no notice of cancellation or termination has been received by any Seller with respect to any such policy, and, to the Knowledge of the Sellers, each Seller has reported all claims to the respective insurance carriers. <u>Schedule 5.1(r)</u> contains a list of all Insurance Policies owned or held by the Sellers as of the Execution Date. Except as set forth on <u>Schedule 5.1(r)</u>, no Seller has made any claim under any Insurance Policies during the two (2) year period prior to the date of this Agreement with respect to which an insurer has, in a written notice to a Seller, questioned, denied or disputed or otherwise reserved its rights with respect to coverage.

(s) <u>Environmental Matters</u>. Except as set forth on <u>Schedule 5.1(s)</u>, (i) each Seller, with respect to the Acquired Assets, has at all times complied with, and are in compliance in all material respects with, all Environmental Laws (which compliance has included obtaining and complying with all permits, licenses and other authorizations required pursuant to Environmental Laws ("<u>Environmental Permits</u>"); and (ii) no Seller has received any written notice, report or other information regarding any actual or alleged violation of Environmental Laws, relating to any Seller, or any Seller's current or former Facilities, properties or assets, in each case under clause (i) and (ii) above, other than any such non-compliance or actual or alleged violations that would not reasonably be expected to cause a Material Adverse Effect.

(t) <u>Affiliated Transactions</u>. Except as disclosed on <u>Schedule 5.1(t)</u>, neither BBH, GmbH nor any Insider is a party to any Contract, commitment or transaction with any Seller or has any interest in the Acquired Assets or any property, real or personal or mixed, tangible or intangible of any Seller.

(u) <u>Relationships with Customers and Suppliers</u>. <u>Schedule 5.1(u)</u> sets forth for the Sellers and BBH, GmbH a true and accurate list of (i) the names and addresses of the top ten (10) customers of the Sellers (on a consolidated basis) and BBH, GmbH (by dollar volume of sales or service to such customers) and (ii) a list of the names and addresses of the top ten (10) suppliers of the Sellers (on a consolidated basis) and BBH, GmbH (by dollar volume of purchases from such suppliers), for the fiscal years ended within the last two (2) years.

(v) <u>Product Liability</u>. There is no Proceeding pending against any Seller relating to any Liability arising out of any injury to individuals or property as a result of the

ownership, possession, or use of any product manufactured, sold, leased, delivered or serviced by any Seller.

(w)     Absence of Certain Developments. Except as set forth on Schedule 5.1(w) and except as expressly contemplated by this Agreement, since the date of the Latest Balance Sheet, no member of the Company Group has taken any action that would require the consent of the Purchasers pursuant to Section 6.1(b).

(x)     Absence of Undisclosed Liabilities. Except as disclosed on Schedule 5.1(x) and to the Knowledge of the Sellers, no Seller has any Liabilities except (i) Liabilities reflected on the liabilities side of the Latest Balance Sheet and (ii) Liabilities which have arisen after the date of the Latest Balance Sheet in the ordinary course of business or otherwise in accordance with the terms and conditions of this Agreement.

(y)     Residence of the Foreign Seller. The Foreign Seller is not a non-resident of Canada for the purposes of the *Income Tax Act* (Canada).

(z)     No Taxable Canadian Property. No Acquired Asset of any US Seller is taxable Canadian property to such US Seller for purposes of the *Income Tax Act* (Canada).

(aa)     Goods and Services Tax and Harmonized Sales Tax Registration. The Foreign Seller is duly registered under Subdivision (d) of Division V of Part IX of the *Excise Tax Act* (Canada) with respect to the goods and services tax and harmonized sales tax and under Division I of Chapter VIII of Title I of the Quebec Sales Tax Act with respect to the Quebec sales tax, and its registration numbers are GST/HST 86531 6418 RT0001 and QST 1089058470TQ000.

5.2    Representations and Warranties of Purchasers. The Purchasers hereby represent and warrant to the Sellers as follows:

(a)     Corporate Organization. Each Purchaser is a limited liability company or corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, and has all requisite corporate or company power and authority to own its properties and assets and to conduct its businesses as now conducted.

(b)     Authorization and Validity. Each Purchaser has, or on the Closing Date will have, all requisite company or corporate power and authority to enter into this Agreement and any Ancillary Agreement to which the Purchasers are or will become a party and to perform their obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which the Purchasers are or will become a party and the performance of the Purchasers' obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate or company action by the Purchasers, and no other corporate or company proceedings on the part of the Purchasers are necessary to authorize such execution, delivery and performance. This Agreement and each Ancillary Agreement to which the Purchasers are or will become a party have been, or on the Closing Date will be, duly executed by the Purchasers and constitute, or will constitute, when executed and delivered, the Purchasers' valid and binding obligations, enforceable against them

in accordance with their respective terms except as may be limited by bankruptcy or other laws affecting creditors' rights and by equitable principles.

(c)    No Conflict or Violation. The execution, delivery and performance by the Purchasers of this Agreement and any Ancillary Agreement to which the Purchasers are or will become parties do not and will not (i) violate or conflict with any provision of the organizational and governing documents of the Purchasers, (ii) violate any provision of Law, or any Order, judgment or decree of any court or Governmental Authority applicable to the Purchasers or (iii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which the Purchasers are party or by which the Purchasers are bound that could reasonably be expected to interfere with or impair the Purchasers' ability to consummate the transactions contemplated hereunder.

(d)    Consents and Approvals. Other than the entry of the Sale Order, the Sale Recognition Order and any Governmental Filings and Approvals, including the expiration or early termination of any waiting period under the HSR Act and a post-Closing notice required under the Investment Canada Act, no consent, waiver, authorization or approval of any Person and no declaration to or filing or registration with any Governmental Authority is required in connection with the execution and delivery by the Purchasers of this Agreement and each Ancillary Agreement to which the Purchasers are or will become a party or the performance by the Purchasers of their obligations hereunder or thereunder.

(e)    Acquisition Funds. The Purchasers have and will have at Closing sufficient funding to enable the Purchasers to consummate the purchase of the Acquired Assets from the Sellers hereunder and to perform the Purchasers' obligations under this Agreement, including without limitation ownership (either directly or through one or more Affiliates of Purchasers) of claims in respect of the Pre-Petition Secured Amount and/or the DIP Amount sufficient to permit the Purchasers to tender the purchase consideration and the releases called for in Article III hereof (to the extent that Purchasers elect to satisfy all or a portion of the Purchase Price in accordance with clause (x) of Section 3.2(a)(i) or (ii)). The Purchasers (either directly or through one or more Affiliates of the Purchasers) have and will have at Closing the power and authority, pursuant to the Pre-Petition Credit Agreement, to direct the agent under the Pre-Petition Credit Agreement, with respect to Pre-Petition Credit Facility and the Pre-Petition Secured Amount, to take the actions necessary for the Purchasers to perform their purchase and release obligations called for to satisfy the Purchase Price in accordance with Article III hereof.

(f)    Authority to Credit Bid and Direct Pre-Petition Agent. The Purchasers have, as of the Execution Date, all requisite power and authority to direct the agent under the Pre-Petition Credit Agreement, to credit bid the Pre-Petition Secured Amount hereunder in accordance with the terms of the Pre-Petition Credit Agreement and any ancillary documents related thereto.

5.3    Brokerage and Finder's Fees. None of the Purchasers, their Affiliates, nor any of their officers or directors has any Liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement.

## ARTICLE VI

## COVENANTS AND OTHER AGREEMENTS

6.1    <u>Pre-Closing Covenants of the Sellers</u>. The Sellers covenant to the Purchasers that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)    <u>General</u>. Each of the Sellers shall use commercially reasonable efforts subject to the orders of the Bankruptcy Court and the Canadian Court to take all action and to do all things necessary, proper, advisable, or reasonably requested by the Purchasers in order to consummate and make effective the transactions contemplated by this Agreement, including but not limited to (i) obtaining the Bankruptcy Orders and the Recognition Orders without modification except as the Purchasers may consent, (ii) satisfaction of the Closing conditions set forth in <u>Article VIII</u> below, (iii) to make, as reasonably requested by the Purchasers, all filings, applications, statements and reports to all Governmental Authorities that are required to be made prior to the Closing Date by or on behalf of the Sellers or any of their Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby and (iv) to obtain, as requested by the Purchasers, all required consents and approvals (if any) necessary to assign and transfer the Acquired Assets and the Sellers' Permits and Licenses (including all Environmental Permits) to the Purchasers at Closing and, to the extent that one or more of the Sellers' Permits and Licenses (including all Environmental Permits) or Acquired Assets are not transferable, to assist the Purchasers in obtaining replacements therefor. In the event that certain of the Sellers' Permits and Licenses (including all Environmental Permits), or any Contract or other license or agreement used in the operation of the Business, are not transferable or replacements therefor are not obtainable on or before the Closing, the Sellers shall continue to use such commercially reasonable efforts in cooperation with the Purchasers after the Closing as may be required to obtain all required consents and approvals to transfer, or obtain replacements for, such Permits and Licenses, Contracts or other agreements after Closing and provide the Purchasers with the rights and benefits (subject to the obligations) under any such Permits and Licenses, Contracts or other license or agreements; <u>provided</u> that Sellers' failure to do so successfully after the Closing shall not, in and of itself, constitute a breach of this Agreement. The Purchasers shall give any other notices to, make any other filings with, and use commercially reasonable efforts to cooperate with the Sellers to obtain, any other authorizations, consents and approvals in connection with the matters contemplated by this <u>Section 6.1(a)</u>.

(b)    <u>Operation of Business</u>. Subject to any restrictions and obligations imposed by (i) the Bankruptcy Code and the Bankruptcy Court and its Orders; and (ii) the CCAA, the Canadian Court and its Orders, none of the Sellers will, and the Sellers will cause BBH, GmbH not to, engage in any practice, take any action, or enter into any transaction outside the ordinary course of business (excluding the entry into this Agreement and the Ancillary Agreements and the actions expressly provided for hereby and thereby), including making any changes to or amendments of any Employee Benefit Plan or Material Contract, or selling, leasing, transferring, licensing or otherwise disposing of any Acquired Assets (including the Company Group IP Rights) and will continue to operate the Business in the ordinary course of business.

Notwithstanding anything to the contrary above, with the mutual consent of BBH and the Purchasers, the Sellers may (i) terminate Contracts related to the Excluded Assets or (ii) lay off employees.

(c) <u>Access to Records and Properties</u>. The Purchasers shall be entitled, and the Sellers and BBH, GmbH shall permit the Purchasers, to conduct such investigation of the condition (financial or otherwise), businesses, assets, properties or operations of the Sellers and BBH, GmbH as the Purchasers shall reasonably deem appropriate. The Sellers and BBH, GmbH shall (A) provide the Purchasers and their representatives access at any reasonable time during normal business hours to all the facilities, offices and personnel of the Sellers and to all of the Books and Records of the Sellers and BBH, GmbH, including, without limitation, to perform field examinations and inspections of the Sellers' Inventory, facilities, equipment and other assets and properties; and (B) cause the Sellers' representatives to furnish the Purchasers with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations as the Purchasers shall reasonably request; <u>provided, however</u>, that the Purchasers and their representatives shall (x) coordinate all requests for access and information with the Chief Executive Officer or Chief Financial Officer of BBH and (y) use all commercially reasonable efforts to prevent any such investigation from unreasonably interfering with the operation of the businesses of the Sellers and BBH, GmbH. The Sellers shall promptly deliver to the Purchasers copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed by the Sellers in their Bankruptcy Case and the CCAA Proceedings as the Purchasers shall reasonably request.

(d) <u>Notice of Certain Events</u>. The Sellers shall promptly notify the Purchasers of, and furnish the Purchasers any information it may reasonably request with respect to, (i) the occurrence or nonoccurrence of any event or condition or the existence of any fact that would reasonably be expected or likely to cause either (A) any of the conditions to the Purchasers' obligations to consummate the transaction(s) contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled, (B) any material breach or inaccuracy of any representation or warranty contained in <u>Section 5.1</u> hereof, or (C) directly or indirectly, any Material Adverse Effect on any Seller, or (ii) the receipt of any proposal for an Alternative Transaction and shall deliver all written proposals for an Alternative Transaction to the Purchasers. Notwithstanding the foregoing, the delivery of any notice pursuant to this <u>Section 6.1(d)</u> shall not (x) be deemed to amend or supplement any of the Schedules contemplated hereby, (y) be deemed to cure any breach of any representation, warranty covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

(e) <u>Schedules</u>. The Sellers' may, at their discretion, include in the Schedules required pursuant to <u>Section 5.1</u> hereof, items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, will not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information required to be disclosed in one section of the Schedules will not suffice for disclosure in another section of the Schedules unless the applicability of such information to such other section is readily apparent from the face of the disclosure.

(f)     Financial Statements.  Beginning with the end of the month in which this Agreement is entered into, the Sellers shall deliver to the Purchasers within thirty (30) days after the end of each month, (i) unaudited consolidated and consolidating balance sheets and the related statements of income and cash flows of the Company Group and (separately) the Foreign Seller, prepared in form and substance consistent with the past practice of the Sellers, (ii) updated thirteen-week cash flows for the Company Group and (separately) the Foreign Seller, and (iii) such other financial information as the Purchaser may reasonably request.

(g)     German Restructuring.  Each of BBH and BBH GmbH shall use their reasonable best efforts to, following to the Closing date: (i) convert BBH, GmbH into a GmbH & Co. KG pursuant to secs. 190 ss. German Merger Act (*Umwandlungsgesetz*) (following such conversion, BBH GmbH being referred to herein as "BBH KG") having (x) as its sole general partner, a newly formed or newly acquired wholly owned Subsidiary of BBH, incorporated in Germany as a GmbH or UG (the "General Partner") and (y) as its sole limited partner, BBH, (ii) cause, promptly after the conversion of BBH GmbH to BBH KG as set forth in clause (i) above, the General Partner to withdraw (*austreten*) from BBH KG, and, upon such withdrawal (and the resulting termination of BBH KG as a GmbH & Co. KG), the then existing assets and liabilities of BBH KG shall automatically accrue to BBH pursuant to applicable Law as universal succession (*Gesamtrechtsnachfolge*), all in accordance with the draft of the documents materially in the form as attached as Schedule 6.1(g), and (iii) then dissolve the General Partner according to sec. 60 para. 1 no. 2 German Act on Limited Liability Companies (*GmbHG*).  Sellers' obligations under this Section 6.1(g) shall continue until the General Partner has been dissolved in accordance with this Section 6.1(g), regardless of whether such consummation and dissolution occur before or after the Closing.

6.2     Pre-Closing Covenants of Purchasers.  The Purchasers covenant to the Sellers that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)     General.  The Purchasers will use commercially reasonable efforts to take all action and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction of the Closing conditions set forth in Article VIII below).

(b)     Adequate Assurances Regarding Acquired Contracts and Required Orders.  With respect to each Acquired Contract, the Purchasers shall provide adequate assurance of the future performance of such Acquired Contract by the Purchasers to the satisfaction of the Bankruptcy Court and the Canadian Court.  The Purchasers shall take such actions as may be reasonably requested by the Sellers that are commercially reasonably and consistent with the Bankruptcy Orders and the Recognition Orders to assist the Sellers in obtaining the Bankruptcy Court's entry of the Sale Order, the Canadian Court's entry of the Sale Recognition Order and any other order of the Bankruptcy Court and the Canadian Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(c)     Notice of Certain Events. The Purchasers shall promptly notify the Sellers of, and furnish the Sellers, any information they may reasonably request with respect to, the occurrence of any event or condition or the existence of any fact that would reasonably be

expected to cause any of the conditions to Sellers' obligations to consummate the transactions contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled. Without limiting the foregoing, if any representation or warranty made by the Purchasers in Section 5.2 hereof are no longer true and correct, the Purchasers shall promptly notify the Sellers of the facts and circumstances relating thereto.

6.3    Other Covenants of Sellers and Purchasers.

(a)    Filings; Notifications. During the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement, each Party shall cooperate with the other Parties in obtaining all authorizations, consents, and approvals of, filing all notices and reports with, and providing information that may be requested by any, Governmental Authorities that may be or become necessary in connection with this Agreement or the consummation of the transactions contemplated by this Agreement (collectively, "Governmental Filings and Approvals"), including, to the extent required in connection with this Agreement or the consummation of the transactions contemplated hereby, any notification to, provision of any information to, or filings with, (i) the Federal Trade Commission (the "FTC") and the United States Department of Justice under the HSR Act and (ii) any state attorney general or foreign competition authority (and request early termination of any applicable waiting period), and to take all reasonable actions to avoid the entry of any Order or decree by any Governmental Authorities prohibiting the consummation of the transactions contemplated hereby, and shall furnish to the other all such information in its possession as may be necessary for the completion of the notifications to be filed by the other. Without limiting the foregoing, to the extent required under the HSR Act, the Sellers and the Purchasers each agree to make a filing of a Notification and Report Form under the HSR Act as promptly as practical, but in no event later than ten (10) Business Days after the Execution Date and to supply as promptly as practicable any additional information and documentary material that may be requested pursuant to the HSR Act and take all other actions necessary, proper or advisable to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as practicable. Neither the Purchasers nor any of their Affiliates shall be required to divest, dispose of or hold separate any assets or any business to secure HSR Act clearance or consents, approvals or waivers and no Seller shall agree to any divesture or disposal of any assets or enter into any agreement with the FTC or any other Governmental Authority regarding HSR Act clearance or consents or approvals without the prior written consent of the Purchasers. The Purchasers shall pay the filing fees and all other costs in connection with any such HSR Act required filing to the FTC. Without limiting the foregoing, all costs and expenses incurred by any party in complying with this Section 6.3(a) shall be borne by the Purchasers.

(b)    Improper Receipt of Payment. From and after the Closing Date, (i) the Sellers shall promptly forward to the Purchaser any and all payments received by the Sellers from customers or any other Persons that constitute part of the Acquired Assets and (ii) the Purchasers shall promptly forward to the Sellers any and all payments received by the Purchasers from customers or any other Persons that constitute part of the Excluded Assets.

(c)    Wind-Down Activities. For a period of not more than 90 days following the Closing Date, the Purchasers shall make the Rehired Employees reasonably available during normal business hours at the Purchasers' business locations to the Sellers' estates, without charge

and upon the reasonable advanced notice from Sellers' estates, in order to assist with the wind-down activities of Sellers' estates to the extent that such assistance does not unreasonably interfere with the operation of the Purchasers' business or the performance by the Rehired Employees of their employment responsibilities to the Purchasers after Closing.

6.4    D&O Tail Policy. Promptly following the Closing, the Purchasers shall purchase a pre-paid tail insurance policy, to be in effect for six years, covering the directors and officers of Sellers that are currently covered by directors and officers insurance policies of the Sellers existing as of the date hereof on terms substantially similar to such existing policies.

6.5    Employment Covenants and Other Undertakings.

(a)    The Purchasers or Affiliates of the Purchasers will offer employment to not less than eight-five percent (85%) of all active employees of the Sellers effective as of the Closing Date, which aggregate number of active employees offered employment shall include all of the active employees of the Foreign Seller, (and to substantially all employees of the Sellers set forth on Schedule 6.5(a), including all of the employees of the Foreign Seller, hereto on maternity leave, short-term disability leave, military leave or another approved leave of absence, effective as of the date such employee is able to commence active employment with the Purchasers, provided that such date is within 12 months of the Closing Date or as otherwise required under applicable Law) initially in a substantially comparable position and at no less favorable base salary as were in effect with respect to such employees immediately prior to the Closing Date. The Purchasers shall be responsible for any obligations or liabilities arising under the WARN Act solely with respect to any active employees of the Sellers as of immediately prior to the Closing that the Purchasers do not offer employment to in accordance with this Section 6.5. Each employee who accepts the offer of employment, actively commences employment with the Purchasers or Affiliates of the Purchasers and becomes employed by the Purchasers pursuant to this Section 6.5 shall be referred to herein as a "Rehired Employee." With respect to the employees of the Sellers listed on Schedule 6.5(a) on short term disability, which schedule shall also provide the amount of monthly short term disability payments paid to each such employee and the time period such employee has been receiving short term disability payments, Purchasers shall provide short-term disability payments under the Assumed Plans or Replicated Plans to any such employees of the Sellers on short-term disability for periods commencing immediately following the Closing Date and until the earlier of (i) the date such employee is eligible for long-term disability benefits, (ii) the date such employee refuses the Purchasers' offer of employment, (iii) the date such employee reports to work with the Purchasers within the 12-month period described above, or (iv) the date on which such employee is no longer eligible to receive short-term disability benefits under the terms of an Assumed Plan or Replicated Plan. For the avoidance of doubt and without limiting the generality of Section 2.5, the Purchasers shall have no Liability for the provision of short-term disability benefits, long-term disability benefits or any other wages, benefits or other compensation to current or former employees of the Sellers or any of their Affiliates that accrue prior to or on the Closing Date, except as specifically provided for in Section 2.4(c).

(b)    At Closing, the Purchasers shall: (i) assume sponsorship of and shall assume all liabilities and obligations (other than any Liabilities arising as a result of any breach of any representation or warranty or covenant hereunder) arising under the Employee Benefit

Plans listed on Schedule 6.5(b)(i) ("Assumed Plans"); and (ii) establish new benefit plans for the purpose of providing coverage to the Rehired Employees with benefits that are substantially equivalent in the aggregate to the benefits in effect as of January 1, 2011 (without giving effect to any change or amendment thereto after such date, whether retroactively effective or otherwise) under the Employee Benefit Plans listed on Schedule 6.5(b)(ii) (the "Replicated Plans"). For a period of three (3) months following the Closing Date, Purchasers shall provide the Rehired Employees who remain actively employed with the Purchasers with the benefits under the Assumed Plans and the Replicated Plans. Nothing in this Section 6.5 shall obligate the Purchasers to preserve or provide compensation or benefits that are determined to discriminate in favor of highly paid employees or that are provided pursuant to individual benefit or compensation agreements or arrangements or that are not in compliance with applicable Laws.

(c)     Rehired Employees shall be given credit for all purposes, except benefit accrual under a defined benefit pension plan and except for purposes of vesting under any equity-based or non-qualified deferred compensation plans, for all service with the Sellers (including service with previous employers which is credited by the Sellers) under the Assumed Plans or Replicated Plans in which they become participants, to the extent such service was recognized for comparable purposes by the Sellers prior to the Closing Date under the Assumed Plans or analogous Employee Benefit Plan. In the event the Purchasers terminate the Assumed Plans that are group health plans during the calendar year in which the Closing Date occurs, the Purchasers shall cause any new health benefit plans made available in lieu thereof to the Rehired Employees to waive, with respect to any Rehired Employee, any pre-existing condition exclusions to coverage, any evidence-of-insurability provisions, and any waiting-period requirements under such plans to the extent waived or satisfied under the applicable Assumed Plan as of the date of its termination. In addition, the Purchasers shall cause any group health plans included in the Replicated Plans to apply to any deductible requirements and out-of-pocket maximum limits applicable in 2011, any amounts paid by such Rehired Employees toward such requirements and limits under any analogous Employee Benefit Plan from January 1, 2011, through Closing. Subject to compliance with applicable Laws, the Purchasers shall allow Rehired Employees to continue to participate in the Assumed Plans or Replicated Plans that are health and dependent care flexible spending accounts until the end of the year in which Closing occurs, provided that the Purchasers may transfer account balances under such Assumed Plans into a Replicated Plan. With respect to the employees of the Sellers listed on Schedule 6.5(a) who are short-term disabled on the Closing Date and who subsequently become eligible to receive long-term disability insurance benefits, if the Sellers have provided to the Purchasers the underwriting information necessary for the Purchasers to obtain third-party fully insured long-term disability coverage for such employees, the Purchasers shall use commercially reasonable efforts to make such long-term disability coverage available to such employees; provided, however, for the avoidance of doubt, the Purchasers shall not be required to provide such long-term disability coverage to the extent the cost of providing such coverage is determined by the Purchasers to be unreasonable.

(d)     Prior to the Closing Date, the Sellers shall take all actions necessary to transfer and spin-off the Welfare Benefit Group Life Insurance Plan (Class 1&2-basic life voluntary and dependent life; Class 3-Retiree; and Class 4 - Disabled) provided through CIGNA (Policy No. FLX-961538) and any other insurance contracts (collectively the "Life Insurance Plan") from the Bowe Bell & Howell Group Benefits Plan (Plan # 518) to a separate, stand alone

plan. The Purchasers and the Sellers agree that the Life Insurance Plan shall not be an Assumed Plan or a Replicated Plan and any current or future liability under the Life Insurance Plan, including, without limitations, any obligations to provide any life insurance benefits to any current or future retired employee shall be an Excluded Liability. Notwithstanding any provision of this Agreement to the contrary, the failure by the Sellers to spin-off the Life Insurance Plan, as set forth above, prior to the Closing shall result in the Bowe Bell & Howell Group Benefits Plan (Plan # 518) and all constituent plans thereunder being deemed removed from Schedule 6.5(b)(i) to Schedule 6.5(b)(ii), and in no event shall the Purchasers be required to provide any post-employment life insurance coverage to any current or former retired employee of the Sellers or their affiliates under the Replicated Plans.

(e) . The Purchasers shall permit Rehired Employees to carry over, and to use after the Closing, all accrued vacation and sick days subject to the Purchasers' policies and procedures, to the extent such accruals have been assumed by the Purchasers pursuant to Section 2.4(c)(i). Subject to limits described in, and solely to the extent such obligations have been assumed by the Purchasers pursuant to, Section 2.4(c)(i), the Purchasers shall (i) pay any employee who is not a Rehired Employee accrued vacation and sick days in accordance with the Purchasers' policies and practices and (ii) assume and discharge all accrued wage and commission payments required to be made to employees (including Rehired Employees) as of the Closing Date and make such payments in accordance with the Purchasers' policies and practices and applicable Law.

(f) The Sellers shall comply in all respects with the WARN Act and any similar U.S. or foreign national, federal, state, local, provincial or other Laws or regulations, in connection with the transactions contemplated hereby.

(g) The US Purchaser shall provide a Replicated Plan that is a defined contribution 401(k) plan (the "Replicated 401(k) Plan") effective as soon as administratively practicable following the Closing Date. The US Purchaser shall use commercially reasonable efforts to cause the Replicated 401(k) Plan to allow Rehired Employees to roll-over their account balances, including promissory notes evidencing loans, from Seller's 401(k) plan to the Replicated 401(k) Plan as permitted under the terms of the Replicated 401(k) Plan and applicable law.

(h) Nothing herein shall be deemed to create any right to employment or continued employment or to a particular term or condition of employment with the Purchasers or any of their Affiliates. Nothing in this Section 6.5 or any other provision of this Agreement: (i) shall be construed to establish, amend, or modify any benefit or compensation plan, program, agreement or arrangement; (ii) shall limit the ability of the Purchasers or any of their Affiliates to amend, modify or terminate any benefit or compensation plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them; or (iii) shall be construed to create any third-party beneficiary right in any employee or other Person other than the Parties to this Agreement.

6.6    Sellers' Names. The Sellers covenant and agree that, within ten (10) Business Days after written request from the Purchasers, the Sellers shall, and shall cause BBH, GmbH to, pass all required resolutions, amend their articles or certificate of incorporation or other

organizational documents and file the relevant name change documents with the applicable Governmental Authority to change their respective corporate or company names to new names that do not include the words "Bowe Bell + Howell" or any other name or mark included in the Company Group IP Rights, any name set forth on the signature pages to this Agreement, any translations, adaptations, derivations or combinations of any of the foregoing and that are not likely to be confused or associated with any of the Sellers' and BBH, GmbH's current names or products (collectively, the "Restricted Names"), and the Sellers shall promptly notify the Purchasers of such name change(s) and the new name(s) chosen by each Seller and BBH, GmbH. From and after the Closing, the Sellers and all Affiliates of Sellers shall cease all use of any Restricted Name, including by removing all Restricted Names from all letterhead, stationary, signage and tangible assets included in the Excluded Assets.

6.7    Bankruptcy Actions.

(a)    Filing of Petition for Relief. Within one (1) Business Day after the execution of this Agreement, each of the Sellers shall file or cause to be filed a petition for relief under chapter 11 of the Bankruptcy Code on behalf of the Sellers (the "Petition for Relief", and the date on which such Petition for Relief is filed being referred to as the "Petition Date") with the United States Bankruptcy Court for the Delaware (the "Bankruptcy Court", the jointly administered bankruptcy cases initiated by the Sellers pursuant to this Section 6.7(a) shall be referred to as the "Bankruptcy Case").

(b)    Sale Motion and Order.

(i)    Within one (1) Business Day following the Petition Date, the Sellers shall serve and file a motion (the "Sale Motion") in the Bankruptcy Case requesting that the Bankruptcy Court (x) schedule the Bidding Procedures Hearing on a date no later than sixteen (16) days following the Petition Date, (y) enter the Bidding Procedures Order no later than sixteen (16) days following the Petition Date and (z) enter the Sale Order at the final hearing on the Sale Motion (the "Sale Hearing") on a date no later than forty-five (45) days following the Petition Date.

(ii)    The Sellers will provide the Purchasers with a reasonable opportunity to review and comment upon the Sale Motion, the Assignment Motion, the Bidding Procedures Order, the Sale Order, and the Assignment Order contemplated by this Agreement prepared by the Sellers prior to the filing thereof with the Bankruptcy Court, each of which shall be in a final form acceptable to the Purchasers.

(c)    Bidding Procedures Order. The Sellers shall in connection with the sale of the Acquired Assets advertise to the public in a commercially reasonable manner as required by the Bankruptcy Code or as shall be directed by the Bankruptcy Court following a preliminary hearing on the Sale Motion (the "Bidding Procedures Hearing") and the entry of an order in the Bankruptcy Case approving procedures for solicitation and consideration by the Bankruptcy Court of bids from third parties for the Acquired Assets (the "Bidding Procedures Order") considered at such Bidding Procedures Hearing. The Bidding Procedures Order shall be in a final form acceptable to the Sellers and the Purchasers, and in any event shall:

(i)        schedule the Sale Hearing;

(ii)        schedule an auction to be held at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 at 10:00 a.m. Eastern Time two (2) Business Days prior to the date of the Sale Hearing, or at such other location, date or time as the Sellers and the Purchasers may otherwise agree (the "Auction");

(iii)       require, as a precondition to participation in the Auction, the submission of a competing bid for some or all of the Acquired Assets no later than 5:00 p.m. Eastern Time at least three (3) Business Days prior to the Auction (the "Bid Deadline");

(iv)       require any Qualifying Bid (as defined below) to be accompanied by (w) an earnest money deposit by wire transfer, certified or cashier's check, in the amount of no less than $5,000,000 (which amount shall be paid to or deposited with an escrow agent to be held pursuant to an escrow agreement to be entered into by such bidder, BBH (on behalf of the Sellers) and such escrow agent); provided, that the Purchasers and/or any of their Affiliates shall not be required to make any such deposit in connection with an exercise of its rights hereunder, (x) an executed confidentiality agreement, (y) an executed asset purchase agreement substantially in the form of this Agreement along with a red-line marked against this Agreement, and (z) written evidence of a commitment for financing or other evidence of the party's ability to consummate the transaction and payment of the purchase price in cash at the Closing;

(v)        provide that if this Agreement is terminated pursuant to Section 9.1, other than by mutual consent of the Parties under Section 9.1(a) or by the Sellers pursuant to Section 9.1(f) as a result of the Purchasers' breach of this Agreement, then the Purchasers shall be entitled to (i) the Purchasers' reasonably documented actual out-of-pocket fees and expenses (including legal, accounting, HSR Act filing fees, escrow and other fees and expenses) not to exceed $1,750,000 (the "Expense Reimbursement") and (ii) in the event that the Sellers consummate an Alternative Transaction on or prior to the date that is fifteen (15) months after the date of such termination, a break-up fee in the amount of an additional $1,500,000 (the "Break-Up Fee") with such amount being payable upon the closing or consummation of such Alternative Transaction;

(vi)       provide that the Sellers are authorized without further Bankruptcy Court action to pay any amounts that become due and payable to the Purchasers pursuant to this Agreement (including the Breakup Fee and Expense Reimbursement), and that pursuant to section 364(c)(1) of the Bankruptcy Code, the Purchasers shall have a super priority administrative expense priority claim, junior only to the claims of the lenders under the DIP Credit Agreement, payable out of the Sellers' cash or other collateral securing the Sellers' obligations (which shall be senior to any and all claims of any creditors of or holders of equity interests in the Sellers, including pre-petition and post-petition amounts owing to the Sellers' pre-petition and post-petition senior secured lenders other than the lenders under the DIP Credit Agreement) for such amounts;

(vii)  provide that no party submitting any other offer to purchase the Acquired Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup, or termination or similar fee or payment;

(viii)  require a bid will not be considered by the Sellers as qualified for the Auction unless such bid is for an amount equal to or more than the aggregate of the sum of (w) the Credit Bid Amount and the Cure Amounts in cash; (x) the dollar value of the Breakup Fee in cash and (y) the dollar value of the Expense Reimbursement in cash, and (z) $250,000 in cash, provided, however, any overbid bids by the Purchasers thereafter shall only be required to be equal to the sum of (A) the then existing leading bid, plus (B) $250,000 less (C) the dollar value of the Breakup Fee less (D) the dollar value of the Expense Reimbursement; provided, further, however, a higher bid will not be considered by the Sellers as qualified for the Auction if (I) such bid contains financing or due diligence contingencies of any kind or any other conditions precedent to such Person's obligation to purchase the Acquired Assets other than such conditions as are included in this Agreement; (II) such bid is not received by the Sellers and the Purchasers in writing on or prior to the Bid Deadline, (III) such bid does not provide for the immediate payment of the Breakup Fee and Expense Reimbursement to the Purchasers from the first proceeds of the cash portion of the purchase price of such bid, (IV) such bid does not contain evidence that the Person submitting it has received debt and/or equity funding commitments (or has cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof of deposit into escrow of no less than $5,000,000 in cash and either an unconditional lending commitment from a recognized banking institution in the amount of the cash portion of the purchase price of such bid or the positing of an unconditional, irrevocable letter of credit from a recognized banking institution issued in favor of the Sellers in the amount of the cash portion of the purchase price of such bid, (V) such bid fails to acquire substantially all of the Acquired Assets, (VI) the purchase price for the Acquired Assets of the Foreign Seller is less than the Canadian Purchase Price or (VII) such bid fails to provide for an acquisition of all of the Acquired Assets of the Foreign Seller (each bid which meets the foregoing criteria constitutes, as applicable, a "Qualifying Bid");

(ix)  require that any subsequent bid at the Auction be at least $250,000 greater than the preceding bid;

(x)  provide that if one (1) or more Qualifying Bids are submitted in accordance with the Bidding Procedures Order, the Sellers will conduct the Auction no later than the Auction Deadline Date in accordance with the Bidding Procedures Order; and at such Auction, the Sellers shall have the right to select the highest and best bid from the Purchasers and any Person who submitted a Qualifying Bid pursuant to Section 6.7(c)(viii) (the "Highest and Best Bid"), which will be determined by considering, among other things: (1) the number, type and nature of any changes to this Agreement requested by each bidder; (2) the extent to which such modifications are likely to delay closing of the sale of the Acquired Assets and the cost to the Sellers of such modifications or delay; (3) the total consideration to be received by the Sellers; (4) the likelihood of the bidder's ability to close a transaction and the timing thereof; and (5) the net benefit to the estate, taking into account the Purchasers' rights to the Breakup Fee and Expense Reimbursement (for the avoidance of doubt, the Sellers hereby agree that the value attributed by the Sellers to any bid made by the Purchasers at the Auction shall at least be equal to the sum of the following (w) the dollar value of the cash consideration (including any

reduction of the principal amount of the Sellers' outstanding obligations under the DIP Credit Agreement and the Pre-Petition Credit Agreement) contained in such bid, (x) the dollar value of any additional consideration (including any reduction of the principal amount of the Sellers' outstanding obligations under the DIP Credit Agreement and the Pre-Petition Credit Agreement) contained in such bid, (y) the dollar value of the Breakup Fee, and (z) the dollar value of the Expense Reimbursement;

(xi)    require at the Auction that the Purchasers have the right to submit further bids along with a markup of this Agreement, and at any time, request that the Sellers announce, subject to any potential new bids, the then current Highest and Best Bid, and to the extent the Purchasers request, use reasonable efforts to clarify any and all questions the Purchasers may have regarding the Sellers' announcement of the then current Highest and Best Bid;

(xii)    unless otherwise agreed to by the Purchasers in their sole discretion, require that only the Persons who submitted Qualifying Bids and the Purchasers may participate in the Auction; and

(xiii)    provide that the Purchasers shall have standing to contest the Highest and Best Bid selected by the Sellers.

(d)    <u>Assignment Motion and Order</u>.  Contemporaneously with the filing of the Sale Motion, the Sellers shall file with the Bankruptcy Court a motion (which may be included in the Sale Motion, the (the "<u>Assignment Motion</u>")) for an order authorizing the assumption and assignment of the Acquired Contracts to the Purchasers pursuant to section 365 of the Bankruptcy Code (the "<u>Assignment Order</u>"), which shall be in form and substance acceptable to the Purchasers.  Subject to <u>Sections 2.6</u>, <u>2.7</u> and <u>2.8</u>, the Acquired Contracts shall be identified on an exhibit to the Assignment Motion.  The exhibit shall set forth the amounts necessary to cure defaults under each of such Acquired Contracts as determined by the Sellers based on the Sellers' Books and Records.  In cases in which the Sellers are unable to establish that a default exists, the relevant cure amount shall be set at $0.00.

(e)    <u>Recognition Orders</u>.

(i)    Following the petition for relief, the Foreign Seller shall:

(A)    file or cause to be filed an application for the entry of the Interim Initial Order under Part IV of the CCAA, on behalf of the Sellers, with the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>"), which Interim Initial Order shall be issued by the Canadian Court no later than two (2) Business Days following the Petition Date; and

(B)    serve and file an application for the entry of the Initial Recognition Orders under Part IV of the CCAA, on behalf of the Sellers, which Initial Recognition Orders shall be issued by the Canadian Court no later than eight (8) Business Days following the Petition Date.

The ancillary proceedings initiated by the Sellers pursuant to this Section 6.7(e)(i) shall be referred to as the "CCAA Proceedings".

(ii)     Following the filing of the Sale Motion, the Foreign Seller shall serve and file or cause to be filed an application for the entry of the Bidding Procedures Recognition Order and the Sale Recognition Order under Part IV of the CCAA on behalf of the Sellers with the Canadian Court. The Bidding Procedures Recognition Order shall be issued by the Canadian Court no later than four (4) Business Days following the entry of the Bidding Procedures Order and the Sale Recognition Order shall be issued by the Canadian Court no later than four (4) Business Days following the entry of the Sale Order.

(iii)     Following the filing of the Assignment Motion, the Foreign Seller shall serve and file or cause to be filed with the Canadian Court an application for the entry of the Assignment Recognition Order, which Assignment Recognition Order shall be issued by the Canadian Court no later than four (4) Business Days following the entry of the Assignment Order.

(iv)     The Sellers will provide the Purchasers with a reasonable opportunity to review and comment upon the applications set out in this Section 6.7 and the Recognition Orders contemplated by this Agreement prepared by the Sellers prior to the service and filing thereof with the Canadian Court, each of which shall be in a final form acceptable to the Purchasers.

(f)     Notice and Reasonable Efforts.  The Sellers shall provide appropriate notice of the hearings on the Sale Motion and the Assignment Motion and the Auction, as is required by the Bankruptcy Code and the Bankruptcy Rules to all parties entitled to notice, including, but not limited to, all parties to the Acquired Contracts and all taxing and environmental authorities in jurisdictions applicable to Seller. Thereafter, the Sellers shall take all actions as may be reasonably necessary to cause each of such Orders to be issued, entered and become a Final Order.

(g)     Defense of Orders.  If the Bidding Procedures Order, the Sale Order, the Assignment Order, the Recognition Orders or any other order of the Bankruptcy Court or the Canadian Court relating to this Agreement shall be appealed (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), the Sellers shall take all steps as may be appropriate to defend against such appeal, petition or motion, and the Purchasers agree to cooperate in such efforts, and each of the Sellers and the Purchasers hereto shall endeavor to obtain an expedited resolution of such appeal.

(h)     Books and Records.  The Purchasers shall make available to the Sellers and copies of all books, files, documents and records included as part of the Acquired Assets as the Sellers may reasonably request for a period of eighteen (18) months post-Closing. If the Sellers desire copies of any of such documents or records, all copying costs shall be borne by the party requesting copies.

6.8     Confidentiality.  Following the Closing, the Sellers shall, and shall cause each of their Affiliates to, maintain as confidential and shall not use or disclose (except as required by

Law, or as authorized in writing by the Purchasers, or as may be required by the Sellers in order to carry out their obligations under Section 7.2 of this Agreement) (i) any information or materials relating to the Business, operations and affairs of the Company Group and (ii) any materials developed by the Purchasers or any of their representatives (including their accountants, advisors, environmental, labor, employee benefits and any other consultants, lenders and legal counsel). Except as otherwise permitted and provided above, in the event any Seller or any of its Affiliates is required by Law to disclose any such confidential information, such Seller shall promptly notify the Purchasers in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with the Purchasers in connection with the Purchasers' efforts to obtain a protective Order (at the Purchasers' sole cost and expense) and otherwise preserve the confidentiality of such information consistent with applicable Law. Information subject to the confidentiality obligations in this Section 6.8 does not include any information which (A) at the time of disclosure is generally available to or known by the public (other than as a result of its disclosure in breach of this Agreement) or (B) becomes available on a non-confidential basis from a Person who is not known to be bound by a confidentiality agreement with the Purchasers or their Affiliates, or who is not otherwise prohibited from transmitting the information. Notwithstanding the foregoing, with respect to Affiliates of the Sellers which are not Subsidiaries of BBH Holdings and which no Seller otherwise controls, the Sellers shall only be required to use their commercially reasonable efforts to cause such Affiliates to comply with the requirements of this Section 6.8.

6.9    Non-Seller Affiliates. To the extent that any Affiliate of any Seller (other than an Affiliate which is a Seller) owns any property, assets, rights, titles or interests of any kind and nature which are or were heretofore used primarily in connection with the Business, each Seller hereby covenants that it will (and it will cause its Affiliates to), from time to time, prior to or subsequent to the Closing, without further consideration, to, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, all further acts, conveyances, transfers, assignments and assurances as reasonably may be required to convey or transfer to the Purchasers any such property, assets, rights, titles or interests free and clear of all Liens and Liabilities, all on terms consistent with this Agreement; provided that with respect to Affiliates of the Sellers which are not Subsidiaries of BBH Holdings and which no Seller otherwise controls, the Sellers shall only be required to use their commercially reasonable efforts to cause such Affiliates to comply with the requirements of this Section 6.9.

## ARTICLE VII

## TAXES

7.1    Taxes Related to Purchase of Acquired Assets.

(a)    All Taxes, including, without limitation, all state, provincial and local Taxes incurred in connection with the transfer of the Acquired Assets to the Purchasers, and all recording and filing fees (collectively, "Transaction Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets shall be borne by the Purchasers of such Acquired Assets. The Purchasers and the Sellers shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions