contemplated under this Agreement, (b) provide all requisite exemption certificates, and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate Governmental Authority taxing authorities.

(b)     Subject to Section 2.1(s), on or prior to the Closing Date, the Sellers shall pay all sales Taxes, use Taxes, payroll Taxes, and other Taxes which are then due and owing with respect to the Acquired Assets and the Business and attributable to tax periods or portions thereof commencing on or after the Petition Date and ending on the Closing Date; provided, however, that the Sellers shall not be obligated to pay any such Tax that is disputed in good faith by the Sellers, as long as appropriate reserves have been established in accordance with GAAP. All sales Taxes, use Taxes, payroll Taxes, real property Taxes (whether owed under any Facility Lease or otherwise), personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that accrue during, or attributable to, the period on or prior to the Closing Date and become due on or after the Closing Date shall be paid by the Sellers. Subject to Section 7.1(a), all sales Taxes, use Taxes, payroll Taxes, real property Taxes (whether owed under any Facility Lease or otherwise), personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that accrue and are due after the Closing Date shall be paid by the Purchasers.

7.2     Allocation of Purchase Price. Within the earlier of (i) 90 days after the Closing Date, or (ii) 30 days prior to the date by which the Sellers' federal income Tax Returns must be filed, the Purchasers shall in good faith and in their reasonable discretion prepare a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as part of the Purchase Price) among the Acquired Assets (such schedule, the "Allocation"), in accordance with section 1060 of the Code and the treasury regulations thereunder (and any similar provision of state, local, or foreign law). Such Allocation shall allocate the Canadian Purchase Price to the assets and liabilities that are acquired and assumed by the Foreign Purchaser under this Agreement. The Allocation shall be binding upon the Sellers, but shall not be used to determine the allocation or distribution of proceeds to, or be binding upon, the Sellers' secured creditors. The Purchasers and the Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith unless required by applicable Law (including in any audits or examinations by any Governmental Authority or any other proceeding). The Purchasers and the Sellers shall cooperate in the filing of any forms (including Internal Revenue Service Form 8594 under section 1060 of the Code) with respect to such Allocation. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 7.2 shall survive the Closing without limitation.

7.3     Goods and Services Tax and Harmonized Sales Tax Election. The Foreign Seller and Foreign Purchaser shall jointly elect under subsection 167(1) of Part IX of the *Excise Tax Act* (Canada), section 75 of the *Quebec Sales Tax Act*, and any equivalent or corresponding provision under any applicable provincial or territorial legislation imposing a similar value added or multi-staged tax, that no tax be payable with respect to the purchase and sale of the Acquired Assets from the Foreign Seller under this Agreement. The Foreign Purchaser and the Foreign Seller shall make such election(s) in prescribed form containing prescribed information and the Purchasers shall file such election(s) in compliance with the requirements of the applicable legislation.

7.4     Canadian Income Tax Elections.  In accordance with the requirements of the *Income Tax Act* (Canada), the regulations thereunder, the administrative practice and policy of the Canada Revenue Agency and any applicable equivalent or corresponding provincial or territorial legislative, regulatory and administrative requirements, the Foreign Seller and Foreign Purchaser shall make and file, in a timely manner,

(a)     a joint election(s) to have the rules in section 22 of the *Income Tax Act* (Canada), and any equivalent or corresponding provision under applicable provincial or territorial tax legislation, apply in respect of the Accounts Receivable acquired from the Foreign Seller, and shall designate therein that portion of the Purchase Price allocated to such Accounts Receivable in accordance with the procedures set out in Section 7.2 of this Agreement as the consideration paid by the Foreign Purchaser to the Foreign Seller; and

(b)     a joint election(s) to have the rules in subsection 20(24) of the *Income Tax Act* (Canada), and any equivalent or corresponding provision under applicable provincial or territorial tax legislation, apply to the obligations of the Foreign Seller in respect of undertakings which arise from the operation of the Business and to which paragraph 12(1)(a) of the *Income Tax Act* (Canada) applies. The Foreign Purchaser and the Foreign Seller acknowledge that the Foreign Seller is transferring assets to the Foreign Purchaser which have a value equal to the elected amount as consideration for the assumption by the Foreign Purchaser of such obligations of the Foreign Seller.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

8.1     Conditions Precedent to Performance by Sellers.  The obligation of the Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 8.1(c)) may be waived in writing by Sellers, in their sole discretion:

(a)     Representations and Warranties of Purchasers. The representations and warranties of the Purchasers made in Section 5.2 of this Agreement, in each case, shall be true and correct as of the Execution Date and in all material respects as of the Closing Date as though made by the Purchasers as of the Closing Date, except that those representations and warranties that are qualified by materiality, material adverse effect or similar phrase shall be true and correct in all respects as of the Closing Date.

(b)     Performance of the Obligations of Purchasers. The Purchasers shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which they are party which are to be performed by it on or before the Closing Date.

(c)     Bankruptcy Orders. The Bankruptcy Orders and the Recognition Orders shall have been entered and shall not have been stayed or materially modified.

(d)     No Violation of Orders. No preliminary or permanent injunction or other Order of any court or Governmental Authority that declares this Agreement invalid or unenforceable in any material respect or that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)     Governmental Filings and Approvals.  To the extent required under the HSR Act, the applicable waiting periods, if any, under the HSR Act shall have expired or been terminated.

(f)     Assignment and Assumption of Liabilities. The Purchasers shall be prepared to, simultaneous with the Closing, execute and deliver to the Sellers an instrument of assignment and assumption of liabilities with respect to the Assumed Liabilities reasonably satisfactory in form and substance to counsel for the Sellers (the "Assignment and Assumption").

(g)     No Prohibition or Illegality.  There shall be no final Order prohibiting the sale and the sale shall not be illegal.

(h)     Other Deliveries.  At the Closing, the Purchasers shall have delivered those items set forth on Schedule 8.1(h).

8.2     Conditions Precedent to the Performance by Purchasers.  The obligations of the Purchasers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 8.2(c)) may be waived by the Purchasers, in their sole discretion:

(a)     Representations and Warranties of Sellers. The representations and warranties of the Sellers made in Section 5.1 of this Agreement shall be true and correct as of the Execution Date and as of the Closing Date as though made by the Sellers as of the Closing Date, except (i) to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date and (ii) to the extent that the failure of such representations and warranties to be true and correct as of the Closing Date or such earlier date, as applicable, has not caused a Material Adverse Effect.

(b)     Performance of the Obligations of Sellers.   The Sellers shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which the Sellers are party which are to be performed by the Sellers on or before the Closing Date.

(c)     Bankruptcy Orders. The Bankruptcy Orders and the Recognition Orders shall have been entered and shall not have been stayed or materially modified.

(d)     No Violation of Orders. No preliminary or permanent injunction or other order of any court or Governmental Authority that declares this Agreement invalid or unenforceable in any material respect or prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)     Governmental Filings and Approvals. To the extent required under the HSR Act, the applicable waiting periods, if any, under the HSR Act shall have expired or been terminated.

(f)     No Prohibition or Illegality. There shall be no final Order prohibiting the transactions contemplated hereunder and such transactions shall not be illegal.

(g)     Consents. The Consents identified on Schedule 8.2(g) shall have been obtained.

(h)     No Group Liability. There shall be no Liability of any Seller, whether in connection with the Acquired Assets, the Assumed Liabilities or otherwise, that could reasonably be expected to become a Liability of, or create any obligation on, any direct or indirect equityholder, stockholder, owner, or Affiliate of any Purchaser (other than the Purchasers or their designee(s)) or any of their respective partners, officers, directors, managers, agents or representatives.

(i)     Credit Bid Approval. The Bankruptcy Court shall have entered a Bankruptcy Order binding on all parties in interest in the Bankruptcy Case (which Bankruptcy Order may be the DIP Order and/or Sale Order) unconditionally allowing (i) a Claim by the lender under the DIP Credit Agreement in an amount equal to the DIP Amount and (ii) a Claim by the agent under the Pre-Petition Credit Agreement in an amount equal to the Pre-Petition Secured Amount, and authorizing and approving any credit bid by the US Purchaser or the agent under the Pre-Petition Credit Agreement contemplated by this Agreement pursuant to section 363(k) of the Bankruptcy Code

(j)     Other Deliveries. At the Closing, the Sellers shall have delivered those items set forth on Schedule 8.2(j).

(k)     Deliveries by BBH, GmbH. BBH, GmbH shall, at the Closing, deliver the German Assets to the US Purchaser or its designees.

8.3     Conditions Precedent to the Performance of Sellers and Purchasers. The Bankruptcy Court shall have entered the Bidding Procedures Order, the Sale Order, and the Assignment Order, and the Canadian Court shall have entered the Recognition Orders, in accordance with Section 6.7 and each such Order shall have become a Final Order. Notwithstanding the foregoing, nothing in this Agreement shall preclude the Parties from consummating the transactions contemplated herein if the Purchasers, in their sole discretion, agree to waive the requirement that each of the Sale Order and the Sale Recognition Order shall have become a Final Order. No notice of such waiver of this condition or any other condition to the Closing need be given except to the Sellers, it being the intention of the Parties that the Purchasers shall be entitled to, and are not waiving, the protection of section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of each of the Sale Order and the Sale Recognition Order becoming a Final Order.

## ARTICLE IX

## TERMINATION

9.1 <u>Conditions of Termination</u>. This Agreement may be terminated only in accordance with this <u>Section 9.1</u>. This Agreement may be terminated at any time before the Closing as follows:

(a) By mutual written consent of the Sellers and the Purchasers;

(b) By the Purchasers or the Sellers if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c) By the Purchasers, by written notice to the Sellers, on or after the date that is one hundred eighty (180) days following the Petition Date (the "<u>Termination Date</u>"), subject, however, to extension by the mutual written consent of the Sellers and the Purchasers, if the Closing shall not have occurred on or prior to the Termination Date; <u>provided</u>, <u>however</u>, that the Purchasers shall not have the right to terminate this Agreement under this <u>Section 9.1(c)</u> if the Purchasers are then in material breach of this Agreement;

(d) By the Sellers, by written notice to the Purchasers, on or after the Termination Date, subject, however, to extension by the mutual written consent of the Purchasers and the Sellers, if the Closing shall not have occurred on or prior to the Termination Date; <u>provided</u>, <u>however</u>, that the Sellers shall not have the right to terminate this Agreement under this <u>Section 9.1(d)</u> if any Seller is then in material breach of this Agreement;

(e) By the Purchasers, by written notice to Sellers, if the Purchasers have previously provided the Sellers with notice, or the Sellers have notified the Purchasers, of any inaccuracy of any representation or warranty of the Sellers contained in <u>Section 5.1</u>, which inaccuracy would reasonably be expected to result in, individually or in the aggregate with the results of other inaccuracies, any of the conditions set forth in <u>Section 8.2</u> not being satisfied, or notice of a material failure to perform any covenant of the Sellers contained in this Agreement, and the Sellers have failed, within twenty (20) Business Days after receiving or providing such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to the Purchasers of the Sellers' ability to remedy such inaccuracy or perform such covenant; <u>provided</u>, <u>however</u>, that the Purchasers shall not have the right to terminate this Agreement under this <u>Section 9.1(e)</u> if the Purchasers are then in material breach of this Agreement;

(f) By the Sellers, by written notice to the Purchasers, if the Sellers have previously provided the Purchasers with notice, or the Purchasers have notified the Sellers, of any inaccuracy of any representation or warranty of the Purchasers contained in <u>Section 5.2</u>, which inaccuracy would reasonably be expected to result in, individually or in the aggregate with the results of other inaccuracies, any of the conditions set forth in <u>Section 8.1</u> not being satisfied, or notice of a material failure to perform any covenant of the Purchasers contained in this Agreement and the Purchasers have failed, within twenty (20) Business Days after such notice,

to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to the Sellers of the Purchasers' ability to remedy such inaccuracy or perform such covenant; provided, however, that the Sellers shall not have the right to terminate this Agreement under this Section 9.1(f) if any Seller is then in material breach of this Agreement;

(g)     By the Purchasers if any Seller (i) designates any Person other than the Purchasers (or their designee(s)) as the successful bidder at the conclusion of the Auction, (ii) seeks or supports Bankruptcy Court and/or the Canadian Court approval of an Alternative Transaction (other than to or by the Purchasers) or plan pursuant to chapter 11 of the Bankruptcy Code and/or the CCAA involving the Acquired Assets, or (iii) executes and delivers an agreement with any Person (other than the Purchasers or their designee(s) and their respective Affiliates) with respect to an Alternative Transaction or plan pursuant to chapter 11 of the Bankruptcy Code and/or the CCAA involving the Acquired Assets;

(h)     By the Purchasers if the Purchasers do not approve of the form and content of (i) the Bidding Procedures Order or the Sale Order to be entered by the Bankruptcy Court or (ii) the Bidding Procedures Recognition Order or the Sale Recognition Order to be issued by the Canadian Court;

(i)     By either the Sellers or the Purchasers, if the Bankruptcy Court and/or the Canadian Court has entered a Final Order approving the sale of the Acquired Assets to any Person other than the Purchasers (or their designee(s)) and such sale closes;

(j)     By the Purchasers if the Sellers shall not have filed the Petition for Relief within the period required by Section 6.7(a), or if the Sales Motion, the Bidding Procedures Hearing, the Bidding Procedures Order or the Sale Order shall not have been served and filed, scheduled, or entered, as applicable, in accordance with, and within the time periods required by, Section 6.7(b);

(k)     By the Purchasers if the Foreign Seller shall not have filed the application for the Interim Initial Order within the time period required by Section 6.7(e)(i)(A), or if the applications for Recognition Orders or the entry of the Recognition Orders shall not have been served and filed, or issued, as applicable, in accordance with, and within the time periods required by Sections 6.7(e)(i)(B), 6.7(e)(ii) and 6.7(e)(iii);

(l)     By the Purchasers at any time on or before the second Business Day prior to the Bidding Procedures Hearing, if the Purchasers are not satisfied in their sole discretion with any amendment, change or update to the Schedules delivered by the Sellers pursuant to Section 11.17;

(m)     So long as any of the Purchasers or the Purchasers' Affiliates is the lender under the DIP Facility, by the Purchasers if there has been a default or event of default under the DIP Facility (unless waived by Purchaser as lender, under the DIP Facility, and with respect to this Agreement) or if the DIP Facility is otherwise terminated;

(n)     By the Purchasers if (i) the Bankruptcy Case is dismissed or converted into a case under chapter 7 of the Bankruptcy Code, (ii) if the CCAA Proceedings are dismissed or converted into full plenary CCAA Proceedings or proceedings under the Bankruptcy and

Insolvency Act (Canada), and, in either case, and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or (iii) a trustee is appointed for the Sellers and such trustee rejects the transactions contemplated by this Agreement.

9.2     Effect of Termination.  In the event of termination pursuant to Section 9.1, this Agreement shall become null and void and have no effect (other than those provisions of Article IX, Article X and Article XI that expressly survive termination), with no liability on the part of the Sellers or the Purchasers, or their respective Affiliates or respective representatives, with respect to this Agreement or any Ancillary Agreement other than as set forth in Section 9.3 below; provided, however, that such termination shall not relieve any Party hereto of any liability for willful breach of this Agreement.

9.3     Break-Up Fee and Expense Reimbursement.  If this Agreement is terminated pursuant to Section 9.1, other than by mutual consent of the Parties under Section 9.1(a) or by the Sellers pursuant to Section 9.1(f) as a result of the Purchasers' breach of this Agreement, then the Purchasers shall be entitled to (a) the Expense Reimbursement with such amount being payable upon termination of this Agreement and (b) in the event that the Sellers obtain Bankruptcy Court approval of an Alternative Transaction on or prior to the date that is fifteen (15) months after the date of such termination, the Break-Up Fee with such amount being payable upon the closing or consummation of such Alternative Transaction.  The Break-Up Fee and the Expense Reimbursement shall be entitled to administrative priority (which shall be a super-priority administrative expense Claim senior to all other administrative expense Claims) under section 364(c)(1) of the Bankruptcy Code.  The obligation to pay in full in cash when due any amount owed by any Seller to the Purchasers under this Agreement, including the Break-Up Fee and the Expense Reimbursement, shall not be discharged, modified or otherwise affected by any plan of reorganization or liquidation for any Seller or by any other Order of the Bankruptcy Court or the Canadian Court.  The Foreign Seller's share of any liability of the Sellers under this Section 9.3 shall be that amount which is equal to (x) the total amount of such Sellers' liability under this Section 9.3, multiplied by (y) a fraction, the numerator of which is the Canadian Purchase Price and the denominator of which is the Purchase Price.  For the avoidance of doubt, the Foreign Seller's liability under this Section 9.3 shall be limited to such proportionate amount, and the Foreign Seller shall not have joint and several liability for any other portion of any liabilities of the Sellers under this Section 9.3.

ARTICLE X

SURVIVAL

10.1     Survival.  Each of the representations and warranties of the Sellers and the Purchasers made in this Agreement shall not survive the Closing Date.  The covenants and agreements of the Sellers and the Purchasers made in this Agreement shall survive until fully performed or discharged.

10.2     Obligations and Liabilities of the Foreign Seller and the Foreign Purchaser. Notwithstanding any other provision of this Agreement: (i) the Foreign Seller shall not have joint and several responsibility for or liability in respect of the covenants, agreements, representations and warranties of the other Sellers that are contained in this Agreement, and shall only be

responsible for, and have liability in respect of, covenants, agreements, representations and warranties that apply to the Foreign Seller; and (ii) the Foreign Purchaser shall not have joint and several responsibility for or liability in respect of the covenants, agreements, representations and warranties of the other Purchasers that are contained in this Agreement, and shall only be responsible for, and have liability in respect of, covenants, agreements, representations and warranties that apply to the Foreign Purchaser.

ARTICLE XI

MISCELLANEOUS

11.1    Joint Drafting.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

11.2    Further Assurances.  The Purchasers or the Sellers and BBH, GmbH (in the case of the German Assets), as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as the Purchasers or the Sellers and BBH, GmbH (in the case of the German Assets), as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements in each case, at the sole cost and expense of the requesting Party.

11.3    Successors and Assigns.  This Agreement shall be binding on and inure to the benefit of the Purchasers, the Sellers and BBH, GmbH and their respective successors and permitted assigns, including, without limitation, any trustee appointed in the Bankruptcy Case or subsequent chapter 7 case.  No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other Parties and any such assignment without prior written consent shall be void and of no force or effect; provided that, the Purchasers may assign any of their rights and obligations hereunder to any Affiliate or Subsidiary of the Purchasers (whether wholly owned or otherwise) or to any lender or other financing source for collateral purposes, and following the Closing, in whole or in part to any successor-in-interest to any Person acquiring all or any portion of the Business or the Acquired Assets; and further provided that the Sellers hereby agree that the Purchasers may grant a security interest in their respective rights and interests hereunder to their lenders, and the Sellers will sign a consent with respect thereto if so requested by the Purchasers or their respective lenders, and that the terms of this Agreement shall be binding upon any subsequent trustee appointed under chapter 11 or chapter 7 of the Bankruptcy Code.

11.4    Governing Law; Jurisdiction.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Delaware (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable Law.  For so long as the Sellers are subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court except to the

extent the Canadian Court retains jurisdiction under the CCAA Proceedings. After the Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, a state or federal court located in the State of Delaware with competent jurisdiction.

11.5    Expenses.  Except as set forth in Sections 7.1(a), 9.3 or 11.2, each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with the negotiation and drafting of this Agreement and closing of the transactions contemplated hereby. Notwithstanding the foregoing, in the event of any action or Proceeding to interpret or enforce this Agreement, the prevailing party in such action or Proceeding (i.e., the party who, in light of the issues contested or determined in the action or Proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

11.6    Severability.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date this Agreement was last amended.

11.7    Notices.

(a)    All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the Party to whom notice is to be given; (ii) on the day of transmission, if sent via electronic transmission to the email address or facsimile given below (with answer back confirmation of such transmission); (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service, or similar service maintained in another applicable country, addressed to the Party to whom notice is to be given; or (iv) on the fifth day after mailing, if mailed to the Party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the Party as follows:

if to the Purchasers:

Contrado BBH Funding, LLC
c/o Versa Capital Management, Inc.
Cira Centre
2929 Arch Street, 27th Floor
Philadelphia, PA 19104
Attn:   Counsel
Email: tkennedy@versa.com
Fax:    (215) 609-3499

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attn:   David L. Eaton
Email: david.eaton@kirkland.com
Fax:    (312) 862-2200

and

Osler Hoskin, & Harcourt LLP
100 King Street West
Suite 6100
Toronto, ON, M5X 1B8
Attn:   Tracy C. Sandler
Email: tsandler@osler.com
Fax     (416) 862-6666

if to the Sellers or BBH, GmbH:

BBH, Inc.
760 S. Wolf Road
Wheeling, IL 60090
Attn:   George Marton, President
Email: George.Marton@bowebellhowell.com
Fax:    (847) 423-7321

with a copy (which shall not constitute notice) to:

McDermott Will & Emery LLP
227 West Monroe Street
Chicago, IL 60606-5096
Attn:   William J. McGrath, PC
E-mail:wmcgrath@mwe.com
Fax:    (312) 984-7700

Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Attn:   Mark D. Collins
E-mail:collins@RLF.com
Fax:    (302) 651-7701

and

PricewaterhouseCoopers Inc.
77 King Street West
Toronto, ON, M5K 1G8
Attn: John McKenna
E-mail:john.p.mckenna@ca.pwc.com
Fax: (416) 814-3210

(b)     Any Party may change its address, email address or facsimile number for the purpose of this Section 11.7 by giving the other Parties written notice of its new address in the manner set forth above.

11.8     Amendments; Waivers. This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the Purchasers and the Sellers and BBH, GmbH, or in the case of a waiver, by the Party waiving compliance. Any waiver by any Party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

11.9     Public Announcements. Neither the Purchasers, on the one hand, nor any Seller or BBH, GmbH, on the other hand, shall, and each of the foregoing shall cause each of its Affiliates not to, make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written agreement from BBH or the Purchasers, respectively, unless a press release or public announcement is required by Law or order of the Bankruptcy Court or the Canadian Court. If any such announcement or other disclosure is required by Law or order of the Bankruptcy Court or the Canadian Court, the form and content of any such announcement or other disclosure shall be subject to the prior written consent of BBH or the Purchasers, as applicable, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, the Purchasers shall not be restricted from making any public announcements or issuing any press releases after the Closing.

11.10     Entire Agreement. This Agreement and the Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All Schedules and Exhibits hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

11.11     No Third Party Beneficiaries. Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Sellers, BBH, GmbH and the Purchasers and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligation or liability of any third party to the Sellers, BBH, GmbH or to the Purchasers. This Agreement is not intended and shall not give any third Persons any right of subrogation or action over or against Sellers, BBH, GmbH or against the Purchasers.

11.12 <u>Headings</u>. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

11.13 <u>Counterparts, Facsimile and PDF Signatures</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or portable document format ("<u>PDF</u>"), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person whether or not originally executed counterparts are delivered. No Party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or PDF to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the enforceability of a contract and each Party forever waives any such defense.

11.14 <u>Construction</u>. Any reference to any federal, state, local or foreign statute or Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. Any reference to the singular in this Agreement shall also include the plural and vice versa.

11.15 <u>Closing Actions</u>. All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the Party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

11.16 <u>Conflict between Transaction Documents</u>. The Parties agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement or document referred to herein, including the Ancillary Agreements, this Agreement shall govern and control.

11.17 <u>Final Schedules</u>. Only with respect to Schedules contemplated by Article V of this Agreement, the Sellers shall have the ability to reasonably amend, change or update such Schedules provided that any such amendment, change or update shall be a particularized disclosure with no general disclaimer and delivered to the Purchasers no less than seven (7) Business Days prior to the Bidding Procedures Hearing; and further provided that, for the avoidance of doubt, prior to the Bidding Procedures Hearing, the Purchasers shall have the right to amend, change or update any Schedules provided by the Purchasers hereunder, including, without limitation, <u>Schedule 8.2(g)</u>.

11.18 <u>Bulk Sales Compliance Waiver</u>. The Purchasers hereby waive compliance by the Sellers with the requirements and provisions of any 'bulk-transfer' laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Acquired Assets to the Purchasers, including in the case of the Foreign Seller the requirements of Section 6 of the *Retail Sales Tax Act* (Ontario) and any equivalent or corresponding provision of any retail sales tax legislation. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the

transfer of the Acquired Assets shall be free and clear of any security interests in the Acquired Assets, including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order and the Sale Recognition Order.

*[Signature pages to follow]*

IN WITNESS WHEREOF, the Parties, being duly authorized to do so, have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

SELLERS:

BBH, INC

By: _Oliver Bialowons_ (signature)
Name: Oliver Bialowons
Title: Vice President

BOWE BELL + HOWELL COMPANY

By: _Oliver Bialowons_ (signature)
Name: Oliver Bialowons
Title: Vice President

BOWE BELL + HOWELL POSTAL SYSTEMS COMPANY

By: _Oliver Bialowons_ (signature)
Name: Oliver Bialowons
Title: Vice President

BOWE SYSTEC INC.

By: _Oliver Bialowons_ (signature)
Name: Oliver Bialowons
Title: Vice President

BOWE BELL + HOWELL HOLDINGS, INC.

By: _Oliver Bialowons_ (signature)
Name: Oliver Bialowons
Title: Vice President

BCC SOFTWARE, INC.

By: _Oliver Bialowons_ (signature)
Name: Oliver Bialowons
Title: Vice President

BOWE BELL + HOWELL INTERNATIONAL LTD.

By: _O. Bialowons_

Name: Oliver Bialowons

Title: Vice President


BOWE BELL + HOWELL, GMBH

By: _O. Bialowons_

Name: Oliver Bialowons

Title: Vice President

US PURCHASER:

CONTRADO BBH FUNDING, LLC

By: _____

Name: _Paul Halpern_

Title: _Authorized Signatory_

## Schedule 2.1(b)
## Personal Property

See Attachments to Schedule 2.1(b).

## Schedule 2.1(h)

### Permits and Licenses

| Agency | Description | License or Account No. |
|---|---|---|
| City of Aurora (Colorado) | License | 28015 |
| City of Durham | Privilege License | 7306 |
| City of Los Angeles | professions / Occupations | 269032-0001-3 |
| City of Los Angeles | Retail Sales | 269032-0001-3 |
| City of Mesa | Transaction Privilege Sales & Use Tax License | 81526 |
| City of Phoenix | Privilege (Sales) Tax License | 90023119 |
| City of Scottsdale | Transaction Privilege Tax License | 130147 |
| City of Tempe | Privilege Tax | 44644 |
| State of Wisconsin | Registration Certificate | 456-0000327194-03 (permit No) |
| Arizona Dept of Rev | TPT License | |
| City of Birmingham | Business License | 147000 |
| City of Chandler (Arizona) | Privilege Tax License | 49558 |
| City of Irondale | Business License | 67516 |
| City of Mobile | Annual Business License | 18596 |
| City of Pueblo | License | |
| City of Seattle | Business License | |
| City of Tacoma | Annual Business License | 500001498 |
| City of Tucson | Business License | 3009329 |
| City of Baton Rouge - Parish of East Baton Rouge | Occupational License Tax | 296591 |
| Village of Wheeling | Business License Renewal | 2265 |
| Cook County Department of Environmental Control | Certificate of Operation bill Date 8/25/2010 | |
| Bethlehem Township | 2011 Business Privilege License | 124500 |
| US Postal Service permits received by Sellers | | |
| Tulalip Gaming Agency | Vendor License | VL-1510 |
| City of Durham Fire Department Fire Prevention Bureau | Permit to store high piled combustible stock | |
| State of North Carolina, Boiler Safety Bureau | Certificate of inspection for air compressors | |
| State of Arkansas | Arkansas Gaming License/Service Industry License | EGS 2011 03 030 |

US Sellers are registered in the following jurisdictions:

<u>Bowe Bell + Howell Holdings, Inc.</u>
Delaware

<u>BBH, Inc.</u>
Delaware

<u>Bowe Bell + Howell Company</u>

All 50 states

Bowe Systec, Inc.
New York

BCC Software, Inc.
Illinois
New York

Bowe Bell + Howell Postal Systems Company
Delaware
Illinois
Tennessee
New York
Texas (Bell & Howell Postal Systems, Inc.)

Bowe Bell + Howell International

| (a) | Ontario Ministry of Finance | Registration No. 6212192 |
|-----|------------------------------|--------------------------|
| (b) | British Columbia Ministry of Small Business and Revenue | Registration No. R193143 |
| (c) | Nova Scotia Service and Municipal Relations Ministry | Registration No. 3225259 |
| (d) | New Brunswick | Registration No. 636069 |
| (e) | Alberta | Registration No. 2113950873 |
| (f) | Newfoundland and Labrador | Registration No. 57475 |
| (g) | Manitoba | Registration No. 5624186 |
| (h) | Saskatchewan | Registration No. 101117181 |
| (i) | Prince Edward Island | Registration No. 26911 |
| (j) | Quebec | Registration No. 1161213948 |
| (k) | Canada Revenue Agency | Business No. 865316418RC0003 |

**Schedule 2.1(o)**
**Other Acquired Assets**

None.

## Schedule 2.1(q)
### Financial Assets

1.  $1.2 million held by Zurich to cover self-insured workers' compensation claims.

2.  Promissory Note issued by BBH, Inc. to Bowe Bell + Howell International Ltd. on January 1, 2009, in an original principal amount of $5 million.

100% of the outstanding stock of Bowe Bell + Howell Holdings, Inc. is held by Bowe Systec AG, which is in insolvency in Germany.

100% of the outstanding stock of BBH, Inc. is held by Bowe Bell + Howell Holdings, Inc.

100% of the outstanding stock of Bowe Systec, Inc. is held by BBH, Inc.

100% of the outstanding stock of Bowe Bell + Howell Postal Systems Company is held by BBH, Inc.

100% of the outstanding stock of Bowe Bell + Howell Company is held by BBH, Inc.

100% of the outstanding stock of BCC Software, Inc. is held by Bowe Bell + Howell Company.

100% of the outstanding stock of Bowe Bell + Howell International, Ltd. is held by Bowe Bell + Howell Company.

Bowe Bell + Howell Postal Systems Company owns all the interest in Bowe Bell + Howell GmbH.

## Schedule 2.3(e)

## Other Excluded Assets[3]

None.

---

[3] Schedule 2.3(e) to be updated and revised in accordance with Section 2.6 of the Agreement.

## Schedule 2.4(c)(i)
## Accruals of Rehired Employees

For the avoidance of doubt, the amounts set forth below shall not include any amounts, obligations or Liability arising out of or relating to the investigation and/or inspection by the Ontario Ministry of Labour, including any payments required under any resulting or related offences, orders, charges or audits.

(as of 3/31/2011)

| | |
|---|---|
| Accrued Wages | $4,488,797 [1] |
| Accrued Commissions | To be reasonably and mutually agreed upon by the Purchasers and the Sellers |
| Accrued Bonuses | $232,244 |
| Accrued Vacation | $326,999 |
| Accrued Sick Days | $0 |
| Accrued Expense Reimbursement | $98,411 [2] |
| Accrued Fringes | $17,722 |
| **Total Accrued Salaries and Wages** | **$6,575,977** |

[1] Gross; includes employee benefit contribution
[2] Represents expense reimbursement liability for submitted but unapproved reports

(as of April 7, 2011)

| EMPLID | NAME | DESCR | BU | Term Date | Total Severance Paid so Far | Total Severance Owed | Still Due | Severance End Date | Total Number of weeks |
|---|---|---|---|---|---|---|---|---|---|
| 1000383 | Barry,Sean | New York City | Service | 2/17/2011 | 5,542.98 | 10,162.11 | 4,619.13 | 5/6/2011 | 11 |
| 1000745 | Eberly,Douglas J | Citibank / Household | Service | 1/17/2011 | 11,908.38 | 23,816.76 | 11,908.38 | 6/18/2011 | 22 |
| 1002353 | Hellstrom,Richard R | Scanners Transition Team | Scanners | 11/10/2010 | 24,038.50 | 28,846.15 | 4,807.65 | 4/28/2011 | 24 |
| 1000323 | Lees,Robert R | New York City | Service | 3/18/2011 | 1,914.70 | 10,530.87 | 8,616.17 | 6/4/2011 | 11 |
| 1000704 | McCall,William | New Jersey | Service | 1/14/2011 | 11,713.57 | 23,427.18 | 11,713.61 | 6/18/2011 | 22 |
| 1003038 | Royal,Timothy | San Francisco | Service | 2/21/2011 | 3,139.08 | 8,632.47 | 5,493.39 | 5/10/2011 | 11 |
| 1002921 | Todd,J J | San Francisco | Service | 3/25/2011 | 0.00 | 3,860.96 | 3,860.96 | 4/30/2011 | 5 |
| 1003475 | Chavez,Ronald | LA North | Service | 4/1/2011 | 0.00 | $4,626.22 | $4,626.22 | 5/14/2011 | 6 |
| 1003358 | Fernando,Lasantha | Sacramento | Service | 4/1/2011 | 0.00 | $4,943.26 | $4,943.26 | 5/14/2011 | 6 |
| 1003287 | Hicks,Michael R | LA North | Service | 4/1/2011 | 0.00 | $21,639.32 | $21,639.32 | 8/27/2011 | 21 |
| 1004781 | Palmer, William M. | Houston/S. TX | Service | 4/15/2011 | 0.00 | 1,654.40 | 1,654.40 | 4/30/2011 | 2 |
| 1004372 | Jackson, Dexter L. | Houston/S. TX | Service | 4/15/2011 | 0.00 | 3,144.14 | 3,144.14 | 5/14/2011 | 4 |
| 1004814 | Williams, Richard K | Houston/S. TX | Service | 4/15/2011 | 0.00 | 1,654.40 | 1,654.40 | 4/30/2011 | 2 |
| 1000510 | Sweeney, Daniel | New York City, NY | Service | 4/22/2011 | 0.00 | 18,938.88 | 18,938.88 | 8/20/2011 | 17 |
| 1004047 | Wisson, Linda | BBH Human Resources | Canada | 3/26/2010 | 69,033.83 | 107,798.02 | 38,764.19 | 12/1/2011 | 87 |
| 1004033 | Eberlin, Ross | SBS Business Development | Canada | 2/22/2010 | 100,985.85 | 125,795.53 | 24,809.68 | 7/1/2011 | 72 |
| 1004197 | Taylor, Anne | Analyst, Business Ops Canada | Canada | 1/19/2011 | 5,653.63 | 40,706.06 | 35,052.43 | 9/29/2011 | 36 |

18

**Schedule 2.4(c)(iv)**
**Expenses for the Seller's Health Benefit Plan**

Incurred But Not Paid claims for medical, prescription drug and dental benefits as of February 28, 2011 of up to $899,000.

**Schedule 2.4(d)(i)**
**Post-Petition Date Accounts Payable**

To be provided prior to the Closing.

**Schedule 2.4(d)(ii)**
**Section 503(b)(9) Accounts Payable**

To be provided prior to the Closing.

AP – Trade

AP – Sales & Use Tax

AP – Other

Intercompany – Trade Rec (Pay)

Intercompany – Non-Trade Rec (Pay)

Accrued Expenses - Miscellaneous

Accrued Expenses – Due to Parent

Accrued Expenses – Accrued Salaries, Wages, Vacation Pay and Employee Expenses

Accrued Expenses – Restructuring, Termination and Severance

Accrued Expenses – Accrued Taxes

Accrued Expenses – Customer Deposits

Accrued Expenses – Deferred Revenue

---

[4] Line items from the Foreign Seller's March 31, 2011 balance sheet.

## Schedule 2.8(a)(i)
### Designated Remaining Leases

All Facility Leases not listed on Schedule 2.1(e) or Schedule 2.3(a) shall automatically be Designated Remaining Leases.

**Designated Remaining Executory Contracts**

All Contracts other than Contracts set forth in the Schedule 2.1(e) or Schedule 2.3(a) shall automatically be Designated Remaining Executory Contracts.

**Schedule 2.8(a)(iii)**
**Designated Remaining Assets**

None.[5]

---

[5]  Subject to updates prior to closing by Purchaser in accordance with <u>Section 2.6</u> of the Agreement.

1. Financial Statements attached:
   - Audited consolidated and consolidating balance sheets as of the Company Group December 31, 2008 and the related consolidated and consolidating statements of income for the fiscal year then ended;
   - Audited consolidated and consolidating balance sheets as of the Company Group as of December 31, 2009 and the related consolidated and consolidating statements of income for the fiscal year then ended;
   - Unaudited consolidated and consolidating balance sheets as of the Company Group as of December 31, 2010 and the related unaudited consolidated and consolidating statements of income for the fiscal year then ended; and
   - Unaudited consolidated and consolidating balance sheets as of the Company Group as of January 31, 2011, and the related unaudited consolidated and consolidating statements of income for the one-month period then ended.
   - Unaudited balance sheets of the Foreign Seller as of December 31, 2010 and March 31, 2011 and the related unaudited statements of income for the twelve month period ended December 31, 2010, and the three month period ended March 31, 2011.

2. The following items were NOT expensed in the 2010 results but will need to be considered before the results are finalized:
   - Goodwill impairment – no adjustment was made to recorded goodwill, currently on the books at $192M.
   - Böwe Receivables – no adjustment was made to write-off the aged receivables from Böwe entities in Germany, UK and Italy. The total of these is $2.9M.
   - Böwe Finished Goods Inventory - no adjustment has been made to the Böwe product inventory valuation. The dis-affiliation with Böwe ownership and the low level of recent sales activity could drive a need to write down the value of these assets, which have a total net book value of $5.0M at year-end.

## Schedule 5.1(d)(iii)
### Accounts Receivables

1.     Receivables owed by Bowe Systec AG in the amount of approximately $278,000 for products sold. It is doubtful that this amount is collectible due to Bowe Systec AG filing insolvency proceedings.

## Schedule 5.1(f)
## Consents

A. US Department of Justice and/or Federal Trade Commission

B. Post Closing notice required under the Investment Canada Act

C. Bankruptcy Court

D. Ontario Superior Court of Justice (Commercial List)

E. Sellers' Board of Directors

F. Consents that may be required for the following Material Contracts to the extent such Material Contracts are either Assumed Contracts or Assigned Designated Remaining Contracts:

    1. Software License Agreement effective September 23, 2004 by and between SAP America, Inc. and Bowe Bell + Howell Company, as amended

    2. Integration and Licensing Agreement dated March 15, 2001 by and between Parascript, LLC and Bell & Howell Mail and Messaging Technologies

    3. Maintenance Agreement between the Internal Revenue Service and Bowe Bell + Howell Company having Bowe Bell + Howell Contract Number 40006918.

    4. Maintenance Agreement between the Internal Revenue Service and Bowe Bell + Howell Company having Bowe Bell + Howell Contract Number 40006897.

## Schedule 5.1(g)
## Litigation

1.  Bethlehem Township. In August 2010, the Township of Bethlehem, PA issued a tax assessment to BBH pertaining to past due business privilege tax. The Township seeks past due business privilege tax, plus interest and penalties, in the amount of $213,715. BBH filed its appeal of the tax assessment. A hearing on the appeal was scheduled for March 9, 2011. However, the hearing was postponed to allow the Township to conduct further audit of BBH's business continuity business. New hearing date has not been set.

2.  Booklet Binding. Booklet Binding, a customer of BCC Software, claims to have been damaged in the amount of $102,060 as a result of an error in the BCC Software's software. Date of loss is claimed to have been on or about November 27, 2009. Booklet Binding's insurance carrier is claiming a right of subrogation for payment of Booklet Binding's claim but has not filed a lawsuit against any Seller.

3.  Bowe Bell + Howell v. La Crosse Mail & Print Solutions, Florida Print & Mail, et.al. In January 2009, BBH filed a collection suit in Lee County, Florida against La Crosse Mail & Print Solutions and related parties for $90,558 due on equipment, parts and services provided to the defendants. Defendants answered the complaint and filed counterclaims for damages in an amount not specified for breach of warranties and declaratory relief from BBH's agreements. Case remains pending as BBH determines if defendants remain an on-going concern against which a judgment could be collected.

4.  Bowe Systec GmbH – Assignment of Accounts Receivables. Bowe Systec GmbH, who acquired the assets of Bowe Systec AG from the insolvency administrator, notified BBH that it purchased the accounts receivables owed by BBH to Bowe Systec AG. The successor to Bowe Systec GmbH assigned a portion of the receivables to Bowe Systec Vertriebs –und Service GmbH in order to allow Bowe Systec Vertriebs –und Service GmbH to offset trade payables owed to BBH and claim the remaining balance due. Both Bowe Systec GmbH and Bowe Systec Vertriebs – und Service GmbH are demanding payment of the receivables in an amount equal to approximately $13 million.

5.  Chinea v. American Optical, et al. including Bowe Bell + Howell Company. In September 2010, Mr. Chinea filed suit in New York state court against several defendants, including BBH, regarding personal injuries. As to BBH, Mr. Chinea claims that BBH is the successor-in-interest to Bell & Howell Company. BBH filed an answer denying the charges as it is not the successor-in-interest to Bell & Howell Company and never manufactured, designed, supplied, sold, distributed and/or installed the product in question. Case is in discovery. BBH filed an unopposed summary judgment motion.

6.   Durham, NC Facility Lease. Landlord for Durham facility sent a notice on March 24, 2011 that BBH is delinquent in rent payment in an amount equal to $83,563.86 and has threatened to take action if not paid.

7.   Gordon Flesch v. Bowe Bell + Howell Company. In February 2011, Gordon Flesch filed suit against BBH for breach of contract for failing to pay amounts due under a copier lease. Gordon Flesch seeks $88,073 in damages plus attorney fees and court costs. BBH is reviewing the claim.

8.   Harris N.A. (Moneris Solutions) v. Bowe Bell + Howell Company. In October 2008, Harris Bank (through its credit card processing provider, Moneris Solutions) filed suit against BBH in Illinois state court for breach of contract pertaining to a Merchant Services Agreement entered between Harris and BBH. Harris claims that BBH breached the exclusivity provision of the agreement when BBH discontinued its credit card processing through Harris and engaged a different credit card processor and, as a result, triggered an early termination fee. The parties agreed to settle the case for $90,000. When BBH did not pay the settlement, Harris filed an amended complaint. Parties are in discussions regarding possible resolution of paying the settlement amount.

9.   Harris N.A., as agent and lender, and all other lenders under the Amended and Restated Credit Agreement dated November 23, 2009. Harris N.A., as agent and lender under the Amended and Restated Credit Agreement dated November 23, 2009 by and among BBH, Inc., Harris and other financial institutions ("Credit Agreement"), sent a letter to the company reserving its rights under the Credit Agreement due to, among other things, BBH's failure to repay the loans. Harris has also requested from certain officers and director the return of a bonus payment made to such officers and directors in July 2010. Harris also indicated that it may attack the validity of settlement payments made to Jon and Erik Runstom in lawsuits filed by these individuals against BBH Company, BCC Software and Mike Wilhelm.

10.  Irving, TX Facility Lease. On or about March 4, 2011, Landlord for Irving facility has sent notice that BBH is delinquent in rent payment in an amount equal to $19,301.51 and has threatened to take action if not paid.

11.  Levin v. Bowe Bell + Howell Company. On March 18, 2010, former service technician filed a discrimination charge with the US EEOC (Pittsburgh, PA area office) on the basis of age. BBH responded denying the charges. On February 22, 2011, BBH received an amended charge claiming hostile work environment in addition to age discrimination. BBH responded to the amended charge denying the claim. EEOC has yet to issue its findings.

12.  McCluskey vs. Allied Packing & Supply, Inc., et al. including Bowe Bell + Howell Company. On October 6, 2010, BBH's registered agent was served with a complaint filed by a Mr. McCluskey in California state court against BBH and

several other defendants regarding personal injuries Mr. McCluskey claimed to have suffered.

13. <u>Wessex Technologies v. Bowe Bell + Howell Postal Systems.</u>  Wessex, a supplier of double detect systems to BBH Postal Systems, filed a claim in arbitration over an incentive payment related to the US Postal Service's (USPS) Doubles Detect program.  Amount sought is approximately $475,000.  The contract for Doubles Detect systems entered into between USPS and BBH Postal Systems contained an incentive payment provision for achieving certain levels of doubles detection on USPS' transport systems.  The USPS paid BBH and its subcontractor, Wessex, the incentive award for the Double Detect systems installed on the AFCS transports.  The USPS and BBH subsequently entered into a contract modification to install the Doubles Detect units on the USPS' DIOSS transports. Wessex believes the payment of the incentive award is due from BBH for Doubles Detect on the DIOSS transport regardless of whether USPS paid BBH.  Parties have reached a tentative settlement and are in the process of finalizing.

14. <u>Robert Williams v. Bowe Bell + Howell, et al.</u>  In December 2009, Mr. Williams, a former temp employee at BBH's business continuity service facility in Bethlehem, PA, filed suit in Pennsylvania state court over injuries he allegedly suffered when he fell in the facility's parking lot in January 2008.  BBH tendered the case to its landlord as landlord had responsibility for clearing the parking lot. Landlord accepted tender and is defending the case.

15. <u>U. S. Environmental Protection Agency/Lake Calumet Site.</u>  The EPA served an entity known as "Bell & Howell" with a general notice dated November 6, 2003 in which the EPA identified Bell & Howell as a PRP with regard to hazardous substances disposed at Lake Calumet Cluster Site in Chicago.  This is a Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") action.  The EPA alleged possession of information that identified Bell & Howell as an owner or generator of hazardous substances disposed of at the Alburn Incinerator which is/was located at the site.  BBH joined a group of potentially responsible parties that had de minimis amount of waste disposed at the site to see if the matter could be resolved.

16. <u>US Customs.</u>  In 2009, US Customs began a focused assessment of BBH's import processes.  US Customs gave BBH its preliminary finding that BBH's import activities represent an acceptable risk to US Customs in the review of Transaction Value and an unacceptable risk in the review of areas of Classification and Anti-Dumping Duties. US Customs has asked BBH to implement a corrective action plan for the Classification and Anti-Dumping Duty areas. As part of its findings, US Customs estimates that BBH underpaid duties as a result of the misclassification errors in the amount of approximately $75,000.

17. <u>US Department of Labor.</u>  In 2008, the US Department of Labor investigated a claim filed by an employee that BBH had improperly classified him as exempt

instead of non-exempt. BBH cooperated with the investigation and provided the US Department of Labor with its position on why the classification was proper. US Department of Labor has never responded to BBH's position.

18. <u>Grayhair Software</u>. In a letter dated March 30, 2011, Grayhair Software, Inc. asserts that BCC Software's use of the mark "Accurant AQ" infringes its mark "AQ". BCC Software is reviewing the claim.

19. <u>Ontario Department of Labour</u>. Ontario Ministry of Labour issued Certificate of Offence #2396118A to Bowe Bell + Howell International Ltd. on March 30, 2011, for failing to comply with the limit on hours of work provision of the Employment Standards Act, 2000. It also issued Order to Comply #59369 to Bowe Bell + Howell International Ltd. to comply with the limit on hours of work, free time from work, overtime pay, public holiday and vacation pay provision(s) of the Employment Standards Act, 2000, as well as to perform a self-audit by April 27, 2011, to assess overtime pay, public holiday pay and vacation pay owed to employees for the period April 1, 2010 to March 31, 2011. Affected employees shall be paid any amounts owing by the following pay day. It is estimated that the liability is approximately $8,000 to $10,000.

20. <u>Pompano Motors v. BBH Financial Services </u>(Note: BBH Financial Services was merged into Bowe Bell + Howell Company) – Joey Accardi Dodge purchased Pompano Dodge from Chrysler. BBH Financial Services had a lease of equipment with Pompano Dodge and had reason to believe that Chrysler would assign the contract to the purchaser of the dealership. Joey Accardi Dodge d/b/a Pompano Dodge made eighteen months of lease payments to BBH Financial Services. In March 2006, Pompano Dodge then filed suit alleging that the payments were made by mistake. The payments were approximately $18,500. The lawsuit seeks return of the payment. Company is defending. Trial is expected to be set for sometime in the summer of 2011.

**Schedule 5.1(j)**
**Permits and Licenses; Compliance with Laws**

Foreign Seller has been informed that it requires a business license for the City of Vancouver where Foreign Seller does not currently have such license as a result of an inspection conducted by the Chief Building Official pursuant to an Order dated January 11, 2011 issued by the City to the Foreign Seller.

Ontario Ministry of Labour issued Certificate of Offence #2396118A to Bowe Bell + Howell International Ltd. for failing to comply with the limit on hours of work provision of the Employment Standards Act, 2000.

Ontario Ministry of Labour issued Order to Comply #59369 to Bowe Bell + Howell International Ltd. to comply with the limit on hours of work, free time from work, overtime pay, public holiday and vacation pay provision(s) of the Employment Standards Act, 2000.

Real property currently leased by Sellers

    a.  3791 S. Alston Avenue, Durham, NC

Lease Agreement dated March 31, 1997 by and between Transwestern Research Tricenter South, L.P., successor in interest to Tri-Center South VI, Limited Partnership and Bowe Bell & Howell Company f/k/a Bell & Howell Mail Processing Systems Company, as amended by First Amendment to Lease dated December 1, 1997, Second Amendment to Lease dated March 4, 1998, Third Lease Amendment dated July 17, 2003, Fourth Amendment to Lease dated November 4, 2004, Fifth Amendment to Lease dated April 2005, Sixth Amendment to Lease dated June 23, 2005, Seventh Amendment to Lease dated August 31, 2005, Eighth Amendment to Lease dated October 31, 2006, and as guaranteed by Lease Guaranty Agreement dated April 3, 1997 by Bell & Howell Operating Company, for lease of space at 3791 S. Alston Avenue, Durham, NC.

    b.  770 Acco Plaza Drive, Wheeling, IL

Multi-Tenant Industrial Building Lease dated January 9, 2004 between CIVF I - IL IM02, LLC, successor in interest to ACCO Brands, Inc. and BBH, Inc., as amended by First Amendment to Lease, dated August 27, 2004, Second Amendment to Lease dated August 27, 2004, Third Amendment to Lease dated November 9, 2004, Fourth Amendment to Lease, dated May 25, 2005, and Fifth Amendment to Lease dated December 21, 2010, for lease of space at 770 Acco Plaza Drive, Wheeling, IL.

    c.  2625 Brodhead Road, Bethlehem, PA

Industrial/Warehouse Lease Agreement effective as of October 5, 2004 by and between Bethlehem Crossings Limited Partnership and Bowe Bell + Howell Company, as amended by First Amendment to Lease dated July 14, 2006, for lease of space at 2625 Brodhead Road, Bethlehem, PA

    d.  2655 Brodhead Road, Bethlehem, PA

Industrial/Warehouse Lease Agreement effective as of October 12, 2005 by and between Bethlehem Crossings II, L.L.C. and Bowe Bell + Howell Company, as amended by First Amendment to Lease dated July 14, 2006, and Second Amendment to Lease dated July 9, 2008, for lease of space at 2655 Brodhead Road, Bethlehem, PA

    e.  8080 Tristar Drive, Irving, TX

Industrial Lease effective December 5, 2008 by and between 8080 Tristar Road Holdings Limited Partnership and Bowe Bell + Howell Company for lease of space at 8080 Tristar Drive, Irving, TX.

f.  30 Mural Street, Richmond Hill, Ontario (Bowe Bell + Howell International)

Lease Agreement dated August 13, 2001 by and between Castleberry Investments Limited and Bell & Howell International Ltd, as amended by Assignment dated September 27, 2001, Addendum to Lease dated February 11, 2002, Extension of Lease dated October 25, 2002, Extension of Lease dated June 8, 2004, Extension of Lease dated May 25, 2005, Extension of Lease dated May 24, 2006, Extension of Lease dated May 28, 2007, and Extension of Lease dated December 17, 2007, Extension of Lease dated July 16, 2008, for lease of space at 30 Mural Street, Richmond Hill, Ontario

g.  75 Josons Drive, Rochester, NY

Amended and Restated Lease Agreement dated July 8, 2005 by and between BCC Partners, LLC and BCC Software, Inc., as guaranteed by Bowe Bell & Howell Company, for lease of space at 75 Josons Drive, Rochester, NY.

h.  500 Weber Street, Waterloo, Ontario (Bowe Bell + Howell International)

Lease dated April 22, 2004 by and between Juscon Corporation and Bowe Bell + Howell International Ltd, as amended by Amendment No. 1 to Lease dated June 9, 2004, and Amendment No. 2 (Lease Extension Agreement) dated February 5, 2010, for lease of space at 500 Weber Street North, Waterloo, Ontario

i.  3600 Clipper Mill Road, Baltimore, MD

Lease Agreement dated April 7, 1995 by and between Eutaw Property Enterprise, a Maryland General Partnership and Bowe Bell + Howell Company, as amended by First Addendum to Lease dated August 5, 1996, Second Addendum to Lease dated July 21, 1998, Third Addendum to Lease dated June 7, 2001, Fourth Addendum to Lease dated April 19, 2006, Fifth Addendum to Lease dated July 23, 2008, and Prepossession Agreement dated July 23, 2008, for lease of space at 3600 Clipper Mill Road, Baltimore, MD.

j.  11818 James Street, Holland, MI (1800 sq ft)

Post Manufacturing and License Agreement effective July 1, 2007 by and between Bowe Bell + Howell Company as successor to Bowe Bell + Howell Mailmobile Company and Egemin Automation, Inc., as amended by the Amendment dated July 8, 2010 to the Post Manufacturing and License Agreement.

k.  5650 Yonge Street, Toronto, Ontario (Bowe Bell + Howell International)

Lease of Office Space dated November 13, 1997 by and between The Manufacturer's Life Insurance Company and OMERS Realty Corporation and Bell & Howell International Ltd., successor in interest to Bell & Howell Ltd, as amended by Amendment to Lease dated January 16, 2002, Amendment to Lease dated January 13, 2003, Sublease Agreement dated November 11, 2008, Consent by Landlord to Sublease dated November 14, 2008, Second Consent by Landlord to Sublease dated March 6, 2010, and letter of extension under sublease dated March 18, 2010, for lease of space at 5650 Yonge Street, Toronto, ON

l.   1052 Oak Forest Drive, Onalaska, WI

Commercial Lease dated March 3, 2010 by and between Oak Forest Partners Two, LLC and BCC Software, Inc., for lease of space at 1052 Oak Forest Drive, Suite 220-250, Onalaska, WI.

Commercial Lease dated April 29, 2009 by and between Oak Forest Partners Two, LLC and BCC Software, Inc., for lease of space at 1052 Oak Forest Drive, Suite 160, Onalaska, WI.

m.   3974 Notre Dame West, Montreal Quebec.

BBH International has a room of about 200 sq ft that is used as a service depot to store parts/office. No written agreement covering use of space. Month to month arrangement (rent is $400 per month).

n.   1161 Grant Street, Vancouver, BC.

This is a customer site. BBH International uses a room in the warehouse to store parts and use as an office. No written agreement covering use of space. Month to month arrangement (rent is $800 per month).

The following are subleases granted by Sellers:

Sublease Agreement dated September 1, 2009 by and between BBH, Inc. and Eastman Kodak Company, for sublease of space at 770 Acco Plaza Drive, Wheeling, IL.

Sublease Agreement dated September 23, 2009 by and between BBH, Inc. and One2One Communications, LLC, for sublease of space at 770 Acco Plaza Drive, Wheeling, IL.

Sublease Agreement dated November 11, 2008 by and between Bowe Bell + Howell International Ltd and Ontario Teachers' Pension Plan Board, as noted above.

## Schedule 5.1(m)
## Labor and Employment Matters

<u>US Department of Labor</u>. In 2008, the US Department of Labor investigated a claim filed by an employee that BBH had improperly classified him as exempt instead of non-exempt. BBH cooperated with the investigation and provided the US Department of Labor with its position on why the classification was proper. US Department of Labor has never responded to BBH's position.

<u>Levin v. Bowe Bell + Howell Company.</u> On March 18, 2010, former service technician filed a discrimination charge with the US EEOC (Pittsburgh, PA area office) on the basis of age. BBH responded denying the charges. On February 22, 2011, BBH received an amended charge claiming hostile work environment in addition to age discrimination. BBH responded to the amended charge denying the claim. EEOC has yet to issue its findings

<u>Ontario Ministry of Labour</u> Ontario Ministry of Labour issued Certificate of Offence #2396118A to Bowe Bell + Howell International Ltd. for failing to comply with the limit on hours of work provision of the Employment Standards Act, 2000. Ontario Ministry of Labour also issued Order to Comply #59369 to Bowe Bell + Howell International Ltd. to comply with the limit on hours of work, free time from work, overtime pay, public holiday and vacation pay provision(s) of the Employment Standards Act, 2000.

Bowe Bell + Howell Retirement Savings Plan (Plan #105)

Bowe Bell + Howell Group Benefits Plan (Plan #518); benefits include:

Welfare Benefit Medical Plan (Group No. 704490)

Welfare Benefit Dental Plan through Metropolitan Life Insurance Company

Welfare Benefit Vision Plan

Welfare Benefit Employee Assistance Program/Health Advocate

Welfare Benefit Group Term Life Insurance Plan (Class 1 & 2 – basic life, voluntary, and dependent; Class 3 – Retiree; and Class 4 – Disabled) through Life Insurance Company of North America (Group No. FLX961538)

Welfare Benefit Accidental Death and Dismemberment Plan (employee, spouse and dependent coverage) through Life Insurance Company of North America (Group No. OK963714)

Welfare Benefit Business Travel Accident Plan through Federal Insurance Company

Welfare Benefit Short Term Disability Plan through Life Insurance Company of North America (Group No. SHD91366)

Welfare Benefit Long Term Disability Plan (including additional coverage provided to executives) through Life Insurance Company of North America (Group No. FLK-960220

Welfare Benefit Retiree Medical Plan (Extended Coverage for Certain Terminated Employees and Retirees effective January 1, 2004)

Welfare Benefit Retiree Dental Plan (Extended Coverage for Certain Terminated Employees and Retirees effective January 1, 2004)

Welfare Benefit Retiree Vision Plan (Extended Coverage for Certain Terminated Employees and Retirees effective January 1, 2004)

Welfare Benefit Health Care Flexible Spending Account

Welfare Benefit Dependent Care Flexible Spending Account

Bowe Bell + Howell Severance Benefits Plan

Bowe Bell + Howell Education Reimbursement Policy

Bowe Bell + Howell Adoption Assistance Plan

Plans, policies and arrangements as set forth in the Company's Employee Handbook (dated 10/9/2008), including Vacation, Sick and Personal Leave, Holidays, Leaves of Absence, Jury Duty and Witness Leave, Service Awards, Bereavement Leave, and Voting Leave.

Bowe Bell + Howell Company Commuter Benefit Plan for San Francisco Associates

Car allowance or equivalent allowance

Management Incentive Compensation Plan

Professional Incentive Compensation Plan

Service Annual Bonus Plan-Field Service

Bowe Bell + Howell Sales Compensation Plan

Bowe Bell + Howell Service Compensation Plan

Bowe Bell + Howell Holdings, Inc. Amended and Restated 2009 Equity Improvement Plan (executives)

Bowe Bell + Howell Holdings, Inc. 2009 Turnaround Incentive Plan (executives)


**Allentown Benefit Plans**
Bell + Howell MMT Legacy Pension Plan (Plan No. 104)

**BBH Holdings Separation and Services Agreements**

Separation Agreement and Release dated September 30, 2009 by and between Bowe Bell + Howell Holdings, Inc and John Lombard

Services Agreement dated July 22, 2009 and effective as of February 23, 2009 by and between Bowe Bell + Howell Holdings, Inc. and George E. Marton, as amended

Services Agreement dated May 17, 2010 by and between Bowe Bell + Howell Holdings, Inc. and Oliver Bialowons.

**BBH, Inc. Extended Severance Agreements**

Michael Wilhelm

John Tarascio
Jeff Gruber
Mark Roberts
Bill Logan
Shuk Ng
Marci Major
Jan Rozelle
James Walsh
Mike Maselli
Eileen Sarro
Mark Paul
Gordon Galloway
Mike Conlen
Chris Richardson
Rob Moody
Rick Paske
Betsy Sullivan
Daniel Quinn
Mark Owens
Blake Eaddy
Ronald Ridge
Joe Taylor
Mark Kilgore

## BBH, Inc. Extended Severance and Retention Bonus Agreements

Sheralean Thompson
Greg Hachmeister
Diedre Martins
Karen Wendorf
Seema Nathani
Pat Varrone
Brian Cipollone
Anneliese Kellner
Greg Padowitz
Russell Wald
Bruce Cann
Doug Hess
Tim Huffield
Danny Morgan
William Grady
Brett Cotton
Ankur Arun Kamdar
Garland Franklin
Dwarkadas Nangrani

Paul Kostyniuk
Manny Panopoulos
Raymond Lee
Steve Seburn
Ken Yuen
Sanjay Ichalkaranje
Parviz Lalehzari
Anuradha Talwar-Trikha
Steven Ksiazek
Scott Westberg
Paula Conti
Bob Dreger
Joseph Evans
Randy McClain
Barry Crabtree
Bob Zick
Rob Atkinson
Murty Duvvuri
Anu Gupta
Gerrold Kruse
Billy Walters
John Lutz
Renea Scott
Dale Curry
Michael Drago
Stephen Gillette
Phuong Van Nguyen
Ed Otto
Craig Adcock
Aaron Kracht
Bill Pickering
Neal Middelberg
Mark Owens


## BBH International Retention Bonus Arrangement
Dan Lepine
Scott Shemilt
James Martin
Michael Boston
Paul Motley
Brent Gray
Bill Bales
Andrew MacLean

**Wheeling Retention Incentive/Severance arrangement with:**
Ypsilantis, James Evan
Nimesheim, Frank Michael
Zakharyuta, Sergey F
Gibbons, Kevin P
Varughese, Thomas
Khim, Molly
Komarov, Alex
**Wheeling Retention bonus arrangement with:**
Schultz,Mark W
Prus,Helen S
Kovach,Michael J
Kamdar,Manoj Nandkishor
Avila,Erasmo
Oliver,Michael D
Engel,Julius C

**Severance Agreements in Pay Status:**

Barry, Sean
Eberly, Douglas J
Hellstrom, Richard R

Lees, Robert R
McCall, William
Royal, Timothy
Todd, J J
Chavez, Ronald
Fernando, Lasantha
Hicks, Michael R
Wisson, Linda
Eberlin, Ross
Taylor, Anne
Lombard, John
Palmer, William M.
Jackson, Dexter L.
Williams, Richard K.
Sweeney, Daniel

**BCC Software Benefit Plans**

BCC Software, Inc. Medical Plan Health Insurance

BCC Software, Inc. Welfare Benefit Plan Dental Insurance

Group Life Insurance Designed for Employees of BCC Software, Inc.

BCC Software, Inc. Accidental Death and Dismemberment Plan

Basic Long Term Care Insurance

Group Short Term Disability Insurance Designed for Employees of BCC Software, Inc.

Group Long Term Disability Insurance Designed for Employees of BCC Software, Inc.

BCC Software, Inc. Flexible Spending Account Plan

BCC Software, Inc. Retirement Savings Plan

Paid Time Off

Holidays

Voluntary Supplemental Life Insurance

Voluntary Supplemental Cancer, Disability and Long Term Care Coverage

### Bowe Bell + Howell International, Ltd.

Group Insurance Plan – via Industrial Alliance:
 Life Insurance
 Optional Life Insurance
 Long-Term Disability Income Insurance
 Supplemental Health Insurance (including Prescription Drugs)
 Dental Care Insurance
 Accidental Death & Dismemberment

Bowe Bell + Howell International Ltd Retirement Savings Program – via Sun Life:
 Registered Pension Plan for Employees of Bowe Bell + Howell International Ltd;
 (Defined Contribution Pension Plan (DCPP); Group Annuity Policy No 68077-G

 Group Retirement Savings Plan for Bowe Bell + Howell International Ltd; Group (Group
 RSPP); Annuity Policy No 68078-G

 Employee Savings Plan of Bowe Bell + Howell International Ltd; Group Annuity Policy
 No 68079-G

Employment Agreement dated April 22, 2004 by and between Bowe Bell + Howell
International, Ltd and Bob Richards

Severance Agreements with Wisson, Linda; Eberlin, Ross; and Taylor, Anne.

**Employee Benefit Plans: Payments**

All contributions, distributions, reimbursements and premium payments with respect to each Employee Benefit Plan have been made or paid.

1.  Sellers provide post-employment or post termination health continuation benefits as mandated by COBRA.  Sellers do not have the ability to modify or terminate COBRA.

2.  Sellers provide post-employment COBRA subsidies to its employees eligible for severance under Sellers' severance plan or other negotiated severance arrangement. Sellers do not have the ability to modify or terminate COBRA.

    a.  See Schedule 2.4(c)(iii) for list of former employees currently receiving severance as of April 1, 2011.

3.  Sellers provide post-employment or post termination welfare or welfare type benefits pursuant to employment contracts or separation agreements.
    a.  Employees or former employees with employment contracts or separation contracts in which such benefits are applicable are:

    (i)   Agreement with Jerryl Adams – coverage at active rates until age 65

    (ii)  Agreement with Edward Mulvey – COBRA coverage until August 1, 2012

    (iii) Agreement with Carol Bistany – coverage at full rate (100%, not COBRA rate) until age 65 (November 1, 2012)

    (iv)  John Lombard: Separation Agreement and Release dated September 30, 2009 by and between Bowe Bell + Howell Holdings, Inc and John Lombard; Services Agreement dated as of April 2003 and effective January 2, 2003 by and between Bowe Bell + Howell Holdings, Inc. and John Lombard  - COBRA coverage ends on June 30, 2013

    (v)   George Marton: Services Agreement dated July 22, 2009 and effective as of February 23, 2009 by and between Bowe Bell + Howell Holdings, Inc. and George E. Marton, as amended.  Receives standard post-employment benefits, which would be COBRA subsidy and COBRA.

    (vi)  Oliver Bialowons: Services Agreement dated May 17, 2010 by and between Bowe Bell + Howell Holdings, Inc. and Oliver Bialowons. Receives standard post-employment benefits, which would be COBRA subsidy and COBRA.

4.	Sellers provide post-employment life insurance to certain retirees under its Welfare Benefit Group Term Life Insurance Plan. Sellers can modify or terminate this plan.

5.	Sellers provide medical, dental and vision benefits to certain retirees under Sellers' Welfare Benefit Retiree Medical Plan (Extended Coverage for Certain Terminated Employees and Retirees effective January 1, 2004). Sellers can modify or terminate this plan.

Bowe Bell + Howell International, Ltd.
None

**Schedule 5.1(p)**
**Subsidiaries**

BBH, Inc. – organized under the laws of the State of Delaware

Bowe Systec, Inc. – organized under the laws of the State of New York

Bowe Bell + Howell Postal Systems Company - organized under the laws of the State of Delaware

Bowe Bell + Howell Company - organized under the laws of the State of Delaware

BCC Software, Inc. – organized under the laws of the State of Illinois

Bowe Bell + Howell International, Ltd. – organized under the laws of Canada

Bowe Bell + Howell GmbH – organized under the laws of Germany

1. Sellers have received notice of the following liabilities:
   a. Rhode Island – sales and use tax of approximately $6,000 for tax period 2005 – 2008. Matter is ongoing.
   b. California – sales and use tax of approximately $760,000 for tax period (1999-2001 and 2004-2006. Approximately $356,000 is under appeal and the remainder has been paid by the Sellers.
   c. California – sales and use tax of approximately $999 for tax period 2006-2009. Case is resolved but not yet paid.
   d. Township of Bethlehem, PA – Assessed approximately $213,000 for business privilege tax for period 2005 through 2010. Assessment is under appeal.
   e. Ohio – claims sales tax owed of approximately $1600 for first quarter 2010. BBH notified the State that this account should have been closed in 2009 due to sale of Scanners business.
   f. US Customs – Estimated underpayment of duties of approximately $75,000 due to misclassification of imports from 2005 to 2010.
   g. Vermont – claims sales & use tax of $270.44 is due.
   h. California – State of California Board of Equalization notified BCC Software that it should have filed quarterly sales tax returns for conducting business in California starting in April 2009. Potential taxes that is claimed to be owed is approximately $40,000. BCC Software is in discussions with the State regarding this issue.

2. Sellers have open tax audits as follows:
   a. BBH Company – sales and use tax in Illinois and Florida for tax period 2006 – 2008 (audit starts in April 2011)
   b. BBH Company – Wisconsin (income/franchise tax audit for the period 1/1/2000 through 12/31/2008)
   c. BBH Company – property tax audit in North Carolina for tax period 2007-2009; 2004-2009 for CIP and demos.
   d. BBH Company – income tax audit in Illinois for period 2005 – 2006.
   e. BBH Company – business privilege tax audit on Business Continuity business for the period 2005 to present.

## Schedule 5.1(r)
## Insurance Policies

(i) Insurance Policies owned or held by Sellers as of Execution Date

| Policy Term | Coverage Type | Carrier |
|---|---|---|
| 1/1/11 -1/1/12 | General Liability | Zurich American Insurance Co. |
| 1/1/11 -1/1/12 | Automobile | Zurich American Insurance Co. |
| 1/1/11 -1/1/12 | Workers Compensation | American Zurich Insurance Co. |
| 1/1/11 -1/1/12 | Umbrella Liability | American Guarantee & Liability Insurance Co. (Zurich) |
| 1/1/11-1/1/12 | Excess Liability | CNA |
| 1/1/11-1/1/12 | Excess Liability | Liberty International Underwriters |
| 1/1/11 -1/1/12 | Foreign Casualty | Zurich Insurance Group |
| 1/31/10 - 1/31/12 | Directors & Officers, including Employment Practices, and Fiduciary Liability | Twin City Fire Insurance Co. (Hartford) |
| 1/31/11 - 1/31/12 | Crime | Hartford Fire Insurance Co. |
| 4/1/11-4/1/12 | Property | Zurich American Insurance Co. |
| 4/1/11-4/1/12 | Ocean Cargo | AGCS Marine Ins. Co. |
| 9/25/10-9/25/11 | Errors & Omissions | Illinois National Insurance Co. (Chartis) |
| 12/31/10-12/31/13 | Kidnap & Ransom | Houston Casualty Company |

Bowe Bell + Howell International Ltd. (Canada)

| Policy Term | Coverage Type | Carrier |
|---|---|---|
| 1/1/11-1/1/12 | General Liability | Zurich Insurance Company Ltd. |
| 1/1/11 – 1/1/12 | Automobile | Zurich Insurance Company Ltd. |

(ii)  Claims under any Insurance Policies during the two (2) year period prior to the date of this Agreement with respect to which an insurer has, in a written notice to a Seller, questioned, denied or disputed or otherwise reserved its rights with respect to coverage

| Matter | Type | Carrier |
|---|---|---|
| Harris, N.A. – July 2, 2010 letter to George Marton, Michael Wilhelm and Oliver Bialowons regarding payment of bonus | D&O | Twin City Fire Insurance |
| Yale Levin | Employment | Twin City Fire Insurance |
| Jon Runstrom and Erik Runstrom | Breach of contract and D&O | Twin City Fire Insurance |
| Sarah Allen | Employment | Twin City Fire Insurance |
| Jillian Trinidad | Product Liability | Zurich |
| William Rock | Product Liability | Zurich |
| Booklet Binding | E&O | Illinois National Insurance (Chartis) |
| New Kirk | E&O | Illinois National Insurance (Chartis) |
| Chinea | Other | Zurich |

None.

## Schedule 5.1(t)
## Affiliated Transactions

1.      Services Agreement dated July 22, 2009 and effective as of February 23, 2009 by and between Bowe Bell + Howell Holdings, Inc. and George E. Marton, as amended by that certain letter dated April 1, 2010.

2.      Services Agreement dated May 17, 2010 by and between Bowe Bell + Howell Holdings, Inc. and Oliver Bialowons.

3.      Extended Severance Agreement with Michael Wilhelm

4.      Extended Severance Agreement with John Tarascio

5.      Extended Severance Agreement with Jeff Gruber

6.      Extended Severance Agreement with Blake Eaddy

7.      Extended Severance Agreement with Ronald Ridge

8.      Extended Severance Agreement with Mark Kilgore

9.      Lease Agreement dated July 8, 2005 by and between BCC Partners, LLC and BCC Software, Inc.

10.     Letter of Intent dated October 14, 2009 by and between Bowe Bell + Howell Company, Bowe Bell + Howell GmbH and Bowe Systec Vertriebs-und Service GmbH

11.     Promissory Note dated January 1, 2009 by and between Bowe Bell + Howell International Ltd and BBH, Inc.

12.     Services Agreement dated January 1, 2008 by and between BBH, Inc. and Bowe Bell + Howell Company

13.     Services Agreement dated January 1, 2008 by and between BBH, Inc. and BCC Software Inc.

14.     Services Agreement dated January 1, 2008 by and between BBH, Inc. and Bowe Bell + Howell International Ltd

15.     Services Agreement dated January 1, 2008 by and between BBH, Inc. and Bowe Systec, Inc.

16.     Services Agreement dated January 1, 2008 by and between BBH, Inc. and Bowe Bell + Howell Postal Systems Company

17.     Services Agreement dated January 1, 2008 by and between BBH, Inc. and Bowe Bell + Howell GmbH

18.     Supply and Product Development Agreement dated June 1, 2009 by and between Lasermax Rolls Systems, Inc and Bowe Bell + Howell Company

20.     Employment Agreement dated April 22, 2004 by and between Bowe Bell + Howell International, Ltd and Bob Richards

21.     BBH Company sells equipment, software, parts and service to Bowe Bell + Howell International Ltd.

Bowe Systec, Inc. is a party to the below listed contracts with Bowe Systec AG, who is in insolvency in Germany. Sellers have no information that the below agreements have been assigned to the purchaser of the assets of Bowe Systec AG.

- Master License Agreement dated December 30, 2002 by and between Bowe Systec AG and Bowe Systec, Inc.

- Distribution Agreement dated December 30, 2002 by and between Bowe Systec AG and Bowe Systec, Inc for distribution of Bowe Systec Products in the United States and Canada. Prior to Bowe Systec AG selling its assets, Sellers purchased equipment, software, parts and services from Bowe Systec AG and its Affiliates and Bowe Systec AG and its Affiliates purchased equipment, parts, software and services from Sellers.

**Schedule 5.1(w)**
**Absence of Certain Developments**

1. Announced plans in January 2011 to relocate sorting manufacturing operations from Wheeling, IL to Durham, NC and Bethlehem, PA.

2. Approved retention arrangements for certain employees at the Wheeling, IL facility related to the relocation of the sorting manufacturing operations.

3. BBH, Inc. renegotiated its lease for the Wheeling, IL facility.

4. Retention of consultants relating to the possible sale of and bankruptcy filing for the Sellers.

**Schedule 5.1(x)**
**Absence of Undisclosed Liabilities**

None.

See attached documents.

# Notarielle Urkunde

Verhandelt zu Düsseldorf

heute am [__]. April 2011.

Vor mir, dem unterzeichnenden Notar

**Dr. Armin Hauschild**

mit dem Amtssitz in

**Düsseldorf**

erschienen heute

1. Herr Dr. Patrick Nordhues, geboren am 27. April 1974, geschäftsansässig Stadttor 1, 40219 Düsseldorf,

   der Erschienene zu 1. handelnd nicht im eigenen Namen, sondern im Namen der

   **Bowe Bell + Howell Postal Systems Company**, 760 South Wolf Road, Wheeling, Illinois, 60089, USA,

   - nachfolgend auch „**BBH US**" -

   aufgrund Vollmacht.

   Der Erschienene zu 1. wies seine Vertretungsberechtigung nach durch Vorlage einer notariell beglaubigten Vollmacht der BBH US vom [__]. April 2011, die im Original vorlag und von der eine beglaubigte Abschrift zu dieser Urkunde genommen wird.

2. Herr Dr. Thomas Ammermann, geboren am 29. Juni 1976, geschäftsansässig Stadttor 1, 40219 Düsseldorf,

der Erschienene zu 2. handelnd nicht im eigenen Namen, sondern im Namen der

> **[_____] Unternehmergesellschaft (haftungsbeschränkt)** mit Sitz in *[Düsseldorf]* und eingetragen im Handelsregister des Amtsgerichts *[Düsseldorf]* unter HRB [_____],

> - nachfolgend auch „[_____] UG" -

aufgrund Vollmacht.

Der Erschienene zu 2. wies seine Vertretungsberechtigung nach durch Vorlage einer beglaubigten Vollmacht der [_____] UG vom [__]. April 2011 sowie eines beglaubigten Handelsregisterauszuges des Amtsgerichts *[Düsseldorf]* vom [__]. April 2011 zu HRB [_____], die jeweils im Original vorlagen und von denen beglaubigte Abschriften zu dieser Urkunde genommen werden.

Die Erschienenen wiesen sich dem Notar gegenüber aus durch Vorlage ihrer amtlichen Personalausweise.

Die Frage, ob eine Vorbefassung des Notars oder eines Partners des Notars oder anderer mit dem Notar zur gemeinsamen Berufsausübung verbundener oder im gemeinsamen Geschäftsraum tätiger Personen im Sinne von § 3 Abs. 1 Nr. 7 BeurkG vorliege, wurde sowohl von den Erschienenen als auch von dem Notar verneint.

Die Erschienenen baten sodann – handelnd wie angegeben – um öffentliche Beurkundung des Folgenden:

## I.

### Vorbemerkung

1. Die BBH US ist die alleinige Gesellschafterin der Böwe Bell + Howell GmbH mit Sitz in Oberursel (Taunus) und eingetragen im Handelsregister des Amtsgerichts Bad Homburg v.d. Höhe unter HRB 11159 (nachfolgend auch die „Gesellschaft").

2. Die Gesellschaft soll in die Rechtsform der Kommanditgesellschaft umgewandelt werden. Die [_____] UG soll als persönlich haftende Gesellschafterin der zukünftigen Kommanditgesellschaft dienen und hierzu treuhänderisch zunächst einen Geschäftsanteil an der Gesellschaft erwerben.

## II.
### Gesellschafterversammlung
### der
### Gesellschaft

1. Die BBH US ist die alleinige Gesellschafterin der Gesellschaft. Das Stammkapital der Gesellschaft beträgt EUR 100.000,00. Die Stammeinlagen auf die von der BBH US an der Gesellschaft gehaltenen Geschäftsanteile im Nennbetrag von EUR 75.000,00 und EUR 25.000,00 sind nach Angaben der BBH US vollständig geleistet. Es bestehen keine Nachschusspflichten.

2. Unter Verzicht auf die Einhaltung sämtlicher durch Gesetz und/oder Gesellschaftsvertrag für die Einberufung, Vorbereitung und Abhaltung einer Gesellschafterversammlung vorgeschriebenen Form- und Fristerfordernisse hält hiermit die BBH US eine

### außerordentliche Gesellschafterversammlung

der Gesellschaft ab und beschließt einstimmig was folgt:

2.1 Die BBH US legt hiermit sämtliche von ihr an der Gesellschaft gehaltenen Geschäftsanteile zu einem Geschäftsanteil im Nennbetrag von EUR 100.000,00 zusammen. Die Gesellschafterversammlung stimmt hiermit gemäß § 46 Nr. 4 GmbHG der Zusammenlegung der Geschäftsanteile zu.

2.2 Die BBH US teilt hiermit den von ihr gehaltenen Geschäftsanteil im Nennbetrag von EUR 100.000,00 in 100.000 Geschäftsanteile zu jeweils EUR 1,00 mit den laufenden Nummern 1 bis 100.000. Die Gesellschafterversammlung stimmt hiermit gemäß § 46 Nr. 4 GmbHG der Teilung des Geschäftsanteils zu.

2.3 Die Geschäftsführung der Gesellschaft wird unter Befreiung von den Beschränkungen des § 181 BGB beauftragt und ermächtigt, alle Handlungen vorzunehmen und Erklärungen abzugeben und entgegenzunehmen, die zur Durchführung dieser Gesellschafterbeschlüsse zweckdienlich und/oder erforderlich sind.

2.4 Der beurkundende Notar wird beauftragt und ermächtigt, unverzüglich gemäß § 40 Abs. 2 GmbHG eine aktualisierte Gesellschafterliste zum Handelsregister der Gesellschaft einzureichen.

2.5 Die Kosten und Auslagen aus und im Zusammenhang mit diesen Beschlüssen und ihrer Durchführung trägt die Gesellschaft.

3. Weitere Beschlüsse wurden nicht gefasst. Die Gesellschafterversammlung wird geschlossen.

## III.
### Geschäftsanteilsabtretung

1. Die BBH US tritt hiermit zum Zwecke der Beteiligung der [_____] UG als zukünftige persönlich haftende Gesellschafterin der formgewechselten Gesellschaft den Geschäftsanteil an der Gesellschaft im Nennbetrag von EUR 1,00 mit der laufenden Nr. 1 einschließlich sämtlicher hiermit verbundener Rechte und Ansprüche an die [_____] UG ab. Die [_____] UG nimmt die Abtretung hiermit an.

2. Im Hinblick darauf, dass die [_____] UG als persönlich haftende Gesellschafterin keinen Kapitalanteil an der durch Formwechsel entstehenden Kommanditgesellschaft erhält und am Gewinn und Verlust der Kommanditgesellschaft nicht beteiligt ist, erfolgt die vorstehende Abtretung bis zur Eintragung des Formwechsels treuhänderisch und ausschließlich zur Erfüllung der umwandlungsrechtlichen Voraussetzungen für den beabsichtigten Formwechsel. Die [_____] UG wird im Hinblick auf den beabsichtigten Formwechsel ihre Rechte aus dem abgetretenen Geschäftsanteil nur nach Weisung und für Rechnung der BBH US wahrnehmen, soweit gesetzlich möglich.

3. Im Hinblick auf die vorstehenden Vereinbarungen ist eine Gegenleistung für den abgetretenen Geschäftsanteil nicht geschuldet.

4. Die Gebühren und etwaige Verkehrssteuern aus und im Zusammenhang mit der notariellen Beurkundung dieses Vertrages und seiner Durchführung trägt die BBH US. Im übrigen trägt jede Partei jeweils ihre eigenen Kosten und Auslagen aus und im Zusammenhang mit der Vorbereitung, dem Abschluss und der Durchführung dieses Vertrages einschließlich der Kosten ihrer Berater.

5. Dieser Vertrag unterliegt dem Recht der Bundesrepublik Deutschland. Gerichtsstand für alle Streitigkeiten aus oder im Zusammenhang mit diesem Vertrag und seiner Durchführung ist Düsseldorf.

6. Sollten einzelne Bestimmungen ganz oder teilweise unwirksam oder undurchführbar sein oder werden, so wird die Wirksamkeit der übrigen Bestimmungen hiervon nicht berührt. Anstelle der unwirksamen oder undurchführbaren Bestimmungen verpflichten sich die Parteien, eine solche Bestimmung zu vereinbaren, die dem am nächsten kommt, was von den Vertragsparteien als ursprünglicher Sinn und Zweck der unwirksamen oder

undurchführbaren Bestimmungen gewollt war. Gleiches gilt für etwaige Lücken in diesem Vertrag.

7. Der beurkundende Notar wird beauftragt und ermächtigt, unverzüglich gemäß § 40 Abs. 2 GmbHG eine aktualisierte Gesellschafterliste zum Handelsregister der Gesellschaft einzureichen.

**IV.**

**Gesellschafterversammlung**

**der**

**Gesellschaft**

1. Die BBH US und die [_____] UG sind die alleinigen Gesellschafter der Gesellschaft. Das Stammkapital der Gesellschaft beträgt EUR 100.000,00. Die Stammeinlagen auf die von der BBH US und der [_____] UG an der Gesellschaft gehaltenen Geschäftsanteile im Nennbetrag von insgesamt EUR 100.000,00 sind nach Angaben der Gesellschafter vollständig geleistet. Es bestehen keine Nachschusspflichten.

2. Bei der Gesellschaft bestehen keine Sonderrechte i.S.v. §§ 23, 50 Abs. 2 UmwG. Die Gesellschaft hat keinen Grundbesitz und hält keine Geschäftsanteile an einer Gesellschaft mit beschränkter Haftung.

3. Im Hinblick auf die nachfolgend abzuhaltende Gesellschafterversammlung hatten die BBH US und die [_____] UG auf alle hierfür im UmwG vorgesehenen Formalien verzichtet, insbesondere auf

   3.1 die Übersendung des Umwandlungsberichtes spätestens zusammen mit der Einberufung der Gesellschafterversammlung gem. § 230 Abs. 1 UmwG,

   3.2 die Ankündigung des Formwechsels als Gegenstand der Gesellschafterversammlung durch die Geschäftsführer nach § 230 Abs. 1 UmwG,

   3.3 die Übersendung des Abfindungsangebotes spätestens zusammen mit der Einberufung der Gesellschafterversammlung gem. § 231 UmwG,

   3.4 auf die Auslegung des Umwandlungsberichtes in der Gesellschafterversammlung gem. § 232 UmwG.

   Dieser Verzicht wird hiermit nochmals bestätigt.

DM_DE 3618244-1.T08745.0010

4. Unter Verzicht auf die Einhaltung sämtlicher durch Gesetz und/oder Gesellschaftsvertrag für die Einberufung, Vorbereitung und Abhaltung einer Gesellschafterversammlung vorgeschriebenen Form- und Fristerfordernisse halten hiermit die BBH US und die [_____] UG eine

### außerordentliche Gesellschafterversammlung

der Gesellschaft ab und beschließen einstimmig was folgt:

4.1 Die Gesellschaft wird gem. §§ 190 ff., 226, 228 ff. UmwG formwechselnd in eine Kommanditgesellschaft umgewandelt.

4.2 Im Innenverhältnis unter den Gesellschaftern bzw. zwischen den Gesellschaftern und der Gesellschaft erfolgt die Umwandlung mit Wirkung zum 1. Januar 2011, 00:00 Uhr. Der Zeitpunkt, von dem an die Handlungen und Geschäfte der GmbH steuerlich als für Rechnung der Kommanditgesellschaft vorgenommen gelten, ist der 1. Januar 2011, 00:00 Uhr.

4.3 Die Kommanditgesellschaft führt die Firma „Böwe Bell + Howell UG (haftungsbeschränkt) & Co. KG" und hat ihren Sitz in Oberursel (Taunus).

4.4 An der künftigen Kommanditgesellschaft sind beteiligt:

4.4.1 die [_____] UG als persönlich haftende Gesellschafterin;

4.4.2 die BBH US als Kommanditistin mit einer Kapitaleinlage von EUR 500,00 und mit einer Hafteinlage von EUR 500,00.

4.5 Die persönlich haftende Gesellschafterin erhält keinen Kapitalanteil und ist am Gewinn und Verlust der Gesellschaft nicht beteiligt. Soweit diese Beteiligung nicht den bisherigen Beteiligungsverhältnissen an der Gesellschaft entspricht, stimmen alle Gesellschafter dem ausdrücklich zu.

4.6 Art und Umfang der Beteiligung an der Kommanditgesellschaft sowie die Rechte der Gesellschafter im Einzelnen ergeben sich aus dem hiermit vereinbarten Gesellschaftsvertrag der Böwe Bell + Howell UG (haftungsbeschränkt) & Co. KG, der dieser Urkunde als **Anlage (A)** beigefügt ist und mit der Beschlussfassung geschlossen wird. Auf Anlage (A) wird verwiesen.

4.7 Keinem Gesellschafter der Gesellschaft bzw. zukünftigen Gesellschafter der Kommanditgesellschaft werden besondere Rechte im Sinne von § 194 Abs. 1 Nr. 5 UmwG eingeräumt und es sind keine Maßnahmen im Sinne von § 194

Abs. 1 Nr. 5 UmwG vorgesehen. Inhaber besonderer Rechte im Sinne von § 194 Abs. 1 Nr. 5 UmwG bestehen nicht.

4.8 Die Aufnahme eines Abfindungsangebots entfällt auf Grund der Zustimmung aller Gesellschafter und des erklärten Verzichtes.

4.9 Die Gesellschaft hat weder Arbeitnehmer noch einen Betriebsrat oder eine sonstige Arbeitnehmervertretung. Bestimmungen nach § 194 Abs. 1 Nr. 7 UmwG sind folglich nicht erforderlich.

4.10 Zum Abschlussprüfer für das erste (am 31. Dezember 2011 endende) Geschäftsjahr wird die [_____] Wirtschaftsprüfungsgesellschaft in [_____] bestellt.

4.11 Schließlich wird im Hinblick auf § 228 Abs. 1 UmwG festgestellt, dass die Geschäftstätigkeit der Gesellschaft im Zeitpunkt der Umwandlung nach Art und Umfang einen in kaufmännischer Weise eingerichteten Geschäftsbetrieb i.S.v. §§ 105 Abs. 1, 1 Abs. 2 HGB erfordert.

4.12 Die Kosten des Formwechsels trägt die Kommanditgesellschaft.

4.13 Die Geschäftsführung der Gesellschaft wird unter Befreiung von den Beschränkungen des § 181 BGB beauftragt und ermächtigt, alle Handlungen vorzunehmen und Erklärungen abzugeben und entgegenzunehmen, die zur Durchführung dieser Gesellschafterbeschlüsse zweckdienlich und/oder erforderlich sind.

5. Weitere Beschlüsse wurden nicht gefasst. Die Gesellschafterversammlung wird geschlossen.

## V.
### Verzichts- und Zustimmungserklärungen
### der
### BBH US und der [_____] UG

1. Nach entsprechender Belehrung durch den beurkundenden Notar erklärten die BBH US und die [_____] UG als alleinige Gesellschafter der Gesellschaft den Verzicht

1.1 auf die Erstattung eines Umwandlungsberichtes nebst Entwurf des Umwandlungsbeschlusses nach § 192 Abs. 1 UmwG,

1.2 auf ein Abfindungsangebot nach § 207 Abs. 1 UmwG und dessen Prüfung nach § 208 UmwG,

1.3 sowie vorsorglich auf ein Verlangen eines Ausgleichs durch bare Zuzahlung nach § 196 UmwG.

2. Nach entsprechender Belehrung durch den beurkundenden Notar erklärten die BBH US und die [_____] UG ferner den Verzicht auf eine Klage (Nichtigkeits-, Anfechtungs- und/oder Unwirksamkeitsklage) gegen die Wirksamkeit des Formwechselbeschlusses gemäß § 195 Abs. 1 UmwG sowie auf eine Klage (Nichtigkeits-, Anfechtungs- und/oder Unwirksamkeitsklage) gegen die Wirksamkeit sämtlicher übriger vorstehend abgegebenen Erklärungen und Beschlüsse.

3. Die [_____] UG stimmt zu, dass im Rahmen der formwechselnden Umwandlung der Gesellschaft eine Verschiebung der Beteiligungsquoten in der Weise erfolgt, dass sie künftig an der Kommanditgesellschaft vermögensmäßig nicht beteiligt ist.

## VI.
### Hinweise und Belehrungen

Der beurkundende Notar erteilte die nach dem Beurkundungsgesetz vorgeschriebenen Belehrungen, insbesondere die folgenden Hinweise und Belehrungen:

1. Der Erwerber erwirbt einen Geschäftsanteil oder ein Recht daran unter bestimmten Voraussetzungen wirksam vom Nichtberechtigten, wenn der Veräußerer als Inhaber des Geschäftsanteils in der im Handelsregister aufgenommenen Gesellschafterliste eingetragen ist. Dies gilt jedoch nicht, wenn die Liste im Zeitpunkt des Erwerbs hinsichtlich des Geschäftsanteils weniger als drei Jahre unrichtig ist und diese Unrichtigkeit dem Berechtigten nicht zuzurechnen ist. Ein gutgläubiger Erwerb ist ferner nicht möglich, wenn dem Erwerber die mangelnde Berechtigung bekannt oder infolge grober Fahrlässigkeit unbekannt ist oder der Liste ein Widerspruch zugeordnet ist. Ein gutgläubiger lastenfreier Erwerb ist in keinem Fall möglich.

2. Der Erwerber von Geschäftsanteilen haftet für die zur Zeit der Abtretung auf die erworbenen Geschäftsanteile rückständigen Leistungen neben dem Veräußerer unbeschränkt.

3. Unbeschadet der Vereinbarungen in dem Geschäftsanteilsabtretungsvertrag haften die Beteiligten für die Kosten und Gebühren der notariellen Beurkundung als Gesamtschuldner.

- 8 -

4. Sämtliche Vereinbarungen müssen richtig und vollständig beurkundet sein. Sämtliche nicht beurkundeten Abreden zwischen den Beteiligten sind nichtig und ein solcher Verstoß gegen die Beurkundungspflicht kann zur Unwirksamkeit des gesamten Geschäftsanteilsabtretungsvertrages führen.

5. Die Geschäftsführer der Gesellschaft haben bei Verletzung ihrer Sorgfaltspflicht der GmbH, ihren Gesellschaftern und Gläubigern gesamtschuldnerisch allen Schaden zu ersetzen, den diese durch den Formwechsel erleiden, § 205 UmwG.

6. Der Formwechsel wird erst wirksam, wenn die neue Rechtsform Kommanditgesellschaft in dem für sie zuständigen Register eingetragen ist.

7. Rechte Dritter an den Geschäftsanteilen an der GmbH bestehen an den künftigen Gesellschaftsanteilen an der Kommanditgesellschaft fort.

8. Das Registergericht wird die Eintragung des Formwechsels bekannt machen. Darin werden die Gläubiger der GmbH auf folgendes Recht hingewiesen werden: Wenn sie binnen sechs Monaten nach Bekanntmachung ihren Anspruch nach Grund und Höhe schriftlich anmelden und glaubhaft machen, dass die Erfüllung ihrer Forderung durch den Formwechsel gefährdet wird, können sie Sicherheitsleistung verlangen, sofern sie nicht schon die Befriedigung ihrer Forderung beanspruchen können.

9. Soweit in der GmbH Sonderrechte zugunsten Dritter bestehen, sind diesen Dritten vergleichbare Rechte in der Kommanditgesellschaft einzuräumen.

Der beurkundende Notar belehrte die Beteiligten ferner über die Unwiderruflichkeit der Verzichtserklärungen und über deren Wirkungen sowie darüber, dass durch diese Erklärungen die Ausübung von Gesellschafterrechten bei der vorstehenden Umwandlung beeinträchtigt werden kann.


## VII.
### Vollzugsvollmacht

Wir bevollmächtigen hiermit

1. Herrn Udo Jansen;

2. Frau Nadine Frenzel;

jeweils geschäftsansässig bei dem amtierenden Notar, je einzeln und unter Befreiung von den Beschränkungen des § 181 BGB, sämtliche Erklärungen abzugeben und entgegenzunehmen

sowie Handlungen vorzunehmen, die nach Auffassung der Bevollmächtigten zum Vollzug dieser Urkunde und zur Eintragung im Handelsregister – insbesondere bei gerichtlichen Zwischenverfügungen – zweckdienlich und/oder erforderlich sind. Die Bevollmächtigten sind insbesondere zu Änderungen und Ergänzungen dieser Niederschrift berechtigt sowie zur Einholung und Entgegennahme der zu der Umwandlung der Gesellschaft etwa erforderlichen Genehmigungen.

## VIII.
### Schlussbestimmungen

1. Alle Genehmigungen werden mit ihrem Eingang bei dem beurkundenden Notar wirksam.

2. Von dieser Urkunde erhalten beglaubigte Abschriften:

    2.1 die Gesellschaft;

    2.2 die BBH US;

    2.3 die [_____] UG;

    2.4 das Registergericht des Sitzes der Gesellschaft;

    2.5 das Finanzamt für Körperschaften der Gesellschaft.

Vorstehende Niederschrift nebst Anlage (A) wurde den Erschienenen von dem Notar vorgelesen, von ihnen genehmigt und eigenhändig von ihnen und dem Notar wie folgt unterschrieben:

DM_DE 3618244-1.T08745.0010



**Anlage (A)**
**zur notariellen Urkunde**
**UR-Nr. [_____]/2011**
**des Notars Dr. Henryk Haibt**
**in Düsseldorf**

*Gesellschaftsvertrag*

*der*

*Böwe Bell + Howell UG (haftungsbeschränkt) & Co. KG*





GESELLSCHAFTSVERTRAG

der

Böwe Bell + Howell UG (haftungsbeschränkt) & Co. KG

mit Sitz in Oberursel (Taunus)

## § 1
### Firma, Sitz

(1) Die Gesellschaft ist eine Kommanditgesellschaft, ihre Firma lautet:

**Böwe Bell + Howell UG (haftungsbeschränkt) & Co. KG**

(2) Sitz der Gesellschaft ist Oberursel (Taunus).


## § 2
### Gegenstand des Unternehmens

(1) Gegenstand des Unternehmens ist der Vertrieb und Kundendienst von Ausrüstungen für die Sortierung und Auslieferung von Postsendungen sowie Entwicklung, Konstruktion, Produktion und Dienstleistungen im Bereich der Postautomatisierung.

(2) Die Gesellschaft ist berechtigt, alle Handlungen vorzunehmen, die mittelbar oder unmittelbar geeignet sind, dem Gegenstand des Unternehmens gemäß Abs. 1 zu dienen.


## § 3
### Gesellschafter, Kommanditeinlage, Konten

(1) Die Gesellschafter sind

a) die [_____] UG (haftungsbeschränkt) mit Sitz in [*Düsseldorf*] und eingetragen im Handelsregister des Amtsgerichts [*Düsseldorf*] unter HRB [_____] (nachfolgend auch „[_____] UG" genannt)

als persönlich haftende Gesellschafterin ohne vermögensmäßige Beteiligung,

b) die Bowe Bell + Howell Postal Systems Company, 760 South Wolf Road, Wheeling, Illinois, 60089, USA, (nachfolgend auch „**BBH**" genannt)

als Kommanditistin mit einer Kommanditeinlage in Höhe von EUR 500,00, die als Haftsumme in das Handelsregister einzutragen ist.

(2) Für die BBH wird ein Kapitalkonto sowie bei Bedarf ein Verlustsonderkonto und daneben ein Privatkonto geführt. Das Privatkonto ist im Soll und im Haben mit 3 %-Punkten über dem jeweiligen Basiszinssatz zu verzinsen, wobei jeweils der Saldo am Anfang eines Monats maßgeblich ist. Die Zinsen stellen im Verhältnis der Gesellschafter untereinander Aufwand und Ertrag dar.

## § 4
### Geschäftsführung und Vertretung

(1) Zur Geschäftsführung und Vertretung der Gesellschaft ist die [_____] UG berechtigt und verpflichtet. Die BBH US ist von der Geschäftsführung und Vertretung der Gesellschaft ausgeschlossen.

(2) Die [_____] UG ist von den Beschränkungen des § 181 BGB befreit.

(3) Die [_____] UG erhält Ersatz für die ihr durch die Geschäftsführung der Gesellschaft entstehenden Aufwendungen sowie eine Vergütung für ihre unbeschränkte Haftung in Höhe von 5 % ihres Reinvermögens (Stammkapital zuzüglich Rücklagen und Gewinnvorträge abzüglich Verlustvorträge), wie sich dieses aus dem jeweils letzten festgestellten Jahresabschluss ergibt. Der Aufwendungsersatz und die Haftungsprämie sind im Verhältnis unter den Gesellschaftern Aufwand.

## § 5
### Gesellschafterversammlung

(1) Die ordentliche Gesellschafterversammlung findet jährlich einmal innerhalb der ersten sechs Monate nach dem Ende eines Geschäftsjahres statt. In ihr hat die Geschäftsführung den Jahresabschluss zu erläutern und über den Geschäftsverlauf, die Lage der Gesellschaft, die beabsichtigte Geschäftspolitik sowie über Vorgänge von besonderer Bedeutung, die nach dem Ende des Geschäftsjahres eingetreten sind, Bericht zu erstatten.

(2) Eine außerordentliche Gesellschafterversammlung ist einzuberufen, wenn ein Gesellschafter die Einberufung schriftlich unter Angabe des Zwecks und der Gründe verlangt.

(3) Zu den Gesellschafterversammlungen sind die Gesellschafter unter Wahrung einer Ladungsfrist von einer Woche und unter Ankündigung der Tagesordnung schriftlich einzuladen. § 50 Abs. 3 GmbHG gilt entsprechend.

- 3 -

(4) Die Gesellschafter können durch einstimmigen Beschluss auf die Einhaltung der Einberufungsfrist und aller anderen Formvorschriften für die Einberufung einer Gesellschafterversammlung verzichten.

(5) Ein Gesellschafter kann sich in der Gesellschafterversammlung mittels schriftlicher Vollmacht durch einen Mitgesellschafter oder einen zur beruflichen Verschwiegenheit verpflichteten Angehörigen der rechts- bzw. steuerberatenden sowie wirtschaftsprüfenden Berufe vertreten lassen. Die Teilnahme anderer Personen als Vertreter oder Beistand bedarf der Zustimmung der Gesellschafterversammlung.

(6) Gesellschafterbeschlüsse werden in Gesellschafterversammlungen gefasst. Wenn kein Gesellschafter widerspricht, können Gesellschafterbeschlüsse auch außerhalb einer Gesellschafterversammlung auf schriftlichem Weg (einschließlich Telefax und E-Mail) oder fernmündlich gefasst werden.

## § 6
### Geschäftsjahr, Jahresabschluss

(1) Geschäftsjahr ist das Kalenderjahr.

(2) Der Jahresabschluss wird von der Gesellschafterversammlung festgestellt. Soweit Bilanzierungsentscheidungen der Sache nach Ergebnisverwendung sind, ist die Gesellschafterversammlung bei der Feststellung nicht an den von der Geschäftsführung aufgestellten Jahresabschluss gebunden.

## § 7
### Ergebnisverwendung

(1) Die [_____] UG ist am Gewinn und Verlust der Gesellschaft nicht beteiligt.

(2) Der verteilungsfähige Gewinn wird den übrigen Gesellschaftern auf den Privatkonten entsprechend dem Verhältnis ihrer Beteiligungen am Vermögen der Gesellschaft (§ 3 Abs.1) gutgeschrieben. Ein etwaiger Verlust wird ihnen auf Verlustsonderkonten belastet. Besteht für einen Gesellschafter ein Verlustsonderkonto, so sind Gewinnanteile, abweichend von Satz 1, diesem Konto solange gutzuschreiben, bis es ausgeglichen ist, ohne dass jedoch dadurch eine Nachschusspflicht begründet wird.

## § 8
### Liquidation

Mangels vermögensmäßiger Beteiligung ist die [_____] UG im Falle der Liquidation der Gesellschaft am Liquidationsergebnis nicht beteiligt.


## § 9
### Salvatorische Klausel

Sollten einzelne Bestimmungen ganz oder teilweise unwirksam oder undurchführbar sein oder werden, so wird die Wirksamkeit der übrigen Bestimmungen hiervon nicht berührt. Anstelle der unwirksamen oder undurchführbaren Bestimmungen verpflichten sich die Gesellschafter, eine solche Bestimmung zu vereinbaren, die dem am nächsten kommt, was von den Gesellschaftern als ursprünglicher Sinn und Zweck der unwirksamen oder undurchführbaren Bestimmungen gewollt war. Gleiches gilt für etwaige Lücken in diesem Gesellschaftsvertrag.

---

DM_DE 3618244-1.T08745.0010

# Austrittsvereinbarung

zwischen

der [ _____ ] UG (haftungsbeschränkt) mit Sitz in *[Düsseldorf]* und eingetragen im Handelsregister des Amtsgerichts *[Düsseldorf]* unter HR B [ _____ ],

- nachfolgend auch „Komplementärin" -

und

der Bowe Bell + Howell Postal Systems Company, 760 South Wolf Road, Wheeling, Illinois 60089, USA,

- nachfolgend auch „Kommanditistin" -

unter Beteiligung der

Böwe Bell + Howell GmbH mit Sitz in Oberursel (Taunus) und eingetragen im Handelsregister des Amtsgerichts Bad Homburg v.d. Höhe unter HR B 11159,

- nachfolgend auch „Gesellschaft" -

- die Komplementärin, die Kommanditistin und die Gesellschaft nachfolgend auch gemeinsam „Vertragsparteien" genannt -

## Präambel

(A)     Die Komplementärin und die Kommanditistin sind die alleinigen Gesellschafter der Gesellschaft.

(B)     Mit notarieller Urkunde vom [__]. April 2011 (UR-Nr. [_____]/2011 des Notars Dr. [_____] in Düsseldorf) ist die Gesellschaft nach §§ 190ff., §§ 226ff. UmwG formwechselnd in eine Kommanditgesellschaft umgewandelt worden.

Dies vorausgeschickt vereinbaren die Parteien was folgt:

## § 1
### Austritt der Komplementärin

1.1     Die Komplementärin erklärt hiermit mit Wirkung auf den Tag der Eintragung der Gesellschaft als Kommanditgesellschaft im zuständigen Handelsregister, 24:00 Uhr, ihren Austritt als persönlich haftende Gesellschafterin der Gesellschaft.

1.2     Mit dem Ausscheiden der Komplementärin als persönlich haftende Gesellschafterin ist die Gesellschaft aufgelöst.

1.3     Die Kommanditistin übernimmt das Handelsgeschäft der Gesellschaft mit allen Aktiva und Passiva ohne Liquidation mit Wirkung auf den Tag der Eintragung der Gesellschaft als Kommanditgesellschaft im zuständigen Handelsregister, 24:00 Uhr.

## § 2
### Verzichtserklärung

Die Komplementärin erklärt hiermit rein vorsorglich den Verzicht auf die Zahlung einer Abfindung im Zusammenhang mit ihrem Austritt aus der Gesellschaft.

## § 3
### Vollmacht

Die Geschäftsführung der Gesellschaft wird ermächtigt und beauftragt, alle Maßnahmen zu treffen und Erklärungen abzugeben, die zur Durchführung der vorstehenden Erklärungen notwendig und/oder zweckdienlich sind.

## § 4
### Schlussbestimmungen

4.1 Änderungen und Ergänzungen dieses Vertrages bedürfen der Schriftform, soweit nicht gesetzlich eine andere Form erforderlich ist.

4.2. Sollten eine oder mehrere Bestimmungen dieses Vertrages ganz oder teilweise nichtig, unwirksam oder undurchführbar sein oder werden, wird die Wirksamkeit der übrigen Bestimmungen dadurch nicht berührt. Anstelle der nichtigen, unwirksamen oder undurchführbaren Bestimmung treffen die Vertragsparteien eine solche Vereinbarung, die im Rahmen des rechtlich Möglichen hinsichtlich Ort, Zeit, Maß und Geltungsbereich dem am nächsten kommt, was von den Vertragsparteien nach dem ursprünglichen Sinn und Zweck der nichtigen, unwirksamen oder undurchführbaren Bestimmung gewollt war. Gleiches gilt für etwaige Lücken in diesem Vertrag.

Oberursel (Taunus), den [__]. April 2011

_____

[_____] UG (haftungsbeschränkt)

vertreten durch

Oliver Bialowons

- alleinvertretungsberechtigter und von den Beschränkungen des § 181 BGB befreiter Geschäftsführer -

Bowe Bell + Howell Postal Systems Company
vertreten durch
Oliver Bialowons
- einzelvertretungsberechtigter Direktor -

Böwe Bell + Howell GmbH
vertreten durch
Oliver Bialowons
- alleinvertretungsberechtigter und von den Beschränkungen
des § 181 BGB befreiter Geschäftsführer -

An das
Amtsgericht Bad Homburg v.d. Höhe
- Handelsregister -
Auf der Steinkaut 10-12
61352 Bad Homburg v.d. Höhe


**HR B 11159**

**Böwe Bell + Howell GmbH**

**hier:**

**Neugründung der Böwe Bell + Howell UG (haftungsbeschränkt) & Co. KG mit Sitz in Oberursel (Taunus) durch Formwechsel**


1. Ich, der unterzeichnete alleinvertretungsberechtigte Geschäftsführer der vorbezeichneten Gesellschaft, Oliver Bialowons, überreiche hiermit

   Ausfertigung der notariellen Urkunde vom [_]. April 2011 (UR-Nr. [_____]/2011 des Notars Dr. [_____] in Düsseldorf) mit dem Beschluss über den Formwechsel der Böwe Bell + Howell GmbH mit Sitz in Oberursel (Taunus) und eingetragen im Handelsregister des Amtsgerichts Bad Homburg v.d. Höhe unter HRB 11159 in die Rechtsform einer Kommanditgesellschaft (UG (haftungsbeschränkt) & Co. KG) mit

   1.1 dem Umwandlungsbeschluss;

   1.2 dem Gesellschaftsvertrag der neuen Kommanditgesellschaft;

   1.3 den Verzichtserklärungen sämtlicher Gesellschafter auf einen Umwandlungsbericht und sämtliche sonstigen Formalien des Formwechsels;

   1.4 den Verzichtserklärungen sämtlicher Gesellschafter auf die Erhebung einer Klage (Nichtigkeits-, Anfechtungs- und/oder Unwirksamkeitsklage) gegen die Wirksamkeit des Umwandlungsbeschlusses nach § 195 Abs. 1 UmwG.

2.    Zur Eintragung ins Handelsregister melde ich an:

2.1   Die Böwe Bell + Howell GmbH mit Sitz in Oberursel (Taunus) und eingetragen im Handelsregister des Amtsgerichts Bad Homburg v.d. Höhe unter HRB 11159 ist aufgrund Umwandlungsbeschlusses vom [__]. April 2011 im Wege des Formwechsels nach §§ 190ff., 226ff. UmwG umgewandelt in eine Kommanditgesellschaft in Firma „Böwe Bell + Howell UG (haftungsbeschränkt) & Co. KG" mit dem Sitz in Oberursel (Taunus).

2.2   Die Kommanditgesellschaft beginnt mit der Eintragung in das Handelsregister.

2.3   Gegenstand der Gesellschaft ist der Vertrieb und Kundendienst von Ausrüstungen für die Sortierung und Auslieferung von Postsendungen sowie Entwicklung, Konstruktion, Produktion und Dienstleistungen im Bereich der Postautomatisierung.

2.4   Persönlich haftende Gesellschafterin ist die [_____] UG (haftungsbeschränkt) mit Sitz in Düsseldorf und eingetragen im Handelsregister des Amtsgerichts Düsseldorf unter HRB [_____].

2.5   Kommanditistin mit einer Hafteinlage von EUR 500,00 ist die Bowe Bell + Howell Postal Systems Company mit Sitz in 760 South Wolf Road, Wheeling, Illinois, 60089 USA.

2.6   Allgemein ist die Vertretungsbefugnis wie folgt geregelt:

Zur Geschäftsführung der Gesellschaft ist ausschließlich die Komplementärin berechtigt und verpflichtet.

Die Komplementärin und deren jeweilige Geschäftsführer sind bei allen Rechtshandlungen mit oder gegenüber der Gesellschaft von den Beschränkungen des § 181 BGB befreit.

Konkret ist die Vertretungsbefugnis wie folgt geregelt:

Die Komplementärin [_____] UG (haftungsbeschränkt) mit Sitz in Düsseldorf ist stets alleinvertretungsberechtigt und von den Beschränkungen des § 181 BGB befreit.

3.  Es wird weiter versichert, dass eine Klage gegen die Wirksamkeit des Umwandlungsbeschlusses nicht erhoben worden ist und auf Grund der notariell beurkundeten Verzichtserklärungen aller Gesellschafter auch nicht erhoben werden kann (§§ 16 Abs. 2, 195 UmwG). Da die Gesellschaft weder über einen Betriebsrat noch eine sonstige Arbeitnehmervertretung verfügt, bedarf es keines Nachweises einer Zuleitung des Entwurfs eines Umwandlungsbeschlusses nach § 194 Abs. 2 iVm § 199 UmwG.

    Auf die Erstellung eines Umwandlungsberichtes wurde von allen Gesellschaftern in notarieller Form verzichtet.

    Hinsichtlich der weiteren Einzelheiten der Umwandlung wird Bezug genommen auf die in der überreichten Urkunde gefassten Beschlüsse und die dort enthaltenen Erklärungen, insbesondere Zustimmungs- und Verzichtserklärungen.

4.  Die inländische Geschäftsanschrift der Gesellschaft lautet:

    Herriotstraße 1
    60528 Frankfurt am Main.

5.  Eintragungsnachrichten werden erbeten an:

    5.1  die Gesellschaft,

    5.2  Notar Dr. [＿＿＿],
         [＿＿＿],
         [＿＿＿],

    5.3  McDermott Will & Emery
         Rechtsanwälte Steuerberater LLP,
         z. Hd. Herrn Rechtsanwalt Dr. Patrick Nordhues,
         Stadttor 1, 40219 Düsseldorf.

6.  Nach erfolgter Eintragung bitte ich um die Übersendung von zwei beglaubigten und drei unbeglaubigten Handelsregisterauszügen zu Händen des Notars Dr. [＿＿＿] in Düsseldorf.

7.  Die Kosten dieser Urkunde und ihrer Durchführung einschließlich der Kosten der Handelsregisterauszüge trägt die Gesellschaft.

8. Ich bevollmächtige hiermit

    8.1   Herrn [_____],

    8.2   Frau [_____],

sämtlich geschäftsansässig bei dem Notar Dr. [_____] in Düsseldorf, jeweils einzeln und unter Befreiung von den Beschränkungen des § 181 BGB, alle zum Vollzug dieser Anmeldung erforderlichen und/oder zweckdienlichen, insbesondere sämtliche vom Registergericht verlangten, Erklärungen abzugeben, diese Anmeldung zu ergänzen, zu ändern oder zurückzunehmen.


_____, den __. April 2011


_____

Oliver Bialowons

- alleinvertretungsberechtigter Geschäftsführer der
Böwe Bell + Howell GmbH -


_____

Oliver Bialowons

- alleinvertretungsberechtigter Geschäftsführer der
[_____] UG (haftungsbeschränkt) -


_____

Oliver Bialowons

- einzelvertretungsberechtigter Direktor der
Bowe Bell + Howell Postal Systems Company -

*[Notarieller Beglaubigungsvermerk]*

**United States Employee Benefits**

The Purchasers intend only to assume the following coverages under the BBH, Inc.

Group Benefits Plan:

> Welfare Benefit Medical Plan
>
> Welfare Benefit Dental Plan
>
> Welfare Benefit Vision Plan
>
> Welfare Benefit Employee Assistance Program/Health Advocate
>
> Welfare Benefit Accidental Death and Dismemberment Plan (employee, spouse and dependent coverage)
>
> Welfare Benefit Business Travel Accident Plan
>
> Welfare Benefit Short Term Disability Plan
>
> Welfare Benefit Long Term Disability Plan (including additional coverage provided to executives)
>
> Welfare Benefit Retiree Medical Plan (Extended Coverage for Certain Terminated Employees and Retirees effective January 1, 2004)
>
> Welfare Benefit Retiree Dental Plan (Extended Coverage for Certain Terminated Employees and Retirees effective January 1, 2004)
>
> Welfare Benefit Retiree Vision Plan (Extended Coverage for Certain Terminated Employees and Retirees effective January 1, 2004)

Welfare Benefit Health Care Flexible Spending Account

Welfare Benefit Dependent Care Flexible Spending Account

**BCC Software Benefit Plans**

BCC Software, Inc. Medical Plan Health Insurance

---

[6] Schedule 6.5(b)(i) can be updated and revised in accordance with Section 2.6 of the Agreement.

BCC Software, Inc. Welfare Benefit Plan Dental Insurance

Group Life Insurance Designed for Employees of BCC Software, Inc.

BCC Software, Inc. Accidental Death and Dismemberment Plan

Basic Long Term Care Insurance

Group Short Term Disability Insurance Designed for Employees of BCC Software, Inc.

Group Long Term Disability Insurance Designed for Employees of BCC Software, Inc.

BCC Software, Inc. Flexible Spending Account Plan

Voluntary Supplemental Life Insurance

Voluntary Supplemental Cancer, Disability and Long Term Care Coverage

**Bowe Bell + Howell International, Ltd.**

None.

Bowe Bell + Howell Retirement Savings Plan

BBH, Inc. Group Benefits Plan

Bowe Bell + Howell Severance Benefits Plan

Welfare Benefit Group Term Life Insurance Plan (Class 1 & 2 – basic life, voluntary, and dependent; and Class 4 – Disabled); provided that for the avoidance of doubt, the Purchasers are not agreeing to provide retiree life insurance as set forth in Section 6.5(d) of the Agreement.

## Bowe Bell + Howell International, Ltd.

Group Insurance Plan – via Industrial Alliance
     Life Insurance
     Optional Life Insurance
     Long-Term Disability Income Insurance
     Supplemental Health Insurance (including Prescription Drugs)
     Dental Care Insurance
     Accidental Death & Dismemberment

Bowe Bell + Howell International Ltd. Retirement Savings Program – via Sun Life
     Registered Pension Plan for Employees of Bowe Bell + Howell International Ltd; Group Annuity Policy No 68077-G

     Group Retirement Savings Plan for Bowe Bell + Howe International Ltd; Group Annuity Policy No 68078-G

Employee Savings Plan of Bowe Bell + Howell International Ltd; Group Annuity Policy No 68079-G

---

[7] Schedule 6.5(b(ii) can be updated and revised in accordance with Section 2.6 of the Agreement.

## Schedule 8.2(g)
## Required Consents

1. Software License Agreement effective September 23, 2004 by and between SAP America, Inc. and Bowe Bell + Howell Company, as amended.

2. Integration and Licensing Agreement dated March 15, 2001 by and between Parascript, LLC and Bell + Howell Mail and Messaging Technologies Company

3. Amended and Restated Supply and Purchase Agreement dated February 11, 2010 by and between Bowe Bell + Howell Company and C.M.C. S.r.L.

4. Software OEM License Agreement dated November 4, 2010 between Sefas Innovations, Inc. and Bowe Bell + Howell Company.

5. Distribution and License Agreement dated February 6, 2008 by and between Bowe Bell + Howell Company and OPEX Corporation

(i)     a certificate signed by the Purchasers, dated the date of the Closing (in form and substance reasonably satisfactory to the Sellers) certifying that the conditions specified in <u>Sections 8.1(a)</u> and <u>8.1(b)</u> of the Agreement have been satisfied as of the Closing; and

(ii)     certified copies of the resolutions of the board of directors or managers, as applicable, of the Purchasers authorizing the execution, delivery and performance of the Agreement and the Ancillary Agreements contemplated thereby and the consummation of the transactions contemplated by the Agreement and the Ancillary Agreements.

## Schedule 8.2(j)
## Sellers' Other Deliveries

(i)     a certificate signed by each Seller, dated the date of the Closing Date, (in form and substance reasonably satisfactory to the Purchasers) certifying that the conditions specified in <u>Sections 8.2(a)</u> and <u>8.2(b)</u> of the Agreement have been satisfied as of the Closing;

(ii)    certified copies of the resolutions of the board of directors or similar governing body of each Seller authorizing the execution, delivery and performance of the Agreement and the Ancillary Agreements contemplated thereby and the consummation of the transactions contemplated by the Agreement and the Ancillary Agreement;

(iii)   originals (or, to the extent originals are not available, copies) of all Acquired Contracts (together with all amendments, supplements or modifications thereto);

(iv)    the Acquired Assets, including physical possession of all of the Acquired Assets capable of passing by delivery with the intent that title in such Acquired Assets shall pass by and upon delivery;

(v)     duly executed bill of sale and assignment and assumption agreement in the form attached to the Agreement as <u>Exhibit A</u> and any other forms each in recordable form to the extent necessary to assign such rights;

(vi)    one or more bills of sale, substantially in the form attached to the Agreement as <u>Exhibit C-1</u> and <u>Exhibit C-2</u>, conveying in the aggregate all of the owned personal property of the Sellers included in the Acquired Assets, duly executed by the Sellers;

(vii)   the Assignment and Assumption duly executed by the relevant Seller or Sellers;

(viii)  duly executed intellectual property assignments in the form attached to the Agreement as <u>Exhibit D</u> and any other forms each in recordable form to the extent necessary to assign such rights;

(ix)    an affidavit from each Seller, other than the Foreign Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury Laws issued pursuant to Section 1445 of the Code stating that such Seller is not a foreign person as defined in Section 1445 of the Code;

(x)     an assignment and assumption of lease with respect to each of the Facility Leases assumed by the Purchasers hereunder in form and substance satisfactory to the Purchasers;

(xi)    certificates of title and title transfer documents to all titled Motor Vehicles;

(xii)   an assignment and assumption agreement with respect to Sellers' Permits and Licenses and warranties in form and substance reasonably acceptable to the Purchasers,

whereby the Sellers shall assign to the Purchasers all of their respective rights in and to any Permits and Licenses and warranties relating (directly or indirectly) to the Acquired Assets or the Business;

(xiii)    all the Books and Records;

(xiv)    such other instruments, in form and substance, reasonably satisfactory to the Purchasers, as are necessary to vest in the Purchasers good and marketable title in and to the Acquired Assets in accordance with the provisions of the Agreement;

(xv)    such documentation as may be necessary to change the authorized signatories on any bank accounts or powers of attorney relating (directly or indirectly) to the Acquired Assets;

(xvi)    evidence of the required name changes of the Sellers and their Affiliates as more fully set forth in Section 6.6 of the Agreement;

(xvii)    a certified copy of the Sale Order and Sale Recognition Order, in recordable form, for each assumed Leased Facility; and

(xviii)    such other documents or instruments as are required to be delivered by any Seller at the Closing pursuant to the terms of the Agreement or that the Purchasers reasonably request prior to the Closing Date to effect the transactions contemplated thereby.