**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Böwe Systec, Inc., <u>et al.</u>,**[1] | ) | **Case No. 11-_____ (_____)** |
| | ) | |
| **Debtors.** | ) | **Joint Administration Requested** |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 AND 507 AND FED. R.
BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY
CODE, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION
363 OF THE BANKRUPTCY CODE, (III) GRANTING LIENS AND SUPER-PRIORITY
CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES AND (V) SCHEDULING A FINAL HEARING
<u>PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)</u>**

The above captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), by

and through their undersigned counsel, hereby submit this motion (the "<u>Motion</u>") for the entry of

interim and final orders (respectively, the "<u>Interim Order</u>" and "<u>Final Order</u>" and together, the

"<u>DIP Orders</u>") authorizing the Debtors to, among other things: (i) obtain post-petition financing

pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of the

Bankruptcy Code in the amount of up to $127,200,000 (the "<u>DIP Facility</u>"), by entering into that

certain Senior Secured, Super-Priority Debtor-In-Possession Credit and Guaranty Agreement

(the "<u>DIP Facility Agreement</u>"),[2] by and among BBH, Inc., a Delaware corporation (the "<u>US</u>

---

[1]  The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Böwe Systec, Inc. (1423), Böwe Bell + Howell Holdings, Inc. (9926), BBH, Inc. (9928), Böwe Bell + Howell Company (0100), Böwe Bell + Howell Postal Systems Company (4944), BCC Software, Inc. (3481) and Böwe Bell + Howell International Ltd. (0001).  The debtors' corporate offices are located at 760 S. Wolf Road, Wheeling, IL 60090.

[2]  A copy of the DIP Facility Agreement is attached hereto as <u>Exhibit A</u>.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Orders or, if not defined therein, in the DIP Facility Agreement.

Borrower") and Bowe Bell + Howell International Ltd., a company organized under the laws of Canada (the "Canadian Borrower", and together with the US Borrower, the "Borrowers", and individually a "Borrower"), as borrowers; Bowe Bell + Howell Holdings, Inc. ("Holdings"), as guarantor; Böwe Systec, Inc., a New York corporation, Böwe Bell + Howell Company, a Delaware corporation, Böwe Bell + Howell Postal Systems Company, a Delaware corporation, and BCC Software, Inc., an Illinois corporation (collectively, the "Subsidiary Guarantors"), as subsidiary guarantors (together with Holdings, each, a "Guarantor" and collectively, the "Guarantors"); and Contrado BBH Funding, LLC, a Delaware limited liability company (together with its successors, assigns and transferees, the "Lender"), as lender; (ii) use Cash Collateral pursuant to section 363 of the Bankruptcy Code; (iii) grant DIP Facility Liens and a DIP Facility Superpriority Claim to the Lender as security for the repayment of the DIP Obligations; and (iv) grant Adequate Protection Liens to the Prepetition Agent, on behalf of the Prepetition Secured Parties, to the extent that there is any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the pendency of the Chapter 11 Cases. In support of this Motion, the Debtors rely on the *Declaration of Michael Wilhelm in Support of First Day Motions* (the "Wilhelm Declaration") and the *Declaration of Oliver Bialowons in Support of First Day Motions* (the "Bialowons Declaration" and, together with the Wilhelm Declaration, the "First Day Declarations"), each filed contemporaneously herewith, and further respectfully represent as follows:

## BANKRUPTCY RULE 4001 CONCISE STATEMENT

1.     Material provisions of the DIP Facility Agreement are set forth in the following sections of the DIP Facility Agreement and/or the Interim Order:[3]

    (a)    ***Borrowers:***  The borrowers are BBH, Inc., a Delaware corporation, and Bowe Bell + Howell International Ltd., a company organized under the laws of Canada.

    (b)    ***Post-Petition Lender:*** The post-petition lender is Contrado BBH Funding, LLC ("Contrado"), a wholly owned subsidiary of Versa Capital Management, Inc. ("Versa").  As discussed in greater detail below, Contrado is the proposed stalking horse purchaser of substantially all of the Debtors' assets and the holder of certain of the Debtors' prepetition secured debt.

    (c)    ***Structure and Amount of DIP Facility.***  Subject to the terms and conditions of the DIP Facility Agreement, the Lender agrees to make available, for the use of the Borrowers and upon the request of the Borrowers therefor:  (i) a revolving loan to the US Borrower in an aggregate principal amount at any time outstanding up to but not exceeding the lesser of (i) the US Availability Amount and (ii) the US Revolving Credit Commitment; and (ii) a revolving loan to the Canadian Borrower in an aggregate principal amount at any time outstanding up to but not exceeding the lesser of (i) the Canadian Availability Amount and (ii) the Canadian Revolving Credit Commitment.  DIP Facility Agreement § 1.1; Interim Order ¶ 3.

    (d)    ***Use of Proceeds:***  US Borrower shall utilize the Collateral and the proceeds of the US Revolving Credit Loans which are incurred on and after the Closing Date (net of any amounts used on the Closing Date to pay Fees) as follows:  (i) for the US Borrower's and the Guarantor's working capital and general corporate purposes, (ii) certain other pre-petition expenses that are approved by the Bankruptcy Court and previously approved by Lender and (iii) to refinance the obligations under the Pre-Petition Loan Agreement outstanding on the Petition Date.  Canadian Borrower shall utilize the Collateral and the proceeds of the Canadian Revolving Credit Loans which are incurred on and after the Closing Date (net of any amounts used on the Closing Date to pay Fees related to the Canadian Revolving Credit Loans and Canadian Revolving Credit Commitment) for the Canadian Borrower's working capital and general corporate purposes.  DIP Facility Agreement § 1.3; Interim Order ¶ 4.

---

[3] The summaries and descriptions of the terms and conditions of the DIP Facility Agreement and the Interim Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the DIP Facility Agreement and the Interim Order.  In the event that there is a conflict between this Motion and the DIP Facility Agreement or the Interim Order, the DIP Facility Agreement or the Interim Order, as applicable, shall control in all respects.

(e)     **_Creeping Roll-Up._**  The DIP Facility effects a "creeping roll-up" of certain of the Debtors' Prepetition Obligations.  The Debtors (excluding the Canadian Borrower) are required to use all Cash Collateral (other than proceeds of the DIP Facility prior to entry of the Final Order) and other proceeds from any Prepetition Collateral to reduce the Prepetition Obligations, and shall apply all such collateral to reduce such obligations on a permanent basis until repaid in full.  Interim Order ¶ 14.

(f)     **_Interest Rate._**  Each Borrower shall be obligated to pay interest to Lender on the outstanding balance of its Revolving Credit Loans at a floating rate equal to the Prime Rate (as in effect from time to time) <u>plus</u> 6.75% per annum.  Upon the occurrence and during the continuance of any Event of Default, the interest rate applicable to all of the Obligations automatically shall be the Default Rate.  DIP Facility Agreement § 1.4(c).

(g)     **_Commitment Termination Date._**  The Revolving Credit Loans and all outstanding Obligations under the DIP Facility shall mature on the earliest of (a) June 13, 2011, (b) the date of termination of the Revolving Credit Commitment pursuant to Section 8.3 of the DIP Facility Agreement, (c) the date of termination of the Revolving Credit Commitment in accordance with the provisions of Section 1.2(c) of the DIP Facility Agreement, (d) two (2) days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date, (e) twenty (20) days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court by such date, (f) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date, (g) the close of business on the first Business Day after the entry of the Interim Order, if by that time Borrowers have not paid Lender the fees required under the DIP Facility Agreement, unless Lender agrees otherwise, (h) the date a plan of reorganization confirmed in the Chapter 11 Cases becomes effective that does not provide for the payment in full of all amounts owed to Lender under the DIP Facility Agreement and the other Loan Documents on such effective date, (i) the date of the closing of a sale of all or substantially all of Borrowers' and/or Guarantors' assets pursuant to Section 363 of the Bankruptcy Code or a confirmed plan of reorganization or, if earlier, the second Business Day after the Sale Order Date unless the buyer under the Asset Purchase Agreement is the winning bidder, or (j) the effective date of a plan of reorganization or arrangement in the Chapter 11 Cases.  DIP Facility Agreement § 1.2; DIP Facility Agreement, definition of "Commitment Termination Date".

(h)     **_Events of Default._**  Events of Default under the DIP Facility Agreement are identified in section 8.1 of the DIP Facility Agreement.

(i)     **_Liens._**  As security for the repayment of the DIP Obligations, the DIP Facility Lenders are to be granted DIP Facility Liens on and in the DIP Collateral and all proceeds thereof.  The DIP Facility Liens granted shall be (x) pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, perfected and non-avoidable first priority liens on and security interests in all assets and property of the Debtors,

including, upon entry of the Final Order, the proceeds of Avoidance Actions, that are not subject to valid, perfected, enforceable and non-avoidable liens as of the Petition Date, (y) pursuant to section 364(c)(3), valid, perfected, enforceable and non-avoidable second priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject to valid, perfected, enforceable and non-avoidable liens in existence on the Petition Date or to valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (other than assets and property that are subject to the existing liens as referred to in subparagraph (z) below, which existing liens shall be primed as provided in the Interim Order) and (z) pursuant to section 364(d) of the Bankruptcy Code, valid, perfected, enforceable and non-avoidable first priority senior priming liens on and security interests in the Prepetition Collateral, except as to the Prepetition Permitted Liens, to the extent such liens and security interests are valid, perfected, enforceable and non-avoidable (provided, that with respect to such excepted liens and security interests, if any, the DIP Facility Lenders shall be granted second priority liens as granted in clause (y) above). The DIP Facility Liens granted by the Canadian Borrower shall be limited to the extent of such Debtor's actual obligations under the DIP Facility Documents to which it is a party or is otherwise bound. In the event of the occurrence of an Event of Default (as defined in the DIP Facility Agreement), or an event that would constitute an Event of Default with the giving of notice of lapse of time or both, the DIP Facility Liens shall be subject only to the payment of the Carve-Out. DIP Facility Agreement § 1.12; Interim Order ¶ 7.

(j)     ***Fees.***  The following Fees are set forth in § 1.5 of the DIP Facility Agreement. Pursuant to the definition of "US Revolving Credit Commitment" in the DIP Facility Agreement, for the purposes of calculating the Fees set forth in § 1.5 of the DIP Facility Agreement, the "US Revolving Credit Commitment" shall mean $4,900,000, as such amount may be reduced or modified pursuant to the DIP Facility Agreement.

US Unused Fee - US Borrower agrees to pay to the Lender an unused facility fee equal to one percent (1.0%) per annum on the average unused daily balance of US Revolving Credit Commitment, payable monthly in arrears (a) on the first Business day of each calendar month commencing on May 1, 2011 and (b) on the Commitment Termination Date. DIP Facility Agreement § 1.5(a).

US Facility Fee - On the Closing Date, US Borrower agrees to pay to the Lender a one-time facility fee equal to two percent (2.0%) of the US Revolving Credit Commitment, which shall be added to the outstanding principal amount of the US Revolving Credit Loan. DIP Facility Agreement § 1.5(b).

US Exit Fee - US Borrower agrees to pay to the Lender a one-time exit fee equal to two percent (2.0%) of the principal amount of US Revolving Credit Commitment in effect on the Closing Date, which amount shall be payable by the

US Borrower in cash upon the Commitment Termination Date. DIP Facility Agreement § 1.5(c).

Canadian Unused Fee - Canadian Borrower agrees to pay to the Lender an unused facility fee equal to one percent (1.0%) per annum on the average unused daily balance of Canadian Revolving Credit Commitment, payable monthly in arrears (a) on the first Business Day of each calendar month commencing on May 1, 2011 and (b) on the Commitment Termination Date. DIP Facility Agreement § 1.5(d).

Canadian Facility Fee - On the Closing Date, Canadian Borrower agrees to pay to the Lender a one-time facility fee equal to two percent (2.0%) of the Canadian Revolving Credit Commitment, which shall be added to the outstanding principal amount of the Canadian Revolving Credit Loan. DIP Facility Agreement § 1.5(e).

Canadian Exit Fee - Canadian Borrower agrees to pay to the Lender a one-time exit fee equal to two percent (2.0%) of the principal amount of Canadian Revolving Credit Commitment in effect on the Closing Date, which amount shall be payable by the Canadian Borrower in cash upon the Commitment Termination Date. DIP Facility Agreement § 1.5(f).

Each Borrower authorizes the Lender to cause to be added to the outstanding principal amount of the relevant Revolving Credit Loan amounts equal to the US Unused Fee or the Canadian Unused Fee, as applicable, as and when such fees become due and payable under the DIP Facility Agreement. Once added to the outstanding principal amount of the Revolving Credit Loans, such amounts shall for all purposes constitute US Revolving Credit Loans and Canadian Revolving Credit Loans, as applicable. DIP Facility Agreement § 1.5(f); Interim Order ¶ 13.

(k)     ***506(c) Waiver.***  Subject to entry of the Final Order, the Debtors are seeking a waiver of section 506(c) of the Bankruptcy Code. Interim Order ¶ 12.

(l)     ***Liens on Avoidance Actions.***  Subject to the entry of the Final Order, the Lender is granted valid, binding, continuing, enforceable, fully perfected and unavoidable first-priority senior priming security interests in and liens upon, *inter alia*, the proceeds of Avoidance Actions. Interim Order ¶ 7.

(m)     ***Carve-Out.***  (a) Subject to the terms and conditions contained in the Interim Order, the DIP Facility Liens, DIP Facility Superpriority Claim, the Adequate Protection Liens and claims of the Prepetition Secured Parties as provided for in the DIP Facility Agreement and the Interim Order, and liens and claims held by the Prepetition Secured Parties, shall be subject and subordinate only to the following (the "Carve-Out"):  (i) unpaid fees of the Clerk of the Bankruptcy Court and the US Trustee pursuant to 28 U.S.C. § 1930(a); (ii) allowed Professional Fees to the extent (x) incurred at any time on or prior to the calendar day on which an Event of Default occurs and for which notice has been given (such day, the "Event Date") and (y) of the aggregate amount of Professional Fees of each Case Professional contemplated to be incurred pursuant to the US Budget for such

Case Professional for the period from the Petition Date through and including the Event Date (less Professional Fees paid to such Case Professional on or before the Event Date plus any retainers held by such Case Professional as of such Date), whether such Professional Fees have been allowed by the Bankruptcy Court before or after the Event Date; and (iii) Professional Fees of Case Professionals incurred subsequent to the calendar day immediately following the Event Date in an aggregate amount not to exceed $100,000 for Professional Fees (of which amount $25,000 shall be allocated to Case Professionals of the Committee). Interim Order ¶ 10.

## JURISDICTION

2.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.       The Chapter 11 Cases and Ancillary Proceeding**

3.       On April 18, 2011, the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.       Following the filing of the Chapter 11 Cases, the Canadian Borrower intends to commence an ancillary proceeding (the "Ancillary Proceeding") under Part IV of the *Companies' Creditors Arrangement Act* in the Ontario Superior Court of Justice (Commercial List).  The Canadian Borrower, as the proposed foreign representative for the Debtors in the Ancillary Proceeding, intends to seek recognition of the Chapter 11 Cases and certain orders entered in the Chapter 11 Cases.  PricewaterhouseCoopers Inc. is the proposed court-appointed Information Officer in the Ancillary Proceeding.

5.     The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

**B.     Overview of the Debtors' Business**

6.     The Debtors are one of two leaders nationally in high volume production mail solutions, offering a combination of hardware, services and software to high volume mailers worldwide including financial and insurance firms, government agencies, services bureaus, utilities, and direct-mail firms and others.  As a result of the Debtors' unique offering of products and services, the Debtors are well-positioned to satisfy a broad range of complex mailing needs for their global customer base.  Due to the large base of installed equipment, a significant percentage of the Debtors' revenues are derived from the sale of recurring, high margin services and software.

7.     The Debtors' offerings can be broken into three key segments:  (i) hardware; (ii) services; and (iii) software.  In most instances, the company provides its client base with a combination of all three segments as part of an overall mail solution.

(a)     <u>Hardware</u>.  The Debtors offer high end, fully integrated inserting and sorting solutions.  With over 9,000 machines installed, the Debtors are the second largest installer of such equipment in the industry.  The inserter line is designed for large mailers who need to customize mass mailings to clients or prospects.  The inserter line allows clients to take printed statements, bills or other updates and insert them along with various flyers, mailers and product promotions to be mailed to targeted recipients.  The Debtors also offer product reconditioning services whereby the company is able to leverage a client's existing equipment or procure other machines to be reconditioned from third parties.  The Debtors analyze and

implement the installed solutions, upgrading the performance of a client's operations to the Debtors' product standards. Additionally, the Debtors are the leader in the U.S. presort market, whereby service bureaus and other large corporate mailers purchase the Debtors' sorters to meet the requirements of the U.S. Postal Service (the "USPS") for postage discounts. Mailers receive these discounts by preparing mail with current and correct addresses in the form of a barcode, or modified address and providing the USPS with sorted trays that can be injected directly into the USPS' delivery network.

(b)     Services.  The Debtors provide a wide variety of on-site services designed to ensure that a client's mail operations run efficiently.  The Debtors' service revenues are generated by Preventative Maintenance Agreements (a "PMA"), field change orders, part sales, and time and material billings.  The Debtors' service contracts are purchased periodically by customers of installed hardware for product support after the warranty support period expires. These contracts are typically structured as PMAs, annual maintenance agreements that entitle a client to a set level of services.  These renewable maintenance and service agreements provide a steady source of revenue for the Debtors and represent approximately $160 million of the company's $248 million in annual revenue.  The Debtors' business model depends on the revenues, mostly prepaid, from these annual maintenance agreements.  The Debtors' customer base includes numerous utility and credit card companies, governmental agencies, banks and others that depend on the Debtors' equipment to generate billions of dollars worth of accounts receivable (through the issuance of billing statements) on a daily basis.  Accordingly, customers need the Debtors' equipment to function properly at all times, which requires the Debtors to respond quickly and responsibly when maintenance issues arise.

(c)  <u>Software</u>.  The Debtors also provide a number of software offerings which help clients manage their mail operations as well as offer specific solutions that improve the accuracy of customers' mailing lists, ensuring data integrity and accuracy and lowering postage costs.

8.  The Debtors are headquartered in Wheeling, Illinois and also have major U.S. manufacturing and service locations in Durham, North Carolina and Bethlehem, Pennsylvania. Additionally, the Debtors have one of the industries' largest nationwide service networks of strategically located service technicians, operating in almost every state and allowing the Debtors to rapidly respond to client service demands.

**C.  The Debtors' Corporate Structure**

9.  The Debtors' history dates back to 1936 when the founder of what would later become Bell + Howell invented, patented and produced the first automated mail inserting machine.  In 2003, Bell + Howell was acquired by Böwe Systec AG ("<u>Böwe Systec</u>"), a German competitor of Bell + Howell, thereby combining their North American mailing operations and changing the name of Bell + Howell to "Böwe Bell + Howell".  The Debtors are each direct or indirect subsidiaries of Böwe Systec.

10.  In May 2010, Böwe Systec commenced an insolvency proceeding in Germany and, as a consequence, Böwe Systec's North American distribution agreements with the Debtors were voided.  On September 2, 2010, the administrator appointed in the German insolvency proceeding agreed to sell substantially all of Böwe Systec's assets to a Swiss private equity firm, Axentum Capital AG.  When Axentum Capital AG was unable to complete the transaction, the administrator regained control of the assets (forming BS GmbH) and subsequently sold the assets

to the Possehl Group. The Debtors were not parties to the German insolvency proceeding, nor were they involved in the transaction with the Possehl Group.

## D.    The Debtors' Capital and Debt Structure

11.    As of the Petition Date, the US Borrower was a borrower under that certain Credit Agreement dated as of September 25, 2003 (the "Original Credit Agreement") by and between the US Borrower, Harris N.A., a national banking association ("Harris"), as Issuing Lender and Agent (as defined in the Original Credit Agreement), and the financial institutions that were or became lenders thereunder (the "Prepetition Lenders"). The Original Credit Agreement provided the US Borrower with (i) a term loan in the maximum principal amount of $50 million (the "Prepetition Term Loan"); and (ii) a revolving loan in the maximum principal amount of $50 million (the "Prepetition Revolving Loan", and together with the Prepetition Term Loan, the "Prepetition Facility"), subject to borrowing base limitations, and less the amount outstanding under any Letters of Credit and the outstanding principal amount of any Swing Loans (as defined under the Original Credit Agreement). The aggregate amount of the Prepetition Term Loan was subsequently increased in July 2004 to $150 million so that approximately $45 million could be paid to Böwe Systec on account of a preferred stock redemption. The US Borrower's obligations under the Prepetition Facility are secured by substantially all of its assets, with each of the other Debtors (other than the Canadian Borrower) guarantying the US Borrower's obligations thereunder.

12.    Pursuant to the terms of the Original Credit Agreement, the Prepetition Revolving Loan was to expire by its terms on September 30, 2009. All other obligations under the Prepetition Facility, including the Prepetition Term Loan, were to become due and owing on September 30, 2010. The parties initially entered into discussions regarding an amendment that

would have extended the maturity date for the Prepetition Revolving Loan to September 30, 2010, consistent with the balance of the Prepetition Facility, but were unable to obtain the unanimous consent of all lenders under the Prepetition Term Loan to such an extension. As a result, the parties entered into that certain Amended and Restated Credit Agreement dated as of November 23, 2009 (the "Amended and Restated Credit Agreement"), which, *inter alia*, (i) restated the Original Credit Agreement, as amended, in its entirety, (ii) increased the interest rate provided thereunder, (iii) fixed the stated maturity date for all obligations under the Prepetition Facility as June 30, 2010 (thereby extending the term of the Prepetition Revolving Loan by nine months, but accelerating the maturity date for all other obligations under the Original Credit Agreement), (iv) reduced the Prepetition Revolving Loan to $35 million and (v) imposed certain additional affirmative covenants on the company relating to the raising of additional capital.

13.     BBH was unable to repay or refinance the Prepetition Facility on or before the June 30, 2010 maturity date. While this constituted an event of default under the terms of the Amended and Restated Credit Agreement, the Prepetition Lenders have permitted the company to continue using cash collateral since such time. While the parties attempted to negotiate a standard forbearance agreement, such efforts have been unsuccessful. Accordingly, there is no forbearance agreement currently in place and certain of the Debtors remain subject to immediate remedial action by the Prepetition Lenders.

14.     In March 2011, Versa, a private equity firm with an interest in acquiring the Debtors or their assets, through one or more affiliates, began purchasing the secured claims of certain of the Prepetition Lenders with the intention of acquiring the Debtors' assets. As of the Petition Date, Versa's affiliates had control over approximately sixty (60) percent of the outstanding debt under the Prepetition Facility and had acquired the balance of the Prepetition

Facility subject to confirmed trades which are in the process of closing. The Lender is a wholly owned subsidiary of Versa. As of the Petition Date, there was an aggregate amount of not less than $121 million outstanding under the Prepetition Facility; the Prepetition Obligations far exceeded the value of the Debtors' assets and properties.

**E.**     **The Stalking Horse Agreement and Proposed Sale**

15.     On April 18, 2011, the Debtors, the Lender (also referred to as the "U.S. Purchaser") and a Canadian corporation to be formed prior to closing (the "Foreign Purchaser", and together with the U.S. Purchaser, the "Purchasers") entered into that certain Asset Purchase Agreement (the "Stalking Horse Agreement") whereby the Purchasers agreed to purchase substantially all of the Debtors' assets. Pursuant to the terms of the Stalking Horse Agreement, the aggregate consideration for the Debtors' assets shall include (i) a credit bid consisting of amounts outstanding under the DIP Facility and the Prepetition Facility, (ii) cash in the amount of $302,000 (Canadian currency) attributable to the assets of the Canadian Borrower, (iii) the payment of all cure amounts relating to any contracts and leases to be assigned in connection with the transaction and (iv) the assumption of certain liabilities. The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids. The Debtors will be filing a motion with the Court on or about the Petition Date seeking approval of certain bidding procedures in connection with an approximately forty-five (45) day sale process followed by approval of a sale of the Debtors' assets to the highest and best bidder as determined at an auction.

**F.**     **The DIP Facility**

16.     In connection with the Chapter 11 Cases, the Borrowers, the Guarantors and the Lender have entered into the DIP Facility Agreement, pursuant to which the Lender has agreed to provide post-petition financing to the Debtors up to the aggregate principal amount of $127,200,000 (inclusive of up to $1,300,000 for post-petition financing to the Canadian Borrower).  The key terms of the DIP Facility are set forth herein, above.  The DIP Facility will be used to, among other things, cover anticipated administrative obligations of the Chapter 11 Cases. As discussed above, the Purchasers shall have the ability to credit bid all amounts outstanding under the DIP Facility in accordance with the terms of the Stalking Horse Agreement.

## RELIEF REQUESTED

17.     By this Motion, the Debtors request entry of the DIP Orders[4] authorizing the Debtors to (i) obtain senior secured, superpriority post-petition financing in the aggregate not to exceed $127,200,000 pursuant to the terms of this Motion, the DIP Facility Agreement, and the DIP Orders, (ii) use Cash Collateral pursuant to section 363 of the Bankruptcy Code; (iii) grant DIP Facility Liens and a DIP Facility Superpriority Claim to the Lender as security for the repayment of the DIP Obligations; and (iv) grant Adequate Protection Liens to the Prepetition Agent, on behalf of the Prepetition Secured Parties, to the extent that there is any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the pendency of the Chapter 11 Cases.

## Negotiations and Need for Post-Petition Financing

---

[4] A copy of the Debtors' proposed Interim Order is attached hereto as Exhibit B.

18.     As demonstrated by the 6-week budget attached hereto as <u>Exhibit C</u> (the "<u>Budget</u>"),[5] the Debtors do not have sufficient available sources of working capital, including cash collateral, to operate in the ordinary course of business without the financing requested in this Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of their estates for the benefit of all creditors of the Debtors.  Moreover, the ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangement with the Lender as set forth herein, in the Interim Order and in the DIP Facility Agreement is vital to the preservation and maintenance of the going concern value of the Debtors.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates.

19.     Prior to the Petition Date, the Debtors and the Lender engaged in extensive, arm's-length negotiations with respect to the terms and conditions of the DIP Facility Agreement.  Despite their efforts, the Debtors were unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets.  Indeed, the Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the Lender pursuant to the DIP

---

[5]  The Debtors and the Lender have agreed upon the Budget, and believe that it is achievable and will allow the Debtors to operate and pay their post-petition obligations as they mature.

Facility Agreement.  As such, the Debtors are seeking approval of the DIP Facility as set forth in the DIP Facility Agreement.

## Use of Cash Collateral and Proposed Adequate Protection

20.     Under the terms of the DIP Facility Agreement, certain of the Debtors require the use of the Cash Collateral of the Prepetition Secured Parties.  The Cash Collateral (other than proceeds of the DIP Facility prior to entry of the Final Order) and other proceeds from any Prepetition Collateral will be used to reduce the Prepetition Obligations, and the Debtors shall apply all such collateral to reduce such obligations on a permanent basis until repaid in full. After the payment of the Prepetition Obligations in full, or after an Event of Default as determined by the Lender, all Cash Collateral shall be applied to the DIP Obligations pursuant to the terms of the DIP Facility Agreement.  The Prepetition Agent, for itself and for the Prepetition Lenders, has consented to the Debtors' use of Cash Collateral on the terms described in the DIP Facility Agreement, subject to the adequate protection liens and payments discussed below and the other terms and conditions set forth in the Interim Order.

21.     The Prepetition Agent has requested and it and the Prepetition Lenders are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in collateral under the Amended and Restated Credit Agreement to the extent that there is a diminution in the value of such collateral from and after the Petition Date.  As adequate protection for any such diminution in value, the Prepetition Agent, on behalf of the Prepetition Secured Parties, shall be granted:

> (a)     (i) a lien on the Prepetition Collateral and the DIP Collateral of the US Borrower and the Guarantors to secure such parties' claim for repayment of the Prepetition Agreement Expenses and (ii) a lien on the Prepetition Collateral and DIP Collateral of the US Borrower and the Guarantors (together with the lien referred to in clause (i), the "Adequate Protection Liens") to the extent there is any diminution in the value of the Prepetition

Secured Parties' interests in the Prepetition Collateral during the pendency of the Chapter 11 Cases, whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the priming of the liens arising under the Prepetition Credit Documents, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, shrinkage or decline in market value of the Prepetition Collateral, the imposition of the automatic stay or otherwise (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Agent's (on behalf of the Prepetition Lenders) seeking vacation of the automatic stay or the Bankruptcy Court granting such relief). The Adequate Protection Liens shall be junior to the Prepetition Permitted Liens, junior to the DIP Facility Liens, junior to the Carve-Out, and senior to any other liens, and shall cover assets, interest and proceeds of the Debtors that are or would be collateral under the Prepetition Credit Documents if not for Bankruptcy Code section 552(a), and all cash and cash equivalents, and all assets, interests and proceeds of the Debtors (other than the Canadian Borrower) that constitute DIP Collateral; and

(b)  in each of the Debtors' Chapter 11 Case (other than the Canadian Borrower's Chapter 11 Case) an allowed administrative claim (the "Adequate Protection Claim") under section 507(b) of the Bankruptcy Code to the extent that the Adequate Protection Liens do not adequately protect the diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral from the Petition Date, and such Adequate Protection Claim shall be shall be junior in priority to the DIP Superpriority Claims and junior and subordinate to the Carve-Out. The Adequate Protection Claim shall include, for the avoidance of doubt, the claims secured by the Adequate Protection Lien; and

22.  As additional adequate protection, (i) the Prepetition Agent shall be entitled to, and the Debtors (other than the Canadian Borrower) shall timely pay, the ongoing payment of the Prepetition Agreement Expenses, including the fees and expenses of legal counsel and other professionals retained by the Prepetition Agent, as and when due and payable under the Prepetition Credit Documents (without giving effect to any acceleration provision therein), regardless of whether such fees accrued prior to the Petition Date, and such adequate protection payments shall not be subject to any limitations in the Budget; and (ii) except for the DIP Facility, the Adequate Protection Liens, the Prepetition Permitted Liens and the DIP Facility

Liens, the Debtors shall be prohibited from incurring additional indebtedness with claim status and with priority over the Prepetition Obligations or liens equal to or senior in priority to the liens arising under the Prepetition Credit Documents. All fees and expenses of the Prepetition Agent and Prepetition Lenders that were incurred under the Prepetition Credit Documents and paid by the Debtors prior to the Petition Date shall be deemed paid as adequate protection, are not subject to recharacterization and are not avoidable or recoverable under any applicable law from the Prepetition Agent, the Prepetition Lenders or any of such professionals.

## The DIP Facility Should Be Authorized

23.     Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including post-petition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtors will be forced to cease operations, which would likely (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to maximize value. The credit provided under the DIP Facility Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees, and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders. The availability of credit under the DIP Facility Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Facility Agreement will be viewed favorably by the Debtors' vendors, employees, and customers, thereby promoting a successful resolution of these Chapter 11 Cases. Accordingly, the timely approval of the relief requested herein is imperative.

24.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtors to obtain credit or incur debt (a) with priority over any and all administrative expenses, as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364.  The Debtors propose to obtain the financing set forth in the DIP Facility Agreement by providing, *inter alia*, superpriority claims, security interests, and liens pursuant to section 364(c)(1), (2), (3) and section 364(d) of the Bankruptcy Code.

25.     The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow under the DIP Facility and to use such proceeds to fund their operations. As discussed above, the Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1).  The Debtors have not been able to obtain post-petition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

26.     Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment.  See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and

powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also In re Funding Sys. Asset Mgmt. Corp., 72 B.R. 87 (Bankr. W.D. Pa. 1987); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

27.     Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  In re Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re 495 Central Park Ave Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming of loan was necessary if debtor were to obtain funding).

28.     Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent granting the proposed superpriority claims and liens.[6]  The Debtors submit that the circumstances of this case require the Debtors to obtain financing pursuant to section 364(c) and section 364(d) of the Bankruptcy Code and, accordingly, the DIP Facility Agreement reflects the exercise of their sound business judgment.

29.     The terms and conditions of the DIP Facility Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at

---

[6]  The Debtors are seeking to prime only the liens of the Prepetition Lenders, and not any third party liens.

arm's-length. Accordingly, the Lender and all obligations incurred under the DIP Facility Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

## The Use of Cash Collateral Should Be Approved

30. Under section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U S.C. § 363(c)(2). The Debtors require the use of Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors. The interests of the Prepetition Lenders in the Cash Collateral will be protected by the adequate protection set forth above. Moreover, the Prepetition Lenders have consented to the use of the Cash Collateral on the terms set forth herein and in the Interim Order. Accordingly, the Debtors' request to use Cash Collateral should be approved.

## The Proposed Adequate Protection Should Be Authorized

31. Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to

protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citation omitted).

32.     The Prepetition Lenders have agreed to the Debtors' use of Cash Collateral and the Debtors' entry into the DIP Facility Agreement in consideration for the adequate protection provided under the DIP Facility Agreement. Accordingly, the adequate protection proposed herein to protect the Prepetition Lenders' interest in the Prepetition Collateral is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

## The Automatic Stay Should Be Modified on a Limited Basis

33.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and superpriority claims described above with respect to the Lender and the Prepetition Lenders, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the Lender to exercise, upon the occurrence of and during the continuance of an event of default, all rights and remedies under the DIP Facility Agreement; and (iii) implement the terms of the proposed DIP Orders.

34.     Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

35.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14)

days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

36. Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to use Cash Collateral and borrow under the DIP Facility on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estate and all parties in interest, and (b) schedule a hearing to consider entry of a final order.

37. The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on this Motion, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide necessary assurance to the Debtors' vendors, employees, and customers of their ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors.

38.     The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

39.     To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

## NOTICE

40.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases.  The Debtors have provided notice of this Motion by facsimile and/or overnight mail to:  (a) the U.S. Trustee; (b) each of the Debtors' creditors holding the twenty (20) largest unsecured claims on a consolidated basis; (c) the Prepetition Secured Parties; (d) all parties asserting a lien against the Prepetition Collateral; (e) the Lender; (f) the Internal Revenue Service; (g) the Office of the United States Attorney General; (h) the Securities Exchange Commission; (i) the Delaware Secretary of State; (j) the Delaware Secretary of State; (k) the Delaware Secretary of the Treasury; (l) the Pension Benefits Guaranty Corporation; (m) Harris; (n) Fifth Third Bancorp; and (o) Canadian Imperial Bank of Commerce.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

WHEREFORE the Debtors respectfully request entry of the DIP Orders granting the relief requested herein and such other and further relief as is just.

Dated: April 18, 2011
   Wilmington, Delaware

          Respectfully submitted,

          */s/ Lee E. Kaufman*
          Mark D. Collins (No. 2981)
          Michael J. Merchant (No. 3854)
          Lee E. Kaufman (No. 4877)
          RICHARDS, LAYTON & FINGER, P.A.
          One Rodney Square
          920 North King Street
          Wilmington, Delaware 19801
          Telephone:  (302) 651-7700
          Facsimile:  (302) 651-7701

          *Proposed Attorneys for the Debtors and*
          *Debtors-in-Possession*