# EXHIBIT A

**DIP Facility Agreement**

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION

CREDIT AND GUARANTY AGREEMENT

DATED AS OF APRIL ___, 2011

BETWEEN

BBH, INC.

AND

BOWE BELL + HOWELL INTERNATIONAL LTD.

AS BORROWERS

THE GUARANTORS PARTY HERETO

AND

CONTRADO BBH FUNDING, LLC

AS

LENDER

# TABLE OF CONTENTS

Page

1. AMOUNT AND TERMS OF CREDIT ................................................................ 2
   1.1. Revolving Credit Advances .................................................................. 2
   1.2. Repayment of Revolving Credit Loan; Termination of Revolving Credit Commitments ......................................................................................... 3
   1.3. Use of Proceeds .................................................................................... 4
   1.4. Interest on Revolving Credit Loans ...................................................... 5
   1.5. Fees ...................................................................................................... 7
   1.6. Receipt of Payments ............................................................................ 8
   1.7. Application and Allocation of Payments .............................................. 8
   1.8. Accounting ........................................................................................... 8
   1.9. Indemnity ............................................................................................. 8
   1.10. Access .................................................................................................. 9
   1.11. Taxes .................................................................................................. 10
   1.12. Super Priority Nature of Obligations and Lender's Liens ................. 11
   1.13. Payment of Obligations ..................................................................... 12
   1.14. No Discharge; Survival of Claims ..................................................... 12
   1.15. Release ............................................................................................... 12
   1.16. Waiver of Any Primary Rights .......................................................... 13
   1.17. Canadian Regulated Interest ............................................................. 13

2. CONDITIONS PRECEDENT ......................................................................... 13
   2.1. Conditions to the Initial Revolving Credit Advance ........................... 13
   2.2. Further Conditions to Each Revolving Credit Advance after the Closing Date ... 15
   2.3. Conditions to the Initial Canadian Revolving Credit Advance ........... 17

3. REPRESENTATIONS AND WARRANTIES ................................................. 17
   3.1. Corporate Existence; Compliance with Law ....................................... 17
   3.2. Executive Offices; Corporate or Other Names; FEIN ......................... 18
   3.3. Corporate Power; Authorization; Enforceable Obligations ................. 18
   3.4. Financial Statements .......................................................................... 18
   3.5. Material Adverse Effect ...................................................................... 19
   3.6. Ownership of Property; Liens ............................................................. 19
   3.7. Restrictions; No Default ..................................................................... 20
   3.8. Labor Matters ..................................................................................... 20
   3.9. Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness ....... 20
   3.10. Government Regulation ...................................................................... 20
   3.11. Margin Regulations ............................................................................ 21
   3.12. Taxes .................................................................................................. 21
   3.13. ERISA ................................................................................................ 21
   3.14. No Litigation ...................................................................................... 22

K&E 18571360.18
RLF1 3982293v. 1

3.15. Brokers ................................................................................................ 22
3.16. Intellectual Property .............................................................................. 23
3.17. Full Disclosure ...................................................................................... 24
3.18. Environmental Matters ........................................................................... 24
3.19. Insurance Policies .................................................................................. 24
3.20. Deposit and Disbursement Accounts ...................................................... 24
3.21. Government Contracts ............................................................................ 24
3.22. Customer and Trade Relations ................................................................ 24
3.23. Agreements and Other Documents .......................................................... 25
3.24. Bankruptcy Matters ............................................................................... 25

4. FINANCIAL STATEMENTS AND INFORMATION ............................................ 26

4.1. Reports and Notices ............................................................................... 26
4.2. Communication with Accountants ........................................................... 26
4.3. Documents Filed with the Bankruptcy Court or Delivered to the US Trustee or Committee ............................................................................................ 26

5. AFFIRMATIVE COVENANTS ........................................................................... 26

5.1. Maintenance of Existence and Conduct of Business ................................ 26
5.2. Payment of Charges and Claims .............................................................. 27
5.3. Books and Records ................................................................................. 27
5.4. Litigation ............................................................................................... 27
5.5. Insurance ............................................................................................... 27
5.6. Compliance with Laws ............................................................................ 28
5.7. Agreements ............................................................................................ 28
5.8. [Reserved] ............................................................................................. 29
5.9. Environmental Matters ........................................................................... 29
5.10. Application of Proceeds .......................................................................... 29
5.11. Fiscal Year ............................................................................................. 29
5.12. Subsidiaries ........................................................................................... 29
5.13. Further Assurances ................................................................................. 29
5.14. Appraisals .............................................................................................. 29
5.15. Intellectual Property .............................................................................. 29
5.16. Sale Process ........................................................................................... 30
5.17. Schedule of Financial Affairs ................................................................. 30
5.18. Sale Milestones ...................................................................................... 30
5.19. Financial Deliverables ............................................................................ 31

6. NEGATIVE COVENANTS ................................................................................. 31

6.1. Mergers, Subsidiaries, Etc. ..................................................................... 32
6.2. Investments ............................................................................................ 32
6.3. Indebtedness ........................................................................................... 32
6.4. Affiliate and Employee Transactions ....................................................... 32
6.5. Capital Structure and Business ................................................................ 32

K&E 18571360.18
RLF1 3982293v. 1

| | | |
|---|---|---:|
| 6.6. | Guaranteed Indebtedness | 32 |
| 6.7. | Liens | 33 |
| 6.8. | Sale of Assets | 33 |
| 6.9. | ERISA | 33 |
| 6.10. | Financial Covenants | 34 |
| 6.11. | Restricted Payments; Use of Proceeds | 34 |
| 6.12. | Hazardous Materials | 34 |
| 6.13. | Sale-Leasebacks | 34 |
| 6.14. | Cancellation of Indebtedness | 34 |
| 6.15. | Bank Accounts | 34 |
| 6.16. | No Speculative Investments | 34 |
| 6.17. | Margin Regulations | 34 |
| 6.18. | Limitation on Negative Pledge Clauses | 35 |
| 6.19. | Material Contracts | 35 |
| 6.20. | Leases | 35 |
| 6.21. | New Premises | 35 |
| 6.22. | Repayment of Indebtedness | 35 |
| 6.23. | Reclamation Claims | 35 |
| 6.24. | Chapter 11 Claims | 35 |
| 6.25. | Change of Management | 36 |
| 6.26. | Intellectual Property | 36 |

| 7. | TERM | 36 |
|---|---|---:|
| 7.1. | Duration | 36 |
| 7.2. | Survival of Obligations | 36 |

| 8. | EVENTS OF DEFAULT; RIGHTS AND REMEDIES | 36 |
|---|---|---:|
| 8.1. | Events of Default | 36 |
| 8.2. | Remedies | 41 |
| 8.3. | Waivers by Borrowers | 41 |

| 9. | SUCCESSORS AND ASSIGNS | 42 |
|---|---|---:|
| 9.1. | Successors and Assigns | 42 |
| 9.2. | Participations; Assignments | 42 |

| 10. | MISCELLANEOUS | 43 |
|---|---|---:|
| 10.1. | Complete Agreement; Modification of Agreement | 43 |
| 10.2. | Fees and Expenses | 43 |
| 10.3. | No Waiver | 44 |
| 10.4. | Remedies | 45 |
| 10.5. | Severability | 45 |
| 10.6. | Conflict of Terms | 45 |
| 10.7. | Right of Setoff | 45 |
| 10.8. | Authorized Signature | 45 |

K&E 18571360.18
RLF1 3982293v. 1

10.9. Notices ........................................................................................................ 45
10.10. Section Titles ............................................................................................... 47
10.11. Counterparts ................................................................................................. 47
10.12. Time of the Essence ..................................................................................... 47
10.13. GOVERNING LAW ..................................................................................... 47
10.14. WAIVER OF JURY TRIAL.......................................................................... 48
10.15. Publicity ....................................................................................................... 48
10.16. Dating........................................................................................................... 49
10.17. Parties Including Trustees; Bankruptcy Court Proceedings ....................... 49

11. GUARANTY .................................................................................................... 49

11.1. Guaranty of the Obligations......................................................................... 49
11.2. Payment by Guarantors................................................................................. 49
11.3. Liability of Guarantors Absolute ................................................................. 50
11.4. Waivers by Guarantors ................................................................................. 52
11.5. Guarantors' Rights of Subrogation, Contribution, etc. ............................... 52
11.6. Subordination of Other Obligations............................................................. 53
11.7. Continuing Guaranty..................................................................................... 53
11.8. Authority of Guarantors or Borrowers......................................................... 53
11.9. Financial Condition of Borrowers ............................................................... 53

K&E 18571360.18
RLF1 3982293v. 1

# INDEX OF ANNEXES, SCHEDULES AND EXHIBITS

| | | |
|---|---|---|
| Annex A | - | Definitions; Rules of Construction |
| Annex B | - | Financial Statements and Notices |
| Annex C-1 | - | Financial Covenants for US Borrower |
| Annex C-2 | - | Financial Covenants for Canadian Borrower |
| Annex D-1 | - | Form of Budget for US Borrower |
| Annex D-2 | - | Form of Budget for Canadian Borrower |
| | | |
| Schedule 2.1(a) | - | Closing Agenda |
| Schedule 2.1(g) | - | Material Adverse Effect as Conditions Precedent |
| Schedule 2.1(k) | | First Day Orders |
| Schedule 3.2 | - | Executive Offices; Principal Places of Business; Locations of Collateral; Trade Names |
| Schedule 3.5 | - | Restricted Payments; Redemptions |
| Schedule 3.6 | - | Real Estate and Leases |
| Schedule 3.8 | - | Labor Matters |
| Schedule 3.9(a) | | List of subsidiaries of US Borrower |
| Schedule 3.9(b) | | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Schedule 3.12 | - | Tax Matters |
| Schedule 3.13 | - | ERISA Plans, etc. |
| Schedule 3.14 | - | Litigation |
| Schedule 3.16 | - | Patents, Trademarks, Copyrights, Internet Domain Names and Licenses |
| Schedule 3.18 | - | Environmental Matters |
| Schedule 3.20 | - | Disbursement and Deposit Accounts |
| Schedule 3.21 | - | Government Contracts |
| Schedule 3.22 | - | Customer & Trade Relations |
| Schedule 3.23 | - | Certain Contracts |
| Schedule 6.2 | - | Investments |
| Schedule 6.3 | - | Indebtedness |
| Schedule 6.4 | - | Loans to and Transactions with Employees |
| Schedule 6.7 | - | Liens |
| Schedule 6.19 | - | Material Contracts |
| Schedule 10.8 | - | Authorized Signatures |
| | | |
| Exhibit A | - | Form of Notice of Revolving Credit Advance |
| Exhibit B | - | Form of Revolving Credit Note |
| Exhibit C | - | Form of Interim Order |

K&E 18571360.18
RLF1 3982293v. 1

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION REVOLVING CREDIT AND GUARANTY AGREEMENT, dated as of April [__], 2011 (this "Agreement"), among BBH, INC., a Delaware corporation (the "US Borrower") and Bowe Bell + Howell International Ltd., a company organized under the laws of Canada (the "Canadian Borrower", and together with the US Borrower, the "Borrowers", and individually a "Borrower"), as borrowers; Bowe Bell + Howell Holdings, Inc. ("Holdings"), as guarantor; the subsidiaries of the US Borrower party hereto (except for the Canadian Borrower) ("Subsidiary Guarantors"), as subsidiary guarantors (together with Holdings, each, a "Guarantor" and collectively, the "Guarantors"); and CONTRADO BBH FUNDING, LLC, a Delaware limited liability company (together with its successors, assigns and transferees, the "Lender"), as lender. Capitalized terms used herein are defined in Annex A or in the text hereof.

## R E C I T A L S

A.      On April ___, 2011 (the "Petition Date"), the US Borrower commenced its Chapter 11 Case No. [11-_____] (the "US Borrower's Case") by filing a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  On the Petition Date, the Canadian Borrower commenced its Chapter 11 Case No. [11-_____] (the "Canadian Borrower's Case") by filing a voluntary petition for the reorganization under the Bankruptcy Code with the Bankruptcy Court.  Each Guarantor also commenced a case under Chapter 11 of the Bankruptcy Code (such cases, together with the US Borrower's Case and the Canadian Borrower's Case, the "Chapter 11 Cases") in the Bankruptcy Court on the Petition Date.  It is anticipated that, after the Petition Date, the Canadian Borrower will make an application to the Ontario Superior Court of Justice (the "Canadian Court") for an initial interim order (the "Interim Initial Order") under the Companies' Creditors Arrangement Act (the "CCAA") to stay any and all proceedings against the Canadian Borrower and thereafter will make certain other applications to the Canadian Court under Part IV of the CCAA for other Canadian Orders recognizing certain orders made in the Canadian Borrower's Case (such applications, recognition orders, other orders and proceedings before the Canadian Court, the "Canadian Proceedings").  The Borrowers and the Guarantors continue to operate their businesses and manage their properties as debtors and a debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code and, as applicable, the Canadian Orders.

B.      Prior to the Petition Date, the US Borrower and the Guarantors entered into that certain Amended and Restated Credit Agreement dated as of November 23, 2009 (as amended, the "Pre-Petition Loan Agreement"), by and among the US Borrower, the lenders from time to time party thereto (the "Prior Lenders") and Harris, N.A. as Administrative Agent (as predecessor to Contrado BBH Investments 1, LLC, the "Existing Agent").

C.      The US Borrower has requested that the Lender provide a revolving credit facility that is senior secured, super-priority as to the US Borrower and the Guarantors of up to $125,900,000 to refinance all of the obligations outstanding under the Pre-Petition Loan Agreement and to fund certain of the working capital requirements of the US Borrower and Guarantors during the Chapter 11 Cases.

D.     The Canadian Borrower has requested that the Lender provide a revolving credit facility that is senior secured, super-priority as to the Canadian Borrower of up to $1,300,000 to fund certain of the working capital requirements of the Canadian Borrower during the Canadian Borrower's Case.

D.     Lender is willing to provide revolving credit facilities to the Borrowers of up to the amount requested upon the terms and conditions set forth herein.

E.     Borrowers and the Guarantors have agreed to secure all of their respective obligations under the Loan Documents by, among other things, granting Lender a security interest in and lien upon substantially all of their existing and after-acquired personal and real property.

F.     Unless otherwise indicated, all references in this Agreement to sections, subsections, schedules, exhibits, and attachments shall refer to the corresponding sections, subsections, schedules, exhibits, and attachments of or to this Agreement.  All schedules, annexes, exhibits and attachments hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together, shall constitute but a single agreement. Unless otherwise expressly set forth herein, or in a written amendment referring to such schedules and annexes, all schedules and annexes referred to herein shall mean the schedules and annexes as in effect as of the Closing Date.  These Recitals shall be construed as part of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, the parties hereto agree as follows:

## 1.     AMOUNT AND TERMS OF CREDIT

1.1.     <u>Revolving Credit Advances</u>.

(a)     Upon and subject to the terms and conditions hereof, the Lender agrees to make available, from time to time, commencing on the date on which each of the conditions specified herein shall have been satisfied or waived by the Lender until the Commitment Termination Date, for the use of the Borrowers and upon the request of the Borrowers therefor:

(i)     A revolving loan to the US Borrower (the "<u>US Revolving Credit Advance</u>") in an aggregate principal amount at any time outstanding up to but not exceeding the lesser of (i) the US Availability Amount and (ii) the US Revolving Credit Commitment; and

(ii)     A revolving loan to the Canadian Borrower (the "<u>Canadian Revolving Credit Advance</u>", and together with the US Revolving Credit Advance, the "<u>Revolving Credit Advances</u>" each individually, a "<u>Revolving Credit Advance</u>") in an aggregate principal amount at any time outstanding up to but not exceeding the lesser of (i) the Canadian Availability Amount and (ii) the Canadian Revolving Credit Commitment.

(b)     Each Borrower may from time to time borrow, repay and reborrow Revolving Credit Advances under this <u>Section 1.1</u> subject to the limitation in the foregoing

2

sentence. Notwithstanding the foregoing, no Revolving Credit Advance shall exceed: (i) (x) in the case of the Revolving Credit Advances to the US Borrower, the amount of borrowings permitted under the US Budget to be outstanding for such period <u>less</u>, (y) the amount by which the US Borrower's and Guarantors' actual receipts for such period exceeds the amount of anticipated receipts for such period as set forth in the US Budget and (ii) (x) in the case of the Revolving Credit Advances to the Canadian Borrower, the amount of borrowing permitted under the Canadian Budget applicable to the Canadian Borrower to be outstanding for such period <u>less</u> (y) the amount by which the Canadian Borrower's actual receipts for such period exceeds the amount of anticipated receipts for such period as set forth in the Canadian Budget applicable to the Canadian Borrower .

(c)      The applicable Borrower shall give Lender notice of each borrowing of a Revolving Credit Advance hereunder as provided in <u>Section 1.1(a)</u> and, Lender shall make available the amount of the Revolving Credit Advance or Advances to be made by it on the requested date, in immediately available funds, to such Borrower as applicable.

(d)      Each notice of borrowing for a Revolving Credit Advance shall be given in writing (by facsimile, hand delivery, or electronic mail) by the applicable Borrower to Lender at its address specified on its signature page hereto, given no later than 12:00 Noon (Eastern time) (i) no more frequently than one time per week per Borrower (subject to the immediately succeeding sentence) and, except for the first week following the Petition Date, only on or after the delivery of the Weekly Budget Variance Report for the immediately prior week, and (ii) at least one Business Day prior to the date of the proposed Revolving Credit Advance. In the event that a Borrower has determined that an additional borrowing during a given week is necessary under the circumstances, a Borrower may request an additional borrowing during such week upon at least one Business Day's prior written notice and delivery of the report referred to in clause (ii), above. Each such notice of borrowing (a "<u>Notice of Revolving Credit Advance</u>") shall be substantially in the form of <u>Exhibit A</u>, specifying therein the requested date, the amount of such Revolving Credit Advance, and such other information as may be reasonably required by Lender. Lender shall be entitled to rely upon and shall be fully protected under this Agreement in accepting any Notice of Revolving Credit Advance reasonably believed by Lender to be genuine and to assume that the persons executing and delivering the same were duly authorized unless the responsible individual acting thereon for Lender shall have actual knowledge to the contrary.

(e)      The Revolving Credit Advances made by Lender may be, upon request of Lender, evidenced by a promissory note issued by the applicable Borrower in favor of Lender substantially in the forms of <u>Exhibit B</u>, dated on or after the Closing Date, payable to Lender in a maximum principal amount equal to the amount of the applicable Revolving Credit Commitment as originally in effect and otherwise duly completed.

1.2.   <u>Repayment of Revolving Credit Loan; Termination of Revolving Credit Commitments</u>.

(a)      The US Borrower hereby promises to pay to Lender the entire outstanding principal amount of the Revolving Credit Loans and all other outstanding Obligations, and the

K&E 18571360.18
RLF1 3982293v. 1

Revolving Credit Loans and all other outstanding Obligations shall mature, on the Commitment Termination Date.

(b)     The Canadian Borrower hereby promises to pay to Lender the entire outstanding principal amount of the Canadian Revolving Credit Loan and all other outstanding Obligations related thereto, and the Canadian Revolving Credit Loans and all other outstanding Obligations related thereto shall mature, on the Commitment Termination Date

(c)     In the event that the outstanding principal amount of the US Revolving Credit Loan shall, at any time (or shall after giving effect to any proposed borrowing) exceed the lesser of the US Availability Amount and the US Borrowing Availability at such time, the US Borrower shall immediately repay (or reduce) that portion of the US Revolving Credit Loan (or requested borrowing) that is in excess of the US Availability Amount or the US Borrowing Availability, as applicable.

(d)     In the event that the outstanding principal amount of the Canadian Revolving Credit Loan shall, at any time (or shall after giving effect to any proposed borrowing) exceed the lesser of the Canadian Availability Amount and the Canadian Borrowing Availability at such time, the Canadian Borrower shall immediately repay or reduce (in the case of a proposed borrowing) that portion of the Canadian Revolving Credit Loan (or requested borrowing) that is in excess of the Canadian Availability Amount or the Canadian Borrowing Availability, as applicable.

(e)     Subject to <u>Section 1.5(c) and (f)</u>, Borrowers, when acting jointly, shall have the right at any time upon three (3) days' prior written notice by Borrowers to Lender to voluntarily terminate the Revolving Credit Commitment (in whole but not in part) without premium or penalty.  Upon the effective date of such termination, Borrowers' rights to receive Revolving Credit Advances and Borrowers' obligation to pay the Unused Fees as applicable (except to the extent for the period prior to such termination) shall simultaneously terminate, and, notwithstanding anything to the contrary contained herein or in any Loan Document, the entire outstanding balance of the Revolving Credit Loan and all other Obligations hereunder shall be immediately due and payable.  On the date of such termination, each Borrower shall pay to Lender in immediately available funds all of the Obligations of such Borrower (as applicable and without duplication), including any accrued and unpaid interest (as applicable) thereon.

1.3.   <u>Use of Proceeds</u>.

(a)     US Borrower shall utilize the Collateral and the proceeds of the US Revolving Credit Loans which are incurred on and after the Closing Date (net of any amounts used on the Closing Date to pay Fees) as follows:  (i) for the US Borrower's and the Guarantor's working capital and general corporate purposes including certain fees and expenses of professionals retained by US Borrower, subject to the Interim Order and Final Order, but excluding in any event the making of any Restricted Payment not specifically permitted by <u>Section 6.11</u> and solely for the purposes specified in the US Budget and to the extent specified in the US Budget (plus any permitted variances), (ii) certain other pre-petition expenses that are approved by the Bankruptcy Court and previously approved by Lender and (iii) to refinance all of the obligations under the Pre-Petition Loan Agreement outstanding on the Petition Date.

K&E 18571360.18
RLFI 3982293v. 1

(b)	Canadian Borrower shall utilize the Collateral and the proceeds of the Canadian Revolving Credit Loans which are incurred on and after the Closing Date (net of any amounts used on the Closing Date to pay Fees related to the Canadian Revolving Credit Loans and Canadian Revolving Credit Commitment) as follows:  (i) for the Canadian Borrower's working capital and general corporate purposes including certain fees and expenses of professionals retained by Canadian Borrower, subject to the Interim Order, Final Order and Canadian Orders, but excluding in any event the making of any Restricted Payment not specifically permitted by Section 6.11 and solely for the purposes specified in the Canadian Budget and to the extent specified in the Canadian Budget (plus any permitted variances).

(c)	Other than as may be expressly permitted in the Interim Order and Final Order, and in respect of the Canadian Borrower, the Canadian Orders, no Borrower or Guarantor shall use the proceeds of the Revolving Credit Loans or the Collateral:  (A) to finance in any way any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type relating to or in connection with the Pre-Petition Loan Agreement or any of the loan documents or in instruments entered into in connection therewith, including, without limitation, any investigation of or challenges to the obligations under the Pre-Petition Loan Agreement, or the validity, perfection, priority, or enforceability of any Lien securing such claims or any payment made thereunder; (B) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of Lender or its rights and remedies under this Agreement, the other Loan Documents, the Interim Order or the Final Order, and in respect of the Canadian Borrower, the Canadian Orders; (C) to make any distribution under a plan of reorganization in any Chapter 11 Case or the Canadian Proceeding; or (D) to make any payment in settlement of any claim, action or proceeding before any court, arbitrator or other governmental body without the prior written consent of Lender.

1.4.	Interest on Revolving Credit Loans.

(a)	US Borrower shall pay interest on all outstanding US Revolving Credit Loans to Lender, (i) in arrears for the preceding calendar month, on the first Business Day of each calendar month commencing May 1, 2011, (ii) on the Commitment Termination Date, and (iii) if any interest accrues or remains payable after the Commitment Termination Date, upon demand.  If any interest or other payment under this Agreement becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.  US Borrower hereby authorizes the Lender to cause to be added to the outstanding principal amount of the Loans an amount equal to interest due and payable (when due and payable) in accordance with clause (a)(i) of this Section 1.4 and, upon such addition, such amount shall constitute a US Revolving Credit Loan hereunder for all purposes.

(b)	Canadian Borrower shall pay interest on all outstanding Canadian Revolving Credit Loans to Lender, (i) in arrears for the preceding calendar month, on the first Business Day of each calendar month commencing May 1, 2011, (ii) on the Commitment Termination Date, and (iii) if any interest accrues or remains payable after the Commitment Termination Date, upon demand.  If any interest or other payment under this Agreement becomes due and payable on a day other than a Business Day, the maturity thereof shall be

5

extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension. Canadian Borrower hereby authorizes the Lender to cause to be added to the outstanding principal amount of Canadian Revolving Credit Loans an amount equal to the interest due and payable (when due and payable) in accordance with clause (b)(i) of this Section 1.4 and, upon such addition, such amount shall constitute a Canadian Revolving Credit Loan hereunder for all purposes.

(c)     Each Borrower shall be obligated to pay interest to Lender on the outstanding balance of its Revolving Credit Loans at a floating rate equal to the Prime Rate (as in effect from time to time) plus 6.75% per annum. All computations of interest shall be made on the basis of a three hundred and sixty (360) day year, in each case for the actual number of days occurring in the period for which such interest is payable.

(d)     Upon the occurrence and during the continuance of any Event of Default, the interest rate applicable to all of the Obligations automatically shall be the Default Rate.

(e)     Notwithstanding anything to the contrary set forth in this Section 1.4, and subject to Section 1.17 solely with respect to the Canadian Borrower, if at any time prior to the Termination Date, the rate of interest payable to Lender hereunder exceeds the highest rate of interest permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto (the "Maximum Lawful Rate"), then in such event and so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder to Lender shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrowers shall continue to pay interest hereunder to Lender at the Maximum Lawful Rate until such time as the total interest received by Lender from the making of the Revolving Credit Loans hereunder is equal to the total interest which Lender would have received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. Thereafter, the interest rate payable to Lender hereunder shall be the rate of interest provided in Sections 1.4 (c) or (d), as applicable, of this Agreement, unless and until the rate of interest again exceeds the Maximum Lawful Rate, in which event this paragraph shall again apply. In no event shall the total interest received by Lender pursuant to the terms hereof exceed the amount which Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. In the event the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. In the event that a court of competent jurisdiction, notwithstanding the provisions of this Section 1.4(e), shall make a final determination that Lender has received interest hereunder or under any of the Loan Documents in excess of the Maximum Lawful Rate, Lender shall, to the extent permitted by Applicable Law, promptly apply such excess first to any lawful interest due and not yet paid hereunder, then to the outstanding principal of the Obligations, then to Fees and any other unpaid Obligations and thereafter shall promptly refund any excess to Borrowers or as a court of competent jurisdiction may otherwise order.

(f)     For the purposes of the Interest Act (Canada) and disclosure thereunder, to the extent applicable to the Canadian Borrower only, whenever any interest or any fee to be paid

6

hereunder or in connection herewith is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable. Solely as to the Canadian Borrower, the rates of interest under this Agreement are nominal rates, not effective rates or yields and the principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

    1.5.   <u>Fees</u>.

    (a)   <u>US Unused Fee</u>. US Borrower agrees to pay to Lender an unused facility fee (the "<u>US Unused Fee</u>") equal to one percent (1.0%) per annum on the average unused daily balance of US Revolving Credit Commitment, payable monthly in arrears (a) on the first Business Day of each calendar month commencing on May 1, 2011 and (b) on the Commitment Termination Date. All computations of the foregoing fee shall be made by Lender on the basis of a three hundred sixty (360) day year, and for the actual number of days occurring in the period for which such fee is payable.

    (b)   <u>US Facility Fee</u>. On the Closing Date, US Borrower agrees to pay to Lender a one-time facility fee equal to two percent (2%) of the US Revolving Credit Commitment, which shall be added to the outstanding principal amount of the US Revolving Credit Loan.

    (c)   <u>US Exit Fee</u>. US Borrower agrees to pay to Lender a one-time exit fee equal to two percent (2%) of the principal amount of US Revolving Credit Commitment in effect on the Closing Date, which amount shall be payable by the US Borrower in cash upon the Commitment Termination Date.

    (d)   <u>Canadian Unused Fee</u>. Canadian Borrower agrees to pay to Lender an unused facility fee (the "<u>Canadian Unused Fee</u>", and together with the US Unused Fee, the "<u>Unused Fees</u>") equal to one percent (1.0%) per annum on the average unused daily balance of Canadian Revolving Credit Commitment, payable monthly in arrears (a) on the first Business Day of each calendar month commencing on May 1, 2011 and (b) on the Commitment Termination Date. All computations of the foregoing fee shall be made by Lender on the basis of a three hundred sixty (360) day year, and for the actual number of days occurring in the period for which such fee is payable.

    (e)   <u>Canadian Facility Fee</u>. On the Closing Date, Canadian Borrower agrees to pay to Lender a one-time facility fee equal to two percent (2%) of the Canadian Revolving Credit Commitment, which shall be added to the outstanding principal amount of the Canadian Revolving Credit Loan.

    (f)   <u>Canadian Exit Fee</u>. Canadian Borrower agrees to pay to Lender a one-time exit fee equal to two percent (2%) of the principal amount of Canadian Revolving Credit Commitment in effect on the Closing Date, which amount shall be payable by the Canadian Borrower in cash upon the Commitment Termination Date.

K&E 18571360.18
RLF1 3982293v. 1

(g)     Payment of Certain Fees.  Each of the US Borrower, in the case of the US Unused Fee referred to in Section 1.5(a), and the Canadian Borrower, in the case of the Canadian Unused Fee referred to in Section 1.5(d), hereby authorizes the Lender to cause to be added to the outstanding principal amount of the US Revolving Credit Loans (in the case of the obligations of the US Borrower referred to herein) and the Canadian Revolving Credit Loans (in the case of the obligations of the Canadian Borrower referred to herein), amounts equal to the US Unused Fee and the Canadian Unused Fee, as applicable, as and when such fees become due and payable hereunder.  Once added to the outstanding principal amount of the Revolving Credit Loans, such amounts shall for all purposes constitute US Revolving Credit Loans and Canadian Revolving Credit Loans, as applicable.

1.6.    Receipt of Payments.  The applicable Borrower shall make each payment under this Agreement not later than 2:00 p.m. (Eastern time) on the day when due in Dollars in immediately available funds to Lender's account specified on its signature page hereto.

1.7.    Application and Allocation of Payments.  Each Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received from or on behalf of such Borrower.  Notwithstanding the foregoing, in the absence of a specific determination by Lender with respect thereto, or if an Event of Default shall have occurred and be continuing, such payments shall be applied in the following order:  (a) then due and payable Fees and expenses of Lender; (b) then due and payable interest payments on the Revolving Credit Loans; (c) Obligations to Lender other than Fees, expenses and interest and principal payments; (d) principal of the Revolving Credit Loans; and (e) to the extent there are no other Obligations then due and payable, to the Borrowers or their successors or assigns or as a court of competent jurisdiction may direct.

1.8.    Accounting.  Lender shall maintain a loan account (the "Loan Account") on its books to record:  all Revolving Credit Advances, all payments made by each Borrower, and all other debits and credits as provided in this Agreement with respect to the Revolving Credit Loans or any other Obligations.  All entries in the Loan Account shall be made in accordance with Lender's customary accounting practices as in effect from time to time.  The balance in the Loan Account, as recorded on Lender's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to Lender by the applicable Borrower; provided, that any failure to so record or any error in so recording shall not limit or otherwise affect a Borrower's duty to pay the Obligations of such Borrower.

1.9.    Indemnity.

(a)     The US Borrower shall indemnify and hold harmless Lender and its Affiliates, and its officers, directors, employees, attorneys and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigations or defense, including those incurred upon any appeal) (including without limitation any and all Environmental Liabilities) (each, a "Claim") which may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and any other Loan Document as it relates to the US Revolving Credit Loan and the administration of such credit,

K&E 18571360.18
RLF1 3982293v. 1

and in connection with or arising out of the transactions contemplated hereunder and thereunder, and any actions or failures to act in connection therewith, including any and all legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents at it relates to the US Revolving Credit Loan (collectively, "US Indemnified Liabilities"); provided, however, that US Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

(b) The Canadian Borrower shall indemnify and hold harmless Lender and its Affiliates, and any Indemnified Person, from and against any and all Claims (including without limitation any and all Environmental Liabilities) which may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and any other Loan Document as it relates to the Canadian Revolving Credit Loan and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder relating to the Canadian Revolving Credit Loan and the Canadian Revolving Credit Commitment, and any actions or failures to act in connection therewith, including any and all legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents at it relates to the Canadian Revolving Credit Loan (collectively, "Canadian Indemnified Liabilities"); provided, however, that Canadian Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

(c) NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

(d) Each Borrower hereby acknowledges and agrees that Lender (as of the date hereof) is not now nor has ever been in control of any of the Subject Property or the affairs or operations of the Borrowers or Guarantors.

1.10. Access.

(a) Borrowers shall: (i) provide access during normal business hours to Lender and any of its officers, employees and agents as frequently as Lender determines to be appropriate upon reasonable advance notice to Borrowers (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times) to the properties and facilities of Borrowers and the Guarantors, and each of their Subsidiaries; (ii) permit Lender and any of its officers, employees and agents, as frequently as Lender determines to be appropriate, to inspect, audit and make extracts from all of

9

Borrowers' and the Guarantors' records, files and books of account upon reasonable advance notice to Borrowers (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times); and (iii) permit Lender and any of its officers, employees and agents, as frequently as Lender determines to be appropriate, upon reasonable advance notice to Borrowers (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times) to conduct audits and to inspect, review and evaluate the Collateral, in each case subject to any confidentiality agreements binding on the Borrowers, and Borrowers agree to render to Lender at Borrowers' cost and expense such clerical and other assistance as may be reasonably requested with regard thereto.

(b)     Each Borrower shall give not less than three (3) Business Day's prior written notice to Lender of any meeting of the board of directors or equivalent governing body of such Borrower, which notice shall state the location of such meeting, and each Borrower shall give a representative designated by Lender the opportunity to attend such meeting as an observer or, if such meeting is held by telephone, to attend such meeting by telephone (other than any portion of such meeting in which the board of directors discusses competing bids for the Borrowers' assets); it being understood that nothing herein shall restrict in any way each Borrower's ability to hold or conduct meetings of its board of directors whether or not Lender elects to have a representative attend any such meeting.  Notwithstanding the foregoing, each Borrower shall be permitted to take necessary measures to preserve such Borrower's attorney-client privilege in the context of such meetings.

(c)     In connection with any audit or inspection permitted by Section 1.10(a), each Borrower shall make available to Lender and its counsel, as quickly as practicable under the circumstances, originals or copies of all books, records, board minutes, contracts, insurance policies, environmental audits, site assessments and reports, business plans, files, financial statements (actual and pro forma), filings with federal, state and local regulatory agencies, other instruments and documents in the custody or control or otherwise belonging to or property of such Borrower and key personnel for interviews which Lender may reasonably request.  Each Borrower shall deliver any document or instrument reasonably necessary for Lender, as it may from time to time request, to obtain records from any service bureau or other Person which maintains records for such Borrower, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by such Borrower.  Each Borrower shall make available to Lender, upon its reasonable request, information and records prepared by its certified public accountants and its banking and other financial institutions.

1.11.   Taxes.

(a)     Any and all payments by or on behalf of any Borrower hereunder or under any Revolving Credit Note or other Loan Document shall be made, in accordance with this Section 1.11, free and clear of and without deduction for any and all present or future Taxes.  If any Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any Revolving Credit Note or other Loan Document, (i) the sum payable shall be increased as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 1.11), Lender receives an amount equal to the sum it would have received had no such deductions been made,

10

(ii) such Borrower shall make such deductions, and (iii) such Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with Applicable Law.

(b)     In addition, each Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder by it or from its the execution, delivery or registration of, or otherwise with respect to, this Agreement (hereinafter referred to as "Other Taxes").

(c)     The applicable Borrower shall indemnify and, within ten (10) days of demand therefor, pay Lender for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 1.11) paid by Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.

(d)     Within thirty (30) days after the date of any such payment of Taxes or Other Taxes described in this Section 1.11(a), (b) or (c), the applicable Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment satisfactory to Lender.

1.12.    Super Priority Nature of Obligations and Lender's Liens.

(a)     The priority of Lender's Liens on the Collateral shall be as set forth in the Interim Order and the Final Order, as applicable, and, in respect of the Canadian Borrower, the applicable Canadian Orders.  Subject to the Interim Order and the Final Order, as applicable, and, solely in the case of the Canadian Borrower, the Canadian Orders, no filings, recordings or other actions shall be necessary to perfect and maintain the perfection and status of such Liens.

(b)     All Obligations of the Borrowers and the Guarantors shall constitute administrative expenses of such Person in the Chapter 11 Cases, with administrative priority and senior-secured status under Sections 364(c) and 364(d) of the Bankruptcy Code.  The Obligations solely with respect to the Canadian Revolving Credit Loans and the Canadian Revolving Credit Commitment shall constitute administrative expenses of the Canadian Borrower, with administrative priority and senior-secured statues under Sections 364(c) and 364(d) of the Bankruptcy Code.  Subject only to the Carve-Out Amount, and, in respect of the Canadian Borrower, the applicable Canadian Orders, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code  and shall at all times be senior to the rights of US Borrower and the Guarantors as it relates to the Revolving Credit Loans and of the Canadian Borrower as it relates to the Canadian Revolving Credit Loans, as well as the respective Borrowers' and Guarantors' estates, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code or, in the case of the Canadian Borrower, under the BIA.  The liens and security interests granted to Lender in and against the Collateral, and the priorities accorded to the Obligations, shall have the priority and senior-secured status afforded by Sections 364(c) and 364(d)(1) of the Bankruptcy Code (all as more fully set forth in the Interim Order and Final Order) senior to all claims and interests other than the the Carve-Out Amount.

K&E 18571360.18
RLF1 3982293v. 1

(c)     Subject to the Interim Order and the Final Order, as applicable, the Lender's Liens and its administrative claims under Sections 364(c)(1) and 364(d) of the Bankruptcy Code afford that the Obligations also shall have priority over any claims arising under Section 506(c) of the Bankruptcy Code.  In accordance with, and to the extent set forth in, the Interim Order and the Final Order, as applicable, the Liens and claims securing the Obligations shall be subject to the Carve-Out.

(d)     Except as set forth in the Interim Order or the Final Order, as applicable, or, in respect of the Canadian Borrower, the Canadian Orders, no other claim having a priority superior or pari passu to that granted to Lender by the Final Order shall be granted or approved while any Obligations under this Agreement remain outstanding.

1.13.    Payment of Obligations.  Subject to the Interim Order and the Final Order, as applicable, and, in respect of the Canadian Borrower, the Canadian Orders, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations without further application to, or order of, the Bankruptcy Court or the Canadian Court.

1.14.    No Discharge; Survival of Claims.  Borrowers and the Guarantors agree, to the extent applicable, that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases or Canadian Proceedings (and Borrowers and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (b) any super-priority administrative claim granted to Lender pursuant to any order described in Section 1.12 and the Liens granted to Lender pursuant to any order described in Section 1.12 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases or Canadian Proceedings.

1.15.    Release.  Subject to the Interim Order and the Final Order, as applicable, and, in respect of the Canadian Borrower, the Canadian Orders relating to the Interim Order and the Final Order, as applicable, the Borrowers and the Guarantors hereby acknowledge that, upon entry of a Final Order, Borrowers and the Guarantors shall not have any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of such parties' liability to repay Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Lender.  Borrowers and each Guarantor, each in its own right and also with respect to its estate, and on behalf of its successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through it, (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharge Lender and all of Lender's past and present officers, directors, servants, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct,

12

indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Order, the Final Order, any Canadian Order relating to the Interim Order or the Final Order, and the transactions contemplated hereby and thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

1.16.    <u>Waiver of Any Primary Rights</u>.  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligation shall be outstanding, each Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

1.17.    <u>Canadian Regulated Interest</u>. If any provision of this Agreement would oblige the Canadian Borrower to make any payment of interest or other amount payable to Lender in an amount or calculated at a rate which would be prohibited by any applicable law in Canada or would result in a receipt by Lender of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be prohibited by applicable law in Canada or so result in a receipt by Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows: (i) first, by reducing the amount or rate of interest required to be paid to the Lender hereunder; and (ii) thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the Lender hereunder which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

## 2.    CONDITIONS PRECEDENT

2.1.    <u>Conditions to the Initial Revolving Credit Advance</u>.  Notwithstanding any other provision of this Agreement (other than Section 2.3 as to the Canadian Borrower) and without affecting in any manner the rights of Lender hereunder, no Borrower shall have any rights under this Agreement (but shall have all applicable obligations hereunder), and Lender shall not be obligated to make any Revolving Credit Advances, or to take, fulfill, or perform any other action hereunder, until the following conditions have been fulfilled to the satisfaction of Lender:

(a)    Lender shall have received duly executed counterparts of the Agreement and the other Loan Documents from the Borrowers and the Guarantors, and such documents, instruments, certificates, and agreements as Lender shall reasonably request in connection with the transactions contemplated by this Agreement, including all documents, instruments, agreements and other materials listed in <u>Schedule 2.1(a)</u>, each in form and substance satisfactory to Lender in its sole discretion;

K&E 18571360.18
RLF1 3982293v. 1

(b)    Lender shall have received evidence satisfactory to it that Borrowers and the Guarantors have obtained consents and acknowledgments of all Persons whose consents and acknowledgments are required, including, but not limited to, all requisite Governmental Authorities, to the terms and to the execution and delivery, of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby.  Lender shall have received resolutions of the board of directors or other governing body of each Borrower and each Guarantor approving and authorizing, among other things, the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or assistant secretary as being in full force and effect without modification or amendment.  Lender shall have received good standing certificates from the applicable Governmental Authority of each Borrower's and each Guarantor's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business (other than, in the case of jurisdictions other than such Borrower's or such Guarantor's jurisdiction of incorporation, organization or formation, where the failure to be in good standing or so qualified could not be reasonably expected to have a Material Adverse Effect).  Lender shall have received signature and incumbency certificates of the officers of such Person executing the Loan Documents;

(c)    Lender shall have received certificates of property and liability insurance of Borrowers and the Guarantors showing loss payable or additional insured clauses or endorsements, or both, as appropriate, in favor of Lender, in form and substance satisfactory to Lender;

(d)    (i) The US Borrower shall have consented to an increase of its Revolving Credit Loans by an amount equal to all Fees, costs, and expenses due by it on the Closing Date (including fees and expenses of consultants and counsel to Lender presented as of the Closing Date) (it being understood that acceptance of the initial Revolving Credit Advance shall be evidence of such consent) and (ii) the Canadian Borrower shall have paid in cash in full the Fees, costs and expenses due by it on the Closing Date (including fees and expenses of consultants and counsel to Lender presented as of the Closing Date);

(e)    No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's sole judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents;

(f)    No later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to Lender, on such prior notice to such parties as may be satisfactory to Lender, the Interim Order.  The Interim Order shall be in full force and effect, shall not be subject to a motion for reconsideration and shall not have been vacated, reversed, modified, amended or stayed;

(g)    Other than the Chapter 11 Cases, the Canadian Proceedings, and the defaults under the Pre-Petition Loan Agreement and as may be disclosed in Schedule 2.1(g),

14

none of the following shall have occurred and be continuing:  (i) a Material Adverse Effect; (ii) a material increase in liabilities, liquidated or contingent (net of any offsetting increase in assets), or a material decrease in assets of Borrowers and Guarantors taken as a whole; or (iii) any litigation or other proceeding is pending or threatened which, if successful, could, individually or in the aggregate, reasonably be expected to have or result in a Material Adverse Effect;

(h)     Lender shall have received from McDermott Will & Emery LLP and Torys LLP, special counsel to the US Borrower and the Canadian Borrower, respectively, an opinion dated as of the date hereof, covering such matters as Lender may request in form and substance satisfactory to Lender.

(i)     Lender shall have received all requested financial information and financial statements requested of Borrowers certified by the Chief Financial Officer of the US Borrower and in form and substance satisfactory to Lender;

(j)     The "first day" orders described on Schedule 2.1(k) (the "First Day Orders") in form and substance satisfactory to Lender shall have been entered in the Chapter 11 Cases;

(k)     Lender, Borrowers and Guarantors shall have entered into the Asset Purchase Agreement and Lender shall have received a copy of the docket in the Borrower's Case (or other of the Chapter 11 Cases which is the "lead case") which reflects the filing of a sale motion (which shall seek, among other things, approval of the Asset Purchase Agreement) by the US Borrower, which pleading(s) shall be in form and substance satisfactory to Lender; and

(l)     Lender shall have received the initial US Budget and the initial Canadian Budget.

2.2.     Further Conditions to Each Revolving Credit Advance after the Closing Date.  It shall be a further condition to the funding of the initial and each subsequent Revolving Credit Advance that the following statements shall be true on the date of each such funding, advance or incurrence, as the case may be:

(a)     The Revolving Credit Advances requested would not cause the aggregate outstanding amount of the Revolving Credit Loans to exceed the amount then authorized by the Interim Order, Final Order, or Canadian Orders as the case may be;

(b)     Borrowers' and Guarantors' representations and warranties contained herein or in any of the Loan Documents shall be true and correct in all material respects on and as of the Closing Date and the date on which such Revolving Credit Advances for such Borrower is made as the case may be, as though made on or incurred on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date and except for changes therein permitted or contemplated by this Agreement;

(c)     No event shall have occurred and be continuing, or would result from the making of such Revolving Credit Advance which constitutes or would constitute a Default;

K&E 18571360.18
RLF1 3982293v. 1

(d)    After giving effect to such Revolving Credit Advance, the aggregate principal amount of the (x) US Revolving Credit Loan shall not exceed the US Borrowing Availability and (y) the Canadian Revolving Credit Loan shall not exceed the Canadian Borrowing Availability;

(e)    Lender shall have a senior priming, first priority perfected security interest in the Collateral subject only to the Carve-Out Amount;

(f)    As to each Revolving Credit Advance requested to occur on or after the date that is 15 days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, on such prior notice to such parties as may be satisfactory to Lender and in compliance with the terms set forth in the Interim Order, which Final Order shall be in full force and effect, shall not be subject to a motion for reconsideration and shall not have been vacated, reversed, modified, amended or stayed;

(g)    As to each Revolving Credit Advance that would, when added to the aggregate amount of all Revolving Credit Advances then outstanding, exceed the amount specified in the definition of the Total Availability Amount, the Bankruptcy Court shall have entered the Final Order authorizing the Borrowers to incur loans to the extent of such aggregate amount;

(h)    There shall be no motion pending that would, if granted, permit any administrative expense against Borrowers or any Guarantor to have administrative priority equal to or superior to the priority of the Lender's in respect of the Obligations;

(i)    Borrowers, as applicable, shall have consented to an increase of the Revolving Credit Loans of the applicable Borrower by an amount equal to all Fees, costs, and expenses (including fees and expenses of consultants and counsel to Lender presented on or before such date) then due and owing (it being understood that the Borrower's acceptance of the requested Revolving Credit Advance shall be evidence of such consent);

(j)    Borrowers and Guarantors shall have used their commercially reasonable efforts to obtain duly executed and enforceable account control agreements (with respect to each of their Deposit Accounts) in form and substance satisfactory to Lender acting reasonably, pursuant to which Lender shall be granted sole dominion and control over the deposits from time to time on deposit in such Deposit Accounts; and

(k)    The funding of any Revolving Credit Advance shall not be enjoined, temporarily, preliminarily or permanently or cause Borrowers or Guarantors to breach any agreement, the enforcement of which is not stayed by the Chapter 11 Cases or Canadian Proceedings, to which Borrowers or any Guarantor are a party.

The request and acceptance by Borrowers of the proceeds of any Revolving Credit Advance shall be deemed to constitute, as of the date of such request and of such acceptance, (i) a representation and warranty by Borrowers and the Guarantors that the conditions in this Section 2.2 (and, in the case of the initial Revolving Credit Advance made on the Closing Date, Section 2.1) have been satisfied and (ii) a confirmation by Borrowers and the Guarantors of the granting

K&E 18571360.18
RLF1 3982293v. 1

and continuance of Lender's Liens, pursuant to the Interim Order, Final Order or Collateral Documents, as the case may be.

2.3. <u>Conditions to the Initial Canadian Revolving Credit Advance</u>.  The Canadian Borrower shall not have any rights under this Agreement (but shall have all applicable obligations hereunder), and Lender shall not be obligated to make any Canadian Revolving Credit Advances (other than any deemed advance as necessary to satisfy the obligations of the Canadian Borrower to pay, among other things, certain fees upon the Closing Date), until the following conditions have been fulfilled to the satisfaction of the Lender:

(a)     The Interim Initial Order in form and substance satisfactory to the Lender shall have been entered in the Canadian Proceedings;

(b)     The Canadian Borrower shall have served and filed and served an application with the Canadian Court in form and substance satisfactory to the Lender requesting the issuance and entry of the Initial Recognition Order and the Supplemental Recognition Orders; and

(c)     The Initial Recognition Order in form and substance satisfactory to the Lender shall have been issued and entered in the Canadian Proceedings.

## 3.     REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and make each Revolving Credit Advance, the US Borrower and Guarantors and, in the case of matters relating to the Canadian Borrower, the Canadian Borrower, make the following representations and warranties to Lender (and each such representation and warranty shall survive the execution and delivery of this Agreement) that:

3.1. <u>Corporate Existence; Compliance with Law</u>.    Each of the Borrowers and each Guarantor:  (a) is an entity duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its formation and is duly qualified to do business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; (b) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and in respect of the Canadian Borrower a corresponding order by the Canadian Court, has the requisite power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease, and to conduct its business as now, heretofore and proposed to be conducted; (c) has all material licenses, permits, consents or approvals from or by, and has made all filings with, and has given all material notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (d) is in compliance with its certificate or articles of formation and by-laws; and (e) is in compliance in all material respects with all Applicable Law (except with respect to Environmental Law which is governed by Section 3.18) except to the extent that (i) such compliance is excused by the U.S.  Bankruptcy Code or by an applicable order of the Bankruptcy Court or, with respect to the Canadian Borrower, the CCAA or by an applicable order of the

Canadian Court and (ii) such non-compliance would neither have nor could reasonably be expected to have a Material Adverse Effect.

3.2.    Executive Offices; Corporate or Other Names; FEIN.    The current locations of Borrowers' and Guarantors' executive offices, principal place of business, corporate offices, all warehouses and premises within which any Collateral is stored or located, and the locations of Borrowers' and Guarantors' records concerning the Collateral are set forth in Schedule 3.2 and, except as set forth in Schedule 3.2, such locations have not changed during the preceding twelve (12) months.  In addition, the US and Canadian federal employer identification number of Borrowers are shown on Schedule 3.2.  During the prior five (5) years, except as set forth in Schedule 3.2, neither Borrower nor any Guarantor has been known as or used any corporate, fictitious or trade name.

3.3.    Corporate Power; Authorization; Enforceable Obligations.    Upon and subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and, in respect of the Canadian Borrower, a corresponding order by a Canadian Court, the execution, delivery and performance by each of the Borrowers and each Guarantor of the Loan Documents to which it is a party and all other instruments and documents to be delivered by it hereunder and thereunder to the extent it is a party thereto and the creation of all Liens provided for herein and therein:  (a) are within its organizational power; (b) have been duly authorized by all necessary action; (c) are not in contravention of any provision of its certificate or articles of organization or by-laws; (d) will not violate any Applicable Law; (e) will not conflict with or result in the breach or termination of, constitute a default under or accelerate any performance required by, any material indenture, mortgage, deed of trust, lease, agreement or other instrument to which it is a party or by which it or any of its material property is bound except to the extent that breach or termination could not reasonable be expected to cause a Material Adverse Effect; (f) will not result in the creation or imposition of any Lien upon any of the property of any Borrower or any Guarantor other than those in favor of Lender, all pursuant to the Loan Documents; and (g) do not require the consent or approval of any Governmental Authority or any other Person, all of which will have been duly obtained, made or complied with prior to the Closing Date and which are in full force and effect.  At or prior to the Closing Date, each of the Loan Documents to which each of the Borrowers and each Guarantor is a party shall have been duly executed and delivered by it and shall then, assuming due execution and delivery by the other parties thereto, subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and, in respect of the Canadian Borrower, a corresponding order by a Canadian Court, constitute a legal, valid and binding obligation of it to the extent it is a party thereto, enforceable against it in accordance with its terms.

3.4.    Financial Statements.

(a)     US Borrower has delivered to Lender unaudited consolidated financial statements of the US Borrower for the fiscal year ended December 31, 2010 (the "Financial Statements").  The Financial Statements, taken as whole, fairly present in all material respects, in accordance with GAAP, (i) the financial condition of Borrowers and Guarantors as of the date thereof, and (ii) the results of operations and cash flow of US Borrower for the Fiscal Year ended December 31, 2010 and the most recently available Fiscal Quarter, as applicable.

K&E 18571360.18
RLF1 3982293v. 1

(b)     Canadian Borrower has delivered to Lender unaudited financial statements of the Canadian Borrower for the fiscal year ended December 31, 2010 and unaudited financial statements for the most recent Fiscal Quarter (together, the "Canadian Financial Statements"). The Canadian Financial Statements, taken as whole, fairly present in all material respects, in accordance with GAAP, (i) the financial condition of Canadian Borrower as of the date thereof, and (ii) the results of operations and cash flow of Canadian Borrower for the Fiscal Year ended December 31, 2010 and the most recently available Fiscal Quarter, as applicable.

3.5.    Material Adverse Effect.  Except as set forth in Schedule 3.5, Borrowers and Guarantors have no material obligations, contingent liabilities, or liabilities for Charges, long-term leases or unusual forward or long-term commitments which are not reflected in the Financial Statements.  Except as otherwise permitted hereunder or as set forth in Schedule 3.5, no Restricted Payment has been made except as reported in the Financial Statements or Canadian Financial Statements, and no shares of Stock of the US Borrower or of Holdings have been, or are now required to be, redeemed, retired, purchased or otherwise acquired for value by the Borrowers or Holdings.   Other than as disclosed in the unaudited consolidated financial statements of the US Borrower for the Fiscal Year ended December 31, 2010, since such date no event or events have occurred or are continuing which, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect, other than the commencement of the Chapter 11 Cases and the Canadian Proceedings.

3.6.    Ownership of Property; Liens.   Except as described in Schedule 3.6, the real estate listed in Schedule 3.6 constitutes all of the real property leased or otherwise used in Borrowers' and Guarantors' businesses.   Each of the Borrowers and Guarantors has valid leasehold interests in its specified real properties listed on such Schedule.   Borrowers and Guarantors do not own any real property or have any real property interests other than as set forth on Schedule 3.6.   None of the properties and assets of any Borrower or any Guarantor is subject to any Liens, except (x) Permitted Encumbrances, (y) the Pre-Petition Liens and (z) from and after the Closing Date, the Lien in favor of Lender pursuant to the Collateral Documents.  Except as described in Schedule 3.6, Borrowers have received all leases and amendments thereto, assignments, waivers, consents, non-disturbance and recognition or similar material agreements, [bills of sale] and other documents, and duly effected all recordings, filings and other material actions necessary to establish, protect and perfect Borrowers' and Guarantors' right, title and interest in and to all such real estate and other assets or property.  Except as described in Schedule 3.6: (i) neither any Borrower nor any Guarantor owns, holds or is obligated under or a party to, any option, right of first refusal or any other contractual right to purchase, acquire, sell, assign or dispose of any real property owned by Borrowers it as set forth in Schedule 3.6, and (ii) no material portion of any real property owned by it has suffered any material damage by fire or other casualty loss which has not heretofore been completely repaired and restored to its condition before the casualty.  All permits required to have been issued or appropriate to enable the real property owned by any Borrower or any Guarantor to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are, as of the date hereof, in full force and effect except where the failure to have any such permit could not reasonably be expected to have a Material Adverse Effect.

K&E 18571360.18
RLF1 3982293v. 1

3.7. <u>Restrictions; No Default</u>.  Since December 31, 2010, no Contract, lease, agreement, instrument or other document to which any Borrower is a party or by which any Borrower or any of its respective properties or assets is bound or affected and no provision of any charter, corporate restriction, Applicable Law or governmental regulation, individually or in the aggregate, has had a Material Adverse Effect.  Borrowers and Guarantors are not in default other than (i) the defaults under the Pre-Petition Loan Agreement and (ii) to the knowledge of Borrowers and Guarantors, no third party is in default, under or with respect to any Contract, lease, agreement, instrument or other documents to which any Borrower or any Guarantor is a party, which default or defaults, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect.  To the knowledge of Borrowers and Guarantors, no Default has occurred and is continuing.

3.8. <u>Labor Matters</u>.  There are no strikes, work stoppages, slowdowns, lockouts, or other material labor disputes against Borrowers or Guarantors that are pending or, to the knowledge of Borrowers or Guarantors, threatened.  Hours worked by and payment made to employees of Borrowers or Guarantors have not been in violation of the Fair Labor Standards Act or any other applicable laws dealing with such matters.  All material payments due from Borrowers or Guarantors on account of employee health and welfare insurance have been paid or accrued as a liability on the books of Borrowers or Guarantors.  Except as set forth in <u>Schedule 3.8</u>, no Borrower or Guarantor has any obligation under any collective bargaining agreement, management agreement, or any employment agreement, and a correct and complete copy of each agreement listed in <u>Schedule 3.8</u> has been provided to Lender.  Except as set forth in <u>Schedule 3.14</u>, there are no union organizing efforts underway or, to the knowledge of Borrowers or Guarantors, threatened with the National Labor Relations Board, and no labor organization or group of employees of Borrowers or Guarantors has made a pending demand for recognition.

3.9. <u>Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness</u>. Holdings has no Subsidiaries other than the US Borrower.  US Borrower has no Subsidiaries other than the Subsidiary Guarantors as set forth on <u>Schedule 3.9(a)</u> and the Canadian Borrower. Canadian Borrower has no Subsidiaries.  Borrowers and the Guarantors are not engaged in any joint venture or partnership with another Person, except as set forth in <u>Schedule 3.9(b)</u>.  Except as set forth in <u>Schedule 3.9(b)</u>, there are no outstanding rights to purchase options, warrants or similar rights or agreements pursuant to which any Borrower may be required to issue, sell or purchase any Stock or other equity security.  <u>Schedule 3.9(b)</u> lists all outstanding Stock of Borrowers and the Guarantors and the percentage of ownership and voting interests of the owners thereof as of the Closing Date.

3.10. <u>Government Regulation</u>.  None of the Borrowers or any Guarantor is (a) an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940 as amended; or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act or any other federal or state statute that restricts or limits Borrowers' and Guarantors' ability to incur Indebtedness, pledge their assets, or to perform their obligations hereunder, or under any other Loan Document; and the making of the Revolving Credit Advances by Lender, the application of the proceeds and repayment thereof by Borrowers and the Guarantors and the consummation of the transactions contemplated by this Agreement and the other Loan

Documents, will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

3.11. <u>Margin Regulations</u>. Neither any Borrower nor any Guarantor is engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock and no proceeds of any Revolving Credit Advance will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock. Borrowers and the Guarantors will not take any action which might cause any Loan Document or any document or instrument delivered pursuant hereto or thereto to violate any regulation of the Board of Governors of the Federal Reserve Board.

3.12. <u>Taxes</u>. Except as set forth in <u>Schedule 3.12</u>, all federal, state, local and foreign tax returns, reports and statements, including information returns required to be filed with respect to Borrowers and the Guarantors have been timely filed, all such tax returns, reports and statements are correct and complete in all material respects, and except as otherwise prohibited by the Chapter 11 Cases or, solely in the case of the Canadian Borrower, the Canadian Proceedings, all Charges and other impositions due and payable with respect to Borrowers and the Guarantors (whether or not shown on any such tax returns, reports and statements) have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof, except such charges or other impositions which are not material and which are being contested in good faith and for which adequate reserves have been maintained. Borrowers and the Guarantors have adequately provided for in their books and records for all unpaid Charges and other impositions. Proper and accurate amounts have been withheld by Borrowers and the Guarantors from their employees and other third parties for all periods and such withholdings have been timely paid to the respective Governmental Authorities. <u>Schedule 3.12</u> sets forth those taxable years for which any of the tax returns of Borrowers and the Guarantors are currently being audited by the IRS or any other applicable Governmental Authority, and any currently, pending or threatened assessments, actions, disputes or claims with respect to taxes are listed thereon. There are no liens on any of the assets of Borrowers and the Guarantors with respect to Taxes except for Permitted Encumbrances. Except as described in <u>Schedule 3.12</u>, Borrowers and the Guarantors have not executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges or the filing of any tax return. None of the property owned by Borrowers and the Guarantors is property which it is required to treat as being owned by any other Person pursuant to the provisions of IRC Section 168(f)(8) of the Internal Revenue Code of 1954, as amended, and in effect immediately prior to the enactment of the Tax Reform Act of 1986 or is "tax-exempt use property" within the meaning of IRC Section 168(h). Borrowers and the Guarantors have not agreed or been requested to make any adjustment under IRC Section 481(a) by reason of a change in accounting method or otherwise. Borrowers and the Guarantors have no obligation under any tax-sharing agreement or arrangement, or liability for Charges or impositions for any other Person under applicable law, as transferee or successor, or by contract, except as described in <u>Schedule 3.12</u>.

3.13. <u>ERISA</u>. <u>Schedule 3.13</u> lists all Plans maintained or contributed to by Borrowers and the Guarantors and all Qualified Plans, Pension Plans, Retiree Welfare Plans or Welfare Plans maintained or contributed to by any ERISA Affiliate. Except as set forth on <u>Schedule 3.13</u>, none of any Borrowers, any Guarantors or any current or former ERISA Affiliate sponsors

21

(or has sponsored), contributes to (or has contributed to), or is (or was) required to contribute to or has any liability (contingent or otherwise) with respect to any Title IV Plan, any Plan subject to IRC Section 412 or ERISA Section 302. None of Borrowers, any Guarantor or any current or former ERISA Affiliate contributes to (or has contributed to) or is (or was) required to contribute to any Multiemployer Plan. IRS determination letters regarding the qualified status under IRC Section 401 of each Qualified Plan have been received as of the dates listed in Schedule 3.13. Except as set forth on Schedule 3.13, each Qualified Plan is intended to meet the requirements qualified plan under Section 401(a) of the Code that such Qualified Plan is so qualified and, to the knowledge of Borrowers and the Guarantors, the Qualified Plans as amended continue to qualify under Section 401 of the IRC, the trusts created thereunder continue to be exempt from tax under the provisions of IRC Section 501(a), and nothing has occurred which would cause the loss of such qualification or tax-exempt status. Except as set forth on Schedule 3.13, each Plan is in compliance in all material respects with the applicable provisions of ERISA and the IRC, including the filing of all reports required under the IRC or ERISA which are true and correct as of the date filed, and all required contributions and benefits have been paid in accordance with the provisions of each such Plan. Borrowers and the Guarantors have not engaged in a prohibited transaction, as defined in IRC Section 4975 or Section 406 of ERISA, in connection with any Plan which would subject any such Person (after giving effect to any exemption) to a material tax on prohibited transactions imposed by IRC Section 4975 or any other material liability. Except as set forth in Schedule 3.13: (i) there are no pending, or to the knowledge of Borrowers and the Guarantors, threatened claims, actions or lawsuits (other than claims for benefits in the normal course), asserted or instituted against (x) any Plan or its assets, (y) any fiduciary with respect to any Plan or (z) Borrowers or the Guarantors (or, to the knowledge of the Borrowers and the Guarantors, any ERISA Affiliate) with respect to any Plan; and (ii) Borrowers and the Guarantors and each ERISA Affiliate have complied with the notice and continuation coverage requirements of COBRA.

3.14. <u>No Litigation</u>. Other than the Chapter 11 Cases and Canadian Proceedings and except as set forth in <u>Schedule 3.14</u> as of the Closing Date, no litigation, claim, action, suit, arbitration, investigation charge, dispute, demand, grievance, audit, investigation, review, inquiry, arbitration, suit in equity or at Law, administrative, regulatory or quasi-judicial proceeding or other proceeding is now pending or, to the knowledge of Borrowers and the Guarantors, threatened against it, at law, in equity or otherwise (a) challenges any such Person's right, power, or competence to enter into or perform any of its obligations under the Loan Documents, or the validity or enforceability of any Loan Document or any action taken thereunder or any Liens granted to Lender, or (b) if determined adversely, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect. To the knowledge of Borrowers and the Guarantors, other than the Chapter 11 Cases and Canadian Proceedings and except as set forth in <u>Schedule 3.14</u> as of the Closing Date, there does not exist a state of facts which could reasonably be expected to give rise to any such litigation, action, suit, claim, arbitration, investigation or other proceeding which, if determined adversely, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect.

3.15. <u>Brokers</u>. No broker or finder, investment banker or other intermediary of any kind acting on behalf of Borrowers and the Guarantors brought about the obtaining, making or closing of the credit extended pursuant to this Agreement or the transactions contemplated by the Loan Documents, and Borrowers and the Guarantors have no obligation to any Person in respect

of any finder's, brokerage investment banking, placement or other fees or amounts (including expenses) due in connection therewith.

3.16. <u>Intellectual Property</u>.

(a)     To the Knowledge of the Borrowers and the Guarantors, set forth in <u>Schedule 3.16</u> is a true and complete list of all material registered or applied for Intellectual Property, owned by or registered in the name of Borrowers and the Guarantors, or of which Borrowers and any of the Guarantors. Except as set forth on Schedule 3.16, Borrowers and the Guarantors own (free and clear of all Liens), license or otherwise have the right to use all Intellectual Property which is used in or necessary for the conduct of their respective businesses as currently conducted by them (collectively, the "<u>Business IP Rights</u>"). Immediately subsequent to the Interim or Final Order, all Intellectual Property owned, licensed or used by the Borrowers and the Guarantors, including the Business IP Rights, will be owned by or available for use by the Lender free and clear of all Liens (except for the Lien granted to the Lender or in favor of the Prepetition Agent).

(b)     The Business IP Rights owned by any Borrower or Guarantor are in full force and effect and have not been used or enforced or failed to be used or enforced in a manner that would result in the abandonment, cancellation or unenforceability of any of such Business IP Rights.

(c)     Except as set forth on <u>Schedule 3.16</u> there is not currently pending against any Borrower or Guarantor any Proceeding brought by any third party before any Governmental Authority (i) contesting the validity, enforceability, use or ownership of any material Business IP Rights owned by any Borrower or Guarantor or (ii) alleging that any Borrower or Guarantor is infringing, misappropriating, diluting or otherwise conflicting with any intellectual property of any third party and to the Knowledge of the Borrowers and Guarantors, there are no facts that indicate a likelihood of any of the foregoing and no Borrower or Guarantor has received any notice or other communication regarding any of the foregoing (including any demands or offers to license any Intellectual Property from any third party).

(d)     No third party is infringing, misappropriating or diluting any Business IP Rights owned by the Borrowers or Guarantors. To the Knowledge of the Borrowers and Guarantors, no third party has infringed, misappropriated, diluted or otherwise conflicted with any of the Business IP Rights and, to the Knowledge of the Borrowers and Guarantors, there are no facts that indicate a likelihood of any of the foregoing.

(e)     Immediately subsequent to the entry of the Interim Order, the Business IP Rights will be owned by or available for use by the Borrowers and the Guarantors (as applicable) on the same terms as those under which such Persons owned or used the Business IP rights immediately prior to the entry of the Interim Order.

(f)     Except as set forth on <u>Schedule 3.16</u>, no Borrower or Guarantor is a party to, or bound by, whether written or oral, any agreement relating to the licensing of Intellectual Property by any Borrower or Guarantor to a third party or by a third party to any Borrower or Guarantor (other than unmodified off-the-shelf software) or any other agreements affecting

K&E 18571360.18
RLF1 3982293v. 1

Borrowers' or Guarantors' ability to use or disclose any Intellectual Property, or any contract which prohibits it from freely engaging in business anywhere in the world.

3.17.  <u>Full Disclosure</u>.  No information contained in this Agreement, the other Loan Documents, the Financial Statements or any written statement furnished by or on behalf of Borrowers and the Guarantors pursuant to the terms of this Agreement or any other Loan Document, which has previously been delivered to Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

3.18.  <u>Environmental Matters</u>.  Except as set forth on <u>Schedule 3.18</u> Borrowers and Guarantors have at all times complied with, and are in compliance with, all Environmental Laws (which compliance has included obtaining and complying with all permits, licenses and other authorizations required pursuant to Environmental Laws); (ii) no Borrower or Guarantor has received any written notice, report or other information regarding any actual or alleged violation of Environmental Laws, relating to any Borrower or Guarantor, or any Borrower or Guarantor's current or former facilities, properties or assets, including without limitation the Subject Property; and (iii)  Borrowers and the Guarantors have no Environmental Liabilities; in each case under clause (i), (ii), and (iii) above, except for such non-compliance, actual or alleged violations, or Environmental Liabilities that, individually or in the aggregate, could not reasonably be expected to have or result in a Material Adverse Effect.

3.19.  <u>Insurance Policies</u>.  Borrowers' and Guarantors' insurance is reasonable and standard for Borrowers' and Guarantors' industry and geographic location.

3.20.  <u>Deposit and Disbursement Accounts</u>.  <u>Schedule 3.20</u> lists all banks and other financial institutions at which Borrowers and the Guarantors maintain deposits or other accounts or post office lock boxes and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number.  Borrowers and the Guarantors have delivered to Lender true, correct and complete copies of all agreements, instruments and other documents relating to any credit card programs, arrangements or agreements to which they are a party.

3.21.  <u>Government Contracts</u>.  Except as set forth in <u>Schedule 3.21</u>, as of the Closing Date, Borrowers and the Guarantors are not party to any contract or agreement with the federal government and no Borrowers' or Guarantors' Accounts are subject to the Federal Assignment of Claims Act (31 U.S.C.  Section 3727).

3.22.  <u>Customer and Trade Relations</u>.  As of the Closing Date, except as set forth on <u>Schedule 3.22</u>, there exists no actual or threatened termination or cancellation of, or any material adverse modification or change in: (a) the business relationship of Borrowers and the Guarantors with any customer or group of customers whose purchases during the preceding twelve (12) months caused them to be ranked among the ten (10) largest customers of Borrowers and the Guarantors; or (b) the business relationship of Borrowers and the Guarantors with any supplier material to its operations.

K&E 18571360.18
RLF1 3982293v. 1

3.23.    Agreements and Other Documents.  As of the Closing Date, Borrowers and the Guarantors have provided Lender and its counsel, accurate and complete copies (or summaries) of all of the following agreements or documents (in addition to the Material Contracts) to which Borrowers and the Guarantors are subject and each of which are listed on Schedule 3.23:  (a) supply agreements and purchase agreements not terminable by Borrowers and the Guarantors within sixty (60) days following written notice issued by Borrowers and the Guarantors and involving transactions in excess of $100,000 per annum; (b) any lease of Equipment having a remaining term of one year or longer and requiring aggregate rental and other payments in excess of $50,000 per annum; (c) licenses and permits held by Borrowers and the Guarantors, the absence of which could be reasonably likely to have a Material Adverse Effect; (d) instruments or documents evidencing Indebtedness of Borrowers and the Guarantors and any security interest granted by Borrowers and the Guarantors with respect thereto; and (e) instruments and agreements evidencing the issuance of any Stock, warrants, rights or options to purchase Stock of Borrowers and the Guarantors.

3.24.    Bankruptcy Matters.

(a)    The Chapter 11 Cases were commenced on the Petition Date in accordance with Applicable Law and proper notice thereof and proper notice of the hearing for the approval of the Interim Order has been given and proper notice of the hearing for the approval of the Final Order will be given.  The Canadian Proceedings will be commenced in accordance with Applicable Law and proper notice thereof and proper notice of the hearing for the approval of the Interim Initial Order and each other Canadian Order will be given.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, and in respect of the Canadian Borrower, a corresponding orders of the Canadian Court, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases, subject to the Interim Order and the Final Order, as applicable, and in respect of the Canadian Borrower, a corresponding orders of the Canadian Court, having priority over all administrative expense claims and unsecured claims against Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out Amount and, in the case of the Canadian Borrower, as provided in the Canadian Orders.

(c)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, and in respect of the Canadian Borrower, a corresponding orders of the Canadian Court, subject to the Interim Order and the Final Order, as applicable, and in respect of the Canadian Borrower, a corresponding orders of the Canadian Court, the Obligations will be secured by a valid and perfected first priority Lien in and against all of the Collateral.

(d)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended

25

(except as may be modified or amended with Lender's express written consent). Once entered, each of the Canadian Orders will be at all times in full force and effect and not been reversed, stayed, modified or amended (except as may be modified or amended with Lender's express written consent).

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, subject to the Interim Order and the Final Order, as applicable, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations from the applicable Borrower and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

## 4.     FINANCIAL STATEMENTS AND INFORMATION

4.1.    <u>Reports and Notices</u>.  Borrowers covenant and agree that from and after the Closing Date and until repayment in full in cash of the Obligations remaining after reduction thereof pursuant to the terms of the Asset Purchase Agreement, it shall deliver to Lender the Financial Statements, Budgets, cash flow forecasts, reports and notices required to be delivered pursuant to the terms of this Agreement at the times and in the manner set forth in <u>Annex B</u>.

4.2.    <u>Communication with Accountants</u>.  Each Borrower authorizes Lender to communicate directly with its independent certified public accountants and tax advisors (excluding legal counsel) and authorizes those accountants and advisors to disclose to Lender any and all work papers and financial statements and other supporting financial documents and schedules, including copies of any management letter with respect to the business, financial condition and other affairs of the Borrowers; <u>provided</u>, <u>however</u>, that Lender shall give the Borrowers reasonable prior notice of any such communications and such Borrowers shall be invited to be present during any such communications (but such presence shall not be a prerequisite of such communications).  At Lender's request, the Borrowers shall send a letter to such accountants and tax advisors, and deliver a copy thereof to Lender, instructing them to make available to Lender such information and records as Lender may reasonably request and to otherwise comply with the provisions of this <u>Section 4</u>.

4.3.    <u>Documents Filed with the Bankruptcy Court or Delivered to the US Trustee or Committee</u>.  At the time any report (including, without limitation, monthly reports), projection, prospectus or other similar document is filed with the Bankruptcy Court or Canadian Court, Borrowers shall deliver to Lender copies of any such report, projection, prospectus or other similar document.  Borrowers shall also promptly provide Lender with copies of all documents or information provided by or on behalf of Borrowers to the Committee with respect to the Chapter 11 Case or Canadian Proceedings.

## 5.     AFFIRMATIVE COVENANTS

Each Borrower covenants and agrees that, unless Lender shall otherwise consent in writing, from and after the date hereof and until the Termination Date, it shall, and the US Borrower shall cause each Guarantor to, comply with the following affirmative covenants:

5.1.    <u>Maintenance of Existence and Conduct of Business</u>.  (a) Except as occasioned by the Chapter 11 Cases or Canadian Proceedings, do or cause to be done all things necessary to

preserve and keep in full force and effect its statutory existence and corporate franchises; (b) continue to conduct its business substantially as now conducted or as otherwise permitted hereunder; (c) preserve all of its material property, in use or useful in the conduct of its business and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices, so that the business carried on in connection therewith may be properly and advantageously conducted at all times, provided that nothing in this Section 5.1(c) shall prevent the Borrowers from discontinuing the use or operation of any property if such discontinuance, in the judgment of the US Borrower's Board of Directors, is desirable in the conduct of the Borrowers' business; and (d) transact business only under the names set forth in Schedule 3.2.

5.2.    Payment of Charges and Claims.  To the extent permitted hereunder and to the extent applicable in the Chapter 11 Cases or Canadian Proceedings, pay and discharge, or cause to be paid and discharged in accordance with the terms thereof, (a) all Charges imposed upon it or its income and profits, or any of its property (real, personal or mixed) prior to the date on which penalties attach thereto, and (b) all lawful claims for labor, materials, supplies and services or otherwise, which, if unpaid, might or could become a Lien on its property; provided, however, that Borrowers shall not be required to pay any such Charge or claim which is being contested in good faith by proper legal actions or proceedings, so long as at the time of commencement of any such action or proceeding and during the pendency thereof (i) reserves with respect thereto are established and are maintained in accordance with GAAP, (ii) such contest operates to suspend collection of the contested Charges or claims and is maintained and prosecuted continuously with diligence, (iii) none of the Collateral would be subject to forfeiture or loss by reason of the institution or prosecution of such contest, (iv) no Liens securing an aggregate amount in excess of $25,000 shall exist for such Charges or claims during such action or proceeding (excluding Liens securing obligations fully covered by insurance or otherwise bonded to the satisfaction of Lender), and (v) if such contest is terminated or discontinued adversely to Borrowers, Borrowers shall promptly pay or discharge such contested Charges and all additional charges, interest penalties and expenses, if any, and shall deliver to Lender evidence reasonably acceptable to Lender of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to Borrowers.

5.3.    Books and Records.  Keep adequate records and books of account with respect to its business activities, in which proper entries, reflecting all of its consolidated and consolidating financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements in all material respects.

5.4.    Litigation.  Notify Lender in writing, promptly upon learning thereof, of any litigation, action, suit, claim, investigation, arbitration or other proceeding commenced or threatened, at law, in equity or otherwise against it, and of the institution against it of any suit or administrative proceeding which (a) could reasonably be expected to involve an amount in excess of $50,000 individually or $100,000 in the aggregate, or (b) if adversely determined, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect.

5.5.    Insurance.

K&E 18571360.18
RLF1 3982293v. 1

(a)     At its sole cost and expense, maintain or cause to be maintained policies of insurance of such type and in such amounts as is reasonable and standard in Borrowers' industry and geographic location and as is satisfactory to Lender and with insurers recognized as adequate by Lender acting reasonably.  Borrowers shall notify Lender promptly of any adverse occurrence causing a material loss or material decline in value of any real or personal property and the estimated (or actual, if available) amount of such loss or material decline.  Borrowers hereby direct all present and future insurers under its "All Risk" policies of insurance to pay all proceeds payable thereunder directly to Lender.  Each of the Borrowers and each Guarantor irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as its true and lawful agent and attorney in-fact for the purpose of, upon the occurrence and during the continuance of a Default, making, settling and adjusting claims under the "All Risk" policies of insurance, endorsing the name of such Person on any check, draft, instrument or other item of payment for the proceeds of such "All Risk" policies of insurance, and for making all determinations and decisions with respect to such "All Risk" policies of insurance.  In the event Borrowers at any time or times hereafter shall fail to obtain or maintain (or fail to cause to be obtained or maintained) any of the policies of insurance required above or to pay any premium in whole or in part relating thereto, Lender, without waiving or releasing any Obligations or Default hereunder, may at any time or times thereafter (but shall not be obligated to) obtain and maintain such policies of insurance and pay such premium and take any other action with respect thereto which Lender deems advisable.  All sums so disbursed, including reasonable attorneys' fees, court costs and other charges related thereto, shall be payable, on demand, by Borrowers to Lender and shall be additional Obligations hereunder secured by the Collateral.

(b)     Lender reserves the right at any time, upon review of Borrowers' risk profile, to reasonably require additional forms and limits of insurance to adequately protect Lender's interests.  Borrowers shall, if so requested by Lender, deliver to Lender, as often as Lender may reasonably request, a report of a reputable insurance broker reasonably satisfactory to Lender with respect to its insurance policies.

5.6.   Compliance with Laws.  Comply in all material respects with all Applicable Laws, including those relating to licensing, environmental, ERISA and labor matters.

5.7.   Agreements.  (i) Perform, within all required time periods (after giving effect to any applicable grace periods), all of its material obligations (except where Borrowers are contesting such obligation reasonably and in good faith or where performance is excused by the Bankruptcy Code, the CCAA, or by an applicable order of the Bankruptcy Court or the Canadian Court, and such non-compliance would neither have nor could be reasonably expected to have a Material Adverse Effect on Borrowers' business or assets or upon any of the rights, remedies or interests of the Lender) and (ii) enforce all of its material rights under each Material Contract or other document or instrument to which it is a party.  Borrowers shall perform and comply in all material respects with all obligations in respect of all material Chattel Paper, Instruments, Contracts, Licenses, and Documents and all other material agreements constituting or giving rise to Collateral, except to the extent that (i) such compliance is excused by the Bankruptcy Code, the CCAA or by an applicable order of the Bankruptcy Court or the Canadian Court and (ii) such non-compliance would neither have nor could reasonably be expected to have a Material

K&E 18571360.18
RLF1 3982293v. 1

Adverse Effect on Borrowers' business or assets or upon any of the rights, remedies or interests of the Lender.

5.8. [Reserved].

5.9. Environmental Matters. (a) Comply in all material respects with all Environmental Laws and Environmental Permits, (b) notify Lender promptly (but no later than five (5) days) after Borrowers become aware of any material Release, or any material violation of any Environmental Law, upon any Subject Property and conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws to abate said Release or otherwise to come into compliance, in all material respects, with Environmental Law, and (c) promptly forward to Lender a copy of any order, notice, permit, application, or any communication or report by any Governmental Authority received by Borrowers or any correspondence or other documentation provided by Borrowers related hereto in connection with any such Release or violation or any other matter relating to the Environmental Laws that may affect any Subject Property or Borrowers, and (d) at the request of Lender, conduct investigations, reasonable in scope and substance under the circumstances of the request, of any known or suspected conditions of contamination which are, or could reasonably be expected to become, material. The provisions of this Section 5.9 shall apply whether or not the Environmental Protection Agency, any other federal agency or any state or local environmental agency has taken or threatened any action in connection with any Release or the presence of any Hazardous Materials.

5.10. Application of Proceeds. Use the proceeds of the Revolving Credit Advances as provided in Section 1.3.

5.11. Fiscal Year. Maintain as its Fiscal Year the calendar year.

5.12. Subsidiaries. Not form or acquire any Subsidiary.

5.13. Further Assurances. At its sole cost and expense, upon request of Lender, duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and documents, including title policies and surveys, and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purposes of this Agreement or any other Loan Document.

5.14. Appraisals. Allow Lender and its designees from time to time as Lender shall direct, to perform, and shall assist Lender and its designees in performing, appraisals of Borrowers' Inventory, Equipment, accounts receivable and Subject Property. So long as no Default has occurred and is continuing, Lender agrees to provide to Borrowers upon the request of Borrowers any such appraisal prepared by a third party unaffiliated with Lender which has consented to Lender so providing such appraisal. In furtherance of the foregoing, Lender agrees to use reasonable efforts to obtain any such consent. Borrowers agree to pay all reasonable out-of-pocket costs and expenses incurred by Lender in connection with such appraisals conducted after a Default.

5.15. Intellectual Property.

(a)    Conduct its business and affairs without infringement of or interference with any intellectual property of any other Person and shall continue to maintain, preserve, and protect all of the material Intellectual Property of the Borrowers and Guarantors so as not to adversely affect the validity or enforceability thereof;.

(b)    In the event that any Business IP Rights owned by Borrowers or Guarantors is or has been infringed, misappropriated, violated, or diluted or otherwise impaired by a third party, such Borrowers or Guarantors shall take such reasonable actions under the circumstances in response thereto, including, if necessary under the circumstances, promptly bringing suit and recovering all damages therefor; and

(c)    Borrowers and Guarantors shall take any and all commercially reasonable steps to protect the secrecy of all trade secrets relating to the products and services sold or delivered under or in connection with the Business IP Rights, including, without limitation, where appropriate entering into confidentiality agreements with employees and labeling and restricting access to secret information and documents..

5.16.   <u>Sale Process</u>.  Pursue authorization and approval of the sale of substantially all of its assets under the Asset Purchase Agreement and the consummation thereof, subject to any higher or better offers that may be received in accordance with the Bid Procedures.  Borrowers and its advisors shall provide the Lender with weekly telephonic updates of sale efforts, including expressions of interest and offers received.

5.17.   <u>Schedule of Financial Affairs</u>.  On or before the date that is 20 days after the Petition Date, file with the Bankruptcy Court completed statements of financial affairs and schedules of assets and liabilities as required by the Bankruptcy Rules.

5.18.   <u>Sale Milestones</u>.

(a)    <u>US Milestones</u>.

(i)    On the Petition Date, the US Borrower shall file a motion in form and substance acceptable to Lender (the "<u>Bid Procedures Motion</u>") establishing the Bid Procedures and seeking to approve the Asset Purchase Agreement and the bid protections contemplated therein (it being understood that such motion may be combined with the Bid Procedures Motion).

(ii)    By no later than 16 days after the Petition Date, the US Borrower shall cause to be entered an order in form and substance satisfactory to Lender, approving the Bid Procedures Motion, the Asset Purchase Agreement and related bid protections.

(iii)    By no later than 2 Business Days prior to the Sale Order Date (the "<u>Auction Date</u>"), the US Borrower shall conduct an auction of the Borrowers' and Guarantors' assets to the extent more than 1 qualifying bid shall have been received.

(iv)    By no later than June 2, 2011 (the "<u>Sale Order Date</u>"), the US Borrower shall cause the Bankruptcy Court to have entered an order, in form and substance

K&E 18571360.18
RLF1 3982293v. 1

satisfactory to the Lender, approving the sale pursuant to the terms of the Asset Purchase Agreement.

        (v)    By no later than the date that is 15 days following the Sale Order Date, the US Borrower shall close the Court approved sale under the Asset Purchase Agreement.

        (b)    <u>Canadian Milestones</u>.

        (i)    By no later than 3 Business Days after the Petition Date, the Canadian Borrower shall commence the Canadian Proceedings.

        (ii)    By no later than 3 Business Days after the Petition Date (x) the Interim Initial Order in form and substance satisfactory to the Lender shall have been entered; and (y) the Canadian Borrower shall have filed and served an application with the Canadian Court for the Initial Recognition Order and the Supplemental Recognition Order in form and substance satisfactory to the Lender.

        (iii)    By no later than 8 Business Days after the Petition Date, the Initial Recognition Order and the Supplemental Recognition Order in form and substance satisfactory to the Lender shall have been entered.

        (iv)    By no later than 8 Business Days after the Petition Date, the Canadian Borrower shall have filed and served an application with the Canadian Court for the Sale Recognition Order, the Assignment Recognition Order and the Bidding Procedures Recognition Order in form and substance satisfactory to the Lender.

        (v)    By no later than 23 days after the Petition Date, the Bidding Procedures Recognition Order, in each case in form and substance satisfactory to the Lender, shall have been entered, and by no later than 51 days after the Petition Date, the Sale Recognition Order and the Assignment Recognition Order, in each case in form and substance satisfactory to the Lender, shall have been entered.

        (vi)    By no later than 25 days after the Petition Date, the Canadian Borrower shall have served and filed an application with the Canadian Court for the Final Order Recognition Order in form and substance satisfactory to the Lender.

        (vii)    By no later than 32 days after the Petition Date, the Final Order Recognition Order, in form and substance satisfactory to the Lender, shall have been entered.

    5.19.   <u>Financial Deliverables</u>.  Comply with the provisions set forth in <u>Annex B</u>.

## 6.    NEGATIVE COVENANTS

    Borrowers covenant and agree that, unless Lender shall otherwise consent in writing, from and after the date hereof and until the Termination Date, Borrowers shall not, and US Borrower shall cause each Guarantor not, to do any of the following:

6.1. <u>Mergers, Subsidiaries, Etc.</u>  Directly or indirectly, by operation of law or otherwise, merge, amalgamate, consolidate or otherwise combine with any Person or acquire or hold all or substantially all of the assets or capital stock of any Person, or form, acquire or hold any Subsidiary.

6.2. <u>Investments</u>.  Directly or indirectly, make or maintain any Investment except:  (a) Investments permitted by <u>Section 6.3</u>, <u>6.4</u>, or <u>6.6</u>; (b) Investments outstanding on the date hereof and listed in <u>Schedule 6.2</u>; (c) Investments in Cash Equivalents at any time during which no Revolving Credit Advances are outstanding and which are subject to a first priority perfected Lien of Lender; (d) Investments representing stock or obligations issued to Borrowers in settlement of claims against any other Person or the other Borrower by reason of a composition or readjustment of debt or reorganization of any debtor of Borrowers; and (e) Investments represented by deposits into bank accounts of Borrowers to the extent permitted hereunder. Notwithstanding anything in this Section 6.2 to the contrary, no Investments by US Borrower or any Guarantors in, to, or on behalf of the Canadian Borrower shall be permitted.

6.3. <u>Indebtedness</u>.  Create, incur, assume or permit to exist any Indebtedness, except: (a) the Obligations; (b) Deferred Taxes; (c) Capital Lease Obligations and Indebtedness secured by purchase money Liens permitted under clause (c) of <u>Section 6.7</u> (including any such Capital Lease Obligations and Indebtedness set forth in <u>Schedule 6.3</u>) and from and after the Closing Date, create, incur or assume vendor debt in a maximum aggregate amount at any one time outstanding not to exceed $10,000,000; (d) Guaranteed Indebtedness permitted under <u>Section 6.6</u>; and (e) Indebtedness existing on the Closing Date and set forth in <u>Schedule 6.3</u>.

6.4. <u>Affiliate and Employee Transactions</u>.  Except as set forth in <u>Schedule 6.4</u> or as otherwise expressly permitted hereunder, enter into or be party to any lending, borrowing or other commercial transaction or arrangement with any of its Affiliates, officers, directors or employees, including payment of any management, consulting, advisory, service or similar fee or any deferred compensation (excluding salaries, bonuses and other compensation to its officers, directors and employees in the ordinary course of business, consistent with past practices).

6.5. <u>Capital Structure and Business</u>.  (a) Make any changes in its business operations which, individually or in the aggregate, could adversely affect the repayment of the Obligations or reasonably be expected to have or result in a Material Adverse Effect; (b) make any change in its capital structure or issue of any Stock or make any revision of the terms of its outstanding Stock or amend or modify any shareholders, voting or similar agreement to which it is a party or enter into any such agreement, in each case, without the prior written consent of Lender; (c) amend its articles or certificate of incorporation, charter, by-laws or other organizational documents; or (d) engage in any business other than the businesses engaged in as of the Closing Date and other business directly related thereto.

6.6. <u>Guaranteed Indebtedness</u>.  Create, incur, assume or permit to exist any Guaranteed Indebtedness except for the Obligations under the Loan Documents and:  (a) endorsements of instruments or items of payment for deposit to any bank accounts of Borrowers; (b) performance bonds or indemnities entered into in the ordinary course of business, consistent with past practices; and (c) Guaranteed Indebtedness outstanding on the Closing Date and listed in <u>Schedule 6.3</u>.  Notwithstanding anything in this Section 6.6 to the contrary, no Guaranteed

K&E 18571360.18
RLF1 3982293v. 1

Indebtedness shall be permitted to be incurred by US Borrower or any Guarantors in, to, or on behalf of the Canadian Borrower.

6.7. <u>Liens</u>. Create or permit to exist any Lien on any of its properties or assets except for: (a) presently existing or hereafter created Liens in favor of Lender, to secure the Obligations; (b) Permitted Encumbrances; (c) purchase money Liens or purchase money security interests upon or in Equipment acquired by Borrowers in the ordinary course of business to secure the purchase price of such Equipment or to secure Capital Lease Obligations, in each case, permitted under clause (c) of <u>Section 6.3</u> and incurred solely for the purpose of financing the acquisition of such Equipment; (d) cash deposits with utility companies as ordered by the Bankruptcy Court or as otherwise agreed to by Borrowers and a utility company with the consent of the Lender; and (e) Liens in respect of the property and assets of the Canadian Borrower only created pursuant to the applicable Canadian Order securing an administrative charge in an amount not to exceed, in the aggregate, $100,000. The prohibition provided for in this <u>Section 6.7</u> specifically includes, without limitation, any effort by Borrowers, any Committee, or any other party-in-interest in the Chapter 11 Case or Canadian Proceedings to prime or create *pari passu* to any claims or interest of Lender any Lien (other than for the Carve-Out Amount) irrespective of whether such claims or interest may be "adequately protected". Notwithstanding anything in this Section 6.7 to the contrary, no Liens on any property or assets of the US Borrower or any Guarantors shall be permitted if the obligation underlying such Lien is for, or for the benefit of, the Canadian Borrower.

6.8. <u>Sale of Assets</u>. Sell, transfer, convey, license, assign or otherwise dispose of any of its tangible or intangible assets or properties, including any Collateral; <u>provided</u>, <u>however</u>, that the foregoing shall not prohibit (a) the sale of Inventory in the ordinary course of business; (b) the sale or disposition for fair consideration in any Fiscal Year of any assets or properties in the ordinary course of business which have become obsolete or surplus to the business of Borrowers having a fair market value of not greater than $50,000 in the aggregate for all Borrowers during such Fiscal Year and (c) the sale contemplated by the Asset Purchase Agreement.

6.9. <u>ERISA</u>. Adopt, participate in or contribute to any new Pension Plan or Multiemployer Plan (other than such plans that are set forth on Schedule 3.13) or acquire any new ERISA Affiliate that maintains or has an obligation to contribute to a Pension Plan or Multiemployer Plan Title IV Plan. Additionally, except as described in clauses (a) through (i) of this Section 6.9 associated with the Bell + Howell Legacy MMT Pension Plan, no Borrower nor any ERISA Affiliate shall: (a) permit or suffer any condition set forth in Section 3.13 to cease to be met and satisfied at any time, other than permitting an ERISA Affiliate acquired after the Closing Date to sponsor a Title IV Plan, a Plan subject to IRC Section 412 or ERISA Section 302, or a Retiree Welfare Plan; (b) terminate any Title IV Plan where such termination could reasonably be anticipated to result in liability to Borrowers; (c) permit any accumulated funding deficiency, as defined in Section 302(a)(2) of ERISA, to be incurred with respect to any Pension Plan; (d) fail to make any contributions or fail to pay any amounts due and owing as required by the terms of any Plan before such contributions or amounts become delinquent; (e) make a complete or partial withdrawal (within the meaning of Section 4201 of ERISA) from any Multiemployer Plan prior to a closing of the transactions under the Asset Purchase Agreement; (f) fail to provide Lender with copies of any Plan documents or governmental reports or filings, if reasonably requested by Lender; (g) fail to make any contribution or pay any amount due as

33

required by IRC Section 412 or Section 302 of ERISA; (h) allow any ERISA Event or event described in Section 4062(e) of ERISA to occur with respect to any Title IV Plan; and (i) with respect to all Retiree Welfare Plans, allow the present value of future anticipated expenses to increase by $500,000.

6.10.  <u>Financial Covenants</u>.  Breach or fail to comply with any of the financial covenants set forth on <u>Annex C-1</u> and <u>Annex C-2</u>, each of which shall be calculated in accordance with GAAP consistently applied (and based upon the financial statements delivered hereunder).

6.11.  <u>Restricted Payments; Use of Proceeds</u>.  (a) Make any Restricted Payment to any Person including payments between US Borrower and Canadian Borrower and between the US Borrower's Subsidiaries and Canadian Borrower, except that the US Borrower and Guarantors may make payments between each other in the ordinary course of business, <u>provided</u>, that any such payments which are in the nature of loans are evidenced by intercompany notes, repayment of which is subordinated to repayment of the Obligations, and which notes shall be collaterally assigned to Lender, to secure the Obligations; or (b) utilize the Collateral and the proceeds of the Revolving Credit Loans which are incurred from time to time other than for (i) working capital and general corporate purposes, including payment of certain fees and expenses of professionals retained by Borrowers in accordance with the terms of this Agreement and the other Loan Documents, subject to the terms of the Interim Order and Final Order and Canadian Orders solely for the purposes specified in the applicable Budget and (ii) certain other pre-petition expenses that are approved by the Bankruptcy Court and previously approved by Lender.

6.12.  <u>Hazardous Materials</u>.  (a) cause or permit a Release of Hazardous Material on, under, in or about any Subject Property which could reasonably be expected to result in any material Environmental Liability; (b) use, store, generate, treat or dispose of Hazardous Materials in any manner which could reasonably be expected to result in any material Environmental Liability; or (c) transport any Hazardous Materials to or from any Subject Property, in any manner which could reasonably be expected to result in any material Environmental Liability.

6.13.  <u>Sale-Leasebacks</u>.  Engage in any sale-leaseback, synthetic lease or similar transaction involving any of its property or assets.

6.14.  <u>Cancellation of Indebtedness</u>.  Subject to any order of the Bankruptcy Court or the Canadian Court entered in the Chapter 11 Cases or  the Canadian Proceedings, respectively, cancel any claim or Indebtedness owing to it, except for adequate consideration negotiated in an arm's length transaction and in the ordinary course of its business, consistent with past practices.

6.15.  <u>Bank Accounts</u>.  Maintain any deposit, operating or other bank accounts except for those accounts identified in <u>Schedule 3.20</u>.

6.16.  <u>No Speculative Investments</u>.  Engage in any speculative investment or any investment involving commodity options or futures contracts.

6.17.  <u>Margin Regulations</u>.  Directly or indirectly, use the proceeds of any Revolving Credit Advance or any of the Revolving Credit Loans to purchase or carry any Margin Stock or

any equity security of a class which is registered pursuant to Section 12 of the Securities Exchange Act of 1934.

6.18. <u>Limitation on Negative Pledge Clauses</u>. Directly or indirectly enter into any agreement (other than the Loan Documents) with any Person which prohibits or limits the ability of Borrowers or any Guarantor to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired.

6.19. <u>Material Contracts</u>. (a) Subject to any order of the Bankruptcy Court or the Canadian Court in the Chapter 11 Cases or the Canadian Proceedings, respectively, cancel or terminate any Material Contract unless, in the discretion of the US Borrower's or the Canadian Borrower's Board of Directors, as applicable, there occurs an event of default by any other party to such contract; or (b) waive any default or breach any Material Contract, or materially amend or otherwise modify any Material Contract or take (or omit to take) any other material adverse action in connection with any Material Contract.

6.20. <u>Leases</u>. (a) Renew (by amendment, modification or otherwise) any Lease or similar agreements other than renewals of existing Leases upon substantially the same terms (other than reasonable increases in rent based on market conditions) as are in effect on the Closing Date, or (b) enter into any new Lease or similar agreements other than as permitted under <u>Section 6.21</u>.

6.21. <u>New Premises</u>. Enter into, or become a lessee under, any Operating Lease of real property without the prior written consent of Lender.

6.22. <u>Repayment of Indebtedness</u>. Except pursuant to a confirmed reorganization plan and except as specifically permitted hereunder, without the express prior written consent of Lender pursuant to an order of the Bankruptcy Court or the Canadian Court after notice and hearing, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Chapter 11 Case that is subject to the automatic stay provisions of the Bankruptcy Code or the CCAA whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

6.23. <u>Reclamation Claims</u>. Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(h) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount of Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $75,000.

6.24. <u>Chapter 11 Claims</u>. Incur, create, assume, suffer to exist or permit any other super-priority administrative claim which is *pari passu* with or senior to the claims of Lender against Borrowers, except as set forth in <u>Section 1.12</u>.

K&E 18571360.18
RLF1 3982293v. 1

6.25.  <u>Change of Management</u>.  (a) Permit the composition of the board of directors (or equivalent) of the Borrowers or any Guarantor to be unsatisfactory to Lender or (b) permit changes to management that are unsatisfactory to the Lender.

6.26.  <u>Intellectual Property</u>.  Unless otherwise agreed in writing by Lender, the Borrowers and Guarantors shall (and shall cause all its licensees to): (a) continue to use each Trademark owned by such Borrowers and Guarantors included in the Business IP Rights in order to maintain such Trademark in full force and effect; and (b) not do any act or omit to do any act whereby: (i) such Trademark (or any goodwill associated therewith) may become destroyed, invalidated, impaired or harmed in any way, (ii) any Patent owned by such Borrowers or Guarantors included in the Business IP Rights may become forfeited, misused, unenforceable, abandoned or dedicated to the public, (iii) any portion of the Copyrights owned by such Borrowers and Guarantors included in the Business IP Rights may become invalidated, otherwise impaired or fall into the public domain or (iv) any Trade Secret owned by such Borrowers and Guarantors and included in the Business IP Rights may become publicly available or otherwise unprotectable.

## 7.  TERM

7.1.  <u>Duration</u>.  The financing arrangement contemplated hereby shall be in effect until the Commitment Termination Date.  On the Commitment Termination Date, the Revolving Credit Commitment shall terminate and the Revolving Credit Loans and all other Obligations shall immediately become due and payable in full, in cash.

7.2.  <u>Survival of Obligations</u>.  Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the Obligations, duties, indemnities, and liabilities of Borrowers or the Guarantors under any of the Loan Documents, or the rights of Lender relating to any Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is not required until after the Commitment Termination Date. Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon Borrowers or Guarantors under any of the Loan Documents, and all rights of Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive such termination or cancellation and shall continue in full force and effect until the Termination Date on which date they shall cease.

## 8.  EVENTS OF DEFAULT; RIGHTS AND REMEDIES

8.1.  <u>Events of Default</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code or otherwise and without application or motion to the Bankruptcy Court or Canadian Court or any notice to Borrowers, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)  the US Borrower or the Canadian Borrower shall fail to make any payment in respect of any Obligations hereunder or under any of the other Loan Documents

when due and payable or declared due and payable, including any payment of principal of, or interest on, the Revolving Credit Loans or reimburse Lender for any expense reimbursable hereunder, any other liabilities or other payment, fee, charge or expense provided for hereunder when due; or

(b)     the US Borrower or the Canadian Borrower shall fail or neglect to perform, keep or observe any of the provisions of Section 4.1, Section 5.2 (solely insofar as such Section requires and Borrowers fail to pay Claims for sales and use taxes and payroll withholding taxes in accordance with the terms of such Section), or Section 5.5, within ten (10) days from the date such performance is due, or at any time any of Section 1.3, Section 5.16, Section 5.17, Section 5.18, Section 5.19 or any subsection of Section 6; or

(c)     the US Borrower or the Canadian Borrower shall fail or neglect to perform, keep or observe any term or provision of this Agreement (other than any such term or provision referred to in paragraph (a) or (b) above) with respect to matters applicable to the US Borrower or the Canadian Borrower, as applicable, or Borrowers or any Guarantor under any of the other Loan Documents or contained in any other agreement or arrangement, now or hereafter entered into between Borrowers and Lender relating to the Obligations, shall fail or neglect to perform, keep or observe any term or provision of any other Loan Document, and the same shall remain unremedied for a period ending on the tenth (10th) day after either Borrower shall become aware of such Default; or

(d)     except for defaults: (i) occasioned by the filing of the Chapter 11 Cases and the Canadian Proceedings;  and (ii) resulting from Obligations with respect to which the Bankruptcy Code or, solely with respect to the Canadian Borrower, the Canadian Orders, prohibits Borrowers from complying with, or permits Borrowers not to comply with the Bankruptcy Code or such Canadian Orders, a default or breach occurs under any other Material Contract, document or instrument entered into either (x) Pre-Petition and which is affirmed after the Petition Date or (y) Post-Petition, to which Borrowers are a party or by which Borrowers or their property is bound, and such default (i) involves the failure to make any payment (after expiration of any applicable grace period), whether of principal, interest or otherwise, due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) in respect of any Indebtedness of Borrowers in an aggregate amount exceeding $100,000 or (ii) causes (or permits any holder of such Indebtedness or a trustee to cause) such Indebtedness, or a portion thereof in an aggregate amount exceeding $100,000, to become due prior to its stated maturity or prior to its regularly scheduled dates of payment; or

(e)     any information contained in any Weekly Budget Variance Report is untrue or incorrect by an amount which exceeds, in the aggregate for all such discrepancies, $100,000 or any representation or warranty herein or in any Loan Document or in any written statement, report, financial statement or certificate (other than a Weekly Budget Variance Report) made or delivered to Lender by Borrowers shall be untrue or incorrect in any material respect as of the date when made or deemed made (including those made or deemed made pursuant to Section 2.2); or

(f)     any judgments which are in the aggregate in excess of $50,000 (to the extent not covered by insurance) as to any post-Petition Date obligation shall be rendered against

37

Borrowers or any Guarantor or the enforcement thereof shall not be stayed (by court ordered stay or by consent of the party litigants); or there shall be rendered against Borrowers or any Guarantor a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a Material Adverse Effect on the ability of Borrowers or any Guarantor to perform its Obligations under the Loan Documents; or

(g)     this Agreement or any other Loan Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Lender shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Lender to take any action within its control; or

(h)     Borrowers or any Guarantor shall contest the validity or enforceability of any of the Loan Documents in writing or deny in writing that it has any further liability, including with respect to future advances by Lender, under any Loan Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Collateral Documents; or

(i)     at any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder; or

(j)     there shall occur a Change of Control; or

(k)     an event or condition specified in Section 6.9 (other than an event or condition associated with the Bell + Howell Legacy MMT Pension Plan) hereof shall occur or exist with respect to any Plan or Multiemployer Plan and, as a result of such event or condition, together with all other such events or conditions, Borrowers or any ERISA Affiliate shall cause or in the opinion of Lender shall be reasonably likely to cause liability to a Plan, a Multiemployer Plan or PBGC (or any combination of the foregoing) to increase by $500,000; or

(l)     the occurrence of any of the following in any of the Chapter 11 Cases or the Canadian Proceedings:

(i)     the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by either Borrower or any Guarantor in the Chapter 11 Case or Canadian Proceedings:  (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Order or the Final Order, as the case may be, to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of Lender; or (D) that is directly adverse to Lender or its rights and remedies hereunder or its interest in the Collateral; or

K&E 18571360.18
RLF1 3982293v. 1

(ii)     the filing of any plan of reorganization or disclosure statement attendant thereto in the Chapter 11 Cases or Canadian Proceedings by Borrowers or any other Person to which Lender does not consent or otherwise agree to the treatment of the claims against the Borrowers and Guarantors; or

(iii)     the entry of an order in the Chapter 11 Case or Canadian Proceedings confirming a plan of reorganization that does not contain a provision for termination of the Revolving Credit Commitments and repayment in full in cash of all of the Obligations under this Agreement and the claims under the Pre-Petition Loan Agreement on or before the effective date of such plan; or

(iv)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order or the Final Order or any Canadian Order without the written consent of Lender or the filing of a motion for reconsideration with respect to the Interim Order of the Final Order or any Canadian Order; or

(v)     the Final Order is not entered within 20 days following the Petition Date; or

(vi)     other than payments permitted pursuant to this Agreement or the Interim Order or the Final Order or Canadian Orders, as applicable, Borrowers or any Guarantor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Indebtedness incurred prior to the Petition Date; or

(vii)     the payment of, or application for authority to pay, any pre-petition claim without Lender's prior written consent or pursuant to an order of the Bankruptcy Court or Canadian Court after notice and hearing unless otherwise permitted under this Agreement; or

(viii)     the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against or with respect to any of the Collateral or Pre-Petition Collateral, other than for the Carve-Out Amount; or

(ix)     Borrowers or any Guarantor shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order in any of the Chapter 11 Cases appointing (i) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of Section 1106(a) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Cases; or

(x)     absent the written consent of Lender, entry by the Bankruptcy Court of an order under Section 363 or 365 of the Bankruptcy Code, or by the Canadian Court of a recognition order authorizing or approving the sale or assignment of a material portion of any of the Borrowers' or Guarantors' assets, or procedures in respect thereof (other than pursuant to the Asset Purchase Agreement), or any of the Borrowers or Guarantors shall seek, support, or fail to contest in good faith, the entry of such an order in any of the Chapter 11 Cases or Canadian Proceedings; or

39

(xi)    the dismissal of any of the Chapter 11 Cases or Canadian Proceedings, or the conversion of any of the Chapter 11 Cases from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or a bankruptcy under the BIA or Borrowers shall file a motion or other pleading seeking the dismissal of any of the Chapter 11 Cases or Canadian Proceedings under Section 1112 of the Bankruptcy Code or otherwise; or

(xii)    the Bankruptcy Court or Canadian Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrowers or any Guarantor which have an aggregate value in excess of $50,000 or (ii) to permit other actions that would have a Material Adverse Effect on the Borrowers or any Guarantor or or any of the Collateral; or

(xiii)    the commencement by Borrowers or any officer or employee of Borrowers or by the Committee in the Chapter 11 Cases or Canadian Proceedings, or any other party in interest in the Chapter 11 Cases or Canadian Proceedings, of a suit, action or contested matter against Lender, the Existing Agent or Prior Lenders or affecting the Collateral which, in the case only of the Committee or other party of interest sets forth (a) a claim in excess of $100,000, (b) any claim or legal or equitable remedy which seeks reduction, setoff, subordination or any recharacterization of the claim or Lien of Lender or Prior Lenders; or (c) a claim that would otherwise have a Material Adverse Effect or a material adverse effect on the rights and remedies of Lender or Prior Lenders under any Loan Document or the Pre-Petition Loan Agreement and related documents or the collectability of all or any portion of the Obligations or Prior Lender Obligations; or

(xiv)    the entry of an order in the Chapter 11 Cases or Canadian Proceedings avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement; or

(xv)    (i) Any of the Borrowers or any Guarantor shall fail to comply with the terms of the Interim Order, Final Order or Canadian Orders, as applicable, in any material respect, (ii) such orders shall be amended, supplemented, stayed, reversed, vacated or otherwise modified without the written consent of Lender, (iii) any of the Borrowers or any Guarantor shall file a motion for reconsideration with respect to the Interim Order, Final Order, or Canadian Orders, or (iv) the right of Borrowers to borrow under this Agreement is terminated by an order entered by the Bankruptcy Court or Canadian Court; or

(xvi)    the Borrowers or any Guarantor shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court or Canadian Court shall enter, an order in any of the Chapter 11 Cases or Canadian Proceedings (i) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code or otherwise, not otherwise permitted pursuant to this Agreement, (ii) granting any Lien (other than Permitted Liens or Liens expressly permitted in the DIP Orders) upon or affecting any Collateral which are pari passu or senior to the Liens on the Collateral in favor of Collateral Agent, for the benefit of Agent and Lenders, (iii) granting any claim priority senior to or pari passu with the claims of the Lenders under the Credit Documents or any other claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or Section 507(b) of the Bankruptcy Code, or (iv) granting any other

40

relief that is adverse to Lender's interests under any Loan Document or its rights and remedies hereunder or their interest in the Collateral; or

(xvii) the failure to achieve a Sale Milestone during the time period specified within the definition of "Sales Milestone"; or

(m) termination of the Asset Purchase Agreement; or

(n) any casualty event occurs, whether or not insured or insurable, as a result of which revenue-producing activities cease or are substantially curtailed at facilities of any Borrower of Guarantor generating more than 10% of US Borrower's consolidated revenues for the Fiscal Year preceding such event and such cessation or curtailment continues for more than thirty (30) days; or

(o) a trustee in bankruptcy, receiver, interim receiver, receiver and manager, monitor or official with similar powers shall be appointed with respect to the Canadian Borrower or its assets.

8.2.    Remedies.  If any Event of Default shall have occurred and be continuing Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code or the other Applicable Laws, without any application, motion or notice to or order from, the Bankruptcy Court or Canadian Court, without prior notice, take any one or more of the following actions:  (a) terminate all or any portion of the Revolving Credit Commitment whereupon Lender's obligation to make further Revolving Credit Advances shall terminate; (b) declare all or any portion of the Obligations to be forthwith due and payable whereupon such Obligations shall become and be due and payable; and/or (c) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and, pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under this Agreement and the Loan Documents, without further application or motion to, or order from, the Bankruptcy Court or Canadian Court; provided, however, notwithstanding anything to the contrary contained herein, Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrowers in the Collateral only upon 5 Business Days' prior written notice to Borrowers, the United States Trustee for the District of Delaware, and any counsel approved by the Bankruptcy Court for the Committee.  Upon the occurrence of an Event of Default and the exercise by Lender of its rights and remedies under this Agreement and the other Loan Documents, Borrowers shall assist Lender to the extent practicable in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

8.3.    Waivers by Borrowers.  Except as otherwise provided for in this Agreement and Applicable Law to the fullest extent permitted by Applicable Law, Borrowers waive (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all Loan Documents, notes, commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrowers may in any way be liable, and Borrowers hereby ratify and

41

confirm whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of any right of redemption and all valuation, appraisal and exemption laws. Each of the Borrowers acknowledge that it has been advised by counsel of its choice with respect to this Agreement, the other Loan Documents and the transactions contemplated by this Agreement and the other Loan Documents, and makes the foregoing waivers knowingly and voluntarily.

## 9. SUCCESSORS AND ASSIGNS

9.1. <u>Successors and Assigns</u>. This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of Borrowers, Lender, and their respective successors and permitted assigns, including, with respect to each of the Borrowers, its estate, any trustee or successor-in-interest of Borrowers in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, except as otherwise provided herein or therein. Each of the Borrowers may not assign, delegate, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the Loan Documents without the prior express written consent of Lender. Any such purported assignment, transfer, hypothecation or other conveyance by Borrowers without such prior express written consent shall be void. The terms and provisions of this Agreement and the other Loan Documents are for the purpose of defining the relative rights and obligations of Borrowers and Lender with respect to the transactions contemplated hereby and there shall be no third party beneficiaries of any of the terms and provisions of this Agreement or any of the other Loan Documents.

9.2. <u>Participations; Assignments</u>.

(a) Lender may, at any time sell to one or more banks or other financial institutions ("<u>Participants</u>") participating interests in all or a portion of its rights and obligations under this Agreement or any other Loan Document (including all or a part of its Revolving Credit Advances, its Revolving Credit Commitment and its Revolving Credit Note, if any).

(b) Borrowers agree that if amounts outstanding under this Agreement are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by Applicable Law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest was owing directly to it as a Lender under this Agreement. Borrowers also agree that each Participant shall be entitled to the benefits of <u>Section 1.10</u> with respect to its participation in the Revolving Credit Commitments and the Revolving Credit Loan outstanding from time to time as if it was a Lender.

(c) This Agreement and each other Loan Document shall inure to the benefit of the Lender and all future holders of any Revolving Credit Note, and each of their respective successors and assigns. No rights are intended to be created under any Loan Document for the benefit of any third party donee, creditor or incidental beneficiary of the Borrowers or Lender. Borrowers acknowledge that Lender at any time and from time to time, without the consent of

42

the Borrowers, may sell, assign or transfer all or any part of its rights or obligations under this Agreement, the Revolving Credit Note and the other Loan Documents and/or the Collateral. Such shall have all of the rights and benefits with respect to this Agreement, the Revolving Credit Note, the Collateral and/or the other Loan Documents held by it as fully as if the original holder thereof and shall become a party to this Agreement by signing a counterpart of this Agreement or a joinder or similar agreement. Notwithstanding any other provision of any Loan Document, Lender may disclose to any potential assignees or participants all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

## 10. MISCELLANEOUS

10.1. <u>Complete Agreement; Modification of Agreement</u>. This Agreement and the other Loan Documents constitute the complete agreement between the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, commitments, understandings or inducements (oral or written, expressed or implied). Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing and signed by Lender.

10.2. <u>Fees and Expenses</u>.

(a) Borrowers agree to pay on demand all reasonable out-of-pocket costs and expenses (including fees and expenses of Kirkland & Ellis LLP and Osler, Hoskin & Harcourt LLP and of other advisors including Young, Conaway, Stargatt & Taylor LLP) of Lender in connection with the preparation, negotiation, approval, execution, delivery, administration, modification, amendment, waiver and enforcement (whether through negotiations, legal proceedings or otherwise) of the Loan Documents, and commitments relating thereto, and the other documents to be delivered hereunder or thereunder and the transactions contemplated hereby and thereby and the fulfillment or attempted fulfillment of conditions precedent hereunder, including: (i) any amendment, modification or waiver of, or consent with respect to, any of the Loan Documents or advice in connection with the administration of the advances made pursuant hereto or its rights hereunder or thereunder; (ii) any litigation, arbitration, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrowers or any other Person) in any way relating to the Collateral, any of the Loan Documents or any other agreements to be executed or delivered in connection therewith or herewith, whether as party, witness, or otherwise, including any litigation, arbitration, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced (A) in good faith by or against Borrowers or any other Person that may be obligated to Lender by virtue of the Loan Documents, or (B) under title 7 or 11 of the United States Code, as now constituted or hereafter amended, or any other applicable Federal, state or foreign bankruptcy or similar insolvency law, <u>provided</u>, <u>however</u>, that Borrowers shall not be required to pay any out-of-pocket costs and expenses of Lender in any litigation, contest, dispute, suit, proceeding or action resulting solely from Lender's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; (iii) any attempt to enforce any rights of Lender against Borrowers or any other Person that may be obligated to Lender by virtue of any of the Loan Documents; (iv) any Default; or (v) subject to <u>Section 5.14</u>, any effort to (A) monitor the Loans

43

and the Loan Documents, (B) evaluate, observe, assess Borrowers or their affairs, or (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of the Collateral. Borrowers and Lender hereby agree that Lender's field examinations and audits conducted hereunder shall be charged against the Revolving Credit Loan; provided, however, that Lender shall charge Borrowers the costs of not more than one such examination or audit per Fiscal Quarter, so long as a Default has not occurred and continuing and Lender's reimbursement for such field examinations shall not exceed $1,500.00 per day per individual (plus all out-of-pocket costs and expenses).

(b) In addition, Borrowers agree to pay on demand all reasonable out-of-pocket costs and expenses (including fees and expenses of counsel) of Lender in connection with any Event of Default and any enforcement or collection proceedings resulting therefrom or any amendment, modification or waiver of, or consent with respect to, any of the Loan Documents in connection with any Event of Default.

(c) In addition, Borrowers agrees to pay on demand all reasonable fees, costs and expenses (including the fees and expenses of all of its counsel, advisors, consultants and auditors) incurred in connection with the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and Canadian Proceedings and any subsequent case under Chapter 7 of the Bankruptcy Code and, in respect of the Canadian Borrower, under the BIA, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and Canadian Proceedings and any subsequent case under Chapter 7 of the Bankruptcy Code or under the BIA, and general monitoring of the Chapter 11 Cases and Canadian Proceedings and any subsequent case under Chapter 7 of the Bankruptcy Code or bankruptcy under the BIA; provided, however, that the foregoing shall not include fees, costs and expenses incurred directly or indirectly in connection with the negotiation, documentation or efforts to obtain approval of the Asset Purchase Agreement.

(d) Without limiting the generality of clauses (a), (b) and (c) above, Borrowers' obligation to reimburse Lender for out-of-pocket costs and expenses shall include the reasonable fees and expenses of counsel (and local, foreign or special counsel, advisors, consultants and auditors retained by such counsel), as well as the reasonable fees and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplicating expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram charges; secretarial overtime charges; expenses for travel, lodging and food; and all other reasonable out-of-pocket costs and expenses of every type and nature paid or incurred in connection with the performance of such legal or other advisory services.

10.3. No Waiver. No failure on the part of Lender, at any time or times, to require strict performance by Borrowers, of any provision of this Agreement and any of the other Loan Documents shall waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver of a Default shall not suspend, waive or affect any other Default whether the same is prior or subsequent thereto and whether of the same or of a different type. None of the undertakings, agreements, warranties, covenants and representations of Borrowers contained in this Agreement or any of the other Loan Documents and no Default by Borrowers shall be deemed to have been suspended or

K&E 18571360.18
RLF1 3982293v. 1

waived by Lender unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of Lender.

10.4.   Remedies.  The rights and remedies of Lender under this Agreement shall be cumulative and nonexclusive of any other rights and remedies which Lender may have under any other agreement, including the Loan Documents, by operation of law or otherwise.  Recourse to the Collateral shall not be required.

10.5.   Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10.6.   Conflict of Terms.  Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any of the other Loan Documents, the provisions contained in this Agreement shall govern and control.

10.7.   Right of Setoff.  Upon the occurrence and during the continuance of any Default, Lender is hereby authorized, at any time and from time to time, to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of Borrowers against any and all of the Obligations now or hereafter existing irrespective of whether or not Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be unmatured. Lender agrees to notify Borrowers after any such setoff and application made by Lender; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of Lender under this Section are in addition to the other rights and remedies (including other rights of setoff) which Lender may have.

10.8.   Authorized Signature.  Until Lender shall be notified by Borrowers to the contrary, the signature upon any document or instrument delivered pursuant hereto and reasonably believed by Lender or any of Lender's officers or employees to be that of an officer or duly authorized representative of Borrowers listed in Schedule 10.8 shall bind Borrowers and be deemed to be the act of Borrowers affixed pursuant to and in accordance with resolutions duly adopted by the US Borrower's Board of Directors and Canadian Borrower's Board of Directors, and Lender shall be entitled to assume the authority of each signature and authority of the Person whose signature it is or reasonably appears to be unless the Person acting in reliance on such signature shall have actual knowledge of the fact that such signature is false or the Person whose signature or purported signature is presented is without authority.

10.9.   Notices.  Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon either of the parties by the other party, or whenever either of the parties desires to give or serve upon the other party any communication with respect to this

45

Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered (a) upon the earlier of actual receipt and three (3) days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (b) upon transmission, when sent by facsimile transmission or e-mail, (c) one Business Day after deposit with a reputable overnight courier with all charges prepaid or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number or e-mail address indicated below or to such other address (or facsimile number or e-mail address) as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than Borrowers or Lender) designated below to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

|  |  |
|---|---|
| If to Lender, at: | c/o Versa Capital Management, Inc.<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA  19104-2868<br>Telephone:  (215) 609-3400<br>Telecopier:  (215) 609-3499<br>Attention:  General Counsel |
| With a copy (which shall not constitute notice) to: | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Telecopier: (212) 446-6460<br>Attention:  Leonard Klingbaum, Esq.<br>E-mail: Leonard.Klingbaum@kirkland.com |
| With a copy (which shall not constitute notice) to: | Osler, Hoskin & Harcourt LLP<br>Box 50, 1 First Canadian Place<br>Toronto, Ontario  M5X 1B8<br>Telephone: (416) 862-5890<br>Telecopier: (416) 862-6666<br>Attention:  Tracy Sandler<br>E-mail: tsandler@osler.com |

46

|                         |                                         |
|-------------------------|-----------------------------------------|
| If to US Borrower, at:  | c/o BBH, Inc.                           |
|                         | 760 S. Wolf Road                        |
|                         | Wheeling, IL  60090                     |
|                         | Telephone: (847) 423-7362               |
|                         | Telecopier: (847) 423-7321              |
|                         | Attention: Michael Wilhelm              |
|                         |                                         |
| With a copy to:         | McDermott Will & Emery LLP              |
|                         | 227 Monroe Street                       |
|                         | Chicago, IL  60606                      |
|                         | Telephone: (312) 984-7572               |
|                         | Telecopier: (312) 984-7700              |
|                         | Attention:  William J. McGrath          |
|                         | E-mail: wmcgrath@mwe.com                |
|                         |                                         |
| If to Canadian          | c/o BBH, Inc.                           |
| Borrower, at:           | 760 S. Wolf Road                        |
|                         | Wheeling, IL  60090                     |
|                         | Telephone: (847) 423-7362               |
|                         | Telecopier: (847) 423-7321              |
|                         | Attention: Michael Wilhelm              |
|                         |                                         |
| With a copy to:         | Torys LLP                               |
|                         | 79 Wellington Street West, Ste. 3000    |
|                         | Toronto, Ontario M4L 2K5                |
|                         | Telephone:  (416) 865-8131              |
|                         | Telecopier:  (416) 865-7380             |
|                         | Attention:  Natasha DeCicco             |
|                         | E-mail: ndecicco@torys.com              |

10.10.  Section Titles.  The Section titles and Table of Contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

10.11.  Counterparts.  This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement.  Any signatures delivered by a party by facsimile transmission or by e-mail in portable document format (.pdf) shall be deemed an original signature hereto.

10.12.  Time of the Essence.  Time is of the essence of this Agreement and each of the other Loan Documents.

10.13.  GOVERNING LAW.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS

K&E 18571360.18
RLF1 3982293v. 1

AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. BORROWERS HEREBY CONSENT AND AGREE THAT THE BANKRUPTCY COURT HAS EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, PROVIDED, HOWEVER, THAT LENDER AND BORROWERS ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT AND, PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER. BORROWERS EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND BORROWERS HEREBY WAIVES ANY OBJECTION WHICH BORROWERS MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. BORROWERS HEREBY WAIVE PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWERS AT THE ADDRESS SET FORTH IN SECTION 10.9 OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF US BORROWER'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE US MAILS, PROPER POSTAGE PREPAID AND RETURN RECEIPT REQUESTED.

10.14. <u>WAIVER OF JURY TRIAL</u>. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.15. <u>Publicity</u>. Borrowers will not, and will not permit any of its Affiliates to, disclose the name of Lender or any of its Affiliates or refer to this Agreement or the other Loan

Documents in any press release or other public disclosure or in any prospectus, proxy statement or other materials filed with any Governmental Authority without Lender's prior written consent unless Borrowers or any of its Affiliates is required to do so under Applicable Law, and then, in any event, Borrowers or such Affiliate will consult with Lender prior to such disclosure. Borrowers consent to Lender publishing a tombstone or similar advertising material relating to the financing transaction contemplated by this Agreement. Lender consents to Borrowers' orally disclosing to its vendors, landlords and prospective landlords, and other third parties, who need to know in the reasonable judgment of Borrowers, only the name of Lender, the amount of Revolving Credit Advances (including loan balances and any other information required to terminate or replace the Revolving Credit Advances), and the Commitment Termination Date. Any written materials of any type disclosing any information of the type referred to herein shall require the written approval of Lender prior to being disseminated to any Person.

10.16.  <u>Dating</u>.  Although this Agreement is dated as of the date first written above for convenience, the actual dates of execution hereof by the parties hereto are respectively the dates set forth under the signatures hereto, and this Agreement shall be effective on the latest of such dates.

10.17.  <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>.  This Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon Borrowers, the estate of Borrowers, and any trustee or successor in interest of Borrowers in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Lender and its transferees and endorsees.  The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the conversion of the Chapter 11 Cases or any other bankruptcy case of Borrowers to a case under Chapter 7 of the Bankruptcy Code or a bankruptcy of the Canadian Borrower under the BIA or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect its security interests or Liens under Applicable Law.

## 11.    GUARANTY

11.1.  <u>Guaranty of the Obligations</u>.  Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Lender the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (collectively, the "<u>Guaranteed Obligations</u>").  For the purposes solely of this Section 11, the US Borrower shall be included as a "Guarantor" and the obligations of the Canadian Borrower shall be "Guaranteed Obligations" of each of the Guarantors including the US Borrower.   For the avoidance of doubt, the Canadian Borrower is not a Guarantor hereunder.

11.2.  <u>Payment by Guarantors</u>.  Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which Lender may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrowers to pay

K&E 18571360.18
RLFI 3982293v. 1

any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, Guarantors will upon demand pay, or cause to be paid, in cash, to Lender, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Borrowers' becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrowers for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Lender as aforesaid.

11.3.    <u>Liability of Guarantors Absolute</u>.    Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b)    Lender may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Borrowers and Lender with respect to the existence of such Event of Default;

(c)    the obligations of each Guarantor hereunder are independent of the obligations of Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrowers, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrowers or any of such other guarantors and whether or not Borrowers is joined in any such action or actions;

(d)    payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if Lender is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment

K&E 18571360.18
RLF1 3982293v. 1

hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for Lender in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that Lender may have against any such security, in each case as Lender in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Borrowers or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)    this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents, or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document, or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though Lender might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Borrowers or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which Borrowers may allege or assert against Lender in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

51

11.4.  <u>Waivers by Guarantors</u>.  Each Guarantor hereby waives, for the benefit of Lender: (a) any right to require Lender, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrowers, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrowers, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of Lender in favor of Borrowers or any other Person, or (iv) pursue any other remedy in the power of Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrowers or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrowers or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrowers and notices of any of the matters referred to in Section 11.3 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

11.5.  <u>Guarantors' Rights of Subrogation, Contribution, etc.</u> .  Until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving  Credit Commitment shall have terminated, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Borrowers or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Borrowers with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that Lender now has or may hereafter have against Borrowers, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by Lender.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Credit Commitment shall have terminated, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is

52

found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrowers or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights Lender may have against Borrowers, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Lender and shall forthwith be paid over to Lender to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

11.6. <u>Subordination of Other Obligations</u>. Any Indebtedness of Borrowers or any Guarantor now or hereafter held by any Guarantor (the "<u>Obligee Guarantor</u>") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Lender and shall forthwith be paid over to Lender to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

11.7. <u>Continuing Guaranty</u>. This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full and the Revolving Credit Commitments shall have terminated and the Obligations paid in full in cash. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

11.8. <u>Authority of Guarantors or Borrowers</u>. It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrowers or the officers, directors or any agents acting or purporting to act on behalf of any of them.

11.9. <u>Financial Condition of Borrowers</u>. Any Revolving Credit Advance may be made to Borrowers or continued from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrowers at the time of any such grant or continuation, as the case may be. Lender shall have no obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrowers. Each Guarantor has adequate means to obtain information from Borrowers on a continuing basis concerning the financial condition of Borrowers and its ability to perform its obligations under the Loan Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrowers and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of Lender to disclose any matter, fact or thing relating to the business, operations or conditions of Borrowers now known or hereafter known by Lender.

K&E 18571360.18
RLF1 3982293v. 1

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

US Borrower:

**BBH, INC.**, as US Borrower and as a Guarantor


By: _____
Name:
Title:

**BOWE BELL + HOWELL INTERNATIONAL LTD.,** as Canadian Borrower

By: _____
Name:
Title:

Guarantors:

**BOWE BELL + HOWELL HOLDINGS, INC.**, as a Guarantor

By: _____
Name:
Title:

**BOWE BELL + HOWELL COMPANY**,
**BCC SOFTWARE, INC.,**
**BOWE SYSTEC INC.,**
**BOWE BELL + HOWELL POSTAL SYSTEMS COMPANY**, each as a Guarantor

By: _____
Name:
Title:

<u>Lender:</u>

**CONTRADO BBH FUNDING, LLC**, as Lender


By: _____
Name:
Title:

Address for Notice of Revolving Credit Advance:

c/o Versa Capital Management, Inc.
Cira Center
2929 Arch Street
Philadelphia, PA 19104-2868
Attention:  Joel Biran
Facsimile No.:  215-609-3499
E-mail:  jbiran@versa.com

With a mandatory copy to:

c/o Versa Capital Management, Inc.
Cira Center
2929 Arch Street
Philadelphia, PA 19104-2868
Attention:  David S. Lorry
Facsimile No.:  215-609-3499
E-mail:  dlorry@versa.com

Lender's Account:

Bank Name: JPMorgan Chase Bank
ABA No.: 0210000021
Name: Contrado BBH Funding, LLC
Account No.:  877171025

*Signature page to DIP Credit Agreement*

## DEFINITIONS; RULES OF CONSTRUCTION

      1.    <u>Definitions</u>.  Capitalized terms used in this Agreement shall have (unless otherwise provided elsewhere in this Agreement) the following respective meanings when used in this Agreement.

      "<u>Account Debtor</u>" shall mean any Person who may become obligated to Borrowers under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles.

      "<u>Accounts</u>" shall mean, with respect to any Person, all "accounts" as such term is defined in the Code, now owned or hereafter acquired by such Person, and shall include, in any event, (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to such Person, whether arising out of goods sold or services rendered by it or from any other transaction (including any such obligations which may be characterized as an account or contract right under the Code), (b) all of such Person's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services, (c) all of such Person's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all monies due or to become due to such Person under all purchase orders and contracts for the sale or lease of goods or the performance of services or both by such Person or in connection with any other transaction (whether or not yet earned by performance on the part of such Person) now or hereafter in existence, including the right to receive the proceeds of said purchase orders and contracts, and (e) all collateral security and guarantees of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

      "<u>Affiliate</u>" shall mean, with respect to any Person, (a) each Person that, directly or indirectly, owns or Controls, whether beneficially, or as a trustee, guardian or other fiduciary, ten percent (10%) or more of the Stock having ordinary voting power in the election of directors of such Person, (b) each Person that Controls, is Controlled by or is under common Control with such Person or (c) each of such Person's officers, directors, joint venturers and partners.

      "<u>Agreement</u>" shall have the meaning assigned ot it in the Introductory paragraph, and shall include this <u>Annex A</u> and all Annexes, Schedules, and Exhibits attached or otherwise identified thereto, restatements and modifications and supplements hereto and any appendices, attachments, exhibits or schedules to any of the foregoing, and shall refer to this Agreement as the same may be in effect at the time such reference becomes operative, <u>provided</u>, <u>however</u> that any reference to the Schedules to this Agreement shall be deemed a reference to the Schedules as in effect on the Closing Date or in a written amendment thereto executed by each of the Borrowers and Lender.

K&E 18571360.18
RLF1 3982293v. 1

"Applicable Law" shall mean, in respect of any Person, all provisions of constitutions, statutes, rules, regulations, and orders of all Governmental Authorities applicable to such Person or by which it is bound.

"Asset Purchase Agreement" shall mean the Asset Purchase Agreement by and between, among others, the US Borrower, the Canadian Borrower and Contrado BBH Funding, LLC, dated as of [_____], 2011, as it may be amended, restated or modified from time to time in accordance with its terms.

"Assignment Recognition Order" shall mean an Order of the Canadian Court which shall be in form and substance acceptable to the Lender recognizing and giving full force and effect to the Assignment Order **[(as defined in the Bid Procedures Motion)]** in all provinces and territories of Canada pursuant to section 49 of the CCAA.

"Auction Date" shall have the meaning assigned to it in Section 5.18(d).

"Avoidance Action" means all actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under Section 552(b), Section 506(c) and Sections 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

"Bankruptcy Code" shall have the meaning assigned to it in the recitals to the Agreement.

"Bankruptcy Court" shall have the meaning assigned to it in the recitals to the Agreement.

"BIA" shall mean the Bankruptcy and Insolvency Act (Canada), as amended from time to time, and the regulations thereunder, and any successor statute.

"Bid Procedures" shall mean the bid procedures to be established by the Bankruptcy Court with respect to the auction of the assets of Borrowers and Guarantors.

"Bid Procedures Motion" shall have the meaning assigned to it in Section 5.18(a).

"Bidding Procedures Recognition Order" shall mean an Order of the Canadian Court which shall be in form and substance acceptable to the Lender recognizing and giving full force and effect to the Bidding Procedures Order **[(as defined in the Bid Procedures Motion)]** in all provinces and territories of Canada pursuant to section 49 of the CCAA.

"Borrower" and "Borrowers" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Borrower's Case" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Budget" shall mean the aggregate, without duplication, of all items approved by the Lender in its sole discretion that are set forth in the budget of Borrowers' cash receipts and expenditures for the thirteen weeks commencing on the Petition Date in the form attached hereto

as <u>Annex D-1</u> (for US Borrower) and <u>Annex D-2</u> (for Canadian Borrower), as modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) delivered in accordance with <u>Annex B</u> and approved by Lender in writing in its sole discretion (with the most recent such approved budget to become the Budget for purposes of this Agreement).

"<u>Business Day</u>" shall mean any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in Philadelphia, Pennsylvania.

"<u>Calendar Week Period</u>" shall mean a weekly period commencing on (and including) Monday of a calendar week and ending on (and including) Sunday of the following calendar week.

"<u>Canadian Availability Amount</u>" shall mean, in respect of the Canadian Borrower, (x) until entry of the Initial Recognition Order, $0, (y) following the entry of the Initial Recognition Order and until entry of the Final Order Recognition Order, the lesser of $500,000 and the aggregate amount authorized by the Bankruptcy Court in the Interim Order to be borrowed by the Canadian Borrower, and (z) following entry of the Final Order Recognition Order, the lesser of $1,300,000 and the aggregate amount authorized by the Bankruptcy Court in the Final Order to be borrowed by the Canadian Borrower.

"<u>Canadian Borrower</u>" shall have the meaning assigned to it in the first paragraph of this Agreement.

"<u>Canadian Borrower's Case</u>" shall have the meaning assigned to it in the first paragraph of this Agreement.

"<u>Canadian Borrowing Availability</u>" shall mean, at any time, an amount equal to the lesser of (x) the excess, if any, of (a) the Canadian Revolving Credit Commitment over (b) the aggregate principal amount of all Canadian Revolving Credit Loans then outstanding and (y) the amount permitted to be outstanding at such time pursuant to the Canadian Budget.

"<u>Canadian Budget</u>" shall mean the Budget attached hereto as Annex D-2, as modified or supplemented from time to time.

"<u>Canadian Court</u>" shall have the meaning assigned to it in the first paragraph of this Agreement.

"<u>Canadian Indemnified Liabilities</u>" shall have the meaning assigned to it in <u>Section 1.9</u>.

"<u>Canadian Orders</u>" means the Interim Initial Order, the Initial Recognition Order, the Supplemental Recognition Order, the Final Order Recognition Order and each and every other recognition order or other order or relief issued or granted by the Canadian Court in respect of the Canadian Borrower in connection with the Canadian Proceedings, and individually any of such orders.

A-3

"Canadian Proceedings" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Canadian Revolving Credit Advance" shall have the meaning assigned to it in Section 1.1(a)(ii).

"Canadian Revolving Credit Commitment" shall mean the commitment of the Lender to make Canadian Revolving Credit Advances to the Canadian Borrower pursuant to Section 1.1(a)(ii) and the other provisions hereof in the principal amount outstanding not to $1,300,000, as such amount may be reduced or modified pursuant to this Agreement.

"Canadian Revolving Credit Loan" shall mean the aggregate amount of Canadian Revolving Credit Advances of Lender outstanding at any time.

"Canadian Security Agreement" means the general security agreement dated of even date herewith by the Canadian Borrower in favor of the Lender, as it may be amended, restated, modified or supplemented from time to time.

"Canadian Unused Fee" shall have the meaning assigned to it in Section 1.6(d).

"Capital Lease" shall mean, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, either would be required to be classified and accounted for as a capital lease on a balance sheet of such Person or otherwise be disclosed as such in a note to such balance sheet.

"Capital Lease Obligation" shall mean, with respect to any Person, the amount of the obligation of such Person as lessee under any Capital Lease that, in accordance with GAAP, would appear on a balance sheet of such Person in respect of such Capital Lease or otherwise be disclosed in a note to such balance sheet.

"Cave-Out" shall have the meaning assigned to it in the Interim Order or the Final Order, as the case may be.

"Carve-Out Amount" shall mean the amount of Professional Fees (as defined in the Interim Order or the Final Order, as applicable), paid or payable subject to the Carve-Out.

"Cash Equivalents" shall mean, (a) securities with maturities of 180 days or less from the date of acquisition issued or fully guaranteed or insured by the United States government or any agency thereof and backed by the full faith and credit of the United States, (b) certificates of deposit, eurodollar time deposits, overnight bank deposits and bankers' acceptances of any domestic commercial bank having capital and surplus in excess of $500,000,000 having maturities of one year or less from the date of acquisition, and (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Corporation or P-1 by Moody's Investors Services, Inc., or carrying an equivalent rating by a nationally recognized rating agency if both of the two named rating agencies cease publishing ratings of investments, in each case, with maturities of not greater than sixty (60) days from the date acquired.

K&E 18571360.18
RLF1 3982293v. 1

"Change of Control" shall mean: (i) Holdings shall fail directly to own 100% of the common stock and voting rights in and to the US Borrower; (ii) Holdings shall fail to own directly or indirectly 100% of the common stock and voting rights in and to the Guarantors (other than Holdings) and the Canadian Borrower; (iii) voting, management and operational control of Holdings changes as compared to such control existing on the Closing Date.

"CCAA" shall have the meaning assigned to it in the recitals to the Agreement.

"Chapter 11 Cases" shall have the meaning assigned to it in the recitals to the Agreement.

"Charges" shall mean, for Borrowers and Guarantors, all federal, state, county, provincial, city, municipal, local, foreign or other governmental taxes (including taxes at the time due and payable), levies, imposts, assessments, charges, Liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of Borrowers and Guarantors, (d) Borrowers' and Guarantors' ownership or use of any of its assets, or (e) imposed upon Borrowers' and Guarantors' business.

"Chattel Paper" shall mean all "chattel paper" as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by Borrowers.

"Claim" shall have the meaning assigned to it in Section 1.9.

"Closing Date" shall mean the Business Day on which the conditions precedent set forth in Section 2 have been satisfied and the initial Revolving Credit Advance has been made.

"COBRA" means the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state Law.

"Code" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, or remedies with respect to, Lender's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"Collateral" shall have the meaning assigned to it in the Security Agreement and the Canadian Security Agreement, and shall include all the Borrowers' and Guarantors' real, personal and mixed property (including equity interests) and all monies and other property of any kind received on account thereof (including, upon and following the approval of the Bankruptcy Court, Avoidance Actions), and all proceeds therefrom, in which Liens are granted whether pursuant to the Interim Order and Final Order, as applicable, the applicable Canadian Orders, the

K&E 18571360.18
RLF1 3982293v. 1

Collateral Documents or otherwise, in each case as security for the Obligations of the Borrowers and Guarantors.

"Collateral Documents" shall mean (x) the Security Agreement and all other instruments, waivers and agreements now or hereinafter securing, in whole or in part, the Obligations and (y) in respect of the Canadian Borrower, the Canadian Security Agreement and all other instruments, waivers and agreements now or hereinafter securing, in whole or in part, the Obligations of the Canadian Borrower under this Agreement and the other Loan Documents.

"Commitment Termination Date" shall mean the earliest of (a) June 13, 2011, (b) the date of termination of the Revolving Credit Commitment pursuant to Section 8.3, (c) the date of termination of the Revolving Credit Commitment in accordance with the provisions of Section 1.2(c), (d) two (2) days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date, (e) twenty (20) days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court by such date, (f) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date, (g) the close of business on the first Business Day after the entry of the Interim Order, if by that time Borrowers have not paid Lender the fees required under this Agreement, unless Lender agrees otherwise, (h) the date a plan of reorganization confirmed in the Chapter 11 Cases becomes effective that does not provide for the payment in full of all amounts owed to Lender under this Agreement and the other Loan Documents on such effective date, (i) the date of the closing of a sale of all or substantially all of Borrowers' and/or Guarantors' assets pursuant to Section 363 of the Bankruptcy Code or a confirmed plan of reorganization or, if earlier, the second Business Day after the Sale Order Date unless the buyer under the Asset Purchase Agreement is the winning bidder, or (j) the effective date of a plan of reorganization or arrangement in the Chapter 11 Cases.

"Committee" shall mean the official committee of unsecured creditors and any other committee formed, appointed, or approved in the Chapter 11 Cases and each of such Committees shall be referred to herein as a Committee.

"Contracts" shall mean, with respect to any Person, all the contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which such Person may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

"Control" shall mean, with respect to a Person, the possession, directly or indirectly, of the power to direct or cause the direction of such Person's management or policies, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Copyrights" means all United States, and foreign copyrights, mask works and copyrightable works, whether registered or unregistered, and, with respect to any and all of the foregoing: (a) all registrations and applications therefor; (b) all extensions and renewals thereof, (c) all rights corresponding thereto throughout the world in all forms or mediums now or

hereafter known or devised; and (d) all rights to sue for past, present and future infringements thereof.

"Default" shall mean any default or any event which, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"Default Rate" shall mean a rate per annum equal to 3.00% plus the otherwise applicable interest rate on such portion of the Obligations as in effect from time to time.

"Deferred Taxes" shall mean, with respect to any Person at any date, the amount of deferred taxes of such Person as shown on the balance sheet of such Person prepared in accordance with GAAP as of such date.

"Deposit Accounts" means all "deposit accounts" as such term is defined in the Code, now or hereafter held in the name of any Borrower or any Guarantor.

"Documents" shall mean any "documents" as such term is defined in the Code and, shall include, in any event, any bills of lading, dock warrants, dock receipts, warehouse receipts, or other documents of title.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Environmental Laws" shall mean, whenever in effect, all federal, state, local and applicable foreign laws, statutes, ordinances, orders, regulations and similar provisions having the force or effect of law, and in each case as amended or supplemented from time to time, any applicable judicial or administrative orders or determinations, and all common law relating to public health and safety, worker health and safety, pollution or protection of the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.); the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901 et seq.) ("RCRA"); the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.); the Clean Air Act, as amended (42 U.S.C. §§ 740 et seq.); the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.) ("OSHA"); and the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300(f) et seq.), and any and all regulations promulgated thereunder, and all analogous state and local counterparts or equivalents and any transfer of ownership notification or approval statutes.

"Environmental Liabilities" shall mean, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest (contingent or otherwise), whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including

A-7

any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or the presence of, or any exposure to, a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" shall mean all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority or otherwise required by any Environmental Laws.

"Equipment" shall mean any "equipment" as such term is defined in the Code and in any event shall include all machinery, equipment, furnishings, fixtures and vehicles and any and all additions, accessions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974 (or any successor legislation thereto), as amended from time to time, and any regulations promulgated thereunder.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) under common control with the Borrowers and which, together with a Guarantor or Borrowers, is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the IRC.

"ERISA Event" shall mean, with respect to the Borrowers or any ERISA Affiliate, (a) a Reportable Event (other than a Reportable Event triggered by a bankruptcy filing) with respect to a Title IV Plan or a Multiemployer Plan; (b) the withdrawal of Borrowers or any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the failure to timely make required contributions to a Qualified Plan other than the Bell + Howell MMT Legacy Pension Plan; or (d) except with respect to the Bell + Howell MMT Legacy Pension Plan, any other event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or the imposition of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA.

"Event of Default" shall have the meaning assigned to it in Section 8.1.

"Executive Officers" shall mean the President, Chief Executive Officer, Chief Financial Officer, Treasurer and Controller of Borrowers.

"Existing Agent" shall have the meaning assigned to it in the recitals of this Agreement.

"Fees" shall mean the fees due to Lender as set forth in Section 1.5 or otherwise pursuant to the Loan Documents.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as

A-8

approved by the Bankruptcy Court which order shall be in form and substance satisfactory to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrowers to obtain credit, incur (or guaranty) Indebtedness, and grant superpriority, priming, first priority Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of Lender's claims.

"Final Order Recognition Order" means the order of the Canadian Court recognizing the Final Order in respect of the Canadian Borrower pursuant to the CCAA.

"Financial Statements" shall have the meaning assigned to it in Section 3.4.

"First Day Orders" shall have the meaning assigned to it in Section 2.1(k).

"Fiscal Month" shall mean any calendar month.

"Fiscal Quarter" shall mean any calendar quarter.

"Fiscal Year" shall mean any calendar year.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time, consistently applied; provided, that with respect to the Canadian Borrower, the term "GAAP" shall mean generally accepted accounting principles in Canada.

"General Intangibles" shall mean, with respect to any Person, all "general intangibles" as such term is defined in the Code, now owned or hereafter acquired by such Person and, in any event, including all right, title and interest which such Person may now or hereafter have in or under any Contract, all payment intangibles, all customer lists, intellectual property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any intellectual property), all rights and claims in or under insurance policies, (including insurance for fire, damage, loss, and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man, and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property, and rights of indemnification.

"Governmental Authority" shall mean any nation or government, any state, political, or quasi-judicial subdivision thereof, and any agency, department, court, board, commission, arbitral body, or other entity exercising valid legal executive, legislative, judicial, regulatory administrative functions.

"Guaranteed Indebtedness" shall mean, as to any Person, any obligation of such Person guaranteeing any indebtedness, lease, dividend, or other obligation ("primary obligations") of any other Person (the "primary obligor") in any manner including any obligation or arrangement of such Person (a) to purchase or repurchase any such primary obligation, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (d) to indemnify the owner of such primary obligation against loss in respect thereof.

"Guaranteed Obligations" shall have the meaning assigned to it in Section 11.1.

"Guarantor" and "Guarantors" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Holdings" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Hazardous Material" shall mean any substance, material or waste, including special waste, that is characterized, classified or designated under any Environmental Law as hazardous, toxic, pollutant or radioactive, including petroleum, asbestos, polychlorinated biphenyls and toxic mold, or otherwise subject to imposition of liability or standards of conduct under any Environmental Law.

"Indebtedness" of any Person shall mean (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (including reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured, but not including obligations to trade creditors incurred in the ordinary course of business that are not unpaid for more than 90 days past the stated due date therefor, unless being contested in good faith), (b) all obligations evidenced by notes, bonds, debentures or similar instruments (including, without limitation, any Subordinated Debt), (c) all indebtedness created or arising under any conditional sale or other title retention agreements with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in an event of default may be limited to repossession or sale of such property), (d) all Capital Lease Obligations, (e) all Guaranteed Indebtedness, (f) all obligations of such Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate option contract, foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap, commodity purchase or option agreements or other similar agreement or contract designed to protect such Person against fluctuations in interest rates, currency values or commodity prices, as the case may be, or other hedging or derivative agreements, (g) all Indebtedness referred to in clause (a), (b), (c), (d), (e) or (f) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed

A-10

or become liable for the payment of such Indebtedness, (h) the Obligations, and (i) all liabilities under Title IV of ERISA.

"Indemnified Person" shall have the meaning assigned to it in Section 1.9.

"Initial Recognition Order" shall mean the order of the Canadian Court recognizing the Canadian Borrower as a "Foreign Representative" in the Chapter 11 Cases and the Chapter 11 Cases as the "Foreign Main Proceeding" in respect of the Canadian Borrower.

"Instruments" shall mean, for any Person, all "instruments" as such term is defined in the Code, now owned or hereafter acquired by such Person, wherever located, and in any event shall include all certificated securities, certificates of deposit and all notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means all (a) Copyrights, (b) Patents, (c) Trademarks, (d) Trade Secrets, (e) Software, (f) copies and tangible embodiments of any of the foregoing in whatever form or medium and (g) all other proprietary and intellectual property and rights therein in any jurisdiction in the world, together with all rights to sue and collect for past, present or future infringement, misappropriation or other unauthorized use thereof, and all rights to income, royalties, payments, proceeds, claims, rights and remedies in connection therewith.

"Interim Initial Order" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Lender, which, among other matters, but not by way of limitation, authorizes, on an interim basis, Borrowers to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit C.

"Internet Domain Names" shall mean all rights in internet web sites and internet domain names presently registered or used by Borrowers.

"Inventory" shall mean, for any Person, all "inventory" as such term is defined in the Code, now owned or hereafter acquired by such Person, wherever located, and in any event shall include inventory, merchandise, goods and other personal property which are held by or on behalf of such Person for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process, finished goods, returned goods or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such Person's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including other supplies, and all accessions and additions thereto and all documents of title covering any of the foregoing.

"Investment" shall mean, for any Person (a) the acquisition (whether for cash, property, services, securities or otherwise) of capital stock, bonds, notes, debentures, partnership

K&E 18571360.18
RLF1 3982293v. 1

or other ownership interests or other securities of any other Person or any agreement to make any such acquisition; (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person); and (c) the entering into of any Guaranteed Indebtedness of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"Investment Property" shall mean all investment property as such term is defined in the Code now owned or hereafter acquired by Borrowers, wherever located, including (i) all securities whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnerships interests, treasuries, certificates of deposit, and mutual fund shares; (ii) all securities entitlements of Borrowers to any securities account and the financial assets held by a securities intermediary with respect to that account; (iii) all securities accounts of Borrowers; (iv) all commodity contracts of Borrowers; and (v) all commodity accounts held by Borrowers.

"IRC" shall mean the Internal Revenue Code of 1986, as amended, and any successor thereto.

"IRS" shall mean the Internal Revenue Service, or any successor thereto.

"Knowledge" for the purposes of the representations and warranties set forth in Section 3.16 of this Agreement shall be determined as follows: an individual will be deemed to have "Knowledge" of a particular fact or other matter only if such individual is actually aware of such fact. A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter only if an individual who is an Executive Officer, partner, executor, or trustee of such Person (or in any similar capacity) has actual Knowledge of such fact or other matter.

"Leases" shall mean all of those leasehold estates in real property now owned or hereafter acquired by Borrowers, as lessee.

"Lender" shall have the meaning provided in the first paragraph of this Agreement.

"License" shall mean, with respect to any Person, any Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by such Person.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, whether or not choate, vested, or perfected (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"Loan Account" shall have the meaning assigned to it in Section 1.8.

A-12

"<u>Loan Documents</u>" shall mean this Agreement, the Revolving Credit Notes (if any), the Collateral Documents, Interim Order and the Final Order and all other pledges, powers of attorney, consents, waivers, assignments, mortgages, deeds of trusts, contracts, notices, letter of credit agreements and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrowers, or any employee of Borrowers, and delivered to Lender or any Lender in connection with the Agreement or the transactions contemplated thereby.

"<u>Margin Stock</u>" shall have the meaning specified in Regulation T, U or X of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the business, assets, operations, or financial condition of Borrowers and the Guarantors, (b) Borrowers' ability to pay or perform its Obligations in accordance with the terms of the Loan Documents, (c) the Collateral or Lender's Lien on the Collateral or the priority or perfection of any such Lien or (d) the rights and remedies of Lender under this Agreement and the other Loan Documents.

"<u>Material Contracts</u>" shall mean the contracts listed on <u>Schedule 6.19</u> hereto and any other Contract of Borrowers which, if cancelled or terminated, could reasonably be expected to have or result in a Material Adverse Effect.

"<u>Maximum Lawful Rate</u>" shall have the meaning assigned to it in <u>Section 1.5(e)</u>.

"<u>Multiemployer Plan</u>" shall mean a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, and to which Borrowers or any ERISA Affiliate is making, is obligated to make, has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

"<u>Notice of Revolving Credit Advance</u>" shall have the meaning assigned to it in <u>Section 1.1(d)</u>.

"<u>Obligations</u>" shall mean: (x) other than with respect to the Canadian Borrower, all loans, advances, debts, liabilities and obligations for the performance of covenants, or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or amounts are liquidated or determinable) owing by the Borrowers and the Guarantors under any of the Loan Documents to Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under any of the Loan Documents; and (y) solely with respect to the Canadian Borrower, all loans, advances, debts, liabilities and obligations for the performance of covenants, or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or amounts are liquidated or determinable) owing by the Canadian Borrower under any of the Loan Documents to Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under any of the Loan Documents with respect to the Canadian Borrower. This term includes all principal and interest on the Revolving Credit Loans, all related Fees, Charges, expenses, attorneys' and other advisors' fees and any other sum chargeable to the Borrowers and Guarantors under any of the Loan Documents.

K&E 18571360.18
RLF1 3982293v. 1

"Obligee Guarantor" shall have the meaning assigned to it in Section 11.6.

"Operating Lease" shall mean any lease of real or personal property, or mixed property, which is not a Capital Lease.

"Other Taxes" shall have the meaning assigned to it in Section 1.11(b).

"Participants" shall have the meaning assigned to it in Section 9.2(a).

"Patent License" shall mean, with respect to any Person, rights under any written agreement now owned or hereafter acquired by such Person granting any right with respect to any invention on which a Patent is in existence.

"Patents" shall mean (a) all United States, Patent Cooperation Treaty and foreign patents and certificates of invention, or similar industrial property rights, and applications and disclosures for any of the foregoing, (b) all reissues, divisions, continuations, continuations-in-part, extensions, supplementary protection certificates, renewals, and reexaminations thereof, (c) all rights corresponding thereto throughout the world, (d) all inventions and improvements described therein, (e) all rights to sue for past, present and future infringements thereof, and (f) all licenses, claims, damages, and proceeds of suit arising therefrom.

"PBGC" shall mean the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" shall mean an employee pension benefit plan, as defined in Section 3(2) of ERISA, which is not an individual account plan, as defined in Section 3(34) of ERISA, and which Borrowers or any ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"Permitted Encumbrances" shall mean:  (a) Liens for Charges provided payment thereof shall not at the time be required under Section 5.2 or to the extent that nonpayment thereof is permitted under the Bankruptcy Code; (b) deposits, Liens or pledges of cash collateral to secure obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation or other public or statutory obligations arising in the ordinary course of business; (c) deposits, Liens or pledges of cash collateral to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), obligations of a tenant under an Operating Lease, or surety, stay or appeal bonds or similar obligations arising in the ordinary course of business; (d) workers', mechanics', suppliers', carriers', warehousemen's Liens or other similar Liens arising by operation of law in the ordinary course of business and securing sums which are not past due or are being contested by Borrowers reasonably and in good faith; (e) any attachment or judgment Lien which does not constitute a Default, unless the judgment it secures shall not, within 15 days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall not have been discharged within 15 days after the expiration of any such stay; (f) zoning restrictions, easements, survey exceptions, building codes, subdivision laws,  rights of way,  conditions, charges, encroachments, licenses, or other restrictions on the use of and encumbrances against the real property or other minor irregularities in title (including leasehold title) thereto, including without limitation those shown on the title policies delivered to Lender on the Closing Date, so

K&E 18571360.18
RLF1 3982293v. 1

long as such restrictions or irregularities, either individually or in the aggregate, do not materially impair the use, value, or marketability of such real property, leases or leasehold estates as currently used by Borrowers; (g) Liens created by statute or common law in favor of landlords for unpaid rent and related amounts that are not more than fifteen days past due or are being contested by Borrowers reasonably and in good faith; (h) Liens of a banking institution encumbering deposits (including setoff rights) held by such banking institution incurred in the ordinary course of business and which are within the general parameters customary in the banking industry; (i) Liens listed in Schedule 6.7 existing on the Closing Date; (j) Liens arising pursuant to the Pre-Petition Loan Agreement; (k) liens affecting the interest or title of a lessor, sublessor, licensor or licensee (and any underlying lessors, sublessors and licensors) under any lease, license or similar agreement entered into by the Borrowers in the ordinary course of business; and (l) ground leases in respect of real property on which facilities leased by the Borrowers are located.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, limited liability partnership, institution, public benefit corporation, entity or government (whether Federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning assigned to it in the recitals to this Agreement.

"Plan" shall mean, with respect to Borrowers or any ERISA Affiliate, at any time, an employee benefit plan, as defined in Section 3(3) of ERISA, (or any similar plan maintained by any Borrowers which such plan is not subject to ERISA) which Borrowers maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"Post-Petition" shall mean the time period beginning immediately after the filing of the Chapter 11 Cases.

"Pre-Petition" shall mean the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Pre-Petition Indebtedness" shall mean all Indebtedness of Borrowers and Guarantors outstanding on the Petition Date immediately prior to the filing of the Chapter 11 Cases, including, without limitation, Indebtedness under the Pre-Petition Loan Agreement.

"Pre-Petition Liens" shall mean all Liens against the assets of Borrowers and Guarantors on the Petition Date immediately prior to the filing of the Chapter 11 Cases, including, without limitation, Liens securing the Pre-Petition Indebtedness arising under the Pre-Petition Loan Agreement.

"Pre-Petition Loan Agreement" shall have the meaning assigned to it in the recitals to this Agreement.

K&E 18571360.18
RLF1 3982293v. 1

"Prime Rate" means the prime rate of interest as published in the Wall Street Journal, such rate to change from time to time; provided, however, that for the purposes of this Agreement, such rate shall be deemed to be no less than 3.00%.

"Prior Lender Obligations" shall mean all obligations of Borrowers and Holdings to the Prior Lenders pursuant to the Pre-Petition Loan Agreement, and all instruments and documents executed pursuant thereto or in connection therewith.

"Prior Lenders" shall have the meaning assigned to it in the recitals to this Agreement.

"Proceeds" shall mean all "proceeds" as such term is defined in the Code and, in any event, shall include, with respect to any Person: (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Person from time to time with respect to any of its property or assets; (b) any and all payments (in any form whatsoever) made or due and payable to such Person from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of such Person's property or assets by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), (c) any claim of such Person against third parties (i) for past, present or future infringement of any Patent or Patent License, or (ii) for past, present or future infringement or dilution of any Trademark or Trademark License or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark License; (d) any recoveries by such Person against third parties with respect to any litigation or dispute concerning any of such Person's property or assets, including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, such property or assets; and (e) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock, and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of the Collateral.

"Proceeding" shall mean any claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, suit in equity or at law, administrative, regulatory or quasi judicial proceeding, account, cost, expense, setoff, contribution, attorneys' fee or causes of action of whatever kind or character.

"PWC" means PricewaterhouseCoopers Inc.

"Qualified Plan" shall mean, for Borrowers an employee pension benefit plan, as defined in Section 3(2) of ERISA, which is intended to be tax-qualified under IRC Section 401(a), and which Borrowers maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"Release" shall mean any release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migration of a Hazardous Material into the indoor or outdoor environment.

A-16

"Releasing Parties" and "Released Parties" shall have the meaning assigned to it in Section 1.16.

"Reportable Event" shall mean any of the events described in Section 404(c) of ERISA except those events for which the 30-day notice period has been waived.

"Restricted Payment" shall mean, with respect to any Person, either directly or indirectly, (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of such Person's Stock, (b) any payment on account of the purchase, redemption, defeasance or other retirement, or to obtain the surrender of, such Person's Stock or any other payment or distribution made in respect thereof, (c) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder or Affiliate of such Person, other than relating to salaries, bonuses and other compensation to such Person's officers, directors and employees in the ordinary course of business consistent with past practice, (d) any payment, purchase, redemption, retirement, or other acquisition for value or setting apart of any money for a sinking, or other analogous reserve fund for the purchase, redemption, retirement or other acquisition of, or to obtain the surrender of, or any payment (scheduled, voluntary or other) of principal of or interest on, or any other amount owing in respect of, any Subordinated Debt, or (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of any Stock of such Person, or of a claim for indemnification or contribution arising out of or relating to any such claim for damages or rescission.

"Retiree Welfare Plan" shall refer to any Welfare Plan providing for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than continuation coverage provided pursuant to IRC Section 4980B and at the sole expense of the participant or the beneficiary of the participant.

"Revolving Credit Advances" shall have the meaning assigned to it in Section 1.1(a).

"Revolving Credit Commitments" shall mean both the US Revolving Credit Commitment and the Canadian Revolving Credit Commitment.

"Revolving Credit Loans" shall mean the US Revolving Credit Loans and the Canadian Revolving Credit Loans.

"Revolving Credit Note" shall mean the promissory note provided for by Section 1.1(e) and all promissory notes delivered in substitution or exchange therefor, in each case as it may be amended, restated, modified or supplemented and in effect from time to time.

"Sale Milestones" shall means the dates and requirements as set forth in Section 5.18.

"Sale Order Date" shall have the meaning assigned to it in 5.18(a)(v).

"Sale Recognition Order" shall mean an Order of the Canadian Court which shall be in form and substance acceptable to the Lender recognizing and giving full force and effect to

the Sale Order **[(as defined in the Bid Procedures Motion)]** in all provinces and territories of Canada pursuant to section 49 of the CCAA.

"<u>Security Agreement</u>" shall mean the Security Agreement dated of even date herewith by the Borrowers and the Guarantors in favor of Lender, as it may be amended, restated, modified or supplemented from time to time.

"<u>Software</u>" shall mean any and all computer programs, applications, software, middleware, libraries, tools, firmware and all software implementations of algorithms, models and methodologies, owned or licensed, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis, etc.) or specific, unique-to-the-business usage, all computer operating, security or programming software, owned or licensed by any of the Borrowers or Guarantors, as applicable, and, in each case, in any form (including all source code and executable code), data, databases and related documentation of any of the foregoing and copies and tangible embodiments of any of the foregoing in whatever form or medium and all rights arising out of or associated with any of the foregoing.

"<u>Stock</u>" shall mean all shares, options, warrants, general or limited partnership interests, membership interests, participation or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended).

"<u>Stockholder</u>" shall mean each holder of Stock of either the US Borrower or the Canadian Borrower.

"<u>Subject Property</u>" shall mean all real property owned, leased or operated by Borrowers.

"<u>Subordinated Debt</u>" shall mean any Indebtedness of Holdings or Borrowers which is expressly and contractually subordinated in right of payment, to the satisfaction of Lender, to the Obligations.

"<u>Subsidiary</u>" shall mean, with respect to any Person, (a) any corporation of which an aggregate of 50% or more of the outstanding Stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person, or by one or more Subsidiaries of such Person, or by both, with respect to which any such Person has the right to vote or designate the vote of 50% or more of such Stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person, or one or more Subsidiaries of such Person, or both, shall have an interest (whether in the form of voting or participation in profits or capital contribution) of 50% or more or of which any such Person is a general partner or managing member, as the case may be, or may exercise the powers of a general partner or managing member, as the case may be.

A-18

"**Subsidiary Guarantors**" shall mean each entity listed on Schedule 3.9(a).

"**Supplemental Recognition Order**" shall mean the order of the Canadian Court (i) appointing PWC as the information officer in the Canadian Proceedings in respect of the Canadian Borrower and (ii) recognizing the Interim Order obtained in the Chapter 11 Cases in respect of the Canadian Borrower.

"**Taxes**" shall mean taxes, levies, imposts, deductions, Charges or withholdings, and all liabilities with respect thereto, excluding taxes, levies, imposts, deductions, charges or withholdings and liabilities with respect thereto that are imposed on or measured by the net income of any Lender by the United States of America or Canada, the jurisdiction under the laws of which Lender is organized or the jurisdiction in which such Lender's applicable lending office is located or, in each case, any political subdivision thereof.

"**Termination Date**" shall mean the date on which (a) the Revolving Credit Commitment has been terminated in full and Lender shall have no further obligation to make any Revolving Credit Advances or any other credit extensions or financial accommodations hereunder or under any other Loan Document, and (b) all Obligations have been irrevocably paid in full.

"**Title IV Plan**" shall mean a Pension Plan, other than a Multiemployer Plan, which is covered by Title IV of ERISA.

"**Total Availability Amount**" shall mean $127,200,000.

"**Trade Secrets**" shall mean all trade secrets and all other confidential or proprietary information and know-how (including formulations, ideas, research and development, know how, inventions (whether or not patentable and whether or not reduced to practice), invention disclosures, formulas, compositions, manufacturing and production processes and techniques, technical data, customer and supplier lists, designs, drawings, plans and specifications) whether or not any of the foregoing has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such Trade Secret, including but not limited to the right to sue for past, present and future misappropriation or other violation of any Trade Secret.

"**Trademark License**" shall mean, with respect to any Person, rights under any written agreement now owned or hereafter acquired by such Person granting any right to use any Trademark.

"**Trademarks**" shall mean (a) all registered and unregistered United States, and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, designs, trade dress, slogans, other source or business identifiers, designs and general intangibles of a like nature, and all registrations and applications for any of the foregoing, (b) all extensions or renewals of any of the foregoing, (c) all translations, adaptations, derivations and combinations of the foregoing, (d) all of the goodwill of the business connected with the use of and symbolized by the foregoing, and (e) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill.

A-19

"Unused Fees" shall have meaning assigned to it in <u>Section 1.6(d)</u>.

"US Availability Amount" shall mean (x) until entry of the Final Order, the lesser of $11,000,000 and the aggregate amount authorized by the Bankruptcy Court in the Interim Order to be borrowed by the US Borrower and (y) following entry of the Final Order, $125,900,000.

"US Borrower" shall have the meaning assigned to it in the first paragraph of this Agreement.

"US Borrowing Availability" shall mean, at any time, an amount equal to the lesser of (x) the excess, if any, of (a) the US Revolving Credit Commitment *minus* the amount of the obligations under the Pre-Petition Loan Agreement then outstanding and not refinanced in accordance with the terms of the Interim Order or Final Order, as applicable, over (b) the aggregate principal amount of all US Revolving Credit Loans then outstanding and (y) the amount permitted to be outstanding at such time pursuant to the US Budget.

"US Budget" shall mean the Budget attached hereto as Annex D-1, as modified or supplement from time to time.

"US Indemnified Liabilities" shall have the meaning assigned to it in <u>Section 1.9</u>.

"US Revolving Credit Advance" shall have the meaning assigned to it in <u>Section 1.1(a)(i)</u>.

"US Revolving Credit Commitment" shall mean the commitment of the Lender to make a US Revolving Credit Advance to the US Borrower pursuant to <u>Section 1.1(a)(i)</u> and the other provisions hereof in the principal amount outstanding not to exceed $125,900,000, as such amount may be reduced or modified pursuant to this Agreement; <u>provided</u>, <u>however</u>, that solely for the purposes of calculating the fees set forth in Section 1.5, the "US Revolving Credit Commitment" shall mean $4,900,000, as such amount may be reduced or modified pursuant to this Agreement.

"US Revolving Credit Loan" shall mean the aggregate amount of US Revolving Credit Advances of Lender outstanding at any time.

"US Trustee" means the United States Trustee appointed in the Chapter 11 Cases.

"US Unused Fee" shall have the meaning assigned to it in <u>Section 1.6(a)</u>.

"Weekly Budget Variance Report" shall have the meaning assigned to it in <u>Annex B</u>.

"Weekly Budgeted Disbursements" shall mean, with respect to any Calendar Week Period, the aggregate amount of projected cash disbursements by the US Borrower and the Canadian Borrower set forth in the US Budget and the Canadian Budget, respectively, with respect to such Calendar Week Period.

K&E 18571360.18
RLF1 3982293v. 1

"Welfare Plans" shall mean any welfare plan, as defined in Section 3(1) of ERISA, which is maintained or contributed to by Borrowers or any ERISA Affiliate.

2.  Certain Matters of Construction.  Any accounting term used in the Agreement or the other Loan Documents shall have, unless otherwise specifically provided therein, the meaning customarily given such term in accordance with GAAP, and all financial computations thereunder shall be computed, unless otherwise specifically provided therein, in accordance with GAAP consistently applied.  That certain items or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing.

All other undefined terms contained in the Agreement or the other Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code as in effect in the State of New York to the extent the same are used or defined therein. The words "herein," "hereof" and "hereunder" or other words of similar import refer to the Agreement as a whole, including the exhibits and schedules thereto, as the same may from time to time be amended, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement.

Whenever any provision in any Loan Document refers to the "knowledge" of any Person, such provision is intended to mean that such Person has actual knowledge or awareness of a particular fact or circumstance, or that such Person, if it had exercised reasonable diligence, should have known or been aware of such fact or circumstance.

For purposes of this Agreement and the other Loan Documents, the following additional rules of construction shall apply:  (a) wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter; (b) the term "including" shall not be limiting or exclusive, unless specifically indicated to the contrary; (c) all references to statutes and related regulations shall include any amendments thereto and any successor statutes and regulations; and (d) all references to any instruments or agreements, including references to any of the Loan Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof, in each case, made in accordance with the terms of the Loan Documents.

K&E 18571360.18
RLF1 3982293v. 1

## FINANCIAL STATEMENTS AND NOTICES[1]

1.    <u>Inventory Report</u>.  Together with the delivery of monthly financials under paragraph 3 below, an Inventory report in form consistent with the Inventory report being delivered under the Pre-Petition Loan Agreement and in substance satisfactory to Lender.

2.    <u>Accounts Receivable Report</u>.  A monthly trial balance showing Accounts outstanding aged from invoice due date as follows: 1-30 days, 31-60 days, 61-90 days and 91 days or more, accompanied by such supporting detail and documentation as shall be requested by Lender, such trial balance to be delivered to Lender no later than five days after the end of the period to which such trial balance relates.

3.    <u>Monthly Financials</u>.  By no later the 30th day after the end of each Fiscal Month:

(a)    internally prepared balance sheet and income statement as of the close of such Fiscal Month and that portion of the current Fiscal Year ending as of the close of such Fiscal Month, in each case, for the US Borrower which financial and other information shall provide comparisons to the prior year's equivalent period, on a year-to-date basis, and to Budget; and

(b)    a certification of the Chief Executive Officer or Chief Financial Officer of the US Borrower that all such financial statements are complete and correct and present fairly in all material respects the financial position, the results of operations of Borrowers as at the end of such Fiscal Month and for the period then ended, that all rent and other obligations of Borrowers with respect to their Leases were paid in accordance with the terms thereof (without giving effect to any grace periods) as at the end of such Fiscal Month and setting forth the aggregate amount so paid or specifying those instances when rent or such other obligations were not so paid together with a detailed explanation of the reasons for the failure of Borrowers to make such payments and the aggregate amount of such payments not made, and that there was no Default in existence as of such time or specifying those Defaults of which he or she was aware.

4.    <u>Management Letters</u>.  Within five (5) Business Days after receipt thereof by US Borrower, copies of all management letters, exception reports or similar letters or reports received by US Borrower from its independent certified public accountants.

5.    <u>Budget Analysis</u>.  Not later than Wednesday by 12:00 noon (eastern time) in each calendar week, a Budget variance report (a "<u>Weekly Budget Variance Report</u>"), in form and scope reasonably acceptable to Lender, which report shall compare (x) actual cash receipts and disbursements of the US Borrower with amounts provided for in the US Budget on a line-by-line and aggregate basis for the preceding weekly period and the cumulative period from the

---

[1] TBD - Separate or additional reporting for Canada

K&E 18571360.18
RLF1 3982293v. 1

Petition Date to the end of the preceding calendar week and (y) actual cash receipts and disbursements of the Canadian Borrower with amounts provided for in the Canadian Budget on a line-by-line and aggregate basis for the preceding weekly period and the cumulative period from the Petition Date to the end of the preceding calendar week.

6.     Updated Budgets.  Not later than the end of business on the Friday two weeks prior to the expiration of the existing Budget, (x) the US Borrower shall deliver to Lender a proposed new thirteen-week debtor-in-possession cash and borrowing forecast for the US Borrower commencing in the week following expiration of the existing US Budget in form and scope consistent with Annex D and otherwise acceptable to Lender in its sole discretion and (y) the Canadian Borrower shall deliver to Lender a proposed new thirteen-week debtor-in-possession cash and borrowing forecast for the Canadian Borrower commencing in the week following expiration of the existing Canadian Budget in form and scope consistent with Annex D and otherwise acceptable to Lender in its sole discretion.

7.     Bankruptcy Matters.  Copies of all monthly reports, projections or other information respecting Borrowers' and Guarantor's business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of US Borrower with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee, or filed by or on behalf of the Canadian Borrower with the Canadian Court or provided to PWC, in all cases at the time such document is filed or provided.

8.     Notice of Default.  As soon as practicable, but in any event within five (5) Business Days after either Borrower becomes aware of the existence of any Default, or any development or other information that, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect, including without limitation any notice received from any holder of Subordinated Debt concerning a default thereunder, telephonic, facsimile or e-mail notice specifying the nature of such Default or development or information, including the anticipated effect thereof, which notice shall be promptly confirmed in writing within four (4) Business Days.

9.     Tax Returns.  Upon Lender's request, copies of all federal, state, local and foreign tax returns, information returns and reports in respect of income, franchise or other taxes on or measured by income (excluding sales, use or like taxes) filed by US Borrower and Canadian Borrower.

10.     SEC Documents.  Promptly upon their becoming available, copies of any final registration statements and the regular, periodic and special reports, if any, which US Borrowers shall have filed with the Securities and Exchange Commission (or any governmental agency substituted therefor) or any national securities exchange.

11.     Documents to Shareholders.  Promptly upon the mailing thereof to the shareholders of Holdings generally, copies of all financial statements, reports and proxy statements so mailed to the extent not otherwise provided to the Lender pursuant to the terms of this Agreement.

K&E 18571360.18
RLF1 3982293v. 1

12.    <u>Lease Documents.</u>  Promptly upon entering into, renewing, amending or modifying any Lease, a copy of such Lease, amendment or other related documentation.

13.    <u>ERISA Documents.</u>  As soon as possible, and in any event within 10 days after either Borrower knows or has reason to believe that any of the events or conditions specified below with respect to any Plan or Multiemployer Plan has occurred or exists, a statement signed by the Chief Financial Officer of Borrowers setting forth details respecting such event or condition and the action, it any, that Borrowers or any ERISA Affiliate proposes to take with respect thereto (and a copy of any report or notice required to be filed with or given to PBGC by Borrowers or any ERISA Affiliate with respect to such event or condition):

(a)    any Reportable Event with respect to a Plan occurs (<u>provided</u> that a failure to meet the minimum funding standard of Section 412 of the IRC or Section 302 of ERISA shall be a reportable event regardless of the issuance of any waivers in accordance with Section 412(d) of the IRC);

(b)    the filing under Section 4041 of ERISA of a notice of intent to terminate any Plan or the termination of any Plan;

(c)    the institution by PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by Borrowers or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by PBGC with respect to such Multiemployer Plan;

(d)    the complete or partial withdrawal by Borrowers or any ERISA Affiliate under Section 4201 or 4204 of ERISA from a Multiemployer Plan, or the receipt by Borrowers or any ERISA Affiliate of notice from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA; and

(e)    the institution of a proceeding by a fiduciary of any Multiemployer Plan against Borrowers or any ERISA Affiliate to enforce Section 515 of ERISA, which proceeding is not dismissed within 30 days.

14.    <u>Other Reports.</u>  Such other reports and information respecting the business, financial condition or prospects of Borrowers, as Lender may, from time to time, reasonably request.  Simultaneously with the transmission thereof, each daily and weekly report reviewed by management relating to the performance and operations of the Borrowers' and Guarantors' business, including with respect to activations, deactivations and shipments.

**FINANCIAL COVENANTS FOR US BORROWER**

1.     Payment of Pre-Petition Claims:  US Borrower shall not make payments to creditors in respect of Pre-Petition trade payables and Pre-Petition obligations except for:  (i) amounts approved in the First Day Orders and (ii) amounts approved by Lender in writing and by the Bankruptcy Court.

2.     Budget Compliance.  US Borrower shall not make any cash disbursement for any line item in the US Budget if, after giving effect thereto: (I) the aggregate cash disbursements for such line item by US Borrower during the applicable week period would exceed the product of:  (i) the aggregate of the Weekly Budgeted Disbursements for such week period including the date of such disbursement times (ii) one hundred fifteen percent (115%) (provided, that the result of such calculation is an amount in excess of $30,000); or (II) the aggregate cash disbursements by US Borrower for such line item by US Borrower during the period from the Petition Date through (and including) the date of such disbursement, would exceed the product of (i) the aggregate of all Weekly Budgeted Disbursements for such period including the date of such disbursement times (ii) one hundred ten percent (110%) (provided, that the result of such calculation is an amount in excess of $30,000).

3.     Ending Revolving Credit Loan Balance:  US Borrower shall not permit the outstanding principal amount of Revolving Credit Loans at the end of any week to exceed the amount shown as the "Ending DIP Facility Balance" for such week on the US Budget attached as Annex D-1 (as updated in accordance with the terms of this Agreement) *less* the aggregate amount, if any, by which actual "Total Cash Inflows" received exceeds the amount of "Total Cash Inflows" shown on such US Budget from the closing date through such week.

4.     Maximum Cash Balance.  Unless the Lender otherwise consents, the US Borrower and the Guarantors shall not maintain cash on deposit in their accounts that is, in the aggregate, in excess of $500,000 as of the end of any Business Day.  To the extent that cash on deposit in their accounts as of the end of any Business Day exceeds $500,000, the US Borrower shall cause to be paid such excess to the Prepetition Agent or the Lender, as required by the Interim Order or the Final Order, for application in accordance with the terms of the Interim Order or the Final Order, as applicable (in the case of payment to the Prepetition Agent) or this Agreement (in the case of payment to the Lender).

K&E 18571360.18
RLF1 3982293v. 1

**ANNEX C-2** to
CREDIT AGREEMENT

**FINANCIAL COVENANTS FOR CANADIAN BORROWER**

1.     <u>Payment of Pre-Petition Claims</u>:  Canadian Borrower shall not make payments to creditors in respect of Pre-Petition trade payables and Pre-Petition obligations except for:  (i) amounts approved in the First Day Orders as recognized by the applicable Canadian Orders and (ii) amounts approved by Lender in writing and by the Bankruptcy Court as recognized by the applicable Canadian Orders.

2.     <u>Budget Compliance</u>.    Canadian Borrower shall not make any cash disbursement for any line item in the Canadian Budget if, after giving effect thereto: (I) the aggregate cash disbursements for such line item by Canadian Borrower during the applicable week period would exceed the product of:   (i) the aggregate of the Weekly Budgeted Disbursements for such week period including the date of such disbursement <u>times</u> (ii) one hundred fifteen percent (115%) (<u>provided</u>, that the result of such calculation is an amount in excess of $30,000); or (II) the aggregate cash disbursements by Canadian Borrower for such line item  by Canadian Borrower during the period from the Petition Date through (and including) the date of such disbursement, would exceed the product of (i) the aggregate of all Weekly Budgeted Disbursements for such period including the date of such disbursement <u>times</u> (ii) one hundred ten percent (110%) (<u>provided</u>, that the result of such calculation is an amount in excess of $30,000).

3.     <u>Ending Revolving Credit Loan Balance</u>:  Canadian Borrower shall not permit the outstanding principal amount of Canadian Revolving Credit Loans at the end of any week to exceed the amount shown as the "Ending DIP Facility Balance" for such week on the Canadian Budget attached as Annex D-2 (as updated in accordance with the terms of this Agreement) *less* the aggregate amount, if any, by which actual "Total Cash Inflows" received exceeds the amount of "Total Cash Inflows" shown on such Canadian Budget from the closing date through such week.

C-2

**ANNEX D-1** to
CREDIT AGREEMENT

**FORM OF BUDGET FOR US BORROWER**

K&E 18571360.18
RLF1 3982293v. 1

**ANNEX D-2** to
CREDIT AGREEMENT

**FORM OF BUDGET FOR CANADIAN BORROWER**

K&E 18571360.18
RLF1 3982293v. 1

# EXHIBIT A

FORM OF NOTICE OF REVOLVING CREDIT ADVANCE

# EXHIBIT B

FORM OF REVOLVING CREDIT NOTE