## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | **Chapter 11** |
| **Böwe Systec, Inc., <u>et</u> <u>al.</u>,**[1] | **Case No. 11-_____ (_____)** |
| **Debtors.** | **Joint Administration Pending** |

## DECLARATION OF MICHAEL WILHELM
## IN SUPPORT OF FIRST DAY MOTIONS

I, Michael Wilhelm, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer of each of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>").  I have been with the Debtors and their predecessor companies for twenty-seven years.  I have been the Chief Financial Officer of the Debtors since 2006.  I am familiar with the Debtors' day-to-day operations, financial condition, books and records, and business affairs.

2.      On April 18, 2011 (the "<u>Petition Date</u>"), the Debtors commenced these cases (the "<u>Chapter 11 Cases</u>") by each filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

3.      To minimize any adverse effects on their business as a result of the commencement of these Chapter 11 Cases, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "<u>First Day Motions</u>").  The First

---

[1]      The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Böwe Systec, Inc. (1423), Böwe Bell + Howell Holdings, Inc. (9926), BBH, Inc. (9928), Böwe Bell + Howell Company (0100), Böwe Bell + Howell Postal Systems Company (4944), BCC Software, Inc. (3481) and Böwe Bell + Howell International Ltd. (0001).  The debtors' corporate offices are located at 760 S. Wolf Road, Wheeling, IL 60090.

Day Motions seek relief, among other things, to: (a) continue the Debtors' operations while in chapter 11 with as little disruption as possible; (b) maintain the confidence and support of key constituencies; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases. Gaining and maintaining the support of the Debtors' employees and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be crucial to the success of the Debtors' efforts in these Chapter 11 Cases.

4.     I submit this Declaration in support of the First Day Motions. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

## I.

## GENERAL BACKGROUND

### A.     The Chapter 11 Cases and Ancillary Proceeding

5.     As discussed above, on April 18, 2011, the Chapter 11 Cases. Following the filing of these Chapter 11 Cases, Debtor Böwe Bell + Howell International Ltd. ("BBH Canada"), BBH's Canadian subsidiary, intends to commence an ancillary proceeding (the "Ancillary Proceeding") under Part IV of the *Companies' Creditors Arrangement Act* (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Ontario Court"). BBH Canada, as the proposed foreign representative for the Debtors in the Canadian Proceeding, intends to seek recognition of the Chapter 11 Cases and certain orders entered in the Chapter 11

2

Cases.  PricewaterhouseCoopers Inc. is the proposed court-appointed Information Officer in the Canadian Proceeding.

6.     The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

**B.     Overview of the Debtors' Business**

7.     The Debtors are one of two leaders nationally in high volume production mail solutions, offering a combination of hardware, services and software to high volume mailers worldwide including financial and insurance firms, government agencies, services bureaus, utilities, and direct-mail firms and others.  As a result of the Debtors' unique offering of products and services, the Debtors are well-positioned to satisfy a broad range of complex mailing needs for their global customer base.  Due to the large base of installed equipment, a significant percentage of the Debtors' revenues are derived from the sale of recurring, high margin services and software.

8.     The Debtors' offerings can be broken into three key segments:  (i) hardware; (ii) services; and (iii) software.  In most instances, the company provides its client base with a combination of all three segments as part of an overall mail solution.

a)     <u>Hardware</u>.  The Debtors offer high end, fully integrated inserting and sorting solutions.  With over 9,000 machines installed, the Debtors are the second largest installer of such equipment in the industry.  The inserter line is designed for large mailers who need to customize mass mailings to clients or prospects.  The inserter line allows clients to take printed statements, bills or other updates and insert them along with various flyers, mailers and product promotions to be mailed to targeted recipients.  The Debtors also offer product reconditioning services whereby the company is able to leverage a client's existing equipment or

procure other machines to be reconditioned from third parties. The Debtors analyze and implement the installed solutions, upgrading the performance of a client's operations to the Debtors' product standards. Additionally, the Debtors are the leader in the U.S. presort market, whereby service bureaus and other large corporate mailers purchase the Debtors' sorters to meet the requirements of the U.S. Postal Service (the "USPS") for postage discounts. Mailers receive these discounts by preparing mail with current and correct addresses in the form of a barcode, or modified address and providing the USPS with sorted trays that can be injected directly into the USPS' delivery network.

        b)      Services. The Debtors provide a wide variety of on-site services designed to ensure that a client's mail operations run efficiently. The Debtors' service revenues are generated by Preventative Maintenance Agreements (a "PMA"), field change orders, part sales, and time and material billings. The Debtors' service contracts are purchased periodically by customers of installed hardware for product support after the warranty support period expires. These contracts are typically structured as PMAs, annual maintenance agreements that entitle a client to a set level of services. These renewable maintenance and service agreements provide a steady source of revenue for the Debtors and represent approximately $160 million of the company's $248 million in annual revenue. The Debtors' business model depends on the revenues, mostly prepaid, from these annual maintenance agreements. The Debtors' customer base includes numerous utility and credit card companies, governmental agencies, banks and others that depend on the Debtors' equipment to generate billions of dollars worth of accounts receivable (through the issuance of billing statements) on a daily basis. Accordingly, customers need the Debtors' equipment to function properly at all times, which requires the Debtors to respond quickly and responsibly when maintenance issues arise.

4

c) _Software_.  The Debtors also provide a number of software offerings which help clients manage their mail operations as well as offer specific solutions that improve the accuracy of customers' mailing lists, ensuring data integrity and accuracy and lowering postage costs.

9.     The Debtors are headquartered in Wheeling, Illinois and also have major U.S. manufacturing and service locations in Durham, North Carolina and Bethlehem, Pennsylvania. Additionally, the Debtors have one of the industries' largest nationwide service networks of strategically located service technicians, operating in almost every state and allowing the Debtors to rapidly respond to client service demands.

**C.     The Debtors' Corporate Structure**

10.     The Debtors' history dates back to 1936 when the founder of what would later become Bell + Howell invented, patented and produced the first automated mail inserting machine.  In 2003, Bell + Howell was acquired by Böwe Systec AG ("Böwe Systec"), a German competitor of Bell + Howell, thereby combining their North American mailing operations and changing the name of Bell + Howell to "Böwe Bell + Howell".  The Debtors are each direct or indirect subsidiaries of Böwe Systec.  A corporate organizational chart reflecting the Debtors' corporate structure is attached hereto as Exhibit A.

11.     In May 2010, Böwe Systec commenced an insolvency proceeding in Germany and, as a consequence, Böwe Systec's North American distribution agreements with the Debtors were voided.   On September 2, 2010, the administrator appointed in the German insolvency proceeding agreed to sell substantially all of Böwe Systec's assets to a Swiss private equity firm, Axentum Capital AG.  When Axentum Capital AG was unable to complete the transaction, the administrator regained control of the assets (forming BS GmbH) and subsequently sold the assets

to the Possehl Group.  The Debtors were not parties to the German insolvency proceeding, nor were they involved in the transaction with the Possehl Group.

**D.      The Debtors' Capital and Debt Structure**

12.      As of the Petition Date, Debtor BBH, Inc. ("BBH") was a borrower under that certain Credit Agreement dated as of September 25, 2003 (the "Original Credit Agreement") by and between BBH, Harris N.A., a national banking association ("Harris" or the "Agent"), as Issuing Lender and Agent (as defined in the Original Credit Agreement), and the financial institutions that were or became lenders thereunder (the "Prepetition Lenders").  The Original Credit Agreement provided BBH with (i) a term loan in the maximum principal amount of $50 million (the "Prepetition Term Loan"); and (ii) a revolving loan in the maximum principal amount of $50 million (the "Prepetition Revolving Loan", and together with the Prepetition Term Loan, the "Prepetition Facility"), subject to borrowing base limitations, and less the amount outstanding under any Letters of Credit and the outstanding principal amount of any Swing Loans (as defined under the Original Credit Agreement).  The aggregate amount of the Prepetition Term Loan was subsequently increased in July 2004 to $150 million so that approximately $45 million could be paid to Böwe Systec on account of a preferred stock redemption.  BBH's obligations under the Prepetition Facility are secured by substantially all of its assets, with each of the other Debtors (other than BBH Canada) guarantying BBH's obligations thereunder.

13.      Pursuant to the terms of the Original Credit Agreement, the Prepetition Revolving Loan was to expire by its terms on September 30, 2009.  All other obligations under the Prepetition Facility, including the Prepetition Term Loan, were to become due and owing on September 30, 2010.  The parties initially entered into discussions regarding an amendment that would have extended the maturity date for the Prepetition Revolving Loan to September 30,

6

2010, consistent with the balance of the Prepetition Facility, but were unable to obtain the unanimous consent of all lenders under the Prepetition Term Loan to such an extension. As a result, the parties entered into that certain Amended and Restated Credit Agreement dated as of November 23, 2009 (the "Amended and Restated Credit Agreement"), which, inter alia, (i) restated the Original Credit Agreement, as amended, in its entirety, (ii) increased the interest rate provided thereunder, (iii) fixed the stated maturity date for all obligations under the Prepetition Facility as June 30, 2010 (thereby extending the term of the Prepetition Revolving Loan by nine months, but accelerating the maturity date for all other obligations under the Original Credit Agreement), (iv) reduced the Prepetition Revolving Loan to $35 million and (iv) imposed certain additional affirmative covenants on the company relating to the raising of additional capital.

14. For the reasons discussed in the *Declaration of Oliver Bialowons in Support of the First Day Motions* (the "Bialowons Declaration")[2], BBH was unable to repay or refinance the Prepetition Facility on or before the June 30, 2010 maturity date. While this constituted an event of default under the terms of the Amended and Restated Credit Agreement, the Prepetition Lenders have permitted the company to continue using cash collateral since such time. While the parties attempted to negotiate a standard forbearance agreement, such efforts have been unsuccessful. Accordingly, there is no forbearance agreement currently in place and the Debtors remain subject to immediate remedial action by the Prepetition Lenders.

15. In March 2011, Versa Capital Management, Inc. ("Versa"), a private equity firm with an interest in acquiring the Debtors or their assets, began purchasing the secured claims of certain of the Prepetition Lenders with the intention of submitting a credit bid for the Debtors'

---

[2] The Bialowons Declaration is being filed contemporaneously with this Declaration and First Day Motions and contains additional background regarding the events leading to the filing of the Chapter 11 Cases and the Debtors' entry into the Stalking Horse Asset Purchase Agreement (as defined herein).

assets pursuant to section 363(k) of the Bankruptcy Code. As of the Petition Date, Versa had control over approximately sixty (60) percent of the outstanding debt under the Prepetition Facility and had acquired the balance of the Prepetition Facility subject to confirmed trades which are in the process of closing. As of the Petition Date, there was an aggregate amount of not less than $121 million outstanding under the Prepetition Facility.

**E.     The Stalking Horse Agreement and Proposed Sale**

16.     On April 18, 2011, the Debtors and Contrado BBH Funding, LLC (the "U.S. Purchaser") and a Canadian corporation to be formed prior to closing (the "Foreign Purchaser", and together with the U.S. Purchaser, the "Purchasers"), each wholly owned subsidiaries of Versa, entered into that certain Asset Purchase Agreement (the "Stalking Horse Agreement") whereby the Purchasers agreed to purchase substantially all of the Debtors' assets. Pursuant to the terms of the Stalking Horse Agreement, the aggregate consideration for the Debtors' assets shall include (i) a credit bid[3] consisting of amounts outstanding under the DIP Facility (as defined herein) and the Prepetition Facility, (ii) cash in the amount of 302,000 (Canadian currency) attributable to the assets of BBH Canada, (iii) the payment of all cure amounts relating to any contracts and leases to be assigned in connection with the transaction and (iv) the assumption of certain liabilities. The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids. The Debtors will be filing a motion with the Court on or about the Petition Date seeking approval of certain bidding procedures in connection with an approximately forty-five (45) day sale process

---

[3]  The "Credit Bid Amount" shall consist of the sum of (x) the U.S. Bid Amount of $80 million, plus (y) the Canadian Bid Amount. Capitalized terms not otherwise defined herein shall have the meanings given to them in the Stalking Horse Agreement.

followed by approval of a sale of the Debtors' assets to the highest and best bidder as determined at an auction.

## F. **The DIP Facility**

17.     In connection with the Chapter 11 Cases, BBH (the "U.S. Borrower") and BBH Canada (the "Canadian Borrower"), as borrowers, and each of the other Debtors, as guarantors, and Contrado BBH Investments, LLC ("Contrado"), a wholly-owned subsidiary of Versa, and one or more additional lenders party from time to time (together with Contrado, the "DIP Facility Lenders") have entered into that certain Senior Secured, Super-Priority Debtor-in-Possession Credit and Guaranty Agreement, dated as of April 18, 2011 (the "DIP Facility Agreement"). Pursuant to the DIP Facility Agreement, the DIP Facility Lenders have agreed to provide postpetition financing up to the aggregate principal amount of $127.2 million (inclusive of up to $1.3 million for postpetition financing by the Canadian Borrower) (the "DIP Facility").[4]   The DIP Facility will be used to, among other things, provide the Debtors with adequate working capital and to cover any administrative obligations incurred during the course of the Chapter 11 Cases. As discussed above, the Purchasers shall have the ability to credit bid all amounts outstanding under the DIP Facility in accordance with the terms of the Stalking Horse Agreement.

## II.

## FIRST DAY MOTIONS[5]

18.     Concurrently with the filing of these Chapter 11 Cases, the Debtors will be filing a number of First Day Motions.  The Debtors anticipate that the Court will conduct a hearing

---

[4]  Subject to entry of a final DIP financing order, the Debtors propose to use a portion of the DIP Facility to pay in full, in cash, the remaining balance outstanding under the Prepetition Facility.
[5]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motion.

soon after the commencement of the Debtors' Chapter 11 Cases (the "First Day Hearing"), at which the Court will hear the First Day Motions.

19.    Generally, the First Day Motions have been designed to meet the goals of: (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of customers, employees and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these cases. I have reviewed each of the First Day Motions, including the exhibits thereto and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to maximize the value of their assets for the benefit of all of the Debtors' economic stakeholders.

**A.    Debtors' Motion for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases**

20.    The Debtors seek joint administration of the Chapter 11 Cases, with all motions, notices and pleadings to be filed on the case docket for Debtor Böwe Systec Inc. The joint administration of the Debtors' cases will facilitate and promote an economically efficient administration of these cases, permit the Clerk of the Court to utilize a single general docket for these cases, and combine notices to creditors of the Debtors' respective estates and other parties in interest which will result in savings to the Debtors' estates.

21.    If joint administration is ordered, the Debtors, the Court, creditors and other parties in interest will be able to avoid incurring considerable unnecessary time and expense in connection with, among other things, the need to file duplicative motions, enter duplicative orders, and forward duplicative notices to creditors and other parties in interest.

22.    Joint administration will further enable parties in interest in these Chapter 11 Cases to be aware of the various matters before the Court in all of the Debtors' cases.

23. To the best of my knowledge, the joint administration of these Chapter 11 Cases will not adversely affect the Debtors' respective constituencies and will not harm parties in interest. Rather, all of these parties will benefit from the cost reductions associated with the joint administration of these cases.

24. Consequently, I believe and submit that the joint administration of these Chapter 11 Cases is in the best interest of the Debtors, the Debtors' estates, their creditors and other parties in interest.

**B. Debtors' Motion Pursuant to Section 1505 of the Bankruptcy Code for Authorization of Böwe Bell + Howell International Ltd. to Act as the Foreign Representative of the Debtors**

25. Currently, as part of their ongoing business operations, the Debtors operate and have material assets in Canada and elsewhere which are critical to the successful restructuring of the Debtors and their affiliates, including BBH Canada. BBH Canada's principle place of business is located in Richmond Hill, Ontario, together with the majority of its assets.[6] Therefore, it is necessary to ensure that BBH Canada's Chapter 11 Case and any orders of the Court issued therein are recognized and respected in Canada. Accordingly, following the filing of the Chapter 11 Cases, BBH Canada intends to commence the Ancillary proceeding under Part IV of the CCAA in the Ontario Court. BBH Canada, as the proposed foreign representative for the Debtors in the Ancillary Proceeding, intends to seek recognition of the Chapter 11 Cases and certain orders entered in the Chapter 11 Cases. PricewaterhouseCoopers Inc. is the prospective Information Officer in the Canadian Proceeding.

26. The Debtors function as an integrated North American business, with facilities strategically located to cover the various regions in which the Debtors operate. As part of this

---

[6] Some of BBH Canada's assets are also located at field offices and customer sites throughout Ontario.

overall business model, BBH Canada was created for purposes of contracting with the Debtors' Canadian customers, providing facilities for the Debtors' Canadian salespeople and service technicians and issuing payroll to these Canadian employees (approximately 117 of the Debtors' over 1600 employees).  BBH Canada accounts for less than eight (8) percent of the company's overall revenue.  While the Debtors have two facilities in Canada (Waterloo, Ontario and Richmond Hill, Ontario), BBH Canada is very much dependent on the Debtors' U.S. operations for all decision-making and administrative functions.  Indeed, all members of the Debtors' management are located at the Debtors' corporate headquarters in Wheeling, Illinois.[7]  BBH Canada does not have its own independent infrastructure and depends on the U.S. entities to provide such services.  More specifically, all human resource, legal, accounting/finance and other administrative functions associated with the company and all employees that perform such services (with the exception of the Canadian Finance Director) are located in the U.S.  In addition, all IT functions, which, among other things, are used to issue invoices, are provided out of the U.S.  Accordingly, the Debtors' "centre of main interest" is in the U.S.  It is for this reason that the Debtors believe that commencement of the Ancillary Proceeding in Canada is appropriate and that it is unnecessary to have a separate plenary proceeding in Canada for BBH Canada.

---

[7]  BBH Canada does have a director of finance (the "Canadian Finance Director") who operates out of BBH Canada's Richmond Hill, Ontario facility.  The Canadian Director of Finance, however, reports to and takes direction from the Debtors' Chief Financial Officer, Michael Wilhelm, who is located at the Debtors' corporate headquarters in Wheeling, Illinois.

**C.      Debtors' Application for Entry of an Order Appointing the Garden City Group, Inc. as Notice, Claims and Balloting Agent**

27.      The Debtors have thousands of creditors.  The sheer size and magnitude of the Debtors' creditor body would most likely make it impracticable for the Office of the Clerk of Court to undertake the tasks of noticing creditors and administering claims.

28.      I believe that the most effective and efficient manner of noticing creditors and parties in interest in these Chapter 11 Cases, and administering the claims process, is for the Debtors to engage an independent third party to act as the Debtors' notice, claims, and balloting agent.  The Debtors may also require the services of an agent to administer votes pursuant to any plan of reorganization or liquidation.  Accordingly, the Debtors propose to employ The Garden City Group, Inc. ("GCG") as the notice, claims, and balloting agent, inter alia, to assist the Debtors in distributing notices, as necessary, and to process other administrative information pertaining to these Chapter 11 Cases.

29.      GCG specializes in noticing, claims processing, balloting, and other administrative tasks in chapter 11 cases.  Therefore, the Debtors wish to engage GCG to send out certain designated notices and to collect and monitor claims and perform certain ballot-related functions with respect to these Chapter 11 Cases.  The Debtors chose GCG based on both its experience and the competitiveness of its fees.  I believe that GCG is well-qualified to serve in this capacity and that GCG's retention is in the best interests of the Debtors' estates and their creditors.

**D.** **Debtors' Motion for Entry of an Order Authorizing Debtors to (I) Continue Using Existing Cash Management System, as Modified, (II) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (III) Maintain Existing Bank Accounts and Business Forms**

*(i)* *Description of the Debtors' Cash Management System*

30.     In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect and disburse funds (collectively, the "Cash Management System").

31.     As set forth below, the continuation of the Cash Management System will not prejudice the rights of any party in interest, but rather will benefit all creditors by minimizing disruptions to the Debtors' businesses and by preserving the administrative savings which the Cash Management System currently provides.  The Cash Management System provides a cost-effective and efficient means of managing the Debtors' finances, and maintenance of the Cash Management System will benefit all creditors by reducing the daily operating expenses of the Debtors' estates.  Failure to continue the Cash Management System would disrupt the Debtors' operations and impose a financial and administrative burden on the estates.

32.     As of the Petition Date, the Debtors maintained bank accounts (the "Bank Accounts") with various banks (the "Cash Management Banks").[8]  The Debtors maintain that substantially all of the Bank Accounts are in financially stable banking institutions with FDIC or FSLIC insurance (up to an applicable limit on each account).  The principal components of the Cash Management System are described below.

The Cash Management System

   (a)     Lockbox Accounts:   The Debtors maintain three principle lockbox accounts (collectively, the "Lockbox Accounts") with Harris, N.A.

_____
[8]  A list of the Bank Accounts and a chart depicting the Debtors' Cash Management System are attached to the cash management First Day Motion as Exhibits B and C, respectively.

("Harris"), tied to the following major business subdivisions (i) Sorting (Wheeling), (ii) Document Productions Services (Durham) and (iii) BCC Software, Inc. The Lockbox Accounts are funded by the receipt of payments from customers. The Lockbox accounts are swept continuously, and any funds are reflected in the Harris Central Collection Account (described below).

(b)     Collections Accounts: The Debtors maintain three collections accounts (collectively, the "Harris Collection Accounts") with Harris tied to (i) sorting collections, (ii) DPS collections, and (iii) BCC Software collections. The Harris Collection Accounts are funded primarily by the receipt of customer payments and other miscellaneous receipts. The Harris Collection Accounts are swept daily, and any funds are deposited in the Harris Collection Account (described below). Consequently, the Harris Collection Accounts are each zero balance accounts.

(c)     Credit Card Collection Accounts: The Debtors maintain five accounts with Fifth Third Bancorp ("Fifth Third") to collect customer payments made by credit card (the "Credit Cart Collection Accounts"). The Debtors have an arrangement with Fifth Third whereby Fifth Third has set up the Credit Card Collection Accounts to process Visa, MasterCard, Discover, and American Express payments. Fifth Third reviews all deposits above $25,000.00 before clearing such deposits. After this review and processing, all deposits into the Credit Card Collection Accounts are swept into the Harris Central Collection Account (defined below).

(d)     Harris Central Collection Account: The Debtors maintain a central collection account (the "Central Collection Account") with Harris. The Central Collection Account is funded from the assets that are swept from the Lockbox Accounts and the Harris Collection Accounts. Funds are drawn down from the Harris Central Collection Account to the Harris Operating Account (as defined below) to fund the Debtors' daily operations. Each day the Debtors communicate to Harris the total amount needed by the Harris Operating Account to fund the outgoing disbursements from the Debtors' controlled disbursement accounts and the Debtors' payroll account. Upon Harris' approval, that amount is drawn down from the Central Collection Account to the Harris Operating Account. Consequently, the Central Collection Account is not a zero balance account. The Debtors believe that, pursuant to section 343 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Wall Street Reform Act") and sections 330.1(r)(1) and 330.16 of title 12 of the Code of Federal Regulations, the Central Collection Account qualifies as a noninterest-bearing transaction account that is fully insured by the FDIC through December 31, 2012.

RLF1 3767911v. 8

(e)     Harris Operating Account:  The Debtors maintain a central operating account at Harris.  On a daily basis, the Debtors will determine the cash needs of the business based on anticipated operating costs and expenses. Based on these determinations, Harris, at its discretion, will draw down the necessary funds from the Central Collection Account. The Harris Operating Account is, in turn, linked to a series of controlled disbursement accounts designed to make disbursements for the Debtors' daily operational needs as well as the Debtors' payroll account.  The Debtors believe that, pursuant to section 343 of the Wall Street Reform Act and sections 330.1(r)(1) and 330.16 of title 12 of the Code of Federal Regulations, the Harris Operating Account qualifies as a noninterest-bearing transaction account that is fully insured by the FDIC through December 31, 2012.

(f)     Checking Accounts:  The Debtors maintain three controlled disbursement checking accounts with Harris, one for Chicago checks, one for DPS checks, and one for BCC Software Distribution (together, the "Checking Accounts"), to cover the Debtors' disbursements relating to their operations (including, without limitation, the payment of invoices for lease payments and other operating expenses), other than those made through the Harris Payroll Account. The Checking Accounts are funded automatically on a daily basis from the Harris Operating Account.  The Checking Accounts are zero balance accounts.

(g)     Harris Payroll Account:  The Debtors maintain a bank account at Harris to cover the Debtors' payroll disbursements to their employees (the "Harris Payroll Account").  The Debtors generally process their payroll through Automatic Data Processing, Inc. ("ADP") and Paychex, Inc. ("Paychex"), which then pays the Debtors' employees either by direct deposit or by check.  The Debtors electronically transfer funds to ADP and Paychex, which in turn fund all direct deposit payroll obligations through ADP or Paychex accounts.  Any of the Debtors' employees that are paid by check, rather than direct deposit, receive a check printed by ADP or Paychex and drawn on an ADP or Paychex bank account.  The Debtors believe that, pursuant to section 343 of the Wall Street Reform Act and sections 330.1(r)(1) and 330.16 of title 12 of the Code of Federal Regulations, the Harris Payroll Account qualifies as a noninterest-bearing transaction account that is fully insured by the FDIC through December 31, 2012.

(h)     Foreign Currency Accounts:  The Debtors also maintain foreign currency accounts (the "Foreign Currency Accounts") with Harris and with the Canadian Imperial Bank of Commerce ("CIBC").  The Foreign Currency Accounts with CIBC are used in the Debtors' Canadian operations to collect customer payments and miscellaneous receipts and to fund payroll and other disbursements in United States or Canadian dollars as

appropriate, while the Foreign Currency Accounts with Harris are no longer active.

33.     The Debtors' Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity to the Debtors.  Indeed, large, multiple-entity businesses use such systems because of the numerous benefits provided, including, without limitation, the ability to:  (a) quickly create status reports on the location and amount of funds, which allows management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds.  Granting the Debtors authority to continue using the Cash Management System will help facilitate a smooth transition into the Chapter 11 Cases.

### (ii)     *The Debtors' Existing Business Forms*

34.     In the ordinary course of business, the Debtors use a variety of business forms.  To minimize expenses to their estates and avoid confusion on the part of employees, customers and suppliers, the Debtors respectfully request that the Court authorize the Debtors to continue to use all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession; provided, however, that the Debtors will obtain new business form stock reflecting their status as debtors-in-possession once all existing business form stock on hand is exhausted.  With such authorization, the Debtors will be able to avoid the expense and delay of ordering entirely new business forms.

### (iii)     *Compliance with Bankruptcy Code Section 345(b)*

35.     The Debtors believe that they are in compliance with the requirements of section 345(b), but out of an abundance of caution, they are seeking that the Court grant them a 60-day extension of time to either (i) comply with the requirements of section 345(b) of the Bankruptcy

Code or (ii) file a motion seeking to waive the requirements of section 345(b) of the Bankruptcy Code, while, in the mean time, permitting the Debtors to maintain their deposits in their accounts in accordance with their existing deposit practices as of the Petition Date.

**E.     Debtors' Motion for Entry of an Order Pursuant to Sections 105(a), 363(b) and 541 of the Bankruptcy Code for Authorization to Pay Prepetition Sales and Use Taxes and Other Charges**

36.     In the ordinary course of business the Debtors: (a) collect sales taxes from their customers and incur taxes, including, but not limited to, income, use, property, and franchise taxes and other taxes necessary to operate their businesses (collectively, the "Taxes"); and (b) charge fees, licenses, permits and other similar charges and assessments (collectively, the "Fees") on behalf of various U.S. and Canadian taxing and licensing authorities (collectively, the "Taxing Authorities"), and pay Fees to such Taxing Authorities for licenses and permits required to conduct the Debtors' businesses.[9]   The Debtors pay the Taxes and Fees monthly, quarterly or annually to the respective Taxing Authorities, in each case as required by applicable laws and regulations.

37.     The Debtors are seeking authority in the First Day Motions to pay any Taxes or Fees in the event and to the extent that any such amounts accrued prepetition and have not been paid or processed prepetition, or were paid in an amount that was less than is actually owed, or in the event that any payments made prepetition were rejected, lost or otherwise not received in full by any Taxing Authorities.   Further, there may be taxes incurred or collected from sales and services provided prepetition that will come due shortly after the Petition Date.

---

[9]   The Debtors have a taxable presence in Alabama, California, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Missouri, Mississippi, North Carolina, Nebraska, Nevada, New Jersey, New Mexico, New York, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, West Virginia, Wisconsin and each province in Canada.

RLF1 3767911v. 8

38.     The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Taxing Authorities will not exceed $943,000.  Any amounts that are actually due, but have not yet been paid to the Taxing Authorities because of the commencement of these Chapter 11 Cases, represent a small fraction of the Debtors' total assets.  If the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates.  Additionally, some, if not all, of the Taxing Authorities may initiate an audit of the Debtors if the Taxes and Fees are not paid immediately.  Such audits will unnecessarily divert the Debtors' attention away from the Chapter 11 Cases.

39.     In all cases, the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate in the ordinary course of business.  Any disputes with Taxing Authorities that could impact their ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole.

**F.      Debtors' Motion for Entry of an Order (A) Authorizing Debtors to Continue Prepetition Insurance Coverage and (B) Authorizing and Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests**

40.     In the ordinary course of business, the Debtors maintain a number of insurance policies that provide coverage for, among other things, workers' compensation liability, general commercial liability, property damage, umbrella liability, excess liability, business automotive liability, ocean cargo liability, and directors' and officers' liability (collectively, the "Policies").  Not only are some of these Policies required by various state and federal regulations, but further, section 1112 of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal

of a chapter 11 case.[10]  A schedule of the current Policies, coverage amounts, terms and coverage dates is attached as Exhibit B to the First Day Motion (the "Policy Schedule").

41.     The total annual premiums for the Policies in 2011 are approximately $2,000,000. It is not always economically advantageous for the Debtors to pay the premiums on all of the Policies on a lump-sum basis.  Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the payment of insurance premiums for some of their Policies (collectively, the "Financed Policies") pursuant to installment plans offered by some of the insurance carriers ("Installment Plans").

42.     As of the Petition Date, payments totaling approximately $1,300,000 have been made against the total annual insurance cost of approximately $2,000,000, leaving an open amount of approximately $700,000 to be paid post-petition.

43.     The Debtors request authority to:  (a) continue insurance coverage entered into prepetition, including, without limitation, the Policies and (b) maintain the Financed Policies.

44.     The Debtors also seek authority to pay, in their discretion, up to $700,000 in prepetition amounts owing in respect of the Policies.

45.     In light of the importance of maintaining insurance coverage and preserving the Debtors' liquidity by financing the insurance premiums, it is in the best interests of the Debtors' estates to authorize them to honor their obligations under the Policies and the Financed Policies.

46.     In the ordinary course of business, the Debtors engaged Mesirow (the "Broker") to act the consultant and insurance broker in placing their annual insurance program.  The Debtors intend to continue their contacts with the Broker in the ordinary course of business.

---

[10]  See 11 U.S.C. § 1112(b)(4)(C).

RLF1 3767911v. 8

## G. Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services

47.     In the normal course of their business, the Debtors have relationships with certain utility providers (the "Utility Providers") for the provision of water, sewer service, electricity, natural gas, telephone service, internet service, waste management service and other services.

48.     In the event the Court approves the Debtors' requested use of cash collateral, the Debtors expect to have adequate funds to timely pay all postpetition obligations owed to their Utility Providers.

49.     To provide additional assurance of payment for future services to the Utility Providers, the Debtors will deposit $92,500 (the "Utility Deposit") into a newly created, segregated, interest-bearing account within twenty (20) days of the Petition Date (the "Utility Deposit Account," and together with cash flow from operations, collectively, the "Proposed Adequate Assurance").  This amount represents a sum equal to 50% of the Debtors' estimated monthly cost of utility service.  The Utility Deposit Account shall be maintained with a minimum balance equal to 50% of the Debtors' estimated monthly cost of utility service, which may be adjusted by the Debtors to account for the termination of utility services by the Debtors and/or agreements with Utility Providers.

50.     Notwithstanding the Proposed Adequate Assurance, if a Utility Provider is not satisfied that the establishment of the Utility Deposit Account provides adequate assurance of future payment, the Debtors propose the following procedures (the "Procedures") under which the Utility Provider may make additional requests for adequate assurance:

> (a)     If a Utility Provider is not satisfied with the assurance of future payment provided by the Debtors, the Utility Provider must serve a written request upon the Debtors setting forth the location(s) at which the given utility services are provided, the account number(s) for such location(s), the outstanding balance for each

account and a summary of the Debtors' payment history in each account (each, a "Request").

(b) The Request must be served upon the Debtors at the following addresses: (i) Böwe Bell + Howell Holdings, Inc., 760 S. Wolf Road, Wheeling, IL 60090, Attn.: Michael Wilhelm; and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn.: Mark D. Collins, Esq. and Lee E. Kaufman, Esq.; with a copy to (iii) Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: James Stempel, Esq. and Arun Kurichety, Esq.

(c) Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Provider serving a timely Request if the Debtors in their discretion determine that the Request is reasonable or if the parties negotiate alternate consensual provisions.

(d) If the Debtors believe that a Request is unreasonable, the Debtors shall file a motion pursuant to section 366(c) of the Bankruptcy Code (a "Determination Motion") within thirty (30) days or receipt of a Request. The Determination Motion shall seek a determination from the Court that the Utility Deposit Account, plus any additional consideration offered by the Debtors, constitutes adequate assurance of payment. Pending notice and a hearing of the Determination Motion, the Utility Provider that is the subject of the Determination Motion may not alter, refuse or discontinue services to the Debtors or recover or set off against a prepetition deposit.

(e) Any Utility Provider that fails to make a Request shall be deemed to be satisfied that the Debtors' Adequate Assurance provides adequate assurance of payment to such Utility Provider within the meaning of section 366 of the Bankruptcy Code.

51.     To the extent the Debtors subsequently identify additional providers of utilities, the Debtors seek authority, in their sole discretion, to amend the Utility Service List to add or remove any Utility Provider. Any subsequently added Utility Provider that objects to the Debtors' Adequate Assurance will be subject to the Procedures.

52.     The Debtors submit that the Utility Deposit Account provides more than adequate assurance of future payment. Subject to the Court's approval of the Debtors' request to obtain

DIP financing and use cash collateral, the Debtors anticipate having sufficient resources to pay, and intend to pay, all valid postpetition obligations for utility services in a timely manner, especially considering that the aggregate amount of the Debtors' utility obligations is not overwhelming. In addition, the Debtors have a powerful incentive to stay current on their utility obligations because of their reliance on utility services for the operation of their business. These factors, which the Court may and should consider when determining the amount of any adequate assurance payments, justify a finding that the Debtors' Proposed Adequate Assurance is more than sufficient to assure the Utility Providers of future payment.

**H.      Debtors' Motion for Entry of an Order Authorizing Payment of Certain Prepetition Common Carrier, Warehouse and Related Obligations**

53.      In the ordinary course of their business, the Debtors employ the services of approximately forty-one (41) Common Carriers to ship (1) the large machines produced by the Debtors or Debtors' suppliers: mail inserting machines and mail sorting machines (the "Products") to their customers; (2) parts needed to update and repair the Products (the "After-Production Parts") to their customers; (3) parts used in the production of the Products (the "Production Parts," and together with the Products and the After-Production Parts, the "Goods") from the producers of the Production Parts to the Debtors; (4) the After-Production Parts from the manufacturers of the After-Production Parts to the Debtors; and (5) software to be used in the Products to customers. Because of the large and expensive nature of the Products, the bulk of the Goods in transit at any time is the After-Production Parts and the Production Parts (collectively, the "Parts"). In 2010, the Debtors paid the Common Carriers approximately $315,000 per month on average to provide these services.

54.      Given the value of the Products in relation to the value of the Parts, the value of Goods in transit can vary dramatically depending upon whether there is a Product or there are

23

Products in transit.  As of the Petition Date, the Debtors have one (1) Product in additional to the normal flow of Parts in transit.  Accordingly, the value of the Goods currently in transit is $1,325,000.

55.     Some of the Common Carriers have outstanding invoices for shipping, storage and associated fees and expenses relating to the Goods shipped by or delivered to the Debtors or placed in storage by the Debtors prior to the Petition Date (collectively, the "Charges").  The Debtors believe that the approximate outstanding amount of the Charges for amounts incurred prepetition is $455,000.  Approximately $50,000 of this amount is on account of Goods shipped to or by BBH Canada.

56.     The Debtors employ Common Carriers to transport four types of goods: Machines, After-Production Parts, Production Parts and software.  The receipt by Debtors (or parties to which the Debtors are shipping such Goods) of each type of Good is essential to the continuation of the Debtors' business as a going concern.

57.     First, the Products are a tremendous source of income for the Debtors, as Machine sales generate future income resulting from the Debtors servicing of such Machines.  Accordingly, the Debtors' ability to transport the Products from their production facilities to customer locations is paramount to the Debtors' continued operations.  The Products, however, are extremely large and heavy.  As such, transporting them requires the Debtors to employ specialized Common Carriers capable of moving the Products without causing damage to them.  Such specialized Common Carriers are expensive, and because they are so specialized, not easy to replace.  The Debtors' ability to make payments to Common Carriers which transport the Products is vital, because failure to make such payments could result in the Common Carriers

refusing to deliver the Products in transit as of the petition date, or the inability to transact with these specialized Common Carriers in the future.

58.     The After-Production Parts are necessary for the service arm of the Debtors' business.  Without the After-Production Parts, the Debtors would be unable to maintain or repair the Products which have been sold to customers.   The annual service and maintenance agreements between the Debtors and their customers account for approximately sixty-five (65) percent of the company's annual revenue.   As these agreements are renewable on an annual basis, the Debtors' ability to obtain the After-Production Parts necessary to satisfy their service obligations to customers is crucial.  Also, the After-Production Parts are often shipped from the Debtors to their customers for the customers to perform repairs themselves.   Inability to ship After-Production Parts for this purpose would also harm the Debtors' customer relationships.

59.     The Debtors also need to maintain access to and the ability to receive the Production Parts through the Common Carriers.  The Debtors would be unable to produce the Products without the Production Parts.  As discussed above, the Products are a vital part of the Debtors business, and the Production Parts are a necessary component of the Debtors' production of the Products.

60.     Finally, the Debtors occasionally ship software through the Common Carriers. While the majority of software is sent to customers electronically, the Debtors occasionally utilize the Common Carriers for this purpose.  Because this is not the typical way that software is sent, to the extent that the Debtors are employing Common Carriers to send software, they are doing so for a specific and necessary purpose.  Accordingly, the Debtors must be able to retain the ability to send software through Common Carriers.

RLF1 3767911v. 8

## I.    Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Customer Programs

61.    Prior to commencement of these Chapter 11 Cases, both in the ordinary course of their business and as is customary in their industry, the Debtors engaged in certain activities to develop and sustain a positive reputation with the customers to whom the Debtors market their products.  To that end, the Debtors implemented various customer programs and policies (collectively, the "Customer Programs") designed to ensure customer satisfaction, drive sales, meet competitive pressures, develop and sustain customer loyalty, improve profitability and generate goodwill for the Debtors and their products, thereby retaining current customers, attracting new ones and ultimately enhancing net income.  Pursuant to sections 105(a), 363(b) and 503(b)(1) of the Bankruptcy Code, the Debtors are seeking authority to continue the Customer Programs in the ordinary course of business.[11]

62.    The benefits of the Customer Programs are integral to the Debtors' efforts to maximize the value of their business as a going concern and ultimately deliver the most value to all stakeholders in these Chapter 11 Cases.  The Debtors believe they must quickly assure customers of the Debtors' continued ability to fulfill their obligations under the prepetition Customer Programs in order to maintain their valuable customer relationships following the commencement of these Chapter 11 Cases, particularly given the increased pressure from competitors that the Debtors believe will inevitably arise.  General descriptions of the Debtors' Customer Programs are set forth below.

---

[11]    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' right to dispute any claim, or an approval or assumption of any agreement, contract or lease under section 365 of the Bankruptcy Code.  Likewise, if this Court grants the relief sought in the First Day Motion, any payment made pursuant to the Court's order is not intended and should not be construed to be an admission as to the validity of any claim or a waiver of the Debtors' right to subsequently dispute such claim.

63.     Warranties.  The Debtors provide a general warranty in connection with the sale of their products (collectively, the "Warranties").  The Debtors' products are specialized and usually manufactured or designed to exact specifications for the Debtors' various customers.  As such, the Debtors will generally deliver completed products to its customers who will, in turn, test those products to ensure that they meet the specifications required by that given customer for the product in question.  In the event that the products delivered by the Debtors exhibit any defects in material and/or workmanship within ninety (90) days from the date of purchase, the Debtors may, at their sole discretion, (i) repair the defective product, (ii) replace the defective product, or (iii) refund the purchase price of the defected product.  It has been the Debtors' practical business experience that the overwhelming number of obligations under the Warranties are honored through the replacement or repair of any non-conforming or defective product rather than through the issuance of a credit or refund.

64.     If the Debtors were not able to honor their Warranties, the Debtors' goodwill would be harmed and their business operations would suffer.   The importance of the Warranties to the Debtors' market competitiveness makes it critical that the Debtors be authorized, but not directed, in the ordinary course of their business and in the exercise of their business judgment, to both honor their prepetition Warranties and to continue to offer warranty programs going forward in connection with sales and provision of services.  The Debtors spend approximately $115,000 per month honoring claims under their various warranty programs.[12]

65.     Maintenance.   In conjunction with the Warranties, the Debtors also provide certain of their customers with optional maintenance programs  (the "Maintenance Programs").  The Debtors produce an array of complex and capital intensive products.  In order to compete in

---

[12]   This figure also includes amounts spent on replacement parts installed for the benefit of customers pursuant to the Maintenance Programs (as defined below).

this sector of the market, it is necessary to offer customers of such products a certain level of maintenance.

66.     The Maintenance Programs differ based on the level of service purchased. The Maintenance Programs provide for either on-site or dispatched technicians to perform preventive and remedial maintenance as well as the replacement of certain parts at no cost to the consumer. The Debtors also offer separate Maintenance Programs for their software products which include email and telephone assistance, remote diagnostic assistance, as well as software fixes and patches, updated electronic operating manuals, and separate enhancements to currently running software.

67.     If the Debtors were not able to honor their obligations under the Maintenance Program, the Debtors' goodwill would be harmed and their business operations would suffer. The importance of the Maintenance Program to the Debtors' market competitiveness makes it critical that the Debtors be authorized, but not directed, in the ordinary course of their business and in the exercise of their business judgment, to both honor their prepetition Maintenance Program obligations, and to continue to offer similar maintenance programs going forward in connection with sales and provision of services.

68.     Customer Deposits.  In the ordinary course of business, because the majority of the Debtors' manufactured products are unique for a specific application or customized to a particular customer's specifications, the Debtors request either a deposit or milestone payments from their customers prior to the delivery of the products (the "Customer Deposits"). The Customer Deposits are negotiated and determined on a contract-by-contract basis; however, the majority of the Debtors' contracts valued at over $50,000 provide for a deposit to be made to the Debtors.  The Customer Deposits provide both (i) the Debtors with liquidity to manufacture the

products ordered and (ii) security to the Debtors in the event that a customer subsequently does not complete the purchase of the product.

69.     Approximately sixty-one (61) customers provided Customer Deposits for various products prior to the Petition Date.  As of the Petition Date, a majority of these products have not been delivered to the purchasing customers.  The Debtors estimate that, as of the Petition Date, they hold approximately $4,000,000 in outstanding Customer Deposits.  Post-petition, these outstanding Customer Deposits will be applied to the pre-petition purchase price upon the corresponding customer remitting the remaining unpaid balance on the purchase.  At the time that such customers made the Customer Deposits, they had every expectation that the Debtors would apply the Customer Deposits toward the purchase price of the selected products.

70.     The Debtors' inability to use their reasonable business judgment to continue honoring Customer Deposits as described above would significantly harm the goodwill of the Debtors and their ongoing business and customer relationships, thereby decreasing the value of their business as a going concern.  Accordingly, the Debtors seek the authority to continue honoring Customer Deposits in the ordinary course and in the exercise of their reasonable business judgment.

71.     Postage Deposit Accounts.  In the ordinary course of business, the Debtors maintain certain deposit accounts (the "Postage Deposit Accounts") to accommodate customers who demand large volume mailings with electronic postmarks.  Such mailings require real-time payments to the United States Postal Service.  Consequently, the Debtors maintain the Postage Deposit Accounts which are prefunded by customers so that the Debtors can charge the postage fees against the account at the time of mailing.  Postage Deposit Accounts have become standard in the mass-mailing industry; as such, it is important that the Debtors be authorized to maintain

29

this program to remain competitive and avoid risking the goodwill of their customers. Accordingly, the Debtors seek the authority to continue to maintain the Postage Deposit Accounts in the ordinary course and in the exercise of their business judgment.

**J.    Debtors' Motion for Entry of an Order Confirming the Administrative Expense Priority Status of the Debtors' Undisputed Obligations for the Postpetition Delivery of Goods and Services**

72.    In the ordinary course of the Debtors' business, numerous suppliers and service providers provide the Debtors with goods and services that are integral to the Debtors' business operations.  As of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "Outstanding Orders") with certain suppliers (collectively, the "Suppliers") for such goods and services.

73.    The Debtors seek entry of an order confirming that the Debtors' undisputed obligations to the Suppliers under Outstanding Orders for (i) shipments of goods delivered to and accepted by the Debtors on and after the Petition Date and (ii) the provision of services to the Debtors on and after the Petition Date at the Debtors' request will be entitled to administrative expense priority status.

74.    As a result of the commencement of these Chapter 11 Cases, the Debtors believe that the Suppliers may perceive a risk that they will be treated as prepetition general unsecured creditors for the cost of any shipments made or services provided after the Petition Date pursuant to the Outstanding Orders.  As a result, the Suppliers may refuse to ship such goods to the Debtors or provide such services to the Debtors unless the Debtors issue substitute postpetition purchase orders or provide other assurances of payment.

75.    Issuing substitute purchase orders on a postpetition basis would be administratively burdensome, time-consuming, and counterproductive to the Debtors' continuing

operations.   Such a requirement imposed by Suppliers – or other requests for assurance of payment – inevitably will lead to delays in the Debtors' receipt of goods and services.

76.     Under these circumstances, the Debtors believe that relief is needed to permit the Debtors to obtain the timely delivery of goods and uninterrupted provision of services from the Suppliers pursuant to the Outstanding Orders.

**K.     Debtors' Motion for Entry of an Order (A) Authorizing, but Not Directing, Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits; and (B) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

*(i)     The Debtors' Workforce*

77.     The Debtors' Employees and Independent Contractors (each as hereinafter defined) are essential to their business operations and perform a variety of critical functions.  The Employees' and Independent Contractors' valuable skill sets, institutional knowledge and understanding of the Debtors' operations and customer relations and their integrated functions and activities, make all of the categories of Employees and Independent Contractors essential to the success of these Chapter 11 Cases.

78.     The Debtors' workforce consists of both hourly and salaried employees (the "Employees").  The Debtors pay approximately eight hundred and sixty-four (864) Employees on an hourly basis and pay approximately seven hundred and thirty-five (735) Employees on a salaried basis.  Additionally, the Debtors utilize twenty-six (26) independent contractors in the ordinary course of business (the "Independent Contractors").  The Independent Contractors are critical to the management and operation of the Debtors' business.   Of the Employees, approximately sixteen (16) are part-time Employees and approximately one thousand, five hundred and eighty-three (1,583) are full-time Employees.  None of the Debtors' Employees are covered by a collective bargaining agreement.

31

79.     The Employees are employed by three of the Debtor entities.  BBH, Inc. ("<u>BBH</u>") employs one thousand, three hundred and eighty-four (1,384) Employees (the "<u>BBH Employees</u>"), BCC Software, Inc. employs ninety-eight (98) Employees (the "<u>BCC Employees</u>"), and Böwe Bell + Howell International Ltd. ("<u>BBH Canada</u>") employs one hundred and seventeen (117) Employees (the "<u>Canadian Employees</u>").  The Employees work at nine (9) facilities and in the field.  The facilities are located in Baltimore, Maryland (7 Employees), Bethlehem, Pennsylvania (83 Employees), Durham, North Carolina (272 Employees), Irving, Texas (36 Employees), Wheeling, Illinois (127 Employees), Rochester, New York (84 Employees), Onalaska, Wisconsin (14 Employees), Waterloo, Ontario, Canada (24 Employees) and Richmond Hill, Ontario, Canada (15 Employees).  The remaining nine hundred and nine (937) Employees work in the field.

80.     The Debtors' Employees include software developers, customer service technicians, engineers, sales personnel, employees working in the manufacturing facilities, and corporate employees, including those working in information technology, human resources, finance, marketing, product management and corporate officers.  Executives, management and professionals are on salary while all other Employees are compensated on an hourly basis.  All BBH Employees report, directly or indirectly, to either the Chief Executive Officer or the Chief Operations Officer.  Those reporting to the CEO include BBH Employees working in the following departments: Field Sales, International Sales, Business Development and Marketing, Operations, Finance, Human Resources, Legal and Software.  Those reporting to the COO include BBH Employees engaged in facility manufacturing and assembly, hardware engineering, customer service related activities, and BBH Employees working for the Information Technology Department.  BCC Employees engage in software product development and

software application support across varied products. Finally, the Canadian Employees are engaged in sales and service activities. Based out of Richmond Hill, Ontario, the Canadian Employees provide technical service support and sales support for product sales and service throughout Canada. The Canadian Employees located at the Waterloo, Ontario facility also engage in software development relating to key inserting product software applications. The operations in Canada are headed by three executives, the Head of Sales, the Head of Service and the Head of Software, all of which report to the corresponding department heads in the U.S. and are not considered part of the Debtors' management team.

81.     The Debtors also utilize twenty-six (26) Independent Contractors. Twenty-four (24) of the Independent Contractors contract with BBH and two (2) Independent Contractors contracts with BBH Canada. The Independent Contractors are comprised of, among other things, engineering and software development resources, finance and accounting resources and manufacturing resources. All of the Independent Contractors are used by the Debtors in the ordinary course of business.

82.     In addition to Employees and Independent Contractors, the Debtors also utilize temporary employees (the "Temporary Employees") which are engaged through various agencies (the "Temp Agencies") with which the Debtors contract. The number of Temporary Employees as well as the tasks they perform vary depending on the Debtors' needs. For example, the Debtors are currently transferring a production line from one of their facilities to another facility. The Debtors have employed several Temporary Employees for six weeks in order to execute this project.

*(ii)*     ***Employee Obligations***

(a)     <u>Unpaid Compensation</u>

83.     In the ordinary course of business, the Debtors pay the Employees on a bi-weekly basis.  The Debtors' payroll obligations generally include wages and salaries, as applicable, as well as commissions and bonuses awarded for sales productivity and goal attainment.

84.     Automatic Data Processing, Inc. ("<u>ADP</u>") provides payroll administration services the Debtors for the BBH Employees and the Canadian Employees.  For the BBH Employees and Canadian Employees paid by direct deposit, the Debtors electronically transfer funds to ADP, which, in turn, transfers the funds to BBH Employees and Canadian Employees by direct deposit.  For the BBH Employees and Canadian Employees paid by check, ADP generates the checks on behalf of the Debtors, which contain the Debtors' name and are drawn on ADP's account.  While payroll services for the BBH Employees and the Canadian Employees are provided by ADP, there is no comingling of funds used to pay the BBH Employees with those used to pay the Canadian Employees.

85.     Payroll administrative services for the Debtors for the BCC Employees are provided by Paychex.  For the BCC Employees paid by direct deposit, the Debtors electronically transfer funds to Paychex, which, in turn, transfers the funds to BCC Employees by direct deposit.  For the BCC Employees paid by check, Paychex generates the checks on behalf of the Debtors which contain the Debtors' name and are drawn on Paychex's account.

86.     On average, the Debtors have gross expenses relating to payroll administrative services totaling $38,050 per month: $1,500 to Paychex, $1,550 to ADP for payroll services relating to the Canadian Employees and $35,000 for payroll services relating to the BBH Employees.  The Debtors estimate that, as of the Petition Date, approximately $37,000 is outstanding in payroll administration expenses for the prepetition period (the "<u>Payroll</u>

34

Administration Expenses"). Accordingly, the Debtors seek authority to pay up to $37,000 in prepetition Payroll Administration Expenses.

87. Additionally, because the Debtors pay Employees in arrears, as of the Petition Date, the Debtors estimate that approximately $750,000 would be due and owing to their Employees on account of accrued wages, salaries, commissions and other compensation earned prior to the Petition Date (the "Unpaid Compensation"). Of this amount, approximately $55,000 is due and owing to the Canadian Employees. The Employees who are employed as sales personnel receive compensation in the form of salary and commissions. These Employees draw salaries which they receive bi-weekly, but they also receive commissions when they make a sale. They receive 50% of their earned commission when the order is booked and the remaining 50% of the commission when the product sold is accepted by the customer. Earned commissions are paid in the subsequent paycheck. Accordingly, the Unpaid Compensation includes commissions earned during the current pay period. Such amounts will come due in the ordinary course of business; consequently, the Debtors seek authority to pay up to $750,000 in Unpaid Compensation, $55,000 of which will be paid to the Canadian Employees. The Debtors do not believe that there are any Employees whose claims for prepetition obligations exceed the $11,725 cap under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. Accordingly, the Debtors are not seeking authority to pay any amounts to Employees in excess of the $11,725 cap under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code pursuant to this Motion.

(b)     Independent Contractor Compensation

88. The Independent Contractors are compensated in three ways: through accounts payable, through the ADP payroll system, and through an agency employed by the Debtors. The Debtors estimate that approximately $285,000 is owed to the Independent Contractors for work completed prior to the Petition Date. Of this amount, approximately $1,500 is owed to

Independent Contractors contracting with BBH Canada. Accordingly, the Debtors request that the Court authorize the Debtors to pay the Independent Contractors up to an amount of $285,000.

(c)     Temporary Employees

89.     The Temporary Employees are compensated through the Temp Agencies. The Debtors make payments to the Temp Agencies on a monthly basis which, in turn, compensate the Temporary Employees for the services that they provided to the Debtors. Because the Debtors' needs with respect to Temporary Employees varies, the cost to the Debtors for Temporary Employees also differs from month to month. The Debtors estimate that they owe approximately $360,000 to the Temp Agencies for the services provided by the Temporary Employees prior to the Petition Date, and accordingly request that the Court authorize the Debtors to pay the Temp Agencies up to an amount of $360,000.

(d)     Deductions and Withholdings

90.     During each applicable pay period, certain amounts are deducted from Employees' paychecks, including, without limitation, (a) garnishments, child support and similar deductions, and (b) other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions, deductions related to personal use of company leased vehicles, and miscellaneous deductions) (collectively, the "Non-Tax Deductions"). The Debtors effect these deductions in accordance with information provided by the Employees and forward the amount of the Non-Tax Deductions to the appropriate third-party recipients. On average, approximately $777,000 is deducted from Employees' paychecks per pay period, and certain of the Non-Tax Deductions may not have been included in the most recent pre-Petition Date funding on account of those obligations. Accordingly, the Debtors seek authority to continue to forward these

36

prepetition Non-Tax Deductions to the applicable third-party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

91.     Federal and state or provincial laws (in both the United States and Canada) require the Debtors to withhold amounts related to federal, state and local income taxes, as well as Social Security and Medicare taxes, for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts").  The Debtors must then provide additional amounts for federal and state unemployment insurance (the "Employer Payroll Taxes" and together with the Withheld Amounts, the "Payroll Taxes").  On average, the Payroll Taxes, including both the employee and employer portions, total approximately $1,682,000 per pay period.  Prior to the Petition Date, the Debtors, through ADP and Paychex, withheld the appropriate amounts from Employees' earnings for the Withheld Amounts, but such funds may not have been forwarded to the appropriate taxing authorities.  Accordingly, the Debtors seek authority to continue to forward these prepetition Payroll Taxes (to the extent there are any that have not been forwarded by ADP and/or Paychex) to the applicable third-party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

(e)     Honoring Checks for, and Payment of, Reimbursable Expenses

92.     In the ordinary course of business, the Debtors reimburse Employees for certain expenses incurred in the scope of their employment and on behalf of the Debtors (the "Reimbursable Expenses").  Employees incur, on average, approximately $256,000 per month in Reimbursable Expenses such as business-related travel and relocation costs (e.g., airfare, meal, hotel and rental car costs) with the understanding that they will be reimbursed.  Employees are required to make travel arrangements through the contracted travel agency, ezRes booking and authorization system.  All requests for reimbursement are to be filed within thirty (30) days after the travel period ends for which the reimbursement is being requested, and appropriate receipts

37

are required. The Debtors currently owe approximately $760,000 on account of Reimbursable Expenses incurred prior to the Petition Date, $85,000 of which is due and owing to Canadian Employees. Accordingly, the Debtors seek authority to reimburse up to $760,000 in prepetition Reimbursable Expenses.

93. In addition to traditional expense-based reimbursement for out-of-pocket expenses incurred by the Employees on the Debtors' behalf, approximately eighty-three (83) Employees (32 BCC Employees, 32 BBH Employees[13] and 19 Canadian Employees) also have company credit cards (each, a "Company Credit Card" and collectively, the "Company Credit Cards"). The Company Credit Cards issued to the BBH Employees and the BCC Employees are issued through American Express. The Company Credit Cards issued to the Canadian Employees are issued through Diners Club International. These cards bear the name of the individual Employee to which the card is issued as well as the name of the Debtor entity for which that Employee works. American Express charges an annual fee of $5,440 for the Company Credit Cards issued to the BCC Employees. This fee, however, was paid in full in January 2011 for the 2011 calendar year. There are no annual fees associated with the Company Credit Cards issued to the BBH Employees and the Canadian Employees. Accordingly, no prepetition amounts are due on account of annual fees for use of the Company Credit Cards. Employees who have been issued Company Credit Cards may not use the cards for personal charges. Each Employee holding a Company Credit Card is required to submit information documenting the expenses incurred thereon. The Debtors, however, are responsible for remitting payments to American Express and Diners Club International for the charges incurred on the Company Credit Cards. Accordingly, any amounts due from the Debtors to American Express

---

[13] Five of the thirty-two Company Credit Cards issued to BBH Employees are currently inactive with no charges having been made in the last twelve months.

and Diners Club International are included within Reimbursable Expenses set forth above. Specifically, approximately $675,000 of the $760,000 in Reimbursable Expenses is due to American Express and $70,000 is due to Diners Club.

94.     Additionally, five hundred and nineteen (519) Employees hold active or inactive corporate credit cards (the "Corporate Credit Cards") which are issued by American Express. The Employees holding Corporate Credit Cards are liable for all charges to them. The Debtors are guarantors to three of the Corporate Credit Cards. As of the Petition Date there are no amounts for which the Debtors are liable on account of the Corporate Credit Cards.

95.     To avoid any disruption with regards to the Corporate Credit Cards that may be caused by the filing of the Chapter 11 Cases, the Debtors have advanced amounts for travel expense reimbursement to approximately two hundred and twenty (220) Employees currently holding Corporate Credit Cards. Such amounts, which did not exceed $180,000 in the aggregate,[14] will be held by the Employees in escrow and drawn down in satisfaction of any expenses that may arise prior to the issuance (if necessary) of replacement Corporate Credit Cards. To the extent that any such amounts held are drawn down, the Employees will submit receipts for expense reimbursement pursuant to the normal company procedure, and further amounts will be advanced to the Employees to replenish the amounts held in escrow to their original balance. Once new Corporate Credit Cards are issued, or the Debtors are comfortable that there will be no disruption to the use of the existing Corporate Credit Cards, the advanced amounts will be deducted from the Employees' compensation. The Debtors have made these

---

[14] The Debtors have established a tier system based on current use by the holders of the Company Credit Cards to determine amounts it will advance to specific Employees. Pursuant to this system, seventy-four (74) Employees will received a $250 advance, sixty-nine (69) Employees will receive a $500 advance, forty-eight (48) Employees will receive a $1,000 advance, nineteen (19) Employees will receive a $2,000 advance, three (3) Employees will receive a $3,000 advance and six (6) Employees will receive a $5,000 advance.

advances rather than require Employees who are traveling on the Petition Date or soon thereafter to use their personal credit cards for travel expenses and then seek reimbursement. Although the Debtors believe that advancing travel expenses is akin to reimbursement and could be considered an action in the ordinary course of business, out of an abundance of caution the Debtors seek Court authority to continue to replenish the advances until all issues with respect to the continued use of the Corporate Credit Cards are satisfactorily resolved.

96. Finally, the Debtors employ Vehicle Reimbursement Programs to BBH Employees and Canadian Employees. First, certain BBH Employees are entitled to participate in a Corporate Reimbursement Services ("CRS") program. The CRS program is a tax-free reimbursement program that provides reimbursement for vehicle and gas expenses at a rate calculated for each BBH Employee based on the expected costs for owning and operating a new, mid-sized sedan. These expected costs include mileage, maintenance, insurance, taxes and fuel prices. Each participating BBH Employee records his or her business mileage by the fourth day of every month, and receives his or her reimbursement via direct deposit as part of the subsequent payroll. Approximately one hundred and twenty-two (122) BBH Employees participate in the CRS program, and the average monthly cost of the CRS program is $95,000.00 Accordingly, the Debtors seek authority to reimburse up to $95,000.00 in prepetition expenses related to the CRS program.

97. Alternatively, certain BBH Employees and Canadian Employees participate in the leased car program (the "Leased Car Program"). Pursuant to the Leased Car Program, BBH and BBH Canada each lease car fleets managed by ARI Fleet ("ARI"). BBH Employees and Canadian Employees who drive more than 18,000 business miles per year are eligible to participate in the Leased Car Program. The Leased Car Program covers the cost of liability

insurance, all vehicle repairs, maintenance costs, including oil changes, taxes, parking, tolls, etc. Employees who participate in the Leased Car Program also receive reimbursement for fuel expenses. Approximately one hundred and thirty-five (135) BBH Employees and forty-six (46) Canadian Employees utilize the Leased Car Program. The Debtors estimate that as of the petition date, approximately $114,000, $74,000 on account of the fleet leased by BBH and $40,000 on account of the fleet leased by BBH Canada, was due and owing to ARI. Accordingly, the Debtors seek authority to pay up to $114,000 to ARI in order to maintain the Leased Car Program. Further, any amounts due to Employees on account of reimbursement for gas expenses has been included in $650,000 sought on account of Reimbursable Expenses, as discussed above.

98.     Any personal use by Employees of the vehicles that are a part of the Leased Car Program are deducted from that Employee's compensation on a monthly basis. The average monthly payroll use deduction for all participating Employees on account of their personal use of a leased vehicle under the Leased Car Program is approximately $40,000. This amount is included in the Non-Tax Deductions discussed above.

        (f)     Severance Program

99.     In the ordinary course of business, the Debtors employ two severance programs through which they make payments to certain former employees. The program utilized by BBH Canada (the "Canadian Severance Program") provides transition assistance for all full time Canadian Employees who are terminated because of a reduction in work force, job elimination, or for any reason other than just cause. The amount of the separation allowance under the Canadian Severance Program is in accordance with applicable local laws and provincial employment standards legislation. BBH also provides transition assistance to former employees (the "American Severance Program," and together with the Canadian Severance Program, the

41

"Severance Programs") to full time employees of BBH and its affiliates. Accordingly, BBH Employees and BCC Employees who are involuntarily terminated due to a reduction in force, reorganization, business necessity, or economic conditions are eligible to receive severance benefits. The amount of the severance benefits under the American Severance Program is one (1) week of severance pay for every year of service, with a minimum of two (2) weeks and a maximum of twenty-four (24) weeks. A "week of severance pay" is determined by the Debtors based upon certain factors including the Employee's base rate of weekly salary as of their last day of employment. The Debtors seek authority to continue the Severance Programs with respect to current Employees that may cease to be employed by the Debtors during the pendency of these chapter 11 cases.

100. Further, as of the Petition Date, the Debtors have certain outstanding obligations on account of the Severance Program to fifteen (15) former employees. The total amounts that the Debtors owe to each of ten (10) of the fifteen (15) former employees do not exceed the $11,725 cap[15] under section 507(a)(4) and 507(a)(5) of the Bankruptcy Code, and accordingly, the Debtors seek authority, in their sole discretion to continue to make payments not to exceed $46,000 to these ten (10) former employees in the ordinary course of business.

101. The amounts due to the remaining five (5) former employees, however, do exceed the $11,725 cap under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. The Debtors are liable to two of the former employees, owed totals of $19,578.44 and $16,710.78, pursuant to the American Severance Program, and to three of the former employees, owed totals of $36,286.07, $32,790.98 and $21,315.36, pursuant to the Canadian Severance Program. Accordingly, the aggregate amount for all former employees in excess of the section 507(a)(4)

---

[15] The ten (10) former employees are each owed between $1,572.07 and $9,743.22 and the aggregate amount owed to these former employees is approximately $46,000.

cap is $68,056.63 (the "Severance Pay Excess").  The Debtors are required pursuant to local and

provincial law in Canada to pay the amounts owed under the Canadian Severance Program.

Because the former employees are each paid portions of the total amounts owed bi-weekly, none

of these five former employees is entitled to receive more than $11,725 during the thirty (30)

days following the Petition Date.   Accordingly, the Debtors seek authority, in their sole

discretion, to continue to make the bi-weekly payments to these former employees up to $11,725

per former employee[16] in the ordinary course of business on an interim basis and authority to pay

the amounts in excess of the section 507(a)(4) cap[17] on a final basis.

### (iii)    *Employee Benefits*

102.    The Debtors offer their Employees the opportunity to participate in the following

benefit programs: health and wellness programs; employee savings and retirement plans; life,

disability, and accidental death and dismemberment plans; flexible benefit plans; vacation, sick

leave and other leaves of absence; and employee assistance and counseling programs

(collectively, the "Employee Benefit Programs").

### (a)    Health and Wellness Plans

103.    All regular, active BBH Employees working at least twenty (20) hours per week,

effective from their first day of employment, and certain eligible former employees (the "BBH

Health Plan Members") are eligible to receive medical, dental, and vision benefits (the "BBH

Health Plans").   Under the BBH Health Plans, the Debtors provide the BBH Health Plan

Members with the option between two medical plans (the "BBH Medical Plans") administered

through UnitedHealthcare ("United"): UnitedHealthcare Definity Choice Plus HRA or

---

[16]   An aggregate of $58,625 to the five (5) former employees, $35,175 of which will be paid to Canadian former employees.

[17]   An aggregate of $68,056.63 to the five (5) former employees, $55,217.41 of which will be paid to Canadian former employees.

UnitedHealthcare Choice Plus PPO. In addition, the Debtors provide BBH Health Plan Members with a dental plan (the "BBH Dental Plan") administered through MetLife Dental ("MetLife"). Finally, the Debtors provide BBH Health Plan Members with a vision plan (the "BBH Vision Plan") administered through EyeMed Vision ("EyeMed"). BBH Health Plan Members contribute 30% to the BBH Medical Plans and the BBH Dental Plan and 80% to the BBH Vision Plan.

104. All full-time BCC Employees who have completed a minimum of one (1) month of employment are eligible to receive medical, dental, and vision benefits (the "BCC Health Plans"). Under the BCC Health Plans, the Debtors provide BCC Employees with the option between three medical plans (the "BCC Medical Plans") administered through Blue Cross/Blue Shield ("BCBS"): EPO-J, EPO-F or SimplyBlue HDHP. In addition, the Debtors provide BCC Employees with a dental plan (the "BCC Dental Plan") administered through Guardian. Finally, the Debtors provide BCC Employees with a supplemental vision plan (the "BCC Vision Plan") as part of the medical option administered through Excellus BC/BS and Rochester Optical (collectively, the "Vision Administrators"). BCC Employees contribute 50% to the BCC Medical Plans and the BCC Dental Plan and receive discounts on vision products and services through the BCC Vision Plan which is part of the EPO-J plan and the Simply Blue HDHP plan.

105. All Canadian Employees who work at least twenty hours per week are eligible to receive medical, dental, and vision benefits (the "Canadian Health Plans," and together with the BBH Health Plans and the BCC Health Plans, the "Health Plans"). Under the Canadian Health Plans, the Debtors provide the Canadian Employees with medical insurance (the "Canadian Medical Plan") administered through Industrial Alliance ("Industrial," and collectively with United, MetLife, EyeMed, BCBS, Guardian and the Vision Administrators, the "Health Plan

Administrators"). In addition, the Debtors provide Canadian Employees with a dental plan (the "Canadian Dental Plan") administered through Industrial. Finally, the Debtors provide Canadian Employees with a supplemental vision plan (the "Canadian Vision Plan") as part of the medical option administered through Industrial. Canadian Employees contribute 14% to the Canadian Medical Plan and 11% to the Canadian Dental Plan and receive discounts on vision products and services through the Canadian Vision Plan which is part of the Canadian Medical Plan.

106. The Debtors withhold the Employees' pretax contribution from their earnings and the Debtors contribute the balance necessary to pay for the incurred claims and the administrative fees to the Health Plan Administrators. Accordingly, the Debtors seek authority to continue to remit the amounts withheld from Employees on account of the Health Plans to the Health Plan Administrators.

107. Currently, the Debtors provide medical, dental and vision benefits to approximately one thousand, one hundred and eighty-three (1,183) BBH Employees under the BBH Health Plans. Moreover, the BBH Health Plans provide health care coverage to approximately one thousand, nine hundred and sixty (1,960) dependents of BBH Employees. The Debtors pay, on average, approximately $128,800 per month to United, MetLife and EyeMed for administration of the BBH Health Plans. The Debtors estimate that approximately $16,000 is outstanding in incurred but unpaid administrative fees associated with the BBH Health Plans. The BBH Health Plans are self insured, and as such, the Debtors pay, on average, approximately $1,200,000 per month on account of claims filed by BBH Employees under the BBH Health Plans and certain former BBH employees under a Cobra Plan available to such former employees. The Debtors estimate that, as of the Petition Date, approximately $1,050,000 is outstanding in incurred but unpaid expenses associated with claims under the BBH Health

Plans.  Accordingly, the Debtors seek authority to pay any outstanding prepetition amounts in their sole discretion.

108.    Additionally, the Debtors provide medical, dental and vision benefits to approximately sixty-nine (69) BCC Employees under the BCC Health Plans.  Moreover, the BCC Health Plans provide health care coverage to approximately one hundred and thirteen (113) dependents of BCC Employees.   The BCC Health Plans cost the Debtors, on average, approximately $53,000 per month in premiums.  Unlike the premiums incurred under the BBH Health Plans, however, the premiums under the BCC Health Plans are not prepaid.  Accordingly, the Debtors estimate that approximately $36,000 is outstanding in incurred but unpaid premiums associated with the BCC Health Plans.  The BCC Health Plans are not self insured, accordingly, the Debtors have no liability on account of claims under the BCC Health Plans.  The Debtors seek authority to pay any outstanding prepetition amounts in their sole discretion.

109.    Finally, the Debtors provide medical, dental and vision benefits to approximately one hundred and sixteen (116) Canadian Employees under the Canadian Health Plans. Moreover, the Canadian Health Plans provide health care coverage to approximately two hundred and forty-five (245) dependents of Canadian Employees.  The Canadian Health Plans cost the Debtors, on average, approximately $28,000 per month in premiums. All of these premiums are prepaid at the beginning of every month for that month.  Accordingly, the Debtors estimate that there are no outstanding incurred but unpaid premiums associated with the Canadian Health Plans.  The Canadian Health Plans are not self insured, and as such, the Debtors have no liability on account of claims under the Canadian Health Plans.

(b)    Employee Savings and Retirement Plans

110.    *401(k)/Retirement Plans.*  The Debtors maintain two capital accumulation plans meeting the requirements of section 401(k) of the Internal Revenue Code for the benefit of all

46

eligible BBH Employees and BCC Employees, one for BBH Employees (the "BBH 401(k) Plan") and the other for BCC Employees (the "BCC 401(k) Plan," and together with the BBH 401(k) Plan, the "401(k) Plans").  In addition, the Debtors maintain a defined contribution pension plan (the "DCPP"), a group registered retirement savings plan (the "GRRSP"), and a non-registered savings plan (the "NRSP," and together with the DCPP and the GRRSP, the "Canadian Savings Plans") for the benefit of all Canadian Employees.

111.    The BBH 401(k) Plan is administered through Fidelity.  BBH Employees are eligible to contribute to the 401(k) Plans immediately upon hire, and they can contribute up to 50% of their compensation on a pretax basis and up to 25% of their compensation on a post-tax basis, subject to regulations set by the Internal Revenue Service.  The Debtors match 100% of the contributions made by the BBH Employees on the first 2% of participant contributions effective the first day of the BBH Employee's employment.  This matching, however, while budgeted for 2011, is currently suspended.  Approximately one thousand, two hundred and eighteen (1,218) active BBH Employees, in addition to approximately five hundred and eighty-eight (588) former BBH Employees, currently participate in the BBH 401(k) Plan.  The approximate amount withheld from BBH Employees' paychecks for 401(k) contributions is $530,000 per month.  An additional $190,000 is withheld from BBH Employees' paychecks for loan repayments.  Although the Debtors are not currently making any matching contributions to the BBH 401(k) Plan, the Debtors pay Fidelity $1,300 semi-annually for administering the BBH 401(k) Plan.  As of the Petition Date, there are no outstanding amounts for administrative expenses related to the BBH 401(k) Plan.

112.    The BCC 401(k) Plan is administered through Mass Mutual.  BCC Employees can contribute up to the Internal Revenue Service Guidelines.  The Debtors match 100% of the

contributions made by BCC Employees up to the first 5% of participant contributions after the BCC Employee has reached his or her one year service date. Approximately sixty-four (64) active BCC Employees in addition to twenty-one (21) former BCC Employees, currently participate in the BCC 401(k) Plan. The approximate amount withheld from BCC Employees' paychecks for 401(k) contributions is $30,670 per month with an additional $3,400 per month withheld for loan repayments. The Debtors make matching contributions to the BCC 401(k) Plan in the amount of $15,700 per month, but there are no administrative costs owed by the debtors to Mass Mutual as such administrative costs are paid for by the BCC 401(k) Plan. Because the matching amounts paid under the BCC 401(k) plan are made concurrent with the BCC Employee's payment into the plan through payroll, there are no amounts outstanding for matching contributions related to the BCC 401(k) Plan.

113.    All three Canadian Savings Plans (collectively, with the 401(k) Plans, the "Savings and Retirement Plans") are administered through Sun Life, and there are no costs to the Debtors for administering these plans. With respect to the DCPP, the Debtors match 100% of the contributions made by Canadian Employees up to the first 2% of participant contributions. The approximate amount withheld from Canadian Employees' paychecks for contributions to the DCPP is $24,600 per month. The Debtors make matching contributions to the DCPP in the amount of $12,800 per month. Because the matching amounts paid under the DCPP plan are made concurrent with the Canadian Employee's payment into the plan through payroll, there are no amounts outstanding for matching contributions related to the DCPP. The Debtors do not match amounts contributed to the GRRSP or the NRSP. The GRRSP is a savings plan to which the Canadian Employees can contribute on a pre-tax basis. The Debtors withhold approximately $7,100 per month from the Canadian Employees' paychecks for contributions to the GRRSP.

The NRSP is a savings plan to which the Canadian Employees can contribute on a post-tax basis. The Debtors withhold approximately $1,580 per month the Canadian Employees' paychecks for contributions to the NRSP.

114. Accordingly, the Debtors seek authority to continue to remit Employee contributions to the respective Savings and Retirement Plans and to pay the amounts owed for administrative expenses and matching for the Savings and Retirement Plans in their sole discretion.

  (c)  <u>Insurance and Flexible Benefit Plans</u>

  *(i)*  *BBH Insurance and Flexible Benefit Plans*

115. The Debtors provide each regular BBH Employee who works at least twenty (20) hours a week, effective on their first day of employment, and certain eligible former employees with group life insurance coverage through CIGNA (the "<u>BBH Life Insurance Plan</u>"). The Debtors fully fund this plan and no Employee contribution is required. Under the BBH Life Insurance Plan, the Debtors provide eligible BBH Employees with coverage in the amount of their base annual salary. Coverage is automatic for eligible employees and no enrollment is required. On average, the BBH Life Insurance Plan costs the Debtors approximately $11,000 per month. The Debtors estimate that, as of the Petition Date, approximately $7,500 is outstanding in incurred but unpaid premium expenses related to BBH Life Insurance Plan for the prepetition period. Accordingly, the Debtors seek authority to pay this amount in their sole discretion.

116. Additionally, the Debtors offer each BBH Employee the option to purchase supplemental life insurance at the BBH Employee's own and exclusive expense (the "<u>BBH Supplemental Term Life Insurance</u>") through CIGNA. BBH Employees may elect to purchase BBH Supplemental Term Life Insurance, at their own expense, in base salary increments, up to

four times the respective BBH Employee's annual salary. BBH employees can also elect to purchase spouse and child(ren) supplemental life insurance in amounts of $5,000 to $25,000.

117. The Debtors also provide their BBH Employees with accidental death and dismemberment coverage (the "BBH AD&D Coverage") through CIGNA for themselves and their dependents at the BBH Employee's own and exclusive expense. BBH Employees may elect to purchase $10,000 to $500,000 worth of coverage for themselves, $10,000 to $250,000 worth of coverage for their spouses, and $10,000 to $50,000 worth of coverage for their children. The bi-weekly cost to each BBH Employee is $.10 per $10,000 worth of coverage.

118. The Debtors withhold the costs associated with the BBH Supplemental Term Life Insurance, approximately $44,000 per month, and the BBH A&D Coverage, approximately $9,100 per month, from each BBH Employee's earnings and remit these amounts to CIGNA. Accordingly, the Debtors seek to continue to remit any of these payments which have been withheld but not forwarded to CIGNA.

119. In addition, the Debtors provide BBH Employees with short-term and long-term disability coverage (the "BBH LT/ST Disability Benefits," and together with the BBH Life Insurance Plan, BBH Supplemental Term Life and BBH AD&D Coverage, the "BBH Insurance Plans"). The BBH LT/ST Disability Benefits are administered by CIGNA. Short-term and long-term disability benefits are provided to all BBH Employees who are regular, active employees working at least twenty hours per week. This coverage is effective on the first day of active employment, and coverage is automatic for eligible BBH Employees and no enrollment is required. The BBH LT/ST Disability Benefits coverage is equal to 50% of an eligible BBH Employees' pre-injury earnings, and BBH Employees can elect to buy-up the BBH LT/ST Disability Benefits to 66 2/3% for their pre-injury earnings. The short-term disability coverage

pays up to twenty-six (26) weeks of disability as salary continuation. Accordingly, any amounts for which the Debtors are liable on account of short-term disability payments to BBH Employees are included in the Unpaid Compensation discussed above. On average, short-term disability coverage costs the Debtors approximately $3,600 per month for administering the plan. Long-term disability benefits pay eligible BBH Employees starting in the twenty-seventh week of a BBH Employee's disability. Long-term disability benefits are offset by other income such as social security and workers compensation. The long-term disability plan is fully insured through CIGNA. Premiums for the 50% benefit are fully paid for by the Debtors. These premiums are approximately $17,550 per month. The Debtors currently owe $12,000 towards BBH LT/ST Disability Benefits. Accordingly, the Debtors seek authority to pay $12,000 to maintain the BBH LT/ST Disability Benefits in their sole discretion.

120. Further, the Debtors offer certain eligible BBH Employees the ability to contribute a portion of their pretax compensation to flexible spending accounts to pay for eligible out-of-pocket health care and dependent care premiums and expenses (the "Flexible Benefit Plan"). Currently, approximately four hundred and forty-four (440) BBH Employees participate in the Flexible Benefit Plan.

121. Finally, BBH Employees may participate in certain voluntary group programs (the "Voluntary Programs") at their own cost and expense. Such programs include a critical illness program through Boston Mutual, a whole life policy through ING, a group legal program through Hyatt Legal, a division of MetLife, and discounts on home and auto insurance through MetLife. The Debtors deduct approximately $7,100 per month from participating BBH Employees' compensation on account of the Voluntary Programs. The Debtors seek authority to continue to remit such withheld amounts to the providers of the Voluntary Programs.

122. The Debtors employ Benefit Express, a vendor which provides administrative services with respect to the BBH Health Plans, the Flexible Benefits Plan available to BBH Employees and Cobra. These services include determining eligibility, providing payroll deducting interface between BBH and ADP and customer service. The average monthly cost to the Debtors for the services provided by Benefit Express is $15,000. The Debtors estimate that they owe Express Benefit approximately $10,000 on account of incurred but unpaid amounts. Accordingly, the Debtors seek authority to pay $10,000 to Benefits Express in their sole discretion.

*(ii)     BCC Insurance and Flexible Benefit Plans*

123. The Debtors provide each full-time BCC Employee, with group life insurance coverage through The Hartford (the "BCC Life Insurance Plan"). The Debtors fully fund this plan and no Employee contribution is required. Under the BCC Life Insurance Plan, the Debtors provide eligible BCC Employees with coverage up to $50,000. Coverage is automatic for eligible employees and no enrollment is required. On average, the BCC Life Insurance Plan costs the Debtors approximately $510 per month. The Debtors estimate that, as of the Petition Date, approximately $350 is outstanding in incurred but unpaid premium expenses related to BCC Life Insurance Plan for the prepetition period. Accordingly, the Debtors seek authority to pay this amount in their sole discretion.

124. The Debtors also provide each BCC Employee with accidental death and dismemberment coverage (the "BCC AD&D Coverage") through the Hartford. The Debtors fully fund this plan and no Employee contribution is required. Under the BCC AD&D Coverage, the Debtors provide eligible BCC Employees with coverage up to $50,000. Coverage is automatic for eligible employees and no enrollment is required. On average, the BCC AD&D Coverage costs the Debtors approximately $150 per month. The Debtors estimate that, as of the

52

Petition Date, approximately $100 is outstanding in incurred but unpaid premium expenses related to BCC AD&D Coverage for the prepetition period. Accordingly, the Debtors seek authority to pay this amount in their sole discretion.

125. Additionally, the Debtors offer each BCC Employee the option to purchase supplemental life insurance and accidental death and dismemberment coverage at the BCC Employee's own and exclusive expense (the "BCC Supplemental Insurance") through The Hartford. The Debtors withhold the costs associated with the BCC Supplemental Insurance from each BCC Employee's earnings and remit these amounts to The Hartford. Accordingly, the Debtors seek to continue to remit these payments to The Hartford. Further, there is a monthly premium of $160 on account of the BCC Supplemental Insurance. The Debtors currently owe $110 towards the premium for the BCC Supplemental Insurance, and thus seek authority to pay this amount in their sole discretion.

126. In addition, the Debtors provide BCC Employees with short-term and long-term disability coverage (the "BCC LT/ST Disability Benefits"). The BCC LT/ST Disability Benefits are administered by The Hartford pursuant to New York State Statutory disability. The BCC LT/ST Disability Benefits are funded by the Debtors and no BCC Employee contribution is required. On average, the BCC LT/ST Disability Benefits plan costs the Debtors approximately $1,300 per month on account of the short-term disability plan and $830 per month on account of the long-term disability plan. The Debtors currently owe $1,450 towards BCC LT/ST Disability Benefits. Accordingly, the Debtors seek authority to pay this amount in their sole discretion.

127. The Debtors provide for Long Term Care Insurance for all BCC Employees (the "BCC Long Term Care Insurance," and together with the BCC Life Insurance, BCC AD&D Coverage, BCC Supplemental Insurance and BCC LT/ST Disability Benefits, the "BCC

53

Insurance Plans"). The BCC Long Term Care Insurance is administered by Unum. The BCC Long Term Care Insurance is funded by the Debtors and no BCC Employee contribution is required. On average, the BCC Long Term Care Insurance costs the Debtors approximately $3,100 per month. The Debtors currently owe $2,100 towards the BCC Long Term Care Insurance. Accordingly, the Debtors seek authority to pay this amount in their sole discretion.

128. Finally, the Debtors offer certain eligible BCC Employees the ability to contribute a portion of their pretax compensation to the Flexible Benefit Plan. Currently, approximately thirty-four (34) BCC Employees participate in the Flexible Benefit Plan.

*(iii)    BBH Canada Insurance*

129. The Debtors provide each regular, active Canadian Employee working at least twenty (20) hours per week, effective on their first day of employment, with group life insurance coverage through Industrial Alliance (the "Canadian Life Insurance Plan"). The Debtors fully fund this plan and no Employee contribution is required. Under the Canadian Life Insurance Plan, the Debtors provide eligible Canadian Employees with coverage in the amount of their base annual salary. Coverage is automatic for eligible employees and no enrollment is required. On average, the Canadian Life Insurance Plan costs the Debtors approximately $2,900 per month. This cost, a premium, is prepaid at the beginning of every month. Accordingly, the Debtors do not owe any outstanding expenses related to Canadian Life Insurance Plan for the prepetition period.

130. Additionally, the Debtors offer each Canadian Employee the option to purchase supplemental life insurance for themselves and their dependents (the "Canadian Supplemental Term Life Insurance") at the Canadian Employee's own and exclusive expense through Industrial Alliance. Canadian Employees may elect to purchase Canadian Supplemental Term Life Insurance in base salary increments, up to three times the respective Canadian Employee's

54

annual salary. Further, each Canadian Employee may elect to purchase Canadian Supplemental Term Life Insurance for up to $5,000 for their spouse and up to $5,000 for each child. The bi-weekly cost to each Canadian Employee is $.66 (CAD) for this additional coverage.

131. The Debtors also provide their Canadian Employees with accidental death and dismemberment coverage (the "Canadian AD&D Coverage") through Industrial Alliance for themselves and their dependents. Canadian Employees are covered for injuries sustained as a result of any accident anywhere in the world for a principal sum of $200,000. Spouses of Canadian Employees without children are insured for 60% of the Canadian Employee's benefit amount. If a Canadian Employee and his/her spouse have children, the spouse is insured for 50% of the Canadian Employee's benefit amount and each child is insured for 15% of the Canadian Employee's benefit amount. Each child of a Canadian Employee without a spouse is insured for 20% of the Canadian Employee's benefit amount. On average, providing the Canadian AD&D Coverage costs the Debtors approximately $550 per month. The Debtors currently owe $375 towards Canadian AD&D Coverage. Accordingly, the Debtors seek authority to pay this amount in their sole discretion. Further, the bi-weekly cost to each Canadian Employee is $2.22 (CAD) for each associate and $3.05 (CAD) for each associate with a spouse and/or child.

132. In addition, the Debtors provide Canadian Employees with long-term disability coverage (the "Canadian LT Disability Benefits," and together with Canadian Life Insurance, Canadian Supplemental Term Life insurance and Canadian AD&D Coverage, the "Canadian Insurance Plans," and together with the BBH Insurance Plans and the BCC Insurance Plans, the "Insurance Plans") at the Canadian Employee's own and exclusive expense. The Canadian LT Disability Benefits are administered by Industrial Alliance. The Canadian LT Disability Benefits

coverage is equal to 66 2/3% of the first $2,500 of an eligible Canadian Employees' monthly salary plus 50% of the balance of the monthly salary. The bi-weekly cost to each Canadian Employee is $.69 (CAD) per $100 (CAD) of coverage.

133. The Debtors withhold the costs associated with the Canadian Supplemental Term Life Insurance, the Canadian A&D Coverage and the Canadian LT Disability Insurance from each Canadian Employee's earnings and remit these amounts to Industrial Alliance. The Debtors seek to continue to remit any of these payments which have been withheld but not forwarded to Industrial Alliance.

(d)     <u>Vacation, Sick Leave and Other Leaves of Absence</u>

134. The Debtors provide paid vacation time ("<u>Vacation Time</u>") to full-time Employees. Vacation Time accrues based on a particular Employee's length of service as set forth below.

135. All full-time Employees are entitled to Vacation Time. Employees begin accruing Vacation Time on their official start date. If the start date falls within the first through the fifteenth of the month, the accrual begins that month. If the start date falls within the sixteenth through the end of the month, the accrual begins the following month. The amount of Vacation Time that is allocated to an Employee can only be used throughout that calendar year unless carry over (as described below) applies. The following schedule details the amount of Vacation Time that Employees are allocated per calendar year:

| BBH Employees | | |
| --- | --- | --- |
| **Years of Service** | **Allocated Vacation Time** | **Hours Per Month** |
| <5 Years | 2 weeks | 6.66 |
| 5 but <7 Years | 3 weeks | 10 |
| 7 but <9 Years | 3 weeks + 1 day | 10.66 |
| 9 but <11 Years | 3 weeks + 2 days | 11.33 |
| 11 but <13 Years | 3 weeks + 3 days | 12 |
| 13 but <15 Years | 3 weeks +4 days | 12.66 |
| 15 Years + | 4 weeks | 13.33 |

| BCC Employees | | |
| --- | --- | --- |
| **Years of Service** | **Hours Per Month** | **Total Accrual Per Year In Days** |
| < 1 Years | 6.67 | 10 |
| 1 but <5 Years | 10.00 | 15 |
| 5 but <10 Years | 13.33 | 20 |
| 10+ Years | 16.67 | 25 |

| Canadian Employees | | |
| --- | --- | --- |
| **Years of Service** | **Annual Vacation** | **Hours Per Month** |
| < 3 Years | 2 weeks | 6.66 |
| 3 but <10 Years | 3 weeks | 10.00 |
| 10 but <20 Years | 4 weeks | 13.33 |
| 20+ Years | 5 weeks | 16.66 |

136.  All part time Employees who work at least twenty (20) hours a week accrue vacation time. They do so on the same schedules as the other Employees working for that Debtor entity.

137.  Certain BBH Employees who have vacation time that is accrued but unused in one (1) calendar year can carry forward a maximum of forty (40) hours of vacation to the next

calendar year, when extenuating business circumstances have prevented them from taking scheduled vacation. This allowed carry over is exhausted by March 31 of the next calendar year. BCC Employees can carry forward a maximum of one hundred and twenty (120) hours. Furthermore, unused vacation time cannot be paid out upon the Employee's termination. Canadian Employees cannot carry any unused vacation time forward to the next calendar year.

138.    The Debtors also allow their Employees to take certain other leaves of absence for personal reasons, many of which are required by law (the "Leaves of Absence"). Leaves of Absence include family medical leave, family care leave, pregnancy disability leave, bereavement leave and military leave.

139.    The Debtors anticipate that their Employees will utilize accrued Vacation Time and Leaves of Absence in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal, ordinary course payroll obligations, and seek authority to honor such accrued benefits. The Debtors seek authority to honor the Vacation Time and Leave of Absence programs.

(e)    Additional Employee Benefits

140.    The Debtors provide an employee assistance plan (the "Employee Assistance Plan") which provides assistance to all Employees, by telephone, with any work life issues they may be experiencing. This support counseling program is fully funded by the Debtors and it is provided by Health Advocate (for BBH Employees), Shepell (for Canadian Employees) and ESI Employee Assistance Group (for BCC Employees). The total monthly cost for this program is approximately $3,500 which is prepaid to each provider. Accordingly, there are no outstanding amounts incurred prepetition. The Debtors seek authority to continue this program.

141.    The Debtors also provide BBH Employees and Canadian Employees with business travel accident insurance (the "Business Travel Accident Insurance") through Chubb.

58

The Business Travel Accident Insurance provides benefits to BBH Employees and Canadian Employees and beneficiaries upon death or permanent disability in an accident while traveling for the Debtors. The Debtors fully fund this plan and no Employee contribution is required. Coverage is determined by eligibility classification. On average, the Business Travel Accident Insurance costs the Debtors approximately $7,700 per month. The Debtors estimate that, as of the Petition Date, there are no outstanding premium expenses related to Business Travel Accident Insurance for the prepetition period.

**L.      Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, II) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to the Prepetition Secured Parties and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) (the "Financing Motion")[18]**

142.     Pursuant to the Financing Motion, the Debtors are seeking entry of an Interim Order and a Final Order allowing them to (i) obtain post-petition financing in the amount of up to $127,200,000 (the "DIP Facility"), by entering into that certain Senior Secured, Super-Priority Debtor-In-Possession Credit and Guaranty Agreement (the "DIP Facility Agreement"), by and among the US Borrower and the Canadian Borrower, as borrowers, the Guarantors, and Contrado BBH Funding, LLC, a Delaware limited liability company (together with its successors, assigns and transferees, the "Lender"), as lender; (ii) use Cash Collateral pursuant to section 363 of the Bankruptcy Code; (iii) grant DIP Facility Liens and a DIP Facility Superpriority Claim to the Lender as security for the repayment of the DIP Obligations; and (iv) grant Adequate Protection Liens to the Prepetition Agent, on behalf of the Prepetition Secured

---

[18]  Capitalized terms used but not otherwise defined in this description shall have the meanings ascribed to them in the Financing Motion.

Parties, to the extent that there is any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the pendency of the Chapter 11 Cases.

143.     Pursuant to the DIP Facility Agreement, the Lender has agreed to provide post-petition financing to the Debtors up to the aggregate principal amount of $127,200,000 (inclusive of up to $1,300,000 for post-petition financing to the Canadian Borrower).  The DIP Facility will be used to, among other things, cover anticipated administrative obligations of the Chapter 11 Cases. As discussed above, the Purchasers shall have the ability to credit bid all amounts outstanding under the DIP Facility in accordance with the terms of the Stalking Horse Agreement.

### (i)       *Negotiations and Need for Post-Petition Financing*

144.     As demonstrated by the Budget, the Debtors do not have sufficient available sources of working capital, including Cash Collateral, to operate in the ordinary course of business without the financing requested in the Financing Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of their estates for the benefit of all creditors of the Debtors.  Moreover, the ability of the Debtors to obtain sufficient working capital and liquidity through the proposed DIP Facility is vital to the preservation and maintenance of the going concern value of the Debtors.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates.

145.     Prior to the Petition Date, the Debtors and the Lender engaged in extensive, arm's-length negotiations with respect to the terms and conditions of the DIP Facility

Agreement.  Despite their efforts, the Debtors were unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets.  Indeed, the Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the Lender pursuant to the DIP Facility Agreement.  As such, the Debtors are seeking approval of the DIP Facility as set forth in the DIP Facility Agreement.

146.    In connection with the DIP Facility, the Debtors and the Lender have agreed upon a 6-week Budget.  Based upon (i) certain assumptions regarding the effect that the filing of the Chapter 11 Cases will have on the business, made with the assistance of various professionals retained to advise the Debtors in connection with their bankruptcy filing, and (ii) the projections provided by such professionals regarding the professional fees to be incurred in connection with the Chapter 11 Cases, I believe that the Budget is achievable and will allow the Debtors to operate and pay their post-petition obligations as they mature.

### (ii)      Use of Cash Collateral and Proposed Adequate Protection

147.    Under the terms of the DIP Facility Agreement, the Debtors require the use of the Cash Collateral of the Prepetition Secured Parties.  The Cash Collateral (other than proceeds of the DIP Facility prior to entry of the Final Order) and other proceeds from any Prepetition Collateral will be used to reduce the Prepetition Obligations, and the Debtors shall apply all such collateral to reduce such obligations on a permanent basis until repaid in full.  After the payment of the Prepetition Obligations in full, or after an Event of Default as determined by the Lender, all Cash Collateral shall be applied to the DIP Obligations pursuant to the terms of the DIP

Facility Agreement. The Prepetition Lenders have consented to the Debtors' use of Cash Collateral on the terms described in the DIP Facility Agreement and the Interim Order.

### (iii) *The DIP Facility Should be Authorized*

148. The terms and conditions of the DIP Facility Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arm's-length. Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including post-petition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtors will be forced to cease operations, which would likely (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to maximize value. The credit provided under the DIP Facility Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees, and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders. The availability of credit under the DIP Facility Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Facility Agreement will be viewed favorably by the Debtors' vendors, employees, and customers, thereby promoting a successful resolution of these Chapter 11 Cases. Accordingly, the timely approval of the relief requested in the Financing Motion is imperative.

## CONCLUSION

149. To preserve the value of their business to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these Chapter 11 Cases by minimizing any adverse impact of the chapter 11 filings on the Debtors'

operations.  For the reasons described herein, in the Bialowons Declaration and in the First Day

Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and

other stakeholders will be substantially enhanced if this Court grants the relief requested in each

of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:   April 18, 2011

_____
Michael Wilhelm
Chief Financial Officer of the Debtors