# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| Böwe Systec, Inc., <u>et al.</u>,[1] | ) ) ) | Case No. 11-_____ (_____) |
| Debtors. | ) ) ) | Joint Administration Requested |

## DECLARATION OF OLIVER BIALOWONS
## IN SUPPORT OF FIRST DAY MOTIONS

I, Oliver Bialowons, being fully sworn, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the Chairman of the Board of Directors for each of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"). I became the Chief Executive Officer of Böwe Systec AG ("<u>Böwe Systec</u>"), the Debtors' ultimate parent, in January 2009, and shortly thereafter was appointed as Chairman of the Board for each of the Debtors. Since becoming Chairman of the Board, I have spent between fifty-five (55) and seventy (70) hours per week working on matters relating to the Debtors. Additionally, I have been retained as a consultant to assist in the operation and management of the Debtors pursuant to a Services Agreement dated as of May 17, 2010 (the "<u>Bialowons Agreement</u>"). I am familiar with the Debtors' day-to-day operations, financial condition, books and records, and business affairs, as well as the events leading up to the filing of these cases and the Debtors' entry into the Stalking Horse Agreement (as defined herein).

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Böwe Systec, Inc. (1423), Böwe Bell + Howell Holdings, Inc. (9926), BBH, Inc. (9928), Böwe Bell + Howell Company (0100), Böwe Bell + Howell Postal Systems Company (4944), BCC Software, Inc. (3481) and Böwe Bell + Howell International Ltd. (0001). The debtors' corporate offices are located at 760 S. Wolf Road, Wheeling, IL 60090.

2. On April 18, 2011 (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

3. To minimize any adverse effects on their business as a result of the commencement of the Chapter 11 Cases, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief, among other things, to: (a) continue the Debtors' operations while in chapter 11 with as little disruption as possible; (b) maintain the confidence and support of key constituencies; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases.

4. Contemporaneously with the filing of the First Day Motions, the Debtors filed the *Declaration of Michael Wilhelm in Support of the First Day Motions* (the "Wilhelm Declaration"). I submit this Declaration in further support of the First Day Motions and to provide additional background regarding the events leading to the filing of the Chapter 11 Cases, the Debtors' entry into the Stalking Horse Agreement and the related sale of substantially all of the Debtors' assets. Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

## GENERAL BACKGROUND

A.  **Overview of the Debtors' Business**

5.  The Debtors are one of two leaders nationally in high volume production mail solutions, offering a combination of hardware, services and software to high volume mailers worldwide including financial and insurance firms, government agencies, services bureaus, utilities, and direct-mail firms and others. As a result of the Debtors' unique offering of products and services, the Debtors are well-positioned to satisfy a broad range of complex mailing needs for its global customer base. Due to the large base of installed equipment, a significant percentage of the Debtors' revenues are derived from the sale of recurring, high margin services and software.

6.  The Debtors' offerings can be broken into three key segments: (i) hardware; (ii) services; and (iii) software. In most instances, the company provides its client base with a combination of all three segments as part of an overall mail solution.

   a)  <u>Hardware</u>. The Debtors offer high end, fully integrated inserting and sorting solutions. With over 9,000 machines installed, the Debtors are the second largest installer of such equipment in the industry. The inserter line is designed for large mailers who need to customize mass mailings to clients or prospects. The inserter line allows clients to take printed statements, bills or other updates and insert them along with various flyers, mailers and product promotions to be mailed to targeted recipients. The Debtors also offer product reconditioning services whereby the company is able to leverage a client's existing equipment or procure other machines to be reconditioned from third parties. The Debtors analyze and implement the installed solutions, upgrading the performance of a client's operations to the Debtors' product standards. Additionally, the Debtors are the leader in the U.S. presort market, whereby service bureaus and other large corporate mailers purchase the Debtors' sorters to meet

3

the requirements of the U.S. Postal Service (the "USPS") for postage discounts. Mailers receive these discounts by preparing mail with current and correct addresses in the form of a barcode, or modified address and providing the USPS with sorted trays that can be injected directly into the USPS' delivery network.

        b)      Services. The Debtors provide a wide variety of on-site services designed to ensure that a client's mail operations run efficiently. The Debtors' service revenues are generated by Preventative Maintenance Agreements (a "PMA"), field change orders, part sales, and time and material billings. The Debtors' service contracts are purchased periodically by customers of installed hardware for product support after the warranty support period expires. These contracts are typically structured as PMAs, annual maintenance agreements that entitle a client to a set level of services. These renewable maintenance and service agreements provide a steady source of revenue for the Debtors and represent approximately $160 million of the company's $248 million in annual revenue. The Debtors' business model depends on the revenues, mostly prepaid, from these annual maintenance agreements. The Debtors' customer base includes numerous utility and credit card companies, governmental agencies, banks and others that depend on the Debtors' equipment to generate billions of dollars worth of accounts receivable (through the issuance of billing statements) on a daily basis. Accordingly, customers need the Debtors' equipment to function properly at all times, which requires the Debtors to respond quickly and responsibly when maintenance issues arise.

        c)      Software. The Debtors also provide a number of software offerings which help clients manage their mail operations as well as offer specific solutions that improve the accuracy of customers' mailing lists, ensuring data integrity and accuracy and lowering postage costs.

4

7. The Debtors are headquartered in Wheeling, Illinois and also have major U.S. manufacturing and service locations in Durham, North Carolina and Bethlehem, Pennsylvania. Additionally, the Debtors have one of the industries' largest nationwide service networks of strategically located service technicians, operating in almost every state and allowing the Debtors to rapidly respond to client service demands.

B. **The Debtors' Corporate Structure**

8. The Debtors' history dates back to 1936 when the founder of what would later become Bell + Howell invented, patented and produced the first automated mail inserting machine. In 2003, Bell + Howell was acquired by Böwe Systec, a German competitor of Bell + Howell, thereby combining their North American mailing operations and changing the name of Bell + Howell to "Böwe Bell + Howell". The Debtors are each direct or indirect subsidiaries of Böwe Systec.

9. In May 2010, Böwe Systec commenced an insolvency proceeding in Germany and, as a consequence, Böwe Systec's North American distribution agreements with the Debtors were voided (the significance of which is discussed herein). On September 2, 2010, the administrator appointed in the German insolvency proceeding agreed to sell substantially all of Böwe Systec's assets to a Swiss private equity firm, Axentum Capital AG. When Axentum Capital AG was unable to complete the transaction, the administrator regained control of the assets (forming BS GmbH) and subsequently sold the assets to the Possehl Group. The Debtors were not parties to the German insolvency proceeding, nor were they involved in the transaction with the Possehl Group.

C. **The Canadian Ancillary Proceeding**

10. Following the filing of these Chapter 11 Cases, Debtor Böwe Bell + Howell International Ltd. ("BBH Canada"), BBH's Canadian subsidiary, intends to commence an

5
RLF1 3804786v. 6

ancillary proceeding (the "Ancillary Proceeding") under Part IV of the *Companies' Creditors Arrangement Act* in the Ontario Superior Court of Justice (Commercial List) (the "Ontario Court"). BBH Canada, as the proposed foreign representative for the Debtors in the Canadian Proceeding, intends to seek recognition of the Chapter 11 Cases and certain orders entered in the Chapter 11 Cases. PricewaterhouseCoopers Inc. is the proposed court-appointed Information Officer in the Canadian Proceeding.

11. The Debtors function as an integrated North American business, with facilities strategically located to cover the various regions in which the Debtors operate. As part of this overall business model, BBH Canada was created for purposes of contracting with the Debtors' Canadian customers, providing facilities for the Debtors' Canadian salespeople and service technicians and issuing payroll to these Canadian employees (approximately 117 of the Debtors' over 1600 employees). BBH Canada accounts for less than eight (8) percent of the company's overall revenue. While the Debtors have two facilities in Canada (Waterloo, Ontario and Richmond Hill, Ontario), BBH Canada is very much dependent on the Debtors' U.S. operations for all decision-making and administrative functions. Indeed, all members of the Debtors' management are located at the Debtors' corporate headquarters in Wheeling, Illinois.[2] BBH Canada does not have its own independent infrastructure and depends on the U.S. entities to provide such services. More specifically, all human resource, legal, accounting/finance and other administrative functions associated with the company and all employees that perform such services (with the exception of the Canadian Finance Director) are located in the U.S. In addition, all IT functions, which, among other things, are used to issue invoices, are provided out

---

[2] BBH Canada does have a director of finance (the "Canadian Finance Director") who operates out of BBH Canada's Richmond Hill, Ontario facility. The Canadian Director of Finance, however, reports to and takes direction from the Debtors' Chief Financial Officer, Michael Wilhelm, who is located at the Debtors' corporate headquarters in Wheeling, Illinois.

of the U.S.  Accordingly, the Debtos' "centre of main interest" is in the U.S.  It is for this reason that the Debtors believe that commencement of the Ancillary Proceeding is appropriate and that it is unnecessary to have a separate plenary proceeding in Canada for BBH Canada.

D.    **The Debtors' Capital and Debt Structure**

12.    As of the Petition Date, Debtor BBH, Inc. ("BBH") was a borrower under that certain Credit Agreement dated as of September 25, 2003 (the "Original Credit Agreement") by and between BBH, Harris N.A., a national banking association ("Harris" or the "Agent"), as Issuing Lender and Agent (as defined in the Original Credit Agreement), and the financial institutions that were or became lenders thereunder (the "Prepetition Lenders").  The Original Credit Agreement provided BBH with (i) a term loan in the maximum principal amount of $50 million (the "Prepetition Term Loan"); and (ii) a revolving loan in the maximum principal amount of $50 million (the "Prepetition Revolving Loan", and together with the Prepetition Term Loan, the "Prepetition Facility"), subject to borrowing base limitations, and less the amount outstanding under any Letters of Credit and the outstanding principal amount of any Swing Loans (as defined under the Original Credit Agreement).  The aggregate amount of the Prepetition Term Loan was subsequently increased in July 2004 to $150 million so that approximately $45 million could be paid to Böwe Systec on account of a preferred stock redemption.  BBH's obligations under the Prepetition Facility are secured by substantially all of its assets, with each of the other Debtors (other than Böwe Bell + Howell International Ltd., the Debtors' Canadian affiliate) guarantying BBH's obligations thereunder.

13.    Pursuant to the terms of the Original Credit Agreement, the Prepetition Revolving Loan was to expire by its terms on September 30, 2009.  All other obligations under the Prepetition Facility, including the Prepetition Term Loan, were to become due and owing on September 30, 2010.  The parties initially entered into discussions regarding an amendment that

7

would have extended the maturity date for the Prepetition Revolving Loan to September 30, 2010, consistent with the balance of the Prepetition Facility, but were unable to obtain the unanimous consent of all lenders under the Prepetition Term Loan to such an extension. As a result, the parties entered into that certain Amended and Restated Credit Agreement dated as of November 23, 2009 (the "Amended and Restated Credit Agreement"), which, inter alia, (i) restated the Original Credit Agreement, as amended, in its entirety, (ii) increased the interest rate provided thereunder, (iii) fixed the stated maturity date for all obligations under the Prepetition Facility as June 30, 2010 (thereby extending the term of the Prepetition Revolving Loan by nine months, but accelerating the maturity date for all other obligations under the Original Credit Agreement), (iv) reduced the Prepetition Revolving Loan to $35 million and (v) imposed certain additional affirmative covenants on the company relating to the raising of additional capital.

14. For the reasons discussed below, BBH was unable to repay or refinance the Prepetition Facility on or before the June 30, 2010 maturity date. While this constituted an event of default under the terms of the Amended and Restated Credit Agreement, the Prepetition Lenders have permitted the company to continue using cash collateral since such time. While the parties attempted to negotiate a standard forbearance agreement, such efforts have been unsuccessful. Accordingly, there is no forbearance agreement currently in place and the Debtors remain subject to immediate remedial action by the Prepetition Lenders.

15. In March 2011, Versa Capital Management, Inc. ("Versa"), a private equity firm with an interest in acquiring the Debtors or their assets, began purchasing the secured claims of certain of the Prepetition Lenders. As of the Petition Date, Versa had control over approximately sixty (60) percent of the outstanding debt under the Prepetition Facility and had acquired the balance of the Prepetition Facility subject to confirmed trades which are in the process of

8

closing. As of the Petition Date, there was an aggregate amount of not less than $121 million outstanding under the Prepetition Facility.

E.   **Events Leading to Chapter 11 Cases**

16.   Following its acquisition of Bell + Howell (the predecessor to BBH) in 2003, Böwe Systec replaced the then current Chief Executive Officer of Bell + Howell, George Marton, with a new Chief Executive Officer designated by Böwe Systec and directed BBH to implement a product strategy that ultimately proved flawed, because it misaligned the BBH product offerings with the requirements of Bell + Howell's diverse customer base. The new product strategy moved BBH away from its broad, market driven product offering, to a model by which BBH became a distribution channel for Böwe Systec's high-end product offering that was engineered with the more highly regulated European mail standards in mind and manufactured in the higher cost environment of Augsburg, Germany. This new strategy resulted in, among other things, (i) BBH being largely limited to the distribution of Böwe Systec manufactured inserting products, which increased Böwe Systec's manufacturing production in Germany but inhibited BBH's ability to compete in the U.S. market; (ii) a loss of lucrative PMA renewals and margins; (iii) new BBH technology such as Gemini (a mid-range inserter) to be discontinued and the Combo and Mercury (a high speed inserter) to be shelved; and (iv) the integration of costly Böwe Systec technology in all new products developed by BBH at the expense of user acceptance and margin. This overall strategy proved ineffective at meeting the needs of BBH's customers, and the company found its dominant market share eroding to competitors. Moreover, as discussed below, this new reliance on Böwe Systec manufactured products and parts made BBH (and its ability to maintain customers) even more susceptible to the effects of Böwe Systec's insolvency proceeding. Further, the global recession that began in 2008 caused a number of high volume mailers to defer capital expenditure projects resulting in a decline in

9

hardware sales for BBH.

17. In early 2009, Böwe Systec brought me in to replace their current Chief Executive Officer. One of my first actions was to bring back George Marton, as Chief Executive Officer of BBH, to help stabilize the business and refocus BBH on its core long-term strategy of providing comprehensive mailing solutions composing of mailing equipment, services and software as well as capitalizing on BBH's large installed base of equipment. Acting together, Mr. Marton and I were able to initiate a number of cost cutting measures to right size the company's cost structure, consolidate operations and enhance its product line to better satisfy current market needs. Indeed, these efforts enabled the Debtors to (i) reduce the principal amount outstanding under the Prepetition Facility from $122 million at the end of 2008 to $100 million on June 30, 2010 (when the Amended and Restated Credit Agreement expired);[3] (ii) raise 2009 EBIDTA to $19.7 million from $14.7 million in 2008; (iii) reduce support costs structure by $15 million in 2009; and (iv) reduce inventories from $56 million to $49 million. Indeed, by August 2009, the Debtors began to experience an increase in incoming orders when compared to the same time periods for the previous year. Notwithstanding these results, numerous factors, including the commencement of the Böwe Systec insolvency proceeding, impeded the Debtors' ability to refinance the Prepetition Facility, in a manner acceptable to the Agent, in advance of the June 30, 2010 maturity date.

F. **Efforts to Refinance Prepetition Facility/Market the Debtors' Assets**

18. As discussed above, the Amended and Restated Credit Agreement fixed the maturity date as June 30, 2010 and imposed certain affirmative covenants upon the company relating to a refinancing of the Prepetition Facility. Among other things, Section 2.9 of the

---

[3] In total, the Debtors have paid down approximately $50 million under the Prepetition Facility since the Original Credit Agreement was amended in July 2004 to increase the amount of the facility to $150 million.

Amended and Restated Credit Agreement required the company to select and engage an investment banker acceptable to the Agent to raise capital (in the form of equity, debt or a combination thereof) with the proceeds thereof going to pay off the outstanding obligations under the Prepetition Facility. Moreover, Section 2.8 of the Amended and Restated Credit Agreement provided that, in the event that BBH failed to deliver one or more written letters of intent for capital by April 30, 2010, the company retain a Chief Restructuring Officer acceptable to the Agent to review the company's business plan and capital raising efforts.

19. In accordance with the Amended and Restated Credit Agreement, the Debtors retained Lazard Middle Market LLC ("LMM") to, among other things, assist the company in identifying prospective financing sources to refinance the Prepetition Facility, including either through a private placement/issuance of debt or equities securities of the company or through loans from banks or other ordinary course lenders. At approximately the same time, I engaged bankers in Europe to seek a refinancing or sale of the entire Böwe Systec group, including the Debtors. Management for the Debtors also undertook a concerted effort to identify and encourage potential strategic buyers to invest in BBH or to buy its stock, assets or debt.

20. LMM's initial efforts focused on a refinancing of the debt or equity contribution which would not result in a change in control. By April 2010, LMM notified the Debtors' Board that it would be unable to refinance the secured debt without offering at least a majority of the equity and providing more assurance to potential buyers of management continuity. The Board then authorized LMM to expand its efforts to include a search for refinancing options which would include an equity contribution that would shift the majority ownership in the company. In addition, the Board authorized BBH to amend the Services Agreement with Mr. Marton to provide for a longer term and to enter into the Bialowons Agreement to assure potential

11

purchasers of my continuing help and support. LMM then sent out a teaser and related materials to over 340 parties, including potential lenders and debt and equity investors, inviting them to purchase a control position in BBH (which could include the sale of up to 100% of the stock).

21. Several events, however, transpired during this period that thwarted the company's efforts to refinance the Prepetition Facility. The primary factor was the commencement of Böwe Systec's European insolvency, which resulted in an immediate cessation in the sale of Böwe Systec products and the loss of certain distribution arrangements between the Debtors and their German parent. As discussed above, the Debtors' renewable maintenance and service agreements represent approximately 65 percent of the company's annual revenue. The Debtors' high-speed inserter line consists entirely of Böwe Systec manufactured products and their other product lines all contain Böwe Systec modules. Accordingly, the Debtors rely on the provision of Böwe Systec parts to comply with their service obligations under the annual maintenance agreements, and thereby avoid the large penalties contemplated thereunder. Although Böwe Systec has resumed providing parts, after a 2-3 month lapse when parts were not available, to the Debtors (including after the sale to the Possehl Group), the absence of any agreement has created customer and investor confidence issues as parties began to question the long-term viability of the Debtors and assume that they would commence their own bankruptcy cases. Given the renewable nature of the PMAs, this loss in consumer confidence has significantly affected the Debtors' business and thereby created uncertainty amongst potential investors and purchasers.

22. Second, the company also found itself in the midst of a global recession that resulted in a tightening of the credit markets during the first quarter of 2009. Third, the Postmaster General issued a forecast in March 2010 that predicted a decline in mail volume,

thereby causing many prospective investors to take a "wait and see" approach to a potential investment. Fourth, the maturity date under the Amended and Restated Credit Agreement caused the Debtors to conduct their refinancing efforts during a period when their working capital needs (and therefore borrowings under the Prepetition Revolving Loan) were at their greatest. The Debtors' business is cyclical in nature with a large part of their revenues being received in the first quarter as customers renew their annual maintenance agreements. Accordingly, an examination of the Debtors' business in the second quarter (and closer to the June 30, 2010 termination date) would lead to an analysis during a period of low cash generation, thereby causing investors to overestimate the going-forward capital needs of the business. Notwithstanding these impediments, by late May 2010, BBH had received several offers to purchase substantially all (but less than 100%) of the equity in the company through the infusion of new capital. None of these proposals were sufficient to pay the amounts outstanding under the Prepetition Facility in full and therefore were not acceptable to the Prepetition Lenders.

23. Beginning on July 1, 2010, following the maturity date under the Amended and Restated Credit Agreement, the Prepetition Lenders began placing greater oversight on the Debtors' use of cash collateral, and caused the Debtors to abandon all efforts to refinance the Prepetition Facility and to focus on a sale of the Debtors' assets. In furtherance of such strategy, the Debtors and LMM entered into a revised engagement letter expanding LMM's retention to include the provision of general restructuring advice, including advising the company in connection with any restructuring and/or sale of the Debtors' assets. In addition, the company independently contacted a number of prospective purchasers, including parties which had at one time engaged Böwe Systec, either before or after the commencement of the German proceeding, in connection with the European process to sell its assets.

24. As a result of their prepetition marketing efforts, the Debtors identified four prospective purchasers of the Debtors' assets. Since early October, the Agent was involved in direct negotiations with one of these parties, a strategic purchaser known to management to the Debtors for many years and with whom management commenced a dialogue with in November 2009, with the goal of negotiating a binding asset purchase agreement. While the Agent assumed the lead role in negotiating with this strategic purchaser, the Debtors made every effort to involve themselves in the process and remained informed regarding the status of the negotiations and the terms of the proposed transaction. Likewise, the Debtors remained responsive to all due diligence/informational requests and did everything possible to support a transaction with this potential purchaser. The Debtors, however, became frustrated with these negotiations as several months passed with little progress on certain outstanding deal issues (many of which are basic to any transaction) that prevented an agreement from being finalized.

25. While remaining supportive of a potential transaction with this strategic purchaser, the Debtors determined that it was necessary to reopen discussions with other interested parties with the goal of entering into a definitive stalking horse agreement with the best available bid for the Debtors' assets and initiating a full, fair and open competitive auction process under the supervision of this Court. Indeed, given the uncertainty caused by Böwe Systec's insolvency proceeding, the general state of the economy and the Debtors' poor liquidity situation, the Debtors believe that the value of their business may likely continue to decline until a sale is consummated. Accordingly, in early January 2011, the Debtors reopened discussions with several prospective purchasers, including extensive negotiations with Versa and another interested financial buyer, regarding a potential sale of substantially all of the Debtors' assets.

### G. Proposed Sale of the Debtors' Assets

26. As discussed above, in March 2011, Versa began acquiring secured debt under the Prepetition Facility from certain of the Prepetition Lenders. As of the Petition Date, Versa had control over approximately sixty (60) percent of the secured debt under the Prepetition Facility and has acquired the balance of the Prepetition Facility pursuant to confirmed trades which are in the process of closing, with the intention of submitting a credit bid for the Debtors' assets pursuant to section 363(k) of the Bankruptcy Code.

27. On April 18, 2011, the Debtors and Contrado BBH Funding, LLC (the "U.S. Purchaser") and a Canadian corporation to be formed prior to closing (the "Foreign Purchaser", and together with the U.S. Purchaser, the "Purchasers"), each wholly owned subsidiaries of Versa, entered into that certain Asset Purchase Agreement (the "Stalking Horse Agreement") whereby the Purchasers agreed to purchase substantially all of the Debtors' assets. Pursuant to the terms of the Stalking Horse Agreement, the aggregate consideration for the Debtors' assets shall include (i) a credit bid[4] consisting of amounts outstanding under the DIP Facility (as defined herein) and the Prepetition Facility, (ii) cash in the amount of 302,000 (Canadian currency) attributable to the assets of BBH Canada, (iii) the payment of all cure amounts relating to any contracts and leases to be assigned in connection with the transaction and (iv) the assumption of certain liabilities. The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids.

---

[4] The "Credit Bid Amount" shall consist of the sum of (x) the U.S. Bid Amount of $80 million, plus (y) the Canadian Bid Amount. Capitalized terms not otherwise defined herein shall have the meanings given to them in the Stalking Horse Agreement.

15

RLF1 3804786v. 6

28. The Debtors will be filing a motion (the "Sale Motion") on or about the Petition Date seeking, inter alia, (i) the entry of an order (a) establishing bidding and auction procedures (the "Bidding Procedures") in connection with the sale of the Debtors' assets, (b) approving proposed bid protections, including the payment of a reasonable break-up fee and actual and reasonable out of pocket legal and other fees and expenses, (c) scheduling an auction (the "Auction") and setting a date and time for the sale hearing (the "Sale Hearing") and (d) establishing procedures for noticing and determining cure amounts for contracts and leases to be assumed and assigned in connection with the sale transaction; and (ii) at the Sale Hearing, subject to the results of the Auction, the entry of an order (a) approving and authorizing a sale to the successful bidder, (b) authorizing the assumption and assignment of certain contracts and leases, (c) establishing assumption and rejection procedures relating to the post-closing assumption or rejection for certain additional contracts and leases and (d) extending the Debtors' deadline by which the Debtors must assume or reject real property leases.

29. Consistent with the Stalking Horse Agreement, the Sale Motion proposes the following timeline:

| ACTION | DEADLINE |
| --- | --- |
| Bidding Procedures Hearing | May 4, 2011 |
| Bid Deadline | May 26, 2011 |
| Auction | May 31, 2011 |
| Sale Hearing | June 2, 2011 |
| Consummation of Sale | June 8, 2011 |

The Bidding Procedures, including the proposed timeline, are designed to maximize the value received for the Debtors' assets and to facilitate a fair and open process in which all interested bidders may participate.

RLF1 3804786v. 6

**H.    The DIP Facility**

30.    In connection with the Chapter 11 Cases, BBH (the "U.S. Borrower") and BBH Canada (the "Canadian Borrower"), as borrowers, and each of the other Debtors, as guarantors, and Contrado BBH Investments, LLC ("Contrado"), a wholly-owned subsidiary of Versa, and one or more additional lenders party from time to time (together with Contrado, the "DIP Facility Lenders") have entered into that certain Senior Secured, Super-Priority Debtor-in-Possession Credit and Guaranty Agreement, dated as of April 18, 2011 (the "DIP Facility Agreement"). Pursuant to the DIP Facility Agreement, the DIP Facility Lenders have agreed to provide postpetition financing up to the aggregate principal amount of $127.2 million (inclusive of up to $1.3 million for postpetition financing by the Canadian Borrower) (the "DIP Facility").[5] The DIP Facility will be used to, among other things, provide the Debtors with adequate working capital and to cover any administrative obligations incurred during the course of the Chapter 11 Cases. As discussed above, the Purchasers shall have the ability to credit bid all amounts outstanding under the DIP Facility in accordance with the terms of the Stalking Horse Agreement.

## CONCLUSION

31.    To preserve the value of their business through the sale process, the Debtors' immediate objective is to maintain "business as usual" following the commencement of these Chapter 11 Cases by minimizing any adverse impact of the chapter 11 filings on the Debtors' operations. For the reasons described herein, in the First Day Motions and the Wilhelm Declaration, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Court grants the relief requested in

---

[5] Subject to the entry of a final DIP financing order, the Debtors propose to use a portion of the DIP Facility to pay in full, in cash, the remaining balance outstanding under the Prepetition Facility.

each of the First Day Motions. Moreover, I believe that the relief requested in the Sale Motion, including the proposed timeline for conducting the sale, is necessary to run a fair and open sale process and to maximize the value obtained for all stakeholders in these Chapter 11 Cases.

[Remainder of page intentionally left blank]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 18, 2011

_____
Oliver Bialowons
Chairman of the Board of Directors for each of
the Debtors and Debtors in Possession

RLF1 3804786v. 6