# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Böwe Systec, Inc., <u>et al.</u>,**[1] | ) | **Case No. 11-_____ (_____)** |
| | ) | |
| **Debtors.** | ) | **Joint Administration Requested** |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (I) CONTINUE USING EXISTING CENTRALIZED CASH MANAGEMENT SYSTEM, AS MODIFIED, (II) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE OF THE CASH MANAGEMENT SYSTEM, AND (III) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS

The above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>") hereby file this motion (the "<u>Motion</u>") for entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, (a) authorizing the Debtors to continue use of their existing cash management system, bank accounts and business forms and (b) extending the Debtors' time to comply with section 345(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532. In support of this Motion, the Debtors rely upon (i) the *Declaration of Michael Wilhelm in Support of First Day Motions* (the "<u>Wilhelm Declaration</u>") and (ii) the *Declaration of Oliver Bialowons in Support of First Day Motions* (the "<u>Bialowons Declaration</u>" and, together with the Wilhelm Declaration, the "<u>First Day Declarations</u>"), each filed contemporaneously herewith, and further respectfully state as follows:

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Böwe Systec, Inc. (1423), Böwe Bell + Howell Holdings, Inc. (9926), BBH, Inc. (9928), Böwe Bell + Howell Company (0100), Böwe Bell + Howell Postal Systems Company (4944), BCC Software, Inc. (3481) and Böwe Bell + Howell International Ltd. (0001). The debtors' corporate offices are located at 760 S. Wolf Road, Wheeling, IL 60090.

## JURISDICTION

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 345, 363, 1107(a) and 1108 of the Bankruptcy Code and Rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

**A.    The Chapter 11 Cases and Ancillary Proceeding**

3.      On April 18, 2011, the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.      Following the filing of the Chapter 11 Cases, Debtor Böwe Bell + Howell International Ltd. ("BBH Canada"), BBH's Canadian subsidiary, intends to commence an ancillary proceeding (the "Ancillary Proceeding") under Part IV of the *Companies' Creditors Arrangement Act* in the Ontario Superior Court of Justice (Commercial List). BBH Canada, as the proposed foreign representative for the Debtors in the Ancillary Proceeding, intends to seek recognition of these Chapter 11 Cases and certain orders entered in the Chapter 11 Cases. PricewaterhouseCoopers Inc. is the proposed court-appointed Information Officer in the Ancillary Proceeding.

5.      The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No

trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

B.     **Overview of the Debtors' Business**

6.     The Debtors are one of two leaders nationally in high volume production mail solutions, offering a combination of hardware, services and software to high volume mailers worldwide including financial and insurance firms, government agencies, services bureaus, utilities, and direct-mail firms and others.  As a result of the Debtors' unique offering of products and services, the Debtors are well-positioned to satisfy a broad range of complex mailing needs for their global customer base.  Due to the large base of installed equipment, a significant percentage of the Debtors' revenues are derived from the sale of recurring, high margin services and software.

7.     The Debtors' offerings can be broken into three key segments:  (i) hardware; (ii) services; and (iii) software.  In most instances, the company provides its client base with a combination of all three segments as part of an overall mail solution.

a)     <u>Hardware</u>.  The Debtors offer high end, fully integrated inserting and sorting solutions.  With over 9,000 machines installed, the Debtors are the second largest installer of such equipment in the industry.  The inserter line is designed for large mailers who need to customize mass mailings to clients or prospects.  The inserter line allows clients to take printed statements, bills or other updates and insert them along with various flyers, mailers and product promotions to be mailed to targeted recipients.  The Debtors also offer product reconditioning services whereby the company is able to leverage a client's existing equipment or procure other machines to be reconditioned from third parties.  The Debtors analyze and implement the installed solutions, upgrading the performance of a client's operations to the Debtors' product standards.  Additionally, the Debtors are the leader in the U.S. presort market, whereby service bureaus and other large corporate mailers purchase the Debtors' sorters to meet

3

the requirements of the U.S. Postal Service (the "USPS") for postage discounts.  Mailers receive these discounts by preparing mail with current and correct addresses in the form of a barcode, or modified address and providing the USPS with sorted trays that can be injected directly into the USPS' delivery network.

      b)     Services.  The Debtors provide a wide variety of on-site services designed to ensure that a client's mail operations run efficiently.  The Debtors' service revenues are generated by Preventative Maintenance Agreements (a "PMA"), field change orders, part sales, and time and material billings.  The Debtors' service contracts are purchased periodically by customers of installed hardware for product support after the warranty support period expires. These contracts are typically structured as PMAs, annual maintenance agreements that entitle a client to a set level of services.  These renewable maintenance and service agreements provide a steady source of revenue for the Debtors and represent approximately $160 million of the company's $248 million in annual revenue.  The Debtors' business model depends on the revenues, mostly prepaid, from these annual maintenance agreements.  The Debtors' customer base includes numerous utility and credit card companies, governmental agencies, banks and others that depend on the Debtors' equipment to generate billions of dollars worth of accounts receivable (through the issuance of billing statements) on a daily basis.  Accordingly, customers need the Debtors' equipment to function properly at all times, which requires the Debtors to respond quickly and responsibly when maintenance issues arise.

      c)     Software.  The Debtors also provide a number of software offerings which help clients manage their mail operations as well as offer specific solutions that improve the accuracy of customers' mailing lists, ensuring data integrity and accuracy and lowering postage costs.

8. The Debtors are headquartered in Wheeling, Illinois and also have major U.S. manufacturing and service locations in Durham, North Carolina and Bethlehem, Pennsylvania. Additionally, the Debtors have one of the industries' largest nationwide service networks of strategically located service technicians, operating in almost every state and allowing the Debtors to rapidly respond to client service demands.

## C. The Debtors' Corporate Structure

9. The Debtors' history dates back to 1936 when the founder of what would later become Bell + Howell invented, patented and produced the first automated mail inserting machine. In 2003, Bell + Howell was acquired by Böwe Systec AG ("Böwe Systec"), a German competitor of Bell + Howell, thereby combining their North American mailing operations and changing the name of Bell + Howell to "Böwe Bell + Howell". The Debtors are each direct or indirect subsidiaries of Böwe Systec.

10. In May 2010, Böwe Systec commenced an insolvency proceeding in Germany and, as a consequence, Böwe Systec's North American distribution agreements with the Debtors were voided. On September 2, 2010, the administrator appointed in the German insolvency proceeding agreed to sell substantially all of Böwe Systec's assets to a Swiss private equity firm, Axentum Capital AG. When Axentum Capital AG was unable to complete the transaction, the administrator regained control of the assets (forming BS GmbH) and subsequently sold the assets to the Possehl Group. The Debtors were not parties to the German insolvency proceeding, nor were they involved in the transaction with the Possehl Group.

## D. The Debtors' Capital and Debt Structure

11. As of the Petition Date, Debtor BBH, Inc. ("BBH") was a borrower under that certain Credit Agreement dated as of September 25, 2003 (the "Original Credit Agreement") by and between BBH, Harris N.A., a national banking association ("Harris" or the "Agent"), as

5

Issuing Lender and Agent (as defined in the Original Credit Agreement), and the financial institutions that were or became lenders thereunder (the "Prepetition Lenders"). The Original Credit Agreement provided BBH with (i) a term loan in the maximum principal amount of $50 million (the "Prepetition Term Loan"); and (ii) a revolving loan in the maximum principal amount of $50 million (the "Prepetition Revolving Loan", and together with the Prepetition Term Loan, the "Prepetition Facility"), subject to borrowing base limitations, and less the amount outstanding under any Letters of Credit and the outstanding principal amount of any Swing Loans (as defined under the Original Credit Agreement). The aggregate amount of the Prepetition Term Loan was subsequently increased in July 2004 to $150 million so that approximately $45 million could be paid to Böwe Systec on account of a preferred stock redemption. BBH's obligations under the Prepetition Facility are secured by substantially all of its assets, with each of the other Debtors (other than BBH Canada) guarantying BBH's obligations thereunder.

12. Pursuant to the terms of the Original Credit Agreement, the Prepetition Revolving Loan was to expire by its terms on September 30, 2009. All other obligations under the Prepetition Facility, including the Prepetition Term Loan, were to become due and owing on September 30, 2010. The parties initially entered into discussions regarding an amendment that would have extended the maturity date for the Prepetition Revolving Loan to September 30, 2010, consistent with the balance of the Prepetition Facility, but were unable to obtain the unanimous consent of all lenders under the Prepetition Term Loan to such an extension. As a result, the parties entered into that certain Amended and Restated Credit Agreement dated as of November 23, 2009 (the "Amended and Restated Credit Agreement"), which, inter alia, (i) restated the Original Credit Agreement, as amended, in its entirety, (ii) increased the interest rate

provided thereunder, (iii) fixed the stated maturity date for all obligations under the Prepetition Facility as June 30, 2010 (thereby extending the term of the Prepetition Revolving Loan by nine months, but accelerating the maturity date for all other obligations under the Original Credit Agreement), (iv) reduced the Prepetition Revolving Loan to $35 million and (v) imposed certain additional affirmative covenants on the company relating to the raising of additional capital.

13. BBH was unable to repay or refinance the Prepetition Facility on or before the June 30, 2010 maturity date. While this constituted an event of default under the terms of the Amended and Restated Credit Agreement, the Prepetition Lenders have permitted the company to continue using cash collateral since such time. While the parties attempted to negotiate a standard forbearance agreement, such efforts have been unsuccessful. Accordingly, there is no forbearance agreement currently in place and the Debtors remain subject to immediate remedial action by the Prepetition Lenders.

14. In March 2011, Versa Capital Management, Inc. ("Versa"), a private equity firm with an interest in acquiring the Debtors or their assets, began purchasing the secured claims of certain of the Prepetition Lenders with the intention of submitting a credit bid for the Debtors' assets pursuant to section 363(k) of the Bankruptcy Code. As of the Petition Date, Versa had control over approximately sixty (60) percent of the outstanding debt under the Prepetition Facility and had acquired the balance of the Prepetition Facility subject to confirmed trades which are in the process of closing. As of the Petition Date, there was an aggregate amount of not less than $121 million outstanding under the Prepetition Facility.

**E. The Stalking Horse Agreement and Proposed Sale**

15. On April 18, 2011, the Debtors and Contrado BBH Funding, LLC (the "U.S. Purchaser") and a Canadian corporation to be formed prior to closing (the "Foreign Purchaser", and together with the U.S. Purchaser, the "Purchasers"), each wholly owned subsidiaries of

Versa, entered into that certain Asset Purchase Agreement (the "Stalking Horse Agreement") whereby the Purchasers agreed to purchase substantially all of the Debtors' assets. Pursuant to the terms of the Stalking Horse Agreement, the aggregate consideration for the Debtors' assets shall include (i) a credit bid[2] consisting of amounts outstanding under the DIP Facility (as defined herein) and the Prepetition Facility, (ii) cash in the amount of 302,000 (Canadian currency) attributable to the assets of BBH Canada, (iii) the payment of all cure amounts relating to any contracts and leases to be assigned in connection with the transaction and (iv) the assumption of certain liabilities. The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids. The Debtors will be filing a motion with the Court on or about the Petition Date seeking approval of certain bidding procedures in connection with an approximately forty-five (45) day sale process followed by approval of a sale of the Debtors' assets to the highest and best bidder as determined at an auction.

## F.     The DIP Facility

16.    In connection with the Chapter 11 Cases, BBH (the "U.S. Borrower") and BBH Canada (the "Canadian Borrower"), as borrowers, and each of the other Debtors, as guarantors, and Contrado BBH Investments, LLC ("Contrado"), a wholly-owned subsidiary of Versa, and one or more additional lenders party from time to time (together with Contrado, the "DIP Facility Lenders") have entered into that certain Senior Secured, Super-Priority Debtor-in-Possession Credit and Guaranty Agreement, dated as of April 18, 2011 (the "DIP Facility Agreement").

---

[2]    The "Credit Bid Amount" shall consist of the sum of (x) the U.S. Bid Amount of $80 million, plus (y) the Canadian Bid Amount. Capitalized terms not otherwise defined herein shall have the meanings given to them in the Stalking Horse Agreement.

Pursuant to the DIP Facility Agreement, the DIP Facility Lenders have agreed to provide postpetition financing up to the aggregate principal amount of $127.2 million (inclusive of up to $1.3 million for postpetition financing by the Canadian Borrower) (the "DIP Facility").[3] The DIP Facility will be used to, among other things, provide the Debtors with adequate working capital and to cover any administrative obligations incurred during the course of the Chapter 11 Cases. As discussed above, the Purchasers shall have the ability to credit bid all amounts outstanding under the DIP Facility in accordance with the terms of the Stalking Horse Agreement.

**G.      Description of the Debtors' Cash Management System**

17.      As set forth in the First Day Declarations, in the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect and disburse funds (collectively, the "Cash Management System").

18.      As set forth below, the continuation of the Cash Management System will not prejudice the rights of any party in interest, but rather will benefit all creditors by minimizing disruptions to the Debtors' businesses and by preserving the administrative savings which the Cash Management System currently provides. The Cash Management System provides a cost-effective and efficient means of managing the Debtors' finances, and maintenance of the Cash Management System will benefit all creditors by reducing the daily operating expenses of the Debtors' estates. Failure to continue the Cash Management System would disrupt the Debtors' operations and impose a financial and administrative burden on the estates.

---

[3]      Subject to entry of a final DIP financing order, the Debtors propose to use a portion of the DIP Facility to pay in full, in cash, the remaining balance outstanding under the Prepetition Facility.

19.     As of the Petition Date, the Debtors maintained the bank accounts (the "Bank Accounts") identified on Exhibit B attached hereto with various banks (the "Cash Management Banks").  The Debtors maintain that substantially all of the Bank Accounts are in financially stable banking institutions with FDIC or FSLIC insurance (up to an applicable limit on each account).  The principal components of the Cash Management System are described below.[4]

The Cash Management System

(a)     Lockbox Accounts:  The Debtors maintain three principle lockbox accounts (collectively, the "Lockbox Accounts") with Harris, N.A. ("Harris"), tied to the following major business subdivisions (i) Sorting (Wheeling), (ii) Document Productions Services (Durham) and (iii) BCC Software, Inc.  The Lockbox Accounts are funded by the receipt of payments from customers.  The Lockbox accounts are swept continuously, and any funds are reflected in the Harris Central Collection Account (described below).

(b)     Collections Accounts:  The Debtors maintain three collections accounts (collectively, the "Harris Collection Accounts") with Harris tied to (i) sorting collections, (ii) DPS collections, and (iii) BCC Software collections.  The Harris Collection Accounts are funded primarily by the receipt of customer payments and other miscellaneous receipts.  The Harris Collection Accounts are swept daily, and any funds are deposited in the Central Collection Account (described below).  Consequently, the Harris Collection Accounts are each zero balance accounts.

(c)     Credit Card Collection Accounts:  The Debtors maintain five accounts with Fifth Third Bancorp ("Fifth Third") to collect customer payments made by credit card (the "Credit Cart Collection Accounts").  The Debtors have an arrangement with Fifth Third whereby Fifth Third has set up the Credit Card Collection Accounts to process Visa, MasterCard, Discover, and American Express payments.  Fifth Third reviews all deposits above $25,000.00 before clearing such deposits.  After this review and processing, all deposits into the Credit Card Collection Accounts are swept into the Harris Central Collection Account (defined below).

(d)     Harris Central Collection Account:  The Debtors maintain a central collection account (the "Central Collection Account") with Harris.  The Central Collection Account is funded from the assets that are swept from

---

[4] A chart depicting the Debtors' Cash Management System is attached hereto as Exhibit C.

the Lockbox Accounts and the Harris Collection Accounts. Funds are drawn down from the Harris Central Collection Account to the Harris Operating Account (as defined below) to fund the Debtors' daily operations. Each day the Debtors communicate to Harris the total amount needed by the Harris Operating Account to fund the outgoing disbursements from the Debtors' controlled disbursement accounts and the Debtors' payroll account. Upon Harris' approval, that amount is drawn down from the Central Collection Account to the Harris Operating Account. Consequently, the Central Collection Account is not a zero balance account. The Debtors believe that, pursuant to section 343 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Wall Street Reform Act") and sections 330.1(r)(1) and 330.16 of title 12 of the Code of Federal Regulations, the Central Collection Account qualifies as a noninterest-bearing transaction account that is fully insured by the FDIC through December 31, 2012.

(e)     Harris Operating Account:  The Debtors maintain a central operating account at Harris. On a daily basis, the Debtors will determine the cash needs of the business based on anticipated operating costs and expenses. Based on these determinations, Harris, at its discretion, will draw down the necessary funds from the Central Collection Account. The Harris Operating Account is, in turn, linked to a series of controlled disbursement accounts designed to make disbursements for the Debtors' daily operational needs as well as the Debtors' payroll account. The Debtors believe that, pursuant to section 343 of the Wall Street Reform Act and sections 330.1(r)(1) and 330.16 of title 12 of the Code of Federal Regulations, the Harris Operating Account qualifies as a noninterest-bearing transaction account that is fully insured by the FDIC through December 31, 2012.

(f)     Checking Accounts:  The Debtors maintain three controlled disbursement checking accounts with Harris, one for Chicago checks, one for DPS checks, and one for BCC Software Distribution (together, the "Checking Accounts"), to cover the Debtors' disbursements relating to their operations (including, without limitation, the payment of invoices for lease payments and other operating expenses), other than those made through the Harris Payroll Account. The Checking Accounts are funded automatically on a daily basis from the Harris Operating Account. The Checking Accounts are zero balance accounts.

(g)     Harris Payroll Account:  The Debtors maintain a bank account at Harris to cover the Debtors' payroll disbursements to their employees (the "Harris Payroll Account"). The Debtors generally process their payroll through Automatic Data Processing, Inc. ("ADP") and Paychex, Inc. ("Paychex"), which then pays the Debtors' employees either by direct deposit or by check. The Debtors electronically transfer funds to ADP and Paychex,

which in turn fund all direct deposit payroll obligations through ADP or Paychex accounts.  Any of the Debtors' employees that are paid by check, rather than direct deposit, receive a check printed by ADP or Paychex and drawn on an ADP or Paychex bank account.   The Debtors believe that, pursuant to section 343 of the Wall Street Reform Act and sections 330.1(r)(1) and 330.16 of title 12 of the Code of Federal Regulations, the Harris Payroll Account qualifies as a noninterest-bearing transaction account that is fully insured by the FDIC through December 31, 2012.

(h)     Foreign Currency Accounts:  The Debtors also maintain foreign currency accounts (the "Foreign Currency Accounts") with Harris and with the Canadian Imperial Bank of Commerce ("CIBC").  The Foreign Currency Accounts with CIBC are used in the Debtors' Canadian operations to collect customer payments and miscellaneous receipts and to fund payroll and other disbursements in United States or Canadian dollars as appropriate, while the Foreign Currency Accounts with Harris are no longer active.

20.     The Debtors' Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity to the Debtors.  Indeed, large, multiple-entity businesses use such systems because of the numerous benefits provided, including, without limitation, the ability to:  (a) quickly create status reports on the location and amount of funds, which allows management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds.  Granting the Debtors authority to continue using the Cash Management System will help facilitate a smooth transition into the Chapter 11 Cases.

## H.     The Debtors' Existing Business Forms

21.     In the ordinary course of business, the Debtors use a variety of business forms. To minimize expenses to their estates and avoid confusion on the part of employees, customers and suppliers, the Debtors respectfully request that the Court authorize the Debtors to continue to use all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession; provided, however, that the

Debtors will obtain new business form stock reflecting their status as debtors-in-possession once all existing business form stock on hand is exhausted. With such authorization, the Debtors will be able to avoid the expense and delay of ordering entirely new business forms.

## RELIEF REQUESTED

22.     By this Motion, the Debtors seek entry of an order authorizing them to: (a) continue use, with the same account numbers, of all Bank Accounts; (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors-in-possession; (c) if needed, open new debtor-in-possession accounts; and (d) use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices), and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to their status as debtors-in-possession. The Debtors also seek an extension of sixty (60) days to comply with section 345(b) of the Bankruptcy Code.[5]

23.     The Debtors also request that the Court authorize the Cash Management Banks to continue to maintain, service and administer such accounts. The Debtors request that the Court authorize the Cash Management Banks to debit the Debtors' accounts in the ordinary course of business on account of: (a) all checks drawn on the Debtors' accounts that are cashed at the Cash Management Banks' counters or exchanged for cashier's checks by the payees thereof prior

---

[5]     As discussed in more detail above, all of the Debtors' funds are maintained in three accounts with Harris: the Central Collection Account, the Harris Operating Account and the Harris Payroll Account. Harris has not executed a Uniform Deposit Agreement with the United States Trustee for the District of Delaware (the "U.S. Trustee"), but has executed a Uniform Deposit Agreement with the United States Trustee for the Northern District of Illinois. The Debtors believe that pursuant to section 343 of the Wall Street Reform Act and sections 330.1(r)(1) and 330.16 of title 12 of the Code of Federal Regulations, the accounts qualify as noninterest-bearing transaction accounts that are fully insured by the FDIC through December 31, 2012. Consequently, the Debtors respectfully submit that the FDIC insurance provides the security desired by the U.S. Trustee and the Debtors are therefore in compliance with 11 U.S.C. § 345(b). However, out of an abundance of caution, the Debtors seek a 60-day extension of the deadline to comply with section 345(b) of the Bankruptcy Code in order to provide adequate time for the U.S. Trustee to confirm that it is satisfied that the Debtors have complied with section 345(b), and for the Debtors to take any actions necessary in the event that the U.S. Trustee does not believe that the Debtors are in compliance.

13

to the Petition Date; (b) all checks or other items deposited in one of Debtors' accounts with the Cash Management Banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Petition Date; and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to the Cash Management Banks as service charges for the maintenance of the Cash Management System, including processing charges related to any credit or debit card transactions.

24.     This Court has the authority to grant the requested relief pursuant to section 105(a) of the Bankruptcy Code, which provides, in relevant part, that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The Debtors respectfully submit that the relief requested herein is both necessary and appropriate to allow the Debtors to successfully prosecute these Chapter 11 Cases, to optimize the Debtors' postpetition business performance, and to maximize the value of the Debtors' estates.

## BASIS FOR RELIEF

**A.     The Continued Use of the Debtors' Cash Management System Is Essential to the Debtors' Ongoing Operations and Restructuring Efforts**

25.     As described in the First Day Declaration, the Debtors' business and financial affairs are complex, requiring them to collect, disburse and move funds through numerous bank accounts. The Office of the United States Trustee has established certain operating guidelines for debtors-in-possession relating to cash management systems (the "UST Guidelines"). These UST Guidelines require, among other things, that a debtor: (a) establish one debtor-in-possession account for all estate funds required for the payment of taxes (including payroll taxes); (b) close all existing bank accounts and open new debtor-in-possession accounts; (c) maintain a separate

debtor-in-possession account for cash collateral and obtain checks that bear the designation "debtor-in-possession"; and (d) reference the bankruptcy case number and type of account on such checks.

26.     However, in similarly large chapter 11 cases, courts in this and other Districts often waive these requirements on the grounds they are impractical and potentially detrimental to a debtor's postpetition business operations and restructuring efforts.  See, e.g., In re: Filene's Basement, Inc., Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); In re: Abitibibowater Inc., Case No. 09-11296 (KJC) (Bankr. D. Del. Apr. 17, 2009); In re: Sportsman's Warehouse, Inc., Case No. 09-10990 (CSS) (Bankr. D. Del. Mar. 23, 2009); In re: The Fairchild Corporation, Case No. 09-10899 (CSS) (Bankr. D. Del. Mar. 20, 2009); In re: Masonite Corporation, Case No. 09-10844 (PJW) (Bankr. D. Del. Mar. 17, 2009); In re: Robbins Bros. Corporation, Case No. 09-10708 (PJW) (Bankr. D. Del. Mar. 5, 2009); In re: Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Jan. 15, 2009); In re: Tribune Company, Case No. 08-13141 (KJC) (Bankr. Dec. 10, 2008); In re: Motor Coach Industries International, Inc., Case No. 08-12136 (BLS) (Bankr. D. Del. Sept. 16, 2008).

27.     The Debtors have utilized their Cash Management System in its current structure, with the exception of the Central Collection Account which was established by Harris in 2010, for several years as part of their ordinary and usual business practices.  Given the corporate and financial structure of the Debtors, it would be difficult to establish an entirely new cash management system for each debtor entity.  To comply with the UST Guidelines, the Debtors also would need to execute new signatory cards and depository agreements and create a new

manual system for issuing checks and paying postpetition obligations.[6]  The delays that would result from opening these accounts, revising cash management procedures, and instructing customers to redirect payments would disrupt the Debtors' business.

28.     In addition, the requirement to maintain all accounts separately would decentralize the Debtors' cash management system.  Courts in this District have noted that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1992), aff'd in part and rev'd in part, 997 F.2d 1039 (3d Cir. 1993).  The United States Court of Appeals for the Third Circuit has agreed, emphasizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."  Columbia Gas, 997 F.2d at 1061; see also In re: Southmark Corp., 49 F.3d 1111, 1114 (5th Cir. 1995) (finding that the cash management system allows the debtor "to administer more efficiently and effectively its financial operations and assets").

**B.      Maintaining the Cash Management System Will Not Harm Parties in Interest**

29.     Approval of the Cash Management System will greatly facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of postpetition debts.  Parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that

---

[6] Notwithstanding anything herein to the contrary, the Debtors reserve their right to close their prepetition Bank Accounts and open new accounts as may be necessary in the Debtors' business judgment and consistent with any postpetition debtor-in-possession financing arrangement approved by the Court.  The Debtors will give notice, however, to the United States Trustee and any official committees that may be appointed in these Chapter 11 Cases prior to opening or closing a bank account.

payments will not be made on any debts incurred before the Petition Date, other than those authorized by the Court. Specifically, the Debtors have centralized their accounts payable systems and implemented restrictions that prohibit payments from being issued without prior approval of the Debtors' finance department.

30. In light of the Debtors' protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their respective estates and creditors.

## C. The Court Should Authorize the Debtors to Continue Using Debit, Wire and Automatic Clearing House Payments

31. The Debtors request that the Court grant further relief from the UST Guidelines to the extent they require the Debtors to make all disbursements by check. In particular, the UST Guidelines require that all receipts and all disbursements of estate funds be made by check with a notation representing the reason for the disbursement.

32. In the ordinary course of business, the Debtors conduct transactions by debit, wire, credit card or automatic clearing house payments ("ACH Payments") and other similar methods, as discussed above. In addition, a certain percentage of the Debtors' customer receipts are received through wire and credit card payments. To deny the Debtors the opportunity to conduct transactions by debit, wire, credit card or ACH Payment or other similar methods would interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations.

## D. The Court Should Authorize the Debtors to Continue to Use Existing Business Forms

33. As described above, in the ordinary course of business, the Debtors use numerous varieties of business forms. To minimize expenses to the estates, the Debtors request authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders and invoices) as such forms were in existence immediately prior to

17

the Petition Date; provided, however, that upon depletion of the Debtors' business forms stock, the Debtors will obtain new business forms stock reflecting their status as debtors-in-possession.

34.     By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, use of new business forms will increase the Debtors' costs. Nonetheless, the Debtors will adjust their check stock to reflect their status as debtors-in-possession in accordance with the UST Guidelines.

35.     Because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession, changing business forms is unnecessary and unduly burdensome. In other large cases, courts in this District have allowed debtors to use their prepetition business forms without the "debtor-in-possession" label, at least until the debtors' existing business forms stock was depleted. See, e.g., In re: Filene's Basement, Inc., Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); In re: Abitibibowater Inc., Case No. 09-11296 (KJC) (Bankr. D. Del. Apr. 17, 2009); In re: Sportsman's Warehouse, Inc., Case No. 09-10990 (CSS) (Bankr. D. Del. Mar. 23, 2009); In re: The Fairchild Corporation, Case No. 09-10899 (CSS) (Bankr. D. Del. Mar. 20, 2009); In re: Masonite Corporation, Case No. 09-10844 (PJW) (Bankr. D. Del. Mar. 17, 2009); In re: Robbins Bros. Corporation, Case No. 09-10708 (PJW) (Bankr. D. Del. Mar. 5, 2009); In re: Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Jan. 15, 2009); In re: Tribune Company, Case No. 08-13141 (KJC) (Bankr. Dec. 10, 2008).

**E.      The Court Should Grant the Debtors an Extension of Time to Either Comply With the Deposit Requirements of 11 U.S.C. § 345(b) or to File a Motion Seeking to Waive Them**

36.     As stated above, while the Debtors respectfully submit that they believe they are in compliance with the requirements of section 345(b) of the Bankruptcy Code, the Debtors further request, out of an abundance of caution, that this Court grant the Debtors a 60-day

extension of time to either (i) comply with the requirements of section 345(b) of the Bankruptcy Code or (ii) file a motion seeking to waive the requirements of section 345(b) of the Bankruptcy Code, while, in the mean time, permitting the Debtors to maintain their deposits in their accounts in accordance with their existing deposit practices as of the Petition Date.

37. Section 345(a) of the Bankruptcy Code authorizes a debtor-in-possession to deposit or invest money of the estate, such as cash, "as will yield the maximum net return on such money, taking into account the safety of such deposit or investment." If deposits or investments are not insured or guaranteed by the United States or backed by the full faith and credit of the United States, section 345(b) of the Bankruptcy Code provides that, unless the Court orders otherwise for cause, the estate must require the entity with which the money is deposited or invested to obtain a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety.

38. It is within the Court's discretion to extend or waive the investment guidelines requirements of section 345(b) of the Bankruptcy Code for "cause." See 11 U.S.C. § 354(b); see also 140 Cong. Rec. H10752-01 (October 4, 1994) (noting that section 345(b) investment guidelines may be "wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, [but] can work to needlessly handcuff larger, more sophisticated Debtors").

39. As this Motion is being filed on the first day of the Debtors' Chapter 11 Cases, the Debtors respectfully request that the Court enter an order extending the Debtors' time to comply with section 345(b) of the Bankruptcy Code for sixty (60) days, without prejudice to the Debtors' ability to seek a final waiver of those requirements. Given the complexity of the Debtors' Cash Management System and the mechanisms in place to ensure the security of the

Cash Management System, the Debtors respectfully submit that cause exists to grant an interim sixty (60) day waiver of the requirements of section 345(b) of the Bankruptcy Code should it be determined that the Cash Management System is not currently in compliance with the requirements of section 345(b) of the Bankruptcy Code. This Court has previously granted similar relief on numerous occasions. See, e.g., In re: Robbins Bros. Corporation, Case No. 09-10708 (PJW) (Bankr. D. Del. Mar. 5, 2009) (granting an extension of approximately 60 days); In re: Lillian Vernon Corporation, Case No. 08-10323 (BLS) (Bankr. D. Del. Feb. 21, 2008) (granting a 60 day extension); In re: American Home Mortgage Holdings, Inc., Case No. 07-11047 (CSS) (Bankr. D. Del. Aug. 7, 2007) (same); In re: ResMAE Mortgage Corp., Case No. 07-10177 (KJC) (Bankr. D. Del. Feb. 13, 2007) (same); In re: HomeBanc Mortgage Corp., Case No. 07-11079 (KJC) (Bankr. D. Del. Aug. 14, 2007) (same).

40.     The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") has been satisfied.

## REQUEST FOR WAIVER OF STAY

41.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." As set forth above, the payments proposed herein are essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize. Accordingly, the Debtors

submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## NOTICE

42.     No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases.  The Debtors have provided notice of this Motion by facsimile and/or overnight mail to:   (a) the U.S. Trustee; (b) each of the Debtors' creditors holding the twenty (20) largest unsecured claims on a consolidated basis; (c) the Debtors' prepetition secured lenders; (d) the Debtors' proposed post-petition lenders; (e) the Internal Revenue Service; (f) the United States Department of Justice; and (g) the Securities Exchange Commission.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

## NO PRIOR REQUEST

43.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the First Day Declarations, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as <u>Exhibit A</u>:  (a) authorizing the Debtors to continue to use their Cash Management System, Bank Accounts and business forms; (b) authorizing the Debtors to treat the Bank Accounts for all purposes as accounts of the Debtors as debtors-in-possession; (c) granting the Debtors a 60-day extension of time to come into compliance with section 345(b) of the Bankruptcy Code; and (d) granting such further relief as the Court may deem just and proper.

Dated: April 18, 2011
      Wilmington, Delaware

Respectfully submitted,

*/s/ Lee E. Kaufman*
Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Lee E. Kaufman (No. 4877)
Andrew C. Irgens (No. 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Proposed Attorneys for the Debtors and*
*Debtors-in-Possession*

# EXHIBIT A

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Böwe Systec, Inc., et al.,**[1] | ) | **Case No. 11-_____ (____)** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |
| | ) | |
| | ) | Re: Docket No. _____ |

**ORDER PURSUANT TO SECTIONS 105(a), 345(b), 363(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004 AUTHORIZING THE DEBTORS TO (I) CONTINUE USING EXISTING CENTRALIZED CASH MANAGEMENT SYSTEM, AS MODIFIED, (II) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE OF THE CASH MANAGEMENT SYSTEM, AND (III) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS**

Upon the Motion, dated April 18, 2011 (the "Motion"), of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code[2] and Bankruptcy Rules 6003 and 6004, for authority to (i) continue to operate the Cash Management System as modified, (ii) honor certain prepetition obligations related to the use of the Cash Management System, (iii) maintain existing business forms, and (iv) maintain existing Bank Accounts, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Böwe Systec, Inc. (1423), Böwe Bell + Howell Holdings, Inc. (9926), BBH, Inc. (9928), Böwe Bell + Howell Company (0100), Böwe Bell + Howell Postal Systems Company (4944), BCC Software, Inc. (3481) and Böwe Bell + Howell International Ltd. (0001). The debtors' corporate offices are located at 760 S. Wolf Road, Wheeling, IL 60090.

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

having been provided to the Notice Parties, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and the appearances of all interested parties having been noted in the record of the Hearing; and upon the *Declaration of Michael Wilhelm in Support of First Day Motions* and the *Declaration of Oliver Bialowons in Support of First Day Motions*, the record of the Hearing, and all of the proceedings had before the Court; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtors, their creditors, and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Debtors are authorized, empowered and directed, pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, to continue to use their Cash Management System, as more fully described in the Motion and subject to the additions described in the Motion, to manage their cash in a manner consistent with the Debtors' prepetition practice (and to effect such changes as are from time to time necessary to address the basic purposes of the Cash Management System), and to collect, concentrate, and disburse cash in accordance with the Cash Management System, including intercompany transfers of funds, in each case as modified to comply with the requirements that have been specifically approved by the Cash Management Banks set forth in any approved debtor-in-possession financing facility, any budget in connection therewith and/or any order regarding the use of cash collateral.

3.      The Debtors shall maintain accurate and detailed records of all transfers, including intercompany transfers, within the Cash Management System so that all postpetition

transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, and traced and recorded properly on, their books and records, to the same extent maintained by the Debtors prior to the Petition Date.

4.      The Debtors are authorized to:  (i) designate, maintain and continue to use any or all of their existing Bank Accounts, including those listed on Exhibit A hereto, in the names and with the account numbers existing immediately prior to the Petition Date (which Exhibit A shall be promptly amended to identify any Bank Accounts inadvertently omitted therefrom and which Exhibit A, as so amended, shall be served within two (2) business days therefrom on the U.S. Trustee, Contrado BBH Investments, LLC (the "Lender"), and the statutory committee of unsecured creditors (when appointed), (ii) deposit funds in and withdraw funds from such Bank Accounts by all usual means including, without limitation, checks, drafts, wire transfers, automated clearinghouse transfers ("ACH Transfers") and other debits, (iii) pay any bank fees or charges associated with the Bank Accounts, and (iv) treat their prepetition Bank Accounts for all purposes as debtors in possession accounts.

5.      Except as otherwise provided in this Order, all Cash Management Banks are authorized and directed to continue to maintain, service, and administer the Bank Accounts without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks, drafts, wire transfers, ACH Transfers or other debits drawn on any of the Bank Accounts after the Petition Date by the holders or makers thereof.

6.      Unless otherwise specifically agreed to by the relevant Cash Management Bank, the Debtors are authorized and hereby direct each such Cash Management Bank to stop payment on, and each such Cash Management Bank is directed not to honor, any and all checks, drafts, wires or ACH Transfers drawn or issued before the Petition Date, but presented on or after the Petition Date; provided that the Debtors, to the extent necessary to comply with any order(s) of

this Court authorizing payment of certain prepetition claims, shall re-issue after the Petition Date such checks, drafts, wire transfers, ACH Transfers or other debits issued before the Petition Date. The Debtors shall provide each Bank with the final prepetition check number for checks issued prepetition on all Bank Accounts and the check number beginning a new check sequence for use postpetition for the applicable Bank Account, such new check sequence to begin with a number that is at least fifty (50) numbers higher than the last check issued from such account prepetition.

7.     The Debtors are granted an additional sixty (60) days from the Petition Date to come into compliance with section 345 of the Bankruptcy Code.  If the Debtors determine that they are unable to comply with the requirements of section 345 within the sixty (60) day period, the Debtors shall file a motion seeking authority to deviate from such requirements.

8.     Nothing contained herein shall prevent the Debtors from opening any additional bank accounts if the Lender consents in writing, or closing any existing Bank Account(s) as they may deem necessary and appropriate, and the Cash Management Banks are authorized to honor the Debtors' requests to open or close, as the case may be, such Bank Accounts or additional bank accounts; provided, however, that any new account shall be with (a) Harris, or (b) a bank that is insured with the Federal Deposit Insurance Corporation and organized under the laws of the United States or any state therein that is acceptable to the Lender and such account is subject to any liens granted in any approved debtor-in-possession financing facility and under an arrangement acceptable to the Lender; provided, further, that any and all accounts opened by any of the Debtors on or after the Petition Date at any bank that is acceptable in writing to the Lender shall, for purposes of this Order, be deemed a Bank Account (as if it had been opened prior to the Petition Date and listed on Exhibit A hereto).

9.     All cash held in each of the Bank Accounts (existing or to come into existence hereafter) shall be subject to (i) the lien and security interest of the DIP Agent, DIP Lenders,

Prepetition Agent and Prepetition Lenders (in each case, as defined in the Debtors' DIP financing motion), under their respective loan documents and as provided for in the Debtors' DIP financing motion; and (ii) the lien granted to Harris in respect of the Harris Cash Management Expenses (defined below), and upon written notice from the DIP Agent of the existence of an Event of Default or Terminating Event as defined in the DIP Credit Agreement (as defined in the Debtors' DIP financing Motion), the Cash Management Banks shall promptly comply with the instructions of the DIP Agent to transfer any available funds in the Bank Accounts as directed by the DIP Agent; provided, however, that (i) a Cash Management Bank may set off and charge against a Bank Account the face amount of each item deposited into or credited to such Bank Account and included in the available funds which were transferred to the DIP Agent pursuant to the DIP Agent's direction and for any reason subsequently returned unpaid, not collected or subject to an adjustment entry, together with such Cash Management Bank's reasonable usual and customary service charges and fees in connection with such Bank Account and such item (collectively, "Permitted Debits") or (ii) if a Cash Management Bank is unable to set off or charge Permitted Debits against such Bank Account due to the fact that such related available funds were transferred to the DIP Agent pursuant to the DIP Agent's direction, the DIP Agent shall, promptly upon demand, reimburse such Cash Management Bank in an amount equal to the lesser of (x) the amount of such Permitted Debits to the extent of such items that provided available funds actually transferred, received and then presently held by the DIP Agent pursuant to the direction of the DIP Agent or (y) the aggregate amount transferred and actually received and then presently held by the DIP Agent from such Bank Account pursuant to the instructions of the DIP Agent, in each case without need for further order of this Court.

10.     The Lender shall have all of the rights, obligations and responsibilities of a "Secured Party" under any prepetition account control agreements just as if such Lender had

executed the account control agreement and was the "Secured Party" under such account control agreement, and each Cash Management Bank shall take direction from the Lender as if such Lender is the "Secured Party" under such account control agreements.

11.    The Debtors shall mark the full name of the relevant debtor in possession exactly as it appears on the voluntary petition as well as the term "Debtor in Possession" and the case number under which the Chapter 11 Cases are being jointly administered on their check stock and wire transfer instructions; however, the Debtors shall not be required to order new check stock with such marking until they exhaust their current stock.

12.    Any obligations, chargebacks, returns, liabilities, costs, charges, fee or expenses incurred by Harris, in its capacity as a Cash Management Bank, that result from ordinary course transactions under the Cash Management System (the "Harris Cash Management Expenses") shall be paid by the Debtors and shall be accorded superpriority status, with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and (i) secured such as if it was part of the indebtedness of any approved debtor-in-possession financing facility with the superpriority postpetition liens granted to Harris, or (ii) if there is no approved debtor-in-possession financing facility, secured just as if it was part of prepetition secured indebtedness with a replacement lien on all prepetition and postpetition collateral granted as adequate protection.

13.    Any Cash Management Bank is authorized to charge back, offset, expense or deduct from any of the Bank Accounts maintained at such Cash Management Bank any amounts (including service charges) incurred by it resulting from cash management expenses, returned checks or other returned items, including, but not limited to, dishonored checks, wire transfers, drafts, ACH Transfers or other debits, regardless of whether such amounts were deposited prepetition and regardless of whether the returned items relate to prepetition or postpetition

items, and that the normal servicing changes may be assessed and deducted by such Cash Management Bank from funds held in the Bank Accounts at such Cash Management Bank with respect to the Cash Management System in the ordinary course of business as well as any other cash management expenses, and for these purposes any restrictions under the automatic stay provisions of section 362 of the Bankruptcy Code are lifted in all respects.

14. The Cash Management Banks are authorized and directed to accept and honor and may rely without any investigation on all representations from the Debtors as to which checks, drafts, wire transfers, ACH Transfers or other debits should be honored or dishonored consistent with any order(s) of this Court, whether the checks, drafts, wire transfers, ACH Transfers or other debits are dated prior to, or on or subsequent to the Petition Date, and whether or such Cash Management Bank believes the payment is or is not authorized by any order(s) of the Court; provided, however, should any Cash Management Bank honor a prepetition check, draft, wire transfer, ACH Transfer or other debit drawn on a Bank Account (a) at the direction of any of the Debtors to honor such prepetition check or item, (b) in good faith belief that the Court has authorized such prepetition item to be honored, (c) as a result of an innocent mistake made despite the implementation of customary item handling procedures or (d) consistent with its past practices under the Cash Management System, such Cash Management Bank shall not be deemed to be, nor shall be liable to, the Debtors or their estates or otherwise in violation of this Order.

15. The Cash Management Banks shall have no liability for any operational processing errors which are the result of human error and no Cash Management Bank shall be liable for any delays or interruption of any performance of service contemplated by this Order if caused directly or indirectly by equipment or communication systems failure, fire or other

casualty, strikes, act of God, civil disturbance, action of governmental authorities or other causes or circumstances beyond the reasonable control of the Cash Management Bank.

16.     The Debtors and each Cash Management Bank are hereby authorized and directed to continue to perform pursuant to the terms of any prepetition cash management agreement that may exist between them, except and to the extent otherwise directed by the terms of this Order and except as amended, modified, or supplemented by agreement between the Debtors and such Cash Management Bank.  The parties to such agreements shall continue to enjoy the rights and remedies afforded them under such agreements, except to the extent modified by the terms of this Order or by operation of the Bankruptcy Code.  The purpose of this Order is to ensure that each Cash Management Bank acting in reliance on this Order shall not be liable for its actions taken in reliance upon this Order or in its postpetition processing of checks and items received pursuant to the Cash Management System.

17.     Any and all intercompany claims against a Debtor by another Debtor or a non-debtor affiliate, arising after the Petition Date, shall be accorded administrative expense priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code junior and subordinate in right of payment only to the superpriority administrative expense claims granted to the Lender and Harris as Cash Management Bank under sections 507(b) and 364 of the Bankruptcy Code.

18.     The Debtors are authorized to direct the Cash Management Banks, and the Cash Management Banks are authorized and directed, to pay obligations in accordance with this or any separate order of this Court, subject to the terms of  any approved debtor-in-possession financing facility, any budget in connection therewith and/or any order regarding the use of cash collateral, but the Cash Management Banks shall not be responsible for ensuring compliance with such facility, budget or order.

19.     The Debtors shall cause a copy of this Order to be served on all of the Cash Management Banks at which any Bank Account is maintained, other than Harris, within five business days of the date hereof.

20.     Bankruptcy Rule 6003 has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.

21.     Notice of the Motion as provided therein constitutes good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are hereby waived.

22.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon entry of the Order.

23.     This Court hereby retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: _____, 2011
   Wilmington, Delaware

      _____
      UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT A**

## Current Cash Management System Bank Accounts

| Bank Name | Account Type | Account Numbers |
|---|---|---|
| HARRIS | Lockbox Account | *6702 |
| HARRIS | Lockbox Account | *1297 |
| HARRIS | Lockbox Account | *9093 |
| HARRIS | Collections Account | ***7879 |
| HARRIS | Collections Account | ***0658 |
| HARRIS | Collections Account | ***4565 |
| HARRIS | Central Collection Account | ***9016 |
| FIFTH THIRD | Credit Card Collection Account | *********2728 |
| FIFTH THIRD | Credit Card Collection Account | *********4080 |
| FIFTH THIRD | Credit Card Collection Account | *********0516 |
| FIFTH THIRD | Credit Card Collection Account | *********8493 |
| FIFTH THIRD | Credit Card Collection Account | *********8501 |
| HARRIS | Central Operations Account | ***0674 |
| HARRIS | Checking Account | ***1409 |
| HARRIS | Checking Account | ***2373 |
| HARRIS | Payroll Account | ***1649 |
| HARRIS | Distribution Account | ***4557 |
| HARRIS | Filemaster Holdings Account | ***1706 |
| HARRIS | Euro Multicurrency Account | *********0658 |

| Bank Name | Account Type | Account Numbers |
|---|---|---|
| HARRIS | GBP Multicurrency Account | ********7583 |
| CIBC | CAD Account | ********9813 |
| CIBC | USD Account | ********2911 |

# <u>EXHIBIT B</u>

**List of Bank Accounts**

# Current Cash Management System Bank Accounts

| Bank Name | Account Type | Account Numbers |
|-----------|--------------|-----------------|
| HARRIS | Lockbox Account | *6702 |
| HARRIS | Lockbox Account | *1297 |
| HARRIS | Lockbox Account | *9093 |
| HARRIS | Collections Account | ***7879 |
| HARRIS | Collections Account | ***0658 |
| HARRIS | Collections Account | ***4565 |
| HARRIS | Central Collection Account | ***9016 |
| FIFTH THIRD | Credit Card Collection Account | *********2728 |
| FIFTH THIRD | Credit Card Collection Account | *********4080 |
| FIFTH THIRD | Credit Card Collection Account | *********0516 |
| FIFTH THIRD | Credit Card Collection Account | *********8493 |
| FIFTH THIRD | Credit Card Collection Account | *********8501 |
| HARRIS | Central Operations Account | ***0674 |
| HARRIS | Checking Account | ***1409 |
| HARRIS | Checking Account | ***2373 |
| HARRIS | Payroll Account | ***1649 |
| HARRIS | Distribution Account | ***4557 |
| HARRIS | Filemaster Holdings Account | ***1706 |
| HARRIS | Euro Multicurrency Account | ********0658 |

| Bank Name | Account Type | Account Numbers |
|---|---|---|
| HARRIS | GBP Multicurrency Account | ********7583 |
| CIBC | CAD Account | ********9813 |
| CIBC | USD Account | ********2911 |

2

# EXHIBIT C

**Cash Management System Chart**

