# EXHIBIT A

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Böwe Systec, Inc., <u>et al.</u>,**[1] | ) | **Case No. 11-_____ (____)** |
| | ) | |
| **Debtors.** | ) | **Joint Administration Requested** |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 AND 507 AND FED. R.
BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY
CODE, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION
363 OF THE BANKRUPTCY CODE, (III) GRANTING LIENS AND SUPER-PRIORITY
CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION
SECURED PARTIES AND (V) SCHEDULING A FINAL HEARING
<u>PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)</u>**

The above captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), by

and through their undersigned counsel, hereby submit this motion (the "<u>Motion</u>") for the entry of

interim and final orders (respectively, the "<u>Interim Order</u>" and "<u>Final Order</u>" and together, the

"<u>DIP Orders</u>") authorizing the Debtors to, among other things: (i) obtain post-petition financing

pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of the

Bankruptcy Code in the amount of up to $127,200,000 (the "<u>DIP Facility</u>"), by entering into that

certain Senior Secured, Super-Priority Debtor-In-Possession Credit and Guaranty Agreement

(the "<u>DIP Facility Agreement</u>"),[2] by and among BBH, Inc., a Delaware corporation (the "<u>US</u>

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Böwe Systec, Inc. (1423), Böwe Bell + Howell Holdings, Inc. (9926), BBH, Inc. (9928), Böwe Bell + Howell Company (0100), Böwe Bell + Howell Postal Systems Company (4944), BCC Software, Inc. (3481) and Böwe Bell + Howell International Ltd. (0001). The debtors' corporate offices are located at 760 S. Wolf Road, Wheeling, IL 60090.

[2] A copy of the DIP Facility Agreement is attached hereto as <u>Exhibit A</u>. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Orders or, if not defined therein, in the DIP Facility Agreement.

Borrower") and Bowe Bell + Howell International Ltd., a company organized under the laws of Canada (the "Canadian Borrower", and together with the US Borrower, the "Borrowers", and individually a "Borrower"), as borrowers; Bowe Bell + Howell Holdings, Inc. ("Holdings"), as guarantor; Böwe Systec, Inc., a New York corporation, Böwe Bell + Howell Company, a Delaware corporation, Böwe Bell + Howell Postal Systems Company, a Delaware corporation, and BCC Software, Inc., an Illinois corporation (collectively, the "Subsidiary Guarantors"), as subsidiary guarantors (together with Holdings, each, a "Guarantor" and collectively, the "Guarantors"); and Contrado BBH Funding, LLC, a Delaware limited liability company (together with its successors, assigns and transferees, the "Lender"), as lender; (ii) use Cash Collateral pursuant to section 363 of the Bankruptcy Code; (iii) grant DIP Facility Liens and a DIP Facility Superpriority Claim to the Lender as security for the repayment of the DIP Obligations; and (iv) grant Adequate Protection Liens to the Prepetition Agent, on behalf of the Prepetition Secured Parties, to the extent that there is any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the pendency of the Chapter 11 Cases. In support of this Motion, the Debtors rely on the *Declaration of Michael Wilhelm in Support of First Day Motions* (the "Wilhelm Declaration") and the *Declaration of Oliver Bialowons in Support of First Day Motions* (the "Bialowons Declaration" and, together with the Wilhelm Declaration, the "First Day Declarations"), each filed contemporaneously herewith, and further respectfully represent as follows:

# BANKRUPTCY RULE 4001 CONCISE STATEMENT

1.      Material provisions of the DIP Facility Agreement are set forth in the following sections of the DIP Facility Agreement and/or the Interim Order:[3]

   (a)  ***Borrowers:***   The borrowers are BBH, Inc., a Delaware corporation, and Bowe Bell + Howell International Ltd., a company organized under the laws of Canada.

   (b)  ***Post-Petition Lender:*** The post-petition lender is Contrado BBH Funding, LLC ("Contrado"), a wholly owned subsidiary of Versa Capital Management, Inc. ("Versa").  As discussed in greater detail below, Contrado is the proposed stalking horse purchaser of substantially all of the Debtors' assets and the holder of certain of the Debtors' prepetition secured debt.

   (c)  ***Structure and Amount of DIP Facility.***  Subject to the terms and conditions of the DIP Facility Agreement, the Lender agrees to make available, for the use of the Borrowers and upon the request of the Borrowers therefor:  (i) a revolving loan to the US Borrower in an aggregate principal amount at any time outstanding up to but not exceeding the lesser of (i) the US Availability Amount and (ii) the US Revolving Credit Commitment; and (ii) a revolving loan to the Canadian Borrower in an aggregate principal amount at any time outstanding up to but not exceeding the lesser of (i) the Canadian Availability Amount and (ii) the Canadian Revolving Credit Commitment.  DIP Facility Agreement § 1.1; Interim Order ¶ 3.

   (d)  ***Use of Proceeds:***  US Borrower shall utilize the Collateral and the proceeds of the US Revolving Credit Loans which are incurred on and after the Closing Date (net of any amounts used on the Closing Date to pay Fees) as follows:  (i) for the US Borrower's and the Guarantor's working capital and general corporate purposes, (ii) certain other pre-petition expenses that are approved by the Bankruptcy Court and previously approved by Lender and (iii) to refinance the obligations under the Pre-Petition Loan Agreement outstanding on the Petition Date.  Canadian Borrower shall utilize the Collateral and the proceeds of the Canadian Revolving Credit Loans which are incurred on and after the Closing Date (net of any amounts used on the Closing Date to pay Fees related to the Canadian Revolving Credit Loans and Canadian Revolving Credit Commitment) for the Canadian Borrower's working capital and general corporate purposes.  DIP Facility Agreement § 1.3; Interim Order ¶ 4.

---

[3] The summaries and descriptions of the terms and conditions of the DIP Facility Agreement and the Interim Order set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the DIP Facility Agreement and the Interim Order.  In the event that there is a conflict between this Motion and the DIP Facility Agreement or the Interim Order, the DIP Facility Agreement or the Interim Order, as applicable, shall control in all respects.

(e) **Creeping Roll-Up.** The DIP Facility effects a "creeping roll-up" of certain of the Debtors' Prepetition Obligations. The Debtors (excluding the Canadian Borrower) are required to use all Cash Collateral (other than proceeds of the DIP Facility prior to entry of the Final Order) and other proceeds from any Prepetition Collateral to reduce the Prepetition Obligations, and shall apply all such collateral to reduce such obligations on a permanent basis until repaid in full. Interim Order ¶ 14.

(f) **Interest Rate.** Each Borrower shall be obligated to pay interest to Lender on the outstanding balance of its Revolving Credit Loans at a floating rate equal to the Prime Rate (as in effect from time to time) plus 6.75% per annum. Upon the occurrence and during the continuance of any Event of Default, the interest rate applicable to all of the Obligations automatically shall be the Default Rate. DIP Facility Agreement § 1.4(c).

(g) **Commitment Termination Date.** The Revolving Credit Loans and all outstanding Obligations under the DIP Facility shall mature on the earliest of (a) June 13, 2011, (b) the date of termination of the Revolving Credit Commitment pursuant to Section 8.3 of the DIP Facility Agreement, (c) the date of termination of the Revolving Credit Commitment in accordance with the provisions of Section 1.2(c) of the DIP Facility Agreement, (d) two (2) days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date, (e) twenty (20) days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court by such date, (f) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date, (g) the close of business on the first Business Day after the entry of the Interim Order, if by that time Borrowers have not paid Lender the fees required under the DIP Facility Agreement, unless Lender agrees otherwise, (h) the date a plan of reorganization confirmed in the Chapter 11 Cases becomes effective that does not provide for the payment in full of all amounts owed to Lender under the DIP Facility Agreement and the other Loan Documents on such effective date, (i) the date of the closing of a sale of all or substantially all of Borrowers' and/or Guarantors' assets pursuant to Section 363 of the Bankruptcy Code or a confirmed plan of reorganization or, if earlier, the second Business Day after the Sale Order Date unless the buyer under the Asset Purchase Agreement is the winning bidder, or (j) the effective date of a plan of reorganization or arrangement in the Chapter 11 Cases. DIP Facility Agreement § 1.2; DIP Facility Agreement, definition of "Commitment Termination Date".

(h) **Events of Default.** Events of Default under the DIP Facility Agreement are identified in section 8.1 of the DIP Facility Agreement.

(i) **Liens.** As security for the repayment of the DIP Obligations, the DIP Facility Lenders are to be granted DIP Facility Liens on and in the DIP Collateral and all proceeds thereof. The DIP Facility Liens granted shall be (x) pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, perfected and non-avoidable first priority liens on and security interests in all assets and property of the Debtors,

including, upon entry of the Final Order, the proceeds of Avoidance Actions, that are not subject to valid, perfected, enforceable and non-avoidable liens as of the Petition Date, (y) pursuant to section 364(c)(3), valid, perfected, enforceable and non-avoidable second priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject to valid, perfected, enforceable and non-avoidable liens in existence on the Petition Date or to valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (other than assets and property that are subject to the existing liens as referred to in subparagraph (z) below, which existing liens shall be primed as provided in the Interim Order) and (z) pursuant to section 364(d) of the Bankruptcy Code, valid, perfected, enforceable and non-avoidable first priority senior priming liens on and security interests in the Prepetition Collateral, except as to the Prepetition Permitted Liens, to the extent such liens and security interests are valid, perfected, enforceable and non-avoidable (provided, that with respect to such excepted liens and security interests, if any, the DIP Facility Lenders shall be granted second priority liens as granted in clause (y) above). The DIP Facility Liens granted by the Canadian Borrower shall be limited to the extent of such Debtor's actual obligations under the DIP Facility Documents to which it is a party or is otherwise bound. In the event of the occurrence of an Event of Default (as defined in the DIP Facility Agreement), or an event that would constitute an Event of Default with the giving of notice of lapse of time or both, the DIP Facility Liens shall be subject only to the payment of the Carve-Out. DIP Facility Agreement § 1.12; Interim Order ¶ 7.

(j) **Fees.** The following Fees are set forth in § 1.5 of the DIP Facility Agreement. Pursuant to the definition of "US Revolving Credit Commitment" in the DIP Facility Agreement, for the purposes of calculating the Fees set forth in § 1.5 of the DIP Facility Agreement, the "US Revolving Credit Commitment" shall mean $4,900,000, as such amount may be reduced or modified pursuant to the DIP Facility Agreement.

US Unused Fee - US Borrower agrees to pay to the Lender an unused facility fee equal to one percent (1.0%) per annum on the average unused daily balance of US Revolving Credit Commitment, payable monthly in arrears (a) on the first Business day of each calendar month commencing on May 1, 2011 and (b) on the Commitment Termination Date. DIP Facility Agreement § 1.5(a).

US Facility Fee - On the Closing Date, US Borrower agrees to pay to the Lender a one-time facility fee equal to two percent (2.0%) of the US Revolving Credit Commitment, which shall be added to the outstanding principal amount of the US Revolving Credit Loan. DIP Facility Agreement § 1.5(b).

US Exit Fee - US Borrower agrees to pay to the Lender a one-time exit fee equal to two percent (2.0%) of the principal amount of US Revolving Credit Commitment in effect on the Closing Date, which amount shall be payable by the

US Borrower in cash upon the Commitment Termination Date. DIP Facility Agreement § 1.5(c).

Canadian Unused Fee - Canadian Borrower agrees to pay to the Lender an unused facility fee equal to one percent (1.0%) per annum on the average unused daily balance of Canadian Revolving Credit Commitment, payable monthly in arrears (a) on the first Business Day of each calendar month commencing on May 1, 2011 and (b) on the Commitment Termination Date. DIP Facility Agreement § 1.5(d).

Canadian Facility Fee - On the Closing Date, Canadian Borrower agrees to pay to the Lender a one-time facility fee equal to two percent (2.0%) of the Canadian Revolving Credit Commitment, which shall be added to the outstanding principal amount of the Canadian Revolving Credit Loan. DIP Facility Agreement § 1.5(e).

Canadian Exit Fee - Canadian Borrower agrees to pay to the Lender a one-time exit fee equal to two percent (2.0%) of the principal amount of Canadian Revolving Credit Commitment in effect on the Closing Date, which amount shall be payable by the Canadian Borrower in cash upon the Commitment Termination Date. DIP Facility Agreement § 1.5(f).

Each Borrower authorizes the Lender to cause to be added to the outstanding principal amount of the relevant Revolving Credit Loan amounts equal to the US Unused Fee or the Canadian Unused Fee, as applicable, as and when such fees become due and payable under the DIP Facility Agreement. Once added to the outstanding principal amount of the Revolving Credit Loans, such amounts shall for all purposes constitute US Revolving Credit Loans and Canadian Revolving Credit Loans, as applicable. DIP Facility Agreement § 1.5(f); Interim Order ¶ 13.

(k)     ***506(c) Waiver.***  Subject to entry of the Final Order, the Debtors are seeking a waiver of section 506(c) of the Bankruptcy Code. Interim Order ¶ 12.

(l)     ***Liens on Avoidance Actions.***  Subject to the entry of the Final Order, the Lender is granted valid, binding, continuing, enforceable, fully perfected and unavoidable first-priority senior priming security interests in and liens upon, *inter alia*, the proceeds of Avoidance Actions. Interim Order ¶ 7.

(m)    ***Carve-Out.***  (a) Subject to the terms and conditions contained in the Interim Order, the DIP Facility Liens, DIP Facility Superpriority Claim, the Adequate Protection Liens and claims of the Prepetition Secured Parties as provided for in the DIP Facility Agreement and the Interim Order, and liens and claims held by the Prepetition Secured Parties, shall be subject and subordinate only to the following (the "Carve-Out"): (i) unpaid fees of the Clerk of the Bankruptcy Court and the US Trustee pursuant to 28 U.S.C. § 1930(a); (ii) allowed Professional Fees to the extent (x) incurred at any time on or prior to the calendar day on which an Event of Default occurs and for which notice has been given (such day, the "Event Date") and (y) of the aggregate amount of Professional Fees of each Case Professional contemplated to be incurred pursuant to the US Budget for such

Case Professional for the period from the Petition Date through and including the Event Date (less Professional Fees paid to such Case Professional on or before the Event Date plus any retainers held by such Case Professional as of such Date), whether such Professional Fees have been allowed by the Bankruptcy Court before or after the Event Date; and (iii) Professional Fees of Case Professionals incurred subsequent to the calendar day immediately following the Event Date in an aggregate amount not to exceed $100,000 for Professional Fees (of which amount $25,000 shall be allocated to Case Professionals of the Committee). Interim Order ¶ 10.

## JURISDICTION

2.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**A.       The Chapter 11 Cases and Ancillary Proceeding**

3.       On April 18, 2011, the Debtors commenced the above-captioned chapter 11 cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

4.       Following the filing of the Chapter 11 Cases, the Canadian Borrower intends to commence an ancillary proceeding (the "Ancillary Proceeding") under Part IV of the *Companies' Creditors Arrangement Act* in the Ontario Superior Court of Justice (Commercial List).  The Canadian Borrower, as the proposed foreign representative for the Debtors in the Ancillary Proceeding, intends to seek recognition of the Chapter 11 Cases and certain orders entered in the Chapter 11 Cases.  PricewaterhouseCoopers Inc. is the proposed court-appointed Information Officer in the Ancillary Proceeding.

5.     The Debtors continue to operate their business and manage their properties as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

**B.     Overview of the Debtors' Business**

6.     The Debtors are one of two leaders nationally in high volume production mail solutions, offering a combination of hardware, services and software to high volume mailers worldwide including financial and insurance firms, government agencies, services bureaus, utilities, and direct-mail firms and others.  As a result of the Debtors' unique offering of products and services, the Debtors are well-positioned to satisfy a broad range of complex mailing needs for their global customer base.  Due to the large base of installed equipment, a significant percentage of the Debtors' revenues are derived from the sale of recurring, high margin services and software.

7.     The Debtors' offerings can be broken into three key segments:  (i) hardware; (ii) services; and (iii) software.  In most instances, the company provides its client base with a combination of all three segments as part of an overall mail solution.

        (a)     <u>Hardware</u>.  The Debtors offer high end, fully integrated inserting and sorting solutions.  With over 9,000 machines installed, the Debtors are the second largest installer of such equipment in the industry.  The inserter line is designed for large mailers who need to customize mass mailings to clients or prospects.  The inserter line allows clients to take printed statements, bills or other updates and insert them along with various flyers, mailers and product promotions to be mailed to targeted recipients.  The Debtors also offer product reconditioning services whereby the company is able to leverage a client's existing equipment or procure other machines to be reconditioned from third parties.  The Debtors analyze and

implement the installed solutions, upgrading the performance of a client's operations to the Debtors' product standards.  Additionally, the Debtors are the leader in the U.S. presort market, whereby service bureaus and other large corporate mailers purchase the Debtors' sorters to meet the requirements of the U.S. Postal Service (the "USPS") for postage discounts.  Mailers receive these discounts by preparing mail with current and correct addresses in the form of a barcode, or modified address and providing the USPS with sorted trays that can be injected directly into the USPS' delivery network.

(b)     Services.  The Debtors provide a wide variety of on-site services designed to ensure that a client's mail operations run efficiently.  The Debtors' service revenues are generated by Preventative Maintenance Agreements (a "PMA"), field change orders, part sales, and time and material billings.  The Debtors' service contracts are purchased periodically by customers of installed hardware for product support after the warranty support period expires.  These contracts are typically structured as PMAs, annual maintenance agreements that entitle a client to a set level of services.  These renewable maintenance and service agreements provide a steady source of revenue for the Debtors and represent approximately $160 million of the company's $248 million in annual revenue.  The Debtors' business model depends on the revenues, mostly prepaid, from these annual maintenance agreements.  The Debtors' customer base includes numerous utility and credit card companies, governmental agencies, banks and others that depend on the Debtors' equipment to generate billions of dollars worth of accounts receivable (through the issuance of billing statements) on a daily basis.  Accordingly, customers need the Debtors' equipment to function properly at all times, which requires the Debtors to respond quickly and responsibly when maintenance issues arise.

(c)  Software.  The Debtors also provide a number of software offerings which help clients manage their mail operations as well as offer specific solutions that improve the accuracy of customers' mailing lists, ensuring data integrity and accuracy and lowering postage costs.

8.  The Debtors are headquartered in Wheeling, Illinois and also have major U.S. manufacturing and service locations in Durham, North Carolina and Bethlehem, Pennsylvania. Additionally, the Debtors have one of the industries' largest nationwide service networks of strategically located service technicians, operating in almost every state and allowing the Debtors to rapidly respond to client service demands.

C.  **The Debtors' Corporate Structure**

9.  The Debtors' history dates back to 1936 when the founder of what would later become Bell + Howell invented, patented and produced the first automated mail inserting machine.  In 2003, Bell + Howell was acquired by Böwe Systec AG ("Böwe Systec"), a German competitor of Bell + Howell, thereby combining their North American mailing operations and changing the name of Bell + Howell to "Böwe Bell + Howell".  The Debtors are each direct or indirect subsidiaries of Böwe Systec.

10.  In May 2010, Böwe Systec commenced an insolvency proceeding in Germany and, as a consequence, Böwe Systec's North American distribution agreements with the Debtors were voided.  On September 2, 2010, the administrator appointed in the German insolvency proceeding agreed to sell substantially all of Böwe Systec's assets to a Swiss private equity firm, Axentum Capital AG.  When Axentum Capital AG was unable to complete the transaction, the administrator regained control of the assets (forming BS GmbH) and subsequently sold the assets

to the Possehl Group.  The Debtors were not parties to the German insolvency proceeding, nor were they involved in the transaction with the Possehl Group.

## D.    The Debtors' Capital and Debt Structure

11.    As of the Petition Date, the US Borrower was a borrower under that certain Credit Agreement dated as of September 25, 2003 (the "Original Credit Agreement") by and between the US Borrower, Harris N.A., a national banking association ("Harris"), as Issuing Lender and Agent (as defined in the Original Credit Agreement), and the financial institutions that were or became lenders thereunder (the "Prepetition Lenders").  The Original Credit Agreement provided the US Borrower with (i) a term loan in the maximum principal amount of $50 million (the "Prepetition Term Loan"); and (ii) a revolving loan in the maximum principal amount of $50 million (the "Prepetition Revolving Loan", and together with the Prepetition Term Loan, the "Prepetition Facility"), subject to borrowing base limitations, and less the amount outstanding under any Letters of Credit and the outstanding principal amount of any Swing Loans (as defined under the Original Credit Agreement).  The aggregate amount of the Prepetition Term Loan was subsequently increased in July 2004 to $150 million so that approximately $45 million could be paid to Böwe Systec on account of a preferred stock redemption.  The US Borrower's obligations under the Prepetition Facility are secured by substantially all of its assets, with each of the other Debtors (other than the Canadian Borrower) guarantying the US Borrower's obligations thereunder.

12.    Pursuant to the terms of the Original Credit Agreement, the Prepetition Revolving Loan was to expire by its terms on September 30, 2009.  All other obligations under the Prepetition Facility, including the Prepetition Term Loan, were to become due and owing on September 30, 2010.  The parties initially entered into discussions regarding an amendment that

would have extended the maturity date for the Prepetition Revolving Loan to September 30, 2010, consistent with the balance of the Prepetition Facility, but were unable to obtain the unanimous consent of all lenders under the Prepetition Term Loan to such an extension. As a result, the parties entered into that certain Amended and Restated Credit Agreement dated as of November 23, 2009 (the "Amended and Restated Credit Agreement"), which, *inter alia*, (i) restated the Original Credit Agreement, as amended, in its entirety, (ii) increased the interest rate provided thereunder, (iii) fixed the stated maturity date for all obligations under the Prepetition Facility as June 30, 2010 (thereby extending the term of the Prepetition Revolving Loan by nine months, but accelerating the maturity date for all other obligations under the Original Credit Agreement), (iv) reduced the Prepetition Revolving Loan to $35 million and (v) imposed certain additional affirmative covenants on the company relating to the raising of additional capital.

13.     BBH was unable to repay or refinance the Prepetition Facility on or before the June 30, 2010 maturity date. While this constituted an event of default under the terms of the Amended and Restated Credit Agreement, the Prepetition Lenders have permitted the company to continue using cash collateral since such time. While the parties attempted to negotiate a standard forbearance agreement, such efforts have been unsuccessful. Accordingly, there is no forbearance agreement currently in place and certain of the Debtors remain subject to immediate remedial action by the Prepetition Lenders.

14.     In March 2011, Versa, a private equity firm with an interest in acquiring the Debtors or their assets, through one or more affiliates, began purchasing the secured claims of certain of the Prepetition Lenders with the intention of acquiring the Debtors' assets. As of the Petition Date, Versa's affiliates had control over approximately sixty (60) percent of the outstanding debt under the Prepetition Facility and had acquired the balance of the Prepetition

Facility subject to confirmed trades which are in the process of closing. The Lender is a wholly owned subsidiary of Versa. As of the Petition Date, there was an aggregate amount of not less than $121 million outstanding under the Prepetition Facility; the Prepetition Obligations far exceeded the value of the Debtors' assets and properties.

**E.     The Stalking Horse Agreement and Proposed Sale**

15.     On April 18, 2011, the Debtors, the Lender (also referred to as the "U.S. Purchaser") and a Canadian corporation to be formed prior to closing (the "Foreign Purchaser", and together with the U.S. Purchaser, the "Purchasers") entered into that certain Asset Purchase Agreement (the "Stalking Horse Agreement") whereby the Purchasers agreed to purchase substantially all of the Debtors' assets. Pursuant to the terms of the Stalking Horse Agreement, the aggregate consideration for the Debtors' assets shall include (i) a credit bid consisting of amounts outstanding under the DIP Facility and the Prepetition Facility, (ii) cash in the amount of $302,000 (Canadian currency) attributable to the assets of the Canadian Borrower, (iii) the payment of all cure amounts relating to any contracts and leases to be assigned in connection with the transaction and (iv) the assumption of certain liabilities. The Stalking Horse Agreement provides the Debtors with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtors with a floor against which other bidders can submit competing bids. The Debtors will be filing a motion with the Court on or about the Petition Date seeking approval of certain bidding procedures in connection with an approximately forty-five (45) day sale process followed by approval of a sale of the Debtors' assets to the highest and best bidder as determined at an auction.

**F.      The DIP Facility**

16.     In connection with the Chapter 11 Cases, the Borrowers, the Guarantors and the Lender have entered into the DIP Facility Agreement, pursuant to which the Lender has agreed to provide post-petition financing to the Debtors up to the aggregate principal amount of $127,200,000 (inclusive of up to $1,300,000 for post-petition financing to the Canadian Borrower).  The key terms of the DIP Facility are set forth herein, above.  The DIP Facility will be used to, among other things, cover anticipated administrative obligations of the Chapter 11 Cases.  As discussed above, the Purchasers shall have the ability to credit bid all amounts outstanding under the DIP Facility in accordance with the terms of the Stalking Horse Agreement.

**RELIEF REQUESTED**

17.     By this Motion, the Debtors request entry of the DIP Orders[4] authorizing the Debtors to (i) obtain senior secured, superpriority post-petition financing in the aggregate not to exceed $127,200,000 pursuant to the terms of this Motion, the DIP Facility Agreement, and the DIP Orders, (ii) use Cash Collateral pursuant to section 363 of the Bankruptcy Code; (iii) grant DIP Facility Liens and a DIP Facility Superpriority Claim to the Lender as security for the repayment of the DIP Obligations; and (iv) grant Adequate Protection Liens to the Prepetition Agent, on behalf of the Prepetition Secured Parties, to the extent that there is any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the pendency of the Chapter 11 Cases.

**Negotiations and Need for Post-Petition Financing**

---

[4]  A copy of the Debtors' proposed Interim Order is attached hereto as <u>Exhibit B</u>.

18.     As demonstrated by the 6-week budget attached hereto as <u>Exhibit C</u> (the "<u>Budget</u>"),[5] the Debtors do not have sufficient available sources of working capital, including cash collateral, to operate in the ordinary course of business without the financing requested in this Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of their estates for the benefit of all creditors of the Debtors.  Moreover, the ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangement with the Lender as set forth herein, in the Interim Order and in the DIP Facility Agreement is vital to the preservation and maintenance of the going concern value of the Debtors.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates.

19.     Prior to the Petition Date, the Debtors and the Lender engaged in extensive, arm's-length negotiations with respect to the terms and conditions of the DIP Facility Agreement.  Despite their efforts, the Debtors were unable to procure financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets.  Indeed, the Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the Lender pursuant to the DIP

---

[5] The Debtors and the Lender have agreed upon the Budget, and believe that it is achievable and will allow the Debtors to operate and pay their post-petition obligations as they mature.

15

Facility Agreement.  As such, the Debtors are seeking approval of the DIP Facility as set forth in the DIP Facility Agreement.

## Use of Cash Collateral and Proposed Adequate Protection

20.    Under the terms of the DIP Facility Agreement, certain of the Debtors require the use of the Cash Collateral of the Prepetition Secured Parties.  The Cash Collateral (other than proceeds of the DIP Facility prior to entry of the Final Order) and other proceeds from any Prepetition Collateral will be used to reduce the Prepetition Obligations, and the Debtors shall apply all such collateral to reduce such obligations on a permanent basis until repaid in full. After the payment of the Prepetition Obligations in full, or after an Event of Default as determined by the Lender, all Cash Collateral shall be applied to the DIP Obligations pursuant to the terms of the DIP Facility Agreement.  The Prepetition Agent, for itself and for the Prepetition Lenders, has consented to the Debtors' use of Cash Collateral on the terms described in the DIP Facility Agreement, subject to the adequate protection liens and payments discussed below and the other terms and conditions set forth in the Interim Order.

21.    The Prepetition Agent has requested and it and the Prepetition Lenders are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in collateral under the Amended and Restated Credit Agreement to the extent that there is a diminution in the value of such collateral from and after the Petition Date.  As adequate protection for any such diminution in value, the Prepetition Agent, on behalf of the Prepetition Secured Parties, shall be granted:

(a)     (i) a lien on the Prepetition Collateral and the DIP Collateral of the US Borrower and the Guarantors to secure such parties' claim for repayment of the Prepetition Agreement Expenses and (ii) a lien on the Prepetition Collateral and DIP Collateral of the US Borrower and the Guarantors (together with the lien referred to in clause (i), the "Adequate Protection Liens") to the extent there is any diminution in the value of the Prepetition

Secured Parties' interests in the Prepetition Collateral during the pendency of the Chapter 11 Cases, whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the priming of the liens arising under the Prepetition Credit Documents, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, shrinkage or decline in market value of the Prepetition Collateral, the imposition of the automatic stay or otherwise (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Agent's (on behalf of the Prepetition Lenders) seeking vacation of the automatic stay or the Bankruptcy Court granting such relief). The Adequate Protection Liens shall be junior to the Prepetition Permitted Liens, junior to the DIP Facility Liens, junior to the Carve-Out, and senior to any other liens, and shall cover assets, interest and proceeds of the Debtors that are or would be collateral under the Prepetition Credit Documents if not for Bankruptcy Code section 552(a), and all cash and cash equivalents, and all assets, interests and proceeds of the Debtors (other than the Canadian Borrower) that constitute DIP Collateral; and

(b)     in each of the Debtors' Chapter 11 Case (other than the Canadian Borrower's Chapter 11 Case) an allowed administrative claim (the "Adequate Protection Claim") under section 507(b) of the Bankruptcy Code to the extent that the Adequate Protection Liens do not adequately protect the diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral from the Petition Date, and such Adequate Protection Claim shall be shall be junior in priority to the DIP Superpriority Claims and junior and subordinate to the Carve-Out. The Adequate Protection Claim shall include, for the avoidance of doubt, the claims secured by the Adequate Protection Lien; and

22.     As additional adequate protection, (i) the Prepetition Agent shall be entitled to, and the Debtors (other than the Canadian Borrower) shall timely pay, the ongoing payment of the Prepetition Agreement Expenses, including the fees and expenses of legal counsel and other professionals retained by the Prepetition Agent, as and when due and payable under the Prepetition Credit Documents (without giving effect to any acceleration provision therein), regardless of whether such fees accrued prior to the Petition Date, and such adequate protection payments shall not be subject to any limitations in the Budget; and (ii) except for the DIP Facility, the Adequate Protection Liens, the Prepetition Permitted Liens and the DIP Facility

Liens, the Debtors shall be prohibited from incurring additional indebtedness with claim status and with priority over the Prepetition Obligations or liens equal to or senior in priority to the liens arising under the Prepetition Credit Documents. All fees and expenses of the Prepetition Agent and Prepetition Lenders that were incurred under the Prepetition Credit Documents and paid by the Debtors prior to the Petition Date shall be deemed paid as adequate protection, are not subject to recharacterization and are not avoidable or recoverable under any applicable law from the Prepetition Agent, the Prepetition Lenders or any of such professionals.

## The DIP Facility Should Be Authorized

23.     Approval of the DIP Facility will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including post-petition wages and salaries and utility and vendor costs. Unless these expenses are paid, the Debtors will be forced to cease operations, which would likely (i) result in irreparable harm to their business, (ii) deplete going concern value, and (iii) jeopardize the Debtors' ability to maximize value. The credit provided under the DIP Facility Agreement and the use of Cash Collateral will enable the Debtors to continue to satisfy their vendors, service their customers, pay their employees, and operate their business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all stakeholders. The availability of credit under the DIP Facility Agreement will provide confidence to the Debtors' creditors that will enable and encourage them to continue their relationships with the Debtors. Finally, the implementation of the DIP Facility Agreement will be viewed favorably by the Debtors' vendors, employees, and customers, thereby promoting a successful resolution of these Chapter 11 Cases. Accordingly, the timely approval of the relief requested herein is imperative.

24.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtors to obtain credit or incur debt (a) with priority over any and all administrative expenses, as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364.  The Debtors propose to obtain the financing set forth in the DIP Facility Agreement by providing, *inter alia*, superpriority claims, security interests, and liens pursuant to section 364(c)(1), (2), (3) and section 364(d) of the Bankruptcy Code.

25.     The Debtors' liquidity needs can be satisfied only if the Debtors are immediately authorized to borrow under the DIP Facility and to use such proceeds to fund their operations. As discussed above, the Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1).  The Debtors have not been able to obtain post-petition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

26.     Bankruptcy courts grant a debtor considerable deference in acting in accordance with its business judgment.  See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and

powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); see also In re Funding Sys. Asset Mgmt. Corp., 72 B.R. 87 (Bankr. W.D. Pa. 1987); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

27.     Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  In re Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re 495 Central Park Ave Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming of loan was necessary if debtor were to obtain funding).

28.     Substantially all of the Debtors' assets are encumbered and the Debtors have been unable to procure the required funding absent granting the proposed superpriority claims and liens.[6]  The Debtors submit that the circumstances of this case require the Debtors to obtain financing pursuant to section 364(c) and section 364(d) of the Bankruptcy Code and, accordingly, the DIP Facility Agreement reflects the exercise of their sound business judgment.

29.     The terms and conditions of the DIP Facility Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at

---

[6]  The Debtors are seeking to prime only the liens of the Prepetition Lenders, and not any third party liens.

arm's-length. Accordingly, the Lender and all obligations incurred under the DIP Facility Agreement should be accorded the benefits of section 364(e) of the Bankruptcy Code.

## The Use of Cash Collateral Should Be Approved

30. Under section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U S.C. § 363(c)(2). The Debtors require the use of Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors. The interests of the Prepetition Lenders in the Cash Collateral will be protected by the adequate protection set forth above. Moreover, the Prepetition Lenders have consented to the use of the Cash Collateral on the terms set forth herein and in the Interim Order. Accordingly, the Debtors' request to use Cash Collateral should be approved.

## The Proposed Adequate Protection Should Be Authorized

31. Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to

protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citation omitted).

32.     The Prepetition Lenders have agreed to the Debtors' use of Cash Collateral and the Debtors' entry into the DIP Facility Agreement in consideration for the adequate protection provided under the DIP Facility Agreement.  Accordingly, the adequate protection proposed herein to protect the Prepetition Lenders' interest in the Prepetition Collateral is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

## The Automatic Stay Should Be Modified on a Limited Basis

33.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and superpriority claims described above with respect to the Lender and the Prepetition Lenders, as the case may be, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the Lender to exercise, upon the occurrence of and during the continuance of an event of default, all rights and remedies under the DIP Facility Agreement; and (iii) implement the terms of the proposed DIP Orders.

34.     Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## Interim Approval Should Be Granted

35.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14)

days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

36. Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to use Cash Collateral and borrow under the DIP Facility on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estate and all parties in interest, and (b) schedule a hearing to consider entry of a final order.

37. The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on this Motion, the Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide necessary assurance to the Debtors' vendors, employees, and customers of their ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' business, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors.

38. The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

39. To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

## NOTICE

40. No trustee, examiner or creditors' committee has been appointed in the Chapter 11 Cases. The Debtors have provided notice of this Motion by facsimile and/or overnight mail to: (a) the U.S. Trustee; (b) each of the Debtors' creditors holding the twenty (20) largest unsecured claims on a consolidated basis; (c) the Prepetition Secured Parties; (d) all parties asserting a lien against the Prepetition Collateral; (e) the Lender; (f) the Internal Revenue Service; (g) the Office of the United States Attorney General; (h) the Securities Exchange Commission; (i) the Delaware Secretary of State; (j) the Delaware Secretary of State; (k) the Delaware Secretary of the Treasury; (l) the Pension Benefits Guaranty Corporation; (m) Harris; (n) Fifth Third Bancorp; and (o) Canadian Imperial Bank of Commerce. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

WHEREFORE the Debtors respectfully request entry of the DIP Orders granting the relief requested herein and such other and further relief as is just.

Dated: April 18, 2011
      Wilmington, Delaware

Respectfully submitted,

*/s/ Lee E. Kaufman*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Lee E. Kaufman (No. 4877)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Proposed Attorneys for the Debtors and Debtors-in-Possession*

# EXHIBIT A

**DIP Facility Agreement**

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION

CREDIT AND GUARANTY AGREEMENT

DATED AS OF APRIL ___, 2011

BETWEEN

BBH, INC.

AND

BOWE BELL + HOWELL INTERNATIONAL LTD.

AS BORROWERS

THE GUARANTORS PARTY HERETO

AND

CONTRADO BBH FUNDING, LLC

AS

LENDER

# TABLE OF CONTENTS

Page

1. AMOUNT AND TERMS OF CREDIT .................................................................. 2
    1.1.   Revolving Credit Advances ............................................................... 2
    1.2.   Repayment of Revolving Credit Loan; Termination of Revolving Credit
           Commitments ..................................................................................... 3
    1.3.   Use of Proceeds ................................................................................. 4
    1.4.   Interest on Revolving Credit Loans .................................................. 5
    1.5.   Fees ..................................................................................................... 7
    1.6.   Receipt of Payments .......................................................................... 8
    1.7.   Application and Allocation of Payments .......................................... 8
    1.8.   Accounting ......................................................................................... 8
    1.9.   Indemnity ........................................................................................... 8
    1.10.  Access ................................................................................................ 9
    1.11.  Taxes ................................................................................................ 10
    1.12.  Super Priority Nature of Obligations and Lender's Liens ............. 11
    1.13.  Payment of Obligations ................................................................... 12
    1.14.  No Discharge; Survival of Claims .................................................. 12
    1.15.  Release ............................................................................................. 12
    1.16.  Waiver of Any Primary Rights ....................................................... 13
    1.17.  Canadian Regulated Interest .......................................................... 13

2. CONDITIONS PRECEDENT ........................................................................... 13
    2.1.   Conditions to the Initial Revolving Credit Advance ...................... 13
    2.2.   Further Conditions to Each Revolving Credit Advance after the Closing Date ... 15
    2.3.   Conditions to the Initial Canadian Revolving Credit Advance ........... 17

3. REPRESENTATIONS AND WARRANTIES ................................................... 17
    3.1.   Corporate Existence; Compliance with Law ................................... 17
    3.2.   Executive Offices; Corporate or Other Names; FEIN .................... 18
    3.3.   Corporate Power; Authorization; Enforceable Obligations ............ 18
    3.4.   Financial Statements ........................................................................ 18
    3.5.   Material Adverse Effect .................................................................. 19
    3.6.   Ownership of Property; Liens .......................................................... 19
    3.7.   Restrictions; No Default .................................................................. 20
    3.8.   Labor Matters ................................................................................... 20
    3.9.   Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness ....... 20
    3.10.  Government Regulation .................................................................... 20
    3.11.  Margin Regulations ......................................................................... 21
    3.12.  Taxes ................................................................................................ 21
    3.13.  ERISA .............................................................................................. 21
    3.14.  No Litigation .................................................................................... 22

i

|       |                                                                          |    |
|-------|--------------------------------------------------------------------------|----|
| 3.15. | Brokers .................................................................. | 22 |
| 3.16. | Intellectual Property ................................................... | 23 |
| 3.17. | Full Disclosure .......................................................... | 24 |
| 3.18. | Environmental Matters ................................................. | 24 |
| 3.19. | Insurance Policies ...................................................... | 24 |
| 3.20. | Deposit and Disbursement Accounts .............................. | 24 |
| 3.21. | Government Contracts ................................................. | 24 |
| 3.22. | Customer and Trade Relations ...................................... | 24 |
| 3.23. | Agreements and Other Documents ................................. | 25 |
| 3.24. | Bankruptcy Matters ..................................................... | 25 |

4. FINANCIAL STATEMENTS AND INFORMATION ........................... 26

| 4.1. | Reports and Notices .................................................... | 26 |
| 4.2. | Communication with Accountants .................................. | 26 |
| 4.3. | Documents Filed with the Bankruptcy Court or Delivered to the US Trustee or Committee ................................................................ | 26 |

5. AFFIRMATIVE COVENANTS ..................................................... 26

| 5.1.  | Maintenance of Existence and Conduct of Business .......... | 26 |
| 5.2.  | Payment of Charges and Claims .................................... | 27 |
| 5.3.  | Books and Records ...................................................... | 27 |
| 5.4.  | Litigation ................................................................... | 27 |
| 5.5.  | Insurance ................................................................... | 27 |
| 5.6.  | Compliance with Laws ................................................. | 28 |
| 5.7.  | Agreements ................................................................ | 28 |
| 5.8.  | [Reserved] ................................................................. | 29 |
| 5.9.  | Environmental Matters ................................................. | 29 |
| 5.10. | Application of Proceeds ............................................... | 29 |
| 5.11. | Fiscal Year ................................................................ | 29 |
| 5.12. | Subsidiaries .............................................................. | 29 |
| 5.13. | Further Assurances ..................................................... | 29 |
| 5.14. | Appraisals ................................................................. | 29 |
| 5.15. | Intellectual Property ................................................... | 29 |
| 5.16. | Sale Process .............................................................. | 30 |
| 5.17. | Schedule of Financial Affairs ....................................... | 30 |
| 5.18. | Sale Milestones .......................................................... | 30 |
| 5.19. | Financial Deliverables ................................................. | 31 |

6. NEGATIVE COVENANTS ......................................................... 31

| 6.1. | Mergers, Subsidiaries, Etc. .......................................... | 32 |
| 6.2. | Investments ............................................................... | 32 |
| 6.3. | Indebtedness ............................................................. | 32 |
| 6.4. | Affiliate and Employee Transactions .............................. | 32 |
| 6.5. | Capital Structure and Business ..................................... | 32 |

K&E 18571360.18
RLF1 3982293v. 1

|  | 6.6. | Guaranteed Indebtedness | 32 |
|--|------|-------------------------|----|
|  | 6.7. | Liens | 33 |
|  | 6.8. | Sale of Assets | 33 |
|  | 6.9. | ERISA | 33 |
|  | 6.10. | Financial Covenants | 34 |
|  | 6.11. | Restricted Payments; Use of Proceeds | 34 |
|  | 6.12. | Hazardous Materials | 34 |
|  | 6.13. | Sale-Leasebacks | 34 |
|  | 6.14. | Cancellation of Indebtedness | 34 |
|  | 6.15. | Bank Accounts | 34 |
|  | 6.16. | No Speculative Investments | 34 |
|  | 6.17. | Margin Regulations | 34 |
|  | 6.18. | Limitation on Negative Pledge Clauses | 35 |
|  | 6.19. | Material Contracts | 35 |
|  | 6.20. | Leases | 35 |
|  | 6.21. | New Premises | 35 |
|  | 6.22. | Repayment of Indebtedness | 35 |
|  | 6.23. | Reclamation Claims | 35 |
|  | 6.24. | Chapter 11 Claims | 35 |
|  | 6.25. | Change of Management | 36 |
|  | 6.26. | Intellectual Property | 36 |
| 7. | TERM | | 36 |
|  | 7.1. | Duration | 36 |
|  | 7.2. | Survival of Obligations | 36 |
| 8. | EVENTS OF DEFAULT; RIGHTS AND REMEDIES | | 36 |
|  | 8.1. | Events of Default | 36 |
|  | 8.2. | Remedies | 41 |
|  | 8.3. | Waivers by Borrowers | 41 |
| 9. | SUCCESSORS AND ASSIGNS | | 42 |
|  | 9.1. | Successors and Assigns | 42 |
|  | 9.2. | Participations; Assignments | 42 |
| 10. | MISCELLANEOUS | | 43 |
|  | 10.1. | Complete Agreement; Modification of Agreement | 43 |
|  | 10.2. | Fees and Expenses | 43 |
|  | 10.3. | No Waiver | 44 |
|  | 10.4. | Remedies | 45 |
|  | 10.5. | Severability | 45 |
|  | 10.6. | Conflict of Terms | 45 |
|  | 10.7. | Right of Setoff | 45 |
|  | 10.8. | Authorized Signature | 45 |

10.9.   Notices ....................................................................................................... 45
10.10.  Section Titles .............................................................................................. 47
10.11.  Counterparts ............................................................................................... 47
10.12.  Time of the Essence .................................................................................... 47
10.13.  GOVERNING LAW ................................................................................... 47
10.14.  WAIVER OF JURY TRIAL......................................................................... 48
10.15.  Publicity ...................................................................................................... 48
10.16.  Dating........................................................................................................... 49
10.17.  Parties Including Trustees; Bankruptcy Court Proceedings ................................ 49

11. GUARANTY ....................................................................................................................... 49

11.1.   Guaranty of the Obligations.......................................................................... 49
11.2.   Payment by Guarantors................................................................................. 49
11.3.   Liability of Guarantors Absolute .................................................................. 50
11.4.   Waivers by Guarantors ................................................................................. 52
11.5.   Guarantors' Rights of Subrogation, Contribution, etc. .................................. 52
11.6.   Subordination of Other Obligations.............................................................. 53
11.7.   Continuing Guaranty..................................................................................... 53
11.8.   Authority of Guarantors or Borrowers.......................................................... 53
11.9.   Financial Condition of Borrowers ................................................................. 53

K&E 18571360.18
RLF1 3982293v. 1

## INDEX OF ANNEXES, SCHEDULES AND EXHIBITS

| | | |
|---|---|---|
| Annex A | - | Definitions; Rules of Construction |
| Annex B | - | Financial Statements and Notices |
| Annex C-1 | - | Financial Covenants for US Borrower |
| Annex C-2 | - | Financial Covenants for Canadian Borrower |
| Annex D-1 | - | Form of Budget for US Borrower |
| Annex D-2 | - | Form of Budget for Canadian Borrower |
| | | |
| Schedule 2.1(a) | - | Closing Agenda |
| Schedule 2.1(g) | - | Material Adverse Effect as Conditions Precedent |
| Schedule 2.1(k) | | First Day Orders |
| Schedule 3.2 | - | Executive Offices; Principal Places of Business; Locations of Collateral; Trade Names |
| Schedule 3.5 | - | Restricted Payments; Redemptions |
| Schedule 3.6 | - | Real Estate and Leases |
| Schedule 3.8 | - | Labor Matters |
| Schedule 3.9(a) | - | List of subsidiaries of US Borrower |
| Schedule 3.9(b) | | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Schedule 3.12 | - | Tax Matters |
| Schedule 3.13 | - | ERISA Plans, etc. |
| Schedule 3.14 | - | Litigation |
| Schedule 3.16 | - | Patents, Trademarks, Copyrights, Internet Domain Names and Licenses |
| Schedule 3.18 | - | Environmental Matters |
| Schedule 3.20 | - | Disbursement and Deposit Accounts |
| Schedule 3.21 | - | Government Contracts |
| Schedule 3.22 | - | Customer & Trade Relations |
| Schedule 3.23 | - | Certain Contracts |
| Schedule 6.2 | - | Investments |
| Schedule 6.3 | - | Indebtedness |
| Schedule 6.4 | - | Loans to and Transactions with Employees |
| Schedule 6.7 | - | Liens |
| Schedule 6.19 | - | Material Contracts |
| Schedule 10.8 | - | Authorized Signatures |
| | | |
| Exhibit A | - | Form of Notice of Revolving Credit Advance |
| Exhibit B | - | Form of Revolving Credit Note |
| Exhibit C | - | Form of Interim Order |

K&E 18571360.18
RLF1 3982293v. 1

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION REVOLVING CREDIT AND GUARANTY AGREEMENT, dated as of April [__], 2011 (this "Agreement"), among BBH, INC., a Delaware corporation (the "US Borrower") and Bowe Bell + Howell International Ltd., a company organized under the laws of Canada (the "Canadian Borrower", and together with the US Borrower, the "Borrowers", and individually a "Borrower"), as borrowers; Bowe Bell + Howell Holdings, Inc. ("Holdings"), as guarantor; the subsidiaries of the US Borrower party hereto (except for the Canadian Borrower) ("Subsidiary Guarantors"), as subsidiary guarantors (together with Holdings, each, a "Guarantor" and collectively, the "Guarantors"); and CONTRADO BBH FUNDING, LLC, a Delaware limited liability company (together with its successors, assigns and transferees, the "Lender"), as lender. Capitalized terms used herein are defined in Annex A or in the text hereof.

# R E C I T A L S

A.      On April ___, 2011 (the "Petition Date"), the US Borrower commenced its Chapter 11 Case No. [11-_____] (the "US Borrower's Case") by filing a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  On the Petition Date, the Canadian Borrower commenced its Chapter 11 Case No. [11-_____] (the "Canadian Borrower's Case") by filing a voluntary petition for the reorganization under the Bankruptcy Code with the Bankruptcy Court.  Each Guarantor also commenced a case under Chapter 11 of the Bankruptcy Code (such cases, together with the US Borrower's Case and the Canadian Borrower's Case, the "Chapter 11 Cases") in the Bankruptcy Court on the Petition Date.  It is anticipated that, after the Petition Date, the Canadian Borrower will make an application to the Ontario Superior Court of Justice (the "Canadian Court") for an initial interim order (the "Interim Initial Order") under the Companies' Creditors Arrangement Act (the "CCAA") to stay any and all proceedings against the Canadian Borrower and thereafter will make certain other applications to the Canadian Court under Part IV of the CCAA for other Canadian Orders recognizing certain orders made in the Canadian Borrower's Case (such applications, recognition orders, other orders and proceedings before the Canadian Court, the "Canadian Proceedings").   The Borrowers and the Guarantors continue to operate their businesses and manage their properties as debtors and a debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code and, as applicable, the Canadian Orders.

B.      Prior to the Petition Date, the US Borrower and the Guarantors entered into that certain Amended and Restated Credit Agreement dated as of November 23, 2009 (as amended, the "Pre-Petition Loan Agreement"), by and among the US Borrower, the lenders from time to time party thereto (the "Prior Lenders") and Harris, N.A. as Administrative Agent (as predecessor to Contrado BBH Investments 1, LLC, the "Existing Agent").

C.      The US Borrower has requested that the Lender provide a revolving credit facility that is senior secured, super-priority as to the US Borrower and the Guarantors of up to $125,900,000 to refinance all of the obligations outstanding under the Pre-Petition Loan Agreement and to fund certain of the working capital requirements of the US Borrower and Guarantors during the Chapter 11 Cases.

D. The Canadian Borrower has requested that the Lender provide a revolving credit facility that is senior secured, super-priority as to the Canadian Borrower of up to $1,300,000 to fund certain of the working capital requirements of the Canadian Borrower during the Canadian Borrower's Case.

D. Lender is willing to provide revolving credit facilities to the Borrowers of up to the amount requested upon the terms and conditions set forth herein.

E. Borrowers and the Guarantors have agreed to secure all of their respective obligations under the Loan Documents by, among other things, granting Lender a security interest in and lien upon substantially all of their existing and after-acquired personal and real property.

F. Unless otherwise indicated, all references in this Agreement to sections, subsections, schedules, exhibits, and attachments shall refer to the corresponding sections, subsections, schedules, exhibits, and attachments of or to this Agreement. All schedules, annexes, exhibits and attachments hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together, shall constitute but a single agreement. Unless otherwise expressly set forth herein, or in a written amendment referring to such schedules and annexes, all schedules and annexes referred to herein shall mean the schedules and annexes as in effect as of the Closing Date. These Recitals shall be construed as part of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, the parties hereto agree as follows:

## 1. AMOUNT AND TERMS OF CREDIT

1.1. <u>Revolving Credit Advances</u>.

(a) Upon and subject to the terms and conditions hereof, the Lender agrees to make available, from time to time, commencing on the date on which each of the conditions specified herein shall have been satisfied or waived by the Lender until the Commitment Termination Date, for the use of the Borrowers and upon the request of the Borrowers therefor:

(i) A revolving loan to the US Borrower (the "<u>US Revolving Credit Advance</u>") in an aggregate principal amount at any time outstanding up to but not exceeding the lesser of (i) the US Availability Amount and (ii) the US Revolving Credit Commitment; and

(ii) A revolving loan to the Canadian Borrower (the "<u>Canadian Revolving Credit Advance</u>", and together with the US Revolving Credit Advance, the "<u>Revolving Credit Advances</u>" each individually, a "<u>Revolving Credit Advance</u>") in an aggregate principal amount at any time outstanding up to but not exceeding the lesser of (i) the Canadian Availability Amount and (ii) the Canadian Revolving Credit Commitment.

(b) Each Borrower may from time to time borrow, repay and reborrow Revolving Credit Advances under this <u>Section 1.1</u> subject to the limitation in the foregoing

sentence. Notwithstanding the foregoing, no Revolving Credit Advance shall exceed: (i) (x) in the case of the Revolving Credit Advances to the US Borrower, the amount of borrowings permitted under the US Budget to be outstanding for such period <u>less</u>, (y) the amount by which the US Borrower's and Guarantors' actual receipts for such period exceeds the amount of anticipated receipts for such period as set forth in the US Budget and (ii) (x) in the case of the Revolving Credit Advances to the Canadian Borrower, the amount of borrowing permitted under the Canadian Budget applicable to the Canadian Borrower to be outstanding for such period <u>less</u> (y) the amount by which the Canadian Borrower's actual receipts for such period exceeds the amount of anticipated receipts for such period as set forth in the Canadian Budget applicable to the Canadian Borrower .

(c)     The applicable Borrower shall give Lender notice of each borrowing of a Revolving Credit Advance hereunder as provided in <u>Section 1.1(a)</u> and, Lender shall make available the amount of the Revolving Credit Advance or Advances to be made by it on the requested date, in immediately available funds, to such Borrower as applicable.

(d)     Each notice of borrowing for a Revolving Credit Advance shall be given in writing (by facsimile, hand delivery, or electronic mail) by the applicable Borrower to Lender at its address specified on its signature page hereto, given no later than 12:00 Noon (Eastern time) (i) no more frequently than one time per week per Borrower (subject to the immediately succeeding sentence) and, except for the first week following the Petition Date, only on or after the delivery of the Weekly Budget Variance Report for the immediately prior week, and (ii) at least one Business Day prior to the date of the proposed Revolving Credit Advance.  In the event that a Borrower has determined that an additional borrowing during a given week is necessary under the circumstances, a Borrower may request an additional borrowing during such week upon at least one Business Day's prior written notice and delivery of the report referred to in clause (ii), above.  Each such notice of borrowing (a "<u>Notice of Revolving Credit Advance</u>") shall be substantially in the form of <u>Exhibit A</u>, specifying therein the requested date, the amount of such Revolving Credit Advance, and such other information as may be reasonably required by Lender.  Lender shall be entitled to rely upon and shall be fully protected under this Agreement in accepting any Notice of Revolving Credit Advance reasonably believed by Lender to be genuine and to assume that the persons executing and delivering the same were duly authorized unless the responsible individual acting thereon for Lender shall have actual knowledge to the contrary.

(e)     The Revolving Credit Advances made by Lender may be, upon request of Lender, evidenced by a promissory note issued by the applicable Borrower in favor of Lender substantially in the forms of <u>Exhibit B</u>, dated on or after the Closing Date, payable to Lender in a maximum principal amount equal to the amount of the applicable Revolving Credit Commitment as originally in effect and otherwise duly completed.

1.2.    <u>Repayment of Revolving Credit Loan; Termination of Revolving Credit Commitments</u>.

(a)     The US Borrower hereby promises to pay to Lender the entire outstanding principal amount of the Revolving Credit Loans and all other outstanding Obligations, and the

K&E 18571360.18
RLF1 3982293v. 1

Revolving Credit Loans and all other outstanding Obligations shall mature, on the Commitment Termination Date.

(b)     The Canadian Borrower hereby promises to pay to Lender the entire outstanding principal amount of the Canadian Revolving Credit Loan and all other outstanding Obligations related thereto, and the Canadian Revolving Credit Loans and all other outstanding Obligations related thereto shall mature, on the Commitment Termination Date

(c)     In the event that the outstanding principal amount of the US Revolving Credit Loan shall, at any time (or shall after giving effect to any proposed borrowing) exceed the lesser of the US Availability Amount and the US Borrowing Availability at such time, the US Borrower shall immediately repay (or reduce) that portion of the US Revolving Credit Loan (or requested borrowing) that is in excess of the US Availability Amount or the US Borrowing Availability, as applicable.

(d)     In the event that the outstanding principal amount of the Canadian Revolving Credit Loan shall, at any time (or shall after giving effect to any proposed borrowing) exceed the lesser of the Canadian Availability Amount and the Canadian Borrowing Availability at such time, the Canadian Borrower shall immediately repay or reduce (in the case of a proposed borrowing) that portion of the Canadian Revolving Credit Loan (or requested borrowing) that is in excess of the Canadian Availability Amount or the Canadian Borrowing Availability, as applicable.

(e)     Subject to Section 1.5(c) and (f), Borrowers, when acting jointly, shall have the right at any time upon three (3) days' prior written notice by Borrowers to Lender to voluntarily terminate the Revolving Credit Commitment (in whole but not in part) without premium or penalty.  Upon the effective date of such termination, Borrowers' rights to receive Revolving Credit Advances and Borrowers' obligation to pay the Unused Fees as applicable (except to the extent for the period prior to such termination) shall simultaneously terminate, and, notwithstanding anything to the contrary contained herein or in any Loan Document, the entire outstanding balance of the Revolving Credit Loan and all other Obligations hereunder shall be immediately due and payable.  On the date of such termination, each Borrower shall pay to Lender in immediately available funds all of the Obligations of such Borrower (as applicable and without duplication), including any accrued and unpaid interest (as applicable) thereon.

1.3.     Use of Proceeds.

(a)     US Borrower shall utilize the Collateral and the proceeds of the US Revolving Credit Loans which are incurred on and after the Closing Date (net of any amounts used on the Closing Date to pay Fees) as follows:  (i) for the US Borrower's and the Guarantor's working capital and general corporate purposes including certain fees and expenses of professionals retained by US Borrower, subject to the Interim Order and Final Order, but excluding in any event the making of any Restricted Payment not specifically permitted by Section 6.11 and solely for the purposes specified in the US Budget and to the extent specified in the US Budget (plus any permitted variances), (ii) certain other pre-petition expenses that are approved by the Bankruptcy Court and previously approved by Lender and (iii) to refinance all of the obligations under the Pre-Petition Loan Agreement outstanding on the Petition Date.

4

(b)     Canadian Borrower shall utilize the Collateral and the proceeds of the Canadian Revolving Credit Loans which are incurred on and after the Closing Date (net of any amounts used on the Closing Date to pay Fees related to the Canadian Revolving Credit Loans and Canadian Revolving Credit Commitment) as follows:  (i) for the Canadian Borrower's working capital and general corporate purposes including certain fees and expenses of professionals retained by Canadian Borrower, subject to the Interim Order, Final Order and Canadian Orders, but excluding in any event the making of any Restricted Payment not specifically permitted by Section 6.11 and solely for the purposes specified in the Canadian Budget and to the extent specified in the Canadian Budget (plus any permitted variances).

(c)     Other than as may be expressly permitted in the Interim Order and Final Order, and in respect of the Canadian Borrower, the Canadian Orders, no Borrower or Guarantor shall use the proceeds of the Revolving Credit Loans or the Collateral:  (A) to finance in any way any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type relating to or in connection with the Pre-Petition Loan Agreement or any of the loan documents or in instruments entered into in connection therewith, including, without limitation, any investigation of or challenges to the obligations under the Pre-Petition Loan Agreement, or the validity, perfection, priority, or enforceability of any Lien securing such claims or any payment made thereunder; (B) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of Lender or its rights and remedies under this Agreement, the other Loan Documents, the Interim Order or the Final Order, and in respect of the Canadian Borrower, the Canadian Orders; (C) to make any distribution under a plan of reorganization in any Chapter 11 Case or the Canadian Proceeding; or (D) to make any payment in settlement of any claim, action or proceeding before any court, arbitrator or other governmental body without the prior written consent of Lender.

1.4.     Interest on Revolving Credit Loans.

(a)     US Borrower shall pay interest on all outstanding US Revolving Credit Loans to Lender, (i) in arrears for the preceding calendar month, on the first Business Day of each calendar month commencing May 1, 2011, (ii) on the Commitment Termination Date, and (iii) if any interest accrues or remains payable after the Commitment Termination Date, upon demand.  If any interest or other payment under this Agreement becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.  US Borrower hereby authorizes the Lender to cause to be added to the outstanding principal amount of the Loans an amount equal to interest due and payable (when due and payable) in accordance with clause (a)(i) of this Section 1.4 and, upon such addition, such amount shall constitute a US Revolving Credit Loan hereunder for all purposes.

(b)     Canadian Borrower shall pay interest on all outstanding Canadian Revolving Credit Loans to Lender, (i) in arrears for the preceding calendar month, on the first Business Day of each calendar month commencing May 1, 2011, (ii) on the Commitment Termination Date, and (iii) if any interest accrues or remains payable after the Commitment Termination Date, upon demand.  If any interest or other payment under this Agreement becomes due and payable on a day other than a Business Day, the maturity thereof shall be

K&E 18571360.18
RLF1 3982293v. 1

extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension. Canadian Borrower hereby authorizes the Lender to cause to be added to the outstanding principal amount of Canadian Revolving Credit Loans an amount equal to the interest due and payable (when due and payable) in accordance with clause (b)(i) of this Section 1.4 and, upon such addition, such amount shall constitute a Canadian Revolving Credit Loan hereunder for all purposes.

(c)     Each Borrower shall be obligated to pay interest to Lender on the outstanding balance of its Revolving Credit Loans at a floating rate equal to the Prime Rate (as in effect from time to time) plus 6.75% per annum. All computations of interest shall be made on the basis of a three hundred and sixty (360) day year, in each case for the actual number of days occurring in the period for which such interest is payable.

(d)     Upon the occurrence and during the continuance of any Event of Default, the interest rate applicable to all of the Obligations automatically shall be the Default Rate.

(e)     Notwithstanding anything to the contrary set forth in this Section 1.4, and subject to Section 1.17 solely with respect to the Canadian Borrower, if at any time prior to the Termination Date, the rate of interest payable to Lender hereunder exceeds the highest rate of interest permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto (the "Maximum Lawful Rate"), then in such event and so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder to Lender shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrowers shall continue to pay interest hereunder to Lender at the Maximum Lawful Rate until such time as the total interest received by Lender from the making of the Revolving Credit Loans hereunder is equal to the total interest which Lender would have received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. Thereafter, the interest rate payable to Lender hereunder shall be the rate of interest provided in Sections 1.4 (c) or (d), as applicable, of this Agreement, unless and until the rate of interest again exceeds the Maximum Lawful Rate, in which event this paragraph shall again apply. In no event shall the total interest received by Lender pursuant to the terms hereof exceed the amount which Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. In the event the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. In the event that a court of competent jurisdiction, notwithstanding the provisions of this Section 1.4(e), shall make a final determination that Lender has received interest hereunder or under any of the Loan Documents in excess of the Maximum Lawful Rate, Lender shall, to the extent permitted by Applicable Law, promptly apply such excess first to any lawful interest due and not yet paid hereunder, then to the outstanding principal of the Obligations, then to Fees and any other unpaid Obligations and thereafter shall promptly refund any excess to Borrowers or as a court of competent jurisdiction may otherwise order.

(f)     For the purposes of the Interest Act (Canada) and disclosure thereunder, to the extent applicable to the Canadian Borrower only, whenever any interest or any fee to be paid

6

hereunder or in connection herewith is to be calculated on the basis of a 360-day or 365-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360 or 365, as applicable. Solely as to the Canadian Borrower, the rates of interest under this Agreement are nominal rates, not effective rates or yields and the principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.

     1.5.   <u>Fees</u>.

     (a)   <u>US Unused Fee</u>. US Borrower agrees to pay to Lender an unused facility fee (the "<u>US Unused Fee</u>") equal to one percent (1.0%) per annum on the average unused daily balance of US Revolving Credit Commitment, payable monthly in arrears (a) on the first Business Day of each calendar month commencing on May 1, 2011 and (b) on the Commitment Termination Date. All computations of the foregoing fee shall be made by Lender on the basis of a three hundred sixty (360) day year, and for the actual number of days occurring in the period for which such fee is payable.

     (b)   <u>US Facility Fee</u>. On the Closing Date, US Borrower agrees to pay to Lender a one-time facility fee equal to two percent (2%) of the US Revolving Credit Commitment, which shall be added to the outstanding principal amount of the US Revolving Credit Loan.

     (c)   <u>US Exit Fee</u>. US Borrower agrees to pay to Lender a one-time exit fee equal to two percent (2%) of the principal amount of US Revolving Credit Commitment in effect on the Closing Date, which amount shall be payable by the US Borrower in cash upon the Commitment Termination Date.

     (d)   <u>Canadian Unused Fee</u>. Canadian Borrower agrees to pay to Lender an unused facility fee (the "<u>Canadian Unused Fee</u>", and together with the US Unused Fee, the "<u>Unused Fees</u>") equal to one percent (1.0%) per annum on the average unused daily balance of Canadian Revolving Credit Commitment, payable monthly in arrears (a) on the first Business Day of each calendar month commencing on May 1, 2011 and (b) on the Commitment Termination Date. All computations of the foregoing fee shall be made by Lender on the basis of a three hundred sixty (360) day year, and for the actual number of days occurring in the period for which such fee is payable.

     (e)   <u>Canadian Facility Fee</u>. On the Closing Date, Canadian Borrower agrees to pay to Lender a one-time facility fee equal to two percent (2%) of the Canadian Revolving Credit Commitment, which shall be added to the outstanding principal amount of the Canadian Revolving Credit Loan.

     (f)   <u>Canadian Exit Fee</u>. Canadian Borrower agrees to pay to Lender a one-time exit fee equal to two percent (2%) of the principal amount of Canadian Revolving Credit Commitment in effect on the Closing Date, which amount shall be payable by the Canadian Borrower in cash upon the Commitment Termination Date.

(g)  **Payment of Certain Fees.**  Each of the US Borrower, in the case of the US Unused Fee referred to in Section 1.5(a), and the Canadian Borrower, in the case of the Canadian Unused Fee referred to in Section 1.5(d), hereby authorizes the Lender to cause to be added to the outstanding principal amount of the US Revolving Credit Loans (in the case of the obligations of the US Borrower referred to herein) and the Canadian Revolving Credit Loans (in the case of the obligations of the Canadian Borrower referred to herein), amounts equal to the US Unused Fee and the Canadian Unused Fee, as applicable, as and when such fees become due and payable hereunder.  Once added to the outstanding principal amount of the Revolving Credit Loans, such amounts shall for all purposes constitute US Revolving Credit Loans and Canadian Revolving Credit Loans, as applicable.

1.6.  **Receipt of Payments.**  The applicable Borrower shall make each payment under this Agreement not later than 2:00 p.m. (Eastern time) on the day when due in Dollars in immediately available funds to Lender's account specified on its signature page hereto.

1.7.  **Application and Allocation of Payments.**  Each Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received from or on behalf of such Borrower.  Notwithstanding the foregoing, in the absence of a specific determination by Lender with respect thereto, or if an Event of Default shall have occurred and be continuing, such payments shall be applied in the following order:  (a) then due and payable Fees and expenses of Lender; (b) then due and payable interest payments on the Revolving Credit Loans; (c) Obligations to Lender other than Fees, expenses and interest and principal payments; (d) principal of the Revolving Credit Loans; and (e) to the extent there are no other Obligations then due and payable, to the Borrowers or their successors or assigns or as a court of competent jurisdiction may direct.

1.8.  **Accounting.**  Lender shall maintain a loan account (the "Loan Account") on its books to record:  all Revolving Credit Advances, all payments made by each Borrower, and all other debits and credits as provided in this Agreement with respect to the Revolving Credit Loans or any other Obligations.  All entries in the Loan Account shall be made in accordance with Lender's customary accounting practices as in effect from time to time.  The balance in the Loan Account, as recorded on Lender's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to Lender by the applicable Borrower; provided, that any failure to so record or any error in so recording shall not limit or otherwise affect a Borrower's duty to pay the Obligations of such Borrower.

1.9.  **Indemnity.**

(a)  The US Borrower shall indemnify and hold harmless Lender and its Affiliates, and its officers, directors, employees, attorneys and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigations or defense, including those incurred upon any appeal) (including without limitation any and all Environmental Liabilities) (each, a "Claim") which may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and any other Loan Document as it relates to the US Revolving Credit Loan and the administration of such credit,

8

and in connection with or arising out of the transactions contemplated hereunder and thereunder, and any actions or failures to act in connection therewith, including any and all legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents at it relates to the US Revolving Credit Loan (collectively, "US Indemnified Liabilities"); provided, however, that US Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

(b)     The Canadian Borrower shall indemnify and hold harmless Lender and its Affiliates, and any Indemnified Person, from and against any and all Claims (including without limitation any and all Environmental Liabilities) which may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and any other Loan Document as it relates to the Canadian Revolving Credit Loan and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder relating to the Canadian Revolving Credit Loan and the Canadian Revolving Credit Commitment, and any actions or failures to act in connection therewith, including any and all legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents at it relates to the Canadian Revolving Credit Loan (collectively, "Canadian Indemnified Liabilities"); provided, however, that Canadian Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

(c)     NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

(d)     Each Borrower hereby acknowledges and agrees that Lender (as of the date hereof) is not now nor has ever been in control of any of the Subject Property or the affairs or operations of the Borrowers or Guarantors.

1.10.   Access.

(a)     Borrowers shall:  (i) provide access during normal business hours to Lender and any of its officers, employees and agents as frequently as Lender determines to be appropriate upon reasonable advance notice to Borrowers (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times) to the properties and facilities of Borrowers and the Guarantors, and each of their Subsidiaries; (ii) permit Lender and any of its officers, employees and agents, as frequently as Lender determines to be appropriate, to inspect, audit and make extracts from all of

9

Borrowers' and the Guarantors' records, files and books of account upon reasonable advance notice to Borrowers (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times); and (iii) permit Lender and any of its officers, employees and agents, as frequently as Lender determines to be appropriate, upon reasonable advance notice to Borrowers (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times) to conduct audits and to inspect, review and evaluate the Collateral, in each case subject to any confidentiality agreements binding on the Borrowers, and Borrowers agree to render to Lender at Borrowers' cost and expense such clerical and other assistance as may be reasonably requested with regard thereto.

(b)     Each Borrower shall give not less than three (3) Business Day's prior written notice to Lender of any meeting of the board of directors or equivalent governing body of such Borrower, which notice shall state the location of such meeting, and each Borrower shall give a representative designated by Lender the opportunity to attend such meeting as an observer or, if such meeting is held by telephone, to attend such meeting by telephone (other than any portion of such meeting in which the board of directors discusses competing bids for the Borrowers' assets); it being understood that nothing herein shall restrict in any way each Borrower's ability to hold or conduct meetings of its board of directors whether or not Lender elects to have a representative attend any such meeting.  Notwithstanding the foregoing, each Borrower shall be permitted to take necessary measures to preserve such Borrower's attorney-client privilege in the context of such meetings.

(c)     In connection with any audit or inspection permitted by Section 1.10(a), each Borrower shall make available to Lender and its counsel, as quickly as practicable under the circumstances, originals or copies of all books, records, board minutes, contracts, insurance policies, environmental audits, site assessments and reports, business plans, files, financial statements (actual and pro forma), filings with federal, state and local regulatory agencies, other instruments and documents in the custody or control or otherwise belonging to or property of such Borrower and key personnel for interviews which Lender may reasonably request.  Each Borrower shall deliver any document or instrument reasonably necessary for Lender, as it may from time to time request, to obtain records from any service bureau or other Person which maintains records for such Borrower, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by such Borrower.  Each Borrower shall make available to Lender, upon its reasonable request, information and records prepared by its certified public accountants and its banking and other financial institutions.

1.11.   Taxes.

(a)     Any and all payments by or on behalf of any Borrower hereunder or under any Revolving Credit Note or other Loan Document shall be made, in accordance with this Section 1.11, free and clear of and without deduction for any and all present or future Taxes.  If any Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any Revolving Credit Note or other Loan Document, (i) the sum payable shall be increased as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 1.11), Lender receives an amount equal to the sum it would have received had no such deductions been made,

K&E 18571360.18
RLF1 3982293v. 1

(ii) such Borrower shall make such deductions, and (iii) such Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with Applicable Law.

(b)     In addition, each Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder by it or from its the execution, delivery or registration of, or otherwise with respect to, this Agreement (hereinafter referred to as "Other Taxes").

(c)     The applicable Borrower shall indemnify and, within ten (10) days of demand therefor, pay Lender for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 1.11) paid by Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.

(d)     Within thirty (30) days after the date of any such payment of Taxes or Other Taxes described in this Section 1.11(a), (b) or (c), the applicable Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment satisfactory to Lender.

1.12.    Super Priority Nature of Obligations and Lender's Liens.

(a)     The priority of Lender's Liens on the Collateral shall be as set forth in the Interim Order and the Final Order, as applicable, and, in respect of the Canadian Borrower, the applicable Canadian Orders.  Subject to the Interim Order and the Final Order, as applicable, and, solely in the case of the Canadian Borrower, the Canadian Orders, no filings, recordings or other actions shall be necessary to perfect and maintain the perfection and status of such Liens.

(b)     All Obligations of the Borrowers and the Guarantors shall constitute administrative expenses of such Person in the Chapter 11 Cases, with administrative priority and senior-secured status under Sections 364(c) and 364(d) of the Bankruptcy Code.  The Obligations solely with respect to the Canadian Revolving Credit Loans and the Canadian Revolving Credit Commitment shall constitute administrative expenses of the Canadian Borrower, with administrative priority and senior-secured statues under Sections 364(c) and 364(d) of the Bankruptcy Code.  Subject only to the Carve-Out Amount, and, in respect of the Canadian Borrower, the applicable Canadian Orders, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code  and shall at all times be senior to the rights of US Borrower and the Guarantors as it relates to the Revolving Credit Loans and of the Canadian Borrower as it relates to the Canadian Revolving Credit Loans, as well as the respective Borrowers' and Guarantors' estates, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code or, in the case of the Canadian Borrower, under the BIA.  The liens and security interests granted to Lender in and against the Collateral, and the priorities accorded to the Obligations, shall have the priority and senior-secured status afforded by Sections 364(c) and 364(d)(1) of the Bankruptcy Code (all as more fully set forth in the Interim Order and Final Order) senior to all claims and interests other than the the Carve-Out Amount.

11

(c)     Subject to the Interim Order and the Final Order, as applicable, the Lender's Liens and its administrative claims under Sections 364(c)(1) and 364(d) of the Bankruptcy Code afford that the Obligations also shall have priority over any claims arising under Section 506(c) of the Bankruptcy Code. In accordance with, and to the extent set forth in, the Interim Order and the Final Order, as applicable, the Liens and claims securing the Obligations shall be subject to the Carve-Out.

(d)     Except as set forth in the Interim Order or the Final Order, as applicable, or, in respect of the Canadian Borrower, the Canadian Orders, no other claim having a priority superior or pari passu to that granted to Lender by the Final Order shall be granted or approved while any Obligations under this Agreement remain outstanding.

1.13.   <u>Payment of Obligations</u>. Subject to the Interim Order and the Final Order, as applicable, and, in respect of the Canadian Borrower, the Canadian Orders, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations without further application to, or order of, the Bankruptcy Court or the Canadian Court.

1.14.   <u>No Discharge; Survival of Claims</u>. Borrowers and the Guarantors agree, to the extent applicable, that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases or Canadian Proceedings (and Borrowers and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (b) any super-priority administrative claim granted to Lender pursuant to any order described in <u>Section 1.12</u> and the Liens granted to Lender pursuant to any order described in <u>Section 1.12</u> shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases or Canadian Proceedings.

1.15.   <u>Release</u>. Subject to the Interim Order and the Final Order, as applicable, and, in respect of the Canadian Borrower, the Canadian Orders relating to the Interim Order and the Final Order, as applicable, the Borrowers and the Guarantors hereby acknowledge that, upon entry of a Final Order, Borrowers and the Guarantors shall not have any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of such parties' liability to repay Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Lender. Borrowers and each Guarantor, each in its own right and also with respect to its estate, and on behalf of its successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through it, (collectively, the "<u>Releasing Parties</u>"), hereby fully, finally and forever releases and discharge Lender and all of Lender's past and present officers, directors, servants, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "<u>Released Parties</u>") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct,

K&E 18571360.18
RLF1 3982293v. 1

indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Interim Order, the Final Order, any Canadian Order relating to the Interim Order or the Final Order, and the transactions contemplated hereby and thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

1.16.  <u>Waiver of Any Primary Rights</u>.  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligation shall be outstanding, each Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

1.17.  <u>Canadian Regulated Interest</u>. If any provision of this Agreement would oblige the Canadian Borrower to make any payment of interest or other amount payable to Lender in an amount or calculated at a rate which would be prohibited by any applicable law in Canada or would result in a receipt by Lender of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be prohibited by applicable law in Canada or so result in a receipt by Lender of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows: (i) first, by reducing the amount or rate of interest required to be paid to the Lender hereunder; and (ii) thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to the Lender hereunder which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

## 2. CONDITIONS PRECEDENT

2.1.  <u>Conditions to the Initial Revolving Credit Advance</u>.  Notwithstanding any other provision of this Agreement (other than Section 2.3 as to the Canadian Borrower) and without affecting in any manner the rights of Lender hereunder, no Borrower shall have any rights under this Agreement (but shall have all applicable obligations hereunder), and Lender shall not be obligated to make any Revolving Credit Advances, or to take, fulfill, or perform any other action hereunder, until the following conditions have been fulfilled to the satisfaction of Lender:

(a)  Lender shall have received duly executed counterparts of the Agreement and the other Loan Documents from the Borrowers and the Guarantors, and such documents, instruments, certificates, and agreements as Lender shall reasonably request in connection with the transactions contemplated by this Agreement, including all documents, instruments, agreements and other materials listed in <u>Schedule 2.1(a)</u>, each in form and substance satisfactory to Lender in its sole discretion;

K&E 18571360.18
RLF1 3982293v. 1

(b)     Lender shall have received evidence satisfactory to it that Borrowers and the Guarantors have obtained consents and acknowledgments of all Persons whose consents and acknowledgments are required, including, but not limited to, all requisite Governmental Authorities, to the terms and to the execution and delivery, of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby.  Lender shall have received resolutions of the board of directors or other governing body of each Borrower and each Guarantor approving and authorizing, among other things, the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or assistant secretary as being in full force and effect without modification or amendment.     Lender shall have received good standing certificates from the applicable Governmental Authority of each Borrower's and each Guarantor's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business (other than, in the case of jurisdictions other than such Borrower's or such Guarantor's jurisdiction of incorporation, organization or formation, where the failure to be in good standing or so qualified could not be reasonably expected to have a Material Adverse Effect).  Lender shall have received signature and incumbency certificates of the officers of such Person executing the Loan Documents;

(c)     Lender shall have received certificates of property and liability insurance of Borrowers and the Guarantors showing loss payable or additional insured clauses or endorsements, or both, as appropriate, in favor of Lender, in form and substance satisfactory to Lender;

(d)     (i) The US Borrower shall have consented to an increase of its Revolving Credit Loans by an amount equal to all Fees, costs, and expenses due by it on the Closing Date (including fees and expenses of consultants and counsel to Lender presented as of the Closing Date) (it being understood that acceptance of the initial Revolving Credit Advance shall be evidence of such consent) and (ii) the Canadian Borrower shall have paid in cash in full the Fees, costs and expenses due by it on the Closing Date (including fees and expenses of consultants and counsel to Lender presented as of the Closing Date);

(e)     No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's sole judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents;

(f)     No later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to Lender, on such prior notice to such parties as may be satisfactory to Lender, the Interim Order.  The Interim Order shall be in full force and effect, shall not be subject to a motion for reconsideration and shall not have been vacated, reversed, modified, amended or stayed;

(g)     Other than the Chapter 11 Cases, the Canadian Proceedings, and the defaults under the Pre-Petition Loan Agreement and as may be disclosed in Schedule 2.1(g),

14

none of the following shall have occurred and be continuing: (i) a Material Adverse Effect; (ii) a material increase in liabilities, liquidated or contingent (net of any offsetting increase in assets), or a material decrease in assets of Borrowers and Guarantors taken as a whole; or (iii) any litigation or other proceeding is pending or threatened which, if successful, could, individually or in the aggregate, reasonably be expected to have or result in a Material Adverse Effect;

(h)     Lender shall have received from McDermott Will & Emery LLP and Torys LLP, special counsel to the US Borrower and the Canadian Borrower, respectively, an opinion dated as of the date hereof, covering such matters as Lender may request in form and substance satisfactory to Lender.

(i)     Lender shall have received all requested financial information and financial statements requested of Borrowers certified by the Chief Financial Officer of the US Borrower and in form and substance satisfactory to Lender;

(j)     The "first day" orders described on Schedule 2.1(k) (the "First Day Orders") in form and substance satisfactory to Lender shall have been entered in the Chapter 11 Cases;

(k)     Lender, Borrowers and Guarantors shall have entered into the Asset Purchase Agreement and Lender shall have received a copy of the docket in the Borrower's Case (or other of the Chapter 11 Cases which is the "lead case") which reflects the filing of a sale motion (which shall seek, among other things, approval of the Asset Purchase Agreement) by the US Borrower, which pleading(s) shall be in form and substance satisfactory to Lender; and

(l)     Lender shall have received the initial US Budget and the initial Canadian Budget.

2.2.     Further Conditions to Each Revolving Credit Advance after the Closing Date.  It shall be a further condition to the funding of the initial and each subsequent Revolving Credit Advance that the following statements shall be true on the date of each such funding, advance or incurrence, as the case may be:

(a)     The Revolving Credit Advances requested would not cause the aggregate outstanding amount of the Revolving Credit Loans to exceed the amount then authorized by the Interim Order, Final Order, or Canadian Orders as the case may be;

(b)     Borrowers' and Guarantors' representations and warranties contained herein or in any of the Loan Documents shall be true and correct in all material respects on and as of the Closing Date and the date on which such Revolving Credit Advances for such Borrower is made as the case may be, as though made on or incurred on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date and except for changes therein permitted or contemplated by this Agreement;

(c)     No event shall have occurred and be continuing, or would result from the making of such Revolving Credit Advance which constitutes or would constitute a Default;

15

(d)     After giving effect to such Revolving Credit Advance, the aggregate principal amount of the (x) US Revolving Credit Loan shall not exceed the US Borrowing Availability and (y) the Canadian Revolving Credit Loan shall not exceed the Canadian Borrowing Availability;

(e)     Lender shall have a senior priming, first priority perfected security interest in the Collateral subject only to the Carve-Out Amount;

(f)     As to each Revolving Credit Advance requested to occur on or after the date that is 15 days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, on such prior notice to such parties as may be satisfactory to Lender and in compliance with the terms set forth in the Interim Order, which Final Order shall be in full force and effect, shall not be subject to a motion for reconsideration and shall not have been vacated, reversed, modified, amended or stayed;

(g)     As to each Revolving Credit Advance that would, when added to the aggregate amount of all Revolving Credit Advances then outstanding, exceed the amount specified in the definition of the Total Availability Amount, the Bankruptcy Court shall have entered the Final Order authorizing the Borrowers to incur loans to the extent of such aggregate amount;

(h)     There shall be no motion pending that would, if granted, permit any administrative expense against Borrowers or any Guarantor to have administrative priority equal to or superior to the priority of the Lender's in respect of the Obligations;

(i)     Borrowers, as applicable, shall have consented to an increase of the Revolving Credit Loans of the applicable Borrower by an amount equal to all Fees, costs, and expenses (including fees and expenses of consultants and counsel to Lender presented on or before such date) then due and owing (it being understood that the Borrower's acceptance of the requested Revolving Credit Advance shall be evidence of such consent);

(j)     Borrowers and Guarantors shall have used their commercially reasonable efforts to obtain duly executed and enforceable account control agreements (with respect to each of their Deposit Accounts) in form and substance satisfactory to Lender acting reasonably, pursuant to which Lender shall be granted sole dominion and control over the deposits from time to time on deposit in such Deposit Accounts; and

(k)     The funding of any Revolving Credit Advance shall not be enjoined, temporarily, preliminarily or permanently or cause Borrowers or Guarantors to breach any agreement, the enforcement of which is not stayed by the Chapter 11 Cases or Canadian Proceedings, to which Borrowers or any Guarantor are a party.

The request and acceptance by Borrowers of the proceeds of any Revolving Credit Advance shall be deemed to constitute, as of the date of such request and of such acceptance, (i) a representation and warranty by Borrowers and the Guarantors that the conditions in this Section 2.2 (and, in the case of the initial Revolving Credit Advance made on the Closing Date, Section 2.1) have been satisfied and (ii) a confirmation by Borrowers and the Guarantors of the granting

K&E 18571360.18
RLF1 3982293v. 1

and continuance of Lender's Liens, pursuant to the Interim Order, Final Order or Collateral Documents, as the case may be.

2.3.    Conditions to the Initial Canadian Revolving Credit Advance.  The Canadian Borrower shall not have any rights under this Agreement (but shall have all applicable obligations hereunder), and Lender shall not be obligated to make any Canadian Revolving Credit Advances (other than any deemed advance as necessary to satisfy the obligations of the Canadian Borrower to pay, among other things, certain fees upon the Closing Date), until the following conditions have been fulfilled to the satisfaction of the Lender:

(a)    The Interim Initial Order in form and substance satisfactory to the Lender shall have been entered in the Canadian Proceedings;

(b)    The Canadian Borrower shall have served and filed and served an application with the Canadian Court in form and substance satisfactory to the Lender requesting the issuance and entry of the Initial Recognition Order and the Supplemental Recognition Orders; and

(c)    The Initial Recognition Order in form and substance satisfactory to the Lender shall have been issued and entered in the Canadian Proceedings.

## 3.    REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and make each Revolving Credit Advance, the US Borrower and Guarantors and, in the case of matters relating to the Canadian Borrower, the Canadian Borrower, make the following representations and warranties to Lender (and each such representation and warranty shall survive the execution and delivery of this Agreement) that:

3.1.    Corporate Existence; Compliance with Law.    Each of the Borrowers and each Guarantor: (a) is an entity duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its formation and is duly qualified to do business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect; (b) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and in respect of the Canadian Borrower a corresponding order by the Canadian Court, has the requisite power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease, and to conduct its business as now, heretofore and proposed to be conducted; (c) has all material licenses, permits, consents or approvals from or by, and has made all filings with, and has given all material notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (d) is in compliance with its certificate or articles of formation and by-laws; and (e) is in compliance in all material respects with all Applicable Law (except with respect to Environmental Law which is governed by Section 3.18) except to the extent that (i) such compliance is excused by the U.S. Bankruptcy Code or by an applicable order of the Bankruptcy Court or, with respect to the Canadian Borrower, the CCAA or by an applicable order of the

K&E 18571360.18
RLF1 3982293v. 1

Canadian Court and (ii) such non-compliance would neither have nor could reasonably be expected to have a Material Adverse Effect.

3.2. <u>Executive Offices; Corporate or Other Names; FEIN</u>.  The current locations of Borrowers' and Guarantors' executive offices, principal place of business, corporate offices, all warehouses and premises within which any Collateral is stored or located, and the locations of Borrowers' and Guarantors' records concerning the Collateral are set forth in <u>Schedule 3.2</u> and, except as set forth in <u>Schedule 3.2</u>, such locations have not changed during the preceding twelve (12) months.  In addition, the US and Canadian federal employer identification number of Borrowers are shown on <u>Schedule 3.2</u>.  During the prior five (5) years, except as set forth in <u>Schedule 3.2</u>, neither Borrower nor any Guarantor has been known as or used any corporate, fictitious or trade name.

3.3. <u>Corporate Power; Authorization; Enforceable Obligations</u>.  Upon and subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and, in respect of the Canadian Borrower, a corresponding order by a Canadian Court, the execution, delivery and performance by each of the Borrowers and each Guarantor of the Loan Documents to which it is a party and all other instruments and documents to be delivered by it hereunder and thereunder to the extent it is a party thereto and the creation of all Liens provided for herein and therein:  (a) are within its organizational power; (b) have been duly authorized by all necessary action; (c) are not in contravention of any provision of its certificate or articles of organization or by-laws; (d) will not violate any Applicable Law; (e) will not conflict with or result in the breach or termination of, constitute a default under or accelerate any performance required by, any material indenture, mortgage, deed of trust, lease, agreement or other instrument to which it is a party or by which it or any of its material property is bound except to the extent that breach or termination could not reasonable be expected to cause a Material Adverse Effect; (f) will not result in the creation or imposition of any Lien upon any of the property of any Borrower or any Guarantor other than those in favor of Lender, all pursuant to the Loan Documents; and (g) do not require the consent or approval of any Governmental Authority or any other Person, all of which will have been duly obtained, made or complied with prior to the Closing Date and which are in full force and effect.  At or prior to the Closing Date, each of the Loan Documents to which each of the Borrowers and each Guarantor is a party shall have been duly executed and delivered by it and shall then, assuming due execution and delivery by the other parties thereto, subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and, in respect of the Canadian Borrower, a corresponding order by a Canadian Court, constitute a legal, valid and binding obligation of it to the extent it is a party thereto, enforceable against it in accordance with its terms.

3.4. <u>Financial Statements</u>.

(a) US Borrower has delivered to Lender unaudited consolidated financial statements of the US Borrower for the fiscal year ended December 31, 2010 (the "<u>Financial Statements</u>").  The Financial Statements, taken as whole, fairly present in all material respects, in accordance with GAAP, (i) the financial condition of Borrowers and Guarantors as of the date thereof, and (ii) the results of operations and cash flow of US Borrower for the Fiscal Year ended December 31, 2010 and the most recently available Fiscal Quarter, as applicable.

K&E 18571360.18
RLF1 3982293v. 1

(b)     Canadian Borrower has delivered to Lender unaudited financial statements of the Canadian Borrower for the fiscal year ended December 31, 2010 and unaudited financial statements for the most recent Fiscal Quarter (together, the "Canadian Financial Statements"). The Canadian Financial Statements, taken as whole, fairly present in all material respects, in accordance with GAAP, (i) the financial condition of Canadian Borrower as of the date thereof, and (ii) the results of operations and cash flow of Canadian Borrower for the Fiscal Year ended December 31, 2010 and the most recently available Fiscal Quarter, as applicable.

3.5.     Material Adverse Effect.  Except as set forth in Schedule 3.5, Borrowers and Guarantors have no material obligations, contingent liabilities, or liabilities for Charges, long-term leases or unusual forward or long-term commitments which are not reflected in the Financial Statements.  Except as otherwise permitted hereunder or as set forth in Schedule 3.5, no Restricted Payment has been made except as reported in the Financial Statements or Canadian Financial Statements, and no shares of Stock of the US Borrower or of Holdings have been, or are now required to be, redeemed, retired, purchased or otherwise acquired for value by the Borrowers or Holdings.   Other than as disclosed in the unaudited consolidated financial statements of the US Borrower for the Fiscal Year ended December 31, 2010, since such date no event or events have occurred or are continuing which, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect, other than the commencement of the Chapter 11 Cases and the Canadian Proceedings.

3.6.     Ownership of Property; Liens.   Except as described in Schedule 3.6, the real estate listed in Schedule 3.6 constitutes all of the real property leased or otherwise used in Borrowers' and Guarantors' businesses.   Each of the Borrowers and Guarantors has valid leasehold interests in its specified real properties listed on such Schedule.   Borrowers and Guarantors do not own any real property or have any real property interests other than as set forth on Schedule 3.6.  None of the properties and assets of any Borrower or any Guarantor is subject to any Liens, except (x) Permitted Encumbrances, (y) the Pre-Petition Liens and (z) from and after the Closing Date, the Lien in favor of Lender pursuant to the Collateral Documents. Except as described in Schedule 3.6, Borrowers have received all leases and amendments thereto, assignments, waivers, consents, non-disturbance and recognition or similar material agreements, [bills of sale] and other documents, and duly effected all recordings, filings and other material actions necessary to establish, protect and perfect Borrowers' and Guarantors' right, title and interest in and to all such real estate and other assets or property.   Except as described in Schedule 3.6: (i) neither any Borrower nor any Guarantor owns, holds or is obligated under or a party to, any option, right of first refusal or any other contractual right to purchase, acquire, sell, assign or dispose of any real property owned by Borrowers it as set forth in Schedule 3.6, and (ii) no material portion of any real property owned by it has suffered any material damage by fire or other casualty loss which has not heretofore been completely repaired and restored to its condition before the casualty.  All permits required to have been issued or appropriate to enable the real property owned by any Borrower or any Guarantor to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are, as of the date hereof, in full force and effect except where the failure to have any such permit could not reasonably be expected to have a Material Adverse Effect.

K&E 18571360.18
RLF1 3982293v. 1

3.7.  Restrictions; No Default.  Since December 31, 2010, no Contract, lease, agreement, instrument or other document to which any Borrower is a party or by which any Borrower or any of its respective properties or assets is bound or affected and no provision of any charter, corporate restriction, Applicable Law or governmental regulation, individually or in the aggregate, has had a Material Adverse Effect.  Borrowers and Guarantors are not in default other than (i) the defaults under the Pre-Petition Loan Agreement and (ii) to the knowledge of Borrowers and Guarantors, no third party is in default, under or with respect to any Contract, lease, agreement, instrument or other documents to which any Borrower or any Guarantor is a party, which default or defaults, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect.  To the knowledge of Borrowers and Guarantors, no Default has occurred and is continuing.

3.8.  Labor Matters.  There are no strikes, work stoppages, slowdowns, lockouts, or other material labor disputes against Borrowers or Guarantors that are pending or, to the knowledge of Borrowers or Guarantors, threatened.  Hours worked by and payment made to employees of Borrowers or Guarantors have not been in violation of the Fair Labor Standards Act or any other applicable laws dealing with such matters.  All material payments due from Borrowers or Guarantors on account of employee health and welfare insurance have been paid or accrued as a liability on the books of Borrowers or Guarantors.  Except as set forth in Schedule 3.8, no Borrower or Guarantor has any obligation under any collective bargaining agreement, management agreement, or any employment agreement, and a correct and complete copy of each agreement listed in Schedule 3.8 has been provided to Lender.  Except as set forth in Schedule 3.14, there are no union organizing efforts underway or, to the knowledge of Borrowers or Guarantors, threatened with the National Labor Relations Board, and no labor organization or group of employees of Borrowers or Guarantors has made a pending demand for recognition.

3.9.  Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness. Holdings has no Subsidiaries other than the US Borrower.  US Borrower has no Subsidiaries other than the Subsidiary Guarantors as set forth on Schedule 3.9(a) and the Canadian Borrower. Canadian Borrower has no Subsidiaries.  Borrowers and the Guarantors are not engaged in any joint venture or partnership with another Person, except as set forth in Schedule 3.9(b).  Except as set forth in Schedule 3.9(b), there are no outstanding rights to purchase options, warrants or similar rights or agreements pursuant to which any Borrower may be required to issue, sell or purchase any Stock or other equity security.  Schedule 3.9(b) lists all outstanding Stock of Borrowers and the Guarantors and the percentage of ownership and voting interests of the owners thereof as of the Closing Date.

3.10.  Government Regulation.  None of the Borrowers or any Guarantor is (a) an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940 as amended; or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act or any other federal or state statute that restricts or limits Borrowers' and Guarantors' ability to incur Indebtedness, pledge their assets, or to perform their obligations hereunder, or under any other Loan Document; and the making of the Revolving Credit Advances by Lender, the application of the proceeds and repayment thereof by Borrowers and the Guarantors and the consummation of the transactions contemplated by this Agreement and the other Loan

K&E 18571360.18
RLF1 3982293v. 1

Documents, will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

3.11.  <u>Margin Regulations</u>.  Neither any Borrower nor any Guarantor is engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock and no proceeds of any Revolving Credit Advance will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock. Borrowers and the Guarantors will not take any action which might cause any Loan Document or any document or instrument delivered pursuant hereto or thereto to violate any regulation of the Board of Governors of the Federal Reserve Board.

3.12.  <u>Taxes</u>.  Except as set forth in <u>Schedule 3.12</u>, all federal, state, local and foreign tax returns, reports and statements, including information returns required to be filed with respect to Borrowers and the Guarantors have been timely filed, all such tax returns, reports and statements are correct and complete in all material respects, and except as otherwise prohibited by the Chapter 11 Cases or, solely in the case of the Canadian Borrower, the Canadian Proceedings, all Charges and other impositions due and payable with respect to Borrowers and the Guarantors (whether or not shown on any such tax returns, reports and statements) have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof, except such charges or other impositions which are not material and which are being contested in good faith and for which adequate reserves have been maintained. Borrowers and the Guarantors have adequately provided for in their books and records for all unpaid Charges and other impositions.  Proper and accurate amounts have been withheld by Borrowers and the Guarantors from their employees and other third parties for all periods and such withholdings have been timely paid to the respective Governmental Authorities.  <u>Schedule 3.12</u> sets forth those taxable years for which any of the tax returns of Borrowers and the Guarantors are currently being audited by the IRS or any other applicable Governmental Authority, and any currently, pending or threatened assessments, actions, disputes or claims with respect to taxes are listed thereon.  There are no liens on any of the assets of Borrowers and the Guarantors with respect to Taxes except for Permitted Encumbrances.  Except as described in <u>Schedule 3.12</u>, Borrowers and the Guarantors have not executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges or the filing of any tax return.  None of the property owned by Borrowers and the Guarantors is property which it is required to treat as being owned by any other Person pursuant to the provisions of IRC Section 168(f)(8) of the Internal Revenue Code of 1954, as amended, and in effect immediately prior to the enactment of the Tax Reform Act of 1986 or is "tax-exempt use property" within the meaning of IRC Section 168(h).  Borrowers and the Guarantors have not agreed or been requested to make any adjustment under IRC Section 481(a) by reason of a change in accounting method or otherwise.  Borrowers and the Guarantors have no obligation under any tax-sharing agreement or arrangement, or liability for Charges or impositions for any other Person under applicable law, as transferee or successor, or by contract, except as described in <u>Schedule 3.12</u>.

3.13.  <u>ERISA</u>.  <u>Schedule 3.13</u> lists all Plans maintained or contributed to by Borrowers and the Guarantors and all Qualified Plans, Pension Plans, Retiree Welfare Plans or Welfare Plans maintained or contributed to by any ERISA Affiliate.  Except as set forth on <u>Schedule 3.13</u>, none of any Borrowers, any Guarantors or any current or former ERISA Affiliate sponsors

K&E 18571360.18
RLF1 3982293v. 1

(or has sponsored), contributes to (or has contributed to), or is (or was) required to contribute to or has any liability (contingent or otherwise) with respect to any Title IV Plan, any Plan subject to IRC Section 412 or ERISA Section 302. None of Borrowers, any Guarantor or any current or former ERISA Affiliate contributes to (or has contributed to) or is (or was) required to contribute to any Multiemployer Plan. IRS determination letters regarding the qualified status under IRC Section 401 of each Qualified Plan have been received as of the dates listed in Schedule 3.13. Except as set forth on Schedule 3.13, each Qualified Plan is intended to meet the requirements qualified plan under Section 401(a) of the Code that such Qualified Plan is so qualified and, to the knowledge of Borrowers and the Guarantors, the Qualified Plans as amended continue to qualify under Section 401 of the IRC, the trusts created thereunder continue to be exempt from tax under the provisions of IRC Section 501(a), and nothing has occurred which would cause the loss of such qualification or tax-exempt status. Except as set forth on Schedule 3.13, each Plan is in compliance in all material respects with the applicable provisions of ERISA and the IRC, including the filing of all reports required under the IRC or ERISA which are true and correct as of the date filed, and all required contributions and benefits have been paid in accordance with the provisions of each such Plan. Borrowers and the Guarantors have not engaged in a prohibited transaction, as defined in IRC Section 4975 or Section 406 of ERISA, in connection with any Plan which would subject any such Person (after giving effect to any exemption) to a material tax on prohibited transactions imposed by IRC Section 4975 or any other material liability. Except as set forth in Schedule 3.13: (i) there are no pending, or to the knowledge of Borrowers and the Guarantors, threatened claims, actions or lawsuits (other than claims for benefits in the normal course), asserted or instituted against (x) any Plan or its assets, (y) any fiduciary with respect to any Plan or (z) Borrowers or the Guarantors (or, to the knowledge of the Borrowers and the Guarantors, any ERISA Affiliate) with respect to any Plan; and (ii) Borrowers and the Guarantors and each ERISA Affiliate have complied with the notice and continuation coverage requirements of COBRA.

3.14. <u>No Litigation</u>. Other than the Chapter 11 Cases and Canadian Proceedings and except as set forth in <u>Schedule 3.14</u> as of the Closing Date, no litigation, claim, action, suit, arbitration, investigation charge, dispute, demand, grievance, audit, investigation, review, inquiry, arbitration, suit in equity or at Law, administrative, regulatory or quasi-judicial proceeding or other proceeding is now pending or, to the knowledge of Borrowers and the Guarantors, threatened against it, at law, in equity or otherwise (a) challenges any such Person's right, power, or competence to enter into or perform any of its obligations under the Loan Documents, or the validity or enforceability of any Loan Document or any action taken thereunder or any Liens granted to Lender, or (b) if determined adversely, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect. To the knowledge of Borrowers and the Guarantors, other than the Chapter 11 Cases and Canadian Proceedings and except as set forth in <u>Schedule 3.14</u> as of the Closing Date, there does not exist a state of facts which could reasonably be expected to give rise to any such litigation, action, suit, claim, arbitration, investigation or other proceeding which, if determined adversely, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect.

3.15. <u>Brokers</u>. No broker or finder, investment banker or other intermediary of any kind acting on behalf of Borrowers and the Guarantors brought about the obtaining, making or closing of the credit extended pursuant to this Agreement or the transactions contemplated by the Loan Documents, and Borrowers and the Guarantors have no obligation to any Person in respect

of any finder's, brokerage investment banking, placement or other fees or amounts (including expenses) due in connection therewith.

3.16. <u>Intellectual Property</u>.

(a)     To the Knowledge of the Borrowers and the Guarantors, set forth in <u>Schedule 3.16</u> is a true and complete list of all material registered or applied for Intellectual Property, owned by or registered in the name of Borrowers and the Guarantors, or of which Borrowers and any of the Guarantors.  Except as set forth on Schedule 3.16, Borrowers and the Guarantors own (free and clear of all Liens), license or otherwise have the right to use all Intellectual Property which is used in or necessary for the conduct of their respective businesses as currently conducted by them (collectively, the "<u>Business IP Rights</u>").   Immediately subsequent to the Interim or Final Order, all Intellectual Property owned, licensed or used by the Borrowers and the Guarantors, including the Business IP Rights, will be owned by or available for use by the Lender free and clear of all Liens (except for the Lien granted to the Lender or in favor of the Prepetition Agent).

(b)     The Business IP Rights owned by any Borrower or Guarantor are in full force and effect and have not been used or enforced or failed to be used or enforced in a manner that would result in the abandonment, cancellation or unenforceability of any of such Business IP Rights.

(c)     Except as set forth on <u>Schedule 3.16</u> there is not currently pending against any Borrower or Guarantor any Proceeding brought by any third party before any Governmental Authority (i) contesting the validity, enforceability, use or ownership of any material Business IP Rights owned by any Borrower or Guarantor or (ii) alleging that any Borrower or Guarantor is infringing, misappropriating, diluting or otherwise conflicting with any intellectual property of any third party and to the Knowledge of the Borrowers and Guarantors, there are no facts that indicate a likelihood of any of the foregoing and no Borrower or Guarantor has received any notice or other communication regarding any of the foregoing (including any demands or offers to license any Intellectual Property from any third party).

(d)     No third party is infringing, misappropriating or diluting any Business IP Rights owned by the Borrowers or Guarantors. To the Knowledge of the Borrowers and Guarantors, no third party has infringed, misappropriated, diluted or otherwise conflicted with any of the Business IP Rights and, to the Knowledge of the Borrowers and Guarantors, there are no facts that indicate a likelihood of any of the foregoing.

(e)     Immediately subsequent to the entry of the Interim Order, the Business IP Rights will be owned by or available for use by the Borrowers and the Guarantors (as applicable) on the same terms as those under which such Persons owned or used the Business IP rights immediately prior to the entry of the Interim Order.

(f)     Except as set forth on <u>Schedule 3.16</u>, no Borrower or Guarantor is a party to, or bound by, whether written or oral, any agreement relating to the licensing of Intellectual Property by any Borrower or Guarantor to a third party or by a third party to any Borrower or Guarantor (other than unmodified off-the-shelf software) or any other agreements affecting

23

Borrowers' or Guarantors' ability to use or disclose any Intellectual Property, or any contract which prohibits it from freely engaging in business anywhere in the world.

3.17.  Full Disclosure.  No information contained in this Agreement, the other Loan Documents, the Financial Statements or any written statement furnished by or on behalf of Borrowers and the Guarantors pursuant to the terms of this Agreement or any other Loan Document, which has previously been delivered to Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

3.18.  Environmental Matters.  Except as set forth on Schedule 3.18 Borrowers and Guarantors have at all times complied with, and are in compliance with, all Environmental Laws (which compliance has included obtaining and complying with all permits, licenses and other authorizations required pursuant to Environmental Laws); (ii) no Borrower or Guarantor has received any written notice, report or other information regarding any actual or alleged violation of Environmental Laws, relating to any Borrower or Guarantor, or any Borrower or Guarantor's current or former facilities, properties or assets, including without limitation the Subject Property; and (iii)  Borrowers and the Guarantors have no Environmental Liabilities; in each case under clause (i), (ii), and (iii) above, except for such non-compliance, actual or alleged violations, or Environmental Liabilities that, individually or in the aggregate, could not reasonably be expected to have or result in a Material Adverse Effect.

3.19.  Insurance Policies.  Borrowers' and Guarantors' insurance is reasonable and standard for Borrowers' and Guarantors' industry and geographic location.

3.20.  Deposit and Disbursement Accounts.  Schedule 3.20 lists all banks and other financial institutions at which Borrowers and the Guarantors maintain deposits or other accounts or post office lock boxes and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number.  Borrowers and the Guarantors have delivered to Lender true, correct and complete copies of all agreements, instruments and other documents relating to any credit card programs, arrangements or agreements to which they are a party.

3.21.  Government Contracts.  Except as set forth in Schedule 3.21, as of the Closing Date, Borrowers and the Guarantors are not party to any contract or agreement with the federal government and no Borrowers' or Guarantors' Accounts are subject to the Federal Assignment of Claims Act (31 U.S.C.  Section 3727).

3.22.  Customer and Trade Relations.  As of the Closing Date, except as set forth on Schedule 3.22, there exists no actual or threatened termination or cancellation of, or any material adverse modification or change in: (a) the business relationship of Borrowers and the Guarantors with any customer or group of customers whose purchases during the preceding twelve (12) months caused them to be ranked among the ten (10) largest customers of Borrowers and the Guarantors; or (b) the business relationship of Borrowers and the Guarantors with any supplier material to its operations.

K&E 18571360.18
RLF1 3982293v. 1

3.23.   Agreements and Other Documents.  As of the Closing Date, Borrowers and the Guarantors have provided Lender and its counsel, accurate and complete copies (or summaries) of all of the following agreements or documents (in addition to the Material Contracts) to which Borrowers and the Guarantors are subject and each of which are listed on Schedule 3.23:  (a) supply agreements and purchase agreements not terminable by Borrowers and the Guarantors within sixty (60) days following written notice issued by Borrowers and the Guarantors and involving transactions in excess of $100,000 per annum; (b) any lease of Equipment having a remaining term of one year or longer and requiring aggregate rental and other payments in excess of $50,000 per annum; (c) licenses and permits held by Borrowers and the Guarantors, the absence of which could be reasonably likely to have a Material Adverse Effect; (d) instruments or documents evidencing Indebtedness of Borrowers and the Guarantors and any security interest granted by Borrowers and the Guarantors with respect thereto; and (e) instruments and agreements evidencing the issuance of any Stock, warrants, rights or options to purchase Stock of Borrowers and the Guarantors.

3.24.   Bankruptcy Matters.

(a)   The Chapter 11 Cases were commenced on the Petition Date in accordance with Applicable Law and proper notice thereof and proper notice of the hearing for the approval of the Interim Order has been given and proper notice of the hearing for the approval of the Final Order will be given.  The Canadian Proceedings will be commenced in accordance with Applicable Law and proper notice thereof and proper notice of the hearing for the approval of the Interim Initial Order and each other Canadian Order will be given.

(b)   After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, and in respect of the Canadian Borrower, a corresponding orders of the Canadian Court, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases, subject to the Interim Order and the Final Order, as applicable, and in respect of the Canadian Borrower, a corresponding orders of the Canadian Court, having priority over all administrative expense claims and unsecured claims against Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out Amount and, in the case of the Canadian Borrower, as provided in the Canadian Orders.

(c)   After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, and in respect of the Canadian Borrower, a corresponding orders of the Canadian Court, subject to the Interim Order and the Final Order, as applicable, and in respect of the Canadian Borrower, a corresponding orders of the Canadian Court, the Obligations will be secured by a valid and perfected first priority Lien in and against all of the Collateral.

(d)   The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended

K&E 18571360.18
RLF1 3982293v. 1

(except as may be modified or amended with Lender's express written consent). Once entered, each of the Canadian Orders will be at all times in full force and effect and not been reversed, stayed, modified or amended (except as may be modified or amended with Lender's express written consent).

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, subject to the Interim Order and the Final Order, as applicable, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations from the applicable Borrower and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

## 4.     FINANCIAL STATEMENTS AND INFORMATION

4.1.     <u>Reports and Notices</u>.  Borrowers covenant and agree that from and after the Closing Date and until repayment in full in cash of the Obligations remaining after reduction thereof pursuant to the terms of the Asset Purchase Agreement, it shall deliver to Lender the Financial Statements, Budgets, cash flow forecasts, reports and notices required to be delivered pursuant to the terms of this Agreement at the times and in the manner set forth in <u>Annex B</u>.

4.2.     <u>Communication with Accountants</u>.  Each Borrower authorizes Lender to communicate directly with its independent certified public accountants and tax advisors (excluding legal counsel) and authorizes those accountants and advisors to disclose to Lender any and all work papers and financial statements and other supporting financial documents and schedules, including copies of any management letter with respect to the business, financial condition and other affairs of the Borrowers; <u>provided</u>, <u>however</u>, that Lender shall give the Borrowers reasonable prior notice of any such communications and such Borrowers shall be invited to be present during any such communications (but such presence shall not be a prerequisite of such communications).  At Lender's request, the Borrowers shall send a letter to such accountants and tax advisors, and deliver a copy thereof to Lender, instructing them to make available to Lender such information and records as Lender may reasonably request and to otherwise comply with the provisions of this <u>Section 4</u>.

4.3.     <u>Documents Filed with the Bankruptcy Court or Delivered to the US Trustee or Committee</u>.  At the time any report (including, without limitation, monthly reports), projection, prospectus or other similar document is filed with the Bankruptcy Court or Canadian Court, Borrowers shall deliver to Lender copies of any such report, projection, prospectus or other similar document.  Borrowers shall also promptly provide Lender with copies of all documents or information provided by or on behalf of Borrowers to the Committee with respect to the Chapter 11 Case or Canadian Proceedings.

## 5.     AFFIRMATIVE COVENANTS

Each Borrower covenants and agrees that, unless Lender shall otherwise consent in writing, from and after the date hereof and until the Termination Date, it shall, and the US Borrower shall cause each Guarantor to, comply with the following affirmative covenants:

5.1.     <u>Maintenance of Existence and Conduct of Business</u>.  (a) Except as occasioned by the Chapter 11 Cases or Canadian Proceedings, do or cause to be done all things necessary to

preserve and keep in full force and effect its statutory existence and corporate franchises; (b) continue to conduct its business substantially as now conducted or as otherwise permitted hereunder; (c) preserve all of its material property, in use or useful in the conduct of its business and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices, so that the business carried on in connection therewith may be properly and advantageously conducted at all times, provided that nothing in this Section 5.1(c) shall prevent the Borrowers from discontinuing the use or operation of any property if such discontinuance, in the judgment of the US Borrower's Board of Directors, is desirable in the conduct of the Borrowers' business; and (d) transact business only under the names set forth in <u>Schedule 3.2</u>.

      5.2.   <u>Payment of Charges and Claims</u>. To the extent permitted hereunder and to the extent applicable in the Chapter 11 Cases or Canadian Proceedings, pay and discharge, or cause to be paid and discharged in accordance with the terms thereof, (a) all Charges imposed upon it or its income and profits, or any of its property (real, personal or mixed) prior to the date on which penalties attach thereto, and (b) all lawful claims for labor, materials, supplies and services or otherwise, which, if unpaid, might or could become a Lien on its property; <u>provided</u>, <u>however</u>, that Borrowers shall not be required to pay any such Charge or claim which is being contested in good faith by proper legal actions or proceedings, so long as at the time of commencement of any such action or proceeding and during the pendency thereof (i) reserves with respect thereto are established and are maintained in accordance with GAAP, (ii) such contest operates to suspend collection of the contested Charges or claims and is maintained and prosecuted continuously with diligence, (iii) none of the Collateral would be subject to forfeiture or loss by reason of the institution or prosecution of such contest, (iv) no Liens securing an aggregate amount in excess of $25,000 shall exist for such Charges or claims during such action or proceeding (excluding Liens securing obligations fully covered by insurance or otherwise bonded to the satisfaction of Lender), and (v) if such contest is terminated or discontinued adversely to Borrowers, Borrowers shall promptly pay or discharge such contested Charges and all additional charges, interest penalties and expenses, if any, and shall deliver to Lender evidence reasonably acceptable to Lender of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to Borrowers.

      5.3.   <u>Books and Records</u>. Keep adequate records and books of account with respect to its business activities, in which proper entries, reflecting all of its consolidated and consolidating financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements in all material respects.

      5.4.   <u>Litigation</u>. Notify Lender in writing, promptly upon learning thereof, of any litigation, action, suit, claim, investigation, arbitration or other proceeding commenced or threatened, at law, in equity or otherwise against it, and of the institution against it of any suit or administrative proceeding which (a) could reasonably be expected to involve an amount in excess of $50,000 individually or $100,000 in the aggregate, or (b) if adversely determined, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect.

      5.5.   <u>Insurance</u>.

K&E 18571360.18
RLF1 3982293v. 1

(a)     At its sole cost and expense, maintain or cause to be maintained policies of insurance of such type and in such amounts as is reasonable and standard in Borrowers' industry and geographic location and as is satisfactory to Lender and with insurers recognized as adequate by Lender acting reasonably.  Borrowers shall notify Lender promptly of any adverse occurrence causing a material loss or material decline in value of any real or personal property and the estimated (or actual, if available) amount of such loss or material decline.  Borrowers hereby direct all present and future insurers under its "All Risk" policies of insurance to pay all proceeds payable thereunder directly to Lender.  Each of the Borrowers and each Guarantor irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as its true and lawful agent and attorney in-fact for the purpose of, upon the occurrence and during the continuance of a Default, making, settling and adjusting claims under the "All Risk" policies of insurance, endorsing the name of such Person on any check, draft, instrument or other item of payment for the proceeds of such "All Risk" policies of insurance, and for making all determinations and decisions with respect to such "All Risk" policies of insurance.  In the event Borrowers at any time or times hereafter shall fail to obtain or maintain (or fail to cause to be obtained or maintained) any of the policies of insurance required above or to pay any premium in whole or in part relating thereto, Lender, without waiving or releasing any Obligations or Default hereunder, may at any time or times thereafter (but shall not be obligated to) obtain and maintain such policies of insurance and pay such premium and take any other action with respect thereto which Lender deems advisable.  All sums so disbursed, including reasonable attorneys' fees, court costs and other charges related thereto, shall be payable, on demand, by Borrowers to Lender and shall be additional Obligations hereunder secured by the Collateral.

(b)     Lender reserves the right at any time, upon review of Borrowers' risk profile, to reasonably require additional forms and limits of insurance to adequately protect Lender's interests.  Borrowers shall, if so requested by Lender, deliver to Lender, as often as Lender may reasonably request, a report of a reputable insurance broker reasonably satisfactory to Lender with respect to its insurance policies.

5.6.    <u>Compliance with Laws</u>.  Comply in all material respects with all Applicable Laws, including those relating to licensing, environmental, ERISA and labor matters.

5.7.    <u>Agreements</u>.  (i) Perform, within all required time periods (after giving effect to any applicable grace periods), all of its material obligations (except where Borrowers are contesting such obligation reasonably and in good faith or where performance is excused by the Bankruptcy Code, the CCAA, or by an applicable order of the Bankruptcy Court or the Canadian Court, and such non-compliance would neither have nor could be reasonably expected to have a Material Adverse Effect on Borrowers' business or assets or upon any of the rights, remedies or interests of the Lender) and (ii) enforce all of its material rights under each Material Contract or other document or instrument to which it is a party.  Borrowers shall perform and comply in all material respects with all obligations in respect of all material Chattel Paper, Instruments, Contracts, Licenses, and Documents and all other material agreements constituting or giving rise to Collateral, except to the extent that (i) such compliance is excused by the Bankruptcy Code, the CCAA or by an applicable order of the Bankruptcy Court or the Canadian Court and (ii) such non-compliance would neither have nor could reasonably be expected to have a Material

28

Adverse Effect on Borrowers' business or assets or upon any of the rights, remedies or interests of the Lender.

5.8. [Reserved].

5.9. <u>Environmental Matters</u>. (a) Comply in all material respects with all Environmental Laws and Environmental Permits, (b) notify Lender promptly (but no later than five (5) days) after Borrowers become aware of any material Release, or any material violation of any Environmental Law, upon any Subject Property and conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws to abate said Release or otherwise to come into compliance, in all material respects, with Environmental Law, and (c) promptly forward to Lender a copy of any order, notice, permit, application, or any communication or report by any Governmental Authority received by Borrowers or any correspondence or other documentation provided by Borrowers related hereto in connection with any such Release or violation or any other matter relating to the Environmental Laws that may affect any Subject Property or Borrowers, and (d) at the request of Lender, conduct investigations, reasonable in scope and substance under the circumstances of the request, of any known or suspected conditions of contamination which are, or could reasonably be expected to become, material. The provisions of this <u>Section 5.9</u> shall apply whether or not the Environmental Protection Agency, any other federal agency or any state or local environmental agency has taken or threatened any action in connection with any Release or the presence of any Hazardous Materials.

5.10. <u>Application of Proceeds</u>. Use the proceeds of the Revolving Credit Advances as provided in <u>Section 1.3</u>.

5.11. <u>Fiscal Year</u>. Maintain as its Fiscal Year the calendar year.

5.12. <u>Subsidiaries</u>. Not form or acquire any Subsidiary.

5.13. <u>Further Assurances</u>. At its sole cost and expense, upon request of Lender, duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and documents, including title policies and surveys, and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purposes of this Agreement or any other Loan Document.

5.14. <u>Appraisals</u>. Allow Lender and its designees from time to time as Lender shall direct, to perform, and shall assist Lender and its designees in performing, appraisals of Borrowers' Inventory, Equipment, accounts receivable and Subject Property. So long as no Default has occurred and is continuing, Lender agrees to provide to Borrowers upon the request of Borrowers any such appraisal prepared by a third party unaffiliated with Lender which has consented to Lender so providing such appraisal. In furtherance of the foregoing, Lender agrees to use reasonable efforts to obtain any such consent. Borrowers agree to pay all reasonable out-of-pocket costs and expenses incurred by Lender in connection with such appraisals conducted after a Default.

5.15. <u>Intellectual Property</u>.

K&E 18571360.18
RLF1 3982293v. 1

(a)     Conduct its business and affairs without infringement of or interference with any intellectual property of any other Person and shall continue to maintain, preserve, and protect all of the material Intellectual Property of the Borrowers and Guarantors so as not to adversely affect the validity or enforceability thereof;.

(b)     In the event that any Business IP Rights owned by Borrowers or Guarantors is or has been infringed, misappropriated, violated, or diluted or otherwise impaired by a third party, such Borrowers or Guarantors shall take such reasonable actions under the circumstances in response thereto, including, if necessary under the circumstances, promptly bringing suit and recovering all damages therefor; and

(c)     Borrowers and Guarantors shall take any and all commercially reasonable steps to protect the secrecy of all trade secrets relating to the products and services sold or delivered under or in connection with the Business IP Rights, including, without limitation, where appropriate entering into confidentiality agreements with employees and labeling and restricting access to secret information and documents..

5.16.    <u>Sale Process</u>.  Pursue authorization and approval of the sale of substantially all of its assets under the Asset Purchase Agreement and the consummation thereof, subject to any higher or better offers that may be received in accordance with the Bid Procedures.  Borrowers and its advisors shall provide the Lender with weekly telephonic updates of sale efforts, including expressions of interest and offers received.

5.17.    <u>Schedule of Financial Affairs</u>.  On or before the date that is 20 days after the Petition Date, file with the Bankruptcy Court completed statements of financial affairs and schedules of assets and liabilities as required by the Bankruptcy Rules.

5.18.    <u>Sale Milestones</u>.

(a)     <u>US Milestones</u>.

(i)     On the Petition Date, the US Borrower shall file a motion in form and substance acceptable to Lender (the "<u>Bid Procedures Motion</u>") establishing the Bid Procedures and seeking to approve the Asset Purchase Agreement and the bid protections contemplated therein (it being understood that such motion may be combined with the Bid Procedures Motion).

(ii)     By no later than 16 days after the Petition Date, the US Borrower shall cause to be entered an order in form and substance satisfactory to Lender, approving the Bid Procedures Motion, the Asset Purchase Agreement and related bid protections.

(iii)     By no later than 2 Business Days prior to the Sale Order Date (the "<u>Auction Date</u>"), the US Borrower shall conduct an auction of the Borrowers' and Guarantors' assets to the extent more than 1 qualifying bid shall have been received.

(iv)     By no later than June 2, 2011 (the "<u>Sale Order Date</u>"), the US Borrower shall cause the Bankruptcy Court to have entered an order, in form and substance

K&E 18571360.18
RLF1 3982293v. 1

satisfactory to the Lender, approving the sale pursuant to the terms of the Asset Purchase Agreement.

(v)     By no later than the date that is 15 days following the Sale Order Date, the US Borrower shall close the Court approved sale under the Asset Purchase Agreement.

(b)     <u>Canadian Milestones</u>.

(i)     By no later than 3 Business Days after the Petition Date, the Canadian Borrower shall commence the Canadian Proceedings.

(ii)     By no later than 3 Business Days after the Petition Date (x) the Interim Initial Order in form and substance satisfactory to the Lender shall have been entered; and (y) the Canadian Borrower shall have filed and served an application with the Canadian Court for the Initial Recognition Order and the Supplemental Recognition Order in form and substance satisfactory to the Lender.

(iii)     By no later than 8 Business Days after the Petition Date, the Initial Recognition Order and the Supplemental Recognition Order in form and substance satisfactory to the Lender shall have been entered.

(iv)     By no later than 8 Business Days after the Petition Date, the Canadian Borrower shall have filed and served an application with the Canadian Court for the Sale Recognition Order, the Assignment Recognition Order and the Bidding Procedures Recognition Order in form and substance satisfactory to the Lender.

(v)     By no later than 23 days after the Petition Date, the Bidding Procedures Recognition Order, in each case in form and substance satisfactory to the Lender, shall have been entered, and by no later than 51 days after the Petition Date, the Sale Recognition Order and the Assignment Recognition Order, in each case in form and substance satisfactory to the Lender, shall have been entered.

(vi)     By no later than 25 days after the Petition Date, the Canadian Borrower shall have served and filed an application with the Canadian Court for the Final Order Recognition Order in form and substance satisfactory to the Lender.

(vii)     By no later than 32 days after the Petition Date, the Final Order Recognition Order, in form and substance satisfactory to the Lender, shall have been entered.

5.19.     <u>Financial Deliverables</u>.  Comply with the provisions set forth in <u>Annex B</u>.

# 6.     NEGATIVE COVENANTS

Borrowers covenant and agree that, unless Lender shall otherwise consent in writing, from and after the date hereof and until the Termination Date, Borrowers shall not, and US Borrower shall cause each Guarantor not, to do any of the following:

K&E 18571360.18
RLF1 3982293v. 1

6.1.     Mergers, Subsidiaries, Etc.     Directly or indirectly, by operation of law or otherwise, merge, amalgamate, consolidate or otherwise combine with any Person or acquire or hold all or substantially all of the assets or capital stock of any Person, or form, acquire or hold any Subsidiary.

6.2.     Investments.  Directly or indirectly, make or maintain any Investment except:  (a) Investments permitted by Section 6.3, 6.4, or 6.6; (b) Investments outstanding on the date hereof and listed in Schedule 6.2; (c) Investments in Cash Equivalents at any time during which no Revolving Credit Advances are outstanding and which are subject to a first priority perfected Lien of Lender; (d) Investments representing stock or obligations issued to Borrowers in settlement of claims against any other Person or the other Borrower by reason of a composition or readjustment of debt or reorganization of any debtor of Borrowers; and (e) Investments represented by deposits into bank accounts of Borrowers to the extent permitted hereunder. Notwithstanding anything in this Section 6.2 to the contrary, no Investments by US Borrower or any Guarantors in, to, or on behalf of the Canadian Borrower shall be permitted.

6.3.     Indebtedness.  Create, incur, assume or permit to exist any Indebtedness, except: (a) the Obligations; (b) Deferred Taxes; (c) Capital Lease Obligations and Indebtedness secured by purchase money Liens permitted under clause (c) of Section 6.7 (including any such Capital Lease Obligations and Indebtedness set forth in Schedule 6.3) and from and after the Closing Date, create, incur or assume vendor debt in a maximum aggregate amount at any one time outstanding not to exceed $10,000,000; (d) Guaranteed Indebtedness permitted under Section 6.6; and (e) Indebtedness existing on the Closing Date and set forth in Schedule 6.3.

6.4.     Affiliate and Employee Transactions.  Except as set forth in Schedule 6.4 or as otherwise expressly permitted hereunder, enter into or be party to any lending, borrowing or other commercial transaction or arrangement with any of its Affiliates, officers, directors or employees, including payment of any management, consulting, advisory, service or similar fee or any deferred compensation (excluding salaries, bonuses and other compensation to its officers, directors and employees in the ordinary course of business, consistent with past practices).

6.5.     Capital Structure and Business.  (a) Make any changes in its business operations which, individually or in the aggregate, could adversely affect the repayment of the Obligations or reasonably be expected to have or result in a Material Adverse Effect; (b) make any change in its capital structure or issue of any Stock or make any revision of the terms of its outstanding Stock or amend or modify any shareholders, voting or similar agreement to which it is a party or enter into any such agreement, in each case, without the prior written consent of Lender; (c) amend its articles or certificate of incorporation, charter, by-laws or other organizational documents; or (d) engage in any business other than the businesses engaged in as of the Closing Date and other business directly related thereto.

6.6.     Guaranteed Indebtedness.  Create, incur, assume or permit to exist any Guaranteed Indebtedness except for the Obligations under the Loan Documents and:  (a) endorsements of instruments or items of payment for deposit to any bank accounts of Borrowers; (b) performance bonds or indemnities entered into in the ordinary course of business, consistent with past practices; and (c) Guaranteed Indebtedness outstanding on the Closing Date and listed in Schedule 6.3.  Notwithstanding anything in this Section 6.6 to the contrary, no Guaranteed

32

Indebtedness shall be permitted to be incurred by US Borrower or any Guarantors in, to, or on behalf of the Canadian Borrower.

6.7. <u>Liens</u>. Create or permit to exist any Lien on any of its properties or assets except for: (a) presently existing or hereafter created Liens in favor of Lender, to secure the Obligations; (b) Permitted Encumbrances; (c) purchase money Liens or purchase money security interests upon or in Equipment acquired by Borrowers in the ordinary course of business to secure the purchase price of such Equipment or to secure Capital Lease Obligations, in each case, permitted under clause (c) of <u>Section 6.3</u> and incurred solely for the purpose of financing the acquisition of such Equipment; (d) cash deposits with utility companies as ordered by the Bankruptcy Court or as otherwise agreed to by Borrowers and a utility company with the consent of the Lender; and (e) Liens in respect of the property and assets of the Canadian Borrower only created pursuant to the applicable Canadian Order securing an administrative charge in an amount not to exceed, in the aggregate, $100,000. The prohibition provided for in this <u>Section 6.7</u> specifically includes, without limitation, any effort by Borrowers, any Committee, or any other party-in-interest in the Chapter 11 Case or Canadian Proceedings to prime or create *pari passu* to any claims or interest of Lender any Lien (other than for the Carve-Out Amount) irrespective of whether such claims or interest may be "adequately protected". Notwithstanding anything in this Section 6.7 to the contrary, no Liens on any property or assets of the US Borrower or any Guarantors shall be permitted if the obligation underlying such Lien is for, or for the benefit of, the Canadian Borrower.

6.8. <u>Sale of Assets</u>. Sell, transfer, convey, license, assign or otherwise dispose of any of its tangible or intangible assets or properties, including any Collateral; <u>provided</u>, <u>however</u>, that the foregoing shall not prohibit (a) the sale of Inventory in the ordinary course of business; (b) the sale or disposition for fair consideration in any Fiscal Year of any assets or properties in the ordinary course of business which have become obsolete or surplus to the business of Borrowers having a fair market value of not greater than $50,000 in the aggregate for all Borrowers during such Fiscal Year and (c) the sale contemplated by the Asset Purchase Agreement.

6.9. <u>ERISA</u>. Adopt, participate in or contribute to any new Pension Plan or Multiemployer Plan (other than such plans that are set forth on Schedule 3.13) or acquire any new ERISA Affiliate that maintains or has an obligation to contribute to a Pension Plan or Multiemployer Plan Title IV Plan. Additionally, except as described in clauses (a) through (i) of this Section 6.9 associated with the Bell + Howell Legacy MMT Pension Plan, no Borrower nor any ERISA Affiliate shall: (a) permit or suffer any condition set forth in Section 3.13 to cease to be met and satisfied at any time, other than permitting an ERISA Affiliate acquired after the Closing Date to sponsor a Title IV Plan, a Plan subject to IRC Section 412 or ERISA Section 302, or a Retiree Welfare Plan; (b) terminate any Title IV Plan where such termination could reasonably be anticipated to result in liability to Borrowers; (c) permit any accumulated funding deficiency, as defined in Section 302(a)(2) of ERISA, to be incurred with respect to any Pension Plan; (d) fail to make any contributions or fail to pay any amounts due and owing as required by the terms of any Plan before such contributions or amounts become delinquent; (e) make a complete or partial withdrawal (within the meaning of Section 4201 of ERISA) from any Multiemployer Plan prior to a closing of the transactions under the Asset Purchase Agreement; (f) fail to provide Lender with copies of any Plan documents or governmental reports or filings, if reasonably requested by Lender; (g) fail to make any contribution or pay any amount due as

33

required by IRC Section 412 or Section 302 of ERISA; (h) allow any ERISA Event or event described in Section 4062(e) of ERISA to occur with respect to any Title IV Plan; and (i) with respect to all Retiree Welfare Plans, allow the present value of future anticipated expenses to increase by $500,000.

6.10. <u>Financial Covenants</u>.  Breach or fail to comply with any of the financial covenants set forth on <u>Annex C-1</u> and <u>Annex C-2</u>, each of which shall be calculated in accordance with GAAP consistently applied (and based upon the financial statements delivered hereunder).

6.11. <u>Restricted Payments; Use of Proceeds</u>.  (a) Make any Restricted Payment to any Person including payments between US Borrower and Canadian Borrower and between the US Borrower's Subsidiaries and Canadian Borrower, except that the US Borrower and Guarantors may make payments between each other in the ordinary course of business, <u>provided</u>, that any such payments which are in the nature of loans are evidenced by intercompany notes, repayment of which is subordinated to repayment of the Obligations, and which notes shall be collaterally assigned to Lender, to secure the Obligations; or (b) utilize the Collateral and the proceeds of the Revolving Credit Loans which are incurred from time to time other than for (i) working capital and general corporate purposes, including payment of certain fees and expenses of professionals retained by Borrowers in accordance with the terms of this Agreement and the other Loan Documents, subject to the terms of the Interim Order and Final Order and Canadian Orders solely for the purposes specified in the applicable Budget and (ii) certain other pre-petition expenses that are approved by the Bankruptcy Court and previously approved by Lender.

6.12. <u>Hazardous Materials</u>.  (a) cause or permit a Release of Hazardous Material on, under, in or about any Subject Property which could reasonably be expected to result in any material Environmental Liability; (b) use, store, generate, treat or dispose of Hazardous Materials in any manner which could reasonably be expected to result in any material Environmental Liability; or (c) transport any Hazardous Materials to or from any Subject Property, in any manner which could reasonably be expected to result in any material Environmental Liability.

6.13. <u>Sale-Leasebacks</u>.  Engage in any sale-leaseback, synthetic lease or similar transaction involving any of its property or assets.

6.14. <u>Cancellation of Indebtedness</u>.  Subject to any order of the Bankruptcy Court or the Canadian Court entered in the Chapter 11 Cases or  the Canadian Proceedings, respectively, cancel any claim or Indebtedness owing to it, except for adequate consideration negotiated in an arm's length transaction and in the ordinary course of its business, consistent with past practices.

6.15. <u>Bank Accounts</u>.  Maintain any deposit, operating or other bank accounts except for those accounts identified in <u>Schedule 3.20</u>.

6.16. <u>No Speculative Investments</u>.  Engage in any speculative investment or any investment involving commodity options or futures contracts.

6.17. <u>Margin Regulations</u>.  Directly or indirectly, use the proceeds of any Revolving Credit Advance or any of the Revolving Credit Loans to purchase or carry any Margin Stock or

any equity security of a class which is registered pursuant to Section 12 of the Securities Exchange Act of 1934.

6.18.   <u>Limitation on Negative Pledge Clauses</u>.   Directly or indirectly enter into any agreement (other than the Loan Documents) with any Person which prohibits or limits the ability of Borrowers or any Guarantor to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired.

6.19.   <u>Material Contracts</u>.   (a) Subject to any order of the Bankruptcy Court or the Canadian Court in the Chapter 11 Cases or the Canadian Proceedings, respectively, cancel or terminate any Material Contract unless, in the discretion of the US Borrower's or the Canadian Borrower's Board of Directors, as applicable, there occurs an event of default by any other party to such contract; or (b) waive any default or breach any Material Contract, or materially amend or otherwise modify any Material Contract or take (or omit to take) any other material adverse action in connection with any Material Contract.

6.20.   <u>Leases</u>.   (a) Renew (by amendment, modification or otherwise) any Lease or similar agreements other than renewals of existing Leases upon substantially the same terms (other than reasonable increases in rent based on market conditions) as are in effect on the Closing Date, or (b) enter into any new Lease or similar agreements other than as permitted under <u>Section 6.21</u>.

6.21.   <u>New Premises</u>.   Enter into, or become a lessee under, any Operating Lease of real property without the prior written consent of Lender.

6.22.   <u>Repayment of Indebtedness</u>.   Except pursuant to a confirmed reorganization plan and except as specifically permitted hereunder, without the express prior written consent of Lender pursuant to an order of the Bankruptcy Court or the Canadian Court after notice and hearing, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Chapter 11 Case that is subject to the automatic stay provisions of the Bankruptcy Code or the CCAA whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

6.23.   <u>Reclamation Claims</u>.   Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(h) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount of Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $75,000.

6.24.   <u>Chapter 11 Claims</u>.   Incur, create, assume, suffer to exist or permit any other super-priority administrative claim which is *pari passu* with or senior to the claims of Lender against Borrowers, except as set forth in <u>Section 1.12</u>.

K&E 18571360.18
RLF1 3982293v. 1

6.25. <u>Change of Management</u>. (a) Permit the composition of the board of directors (or equivalent) of the Borrowers or any Guarantor to be unsatisfactory to Lender or (b) permit changes to management that are unsatisfactory to the Lender.

6.26. <u>Intellectual Property</u>. Unless otherwise agreed in writing by Lender, the Borrowers and Guarantors shall (and shall cause all its licensees to): (a) continue to use each Trademark owned by such Borrowers and Guarantors included in the Business IP Rights in order to maintain such Trademark in full force and effect; and (b) not do any act or omit to do any act whereby: (i) such Trademark (or any goodwill associated therewith) may become destroyed, invalidated, impaired or harmed in any way, (ii) any Patent owned by such Borrowers or Guarantors included in the Business IP Rights may become forfeited, misused, unenforceable, abandoned or dedicated to the public, (iii) any portion of the Copyrights owned by such Borrowers and Guarantors included in the Business IP Rights may become invalidated, otherwise impaired or fall into the public domain or (iv) any Trade Secret owned by such Borrowers and Guarantors and included in the Business IP Rights may become publicly available or otherwise unprotectable.

## 7. TERM

7.1. <u>Duration</u>. The financing arrangement contemplated hereby shall be in effect until the Commitment Termination Date. On the Commitment Termination Date, the Revolving Credit Commitment shall terminate and the Revolving Credit Loans and all other Obligations shall immediately become due and payable in full, in cash.

7.2. <u>Survival of Obligations</u>. Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the Obligations, duties, indemnities, and liabilities of Borrowers or the Guarantors under any of the Loan Documents, or the rights of Lender relating to any Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is not required until after the Commitment Termination Date. Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon Borrowers or Guarantors under any of the Loan Documents, and all rights of Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive such termination or cancellation and shall continue in full force and effect until the Termination Date on which date they shall cease.

## 8. EVENTS OF DEFAULT; RIGHTS AND REMEDIES

8.1. <u>Events of Default</u>. Notwithstanding the provisions of Section 362 of the Bankruptcy Code or otherwise and without application or motion to the Bankruptcy Court or Canadian Court or any notice to Borrowers, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a) the US Borrower or the Canadian Borrower shall fail to make any payment in respect of any Obligations hereunder or under any of the other Loan Documents

K&E 18571360.18
RLF1 3982293v. 1

when due and payable or declared due and payable, including any payment of principal of, or interest on, the Revolving Credit Loans or reimburse Lender for any expense reimbursable hereunder, any other liabilities or other payment, fee, charge or expense provided for hereunder when due; or

(b)      the US Borrower or the Canadian Borrower shall fail or neglect to perform, keep or observe any of the provisions of Section 4.1, Section 5.2 (solely insofar as such Section requires and Borrowers fail to pay Claims for sales and use taxes and payroll withholding taxes in accordance with the terms of such Section), or Section 5.5, within ten (10) days from the date such performance is due, or at any time any of Section 1.3, Section 5.16, Section 5.17, Section 5.18, Section 5.19 or any subsection of Section 6; or

(c)      the US Borrower or the Canadian Borrower shall fail or neglect to perform, keep or observe any term or provision of this Agreement (other than any such term or provision referred to in paragraph (a) or (b) above) with respect to matters applicable to the US Borrower or the Canadian Borrower, as applicable, or Borrowers or any Guarantor under any of the other Loan Documents or contained in any other agreement or arrangement, now or hereafter entered into between Borrowers and Lender relating to the Obligations, shall fail or neglect to perform, keep or observe any term or provision of any other Loan Document, and the same shall remain unremedied for a period ending on the tenth (10th) day after either Borrower shall become aware of such Default; or

(d)      except for defaults: (i) occasioned by the filing of the Chapter 11 Cases and the Canadian Proceedings;  and (ii) resulting from Obligations with respect to which the Bankruptcy Code or, solely with respect to the Canadian Borrower, the Canadian Orders, prohibits Borrowers from complying with, or permits Borrowers not to comply with the Bankruptcy Code or such Canadian Orders, a default or breach occurs under any other Material Contract, document or instrument entered into either (x) Pre-Petition and which is affirmed after the Petition Date or (y) Post-Petition, to which Borrowers are a party or by which Borrowers or their property is bound, and such default (i) involves the failure to make any payment (after expiration of any applicable grace period), whether of principal, interest or otherwise, due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) in respect of any Indebtedness of Borrowers in an aggregate amount exceeding $100,000 or (ii) causes (or permits any holder of such Indebtedness or a trustee to cause) such Indebtedness, or a portion thereof in an aggregate amount exceeding $100,000, to become due prior to its stated maturity or prior to its regularly scheduled dates of payment; or

(e)      any information contained in any Weekly Budget Variance Report is untrue or incorrect by an amount which exceeds, in the aggregate for all such discrepancies, $100,000 or any representation or warranty herein or in any Loan Document or in any written statement, report, financial statement or certificate (other than a Weekly Budget Variance Report) made or delivered to Lender by Borrowers shall be untrue or incorrect in any material respect as of the date when made or deemed made (including those made or deemed made pursuant to Section 2.2); or

(f)      any judgments which are in the aggregate in excess of $50,000 (to the extent not covered by insurance) as to any post-Petition Date obligation shall be rendered against

37

Borrowers or any Guarantor or the enforcement thereof shall not be stayed (by court ordered stay or by consent of the party litigants); or there shall be rendered against Borrowers or any Guarantor a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a Material Adverse Effect on the ability of Borrowers or any Guarantor to perform its Obligations under the Loan Documents; or

(g)    this Agreement or any other Loan Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Lender shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Lender to take any action within its control; or

(h)    Borrowers or any Guarantor shall contest the validity or enforceability of any of the Loan Documents in writing or deny in writing that it has any further liability, including with respect to future advances by Lender, under any Loan Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Collateral Documents; or

(i)    at any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder; or

(j)    there shall occur a Change of Control; or

(k)    an event or condition specified in Section 6.9 (other than an event or condition associated with the Bell + Howell Legacy MMT Pension Plan) hereof shall occur or exist with respect to any Plan or Multiemployer Plan and, as a result of such event or condition, together with all other such events or conditions, Borrowers or any ERISA Affiliate shall cause or in the opinion of Lender shall be reasonably likely to cause liability to a Plan, a Multiemployer Plan or PBGC (or any combination of the foregoing) to increase by $500,000; or

(l)    the occurrence of any of the following in any of the Chapter 11 Cases or the Canadian Proceedings:

(i)    the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by either Borrower or any Guarantor in the Chapter 11 Case or Canadian Proceedings:  (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Order or the Final Order, as the case may be, to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of Lender; or (D) that is directly adverse to Lender or its rights and remedies hereunder or its interest in the Collateral; or

(ii)     the filing of any plan of reorganization or disclosure statement attendant thereto in the Chapter 11 Cases or Canadian Proceedings by Borrowers or any other Person to which Lender does not consent or otherwise agree to the treatment of the claims against the Borrowers and Guarantors; or

(iii)     the entry of an order in the Chapter 11 Case or Canadian Proceedings confirming a plan of reorganization that does not contain a provision for termination of the Revolving Credit Commitments and repayment in full in cash of all of the Obligations under this Agreement and the claims under the Pre-Petition Loan Agreement on or before the effective date of such plan; or

(iv)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order or the Final Order or any Canadian Order without the written consent of Lender or the filing of a motion for reconsideration with respect to the Interim Order of the Final Order or any Canadian Order; or

(v)     the Final Order is not entered within 20 days following the Petition Date; or

(vi)     other than payments permitted pursuant to this Agreement or the Interim Order or the Final Order or Canadian Orders, as applicable, Borrowers or any Guarantor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Indebtedness incurred prior to the Petition Date; or

(vii)     the payment of, or application for authority to pay, any pre-petition claim without Lender's prior written consent or pursuant to an order of the Bankruptcy Court or Canadian Court after notice and hearing unless otherwise permitted under this Agreement; or

(viii)     the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against or with respect to any of the Collateral or Pre-Petition Collateral, other than for the Carve-Out Amount; or

(ix)     Borrowers or any Guarantor shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order in any of the Chapter 11 Cases appointing (i) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of Section 1106(a) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Cases; or

(x)     absent the written consent of Lender, entry by the Bankruptcy Court of an order under Section 363 or 365 of the Bankruptcy Code, or by the Canadian Court of a recognition order authorizing or approving the sale or assignment of a material portion of any of the Borrowers' or Guarantors' assets, or procedures in respect thereof (other than pursuant to the Asset Purchase Agreement), or any of the Borrowers or Guarantors shall seek, support, or fail to contest in good faith, the entry of such an order in any of the Chapter 11 Cases or Canadian Proceedings; or

39

(xi)    the dismissal of any of the Chapter 11 Cases or Canadian Proceedings, or the conversion of any of the Chapter 11 Cases from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or a bankruptcy under the BIA or Borrowers shall file a motion or other pleading seeking the dismissal of any of the Chapter 11 Cases or Canadian Proceedings under Section 1112 of the Bankruptcy Code or otherwise; or

(xii)    the Bankruptcy Court or Canadian Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrowers or any Guarantor which have an aggregate value in excess of $50,000 or (ii) to permit other actions that would have a Material Adverse Effect on the Borrowers or any Guarantor or or any of the Collateral; or

(xiii)    the commencement by Borrowers or any officer or employee of Borrowers or by the Committee in the Chapter 11 Cases or Canadian Proceedings, or any other party in interest in the Chapter 11 Cases or Canadian Proceedings, of a suit, action or contested matter against Lender, the Existing Agent or Prior Lenders or affecting the Collateral which, in the case only of the Committee or other party of interest sets forth (a) a claim in excess of $100,000, (b) any claim or legal or equitable remedy which seeks reduction, setoff, subordination or any recharacterization of the claim or Lien of Lender or Prior Lenders; or (c) a claim that would otherwise have a Material Adverse Effect or a material adverse effect on the rights and remedies of Lender or Prior Lenders under any Loan Document or the Pre-Petition Loan Agreement and related documents or the collectability of all or any portion of the Obligations or Prior Lender Obligations; or

(xiv)    the entry of an order in the Chapter 11 Cases or Canadian Proceedings avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement; or

(xv)    (i) Any of the Borrowers or any Guarantor shall fail to comply with the terms of the Interim Order, Final Order or Canadian Orders, as applicable, in any material respect, (ii) such orders shall be amended, supplemented, stayed, reversed, vacated or otherwise modified without the written consent of Lender, (iii) any of the Borrowers or any Guarantor shall file a motion for reconsideration with respect to the Interim Order, Final Order, or Canadian Orders, or (iv) the right of Borrowers to borrow under this Agreement is terminated by an order entered by the Bankruptcy Court or Canadian Court; or

(xvi)    the Borrowers or any Guarantor shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court or Canadian Court shall enter, an order in any of the Chapter 11 Cases or Canadian Proceedings (i) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code or otherwise, not otherwise permitted pursuant to this Agreement, (ii) granting any Lien (other than Permitted Liens or Liens expressly permitted in the DIP Orders) upon or affecting any Collateral which are pari passu or senior to the Liens on the Collateral in favor of Collateral Agent, for the benefit of Agent and Lenders, (iii) granting any claim priority senior to or pari passu with the claims of the Lenders under the Credit Documents or any other claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or Section 507(b) of the Bankruptcy Code, or (iv) granting any other

40

relief that is adverse to Lender's interests under any Loan Document or its rights and remedies hereunder or their interest in the Collateral; or

(xvii)  the failure to achieve a Sale Milestone during the time period specified within the definition of "Sales Milestone"; or

(m)  termination of the Asset Purchase Agreement; or

(n)  any casualty event occurs, whether or not insured or insurable, as a result of which revenue-producing activities cease or are substantially curtailed at facilities of any Borrower of Guarantor generating more than 10% of US Borrower's consolidated revenues for the Fiscal Year preceding such event and such cessation or curtailment continues for more than thirty (30) days; or

(o)  a trustee in bankruptcy, receiver, interim receiver, receiver and manager, monitor or official with similar powers shall be appointed with respect to the Canadian Borrower or its assets.

8.2.  <u>Remedies</u>.  If any Event of Default shall have occurred and be continuing Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code or the other Applicable Laws, without any application, motion or notice to or order from, the Bankruptcy Court or Canadian Court, without prior notice, take any one or more of the following actions:  (a) terminate all or any portion of the Revolving Credit Commitment whereupon Lender's obligation to make further Revolving Credit Advances shall terminate; (b) declare all or any portion of the Obligations to be forthwith due and payable whereupon such Obligations shall become and be due and payable; and/or (c) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and, pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under this Agreement and the Loan Documents, without further application or motion to, or order from, the Bankruptcy Court or Canadian Court; <u>provided</u>, <u>however</u>, notwithstanding anything to the contrary contained herein, Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrowers in the Collateral only upon 5 Business Days' prior written notice to Borrowers, the United States Trustee for the District of Delaware, and any counsel approved by the Bankruptcy Court for the Committee.  Upon the occurrence of an Event of Default and the exercise by Lender of its rights and remedies under this Agreement and the other Loan Documents, Borrowers shall assist Lender to the extent practicable in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

8.3.  <u>Waivers by Borrowers</u>.  Except as otherwise provided for in this Agreement and Applicable Law to the fullest extent permitted by Applicable Law, Borrowers waive (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all Loan Documents, notes, commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrowers may in any way be liable, and Borrowers hereby ratify and

41

confirm whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of any right of redemption and all valuation, appraisal and exemption laws. Each of the Borrowers acknowledge that it has been advised by counsel of its choice with respect to this Agreement, the other Loan Documents and the transactions contemplated by this Agreement and the other Loan Documents, and makes the foregoing waivers knowingly and voluntarily.

## 9.    SUCCESSORS AND ASSIGNS

9.1.    <u>Successors and Assigns</u>.  This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of Borrowers, Lender, and their respective successors and permitted assigns, including, with respect to each of the Borrowers, its estate, any trustee or successor-in-interest of Borrowers in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, except as otherwise provided herein or therein.  Each of the Borrowers may not assign, delegate, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the Loan Documents without the prior express written consent of Lender.  Any such purported assignment, transfer, hypothecation or other conveyance by Borrowers without such prior express written consent shall be void.  The terms and provisions of this Agreement and the other Loan Documents are for the purpose of defining the relative rights and obligations of Borrowers and Lender with respect to the transactions contemplated hereby and there shall be no third party beneficiaries of any of the terms and provisions of this Agreement or any of the other Loan Documents.

9.2.    <u>Participations; Assignments</u>.

(a)    Lender may, at any time sell to one or more banks or other financial institutions ("<u>Participants</u>") participating interests in all or a portion of its rights and obligations under this Agreement or any other Loan Document (including all or a part of its Revolving Credit Advances, its Revolving Credit Commitment and its Revolving Credit Note, if any).

(b)    Borrowers agree that if amounts outstanding under this Agreement are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by Applicable Law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest was owing directly to it as a Lender under this Agreement.  Borrowers also agree that each Participant shall be entitled to the benefits of <u>Section 1.10</u> with respect to its participation in the Revolving Credit Commitments and the Revolving Credit Loan outstanding from time to time as if it was a Lender.

(c)    This Agreement and each other Loan Document shall inure to the benefit of the Lender and all future holders of any Revolving Credit Note, and each of their respective successors and assigns.  No rights are intended to be created under any Loan Document for the benefit of any third party donee, creditor or incidental beneficiary of the Borrowers or Lender. Borrowers acknowledge that Lender at any time and from time to time, without the consent of

the Borrowers, may sell, assign or transfer all or any part of its rights or obligations under this Agreement, the Revolving Credit Note and the other Loan Documents and/or the Collateral. Such shall have all of the rights and benefits with respect to this Agreement, the Revolving Credit Note, the Collateral and/or the other Loan Documents held by it as fully as if the original holder thereof and shall become a party to this Agreement by signing a counterpart of this Agreement or a joinder or similar agreement. Notwithstanding any other provision of any Loan Document, Lender may disclose to any potential assignees or participants all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

## 10.    MISCELLANEOUS

10.1.    <u>Complete Agreement; Modification of Agreement</u>.  This Agreement and the other Loan Documents constitute the complete agreement between the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, commitments, understandings or inducements (oral or written, expressed or implied).  Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing and signed by Lender.

10.2.    <u>Fees and Expenses</u>.

(a)    Borrowers agree to pay on demand all reasonable out-of-pocket costs and expenses (including fees and expenses of Kirkland & Ellis LLP and Osler, Hoskin & Harcourt LLP and of other advisors including Young, Conaway, Stargatt & Taylor LLP) of Lender in connection with the preparation, negotiation, approval, execution, delivery, administration, modification, amendment, waiver and enforcement (whether through negotiations, legal proceedings or otherwise) of the Loan Documents, and commitments relating thereto, and the other documents to be delivered hereunder or thereunder and the transactions contemplated hereby and thereby and the fulfillment or attempted fulfillment of conditions precedent hereunder, including:  (i) any amendment, modification or waiver of, or consent with respect to, any of the Loan Documents or advice in connection with the administration of the advances made pursuant hereto or its rights hereunder or thereunder; (ii) any litigation, arbitration, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrowers or any other Person) in any way relating to the Collateral, any of the Loan Documents or any other agreements to be executed or delivered in connection therewith or herewith, whether as party, witness, or otherwise, including any litigation, arbitration, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced (A) in good faith by or against Borrowers or any other Person that may be obligated to Lender by virtue of the Loan Documents, or (B) under title 7 or 11 of the United States Code, as now constituted or hereafter amended, or any other applicable Federal, state or foreign bankruptcy or similar insolvency law, <u>provided</u>, <u>however</u>, that Borrowers shall not be required to pay any out-of-pocket costs and expenses of Lender in any litigation, contest, dispute, suit, proceeding or action resulting solely from Lender's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; (iii) any attempt to enforce any rights of Lender against Borrowers or any other Person that may be obligated to Lender by virtue of any of the Loan Documents; (iv) any Default; or (v) subject to <u>Section 5.14</u>, any effort to (A) monitor the Loans

and the Loan Documents, (B) evaluate, observe, assess Borrowers or their affairs, or (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of the Collateral. Borrowers and Lender hereby agree that Lender's field examinations and audits conducted hereunder shall be charged against the Revolving Credit Loan; provided, however, that Lender shall charge Borrowers the costs of not more than one such examination or audit per Fiscal Quarter, so long as a Default has not occurred and continuing and Lender's reimbursement for such field examinations shall not exceed $1,500.00 per day per individual (plus all out-of-pocket costs and expenses).

(b)     In addition, Borrowers agree to pay on demand all reasonable out-of-pocket costs and expenses (including fees and expenses of counsel) of Lender in connection with any Event of Default and any enforcement or collection proceedings resulting therefrom or any amendment, modification or waiver of, or consent with respect to, any of the Loan Documents in connection with any Event of Default.

(c)     In addition, Borrowers agrees to pay on demand all reasonable fees, costs and expenses (including the fees and expenses of all of its counsel, advisors, consultants and auditors) incurred in connection with the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and Canadian Proceedings and any subsequent case under Chapter 7 of the Bankruptcy Code and, in respect of the Canadian Borrower, under the BIA, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and Canadian Proceedings and any subsequent case under Chapter 7 of the Bankruptcy Code or under the BIA, and general monitoring of the Chapter 11 Cases and Canadian Proceedings and any subsequent case under Chapter 7 of the Bankruptcy Code or bankruptcy under the BIA; provided, however, that the foregoing shall not include fees, costs and expenses incurred directly or indirectly in connection with the negotiation, documentation or efforts to obtain approval of the Asset Purchase Agreement.

(d)     Without limiting the generality of clauses (a), (b) and (c) above, Borrowers' obligation to reimburse Lender for out-of-pocket costs and expenses shall include the reasonable fees and expenses of counsel (and local, foreign or special counsel, advisors, consultants and auditors retained by such counsel), as well as the reasonable fees and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplicating expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram charges; secretarial overtime charges; expenses for travel, lodging and food; and all other reasonable out-of-pocket costs and expenses of every type and nature paid or incurred in connection with the performance of such legal or other advisory services.

10.3.   No Waiver.  No failure on the part of Lender, at any time or times, to require strict performance by Borrowers, of any provision of this Agreement and any of the other Loan Documents shall waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith.   Any suspension or waiver of a Default shall not suspend, waive or affect any other Default whether the same is prior or subsequent thereto and whether of the same or of a different type. None of the undertakings, agreements, warranties, covenants and representations of Borrowers contained in this Agreement or any of the other Loan Documents and no Default by Borrowers shall be deemed to have been suspended or

44

waived by Lender unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of Lender.

10.4.   <u>Remedies</u>.   The rights and remedies of Lender under this Agreement shall be cumulative and nonexclusive of any other rights and remedies which Lender may have under any other agreement, including the Loan Documents, by operation of law or otherwise.   Recourse to the Collateral shall not be required.

10.5.   <u>Severability</u>.   Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10.6.   <u>Conflict of Terms</u>.   Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any of the other Loan Documents, the provisions contained in this Agreement shall govern and control.

10.7.   <u>Right of Setoff</u>.   Upon the occurrence and during the continuance of any Default, Lender is hereby authorized, at any time and from time to time, to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of Borrowers against any and all of the Obligations now or hereafter existing irrespective of whether or not Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be unmatured. Lender agrees to notify Borrowers after any such setoff and application made by Lender; <u>provided</u>, <u>however</u>, that the failure to give such notice shall not affect the validity of such setoff and application.   The rights of Lender under this Section are in addition to the other rights and remedies (including other rights of setoff) which Lender may have.

10.8.   <u>Authorized Signature</u>.   Until Lender shall be notified by Borrowers to the contrary, the signature upon any document or instrument delivered pursuant hereto and reasonably believed by Lender or any of Lender's officers or employees to be that of an officer or duly authorized representative of Borrowers listed in <u>Schedule 10.8</u> shall bind Borrowers and be deemed to be the act of Borrowers affixed pursuant to and in accordance with resolutions duly adopted by the US Borrower's Board of Directors and Canadian Borrower's Board of Directors, and Lender shall be entitled to assume the authority of each signature and authority of the Person whose signature it is or reasonably appears to be unless the Person acting in reliance on such signature shall have actual knowledge of the fact that such signature is false or the Person whose signature or purported signature is presented is without authority.

10.9.   <u>Notices</u>.   Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon either of the parties by the other party, or whenever either of the parties desires to give or serve upon the other party any communication with respect to this

45

Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered (a) upon the earlier of actual receipt and three (3) days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (b) upon transmission, when sent by facsimile transmission or e-mail, (c) one Business Day after deposit with a reputable overnight courier with all charges prepaid or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number or e-mail address indicated below or to such other address (or facsimile number or e-mail address) as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than Borrowers or Lender) designated below to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

| | |
|---|---|
| If to Lender, at: | c/o Versa Capital Management, Inc.<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA 19104-2868<br>Telephone: (215) 609-3400<br>Telecopier: (215) 609-3499<br>Attention: General Counsel |
| With a copy (which shall not constitute notice) to: | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone: (212) 446-4800<br>Telecopier: (212) 446-6460<br>Attention: Leonard Klingbaum, Esq.<br>E-mail: Leonard.Klingbaum@kirkland.com |
| With a copy (which shall not constitute notice) to: | Osler, Hoskin & Harcourt LLP<br>Box 50, 1 First Canadian Place<br>Toronto, Ontario M5X 1B8<br>Telephone: (416) 862-5890<br>Telecopier: (416) 862-6666<br>Attention: Tracy Sandler<br>E-mail: tsandler@osler.com |

K&E 18571360.18<br>RLF1 3982293v. 1

|                          |                                      |
|--------------------------|--------------------------------------|
| If to US Borrower, at:   | c/o BBH, Inc.                        |
|                          | 760 S. Wolf Road                     |
|                          | Wheeling, IL  60090                  |
|                          | Telephone: (847) 423-7362            |
|                          | Telecopier: (847) 423-7321           |
|                          | Attention: Michael Wilhelm           |
|                          |                                      |
| With a copy to:          | McDermott Will & Emery LLP           |
|                          | 227 Monroe Street                    |
|                          | Chicago, IL  60606                   |
|                          | Telephone: (312) 984-7572            |
|                          | Telecopier: (312) 984-7700           |
|                          | Attention:  William J. McGrath       |
|                          | E-mail: wmcgrath@mwe.com             |
|                          |                                      |
| If to Canadian           | c/o BBH, Inc.                        |
| Borrower, at:            | 760 S. Wolf Road                     |
|                          | Wheeling, IL  60090                  |
|                          | Telephone: (847) 423-7362            |
|                          | Telecopier: (847) 423-7321           |
|                          | Attention: Michael Wilhelm           |
|                          |                                      |
| With a copy to:          | Torys LLP                            |
|                          | 79 Wellington Street West, Ste. 3000 |
|                          | Toronto, Ontario M4L 2K5             |
|                          | Telephone:  (416) 865-8131           |
|                          | Telecopier:  (416) 865-7380          |
|                          | Attention:  Natasha DeCicco          |
|                          | E-mail: ndecicco@torys.com           |

10.10.  <u>Section Titles</u>.  The Section titles and Table of Contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

10.11.  <u>Counterparts</u>.  This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement.  Any signatures delivered by a party by facsimile transmission or by e-mail in portable document format (.pdf) shall be deemed an original signature hereto.

10.12.  <u>Time of the Essence</u>.  Time is of the essence of this Agreement and each of the other Loan Documents.

10.13.  <u>GOVERNING LAW</u>.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS

K&E 18571360.18
RLF1 3982293v. 1

AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. BORROWERS HEREBY CONSENT AND AGREE THAT THE BANKRUPTCY COURT HAS EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, PROVIDED, HOWEVER, THAT LENDER AND BORROWERS ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT AND, PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER. BORROWERS EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND BORROWERS HEREBY WAIVES ANY OBJECTION WHICH BORROWERS MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. BORROWERS HEREBY WAIVE PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWERS AT THE ADDRESS SET FORTH IN SECTION 10.9 OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF US BORROWER'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE US MAILS, PROPER POSTAGE PREPAID AND RETURN RECEIPT REQUESTED.

10.14. <u>WAIVER OF JURY TRIAL</u>. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.15. <u>Publicity</u>. Borrowers will not, and will not permit any of its Affiliates to, disclose the name of Lender or any of its Affiliates or refer to this Agreement or the other Loan

K&E 18571360.18
RLF1 3982293v. 1

Documents in any press release or other public disclosure or in any prospectus, proxy statement or other materials filed with any Governmental Authority without Lender's prior written consent unless Borrowers or any of its Affiliates is required to do so under Applicable Law, and then, in any event, Borrowers or such Affiliate will consult with Lender prior to such disclosure. Borrowers consent to Lender publishing a tombstone or similar advertising material relating to the financing transaction contemplated by this Agreement. Lender consents to Borrowers' orally disclosing to its vendors, landlords and prospective landlords, and other third parties, who need to know in the reasonable judgment of Borrowers, only the name of Lender, the amount of Revolving Credit Advances (including loan balances and any other information required to terminate or replace the Revolving Credit Advances), and the Commitment Termination Date. Any written materials of any type disclosing any information of the type referred to herein shall require the written approval of Lender prior to being disseminated to any Person.

10.16. <u>Dating</u>. Although this Agreement is dated as of the date first written above for convenience, the actual dates of execution hereof by the parties hereto are respectively the dates set forth under the signatures hereto, and this Agreement shall be effective on the latest of such dates.

10.17. <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>. This Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon Borrowers, the estate of Borrowers, and any trustee or successor in interest of Borrowers in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Lender and its transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the conversion of the Chapter 11 Cases or any other bankruptcy case of Borrowers to a case under Chapter 7 of the Bankruptcy Code or a bankruptcy of the Canadian Borrower under the BIA or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect its security interests or Liens under Applicable Law.

## 11.    GUARANTY

11.1. <u>Guaranty of the Obligations</u>. Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Lender the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (collectively, the "<u>Guaranteed Obligations</u>"). For the purposes solely of this Section 11, the US Borrower shall be included as a "Guarantor" and the obligations of the Canadian Borrower shall be "Guaranteed Obligations" of each of the Guarantors including the US Borrower. For the avoidance of doubt, the Canadian Borrower is not a Guarantor hereunder.

11.2. <u>Payment by Guarantors</u>. Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which Lender may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrowers to pay

K&E 18571360.18
RLF1 3982293v. 1

any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, Guarantors will upon demand pay, or cause to be paid, in cash, to Lender, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Borrowers' becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrowers for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Lender as aforesaid.

11.3. <u>Liability of Guarantors Absolute</u>. Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a) this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b) Lender may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Borrowers and Lender with respect to the existence of such Event of Default;

(c) the obligations of each Guarantor hereunder are independent of the obligations of Borrowers and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrowers, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrowers or any of such other guarantors and whether or not Borrowers is joined in any such action or actions;

(d) payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if Lender is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e) Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment

K&E 18571360.18
RLF1 3982293v. 1

hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for Lender in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that Lender may have against any such security, in each case as Lender in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Borrowers or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)     this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents, or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document, or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though Lender might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Borrowers or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which Borrowers may allege or assert against Lender in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

11.4.    Waivers by Guarantors.  Each Guarantor hereby waives, for the benefit of Lender: (a) any right to require Lender, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrowers, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrowers, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of Lender in favor of Borrowers or any other Person, or (iv) pursue any other remedy in the power of Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrowers or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrowers or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrowers and notices of any of the matters referred to in Section 11.3 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

11.5.    Guarantors' Rights of Subrogation, Contribution, etc. .    Until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving  Credit Commitment shall have terminated, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Borrowers or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Borrowers with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that Lender now has or may hereafter have against Borrowers, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by Lender.  In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Credit Commitment shall have terminated, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations.  Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is

52

found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrowers or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights Lender may have against Borrowers, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Lender and shall forthwith be paid over to Lender to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

11.6.    Subordination of Other Obligations.  Any Indebtedness of Borrowers or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Lender and shall forthwith be paid over to Lender to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

11.7.    Continuing Guaranty.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full and the Revolving Credit Commitments shall have terminated and the Obligations paid in full in cash. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

11.8.    Authority of Guarantors or Borrowers.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrowers or the officers, directors or any agents acting or purporting to act on behalf of any of them.

11.9.    Financial Condition of Borrowers.  Any Revolving Credit Advance may be made to Borrowers or continued from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrowers at the time of any such grant or continuation, as the case may be.  Lender shall have no obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrowers.  Each Guarantor has adequate means to obtain information from Borrowers on a continuing basis concerning the financial condition of Borrowers and its ability to perform its obligations under the Loan Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrowers and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of Lender to disclose any matter, fact or thing relating to the business, operations or conditions of Borrowers now known or hereafter known by Lender.

K&E 18571360.18
RLF1 3982293v. 1

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

US Borrower:

**BBH, INC.**, as US Borrower and as a Guarantor

By: _____
Name:
Title:

K&E 18571360.18
RLFI 3982293v. 1

<u>Canadian Borrower</u>:

**BOWE BELL + HOWELL INTERNATIONAL LTD.,** as Canadian Borrower

By: _____
Name:
Title:

Guarantors:

**BOWE BELL + HOWELL HOLDINGS, INC.**, as a Guarantor

By: _____
Name:
Title:

**BOWE BELL + HOWELL COMPANY**, **BCC SOFTWARE, INC.**, **BOWE SYSTEC INC.**, **BOWE BELL + HOWELL POSTAL SYSTEMS COMPANY**, each as a Guarantor

By: _____
Name:
Title:

Lender:

**CONTRADO BBH FUNDING, LLC**, as Lender


By: _____
Name:
Title:

Address for Notice of Revolving Credit Advance:

c/o Versa Capital Management, Inc.
Cira Center
2929 Arch Street
Philadelphia, PA 19104-2868
Attention:  Joel Biran
Facsimile No.:  215-609-3499
E-mail:  jbiran@versa.com

With a mandatory copy to:

c/o Versa Capital Management, Inc.
Cira Center
2929 Arch Street
Philadelphia, PA 19104-2868
Attention:  David S. Lorry
Facsimile No.:  215-609-3499
E-mail:  dlorry@versa.com

Lender's Account:

Bank Name: JPMorgan Chase Bank
ABA No.: 0210000021
Name: Contrado BBH Funding, LLC
Account No.:  877171025

**DEFINITIONS; RULES OF CONSTRUCTION**

1.    Definitions.  Capitalized terms used in this Agreement shall have (unless otherwise provided elsewhere in this Agreement) the following respective meanings when used in this Agreement.

"Account Debtor" shall mean any Person who may become obligated to Borrowers under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles.

"Accounts" shall mean, with respect to any Person, all "accounts" as such term is defined in the Code, now owned or hereafter acquired by such Person, and shall include, in any event, (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to such Person, whether arising out of goods sold or services rendered by it or from any other transaction (including any such obligations which may be characterized as an account or contract right under the Code), (b) all of such Person's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services, (c) all of such Person's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all monies due or to become due to such Person under all purchase orders and contracts for the sale or lease of goods or the performance of services or both by such Person or in connection with any other transaction (whether or not yet earned by performance on the part of such Person) now or hereafter in existence, including the right to receive the proceeds of said purchase orders and contracts, and (e) all collateral security and guarantees of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"Affiliate" shall mean, with respect to any Person, (a) each Person that, directly or indirectly, owns or Controls, whether beneficially, or as a trustee, guardian or other fiduciary, ten percent (10%) or more of the Stock having ordinary voting power in the election of directors of such Person, (b) each Person that Controls, is Controlled by or is under common Control with such Person or (c) each of such Person's officers, directors, joint venturers and partners.

"Agreement" shall have the meaning assigned ot it in the Introductory paragraph, and shall include this Annex A and all Annexes, Schedules, and Exhibits attached or otherwise identified thereto, restatements and modifications and supplements hereto and any appendices, attachments, exhibits or schedules to any of the foregoing, and shall refer to this Agreement as the same may be in effect at the time such reference becomes operative, provided, however that any reference to the Schedules to this Agreement shall be deemed a reference to the Schedules as in effect on the Closing Date or in a written amendment thereto executed by each of the Borrowers and Lender.

A-1

"<u>Applicable Law</u>" shall mean, in respect of any Person, all provisions of constitutions, statutes, rules, regulations, and orders of all Governmental Authorities applicable to such Person or by which it is bound.

"<u>Asset Purchase Agreement</u>" shall mean the Asset Purchase Agreement by and between, among others, the US Borrower, the Canadian Borrower and Contrado BBH Funding, LLC, dated as of [_____], 2011, as it may be amended, restated or modified from time to time in accordance with its terms.

"<u>Assignment Recognition Order</u>" shall mean an Order of the Canadian Court which shall be in form and substance acceptable to the Lender recognizing and giving full force and effect to the Assignment Order **[(as defined in the Bid Procedures Motion)]** in all provinces and territories of Canada pursuant to section 49 of the CCAA.

"<u>Auction Date</u>" shall have the meaning assigned to it in <u>Section 5.18(d)</u>.

"<u>Avoidance Action</u>" means all actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under Section 552(b), Section 506(c) and Sections 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" shall have the meaning assigned to it in the recitals to the Agreement.

"<u>Bankruptcy Court</u>" shall have the meaning assigned to it in the recitals to the Agreement.

"<u>BIA</u>" shall mean the Bankruptcy and Insolvency Act (Canada), as amended from time to time, and the regulations thereunder, and any successor statute.

"<u>Bid Procedures</u>" shall mean the bid procedures to be established by the Bankruptcy Court with respect to the auction of the assets of Borrowers and Guarantors.

"<u>Bid Procedures Motion</u>" shall have the meaning assigned to it in <u>Section 5.18(a)</u>.

"<u>Bidding Procedures Recognition Order</u>" shall mean an Order of the Canadian Court which shall be in form and substance acceptable to the Lender recognizing and giving full force and effect to the Bidding Procedures Order **[(as defined in the Bid Procedures Motion)]** in all provinces and territories of Canada pursuant to section 49 of the CCAA.

"<u>Borrower</u>" and "<u>Borrowers</u>" shall have the meaning assigned to it in the first paragraph of this Agreement.

"<u>Borrower's Case</u>" shall have the meaning assigned to it in the first paragraph of this Agreement.

"<u>Budget</u>" shall mean the aggregate, without duplication, of all items approved by the Lender in its sole discretion that are set forth in the budget of Borrowers' cash receipts and expenditures for the thirteen weeks commencing on the Petition Date in the form attached hereto

as <u>Annex D-1</u> (for US Borrower) and <u>Annex D-2</u> (for Canadian Borrower), as modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) delivered in accordance with <u>Annex B</u> and approved by Lender in writing in its sole discretion (with the most recent such approved budget to become the Budget for purposes of this Agreement).

"<u>Business Day</u>" shall mean any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in Philadelphia, Pennsylvania.

"<u>Calendar Week Period</u>" shall mean a weekly period commencing on (and including) Monday of a calendar week and ending on (and including) Sunday of the following calendar week.

"<u>Canadian Availability Amount</u>" shall mean, in respect of the Canadian Borrower, (x) until entry of the Initial Recognition Order, $0, (y) following the entry of the Initial Recognition Order and until entry of the Final Order Recognition Order, the lesser of $500,000 and the aggregate amount authorized by the Bankruptcy Court in the Interim Order to be borrowed by the Canadian Borrower, and (z) following entry of the Final Order Recognition Order, the lesser of $1,300,000 and the aggregate amount authorized by the Bankruptcy Court in the Final Order to be borrowed by the Canadian Borrower.

"<u>Canadian Borrower</u>" shall have the meaning assigned to it in the first paragraph of this Agreement.

"<u>Canadian Borrower's Case</u>" shall have the meaning assigned to it in the first paragraph of this Agreement.

"<u>Canadian Borrowing Availability</u>" shall mean, at any time, an amount equal to the lesser of (x) the excess, if any, of (a) the Canadian Revolving Credit Commitment over (b) the aggregate principal amount of all Canadian Revolving Credit Loans then outstanding and (y) the amount permitted to be outstanding at such time pursuant to the Canadian Budget.

"<u>Canadian Budget</u>" shall mean the Budget attached hereto as Annex D-2, as modified or supplemented from time to time.

"<u>Canadian Court</u>" shall have the meaning assigned to it in the first paragraph of this Agreement.

"<u>Canadian Indemnified Liabilities</u>" shall have the meaning assigned to it in <u>Section 1.9</u>.

"<u>Canadian Orders</u>" means the Interim Initial Order, the Initial Recognition Order, the Supplemental Recognition Order, the Final Order Recognition Order and each and every other recognition order or other order or relief issued or granted by the Canadian Court in respect of the Canadian Borrower in connection with the Canadian Proceedings, and individually any of such orders.

"Canadian Proceedings" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Canadian Revolving Credit Advance" shall have the meaning assigned to it in Section 1.1(a)(ii).

"Canadian Revolving Credit Commitment" shall mean the commitment of the Lender to make Canadian Revolving Credit Advances to the Canadian Borrower pursuant to Section 1.1(a)(ii) and the other provisions hereof in the principal amount outstanding not to $1,300,000, as such amount may be reduced or modified pursuant to this Agreement.

"Canadian Revolving Credit Loan" shall mean the aggregate amount of Canadian Revolving Credit Advances of Lender outstanding at any time.

"Canadian Security Agreement" means the general security agreement dated of even date herewith by the Canadian Borrower in favor of the Lender, as it may be amended, restated, modified or supplemented from time to time.

"Canadian Unused Fee" shall have the meaning assigned to it in Section 1.6(d).

"Capital Lease" shall mean, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, either would be required to be classified and accounted for as a capital lease on a balance sheet of such Person or otherwise be disclosed as such in a note to such balance sheet.

"Capital Lease Obligation" shall mean, with respect to any Person, the amount of the obligation of such Person as lessee under any Capital Lease that, in accordance with GAAP, would appear on a balance sheet of such Person in respect of such Capital Lease or otherwise be disclosed in a note to such balance sheet.

"Cave-Out" shall have the meaning assigned to it in the Interim Order or the Final Order, as the case may be.

"Carve-Out Amount" shall mean the amount of Professional Fees (as defined in the Interim Order or the Final Order, as applicable), paid or payable subject to the Carve-Out.

"Cash Equivalents" shall mean, (a) securities with maturities of 180 days or less from the date of acquisition issued or fully guaranteed or insured by the United States government or any agency thereof and backed by the full faith and credit of the United States, (b) certificates of deposit, eurodollar time deposits, overnight bank deposits and bankers' acceptances of any domestic commercial bank having capital and surplus in excess of $500,000,000 having maturities of one year or less from the date of acquisition, and (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Corporation or P-1 by Moody's Investors Services, Inc., or carrying an equivalent rating by a nationally recognized rating agency if both of the two named rating agencies cease publishing ratings of investments, in each case, with maturities of not greater than sixty (60) days from the date acquired.

A-4

"Change of Control" shall mean: (i) Holdings shall fail directly to own 100% of the common stock and voting rights in and to the US Borrower; (ii) Holdings shall fail to own directly or indirectly 100% of the common stock and voting rights in and to the Guarantors (other than Holdings) and the Canadian Borrower; (iii) voting, management and operational control of Holdings changes as compared to such control existing on the Closing Date.

"CCAA" shall have the meaning assigned to it in the recitals to the Agreement.

"Chapter 11 Cases" shall have the meaning assigned to it in the recitals to the Agreement.

"Charges" shall mean, for Borrowers and Guarantors, all federal, state, county, provincial, city, municipal, local, foreign or other governmental taxes (including taxes at the time due and payable), levies, imposts, assessments, charges, Liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of Borrowers and Guarantors, (d) Borrowers' and Guarantors' ownership or use of any of its assets, or (e) imposed upon Borrowers' and Guarantors' business.

"Chattel Paper" shall mean all "chattel paper" as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by Borrowers.

"Claim" shall have the meaning assigned to it in Section 1.9.

"Closing Date" shall mean the Business Day on which the conditions precedent set forth in Section 2 have been satisfied and the initial Revolving Credit Advance has been made.

"COBRA" means the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state Law.

"Code" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, or remedies with respect to, Lender's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"Collateral" shall have the meaning assigned to it in the Security Agreement and the Canadian Security Agreement, and shall include all the Borrowers' and Guarantors' real, personal and mixed property (including equity interests) and all monies and other property of any kind received on account thereof (including, upon and following the approval of the Bankruptcy Court, Avoidance Actions), and all proceeds therefrom, in which Liens are granted whether pursuant to the Interim Order and Final Order, as applicable, the applicable Canadian Orders, the

Collateral Documents or otherwise, in each case as security for the Obligations of the Borrowers and Guarantors.

"Collateral Documents" shall mean (x) the Security Agreement and all other instruments, waivers and agreements now or hereinafter securing, in whole or in part, the Obligations and (y) in respect of the Canadian Borrower, the Canadian Security Agreement and all other instruments, waivers and agreements now or hereinafter securing, in whole or in part, the Obligations of the Canadian Borrower under this Agreement and the other Loan Documents.

"Commitment Termination Date" shall mean the earliest of (a) June 13, 2011, (b) the date of termination of the Revolving Credit Commitment pursuant to Section 8.3, (c) the date of termination of the Revolving Credit Commitment in accordance with the provisions of Section 1.2(c), (d) two (2) days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date, (e) twenty (20) days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court by such date, (f) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date, (g) the close of business on the first Business Day after the entry of the Interim Order, if by that time Borrowers have not paid Lender the fees required under this Agreement, unless Lender agrees otherwise, (h) the date a plan of reorganization confirmed in the Chapter 11 Cases becomes effective that does not provide for the payment in full of all amounts owed to Lender under this Agreement and the other Loan Documents on such effective date, (i) the date of the closing of a sale of all or substantially all of Borrowers' and/or Guarantors' assets pursuant to Section 363 of the Bankruptcy Code or a confirmed plan of reorganization or, if earlier, the second Business Day after the Sale Order Date unless the buyer under the Asset Purchase Agreement is the winning bidder, or (j) the effective date of a plan of reorganization or arrangement in the Chapter 11 Cases.

"Committee" shall mean the official committee of unsecured creditors and any other committee formed, appointed, or approved in the Chapter 11 Cases and each of such Committees shall be referred to herein as a Committee.

"Contracts" shall mean, with respect to any Person, all the contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which such Person may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

"Control" shall mean, with respect to a Person, the possession, directly or indirectly, of the power to direct or cause the direction of such Person's management or policies, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Copyrights" means all United States, and foreign copyrights, mask works and copyrightable works, whether registered or unregistered, and, with respect to any and all of the foregoing: (a) all registrations and applications therefor; (b) all extensions and renewals thereof, (c) all rights corresponding thereto throughout the world in all forms or mediums now or

hereafter known or devised; and (d) all rights to sue for past, present and future infringements thereof.

"Default" shall mean any default or any event which, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"Default Rate" shall mean a rate per annum equal to 3.00% plus the otherwise applicable interest rate on such portion of the Obligations as in effect from time to time.

"Deferred Taxes" shall mean, with respect to any Person at any date, the amount of deferred taxes of such Person as shown on the balance sheet of such Person prepared in accordance with GAAP as of such date.

"Deposit Accounts" means all "deposit accounts" as such term is defined in the Code, now or hereafter held in the name of any Borrower or any Guarantor.

"Documents" shall mean any "documents" as such term is defined in the Code and, shall include, in any event, any bills of lading, dock warrants, dock receipts, warehouse receipts, or other documents of title.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Environmental Laws" shall mean, whenever in effect, all federal, state, local and applicable foreign laws, statutes, ordinances, orders, regulations and similar provisions having the force or effect of law, and in each case as amended or supplemented from time to time, any applicable judicial or administrative orders or determinations, and all common law relating to public health and safety, worker health and safety, pollution or protection of the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.); the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901 et seq.) ("RCRA"); the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.); the Clean Air Act, as amended (42 U.S.C. §§ 740 et seq.); the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.) ("OSHA"); and the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300(f) et seq.), and any and all regulations promulgated thereunder, and all analogous state and local counterparts or equivalents and any transfer of ownership notification or approval statutes.

"Environmental Liabilities" shall mean, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest (contingent or otherwise), whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including

any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or the presence of, or any exposure to, a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" shall mean all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority or otherwise required by any Environmental Laws.

"Equipment" shall mean any "equipment" as such term is defined in the Code and in any event shall include all machinery, equipment, furnishings, fixtures and vehicles and any and all additions, accessions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974 (or any successor legislation thereto), as amended from time to time, and any regulations promulgated thereunder.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) under common control with the Borrowers and which, together with a Guarantor or Borrowers, is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the IRC.

"ERISA Event" shall mean, with respect to the Borrowers or any ERISA Affiliate, (a) a Reportable Event (other than a Reportable Event triggered by a bankruptcy filing) with respect to a Title IV Plan or a Multiemployer Plan; (b) the withdrawal of Borrowers or any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the failure to timely make required contributions to a Qualified Plan other than the Bell + Howell MMT Legacy Pension Plan; or (d) except with respect to the Bell + Howell MMT Legacy Pension Plan, any other event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or the imposition of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA.

"Event of Default" shall have the meaning assigned to it in Section 8.1.

"Executive Officers" shall mean the President, Chief Executive Officer, Chief Financial Officer, Treasurer and Controller of Borrowers.

"Existing Agent" shall have the meaning assigned to it in the recitals of this Agreement.

"Fees" shall mean the fees due to Lender as set forth in Section 1.5 or otherwise pursuant to the Loan Documents.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as

approved by the Bankruptcy Court which order shall be in form and substance satisfactory to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrowers to obtain credit, incur (or guaranty) Indebtedness, and grant superpriority, priming, first priority Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of Lender's claims.

"Final Order Recognition Order" means the order of the Canadian Court recognizing the Final Order in respect of the Canadian Borrower pursuant to the CCAA.

"Financial Statements" shall have the meaning assigned to it in Section 3.4.

"First Day Orders" shall have the meaning assigned to it in Section 2.1(k).

"Fiscal Month" shall mean any calendar month.

"Fiscal Quarter" shall mean any calendar quarter.

"Fiscal Year" shall mean any calendar year.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time, consistently applied; provided, that with respect to the Canadian Borrower, the term "GAAP" shall mean generally accepted accounting principles in Canada.

"General Intangibles" shall mean, with respect to any Person, all "general intangibles" as such term is defined in the Code, now owned or hereafter acquired by such Person and, in any event, including all right, title and interest which such Person may now or hereafter have in or under any Contract, all payment intangibles, all customer lists, intellectual property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any intellectual property), all rights and claims in or under insurance policies, (including insurance for fire, damage, loss, and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man, and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property, and rights of indemnification.

"Governmental Authority" shall mean any nation or government, any state, political, or quasi-judicial subdivision thereof, and any agency, department, court, board, commission, arbitral body, or other entity exercising valid legal executive, legislative, judicial, regulatory administrative functions.

"Guaranteed Indebtedness" shall mean, as to any Person, any obligation of such Person guaranteeing any indebtedness, lease, dividend, or other obligation ("primary obligations") of any other Person (the "primary obligor") in any manner including any obligation or arrangement of such Person (a) to purchase or repurchase any such primary obligation, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (d) to indemnify the owner of such primary obligation against loss in respect thereof.

"Guaranteed Obligations" shall have the meaning assigned to it in Section 11.1.

"Guarantor" and "Guarantors" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Holdings" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Hazardous Material" shall mean any substance, material or waste, including special waste, that is characterized, classified or designated under any Environmental Law as hazardous, toxic, pollutant or radioactive, including petroleum, asbestos, polychlorinated biphenyls and toxic mold, or otherwise subject to imposition of liability or standards of conduct under any Environmental Law.

"Indebtedness" of any Person shall mean (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (including reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured, but not including obligations to trade creditors incurred in the ordinary course of business that are not unpaid for more than 90 days past the stated due date therefor, unless being contested in good faith), (b) all obligations evidenced by notes, bonds, debentures or similar instruments (including, without limitation, any Subordinated Debt), (c) all indebtedness created or arising under any conditional sale or other title retention agreements with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in an event of default may be limited to repossession or sale of such property), (d) all Capital Lease Obligations, (e) all Guaranteed Indebtedness, (f) all obligations of such Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate option contract, foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap, commodity purchase or option agreements or other similar agreement or contract designed to protect such Person against fluctuations in interest rates, currency values or commodity prices, as the case may be, or other hedging or derivative agreements, (g) all Indebtedness referred to in clause (a), (b), (c), (d), (e) or (f) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed

A-10

or become liable for the payment of such Indebtedness, (h) the Obligations, and (i) all liabilities under Title IV of ERISA.

"Indemnified Person" shall have the meaning assigned to it in Section 1.9.

"Initial Recognition Order" shall mean the order of the Canadian Court recognizing the Canadian Borrower as a "Foreign Representative" in the Chapter 11 Cases and the Chapter 11 Cases as the "Foreign Main Proceeding" in respect of the Canadian Borrower.

"Instruments" shall mean, for any Person, all "instruments" as such term is defined in the Code, now owned or hereafter acquired by such Person, wherever located, and in any event shall include all certificated securities, certificates of deposit and all notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means all (a) Copyrights, (b) Patents, (c) Trademarks, (d) Trade Secrets, (e) Software, (f) copies and tangible embodiments of any of the foregoing in whatever form or medium and (g) all other proprietary and intellectual property and rights therein in any jurisdiction in the world, together with all rights to sue and collect for past, present or future infringement, misappropriation or other unauthorized use thereof, and all rights to income, royalties, payments, proceeds, claims, rights and remedies in connection therewith.

"Interim Initial Order" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Lender, which, among other matters, but not by way of limitation, authorizes, on an interim basis, Borrowers to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit C.

"Internet Domain Names" shall mean all rights in internet web sites and internet domain names presently registered or used by Borrowers.

"Inventory" shall mean, for any Person, all "inventory" as such term is defined in the Code, now owned or hereafter acquired by such Person, wherever located, and in any event shall include inventory, merchandise, goods and other personal property which are held by or on behalf of such Person for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process, finished goods, returned goods or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such Person's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including other supplies, and all accessions and additions thereto and all documents of title covering any of the foregoing.

"Investment" shall mean, for any Person (a) the acquisition (whether for cash, property, services, securities or otherwise) of capital stock, bonds, notes, debentures, partnership

or other ownership interests or other securities of any other Person or any agreement to make any such acquisition; (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person); and (c) the entering into of any Guaranteed Indebtedness of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"<u>Investment Property</u>" shall mean all investment property as such term is defined in the Code now owned or hereafter acquired by Borrowers, wherever located, including (i) all securities whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnerships interests, treasuries, certificates of deposit, and mutual fund shares; (ii) all securities entitlements of Borrowers to any securities account and the financial assets held by a securities intermediary with respect to that account; (iii) all securities accounts of Borrowers; (iv) all commodity contracts of Borrowers; and (v) all commodity accounts held by Borrowers.

"<u>IRC</u>" shall mean the Internal Revenue Code of 1986, as amended, and any successor thereto.

"<u>IRS</u>" shall mean the Internal Revenue Service, or any successor thereto.

"<u>Knowledge</u>" for the purposes of the representations and warranties set forth in Section 3.16 of this Agreement shall be determined as follows: an individual will be deemed to have "Knowledge" of a particular fact or other matter only if such individual is actually aware of such fact. A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter only if an individual who is an Executive Officer, partner, executor, or trustee of such Person (or in any similar capacity) has actual Knowledge of such fact or other matter.

"<u>Leases</u>" shall mean all of those leasehold estates in real property now owned or hereafter acquired by Borrowers, as lessee.

"<u>Lender</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>License</u>" shall mean, with respect to any Person, any Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by such Person.

"<u>Lien</u>" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, whether or not choate, vested, or perfected (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"<u>Loan Account</u>" shall have the meaning assigned to it in <u>Section 1.8</u>.

K&E 18571360.18
RLF1 3982293v. 1

"Loan Documents" shall mean this Agreement, the Revolving Credit Notes (if any), the Collateral Documents, Interim Order and the Final Order and all other pledges, powers of attorney, consents, waivers, assignments, mortgages, deeds of trusts, contracts, notices, letter of credit agreements and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrowers, or any employee of Borrowers, and delivered to Lender or any Lender in connection with the Agreement or the transactions contemplated thereby.

"Margin Stock" shall have the meaning specified in Regulation T, U or X of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, assets, operations, or financial condition of Borrowers and the Guarantors, (b) Borrowers' ability to pay or perform its Obligations in accordance with the terms of the Loan Documents, (c) the Collateral or Lender's Lien on the Collateral or the priority or perfection of any such Lien or (d) the rights and remedies of Lender under this Agreement and the other Loan Documents.

"Material Contracts" shall mean the contracts listed on Schedule 6.19 hereto and any other Contract of Borrowers which, if cancelled or terminated, could reasonably be expected to have or result in a Material Adverse Effect.

"Maximum Lawful Rate" shall have the meaning assigned to it in Section 1.5(e).

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, and to which Borrowers or any ERISA Affiliate is making, is obligated to make, has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

"Notice of Revolving Credit Advance" shall have the meaning assigned to it in Section 1.1(d).

"Obligations" shall mean: (x) other than with respect to the Canadian Borrower, all loans, advances, debts, liabilities and obligations for the performance of covenants, or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or amounts are liquidated or determinable) owing by the Borrowers and the Guarantors under any of the Loan Documents to Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under any of the Loan Documents; and (y) solely with respect to the Canadian Borrower, all loans, advances, debts, liabilities and obligations for the performance of covenants, or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or amounts are liquidated or determinable) owing by the Canadian Borrower under any of the Loan Documents to Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under any of the Loan Documents with respect to the Canadian Borrower. This term includes all principal and interest on the Revolving Credit Loans, all related Fees, Charges, expenses, attorneys' and other advisors' fees and any other sum chargeable to the Borrowers and Guarantors under any of the Loan Documents.

A-13

"Obligee Guarantor" shall have the meaning assigned to it in Section 11.6.

"Operating Lease" shall mean any lease of real or personal property, or mixed property, which is not a Capital Lease.

"Other Taxes" shall have the meaning assigned to it in Section 1.11(b).

"Participants" shall have the meaning assigned to it in Section 9.2(a).

"Patent License" shall mean, with respect to any Person, rights under any written agreement now owned or hereafter acquired by such Person granting any right with respect to any invention on which a Patent is in existence.

"Patents" shall mean (a) all United States, Patent Cooperation Treaty and foreign patents and certificates of invention, or similar industrial property rights, and applications and disclosures for any of the foregoing, (b) all reissues, divisions, continuations, continuations-in-part, extensions, supplementary protection certificates, renewals, and reexaminations thereof, (c) all rights corresponding thereto throughout the world, (d) all inventions and improvements described therein, (e) all rights to sue for past, present and future infringements thereof, and (f) all licenses, claims, damages, and proceeds of suit arising therefrom.

"PBGC" shall mean the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" shall mean an employee pension benefit plan, as defined in Section 3(2) of ERISA, which is not an individual account plan, as defined in Section 3(34) of ERISA, and which Borrowers or any ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"Permitted Encumbrances" shall mean:  (a) Liens for Charges provided payment thereof shall not at the time be required under Section 5.2 or to the extent that nonpayment thereof is permitted under the Bankruptcy Code; (b) deposits, Liens or pledges of cash collateral to secure obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation or other public or statutory obligations arising in the ordinary course of business; (c) deposits, Liens or pledges of cash collateral to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), obligations of a tenant under an Operating Lease, or surety, stay or appeal bonds or similar obligations arising in the ordinary course of business; (d) workers', mechanics', suppliers', carriers', warehousemen's Liens or other similar Liens arising by operation of law in the ordinary course of business and securing sums which are not past due or are being contested by Borrowers reasonably and in good faith; (e) any attachment or judgment Lien which does not constitute a Default, unless the judgment it secures shall not, within 15 days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall not have been discharged within 15 days after the expiration of any such stay; (f) zoning restrictions, easements, survey exceptions, building codes, subdivision laws,  rights of way,  conditions, charges, encroachments, licenses, or other restrictions on the use of and encumbrances against the real property or other minor irregularities in title (including leasehold title) thereto, including without limitation those shown on the title policies delivered to Lender on the Closing Date, so

long as such restrictions or irregularities, either individually or in the aggregate, do not materially impair the use, value, or marketability of such real property, leases or leasehold estates as currently used by Borrowers; (g) Liens created by statute or common law in favor of landlords for unpaid rent and related amounts that are not more than fifteen days past due or are being contested by Borrowers reasonably and in good faith; (h) Liens of a banking institution encumbering deposits (including setoff rights) held by such banking institution incurred in the ordinary course of business and which are within the general parameters customary in the banking industry; (i) Liens listed in <u>Schedule 6.7</u> existing on the Closing Date; (j) Liens arising pursuant to the Pre-Petition Loan Agreement; (k) liens affecting the interest or title of a lessor, sublessor, licensor or licensee (and any underlying lessors, sublessors and licensors) under any lease, license or similar agreement entered into by the Borrowers in the ordinary course of business; and (l) ground leases in respect of real property on which facilities leased by the Borrowers are located.

"<u>Person</u>" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, limited liability partnership, institution, public benefit corporation, entity or government (whether Federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"<u>Petition Date</u>" shall have the meaning assigned to it in the recitals to this Agreement.

"<u>Plan</u>" shall mean, with respect to Borrowers or any ERISA Affiliate, at any time, an employee benefit plan, as defined in Section 3(3) of ERISA, (or any similar plan maintained by any Borrowers which such plan is not subject to ERISA) which Borrowers maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"<u>Post-Petition</u>" shall mean the time period beginning immediately after the filing of the Chapter 11 Cases.

"<u>Pre-Petition</u>" shall mean the time period ending immediately prior to the filing of the Chapter 11 Cases.

"<u>Pre-Petition Indebtedness</u>" shall mean all Indebtedness of Borrowers and Guarantors outstanding on the Petition Date immediately prior to the filing of the Chapter 11 Cases, including, without limitation, Indebtedness under the Pre-Petition Loan Agreement.

"<u>Pre-Petition Liens</u>" shall mean all Liens against the assets of Borrowers and Guarantors on the Petition Date immediately prior to the filing of the Chapter 11 Cases, including, without limitation, Liens securing the Pre-Petition Indebtedness arising under the Pre-Petition Loan Agreement.

"<u>Pre-Petition Loan Agreement</u>" shall have the meaning assigned to it in the recitals to this Agreement.

"<u>Prime Rate</u>" means the prime rate of interest as published in the Wall Street Journal, such rate to change from time to time; <u>provided</u>, <u>however</u>, that for the purposes of this Agreement, such rate shall be deemed to be no less than 3.00%.

"<u>Prior Lender Obligations</u>" shall mean all obligations of Borrowers and Holdings to the Prior Lenders pursuant to the Pre-Petition Loan Agreement, and all instruments and documents executed pursuant thereto or in connection therewith.

"<u>Prior Lenders</u>" shall have the meaning assigned to it in the recitals to this Agreement.

"<u>Proceeds</u>" shall mean all "proceeds" as such term is defined in the Code and, in any event, shall include, with respect to any Person: (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Person from time to time with respect to any of its property or assets; (b) any and all payments (in any form whatsoever) made or due and payable to such Person from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of such Person's property or assets by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), (c) any claim of such Person against third parties (i) for past, present or future infringement of any Patent or Patent License, or (ii) for past, present or future infringement or dilution of any Trademark or Trademark License or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark License; (d) any recoveries by such Person against third parties with respect to any litigation or dispute concerning any of such Person's property or assets, including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, such property or assets; and (e) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock, and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of the Collateral.

"<u>Proceeding</u>" shall mean any claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, suit in equity or at law, administrative, regulatory or quasi judicial proceeding, account, cost, expense, setoff, contribution, attorneys' fee or causes of action of whatever kind or character.

"<u>PWC</u>" means PricewaterhouseCoopers Inc.

"<u>Qualified Plan</u>" shall mean, for Borrowers an employee pension benefit plan, as defined in Section 3(2) of ERISA, which is intended to be tax-qualified under IRC Section 401(a), and which Borrowers maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"<u>Release</u>" shall mean any release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migration of a Hazardous Material into the indoor or outdoor environment.

K&E 18571360.18
RLF1 3982293v. 1

"Releasing Parties" and "Released Parties" shall have the meaning assigned to it in Section 1.16.

"Reportable Event" shall mean any of the events described in Section 404(c) of ERISA except those events for which the 30-day notice period has been waived.

"Restricted Payment" shall mean, with respect to any Person, either directly or indirectly, (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of such Person's Stock, (b) any payment on account of the purchase, redemption, defeasance or other retirement, or to obtain the surrender of, such Person's Stock or any other payment or distribution made in respect thereof, (c) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder or Affiliate of such Person, other than relating to salaries, bonuses and other compensation to such Person's officers, directors and employees in the ordinary course of business consistent with past practice, (d) any payment, purchase, redemption, retirement, or other acquisition for value or setting apart of any money for a sinking, or other analogous reserve fund for the purchase, redemption, retirement or other acquisition of, or to obtain the surrender of, or any payment (scheduled, voluntary or other) of principal of or interest on, or any other amount owing in respect of, any Subordinated Debt, or (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of any Stock of such Person, or of a claim for indemnification or contribution arising out of or relating to any such claim for damages or rescission.

"Retiree Welfare Plan" shall refer to any Welfare Plan providing for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than continuation coverage provided pursuant to IRC Section 4980B and at the sole expense of the participant or the beneficiary of the participant.

"Revolving Credit Advances" shall have the meaning assigned to it in Section 1.1(a).

"Revolving Credit Commitments" shall mean both the US Revolving Credit Commitment and the Canadian Revolving Credit Commitment.

"Revolving Credit Loans" shall mean the US Revolving Credit Loans and the Canadian Revolving Credit Loans.

"Revolving Credit Note" shall mean the promissory note provided for by Section 1.1(e) and all promissory notes delivered in substitution or exchange therefor, in each case as it may be amended, restated, modified or supplemented and in effect from time to time.

"Sale Milestones" shall means the dates and requirements as set forth in Section 5.18.

"Sale Order Date" shall have the meaning assigned to it in 5.18(a)(v).

"Sale Recognition Order" shall mean an Order of the Canadian Court which shall be in form and substance acceptable to the Lender recognizing and giving full force and effect to

K&E 18571360.18
RLF1 3982293v. 1

the Sale Order **[(as defined in the Bid Procedures Motion)]** in all provinces and territories of Canada pursuant to section 49 of the CCAA.

"<u>Security Agreement</u>" shall mean the Security Agreement dated of even date herewith by the Borrowers and the Guarantors in favor of Lender, as it may be amended, restated, modified or supplemented from time to time.

"<u>Software</u>" shall mean any and all computer programs, applications, software, middleware, libraries, tools, firmware and all software implementations of algorithms, models and methodologies, owned or licensed, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis, etc.) or specific, unique-to-the-business usage, all computer operating, security or programming software, owned or licensed by any of the Borrowers or Guarantors, as applicable, and, in each case, in any form (including all source code and executable code), data, databases and related documentation of any of the foregoing and copies and tangible embodiments of any of the foregoing in whatever form or medium and all rights arising out of or associated with any of the foregoing.

"<u>Stock</u>" shall mean all shares, options, warrants, general or limited partnership interests, membership interests, participation or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended).

"<u>Stockholder</u>" shall mean each holder of Stock of either the US Borrower or the Canadian Borrower.

"<u>Subject Property</u>" shall mean all real property owned, leased or operated by Borrowers.

"<u>Subordinated Debt</u>" shall mean any Indebtedness of Holdings or Borrowers which is expressly and contractually subordinated in right of payment, to the satisfaction of Lender, to the Obligations.

"<u>Subsidiary</u>" shall mean, with respect to any Person, (a) any corporation of which an aggregate of 50% or more of the outstanding Stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person, or by one or more Subsidiaries of such Person, or by both, with respect to which any such Person has the right to vote or designate the vote of 50% or more of such Stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person, or one or more Subsidiaries of such Person, or both, shall have an interest (whether in the form of voting or participation in profits or capital contribution) of 50% or more or of which any such Person is a general partner or managing member, as the case may be, or may exercise the powers of a general partner or managing member, as the case may be.

A-18

"**Subsidiary Guarantors**" shall mean each entity listed on Schedule 3.9(a).

"**Supplemental Recognition Order**" shall mean the order of the Canadian Court (i) appointing PWC as the information officer in the Canadian Proceedings in respect of the Canadian Borrower and (ii) recognizing the Interim Order obtained in the Chapter 11 Cases in respect of the Canadian Borrower.

"**Taxes**" shall mean taxes, levies, imposts, deductions, Charges or withholdings, and all liabilities with respect thereto, excluding taxes, levies, imposts, deductions, charges or withholdings and liabilities with respect thereto that are imposed on or measured by the net income of any Lender by the United States of America or Canada, the jurisdiction under the laws of which Lender is organized or the jurisdiction in which such Lender's applicable lending office is located or, in each case, any political subdivision thereof.

"**Termination Date**" shall mean the date on which (a) the Revolving Credit Commitment has been terminated in full and Lender shall have no further obligation to make any Revolving Credit Advances or any other credit extensions or financial accommodations hereunder or under any other Loan Document, and (b) all Obligations have been irrevocably paid in full.

"**Title IV Plan**" shall mean a Pension Plan, other than a Multiemployer Plan, which is covered by Title IV of ERISA.

"**Total Availability Amount**" shall mean $127,200,000.

"**Trade Secrets**" shall mean all trade secrets and all other confidential or proprietary information and know-how (including formulations, ideas, research and development, know how, inventions (whether or not patentable and whether or not reduced to practice), invention disclosures, formulas, compositions, manufacturing and production processes and techniques, technical data, customer and supplier lists, designs, drawings, plans and specifications) whether or not any of the foregoing has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such Trade Secret, including but not limited to the right to sue for past, present and future misappropriation or other violation of any Trade Secret.

"**Trademark License**" shall mean, with respect to any Person, rights under any written agreement now owned or hereafter acquired by such Person granting any right to use any Trademark.

"**Trademarks**" shall mean (a) all registered and unregistered United States, and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, designs, trade dress, slogans, other source or business identifiers, designs and general intangibles of a like nature, and all registrations and applications for any of the foregoing, (b) all extensions or renewals of any of the foregoing, (c) all translations, adaptations, derivations and combinations of the foregoing, (d) all of the goodwill of the business connected with the use of and symbolized by the foregoing, and (e) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill.

"**Unused Fees**" shall have meaning assigned to it in <u>Section 1.6(d)</u>.

"**US Availability Amount**" shall mean (x) until entry of the Final Order, the lesser of $11,000,000 and the aggregate amount authorized by the Bankruptcy Court in the Interim Order to be borrowed by the US Borrower and (y) following entry of the Final Order, $125,900,000.

"**US Borrower**" shall have the meaning assigned to it in the first paragraph of this Agreement.

"**US Borrowing Availability**" shall mean, at any time, an amount equal to the lesser of (x) the excess, if any, of (a) the US Revolving Credit Commitment *minus* the amount of the obligations under the Pre-Petition Loan Agreement then outstanding and not refinanced in accordance with the terms of the Interim Order or Final Order, as applicable, over (b) the aggregate principal amount of all US Revolving Credit Loans then outstanding and (y) the amount permitted to be outstanding at such time pursuant to the US Budget.

"**US Budget**" shall mean the Budget attached hereto as Annex D-1, as modified or supplement from time to time.

"**US Indemnified Liabilities**" shall have the meaning assigned to it in <u>Section 1.9</u>.

"**US Revolving Credit Advance**" shall have the meaning assigned to it in <u>Section 1.1(a)(i)</u>.

"**US Revolving Credit Commitment**" shall mean the commitment of the Lender to make a US Revolving Credit Advance to the US Borrower pursuant to <u>Section 1.1(a)(i)</u> and the other provisions hereof in the principal amount outstanding not to exceed $125,900,000, as such amount may be reduced or modified pursuant to this Agreement; <u>provided</u>, <u>however</u>, that solely for the purposes of calculating the fees set forth in Section 1.5, the "US Revolving Credit Commitment" shall mean $4,900,000, as such amount may be reduced or modified pursuant to this Agreement.

"**US Revolving Credit Loan**" shall mean the aggregate amount of US Revolving Credit Advances of Lender outstanding at any time.

"**US Trustee**" means the United States Trustee appointed in the Chapter 11 Cases.

"**US Unused Fee**" shall have the meaning assigned to it in <u>Section 1.6(a)</u>.

"**Weekly Budget Variance Report**" shall have the meaning assigned to it in <u>Annex B</u>.

"**Weekly Budgeted Disbursements**" shall mean, with respect to any Calendar Week Period, the aggregate amount of projected cash disbursements by the US Borrower and the Canadian Borrower set forth in the US Budget and the Canadian Budget, respectively, with respect to such Calendar Week Period.

"Welfare Plans" shall mean any welfare plan, as defined in Section 3(1) of ERISA, which is maintained or contributed to by Borrowers or any ERISA Affiliate.

2. <u>Certain Matters of Construction</u>. Any accounting term used in the Agreement or the other Loan Documents shall have, unless otherwise specifically provided therein, the meaning customarily given such term in accordance with GAAP, and all financial computations thereunder shall be computed, unless otherwise specifically provided therein, in accordance with GAAP consistently applied. That certain items or computations are explicitly modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing.

All other undefined terms contained in the Agreement or the other Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code as in effect in the State of New York to the extent the same are used or defined therein. The words "herein," "hereof" and "hereunder" or other words of similar import refer to the Agreement as a whole, including the exhibits and schedules thereto, as the same may from time to time be amended, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement.

Whenever any provision in any Loan Document refers to the "knowledge" of any Person, such provision is intended to mean that such Person has actual knowledge or awareness of a particular fact or circumstance, or that such Person, if it had exercised reasonable diligence, should have known or been aware of such fact or circumstance.

For purposes of this Agreement and the other Loan Documents, the following additional rules of construction shall apply: (a) wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter; (b) the term "including" shall not be limiting or exclusive, unless specifically indicated to the contrary; (c) all references to statutes and related regulations shall include any amendments thereto and any successor statutes and regulations; and (d) all references to any instruments or agreements, including references to any of the Loan Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof, in each case, made in accordance with the terms of the Loan Documents.

A-21

**ANNEX B** to
CREDIT AGREEMENT

**FINANCIAL STATEMENTS AND NOTICES**[1]


1. <u>Inventory Report</u>.  Together with the delivery of monthly financials under paragraph 3 below, an Inventory report in form consistent with the Inventory report being delivered under the Pre-Petition Loan Agreement and in substance satisfactory to Lender.

2. <u>Accounts Receivable Report</u>.  A monthly trial balance showing Accounts outstanding aged from invoice due date as follows: 1-30 days, 31-60 days, 61-90 days and 91 days or more, accompanied by such supporting detail and documentation as shall be requested by Lender, such trial balance to be delivered to Lender no later than five days after the end of the period to which such trial balance relates.

3. <u>Monthly Financials</u>.  By no later the 30th day after the end of each Fiscal Month:

    (a)    internally prepared balance sheet and income statement as of the close of such Fiscal Month and that portion of the current Fiscal Year ending as of the close of such Fiscal Month, in each case, for the US Borrower which financial and other information shall provide comparisons to the prior year's equivalent period, on a year-to-date basis, and to Budget; and

    (b)    a certification of the Chief Executive Officer or Chief Financial Officer of the US Borrower that all such financial statements are complete and correct and present fairly in all material respects the financial position, the results of operations of Borrowers as at the end of such Fiscal Month and for the period then ended, that all rent and other obligations of Borrowers with respect to their Leases were paid in accordance with the terms thereof (without giving effect to any grace periods) as at the end of such Fiscal Month and setting forth the aggregate amount so paid or specifying those instances when rent or such other obligations were not so paid together with a detailed explanation of the reasons for the failure of Borrowers to make such payments and the aggregate amount of such payments not made, and that there was no Default in existence as of such time or specifying those Defaults of which he or she was aware.

4. <u>Management Letters</u>.  Within five (5) Business Days after receipt thereof by US Borrower, copies of all management letters, exception reports or similar letters or reports received by US Borrower from its independent certified public accountants.

5. <u>Budget Analysis</u>.  Not later than Wednesday by 12:00 noon (eastern time) in each calendar week, a Budget variance report (a "<u>Weekly Budget Variance Report</u>"), in form and scope reasonably acceptable to Lender, which report shall compare (x) actual cash receipts and disbursements of the US Borrower with amounts provided for in the US Budget on a line-by-line and aggregate basis for the preceding weekly period and the cumulative period from the

_____
[1] TBD - Separate or additional reporting for Canada

B-1

Petition Date to the end of the preceding calendar week and (y) actual cash receipts and disbursements of the Canadian Borrower with amounts provided for in the Canadian Budget on a line-by-line and aggregate basis for the preceding weekly period and the cumulative period from the Petition Date to the end of the preceding calendar week.

6.    Updated Budgets.  Not later than the end of business on the Friday two weeks prior to the expiration of the existing Budget, (x) the US Borrower shall deliver to Lender a proposed new thirteen-week debtor-in-possession cash and borrowing forecast for the US Borrower commencing in the week following expiration of the existing US Budget in form and scope consistent with Annex D and otherwise acceptable to Lender in its sole discretion and (y) the Canadian Borrower shall deliver to Lender a proposed new thirteen-week debtor-in-possession cash and borrowing forecast for the Canadian Borrower commencing in the week following expiration of the existing Canadian Budget in form and scope consistent with Annex D and otherwise acceptable to Lender in its sole discretion.

7.    Bankruptcy Matters.  Copies of all monthly reports, projections or other information respecting Borrowers' and Guarantor's business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of US Borrower with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee, or filed by or on behalf of the Canadian Borrower with the Canadian Court or provided to PWC, in all cases at the time such document is filed or provided.

8.    Notice of Default.  As soon as practicable, but in any event within five (5) Business Days after either Borrower becomes aware of the existence of any Default, or any development or other information that, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect, including without limitation any notice received from any holder of Subordinated Debt concerning a default thereunder, telephonic, facsimile or e-mail notice specifying the nature of such Default or development or information, including the anticipated effect thereof, which notice shall be promptly confirmed in writing within four (4) Business Days.

9.    Tax Returns.  Upon Lender's request, copies of all federal, state, local and foreign tax returns, information returns and reports in respect of income, franchise or other taxes on or measured by income (excluding sales, use or like taxes) filed by US Borrower and Canadian Borrower.

10.    SEC Documents.  Promptly upon their becoming available, copies of any final registration statements and the regular, periodic and special reports, if any, which US Borrowers shall have filed with the Securities and Exchange Commission (or any governmental agency substituted therefor) or any national securities exchange.

11.    Documents to Shareholders.  Promptly upon the mailing thereof to the shareholders of Holdings generally, copies of all financial statements, reports and proxy statements so mailed to the extent not otherwise provided to the Lender pursuant to the terms of this Agreement.

K&E 18571360.18
RLF1 3982293v. 1

12.  Lease Documents.  Promptly upon entering into, renewing, amending or modifying any Lease, a copy of such Lease, amendment or other related documentation.

13.  ERISA Documents.  As soon as possible, and in any event within 10 days after either Borrower knows or has reason to believe that any of the events or conditions specified below with respect to any Plan or Multiemployer Plan has occurred or exists, a statement signed by the Chief Financial Officer of Borrowers setting forth details respecting such event or condition and the action, it any, that Borrowers or any ERISA Affiliate proposes to take with respect thereto (and a copy of any report or notice required to be filed with or given to PBGC by Borrowers or any ERISA Affiliate with respect to such event or condition):

(a)  any Reportable Event with respect to a Plan occurs (provided that a failure to meet the minimum funding standard of Section 412 of the IRC or Section 302 of ERISA shall be a reportable event regardless of the issuance of any waivers in accordance with Section 412(d) of the IRC);

(b)  the filing under Section 4041 of ERISA of a notice of intent to terminate any Plan or the termination of any Plan;

(c)  the institution by PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by Borrowers or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by PBGC with respect to such Multiemployer Plan;

(d)  the complete or partial withdrawal by Borrowers or any ERISA Affiliate under Section 4201 or 4204 of ERISA from a Multiemployer Plan, or the receipt by Borrowers or any ERISA Affiliate of notice from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA; and

(e)  the institution of a proceeding by a fiduciary of any Multiemployer Plan against Borrowers or any ERISA Affiliate to enforce Section 515 of ERISA, which proceeding is not dismissed within 30 days.

14.  Other Reports.  Such other reports and information respecting the business, financial condition or prospects of Borrowers, as Lender may, from time to time, reasonably request.  Simultaneously with the transmission thereof, each daily and weekly report reviewed by management relating to the performance and operations of the Borrowers' and Guarantors' business, including with respect to activations, deactivations and shipments.

K&E 18571360.18
RLF1 3982293v. 1

**ANNEX C-1** to
CREDIT AGREEMENT

**FINANCIAL COVENANTS FOR US BORROWER**

1.    <u>Payment of Pre-Petition Claims</u>:  US Borrower shall not make payments to creditors in respect of Pre-Petition trade payables and Pre-Petition obligations except for:  (i) amounts approved in the First Day Orders and (ii) amounts approved by Lender in writing and by the Bankruptcy Court.

2.    <u>Budget Compliance</u>.  US Borrower shall not make any cash disbursement for any line item in the US Budget if, after giving effect thereto: (I) the aggregate cash disbursements for such line item by US Borrower during the applicable week period would exceed the product of:  (i) the aggregate of the Weekly Budgeted Disbursements for such week period including the date of such disbursement <u>times</u> (ii) one hundred fifteen percent (115%) (<u>provided</u>, that the result of such calculation is an amount in excess of $30,000); or (II) the aggregate cash disbursements by US Borrower for such line item by US Borrower during the period from the Petition Date through (and including) the date of such disbursement, would exceed the product of (i) the aggregate of all Weekly Budgeted Disbursements for such period including the date of such disbursement <u>times</u> (ii) one hundred ten percent (110%) (<u>provided</u>, that the result of such calculation is an amount in excess of $30,000).

3.    <u>Ending Revolving Credit Loan Balance</u>:  US Borrower shall not permit the outstanding principal amount of Revolving Credit Loans at the end of any week to exceed the amount shown as the "Ending DIP Facility Balance" for such week on the US Budget attached as Annex D-1 (as updated in accordance with the terms of this Agreement) *less* the aggregate amount, if any, by which actual "Total Cash Inflows" received exceeds the amount of "Total Cash Inflows" shown on such US Budget from the closing date through such week.

4.    <u>Maximum Cash Balance</u>.  Unless the Lender otherwise consents, the US Borrower and the Guarantors shall not maintain cash on deposit in their accounts that is, in the aggregate, in excess of $500,000 as of the end of any Business Day.  To the extent that cash on deposit in their accounts as of the end of any Business Day exceeds $500,000, the US Borrower shall cause to be paid such excess to the Prepetition Agent or the Lender, as required by the Interim Order or the Final Order, for application in accordance with the terms of the Interim Order or the Final Order, as applicable (in the case of payment to the Prepetition Agent) or this Agreement (in the case of payment to the Lender).

C-1

**ANNEX C-2** to
CREDIT AGREEMENT

**FINANCIAL COVENANTS FOR CANADIAN BORROWER**

1.     <u>Payment of Pre-Petition Claims</u>:   Canadian Borrower shall not make payments to creditors in respect of Pre-Petition trade payables and Pre-Petition obligations except for:  (i) amounts approved in the First Day Orders as recognized by the applicable Canadian Orders and (ii) amounts approved by Lender in writing and by the Bankruptcy Court as recognized by the applicable Canadian Orders.

2.     <u>Budget Compliance</u>.   Canadian Borrower shall not make any cash disbursement for any line item in the Canadian Budget if, after giving effect thereto: (I) the aggregate cash disbursements for such line item by Canadian Borrower during the applicable week period would exceed the product of:   (i) the aggregate of the Weekly Budgeted Disbursements for such week period including the date of such disbursement <u>times</u> (ii) one hundred fifteen percent (115%) (<u>provided</u>, that the result of such calculation is an amount in excess of $30,000); or (II) the aggregate cash disbursements by Canadian Borrower for such line item  by Canadian Borrower during the period from the Petition Date through (and including) the date of such disbursement, would exceed the product of (i) the aggregate of all Weekly Budgeted Disbursements for such period including the date of such disbursement <u>times</u> (ii) one hundred ten percent (110%) (<u>provided</u>, that the result of such calculation is an amount in excess of $30,000).

3.     <u>Ending Revolving Credit Loan Balance</u>:   Canadian Borrower shall not permit the outstanding principal amount of Canadian Revolving Credit Loans at the end of any week to exceed the amount shown as the "Ending DIP Facility Balance" for such week on the Canadian Budget attached as Annex D-2 (as updated in accordance with the terms of this Agreement) *less* the aggregate amount, if any, by which actual "Total Cash Inflows" received exceeds the amount of "Total Cash Inflows" shown on such Canadian Budget from the closing date through such week.

K&E 18571360.18
RLF1 3982293v. 1

**FORM OF BUDGET FOR US BORROWER**

K&E 18571360.18
RLF1 3982293v. 1

**FORM OF BUDGET FOR CANADIAN BORROWER**

K&E 18571360.18
RLF1 3982293v. 1

## EXHIBIT A

FORM OF NOTICE OF REVOLVING CREDIT ADVANCE

**EXHIBIT B**

FORM OF REVOLVING CREDIT NOTE

# EXHIBIT B

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Böwe Systec, Inc., <u>et al.</u>,[1] | ) Case No. 11-_____ (_____) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) Re: Docket No. ____ |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES AND (V) SCHEDULING A FINAL HEARING <u>PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)</u>**

This matter is before the above-captioned court (the "<u>Bankruptcy Court</u>") on the motion filed by Böwe Systec, Inc., and its debtor affiliates, as debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above captioned chapter 11 cases (collectively, the "<u>Cases</u>"), dated April 18, 2011 (the "<u>Motion</u>") requesting entry of an interim order (this "<u>Interim Order</u>") and a final order ("<u>Final Order</u>"):

(1)  for immediate authorization and approval, pursuant to sections 105, 361, 362, 363(c), 363(e), 364 and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for BBH, Inc. as a borrower under DIP Facility (as defined herein) (the "<u>US Borrower</u>") and Bowe Bell + Howell International Ltd. as a borrower under the DIP Facility (the "<u>Canadian</u>

---

[1]  The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Böwe Systec, Inc. (1423), Böwe Bell + Howell Holdings, Inc. (9926), BBH, Inc. (9928), Böwe Bell + Howell Company (0100), Böwe Bell + Howell Postal Systems Company (4944), BCC Software, Inc. (3481) and Böwe Bell + Howell International Ltd. (0001).  The debtors' corporate offices are located at 760 S. Wolf Road, Wheeling, IL 60090.

Borrower"), to obtain postpetition financing up to the aggregate principal amount of $127,200,000 (inclusive of up to $1,300,000 for postpetition financing by the Canadian Borrower) (the "DIP Facility"), and authorization for each Debtor (other than the Canadian Borrower) (collectively, the "Guarantors") to guarantee the repayment of the DIP Obligations (as defined herein) to the extent set forth in the DIP Facility, from Contrado BBH Funding, LLC ("Contrado") and one or more additional lenders party from time to time to the DIP Facility (collectively, the "DIP Facility Lenders");

(2) authorizing the US Borrower, the Canadian Borrower and Guarantors to execute and enter into the DIP Facility Documents (as defined herein) and to perform such other and further acts as may be required in connection with the DIP Facility Documents;

(3) requesting, pursuant to section 364(c) and (d) of the Bankruptcy Code, that the claim for repayment of the DIP Obligations:

a. subject to the Carve-Out (as defined herein), have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113 and/or 1114 of the Bankruptcy Code and all administrative claims granted pursuant to an order of the Bankruptcy Court, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Cases or any successor case, which allowed super-priority claim of the DIP Facility Lenders shall be payable from and have recourse to all prepetition and postpetition property of the Debtors, to the extent provided for herein (the "DIP Facility Superpriority Claim"); and

b. be and be deemed immediately secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first-priority senior priming security

2

interests in and liens upon (collectively, the "DIP Facility Liens") all prepetition and postpetition property of the Debtors, whether now existing or hereafter acquired, and to the extent not otherwise included, all proceeds, commercial tort claims, insurance claims (as to insurance claims, to the extent of the Debtors' interest therein) and other rights to payments not otherwise included in the foregoing assets and all products of the foregoing assets and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing assets, including, without limitation, and solely upon approval and entry of the Final Order, the proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code pursuant to sections 502(d), 544, 545, 547, 548, 550 and/or 553 of the Bankruptcy Code (the "Avoidance Actions") (collectively, the "DIP Collateral"), as provided for by section 364(c) and (d) of the Bankruptcy Code, subject only to (i) the Carve-Out, and (ii) the Prepetition Permitted Liens (as defined herein);

(4) seeking the Bankruptcy Court's authorization pursuant to sections 361(a) and 363(c) of the Bankruptcy Code to authorize the Debtors' use of cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code) constituting Prepetition Collateral (as defined herein) (as so defined, the "Cash Collateral"), on the terms and conditions set forth in this Interim Order and in the DIP Facility Agreement (as defined herein);

(5) seeking the Bankruptcy Court's authorization of certain of the Debtors' grant of adequate protection replacement liens, claims and security interests to the Prepetition Agent and Prepetition Lenders (collectively, the "Prepetition Secured Parties") as provided in this Interim Order and DIP Facility Agreement;

(6) seeking the Bankruptcy Court's authorization for the US Borrower to use a portion of the proceeds from the DIP Facility (i) upon and following entry of the Final Order,

3

to pay in full, in cash, any remaining balance of the Prepetition Obligations (as defined herein), subject to paragraph 11 below, whether incurred prior or subsequent to the Petition Date and as and when and in the manner due under the Prepetition Loan Documents; and (ii) upon and following entry of this Interim Order, for working capital needs and for such other uses as are approved under this Interim Order, subject to the terms set forth in the DIP Facility Agreement and the US Budget (as defined herein);

(7)     seeking the Bankruptcy Court's authorization for the Canadian Borrower to use a portion of the proceeds from the DIP Facility upon and following entry of this Interim Order for the uses as are approved under this Interim Order, subject to the terms set forth in the DIP Facility Agreement and the Canadian Budget (as defined herein);

(8)     seeking the Bankruptcy Court's authorization to use a portion of the proceeds from the DIP Facility upon and following entry of this Interim Order to (i) in the case of the US Borrower, make adequate protection payments as provided for in this Interim Order (collectively, the "<u>Adequate Protection Obligations</u>") to the Prepetition Secured Parties (including repayment of the Prepetition Obligations); (ii) in the case of the US Borrower and the Canadian Borrower to pay certain transaction fees and other costs relating to the DIP Facility; (iii) in the case of the US Borrower and the Canadian Borrower to fund, among other things, ongoing working capital and general corporate financing needs of the Debtors, or the Canadian Borrower, respectively, as the case may be, to the extent set forth for the US Borrower in the budget attached as <u>Annex D-1</u> to the DIP Facility Agreement (the "<u>US Budget</u>") and for the Canadian Borrower in the budget attached as Annex D-2 to the DIP Facility Agreement (the "<u>Canadian Budget</u>" and, with the US Budget, the "<u>Budgets</u>"); (iv) pay amounts owing to the DIP Facility Lenders under the DIP Facility, including, but not limited to, fees and expenses

4

(including reasonable attorneys' fees and expenses) owed to the DIP Facility Lenders; and (v) prior to an event of default under the DIP Facility, pay fees and expenses of professionals retained pursuant to sections 327, 328 or 1103 of the Bankruptcy Code by the US Borrower or the Committee (as defined herein), subject to the amounts set forth in the US Budget, and subject to such carve-outs and other agreements as may be agreed to by the DIP Facility Lenders, to the extent such professional fees and expenses are approved by the Bankruptcy Court;

(9)     requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before the Bankruptcy Court to consider entry of the Interim Order authorizing the Debtors other than the Canadian Borrower, on an interim basis, to use Cash Collateral and obtain interim financing in the principal amount of $11,000,000 under the DIP Facility from the DIP Facility Lenders and authorizing the Canadian Borrower, on an interim basis, to use Cash Collateral and obtain interim financing in the principal amount of $500,000 under the DIP Facility from the DIP Facility Lenders; and

(10)    requesting, pursuant to Bankruptcy Rule 4001, that a final hearing (the "Final Hearing") be held before the Bankruptcy Court to consider entry of a Final Order authorizing the balance of the borrowings under the DIP Facility Documents on a final basis and approval of notice and the grant of adequate protection to the Prepetition Secured Parties as provided for in this Interim Order, all on a final basis, as set forth in the Motion.

Pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), due and sufficient notice under the circumstances of the Motion and the Interim Hearing having been provided by the Debtors as set forth in paragraph I below; and the Interim Hearing having been held on April __, 2011; and upon consideration of all the pleadings filed with the Bankruptcy Court; and upon the record made by the Debtors at the Interim Hearing and in the declarations of Oliver Bialowns

5

and Michael Wilhelm in support of first day pleadings (the "First Day Declaration"); and it appearing that approval of the Interim Order is necessary to avoid immediate and irreparable harm pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and all parties in interest and is essential for the continued operations of the Debtors' businesses; and after due deliberation and consideration and good and sufficient cause appearing therefor;

IT IS HEREBY FOUND:

A.     On April 18, 2011 (the "Petition Date"), the Debtors commenced the Cases in the Bankruptcy Court.  The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  Substantially contemporaneously with the Debtors' commencement of the Cases, the Canadian Borrower is commencing a proceeding (the "Canadian Proceedings") pursuant to the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36 as amended (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario Canada, seeking, among other things, an initial interim order under the CCAA.

B.     Concurrently with the filing of the Motion, the Debtors filed (i) a motion seeking joint administration of the Cases and (ii) a motion seeking an order, inter alia, approving bid procedures, an asset purchase agreement and sale process (the "Bidding Procedures Motion").  No request for the appointment of a trustee or examiner has been made in the Cases. No committee has been appointed or designated in the Cases.

6

C.     The Bankruptcy Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     Without prejudice to the rights of any non-debtor party in interest as provided in paragraph 11 herein, the Debtors acknowledge, agree and stipulate that:

(i)     Pursuant to that certain Amended and Restated Credit Agreement, dated as of November 23, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement" and together with all Loan Documents (as defined in the Prepetition Credit Agreement) and all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Credit Documents"), Contrado BBH Investments 1, LLC, as administrative agent (as successor to Harris, N.A. ("Harris")) (the "Prepetition Agent"), and lenders under the Prepetition Credit Agreement (the "Prepetition Lenders"), made loans and advances to and/or provided other financial accommodations to or for the benefit of the US Borrower from time to time (collectively, the "Prepetition Loans").

(ii)     Pursuant to the Prepetition Credit Documents, the Debtors party thereto were, as of the Petition Date, jointly and severally indebted to the Prepetition Secured Parties on account of the Prepetition Obligations in the approximate principal amount outstanding of not less than the amount of the Prepetition Loans plus accrued but unpaid interest, fees, costs and expenses incurred by the Prepetition Secured Parties under the Prepetition Credit Documents and all indemnification rights or claims they have or may have under the Prepetition Credit Documents (all such interest, fees, costs, expenses and indemnification rights or claims, the "Prepetition Agreement Expenses"), together with the Prepetition Loans, in an aggregate

7

RLFI 3982294v. 1

C.     The Bankruptcy Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     Without prejudice to the rights of any non-debtor party in interest as provided in paragraph 11 herein, the Debtors acknowledge, agree and stipulate that:

(i)     Pursuant to that certain Amended and Restated Credit Agreement, dated as of November 23, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement" and together with all Loan Documents (as defined in the Prepetition Credit Agreement) and all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Credit Documents"), Contrado BBH Investments 1, LLC, as administrative agent (as successor to Harris, N.A. ("Harris")) (the "Prepetition Agent"), and lenders under the Prepetition Credit Agreement (the "Prepetition Lenders"), made loans and advances to and/or provided other financial accommodations to or for the benefit of the US Borrower from time to time (collectively, the "Prepetition Loans").

(ii)     Pursuant to the Prepetition Credit Documents, the Debtors party thereto were, as of the Petition Date, jointly and severally indebted to the Prepetition Secured Parties on account of the Prepetition Obligations in the approximate principal amount outstanding of not less than the amount of the Prepetition Loans plus accrued but unpaid interest, fees, costs and expenses incurred by the Prepetition Secured Parties under the Prepetition Credit Documents and all indemnification rights or claims they have or may have under the Prepetition Credit Documents (all such interest, fees, costs, expenses and indemnification rights or claims, the "Prepetition Agreement Expenses"), together with the Prepetition Loans, in an aggregate

7

amount of not less than $121,000,000 (the "<u>Prepetition Obligations</u>").  For purposes of this Interim Order, the term "<u>Prepetition Obligations</u>" shall mean and include, without duplication, any and all amounts owing or outstanding under the Prepetition Loan Documents (including, without limitation, all "Obligations" as defined in the Prepetition Credit Agreement), whether incurred prepetition or postpetition, including all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including, without limitation, any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Loan Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Secured Parties by the Debtors party to the Prepetition Loan Documents, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, and whether or not contingent or otherwise.

     (iii)  Pursuant to the Prepetition Loan Documents, including, without limitation, (x) those certain guaranty agreements, entered into by and among the Prepetition Agent, for the benefit of itself and the Prepetition Lenders and, other than the US Borrower and the Canadian Borrower, each Debtor (such Debtors, collectively, the "<u>Prepetition Guarantors</u>") signatory thereto (as amended, restated, supplemented or otherwise modified from time to time, collectively, the "<u>Prepetition Guaranty Agreement</u>"),  the Prepetition Guarantors jointly and severally guaranteed, among other things, the payment and performance in full of all of the Prepetition Obligations and (y) those certain security agreements and pledge agreements, entered into by and among the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, the US Borrower and each other Debtor party signatory thereto (as amended, restated, supplemented or otherwise modified from time to time, collectively, the "<u>Prepetition Security Agreement</u>")

8

granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, to secure the US Borrower's and the Prepetition Guarantors' obligations under the Prepetition Credit Documents, a security interest in and continuing lien on the Prepetition Collateral (as defined herein). All collateral granted or pledged by the Debtors pursuant to the Prepetition Credit Documents shall collectively be referred to herein as the "<u>Prepetition Collateral</u>";

                (iv)     As of the Petition Date and immediately prior to giving effect to this Interim Order, (a) the Prepetition Credit Documents are valid and binding agreements and obligations of the Debtors party thereto, and the liens granted pursuant to the Prepetition Credit Documents (i) constitute valid, binding, enforceable and perfected security interests and liens, subject only to the liens permitted under the Prepetition Credit Documents, but only to the extent such permitted liens are valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and, to the extent permitted pursuant to the terms of the Prepetition Credit Documents, are senior in priority to the liens of the Prepetition Secured Parties in the Prepetition Collateral as of the Petition Date (to the extent applicable, the "<u>Prepetition Permitted Liens</u>"); and (ii) are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (b) the Prepetition Obligations constitute the legal, valid and binding obligation of Debtors, enforceable in accordance with the terms of the Prepetition Credit Documents and (i) no objection, offset, defense or counterclaim of any kind or nature to the Prepetition Obligations exists, (ii) the Prepetition Obligations, and any amounts paid at any time to the Prepetition Agent on account

thereof or with respect thereto, are not subject to avoidance, reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(v)     The Debtors have waived, discharged and released any right they may have to challenge any of the Prepetition Obligations and the liens, claims and security for those obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the Prepetition Agent and the Prepetition Lenders and/or any of their respective affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees and no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors irrevocably waive any right to challenge or contest the Prepetition Obligations and the liens, claims and security for those obligations of the Prepetition Secured Parties in the Prepetition Collateral or the validity of the Prepetition Obligations;

(vi)    As of the Petition Date, the amount of the Prepetition Obligations for which the Debtors (other than the Canadian Borrower) were truly and justly indebted to the Prepetition Secured Parties, without defense, counterclaim or offset of any kind, aggregated not less than approximately $121,000,000;

(vii)   As of the Petition Date, the Prepetition Obligations far exceeded the value of the Debtors' assets and properties; and

(viii)  The claims arising from or in connection with the Prepetition Obligations are "allowed claims" within the meaning of section 502 of the Bankruptcy Code.

10

E.     The Debtors' businesses have an immediate need to obtain the DIP Facility and use Cash Collateral in order to have adequate liquidity to provide for, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, and to satisfy other working capital and operational, financial and general corporate needs.  The immediate availability of credit under the DIP Facility is intended to provide confidence to the Debtors' creditors, including their trade vendors and foreign creditors, and the Debtors' employees that will enable and encourage them to continue their relationships with the Debtors and, thereby, is intended to enhance the value of the Debtors' estates.  The access of the Debtors to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations and use of Cash Collateral is vital to the preservation and maintenance of the going concern values of the Debtors and to the success of these Cases, including consummation of the sale of substantially all of the Debtors' assets at an Auction pursuant to the Bidding Procedures Order (each as defined in the Bidding Procedures Motion). Without such credit and use of Cash Collateral, the Debtors' estates would be irreparably harmed.

F.     The Debtors are unable to obtain sufficient financing from sources other than the DIP Facility Lenders on terms more favorable than under the DIP Facility and all the documents, exhibits, schedules and instruments delivered pursuant thereto or in connection therewith (inclusive of the DIP Facility Agreement, the "<u>DIP Facility Documents</u>").  The Debtors have been unable to obtain sufficient unsecured credit solely under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  New credit is unavailable to the Debtors without (i) granting the DIP Facility Lenders the DIP Facility Superpriority Claims and the DIP

11

Facility Liens as provided herein and in the DIP Facility Documents and (ii) concurrently providing for the adequate protection to the Prepetition Secured Parties on the terms and conditions as set forth herein.

G.     The DIP Facility Lenders and Prepetition Secured Parties have agreed and consented to, or not opposed, as applicable, the provision of financing to the Debtors and the use of Cash Collateral by the Debtors subject to (i) the entry of this Interim Order, (ii) the terms and conditions of the DIP Facility Agreement, and (iii) findings by the Bankruptcy Court that such postpetition financing and use of Cash Collateral is essential to the Debtors' estates, that the terms of such financing and use of Cash Collateral were negotiated in good faith and at arm's length, and that the DIP Facility Liens and DIP Facility Superpriority Claims, and other protections granted pursuant to this Interim Order and the DIP Facility Documents will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code. Each of the DIP Facility Lenders, Prepetition Agent and Prepetition Lenders have acted in good faith in, as applicable, negotiating, consenting to and in agreeing to provide the postpetition financing arrangements and use of Cash Collateral (or otherwise not opposing such use) contemplated by this Interim Order and the other DIP Facility Documents and the reliance of each of the DIP Facility Lenders, Prepetition Agent and Prepetition Secured Parties on the assurances referred to above is in good faith.

H.     Telephonic, facsimile notice, electronic mail or overnight mail notice of the Interim Hearing and the proposed entry of this Interim Order has been provided to (i) the Office of the United States Trustee for the District of Delaware (the "US Trustee"); (ii) the entities listed on the Consolidated List of Creditors Holding the Twenty Largest Unsecured

12

Claims filed pursuant to Bankruptcy Rule 1007(d), (iii) counsel to the DIP Facility Lenders, (iv) counsel to the Prepetition Agent, (v) each of the financial institutions identified on the chart annexed as Exhibit B to the Debtors' motion to continue use of their cash management system,[2] (vi) all known parties asserting a lien against the Prepetition Collateral, (vii) the Internal Revenue Service, (viii) the Delaware Secretary of State, (ix) the Delaware Secretary of Treasury, (x) the Delaware State Attorney General, (xi) the Office of the United States Attorney General for the State of Delaware, (xii) the Securities and Exchange Commission, (xiii) the Pension Benefit Guaranty Corporation, (xiv) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules, (xv) Dell Financial Services Canada Limited, (xvi) ARI Financial Services Inc., (xvii) Capital Underwriters Inc. and (xviii) Ford Credit Canada Limited ((i) through (xviii), the "Notice Parties"). The requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, which notice is sufficient under the circumstances, including, without limitation, sections 102(1) and 364 of the Bankruptcy Code, and no other notice need be provided for entry of this Interim Order.

I.      The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b) (2) and 4001(c) (2). Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.

J.      The ability of the Debtors to finance their respective operations and the availability to the Debtors of sufficient working capital and other financial and general corporate liquidity through the incurrence of new indebtedness for borrowed money and other financial

---

[2] *See* Debtors' *Motion for Entry of an Order Authorizing the Debtors to (I) Continue Using Existing Centralized Cash Management System, as Modified, (II) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (III) Maintain Existing Bank Accounts and Business Forms* [Docket No. 5].

accommodations and use of Cash Collateral is in the best interests of the Debtors and their respective creditors and estates. The interim financing and use of Cash Collateral authorized hereunder is necessary to avoid immediate irreparable harm to the Debtors' businesses, properties and estates and to allow the orderly continuation of the Debtors' businesses.

K.       Based on the record presented by the Debtors to the Bankruptcy Court and the First Day Declaration: (i) the terms of the DIP Facility and use of Cash Collateral are the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; and (ii) the DIP Facility and use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors and the DIP Facility Lenders and the Prepetition Secured Parties, and any credit extended, loans made, credit support provided and other financial accommodations extended to the Debtors by the DIP Facility Lenders and use of Cash Collateral by the Debtors shall be deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

L.       None of the Prepetition Secured Parties has opposed the terms and conditions of this Interim Order, including the priming under section 364(d) of the Bankruptcy Code as provided for herein. The consent of the Prepetition Secured Parties granted herein is expressly limited to (i) the Debtors' use of Cash Collateral solely on the terms and conditions set forth in this Interim Order and (ii) the postpetition financing being provided by the DIP Facility Lenders as contemplated by this Interim Order and the DIP Facility Agreement. Nothing in this Interim Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the

Prepetition Secured Parties are or will be adequately protected with respect to any non-consensual use of Cash Collateral.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.      <u>Disposition</u>.  The Motion is granted as set forth in this Interim Order.  Any objections to the Motion that have not previously been resolved or withdrawn are hereby overruled.  This Interim Order shall immediately become effective upon its entry.  To the extent that the terms of the DIP Facility Documents differ from the terms of this Interim Order, this Interim Order shall control.

2.      <u>Authorization to Borrow</u>.  Upon execution and delivery of that certain Senior Secured, Super-Priority Debtor-in-Possession Credit and Guaranty Agreement (the "<u>DIP Facility Agreement</u>") by and among the US Borrower, the Canadian Borrower, the Guarantors, and the DIP Facility Lenders, in substantially the form annexed to the Motion and provided that the Debtors are not in default under the terms of this Interim Order, the US Borrower is immediately authorized to borrow (and receive other extensions of credit) under the DIP Facility from the DIP Facility Lenders up to $11,000,000 (together with interest, fees, charges and expenses payable under the DIP Facility Documents), pursuant and subject to the terms and conditions of the DIP Facility Agreement (including the conditions to effectiveness thereof). Upon execution and delivery of the DIP Facility Agreement and provided that the Debtors are not in default under the terms of this Interim Order, the Canadian Borrower is immediately authorized to borrow (and receive other extensions of credit) under the DIP Facility from the DIP Facility Lenders up to $500,000 (together with interest, fees, charges and expenses payable under the DIP Facility Documents), pursuant and subject to the terms and conditions of the DIP Facility Agreement (including the conditions to effectiveness thereof (including the conditions to

15

borrowings by the Canadian Borrower)).  The Debtors are authorized and directed to use such DIP Loans (as defined herein) in accordance with the terms of the DIP Facility Agreement and this Interim Order.  Upon execution and delivery of the DIP Facility Documents, the DIP Facility Documents shall constitute legal, valid and binding obligations of the Debtors party thereto, enforceable against the Debtors in accordance with their terms.

3.  _Structure and Amount of DIP Facility._  The DIP Facility in the maximum principal amount of $127,200,000 shall be comprised of a senior secured first-out revolving credit facility, as set forth in the DIP Facility Agreement.  The Debtors have prepared and delivered the Budgets to the DIP Lender and such Budgets have been thoroughly reviewed by the Debtors and their management.  The Debtors represent that they believe that the Budgets are achievable and should allow the Debtors to operate their businesses and otherwise conduct their Chapter 11 cases.  The DIP Facility Lenders are relying upon the Debtors' compliance with the Budgets in accordance with the Interim Order and the DIP Facility Documents in determining to enter into the postpetition financing arrangements provided for herein.

4.  _DIP Facility Proceeds_.  (a) Subject to the terms and conditions contained in this Interim Order and the DIP Facility Agreement and as and for, _inter alia_, adequate protection, upon entry of this Interim Order and the closing of transactions contemplated under the DIP Facility Agreement, the Debtors (other than the Canadian Borrower) shall use all cash held by such Debtors or held by the Prepetition Agent or any bank or other financial institution at which any such Debtor maintains any account (each, a "_Prepetition Bank_"), on the Petition Date and each day thereafter, in each case constituting Cash Collateral, to pay outstanding Prepetition Obligations (other than contingent indemnification obligations), subject to paragraph 11 below.  Each Prepetition Bank is hereby directed to release all of each such Debtor's funds on deposit

16

with such Prepetition Bank to permit such Debtors to comply with the requirements of this paragraph 4 and the DIP Facility. The Prepetition Agent may, but shall not be required to, maintain in a segregated account owned by the Prepetition Agent, any amount repaid by the Debtors on account of the Prepetition Obligations (it being understood that once paid to the Prepetition Agent, such amounts shall be considered as having been paid in compliance with the terms of the Prepetition Credit Agreement as if paid to the lenders thereunder). The application of any payments to the Prepetition Obligations pursuant to this section shall be subject to the Challenge (as defined below).

(b) After the payment of the Prepetition Obligations in full, or after an Event of Default as determined by the DIP Facility Lender, all Cash Collateral and other DIP Collateral collected, and all voluntary or mandatory payments made by the Debtors, as required or permitted pursuant to the DIP Facility Agreement in accordance with the terms of the DIP Facility Agreement, shall be applied to the DIP Obligations (as defined herein) pursuant to the terms of the DIP Facility Agreement. Subject to the terms and conditions of this Interim Order, the Prepetition Secured Parties' claims on account of the Prepetition Obligations shall be allowed pursuant to section 502 of the Bankruptcy Code, and no Prepetition Secured Party shall be required to file a proof of claim with respect to any such claim.

5.     <u>Continuation of Liens and Liens Securing DIP Obligations</u>.     Until payment in full, in cash, of all of the obligations of the Debtors with respect to the DIP Facility and, other than with respect to the Canadian Borrower, the Prepetition Credit Documents, and termination of the DIP Facility Lenders' commitments under the DIP Facility, and until such time as the Prepetition Obligations shall have been allowed in full and the time period for any challenge thereto shall have expired, all liens and security interests of the Prepetition Agent and

17

Prepetition Secured Parties (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein. Notwithstanding any payment of all or any portion of the Prepetition Obligations, the Liens arising under the Prepetition Credit Documents shall continue in full force and effect and shall, and shall be deemed to, secure the full and timely payment of the DIP Obligations (separate from and in addition to the DIP Facility Liens granted to the DIP Facility Lenders, in Paragraph 7 below) until the payment in full, in cash, of all of the DIP Obligations and the termination of the DIP Facility Lenders' commitments under the DIP Facility.

6. <u>DIP Loans</u>. All loans made to or for the benefit of the Debtors on or after the Petition Date under the DIP Facility Documents (collectively, the "<u>DIP Loans</u>"), including the defined term "Obligations", which includes, without limitation, principal, interest, fees, costs, expenses, indemnification obligations and other obligations and amounts due from time to time by the Debtors to the DIP Facility Lenders under the DIP Facility Documents and this Interim Order, shall hereinafter be referred to as the "<u>DIP Obligations.</u>" The DIP Loans and the DIP Obligations: (i) shall be evidenced by the books and records of the DIP Facility Lenders; (ii) shall bear interest payable at the rates set forth in the DIP Facility Agreement; (iii) shall be secured in the manner specified in paragraph 7 below; (iv) shall be payable in accordance with the terms of the DIP Facility Documents; and (v) shall otherwise be governed by the terms set forth herein and in the DIP Facility Documents.

7. <u>DIP Facility Liens</u>. As security for the repayment of the DIP Obligations, pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, the DIP Facility Lenders, are hereby granted (without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lock box agreements, financing statements or

18

otherwise) the DIP Facility Liens on and in the DIP Collateral and all proceeds thereof, which liens are valid, binding, enforceable and fully perfected as of the date hereof, not subject to subordination, impairment or avoidance, for all purposes in the Cases and any successor case. The DIP Facility Liens granted herein shall be (x) pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, perfected and non-avoidable first priority liens on and security interests inn all now owned or hereafter acquired assets and property of the Debtors, including, upon entry of the Final Order, the proceeds of Avoidance Actions, that are not subject to valid, perfected, enforceable and non-avoidable liens as of the Petition Date, (y) pursuant to section 364(c)(3), valid, perfected, enforceable and non-avoidable second priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject to valid, perfected, enforceable and non-avoidable liens in existence on the Petition Date or to valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (other than assets and property that are subject to the existing liens as referred to in subparagraph (c) below, which existing liens shall be primed as provided herein) and (z) pursuant to section 364(d) of the Bankruptcy Code, valid, perfected, enforceable and non-avoidable first priority senior priming liens on and security interests in the Prepetition Collateral, except as to the Prepetition Permitted Liens, to the extent such liens and security interests are valid, perfected, enforceable and non-avoidable (provided, that with respect to such excepted liens and security interests, if any, the DIP Facility Lenders shall be granted second priority liens as granted in clause (y) above). The DIP Facility Liens granted by the Canadian Borrower shall be limited to the extent of such Debtor's actual obligations under the DIP Facility Documents to which it is a party or is otherwise bound. In the event of the occurrence of an Event of Default (as defined in the DIP

19

Facility Agreement), or an event that would constitute an Event of Default with the giving of notice of lapse of time or both, the DIP Facility Liens shall be subject only to the payment of the Carve-Out.

8. <u>Turnover of Assets; Account Control</u>. (a) Upon entry of this Interim Order, all possessory collateral held by the Prepetition Secured Parties and their predecessors (including the predecessor to the Prepetition Agent) shall be deemed to have been transferred to the DIP Facility Lenders and all lockbox, blocked account and similar agreements shall be deemed assigned to the DIP Facility Lenders, as security for the DIP Obligations. Harris shall continue to cooperate with the Prepetition Agent to facilitate the foregoing.

(b) The Debtors and each Prepetition Bank, including Harris and its affiliates, are authorized and directed to remit funds in accordance with the direction given by the DIP Facility Lenders. The benefits and rights afforded the secured party under any Pre-Petition Date account control agreements are deemed afforded to the DIP Facility Lenders exclusively.

9. <u>DIP Facility Superpriority Claim</u>. For all of the DIP Obligations arising under the DIP Facility and the DIP Facility Documents, the DIP Facility Lenders are granted, pursuant to section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out, the allowed DIP Facility Superpriority Claim, which claim shall be payable from and have recourse to the DIP Collateral. The DIP Facility Superpriority Claim shall be deemed a legal, valid, binding, enforceable and perfected claim, not subject to subordination, impairment or avoidance, for all purposes in the Cases and any successor case.

10. <u>Carve-Out</u>. (a) Subject to the terms and conditions contained in this Interim Order, the DIP Facility Liens, DIP Facility Superpriority Claim, the adequate protection

20

liens and claims of the Prepetition Secured Parties as provided for herein and liens and claims

held by the Prepetition Secured Parties shall be subject and subordinate only to the following

(the "Carve-Out"): (i) unpaid fees of the Clerk of the Bankruptcy Court and the US Trustee

pursuant to 28 U.S.C. § 1930(a); (ii) allowed reasonable fees and expenses (other than any

"success", transaction, restructuring, completion or similar fees) (the "Professional Fees") of

attorneys and financial advisors employed by the Debtors and the official committee of

unsecured creditors (the "Committee") pursuant to sections 327 and 1103 of the Bankruptcy

Code (collectively, the "Case Professionals"), to the extent (x) incurred at any time on or prior to

the calendar day on which an Event of Default occurs and for which notice has been given (such

day, the "Event Date") and (y) of the aggregate amount of Professional Fees of each Case

Professional contemplated to be incurred pursuant to the US Budget for such Case Professional

for the period from the Petition Date through and including the Event Date (less Professional

Fees paid to such Case Professional on or before the Event Date (plus any retainers held by such

Case Professional as of such date), whether such Professional Fees have been allowed by the

Bankruptcy Court before or after the Event Date; and (iii) Professional Fees of Case

Professionals incurred subsequent to the calendar day immediately following the Event Date in

an aggregate amount not to exceed $100,000 for Professional Fees (of which amount $25,000

shall be allocated to Case Professionals of the Committee). Subject to the terms and conditions

contained in this Interim Order, the DIP Facility Liens and the DIP Facility Superpriority Claim

as provided for herein shall be subject and subordinate to all fees and expenses required to be

paid to the Information Officer (as defined below) in connection with the Canadian Proceedings,

including to the extent secured by the charge to be granted by the Canadian Court over the

Debtors' Property (as defined below), in the maximum amount of $100,000, to secure payment

of any such fees and expenses of the Information Officer. "Information Officer" means the information officer to be appointed by the Canadian Court in connection with the proceedings commenced pursuant to the CCAA. "Property" means all of the Debtors' current and future assets, undertakings and properties of every nature and kind whatsoever, and wheresoever situated, including all proceeds thereof, of any of the Debtors in Canada that relates to their business in Canada. The foregoing shall not be construed as consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Debtors, DIP Facility Lenders, Prepetition Secured Parties, the Committee (if appointed), the US Trustee or other parties in interest to object to the allowance and payment of such amounts. Payment of any portion of the Carve-Out shall not, and shall not be deemed to, (i) reduce any Debtor's obligations owed to any of the DIP Facility Lenders, or Prepetition Secured Parties or (ii) subordinate, modify, alter or otherwise affect any of the liens and security interests of such parties in the DIP Collateral or Prepetition Collateral (or their respective claims against the Debtors). Notwithstanding anything to the contrary in this Interim Order, the DIP Facility Lenders reserve the right to review and object to any fee statement, interim application or monthly application issued or filed by estate professionals. Notwithstanding any provision (including, without limitation, any "variance" or similar provision) of this Interim Order, any Final Order or the DIP Facility Agreement to the contrary, aggregate cumulative expenditures for restructuring professional fees of the Debtors or any Committee shall not exceed 100% of the amount with respect thereto set forth in the Budget and Professional Fees for any Case Professional shall not exceed 100% of the amount listed in the line item in the Budget for such Professional.

(b) Notwithstanding anything herein to the contrary (other than as expressly contemplated by paragraph 11 of this Interim Order), no Prepetition Collateral, DIP

22

Collateral, proceeds thereof, or Cash Collateral, or any portion of the Carve-Out or financing provided under the DIP Facility shall include, apply to or be available for any fees or expenses incurred by any party, including the Case Professionals, in connection with (i) the investigation (subject to paragraph 11), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Facility Lenders, including, without limitation, challenging the amount, validity, extent, perfection, priority, characterization or enforceability of, or asserting any defense, counterclaim or offset to, the DIP Obligations, DIP Facility Liens or the DIP Facility Superpriority Claim, in respect thereof, (ii) asserting any claims or causes of action (including, without limitation, claims or actions to hinder or delay any DIP Facility Lender's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Facility Documents or this Interim Order or any Avoidance Actions) against the any DIP Facility Lender, the Prepetition Agent, or any Prepetition Lender, (iii) the investigation (subject to paragraph 11), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Prepetition Secured Parties, including, without limitation, challenging the amount, validity, extent, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the Prepetition Obligations or the Adequate Protection granted herein, (iv) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the DIP Facility Lenders or (v) incurring Indebtedness (as defined in the DIP Credit Agreement) other than as expressly permitted by the DIP Facility Documents.

11. <u>Investigation Rights.</u> Other than a $25,000 disbursement set forth in the Budget to investigate claims or causes of action against the Prepetition Secured Parties (the "<u>Investigation Funds</u>"), no portion of the DIP Facility, the DIP Collateral, the Prepetition

Collateral, the Cash Collateral or the Carve-Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting any claims or causes of action against the DIP Facility Lenders, and the Prepetition Secured Parties, including, without limitation, any action challenging or raising any defenses to the DIP Obligations or the Prepetition Obligations or the liens of the Prepetition Secured Parties or the DIP Facility Lenders on the Prepetition Collateral and/or DIP Collateral. Notwithstanding anything herein to the contrary, all non-debtor parties in interest (including any trustee or Committee appointed or elected in the Cases prior to the Investigation Termination Date (as defined herein)) shall have until the date that is the earliest of (i) 45 days after the Petition Date, (ii) 30 days from the date a Committee is first appointed or (iii) 5 business days prior to the date set for the Auction (as defined in the Bidding Procedures Motion) (the "Investigation Termination Date") to investigate the validity, perfection, and enforceability of the liens of the Prepetition Secured Parties, and the amount and allowability of the Prepetition Obligations owed to the Prepetition Secured Parties, the use of all cash held by the Debtors or held by the Prepetition Agent from proceeds of Prepetition Collateral as of the Petition Date and the first proceeds of the DIP Facility to pay in full, in cash, all outstanding Prepetition Obligations as set forth in paragraph 4(a) above and to assert any claims or causes of action against any of the Prepetition Secured Parties. If the Committee, if appointed, or any non-debtor party in interest hereafter vested with authority by the Bankruptcy Court, determines that there may be a challenge by the Investigation Termination Date, prior to the Investigation Termination Date, such Committee or other non-debtor party in interest hereafter vested with authority by the Bankruptcy Court must initiate prior to the Investigation Termination Date any appropriate action or adversary proceeding on behalf of the Debtors' estates setting forth the basis of any

24

such challenge, claim or cause of action (each, a "Challenge"). If no Challenge is filed prior to the Investigation Termination Date, then the agreements, acknowledgements, releases and stipulations contained in this Interim Order including paragraphs D(i) through D(xiv) shall be irrevocably binding on all the estates, the Committee, if appointed, and all parties in interest (including without limitation a receiver, administrator or trustee appointed in any of the Cases or any successor case or in any jurisdiction) without further action by any party or the Bankruptcy Court, and the Committee and all other parties in interest (including without limitation a receiver, administrator or trustee appointed in any of the Cases or any successor case or in any jurisdiction) shall thereafter be forever estopped and barred from bringing any Challenge with respect to the Prepetition Secured Parties, the Prepetition Obligations and the repayment thereof as set forth in paragraph 4(a) of this Interim Order. If any complaint or other pleading is timely filed on or before the applicable Investigation Termination Date (or any amendment to such complaint as may be allowed thereafter), all other claims and actions against the Prepetition Secured Parties or relating to the Prepetition Obligations and the repayment thereof as set forth in paragraph 4(a) of this Interim Order, not expressly asserted in such applicable complaint, amended complaint or other pleading shall be deemed, immediately and without further notice, motion or application to, order of, or hearing before, the Bankruptcy Court, to have been forever relinquished, discharged, released and waived. Notwithstanding anything herein to the contrary, if the Committee has been appointed, then, upon entry of a Final Order, only the Committee (or any subsequently appointed trustee in these Cases) shall be entitled to seek authority to bring a Challenge on behalf of the Debtors' estates against any of the Prepetition Secured Parties; no other party in interest shall be entitled to investigate the validity, amount, perfection, priority or enforceability of the liens of the Prepetition Secured Parties as to liens arising under the

25

Prepetition Credit Documents and Prepetition Obligations, and the amount and allowability of the Prepetition Obligations, or to assert any other claims or causes of action held by the Debtors' estates against any of the Prepetition Secured Parties.

12. <u>Limitation on Additional Surcharges</u>. Subject to entry of the Final Order, with the exception of the Carve-Out, neither the DIP Collateral, Prepetition Collateral nor any DIP Facility Lender or Prepetition Secured Party shall be subject to surcharge, pursuant to sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest without the prior written consent of the Prepetition Agent, and no such consent shall be implied from any other action, inaction or acquiescence by such parties in this proceeding, including but not limited to funding of the Debtors' ongoing operation by the DIP Facility Lenders. Subject to entry of the Final Order, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived. Upon entry of the Final Order, the DIP Facility Lenders and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Prepetition Collateral.

13. <u>Payment of DIP Fees and Expenses</u>. The Debtors are hereby authorized and directed to pay on demand all fees, expenses and other amounts payable under and in accordance with the terms of the DIP Facility Agreement, including, without limitation, all closing fees, agency fees and all of the fees and all out-of-pocket costs and expenses of the DIP Facility Lenders in accordance with the terms of the DIP Facility Agreement including, without limitation, the prepetition and postpetition fees and disbursements of legal counsel, local Delaware counsel, financial advisors and third-party appraisers and consultants advising the DIP Facility Lenders. None of such costs, fees and expenses shall be subject to Bankruptcy Court

26

approval or US Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court; provided, however, that the DIP Facility Lenders as well as the Prepetition Agent (with respect to the adequate protection in the form of expense reimbursement granted hereunder) shall independently submit summary statements of their respective professional fee invoices to the Debtors, and the Debtors shall send copies of such statements to the US Trustee and any Committee within five (5) business days of their receipt thereof.  In addition, the Debtors are hereby authorized to indemnify the DIP Facility Lenders and certain other parties against any liability arising in connection with the DIP Facility Documents to the extent set forth in and in accordance with the terms of the DIP Facility Documents.  All such unpaid fees, expenses and indemnities of the DIP Facility Lenders shall constitute DIP Obligations and the repayment thereof shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Facility Documents.

14.     Use of Cash Collateral; Adequate Protection of Prepetition Secured Parties.  I.  Subject to the terms and conditions of this Interim Order, the DIP Facility and the DIP Facility Documents, and including subject to the US Budget, the US Borrower and the Guarantors are authorized to use Cash Collateral.  Such Debtors are required to use all Cash Collateral (other than proceeds of the DIP Facility prior to entry of the Final Order) and other proceeds from any Prepetition Collateral, to reduce the Prepetition Obligations, and shall apply all such collateral to reduce such obligations on a permanent basis until repaid in full (subject to paragraph 11 of this Interim Order).

II.     As additional consideration for the use of Cash Collateral and the priming of the Prepetition Secured Parties' liens, claims and interests in the Prepetition Collateral (solely

27

upon the terms and conditions of this Interim Order), the Prepetition Secured Parties shall receive the following (together with the protection referred to in clause (I) of this paragraph 14, collectively, the "Adequate Protection"):

(a) Adequate Protection Liens. The Prepetition Agent, on behalf of the Prepetition Secured Parties, is granted as adequate protection (i) a lien on the Prepetition Collateral and the DIP Collateral of the US Borrower and the Guarantors to secure such parties' claim for repayment of the Prepetition Agreement Expenses and (ii) a lien on the Prepetition Collateral and DIP Collateral of the US Borrower and the Guarantors (together with the lien referred to in clause (i), the "Adequate Protection Liens") to the extent there is any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the pendency of these Cases, whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the priming of the liens arising under the Prepetition Credit Documents, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, shrinkage or decline in market value of the Prepetition Collateral, the imposition of the automatic stay or otherwise (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Agent's (on behalf of the Prepetition Lenders) seeking vacation of the automatic stay or the Bankruptcy Court granting such relief). The Adequate Protection Liens shall be junior to the Prepetition Permitted Liens, junior to the DIP Facility Liens, junior to the Carve-Out, and senior to any other liens. The Adequate Protection Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtors or the Prepetition Agent of security agreements, pledge agreements, financing statements or other agreements. The Adequate Protection Liens shall

28

cover assets, interest and proceeds of the Debtors that are or would be collateral under the Prepetition Credit Documents if not for Bankruptcy Code section 552(a), and all cash and cash equivalents, and all assets, interests and proceeds of the Debtors (other than the Canadian Borrower) that constitute DIP Collateral.

(b)     Administrative Claim.  The Prepetition Agent, on behalf of itself and the Prepetition Lenders, is hereby granted in each of the Debtors' Cases (other than the Canadian Borrower's Case) an allowed administrative claim (the "Adequate Protection Claim") under section 507(b) of the Bankruptcy Code to the extent that the Adequate Protection Liens do not adequately protect the diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral from the Petition Date, and such Adequate Protection Claim shall be shall be junior in priority to the DIP Superiority Claims and junior and subordinate to the Carve-Out.  The Adequate Protection Claim shall include, for the avoidance of doubt, the claims secured by the Adequate Protection Lien.

(c)     Adequate Protection Payments.   As additional adequate protection, (i) the Prepetition Agent shall be entitled to, and the Debtors (other than the Canadian Borrower) are directed to timely pay, the ongoing payment of the Prepetition Agreement Expenses, including the fees and expenses of legal counsel and other professionals retained by the Prepetition Agent, as and when due and payable under the Prepetition Credit Documents (without giving effect to any acceleration provision therein), regardless of whether such fees accrued prior to the Petition Date, and such adequate protection payments shall not be subject to any limitations in the US Budget; and (ii) except for the DIP Facility, the Adequate Protection Liens, the Prepetition Permitted Liens and the DIP Facility Liens, pursuant to this Interim Order, the Debtors shall be prohibited from incurring additional

29

indebtedness with claim status and with priority over the Prepetition Obligations or liens equal to or senior in priority to the liens arising under the Prepetition Credit Documents. All fees and expenses of the Prepetition Agent and Prepetition Lenders that were incurred under the Prepetition Credit Documents and paid by the Debtors prior to the Petition Date are deemed paid as adequate protection and are not subject to recharacterization and are not avoidable or recoverable under any applicable law from the Prepetition Agent, the Prepetition Lenders or any of such professionals. All amounts paid as adequate protection are deemed permitted uses of Cash Collateral.

(d)     Budget. Except pursuant to permitted variances provided for in the DIP Financing Documents, the Debtors shall not make disbursements in excess of those projected in the Budgets and shall not otherwise deviate from the terms of the Budgets, without the written consent of the Prepetition Agent and the DIP Facility Lenders.

(e)     Additional Adequate Protection. The Prepetition Secured Parties may petition the Bankruptcy Court for any such additional protection they may reasonably require with respect to the Prepetition Obligations or otherwise, including, without limitation, their rights to request additional adequate protection of their interests in the Prepetition Collateral or the Cash Collateral or relief from or modification of the automatic stay extant under section 362 of the Bankruptcy Code.

15.     Restrictions on the Debtors. Other than the Carve-Out, no claim or lien having a priority superior or *pari passu* with those granted by this Interim Order to the DIP Facility Lenders, shall be granted by any Debtor, while any portion of the DIP Facility (or refinancing thereof), or any commitment thereunder remains outstanding, or the Investigation Termination Date shall have not occurred. The Debtors will not, at any time during the Cases,

grant mortgages, security interests, or liens in the DIP Collateral or any portion thereof to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

16.  Additional Perfection Measures. The DIP Facility Lenders and the Prepetition Secured Parties shall not be required to file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction or effect any other action to attach or perfect the security interests and liens granted under the DIP Facility Documents and this Interim Order (including, without limitation, the taking possession of any of the DIP Collateral (in accordance with the terms of the DIP Facility Agreement), or the taking of any action to have security interests or liens noted on certificates of title or similar documents). Notwithstanding the foregoing, the DIP Facility Lenders and the Prepetition Secured Parties may, in their respective sole discretion, file this Interim Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm perfection of such liens, security interests and mortgages without seeking modification of the automatic stay under section 362 of the Bankruptcy Code and all such documents shall be deemed to have been filed or recorded at the time of and on the Petition Date, with the priorities set forth herein.

17.  Access to Collateral – No Landlord's Liens. Solely upon entry of the Final Order, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Facility Lenders, contained in this Interim Order or the DIP Facility Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Facility Agreement, upon reasonable prior written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Facility Documents, the DIP Facility Lenders may enter upon any leased premises of the Debtors for the purpose of exercising any remedy (in accordance with the terms of the DIP Facility Agreement)

31

with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder; provided that, the DIP Facility Lenders shall only pay rent of the Debtors that first accrues after the DIP Facility Lenders' written notice and that is payable during the period of such occupancy by the DIP Facility Lenders, calculated on a per diem basis. Nothing herein shall require the DIP Facility Lenders to assume any lease as a condition to the rights afforded to the DIP Facility Lenders in this paragraph.

18. _Automatic Stay_. (a) Subject only to the provisions of the DIP Facility Agreement and without further order from the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Facility Lenders to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Facility Documents (including, without limitation and without prior notice, the right to freeze monies or balances in the Debtors' accounts or set off monies or balances of the Debtors in accounts maintained by the DIP Facility Lenders, Prepetition Bank or any other financial institution maintaining any of the Debtors' deposits, the right to charge default rate of interest and to terminate commitments); provided, however, that prior to the exercise of any enforcement or liquidation remedies against the DIP Collateral (other than those specifically set forth in the parenthetical included in the preceding portion of this sentence), the DIP Facility Lenders shall be required to give five (5) business days prior written notice to the Debtors, counsel to the Debtors, the Committee's counsel (if appointed), and the US Trustee; provided, further, that during such five (5) business day period the US Borrower's and Canadian Borrower's authority to use Cash Collateral (subject to the Budgets) shall not terminate. Notwithstanding the occurrence of an

32

Event of Default or termination of the Commitments under the DIP Facility Agreement or anything herein, all of the rights, remedies, benefits and protections provided to the Prepetition Secured Parties under the Prepetition Credit Documents and the DIP Facility Lenders under the DIP Facility Documents and this Interim Order shall survive the Termination Date (as defined in the DIP Facility Agreement). Upon receiving notice of the exercise of remedies by the DIP Facility Lenders, the Debtors, and/or the Committee shall be entitled to seek an expedited hearing following the occurrence of an Event of Default; provided, however, that the only issue to be determined at such hearing is whether an Event of Default has occurred and is continuing. Upon expiration of such five (5) business day period, the Debtors' authority to use Cash Collateral shall terminate without further order of the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

(b)       Immediately following the giving of notice by the DIP Facility Lenders, subject to the terms and conditions set forth in the DIP Facility Agreement, of the occurrence of an Event of Default (except as otherwise ordered by this Bankruptcy Court): (i) the Debtors shall to deliver and cause the delivery of the proceeds of DIP Collateral, in accordance with this Interim Order and the DIP Facility Agreement to the DIP Facility Lenders for application to the DIP Obligations pursuant to the DIP Facility Agreements, and (ii) the DIP Facility Lenders shall continue to apply such proceeds in accordance with the provisions of this Interim Order and the DIP Facility Agreement; (iii) the Debtors shall have no right to seek to use any of such proceeds, nor any other Cash Collateral other than towards the satisfaction of post-petition employee obligations incurred in accordance with the Budgets,

33

the Prepetition Obligations, the DIP Obligations, obligations arising as a result of the Adequate Protection Liens and the Carve-Out; and (iv) any obligation otherwise imposed on the applicable DIP Facility Lenders to provide any loan or advance to or for the benefit of Debtors pursuant to the DIP Facility shall be immediately suspended.

(c)     If the Debtors or Committee do not contest the right of the DIP Facility Lenders to exercise their remedies based upon whether an Event of Default has occurred within such time period, or if the Debtors or Committee do timely contest the occurrence of an Event of Default and this Bankruptcy Court after notice and hearing declines to stay the enforcement thereof, the automatic stay, as to the DIP Facility Lenders shall automatically terminate at the end of such notice period.

(d)     If the DIP Facility Lenders shall exercise any of their rights and remedies upon the occurrence of an Event of Default, the DIP Facility Lenders, subject to the terms and conditions set forth in the DIP Facility Agreement, upon notice to the Debtors and Committee, may retain one or more agents to sell, lease, or otherwise dispose of the DIP Collateral.  In any exercise of their rights and remedies upon an Event of Default, the DIP Facility Lenders, subject to the terms and conditions set forth in the DIP Facility Agreement, are authorized to proceed under or pursuant to the DIP Facility Agreement.

(e)     Subject to the rights, if any, of the holders of any Prepetition Permitted Liens and the Carve Out, or as may be otherwise ordered by the Court, all proceeds realized from any of the foregoing shall be turned over to the DIP Facility Lenders for application to the DIP Obligations pursuant to the DIP Facility Agreement and this Interim Order and, following payment in full, in cash, of the DIP Obligations, to the Prepetition Agent for

34

application to the Prepetition Obligations, to the extent outstanding, and following payment in full, in cash, of the Prepetition Obligations, to the Debtors for distribution pursuant to a further order of the Court.

19.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Facility Agreement so, as necessary, to (1) permit the applicable Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations under the DIP Facility Agreement, the DIP Facility, and this Interim Order, as applicable, and (2) authorize the Prepetition Secured Parties to retain and apply payments hereunder.

20.    <u>Credit Bid</u>.  The Prepetition Agent shall have the unqualified right to credit bid up to the full amount of any Prepetition Obligations in any sale of the DIP Collateral securing any of the Prepetition Obligations (including Adequate Protection Obligations) or Prepetition Collateral, as applicable, under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.  The Debtors, on behalf of themselves and their estates, stipulate and agree that any sale of all or part of the Prepetition Collateral that does not include an unqualified right to credit bid up to the full amount of the Prepetition Obligations would not result in the Prepetition Agent and the Prepetition Secured Parties receiving the indubitable equivalent of their claims and interest.

21.    <u>DIP Credit Bid</u>.  The DIP Facility Lenders shall have the right to credit bid the obligations arising under the DIP Facility under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the

Bankruptcy Code, or (iii) a sale or disposition by a Chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

22. <u>Nullifying Prepetition Restrictions on Postpetition Lien Grants</u>. Notwithstanding anything to the contrary contained in any prepetition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, any provision that restricts, limits or impairs in any way any Debtor's ability or right to grant liens or security interests upon any of the Collateral (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the DIP Facility Documents or this Interim Order or otherwise enter into and comply with all of the terms, conditions and provisions thereof (all such provisions being collectively referred to as the "<u>Restrictive Clauses</u>") shall not be effective and shall be unenforceable against any such Debtor and the DIP Facility Lenders to the maximum extent permitted under the Bankruptcy Code and other applicable law, but only with respect to the entry of this Interim Order, and, therefore, shall not adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to the DIP Facility Lenders or granted to the Prepetition Secured Parties hereunder, to the maximum extent permitted under the Bankruptcy Code and other applicable law. Such Restrictive Clauses shall not, to the maximum extent permitted under the Bankruptcy Code and applicable law, render any contract or lease unable to be assumed and/or assigned by any Debtor (or by the DIP Facility Lenders pursuant to the provisions contained in this Interim Order), or in any way impair or limit the ability or right of any Debtor (or by the DIP Facility Lenders, on behalf of any Debtor, pursuant to the provisions contained in this Interim Order) to assume and/or assign any contract or lease under sections 365 or 1123 of the Bankruptcy Code.

RLF1 3982294v. 1

23. <u>Amendment to DIP Facility Documents</u>. The DIP Facility Lenders, with the consent of the Borrowers, are authorized to amend and/or modify the DIP Facility Documents without further order of the Court; <u>provided</u> that any such amendments or modifications must be in writing and served upon counsel for the Committee (if appointed at such time) and the US Trustee; <u>provided</u>, <u>further</u> that any amendments or modifications that would have the effect of shortening the maturity date of the DIP Facility, increasing the aggregate fees, or the rate or amount of interest payable, or otherwise materially adversely affecting the Debtors' rights or obligations, under the DIP Facility shall be done only pursuant to further order of the Court.

24. <u>Binding Effect</u>. The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Facility Lenders, Prepetition Secured Parties, the Debtors and each of the foregoing parties' respective successors and assigns, including any trustee hereafter appointed for the estate of any of the Debtors, whether in these Cases or in the event of the conversion of any of the Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Interim Order.

25. <u>Survival</u>. The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order (i) confirming any plan of reorganization in any of the Cases (and, to the extent not satisfied in full, in cash, the DIP Obligations shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge), (ii) converting any of the Cases to a chapter 7 case unless permitted under the DIP Facility Documents, or (iii) dismissing any of the Cases unless permitted under the DIP Facility Documents, and the terms and provisions of this Interim Order as well as the DIP Facility Superpriority Claims, the DIP

Facility Liens, the adequate protection granted pursuant to this Interim Order and/or the DIP Facility Documents shall continue in full force and effect notwithstanding the entry of any such order, and such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Facility Documents to the maximum extent permitted by law until all of the DIP Obligations is indefeasibly paid in full, in cash, and discharged.

26. *Access to the Debtors*. In accordance with the provisions of access in the DIP Facility Documents, the Debtors shall permit representatives, agents and/or employees of the DIP Facility Agents and their respective counsel to have reasonable access to their premises and records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with and provide to such representatives, agents and/or employees all such information as they may reasonably request.

27. *Authorization to Act*. Each of the Debtors is authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, mortgages and financing statements), and to pay interest, fees and all other amounts as provided under and subject to the terms of this Interim Order and the DIP Facility Documents, which may be reasonably required or necessary for the Debtors' full and timely performance under the DIP Facility and this Interim Order, including, without limitation:

(a) the execution of the DIP Facility Documents;

(b) the modification or amendment of the DIP Facility Agreement or any other DIP Facility Documents without further order of the Bankruptcy Court, in each case, in such form as the Debtors, and the DIP Facility Lenders may agree in accordance with and subject to the terms of the terms of the DIP Facility Documents; provided, however, that notice

38

of any material modification or amendment (including any waiver of any Event of Default) shall be provided to counsel for the Committee, if appointed, and the US Trustee, each of which will have five (5) days from the date of delivery of such notice within which to object in writing; provided further, however, that if such objection is timely provided, then such modification or amendment shall be permitted only pursuant to an order of the Bankruptcy Court; and

(c)     the non-refundable payments to the DIP Facility Lenders of the fees referred to in the DIP Facility Agreement, and reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable attorneys' and other professional fees and disbursements as provided in the DIP Facility Documents.

28.     Insurance Policies.  Upon entry of this Interim Order, the Administrative Agents and DIP Facility Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.  Any insurance proceeds or other receipts from any source (excluding other authorized payments provided for herein) paid to any of the Prepetition Secured Parties shall be immediately delivered to the Debtors and subject to the DIP Facility Liens and provisions of the DIP Facility Agreement.

29.     Subsequent Reversal.  If any or all of the provisions of this Interim Order or the DIP Facility Documents are hereafter modified, vacated, amended or stayed by subsequent order of the Bankruptcy Court or any other court:  (i) such modification, vacatur, amendment or stay shall not affect the validity of any obligation of any Debtor or Guarantor to the DIP Facility Lenders or Prepetition Secured Parties (to the extent of adequate protection provided hereunder), or the validity, enforceability or priority of the DIP Facility Superpriority Claims, DIP Facility

39

Liens, adequate protection or other grant authorized or created by this Interim Order and the DIP Facility Documents; and (ii) the DIP Obligations and adequate protection pursuant to this Interim Order and the DIP Facility Documents shall be governed in all respects by the original provisions of this Interim Order and the DIP Facility Documents, and the validity of any such credit extended or security interest granted pursuant to this Interim Order and the DIP Facility Documents and use of Cash Collateral is and shall be protected by section 364(e) of the Bankruptcy Code.

30. <u>Effect of Dismissal of Cases</u>. If the Cases are dismissed, converted or substantively consolidated, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of these Cases shall affect the rights of the DIP Facility Lenders and the Prepetition Secured Parties (to the extent of adequate protection provided hereunder) under their respective documents or this Interim Order, and all of the respective rights and remedies thereunder of the DIP Facility Lenders and the Prepetition Secured Parties (to the extent of adequate protection provided hereunder) shall remain in full force and effect as if the Cases had not been dismissed, converted or substantively consolidated. If an order dismissing any of the Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Facility Liens and DIP Facility Superpriority Claim granted to and conferred upon the DIP Facility Lenders and the protections afforded to the DIP Facility Lenders pursuant to this Interim Order and the DIP Facility Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full, in cash (and that such DIP Facility Liens, DIP Facility Superpriority Claim and other protections shall, notwithstanding such dismissal, remain binding on all interested parties), (ii) the Adequate

40

Protection granted to and conferred upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until such adequate protection has been satisfied, (iii) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Facility Liens, Adequate Protection Liens, liens arising under the Prepetition Credit Documents, the DIP Facility Superpriority Claim and other adequate protection referred to herein, and (iv) any hearing on a motion to dismiss any of the Cases shall require at least twenty (20) days prior notice to the DIP Facility Lenders and the Prepetition Agent.

31.     <u>Findings of Fact and Conclusions of Law</u>.  This Interim Order constitutes findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon the entry thereof.

32.     <u>Controlling Effect of Interim Order</u>.  To the extent any provision of this Interim Order conflicts with any provision of the Motion, any prepetition agreement or any document executed in connection with the DIP Facility, the provisions of this Interim Order shall control.

33.     <u>Termination of Commitments</u>.  The commitment of the DIP Facility Lenders shall terminate and all amounts owing under the DIP Facility shall be due and payable on the terms and conditions set forth in the DIP Facility Agreement.

34.     <u>Final Hearing.</u>   A final hearing on the Motion shall be heard before the Bankruptcy Court on _____, 2011 at _____ _____.m. (EDT) at the United States Bankruptcy Court for the District of Delaware.

35.     <u>Adequate Notice.</u>  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rule 4001(c)(2).  The Debtors shall promptly mail or

41

fax copies of this Interim Order and notice of the Final Hearing to the Notice Parties and all landlords of the Debtors. Any party-in-interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file the same with the Bankruptcy Court (with a courtesy copy to chambers) and serve (so as to be received) such objection no later than **____, 2011 at _____ ____.m. (EDT)** on the following:

(a) **Richards, Layton & Finger, P.A.,** One Rodney Square, Wilmington, Delaware 19801, Attn: Mark D. Collins, Collins@rlf.com, proposed counsel to Debtors and Debtors-in-Possession;

(b) **Kirkland & Ellis LLP**, 300 North LaSalle, Chicago, IL 60654, Attn: David Eaton, david.eaton@kirkland.com, and 601 Lexington Avenue, New York, NY 10022, Attn: Leonard Klingbaum, leonard.klingbaum@kirkland.com, counsel to the DIP Facility Lenders; and

(c) **Office of the United States Trustee for the District of Delaware**, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Juliet M. Sarkessian, Esq.).

Dated: April ___, 2011
      Wilmington, Delaware

                        _____
                        UNITED STATES BANKRUPTCY JUDGE

RLF1 3982294v. 1

# __EXHIBIT C__

**6-Week Budget**

# Bell & Howell

**US DIP BUDGET - DRAFT**
($000)

| | | Post - Filing | | | | Anticipated Close --> | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | **15-Apr**<br>EST | **22-Apr**<br>FCST | **29-Apr**<br>FCST | **6-May**<br>FCST | **13-May**<br>FCST | **20-May**<br>FCST | **27-May**<br>FCST | **3-Jun**<br>FCST | **Total**<br>Pre Close | **Notes** |
| **US** | | | | | | | | | | |
| PMA/SMA Collections | 3,733 | 2,202 | 2,202 | 2,090 | 3,881 | 1,216 | 1,216 | 1,203 | 14,010 | 5 |
| Other Collections | | | | | | | | | | |
|   Equipment/Clicks | 1,350 | 883 | 883 | 787 | 787 | 960 | 960 | 775 | 6,034 | 1, 5 |
|   Service/Logistics | 231 | 395 | 395 | 225 | 225 | 240 | 240 | 217 | 1,938 | 5 |
|   Postal | 0 | 0 | 25 | 125 | 0 | 0 | 19 | 0 | 169 | 5 |
|   BCC | 430 | 183 | 183 | 536 | 536 | 283 | 283 | 250 | 2,254 | 5 |
|   Bowe | 0 | 0 | 388 | 0 | 0 | 0 | 0 | 0 | 388 | 5 |
| Total Other Collections | 2,011 | 1,461 | 1,874 | 1,674 | 1,549 | 1,482 | 1,501 | 1,242 | 10,782 | |
| **Total Collections** | **5,744** | **3,663** | **4,076** | **3,764** | **5,430** | **2,698** | **2,716** | **2,446** | **24,793** | |
| Disbursements: | | | | | | | | | | |
| Payroll | | | | | | | | | | |
|   BBH | (4,000) | (300) | 0 | (4,000) | 0 | (4,000) | 0 | (4,000) | (12,300) | 5 |
|   Fringes | (630) | (224) | (185) | (448) | (215) | (231) | (185) | (422) | (1,910) | 5 |
|   BCC | (267) | 0 | (275) | 0 | (250) | 0 | (275) | 0 | (800) | 5 |
| Total Payroll | (4,897) | (524) | (460) | (4,448) | (465) | (4,231) | (460) | (4,422) | (15,010) | |
| Vendor Payments | | | | | | | | | | |
|   Durham & Wheeling Vendor payments | (1,016) | (615) | (694) | (444) | (569) | (444) | (523) | (408) | (3,698) | 5 |
|   BCC Vendor Payments | (16) | (148) | (148) | (144) | (144) | (140) | (140) | (57) | (921) | 5 |
|   Bowe Parts and Components Payments | (279) | (96) | (96) | (414) | (414) | (414) | (414) | (408) | (2,258) | 5 |
| Total Vendor Payments | (1,311) | (859) | (938) | (1,003) | (1,128) | (998) | (1,077) | (873) | (6,877) | |
| Other Payments | | | | | | | | | | |
|   Facility expense | (327) | 0 | (327) | 0 | (709) | 0 | (327) | 0 | (1,364) | 5 |
|   Sale and Use Taxes | (379) | (80) | (120) | 0 | (80) | (463) | 0 | 0 | (743) | 5 |
|   Travel & Entertainment | (206) | 0 | (226) | 0 | (237) | 0 | (226) | 0 | (690) | 5 |
|   Freight | (211) | 0 | (238) | 0 | (248) | 0 | (238) | 0 | (723) | 5 |
|   Professional Services | (268) | 0 | (155) | 0 | (574) | 0 | (155) | 0 | (884) | 5 |
|   Insurance Payments | | 0 | 0 | (126) | 0 | 0 | 0 | (126) | (252) | 5 |
|   Bank Fees | | 0 | 0 | 0 | (12) | 0 | 0 | 0 | (12) | 5 |
|   Federal & State Tax payments | | 0 | (480) | 0 | 0 | 0 | 0 | 0 | (480) | 5 |
|   All Other Corporate Payments | 0 | 0 | 0 | (750) | 0 | 0 | 400 | 0 | (350) | 6 |
|   Miscellaneous Expenses | (163) | (29) | (29) | (174) | (174) | (29) | (29) | (140) | (605) | 5 |
| Total Other Payments | (1,554) | (109) | (1,575) | (1,051) | (2,034) | (492) | (575) | (266) | (6,103) | |
| Restructuring Expenses | | | | | | | | | | |
|   Deposits and Court Costs | | (58) | 0 | (200) | 0 | 0 | (100) | (100) | (458) | |
|   Debtor's and Committee's Profesional Fees | 0 | 0 | (391) | (60) | (330) | 0 | (441) | (40) | (1,261) | |
|   Creditor's Counsel Fees | 0 | 0 | (120) | (400) | 0 | (200) | (120) | 0 | (840) | |
| Total Restructuring Expenses | 0 | (58) | (511) | (660) | (330) | (200) | (661) | (140) | (2,559) | 8 |
| **Total Disbursements US** | **(7,762)** | **(1,550)** | **(3,484)** | **(7,162)** | **(3,957)** | **(5,922)** | **(2,773)** | **(5,701)** | **(30,548)** | |
| **Cash Source / (Use)** | **(2,018)** | **2,113** | **592** | **(3,398)** | **1,472** | **(3,224)** | **(56)** | **(3,255)** | **(5,755)** | |
| Minimum Cash Balance | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | | |
| **Beginning Cash Balance** | **5,366** | **2,000** | **500** | **500** | **500** | **500** | **500** | **500** | **2,000** | |
|   Cash Source / (Use) | (2,018) | 2,113 | 592 | (3,398) | 1,472 | (3,224) | (56) | (3,255) | (5,755) | |
|   Borrowing / (Repayment) | (1,349) | (3,613) | (592) | 3,398 | (1,472) | 3,224 | 56 | 3,255 | 4,255 | |
| **Ending Cash Balance** | **2,000** | **500** | **500** | **500** | **500** | **500** | **500** | **500** | **500** | |
| **DEBT SUMMARY** | | | | | | | | | | |
| **Pre-Petition Debt** | | | | | | | | | | |
| **Beginning Balance** | | | | | | | | | | |
|   Term Loan | 72,136 | | | | | | | | | |
|   Revolver | 34,000 | | | | | | | | | |
|   Total Accrued Interest | 14,857 | | | | | | | | | 4 |
| **Total Beginning Balance** | **120,993** | **119,644** | **115,981** | **111,905** | **108,141** | **102,711** | **100,014** | **97,297** | **119,644** | |
|   Interest | 0% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
|   Borrowing/(Repayment) | (1,349) | (3,663) | (4,076) | (3,764) | (5,430) | (2,698) | (2,716) | (2,446) | (24,793) | 2 |
| **Ending Balance** | **119,644** | **115,981** | **111,905** | **108,141** | **102,711** | **100,014** | **97,297** | **94,851** | **94,851** | |
| **Post-Petition Debt Roll Forward** | | | | | | | | | | |
| **Opening Balance** | | **0** | **148** | **3,806** | **11,000** | **14,957** | **20,879** | **23,826** | **0** | |
|   Draw / (Pay down) | | 50 | 3,484 | 7,162 | 3,957 | 5,922 | 2,773 | 5,701 | 29,048 | 3 |
|   Lender Fees | | 98 | 175 | 3 | 0 | 0 | 175 | 2 | 453 | |
|   Post-Petition Interest | | 0 | 0 | 29 | 0 | 0 | 0 | 171 | 200 | |
| **Ending Balance** | | **148** | **3,806** | **11,000** | **14,957** | **20,879** | **23,826** | **29,701** | **29,701** | |
|   Pre-Petition Debt | | 115,981 | 111,905 | 108,141 | 102,711 | 100,014 | 97,297 | 94,851 | 94,851 | |
|   Post-Petition Funding | | 148 | 3,806 | 11,000 | 14,957 | 20,879 | 23,826 | 29,701 | 29,701 | |
| **Total Debt** | **119,644** | **116,129** | **115,711** | **119,141** | **117,668** | **120,892** | **121,124** | **124,553** | **124,553** | |
| Net Increase/(Decrease) in Debt | | (3,515) | (417) | 3,429 | (1,472) | 3,224 | 231 | 3,429 | 4,909 | |
| Cumulative Increase/(Decrease) in Debt | | (3,515) | (3,933) | (503) | (1,976) | 1,248 | 1,480 | 4,909 | 4,909 | |

## Bell & Howell

**US DIP BUDGET - DRAFT**

($000)

Notes

1 Includes payments to US company for parts, components and software purchased by Canada Co.
2 Collections pay down the Pre-Petition Debt
3 Funds are borrowed from the DIP to make disbursements.
4 Includes PIK interest of $7.3 million and unpaid cash interest of $7.544 million
5 Based on Company's forecast
6 Includes return of $400 thousand retainer from Chapman and Cutler and $750 thousand payment for retention bonuses to middle management
7 Included in the post-petition interest
8 Per Company projections plus UCC counsel

# Bell & Howell

**CANADA DIP BUDGET - DRAFT**

($000)

| Week Ending | 15-Apr FCST | 22-Apr FCST | 29-Apr FCST | 6-May FCST | 13-May FCST | 20-May FCST | 27-May FCST | 3-Jun FCST | Total | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Post - Filing | | | | | Anticipated Close --> | | | |
| **Canada** | | | | | | | | | | |
| **Collections** | 336 | 226 | 226 | 251 | 251 | 320 | 320 | 244 | **1,837** | 1 |
| **Operational Disbursements** | | | | | | | | | | |
| Payroll | (305) | 0 | 0 | (350) | 0 | (350) | 0 | (350) | **(1,050)** | 3 |
| Vendor Payments | (107) | (333) | (421) | (191) | (191) | (223) | (223) | (495) | **(2,077)** | 2 |
| Total Operational Disbursements | (412) | (333) | (421) | (541) | (191) | (573) | (223) | (845) | **(3,127)** | |
| Restructuring Expenses | | | | | | | | | | |
| Deposits and Court Costs | | (35) | 0 | 0 | 0 | 0 | 0 | 0 | **(35)** | |
| Debtor's and Committee's Profesional Fees | 0 | 0 | (160) | (250) | 0 | 0 | (80) | 0 | **(490)** | |
| Lender's Counsel Fees | 0 | 0 | (40) | 0 | 0 | 0 | 0 | 0 | **(40)** | |
| Total Restructuring Expenses | 0 | (35) | (200) | (250) | 0 | 0 | (80) | 0 | **(565)** | 5 |
| **Total Disbursements** | **(412)** | **(368)** | **(621)** | **(791)** | **(191)** | **(573)** | **(303)** | **(845)** | **(3,692)** | |
| **Cash Source / (Use)** | **(76)** | **(142)** | **(395)** | **(540)** | **60** | **(253)** | **17** | **(601)** | **(1,855)** | |
| Min Cash Balance | | 200 | 200 | 200 | 200 | 200 | 200 | 200 | | |
| **Beginning Cash Balance** | 1,076 | 1,000 | 832 | 463 | 200 | 200 | 200 | 200 | **1,000** | |
| Cash Source / (Use) | (76) | (142) | (395) | (540) | 60 | (253) | 17 | (601) | **(1,855)** | |
| Borrowing/(repayment) | | (26) | 26 | 277 | (60) | 253 | (17) | 601 | **1,055** | |
| **Ending Cash Balance** | 1,000 | 832 | 463 | 200 | 200 | 200 | 200 | 200 | **200** | |
| **Post - Petition Debt Canada** | | | | | | | | | | |
| **Opening Balance** | | 0 | 0 | 76 | 355 | 295 | 548 | 582 | **0** | |
| Borrowings/(Pay down) | | (26) | 26 | 277 | (60) | 253 | (17) | 601 | **1,055** | 4 |
| Lender Fees | | 26 | 50 | 1 | 0 | 0 | 50 | 1 | **127** | 4 |
| Post-Petition Interest | | 0 | 0 | 1 | 0 | 0 | 0 | 5 | **6** | 4 |
| **Ending Balance** | | 0 | 76 | 355 | 295 | 548 | 582 | 1,188 | **1,188** | |
| Pre-Petition Debt | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | |
| Post-Petition Debt | | 0 | 76 | 355 | 295 | 548 | 582 | 1,188 | **1,188** | |
| Total Debt | 0 | 0 | 76 | 355 | 295 | 548 | 582 | 1,188 | **1,188** | |
| Net Increase/(Decrease) in Debt | | 0 | 76 | 279 | (60) | 253 | 33 | 607 | **1,188** | |
| Cumulative Increase/(Decrease) in Debt in DIP Period | | 0 | 76 | 355 | 295 | 548 | 582 | 1,188 | **1,188** | |

Notes
1 Per company projections
2 Includes payments to US company for parts, components and software purchased by Canada Co.
3 Per Leader Wong
4 Except for close fee, lender fees and interest are non-cash and are not paid in this period
5 Per company projections plus lenders counsel