# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Böwe Systec, Inc., et al.,[1] | ) | Case No. 11-1187 (PJW) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | Re: Docket No. 15 |

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES AND (V) SCHEDULING A FINAL HEARING
## PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

This matter is before the above-captioned court (the "Bankruptcy Court") on the motion filed by Böwe Systec, Inc., and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") in the above captioned chapter 11 cases (collectively, the "Cases"), dated April 18, 2011 (the "Motion") requesting entry of an interim order (this "Interim Order") and a final order ("Final Order"):

(1)       for immediate authorization and approval, pursuant to sections 105, 361, 362, 363(c), 363(e), 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for BBH, Inc. as a borrower under DIP Facility (as defined herein) (the "US Borrower") and Bowe Bell + Howell International Ltd. as a borrower under the DIP Facility (the "Canadian

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Böwe Systec, Inc. (1423), Böwe Bell + Howell Holdings, Inc. (9926), BBH, Inc. (9928), Böwe Bell + Howell Company (0100), Böwe Bell + Howell Postal Systems Company (4944), BCC Software, Inc. (3481) and Böwe Bell + Howell International Ltd. (0001). The debtors' corporate offices are located at 760 S. Wolf Road, Wheeling, IL 60090.

Borrower"), to obtain postpetition financing up to the aggregate principal amount of $127,200,000 (inclusive of up to $1,300,000 for postpetition financing by the Canadian Borrower) (the "DIP Facility"), and authorization for each Debtor (other than the Canadian Borrower) (collectively, the "Guarantors") to guarantee the repayment of the DIP Obligations (as defined herein) to the extent set forth in the DIP Facility, from Contrado BBH Funding, LLC ("Contrado") and one or more additional lenders party from time to time to the DIP Facility (collectively, the "DIP Facility Lenders");

(2) authorizing the US Borrower, the Canadian Borrower and Guarantors to execute and enter into the DIP Facility Documents (as defined herein) and to perform such other and further acts as may be required in connection with the DIP Facility Documents;

(3) requesting, pursuant to section 364(c) and (d) of the Bankruptcy Code, that the claim for repayment of the DIP Obligations:

a. subject to the Carve-Out (as defined herein), have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113 and/or 1114 of the Bankruptcy Code and all administrative claims granted pursuant to an order of the Bankruptcy Court, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Cases or any successor case, which allowed super-priority claim of the DIP Facility Lenders shall be payable from and have recourse to all prepetition and postpetition property of the Debtors, to the extent provided for herein (the "DIP Facility Superpriority Claim"); and

b. be and be deemed immediately secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first-priority senior priming security

2

interests in and liens upon (collectively, the "DIP Facility Liens") all prepetition and postpetition property of the Debtors, whether now existing or hereafter acquired, and to the extent not otherwise included, all proceeds, commercial tort claims, insurance claims (as to insurance claims, to the extent of the Debtors' interest therein) and other rights to payments not otherwise included in the foregoing assets and all products of the foregoing assets and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing assets, including, without limitation, and solely upon approval and entry of the Final Order, the proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code pursuant to sections 502(d), 544, 545, 547, 548, 550 and/or 553 of the Bankruptcy Code (the "Avoidance Actions") (collectively, the "DIP Collateral"), as provided for by section 364(c) and (d) of the Bankruptcy Code, subject only to (i) the Carve-Out, and (ii) the Prepetition Permitted Liens (as defined herein);

(4) seeking the Bankruptcy Court's authorization pursuant to sections 361(a) and 363(c) of the Bankruptcy Code to authorize the Debtors' use of cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code) constituting Prepetition Collateral (as defined herein) (as so defined, the "Cash Collateral"), on the terms and conditions set forth in this Interim Order and in the DIP Facility Agreement (as defined herein);

(5) seeking the Bankruptcy Court's authorization of certain of the Debtors' grant of adequate protection replacement liens, claims and security interests to the Prepetition Agent and Prepetition Lenders (collectively, the "Prepetition Secured Parties") as provided in this Interim Order and DIP Facility Agreement;

(6) seeking the Bankruptcy Court's authorization for the US Borrower to use a portion of the proceeds from the DIP Facility (i) upon and following entry of the Final Order,

3

to pay in full, in cash, any remaining balance of the Prepetition Obligations (as defined herein), subject to paragraph 11 below, whether incurred prior or subsequent to the Petition Date and as and when and in the manner due under the Prepetition Loan Documents; and (ii) upon and following entry of this Interim Order, for working capital needs and for such other uses as are approved under this Interim Order, subject to the terms set forth in the DIP Facility Agreement and the US Budget (as defined herein);

(7)     seeking the Bankruptcy Court's authorization for the Canadian Borrower to use a portion of the proceeds from the DIP Facility upon and following entry of this Interim Order for the uses as are approved under this Interim Order, subject to the terms set forth in the DIP Facility Agreement and the Canadian Budget (as defined herein);

(8)     seeking the Bankruptcy Court's authorization to use a portion of the proceeds from the DIP Facility upon and following entry of this Interim Order to (i) in the case of the US Borrower, make adequate protection payments as provided for in this Interim Order (collectively, the "Adequate Protection Obligations") to the Prepetition Secured Parties (including repayment of the Prepetition Obligations); (ii) in the case of the US Borrower and the Canadian Borrower to pay certain transaction fees and other costs relating to the DIP Facility; (iii) in the case of the US Borrower and the Canadian Borrower to fund, among other things, ongoing working capital and general corporate financing needs of the Debtors, or the Canadian Borrower, respectively, as the case may be, to the extent set forth for the US Borrower in the budget attached as Annex D-1 to the DIP Facility Agreement (the "US Budget") and for the Canadian Borrower in the budget attached as Annex D-2 to the DIP Facility Agreement (the "Canadian Budget" and, with the US Budget, the "Budgets"); (iv) pay amounts owing to the DIP Facility Lenders under the DIP Facility, including, but not limited to, fees and expenses

4

(including reasonable attorneys' fees and expenses) owed to the DIP Facility Lenders; and (v) prior to an event of default under the DIP Facility, pay fees and expenses of professionals retained pursuant to sections 327, 328 or 1103 of the Bankruptcy Code by the US Borrower or the Committee (as defined herein), subject to the amounts set forth in the US Budget, and subject to such carve-outs and other agreements as may be agreed to by the DIP Facility Lenders, to the extent such professional fees and expenses are approved by the Bankruptcy Court;

(9)     requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before the Bankruptcy Court to consider entry of the Interim Order authorizing the Debtors other than the Canadian Borrower, on an interim basis, to use Cash Collateral and obtain interim financing in the principal amount of $11,000,000 under the DIP Facility from the DIP Facility Lenders and authorizing the Canadian Borrower, on an interim basis, to use Cash Collateral and obtain interim financing in the principal amount of $500,000 under the DIP Facility from the DIP Facility Lenders; and

(10)     requesting, pursuant to Bankruptcy Rule 4001, that a final hearing (the "Final Hearing") be held before the Bankruptcy Court to consider entry of a Final Order authorizing the balance of the borrowings under the DIP Facility Documents on a final basis and approval of notice and the grant of adequate protection to the Prepetition Secured Parties as provided for in this Interim Order, all on a final basis, as set forth in the Motion.

Pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), due and sufficient notice under the circumstances of the Motion and the Interim Hearing having been provided by the Debtors as set forth in paragraph I below; and the Interim Hearing having been held on April 20, 2011; and upon consideration of all the pleadings filed with the Bankruptcy Court; and upon the record made by the Debtors at the Interim Hearing and in the declarations of Oliver Bialowns

5

and Michael Wilhelm in support of first day pleadings (the "First Day Declaration"); and it appearing that approval of the Interim Order is necessary to avoid immediate and irreparable harm pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and all parties in interest and is essential for the continued operations of the Debtors' businesses; and after due deliberation and consideration and good and sufficient cause appearing therefor;

BASED ON THE RECORD PRESENTED BY THE DEBTORS AT THE FIRST DAY HEARING,

IT IS HEREBY FOUND:

A.   On April 18, 2011 (the "Petition Date"), the Debtors commenced the Cases in the Bankruptcy Court.   The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. Substantially contemporaneously with the Debtors' commencement of the Cases, the Canadian Borrower is commencing a proceeding (the "Canadian Proceedings") pursuant to the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36 as amended (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario Canada, seeking, among other things, an initial interim order under the CCAA.

B.   Concurrently with the filing of the Motion, the Debtors filed (i) a motion seeking joint administration of the Cases and (ii) a motion seeking an order, inter alia, approving bid procedures, an asset purchase agreement and sale process (the "Bidding Procedures Motion"). No request for the appointment of a trustee or examiner has been made in the Cases. No committee has been appointed or designated in the Cases.

6

C.     The Bankruptcy Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     Without prejudice to the rights of any non-debtor party in interest as provided in paragraph 11 herein, the Debtors acknowledge, agree and stipulate that:

(i)     Pursuant to that certain Amended and Restated Credit Agreement, dated as of November 23, 2009 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement" and together with all Loan Documents (as defined in the Prepetition Credit Agreement) and all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Credit Documents"), Contrado BBH Investments 1, LLC, as administrative agent (as successor to Harris, N.A. ("Harris")) (the "Prepetition Agent"), and lenders under the Prepetition Credit Agreement (the "Prepetition Lenders"), made loans and advances to and/or provided other financial accommodations to or for the benefit of the US Borrower from time to time (collectively, the "Prepetition Loans").

(ii)     Pursuant to the Prepetition Credit Documents, the Debtors party thereto were, as of the Petition Date, jointly and severally indebted to the Prepetition Secured Parties on account of the Prepetition Obligations in the approximate principal amount outstanding of not less than the amount of the Prepetition Loans plus accrued but unpaid interest, fees, costs and expenses incurred by the Prepetition Secured Parties under the Prepetition Credit Documents and all indemnification rights or claims they have or may have under the Prepetition Credit Documents (all such interest, fees, costs, expenses and indemnification rights or claims, the "Prepetition Agreement Expenses"), together with the Prepetition Loans, in an aggregate

7

amount of not less than $121,000,000 (the "Prepetition Obligations"). For purposes of this Interim Order, the term "Prepetition Obligations" shall mean and include, without duplication, any and all amounts owing or outstanding under the Prepetition Loan Documents (including, without limitation, all "Obligations" as defined in the Prepetition Credit Agreement), whether incurred prepetition or postpetition, including all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, expenses (including, without limitation, any and all attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable, reimbursable or otherwise payable under the Prepetition Loan Documents) and obligations for the performance of covenants, tasks or duties, or for the payment of monetary amounts owing to the Prepetition Secured Parties by the Debtors party to the Prepetition Loan Documents, of any kind or nature, whether or not evidenced by any note, agreement or other instrument, and whether or not contingent or otherwise.

(iii)     Pursuant to the Prepetition Loan Documents, including, without limitation, (x) those certain guaranty agreements, entered into by and among the Prepetition Agent, for the benefit of itself and the Prepetition Lenders and, other than the US Borrower and the Canadian Borrower, each Debtor (such Debtors, collectively, the "Prepetition Guarantors") signatory thereto (as amended, restated, supplemented or otherwise modified from time to time, collectively, the "Prepetition Guaranty Agreement"), the Prepetition Guarantors jointly and severally guaranteed, among other things, the payment and performance in full of all of the Prepetition Obligations and (y) those certain security agreements and pledge agreements, entered into by and among the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, the US Borrower and each other Debtor party signatory thereto (as amended, restated, supplemented or otherwise modified from time to time, collectively, the "Prepetition Security Agreement")

8

granted to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, to secure the US Borrower's and the Prepetition Guarantors' obligations under the Prepetition Credit Documents, a security interest in and continuing lien on the Prepetition Collateral (as defined herein). All collateral granted or pledged by the Debtors pursuant to the Prepetition Credit Documents shall collectively be referred to herein as the "Prepetition Collateral";

      (iv)    As of the Petition Date and immediately prior to giving effect to this Interim Order, (a) the Prepetition Credit Documents are valid and binding agreements and obligations of the Debtors party thereto, and the liens granted pursuant to the Prepetition Credit Documents (i) constitute valid, binding, enforceable and perfected security interests and liens, subject only to valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Petition Date or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (it being understood that the Prepetition Agent reserves its rights to challenge whether such liens were permitted under the Prepetition Credit Documents), to the extent senior in priority to the liens of the Prepetition Secured Parties in the Prepetition Collateral as of the Petition Date (to the extent applicable, the "Prepetition Permitted Liens"); and (ii) are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (b) the Prepetition Obligations constitute the legal, valid and binding obligation of Debtors, enforceable in accordance with the terms of the Prepetition Credit Documents and (i) no objection, offset, defense or counterclaim of any kind or nature to the Prepetition Obligations exists, (ii) the Prepetition Obligations, and any amounts paid at any time to the Prepetition Agent on account thereof or with respect thereto, are not subject to avoidance,

9

reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(v)     The Debtors have waived, discharged and released any right they may have to challenge any of the Prepetition Obligations and the liens, claims and security for those obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the Prepetition Agent and the Prepetition Lenders and/or any of their respective affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees and no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors irrevocably waive any right to challenge or contest the Prepetition Obligations and the liens, claims and security for those obligations of the Prepetition Secured Parties in the Prepetition Collateral or the validity of the Prepetition Obligations;

(vi)    As of the Petition Date, the amount of the Prepetition Obligations for which the Debtors (other than the Canadian Borrower) were truly and justly indebted to the Prepetition Secured Parties, without defense, counterclaim or offset of any kind, aggregated not less than approximately $121,000,000;

(vii)   As of the Petition Date, the Prepetition Obligations far exceeded the value of the Debtors' assets and properties; and

(viii)  The claims arising from or in connection with the Prepetition Obligations are "allowed claims" within the meaning of section 502 of the Bankruptcy Code.

E.      The Debtors' businesses have an immediate need to obtain the DIP Facility and use Cash Collateral in order to have adequate liquidity to provide for, among other

10

things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, and to satisfy other working capital and operational, financial and general corporate needs. The immediate availability of credit under the DIP Facility is intended to provide confidence to the Debtors' creditors, including their trade vendors and foreign creditors, and the Debtors' employees that will enable and encourage them to continue their relationships with the Debtors and, thereby, is intended to enhance the value of the Debtors' estates. The access of the Debtors to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations and use of Cash Collateral is vital to the preservation and maintenance of the going concern values of the Debtors and to the success of these Cases, including consummation of the sale of substantially all of the Debtors' assets at an Auction pursuant to the Bidding Procedures Order (each as defined in the Bidding Procedures Motion). Without such credit and use of Cash Collateral, the Debtors' estates would be irreparably harmed.

F. The Debtors are unable to obtain sufficient financing from sources other than the DIP Facility Lenders on terms more favorable than under the DIP Facility and all the documents, exhibits, schedules and instruments delivered pursuant thereto or in connection therewith (inclusive of the DIP Facility Agreement, the "DIP Facility Documents"). The Debtors have been unable to obtain sufficient unsecured credit solely under section 503(b)(1) of the Bankruptcy Code as an administrative expense. New credit is unavailable to the Debtors without (i) granting the DIP Facility Lenders the DIP Facility Superpriority Claims and the DIP Facility Liens as provided herein and in the DIP Facility Documents and (ii) concurrently

11

providing for the adequate protection to the Prepetition Secured Parties on the terms and conditions as set forth herein.

G.    The DIP Facility Lenders and Prepetition Secured Parties have agreed and consented to, or not opposed, as applicable, the provision of financing to the Debtors and the use of Cash Collateral by the Debtors subject to (i) the entry of this Interim Order, (ii) the terms and conditions of the DIP Facility Agreement, and (iii) findings by the Bankruptcy Court that such postpetition financing and use of Cash Collateral is essential to the Debtors' estates, that the terms of such financing and use of Cash Collateral were negotiated in good faith and at arm's length, and that the DIP Facility Liens and DIP Facility Superpriority Claims, and other protections granted pursuant to this Interim Order and the DIP Facility Documents will not be affected by any subsequent reversal, modification, vacatur or amendment of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code. Each of the DIP Facility Lenders, Prepetition Agent and Prepetition Lenders have acted in good faith in, as applicable, negotiating, consenting to and in agreeing to provide the postpetition financing arrangements and use of Cash Collateral (or otherwise not opposing such use) contemplated by this Interim Order and the other DIP Facility Documents and the reliance of each of the DIP Facility Lenders, Prepetition Agent and Prepetition Secured Parties on the assurances referred to above is in good faith.

H.    Telephonic, facsimile notice, electronic mail or overnight mail notice of the Interim Hearing and the proposed entry of this Interim Order has been provided to (i) the Office of the United States Trustee for the District of Delaware (the "US Trustee"); (ii) the entities listed on the Consolidated List of Creditors Holding the Twenty Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d), (iii) counsel to the DIP Facility Lenders, (iv)

12

counsel to the Prepetition Agent, (v) each of the financial institutions identified on the chart annexed as Exhibit B to the Debtors' motion to continue use of their cash management system,[2] (vi) all known parties asserting a lien against the Prepetition Collateral, (vii) the Internal Revenue Service, (viii) the Delaware Secretary of State, (ix) the Delaware Secretary of Treasury, (x) the Delaware State Attorney General, (xi) the Office of the United States Attorney General for the State of Delaware, (xii) the Securities and Exchange Commission, (xiii) the Pension Benefit Guaranty Corporation, (xiv) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules, (xv) Dell Financial Services Canada Limited, (xvi) ARI Financial Services Inc., (xvii) Capital Underwriters Inc. and (xviii) Ford Credit Canada Limited ((i) through (xviii), the "Notice Parties"). The requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, which notice is sufficient under the circumstances, including, without limitation, sections 102(1) and 364 of the Bankruptcy Code, and no other notice need be provided for entry of this Interim Order.

I.   The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b) (2) and 4001(c) (2). Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.

J.   The ability of the Debtors to finance their respective operations and the availability to the Debtors of sufficient working capital and other financial and general corporate liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations and use of Cash Collateral is in the best interests of the Debtors and their

---

[2] _See_ Debtors' _Motion for Entry of an Order Authorizing the Debtors to (I) Continue Using Existing Centralized Cash Management System, as Modified, (II) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (III) Maintain Existing Bank Accounts and Business Forms_ [Docket No. 5].

13

respective creditors and estates. The interim financing and use of Cash Collateral authorized hereunder is necessary to avoid immediate irreparable harm to the Debtors' businesses, properties and estates and to allow the orderly continuation of the Debtors' businesses.

K.     Based on the record presented by the Debtors to the Bankruptcy Court and the First Day Declaration: (i) the terms of the DIP Facility and use of Cash Collateral are the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; and (ii) the DIP Facility and use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors and the DIP Facility Lenders and the Prepetition Secured Parties, and any credit extended, loans made, credit support provided and other financial accommodations extended to the Debtors by the DIP Facility Lenders and use of Cash Collateral by the Debtors shall be deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

L.     None of the Prepetition Secured Parties has opposed the terms and conditions of this Interim Order, including the priming under section 364(d) of the Bankruptcy Code as provided for herein. The consent of the Prepetition Secured Parties granted herein is expressly limited to (i) the Debtors' use of Cash Collateral solely on the terms and conditions set forth in this Interim Order and (ii) the postpetition financing being provided by the DIP Facility Lenders as contemplated by this Interim Order and the DIP Facility Agreement. Nothing in this Interim Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Prepetition Secured Parties are or will be adequately protected with respect to any non-consensual use of Cash Collateral.

14

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.      Disposition.  The Motion is granted as set forth in this Interim Order.  Any objections to the Motion that have not previously been resolved or withdrawn are hereby overruled.  This Interim Order shall immediately become effective upon its entry.  To the extent that the terms of the DIP Facility Documents differ from the terms of this Interim Order, this Interim Order shall control.

2.      Authorization to Borrow.  Upon execution and delivery of that certain Senior Secured, Super-Priority Debtor-in-Possession Credit and Guaranty Agreement (the "DIP Facility Agreement") by and among the US Borrower, the Canadian Borrower, the Guarantors, and the DIP Facility Lenders, in substantially the form annexed to the Motion and provided that the Debtors are not in default under the terms of this Interim Order, the US Borrower is immediately authorized to borrow (and receive other extensions of credit) under the DIP Facility from the DIP Facility Lenders up to $11,000,000 (together with interest, fees, charges and expenses payable under the DIP Facility Documents), pursuant and subject to the terms and conditions of the DIP Facility Agreement (including the conditions to effectiveness thereof). Upon execution and delivery of the DIP Facility Agreement and provided that the Debtors are not in default under the terms of this Interim Order, the Canadian Borrower is immediately authorized to borrow (and receive other extensions of credit) under the DIP Facility from the DIP Facility Lenders up to $500,000 (together with interest, fees, charges and expenses payable under the DIP Facility Documents), pursuant and subject to the terms and conditions of the DIP Facility Agreement (including the conditions to effectiveness thereof (including the conditions to borrowings by the Canadian Borrower)).  The Debtors are authorized and directed to use such DIP Loans (as defined herein) in accordance with the terms of the DIP Facility Agreement and

15

this Interim Order. Upon execution and delivery of the DIP Facility Documents, the DIP Facility Documents shall constitute legal, valid and binding obligations of the Debtors party thereto, enforceable against the Debtors in accordance with their terms.

3.     Structure and Amount of DIP Facility.     The DIP Facility in the maximum principal amount of $127,200,000 shall be comprised of a senior secured first-out revolving credit facility, as set forth in the DIP Facility Agreement. The Debtors have prepared and delivered the Budgets to the DIP Lender and such Budgets have been thoroughly reviewed by the Debtors and their management. The Debtors represent that they believe that the Budgets are achievable and should allow the Debtors to operate their businesses and otherwise conduct their Chapter 11 cases. The DIP Facility Lenders are relying upon the Debtors' compliance with the Budgets in accordance with the Interim Order and the DIP Facility Documents in determining to enter into the postpetition financing arrangements provided for herein.

4.     DIP Facility Proceeds.  (a) Subject to the terms and conditions contained in this Interim Order and the DIP Facility Agreement and as and for, *inter alia*, adequate protection, upon entry of this Interim Order and the closing of transactions contemplated under the DIP Facility Agreement, the Debtors (other than the Canadian Borrower) shall use all cash held by such Debtors or held by the Prepetition Agent or any bank or other financial institution at which any such Debtor maintains any account (each, a "Prepetition Bank"), from and after the Petition Date, in each case constituting Cash Collateral, to pay outstanding Prepetition Obligations (other than contingent indemnification obligations), subject to paragraph 11 below. Each Prepetition Bank is hereby directed to release all of each such Debtor's funds on deposit with such Prepetition Bank to permit such Debtors to comply with the requirements of this paragraph 4 and the DIP Facility. Until entry by this Court of the Final Order, the Prepetition

16

Agent shall maintain in a segregated account owned by the Prepetition Agent all amounts repaid by the Debtors on account of the Prepetition Obligations (it being understood that once paid to the Prepetition Agent, such amounts shall be considered as having been paid in compliance with the terms of the Prepetition Credit Agreement as if paid to the lenders thereunder). The application of any payments to the Prepetition Obligations pursuant to this section shall be subject to the Challenge (as defined below).

(b) After the payment of the Prepetition Obligations in full, or after an Event of Default as determined by the DIP Facility Lender, all Cash Collateral and other DIP Collateral collected, and all voluntary or mandatory payments made by the Debtors, as required or permitted pursuant to the DIP Facility Agreement in accordance with the terms of the DIP Facility Agreement, shall be applied to the DIP Obligations (as defined herein) pursuant to the terms of the DIP Facility Agreement. Subject to the terms and conditions of this Interim Order, the Prepetition Secured Parties' claims on account of the Prepetition Obligations shall be allowed pursuant to section 502 of the Bankruptcy Code, and no Prepetition Secured Party shall be required to file a proof of claim with respect to any such claim.

5.      Continuation of Liens and Liens Securing DIP Obligations.      Until payment in full, in cash, of all of the obligations of the Debtors with respect to the DIP Facility and, other than with respect to the Canadian Borrower, the Prepetition Credit Documents, and termination of the DIP Facility Lenders' commitments under the DIP Facility, and until such time as the Prepetition Obligations shall have been allowed in full and the time period for any challenge thereto shall have expired, all liens and security interests of the Prepetition Agent and Prepetition Secured Parties (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described

17

herein. Notwithstanding any payment of all or any portion of the Prepetition Obligations, the Liens arising under the Prepetition Credit Documents shall continue in full force and effect and shall, and shall be deemed to, secure the full and timely payment of the DIP Obligations (separate from and in addition to the DIP Facility Liens granted to the DIP Facility Lenders, in Paragraph 7 below) until the payment in full, in cash, of all of the DIP Obligations and the termination of the DIP Facility Lenders' commitments under the DIP Facility.

6.      DIP Loans.  All loans made to or for the benefit of the Debtors on or after the Petition Date under the DIP Facility Documents (collectively, the "DIP Loans"), including the defined term "Obligations", which includes, without limitation, principal, interest, fees, costs, expenses, indemnification obligations and other obligations and amounts due from time to time by the Debtors to the DIP Facility Lenders under the DIP Facility Documents and this Interim Order, shall hereinafter be referred to as the "DIP Obligations."  The DIP Loans and the DIP Obligations: (i) shall be evidenced by the books and records of the DIP Facility Lenders; (ii) shall bear interest payable at the rates set forth in the DIP Facility Agreement; (iii) shall be secured in the manner specified in paragraph 7 below; (iv) shall be payable in accordance with the terms of the DIP Facility Documents; and (v) shall otherwise be governed by the terms set forth herein and in the DIP Facility Documents.

7.      DIP Facility Liens.  As security for the repayment of the DIP Obligations, pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, the DIP Facility Lenders, are hereby granted (without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lock box agreements, financing statements or otherwise) the DIP Facility Liens on and in the DIP Collateral and all proceeds thereof, which liens are valid, binding, enforceable and fully perfected as of the date hereof, not subject to

18

subordination, impairment or avoidance, for all purposes in the Cases and any successor case. The DIP Facility Liens granted herein shall be (x) pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, perfected and non-avoidable first priority liens on and security interests inn all now owned or hereafter acquired assets and property of the Debtors, including, upon entry of the Final Order, the proceeds of Avoidance Actions, that are not subject to valid, perfected, enforceable and non-avoidable liens as of the Petition Date, (y) pursuant to section 364(c)(3), valid, perfected, enforceable and non-avoidable second priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject to valid, perfected, enforceable and non-avoidable liens in existence on the Petition Date or to valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (other than assets and property that are subject to the existing liens as referred to in subparagraph (z) below, which existing liens shall be primed as provided herein) and (z) pursuant to section 364(d) of the Bankruptcy Code, valid, perfected, enforceable and non-avoidable first priority senior priming liens on and security interests in the Prepetition Collateral, except as to the Prepetition Permitted Liens, to the extent such liens and security interests are valid, perfected, enforceable and non-avoidable (provided, that with respect to such excepted liens and security interests, if any, the DIP Facility Lenders shall be granted second priority liens as granted in clause (y) above). The DIP Facility Liens granted by the Canadian Borrower shall be limited to the extent of such Debtor's actual obligations under the DIP Facility Documents to which it is a party or is otherwise bound. In the event of the occurrence of an Event of Default (as defined in the DIP Facility Agreement), or an event that would constitute an Event of Default with the giving of

19

notice of lapse of time or both, the DIP Facility Liens shall be subject only to the payment of the Carve-Out.

8.     Turnover of Assets; Account Control.    (a) Upon entry of this Interim Order, all possessory collateral held by the Prepetition Secured Parties and their predecessors (including the predecessor to the Prepetition Agent) shall be deemed to have been transferred to the DIP Facility Lenders and all lockbox, blocked account and similar agreements shall be deemed assigned to the DIP Facility Lenders, as security for the DIP Obligations.  Harris shall continue to cooperate with the Prepetition Agent to facilitate the foregoing.

(b)     The Debtors and each Prepetition Bank, including Harris and its affiliates, are authorized and directed to remit funds in accordance with the direction given by the DIP Facility Lenders.  The benefits and rights afforded the secured party under any Pre-Petition Date account control agreements are deemed afforded to the DIP Facility Lenders exclusively.

9.     DIP Facility Superpriority Claim.    For all of the DIP Obligations arising under the DIP Facility and the DIP Facility Documents, the DIP Facility Lenders are granted, pursuant to section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out, the allowed DIP Facility Superpriority Claim, which claim shall be payable from and have recourse to the DIP Collateral.  The DIP Facility Superpriority Claim shall be deemed a legal, valid, binding, enforceable and perfected claim, not subject to subordination, impairment or avoidance, for all purposes in the Cases and any successor case.

10.     Carve-Out.    (a) Subject to the terms and conditions contained in this Interim Order, the DIP Facility Liens, DIP Facility Superpriority Claim, the adequate protection liens and claims of the Prepetition Secured Parties as provided for herein and liens and claims

20

held by the Prepetition Secured Parties shall be subject and subordinate only to the following (the "Carve-Out"): (i) unpaid fees of the Clerk of the Bankruptcy Court and the US Trustee pursuant to 28 U.S.C. § 1930(a); (ii) allowed reasonable fees and expenses (other than any "success", transaction, restructuring, completion or similar fees) (the "Professional Fees") of attorneys and financial advisors employed by the Debtors and the official committee of unsecured creditors (the "Committee") pursuant to sections 327 and 1103 of the Bankruptcy Code (collectively, the "Case Professionals"), to the extent (x) incurred at any time on or prior to the calendar day on which an Event of Default occurs and for which notice has been given (such day, the "Event Date") and (y) of the aggregate amount of Professional Fees of each Case Professional contemplated to be incurred pursuant to the US Budget for such Case Professional for the period from the Petition Date through and including the Event Date (less Professional Fees paid to such Case Professional on or before the Event Date (plus any retainers held by such Case Professional as of such date), whether such Professional Fees have been allowed by the Bankruptcy Court before or after the Event Date; and (iii) Professional Fees of Case Professionals incurred subsequent to the calendar day immediately following the Event Date in an aggregate amount not to exceed $100,000 for Professional Fees (of which amount, subject to entry of a Final Order, $25,000 shall be allocated to Case Professionals of the Committee). Subject to the terms and conditions contained in this Interim Order, the DIP Facility Liens and the DIP Facility Superpriority Claim as provided for herein shall be subject and subordinate to all fees and expenses required to be paid to the Information Officer (as defined below) in connection with the Canadian Proceedings, including to the extent secured by the charge to be granted by the Canadian Court over the Debtors' Property (as defined below), in the maximum amount of $100,000, to secure payment of any such fees and expenses of the Information

21

Officer. "Information Officer" means the information officer to be appointed by the Canadian Court in connection with the proceedings commenced pursuant to the CCAA. "Property" means all of the Debtors' current and future assets, undertakings and properties of every nature and kind whatsoever, and wheresoever situated, including all proceeds thereof, of any of the Debtors in Canada that relates to their business in Canada. The foregoing shall not be construed as consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Debtors, DIP Facility Lenders, Prepetition Secured Parties, the Committee (if appointed), the US Trustee or other parties in interest to object to the allowance and payment of such amounts. Payment of any portion of the Carve-Out shall not, and shall not be deemed to, (i) reduce any Debtor's obligations owed to any of the DIP Facility Lenders, or Prepetition Secured Parties or (ii) subordinate, modify, alter or otherwise affect any of the liens and security interests of such parties in the DIP Collateral or Prepetition Collateral (or their respective claims against the Debtors). Notwithstanding anything to the contrary in this Interim Order, the DIP Facility Lenders reserve the right to review and object to any fee statement, interim application or monthly application issued or filed by estate professionals. Notwithstanding any provision (including, without limitation, any "variance" or similar provision) of this Interim Order, any Final Order or the DIP Facility Agreement to the contrary, aggregate cumulative expenditures for restructuring professional fees of the Debtors or any Committee shall not exceed 100% of the amount with respect thereto set forth in the Budget and Professional Fees for any Case Professional shall not exceed 100% of the amount listed in the line item in the Budget for such Professional.

(b)     Notwithstanding anything herein to the contrary (other than as expressly contemplated by paragraph 11 of this Interim Order), no Prepetition Collateral, DIP

22

Collateral, proceeds thereof, or Cash Collateral, or any portion of the Carve-Out or financing provided under the DIP Facility shall include, apply to or be available for any fees or expenses incurred by any party, including the Case Professionals, in connection with (i) the investigation (subject to paragraph 11), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Facility Lenders, including, without limitation, challenging the amount, validity, extent, perfection, priority, characterization or enforceability of, or asserting any defense, counterclaim or offset to, the DIP Obligations, DIP Facility Liens or the DIP Facility Superpriority Claim, in respect thereof, (ii) asserting any claims or causes of action (including, without limitation, claims or actions to hinder or delay any DIP Facility Lender's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Facility Documents or this Interim Order or any Avoidance Actions) against the any DIP Facility Lender, the Prepetition Agent, or any Prepetition Lender, (iii) the investigation (subject to paragraph 11), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Prepetition Secured Parties, including, without limitation, challenging the amount, validity, extent, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the Prepetition Obligations or the Adequate Protection granted herein, (iv) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the DIP Facility Lenders or (v) incurring Indebtedness (as defined in the DIP Credit Agreement) other than as expressly permitted by the DIP Facility Documents.

11.    Investigation Rights.  Subject to entry of the Final Order,  other than a $25,000 disbursement set forth in the Budget to investigate claims or causes of action against the Prepetition Secured Parties (the "Investigation Funds"), no portion of the DIP Facility, the DIP

23

Collateral, the Prepetition Collateral, the Cash Collateral or the Carve-Out, and no disbursements set forth in the Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with asserting any claims or causes of action against the DIP Facility Lenders, and the Prepetition Secured Parties, including, without limitation, any action challenging or raising any defenses to the DIP Obligations or the Prepetition Obligations or the liens of the Prepetition Secured Parties or the DIP Facility Lenders on the Prepetition Collateral and/or DIP Collateral. Notwithstanding anything herein to the contrary, all non-debtor parties in interest (including any trustee or Committee appointed or elected in the Cases prior to the Investigation Termination Date (as defined herein)), subject to entry of the Final Order, shall have until the date that is the earlier of (i) the earlier of 75 days after the Petition Date and 60 days from the date a Committee is first appointed and (ii) the business day prior to the date set for the Auction (as defined in the Bidding Procedures Motion) (the "Investigation Termination Date") to investigate the validity, perfection, and enforceability of the liens of the Prepetition Secured Parties, and the amount and allowability of the Prepetition Obligations owed to the Prepetition Secured Parties, the use of all cash held by the Debtors or held by the Prepetition Agent from proceeds of Prepetition Collateral as of the Petition Date and the first proceeds of the DIP Facility to pay in full, in cash, all outstanding Prepetition Obligations as set forth in paragraph 4(a) above and to assert any claims or causes of action against any of the Prepetition Secured Parties. In the event the Cases are converted to cases under Chapter 7 of the Bankruptcy Code prior to the passage of the Investigation Period specified above, then the Investigation Period shall be extended, solely for the benefit of the Chapter 7 trustee appointed in such cases, for 45 days from the date of such conversion. If the Committee, if appointed, or any non-debtor party in interest hereafter vested with authority by the Bankruptcy Court, determines that there

24

may be a challenge by the Investigation Termination Date, prior to the Investigation Termination Date, such Committee or other non-debtor party in interest hereafter vested with authority by the Bankruptcy Court must initiate prior to the Investigation Termination Date any appropriate action or adversary proceeding on behalf of the Debtors' estates setting forth the basis of any such challenge, claim or cause of action (each, a "Challenge"). If no Challenge is filed prior to the Investigation Termination Date, then the agreements, acknowledgements, releases and stipulations contained in this Interim Order including paragraphs D(i) through D(xiv) shall be irrevocably binding on all the estates, the Committee, if appointed, and all parties in interest (including without limitation a receiver, administrator or trustee appointed in any of the Cases or any successor case or in any jurisdiction) without further action by any party or the Bankruptcy Court, and the Committee and all other parties in interest (including without limitation a receiver, administrator or trustee appointed in any of the Cases or any successor case or in any jurisdiction) shall thereafter be forever estopped and barred from bringing any Challenge with respect to the Prepetition Secured Parties, the Prepetition Obligations and the repayment thereof as set forth in paragraph 4(a) of this Interim Order. If any complaint or other pleading is timely filed on or before the applicable Investigation Termination Date (or any amendment to such complaint as may be allowed thereafter), all other claims and actions against the Prepetition Secured Parties or relating to the Prepetition Obligations and the repayment thereof as set forth in paragraph 4(a) of this Interim Order, not expressly asserted in such applicable complaint, amended complaint or other pleading shall be deemed, immediately and without further notice, motion or application to, order of, or hearing before, the Bankruptcy Court, to have been forever relinquished, discharged, released and waived.

25

12.    Limitation on Additional Surcharges.  Subject to entry of the Final Order, with the exception of the Carve-Out, neither the DIP Collateral, Prepetition Collateral nor any DIP Facility Lender or Prepetition Secured Party shall be subject to surcharge, pursuant to sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest without the prior written consent of the Prepetition Agent, and no such consent shall be implied from any other action, inaction or acquiescence by such parties in this proceeding, including but not limited to funding of the Debtors' ongoing operation by the DIP Facility Lenders.  Subject to entry of the Final Order, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived.  Upon entry of the Final Order, the DIP Facility Lenders and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Prepetition Collateral.

13.    Payment of DIP Fees and Expenses.  The Debtors are hereby authorized and directed to pay on demand all fees, expenses and other amounts payable under and in accordance with the terms of the DIP Facility Agreement, including, without limitation, all closing fees, agency fees and all of the fees and all out-of-pocket costs and expenses of the DIP Facility Lenders in accordance with the terms of the DIP Facility Agreement including, without limitation, the prepetition and postpetition fees and disbursements of legal counsel, local Delaware counsel, financial advisors and third-party appraisers and consultants advising the DIP Facility Lenders. None of such costs, fees and expenses shall be subject to Bankruptcy Court approval or US Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Bankruptcy Court; provided, however, that the DIP Facility Lenders as well as the Prepetition Agent (with respect to the

26

adequate protection in the form of expense reimbursement granted hereunder) shall independently submit summary statements of their respective professional fee invoices to the Debtors, and the Debtors shall send copies of such statements to the US Trustee and any Committee within ten (10) days of their receipt thereof. In addition, the Debtors are hereby authorized to indemnify the DIP Facility Lenders and certain other parties against any liability arising in connection with the DIP Facility Documents to the extent set forth in and in accordance with the terms of the DIP Facility Documents. All such unpaid fees, expenses and indemnities of the DIP Facility Lenders shall constitute DIP Obligations and the repayment thereof shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Facility Documents.

14. Use of Cash Collateral; Adequate Protection of Prepetition Secured Parties. I. Subject to the terms and conditions of this Interim Order, the DIP Facility and the DIP Facility Documents, and including subject to the US Budget, the US Borrower and the Guarantors are authorized to use Cash Collateral. Such Debtors are required to use all Cash Collateral (other than proceeds of the DIP Facility prior to entry of the Final Order) and other proceeds from any Prepetition Collateral, to reduce the Prepetition Obligations, and shall apply all such collateral to reduce such obligations on a permanent basis until repaid in full (subject to paragraph 11 of this Interim Order).

II. As additional consideration for the use of Cash Collateral and the priming of the Prepetition Secured Parties' liens, claims and interests in the Prepetition Collateral (solely upon the terms and conditions of this Interim Order), the Prepetition Secured Parties shall receive the following (together with the protection referred to in clause (I) of this paragraph 14, collectively, the "Adequate Protection"):

27

(a)     Adequate Protection Liens. The Prepetition Agent, on behalf of the Prepetition Secured Parties, is granted as adequate protection a lien on the Prepetition Collateral and DIP Collateral of the US Borrower and the Guarantors (the "Adequate Protection Liens") to the extent there is any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral during the pendency of these Cases, whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the priming of the liens arising under the Prepetition Credit Documents, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, shrinkage or decline in market value of the Prepetition Collateral, the imposition of the automatic stay or otherwise (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Agent's (on behalf of the Prepetition Lenders) seeking vacation of the automatic stay or the Bankruptcy Court granting such relief). The Adequate Protection Liens shall be junior to the Prepetition Permitted Liens, junior to the DIP Facility Liens, junior to the Carve-Out, and senior to any other liens. The Adequate Protection Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtors or the Prepetition Agent of security agreements, pledge agreements, financing statements or other agreements. The Adequate Protection Liens shall cover assets, interest and proceeds of the Debtors that are or would be collateral under the Prepetition Credit Documents if not for Bankruptcy Code section 552(a), and all cash and cash equivalents, and all assets, interests and proceeds of the Debtors (other than the Canadian Borrower) that constitute DIP Collateral.

(b)     Administrative Claim. The Prepetition Agent, on behalf of itself and the Prepetition Lenders, is hereby granted in each of the Debtors' Cases (other than the

28

Canadian Borrower's Case) an allowed administrative claim (the "Adequate Protection Claim") under section 507(b) of the Bankruptcy Code to the extent that the Adequate Protection Liens do not adequately protect the diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral from the Petition Date, and such Adequate Protection Claim shall be shall be junior in priority to the DIP Superpriority Claims and junior and subordinate to the Carve-Out. The Adequate Protection Claim shall include, for the avoidance of doubt, the claims secured by the Adequate Protection Lien.

(c)     Adequate Protection Payments.     As additional adequate protection, (i) the Prepetition Agent shall be entitled to, and the Debtors (other than the Canadian Borrower) are directed to timely pay, the ongoing payment of the Prepetition Agreement Expenses, including the fees and expenses of legal counsel and other professionals retained by the Prepetition Agent, as and when due and payable under the Prepetition Credit Documents (without giving effect to any acceleration provision therein), regardless of whether such fees accrued prior to the Petition Date, and such adequate protection payments shall not be subject to any limitations in the US Budget; and (ii) except for the DIP Facility, the Adequate Protection Liens, the Prepetition Permitted Liens and the DIP Facility Liens, pursuant to this Interim Order, the Debtors shall be prohibited from incurring additional indebtedness with claim status and with priority over the Prepetition Obligations or liens equal to or senior in priority to the liens arising under the Prepetition Credit Documents. Subject to paragraph 11 of this Interim Order, all fees and expenses of the Prepetition Agent and Prepetition Lenders that were incurred under the Prepetition Credit Documents and paid by the Debtors prior to the Petition Date are deemed paid as adequate protection and are not subject to recharacterization and are not avoidable or recoverable under any applicable law from the

29

Prepetition Agent, the Prepetition Lenders or any of such professionals. All amounts paid as adequate protection are deemed permitted uses of Cash Collateral.

(d)     Budget. Except pursuant to permitted variances provided for in the DIP Financing Documents, the Debtors shall not make disbursements in excess of those projected in the Budgets and shall not otherwise deviate from the terms of the Budgets, without the written consent of the Prepetition Agent and the DIP Facility Lenders.

(e)     Additional Adequate Protection. The Prepetition Secured Parties may petition the Bankruptcy Court for any such additional protection they may reasonably require with respect to the Prepetition Obligations or otherwise, including, without limitation, their rights to request additional adequate protection of their interests in the Prepetition Collateral or the Cash Collateral or relief from or modification of the automatic stay extant under section 362 of the Bankruptcy Code.

15.     Restrictions on the Debtors. Other than the Carve-Out, no claim or lien having a priority superior or *pari passu* with those granted by this Interim Order to the DIP Facility Lenders, shall be granted by any Debtor, while any portion of the DIP Facility (or refinancing thereof), or any commitment thereunder remains outstanding, or the Investigation Termination Date shall have not occurred. The Debtors will not, at any time during the Cases, grant mortgages, security interests, or liens in the DIP Collateral or any portion thereof to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

16.     Additional Perfection Measures. The DIP Facility Lenders and the Prepetition Secured Parties shall not be required to file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction or effect any other action to attach or perfect the security interests and liens granted under the DIP Facility

30

Documents and this Interim Order (including, without limitation, the taking possession of any of the DIP Collateral (in accordance with the terms of the DIP Facility Agreement), or the taking of any action to have security interests or liens noted on certificates of title or similar documents). Notwithstanding the foregoing, the DIP Facility Lenders and the Prepetition Secured Parties may, in their respective sole discretion, file this Interim Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm perfection of such liens, security interests and mortgages without seeking modification of the automatic stay under section 362 of the Bankruptcy Code and all such documents shall be deemed to have been filed or recorded at the time of and on the Petition Date, with the priorities set forth herein.

and subject to applicable non-bankruptcy law

17.     **Access to Collateral – No Landlord's Liens.**  Solely upon entry of the Final Order, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Facility Lenders, contained in this Interim Order or the DIP Facility Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Facility Agreement, upon reasonable prior written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Facility Documents, the DIP Facility Lenders may enter upon any leased premises of the Debtors for the purpose of exercising any remedy (in accordance with the terms of the DIP Facility Agreement) with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder; provided that, the DIP Facility Lenders shall only pay rent of the Debtors that first accrues after the DIP Facility Lenders' written notice and that is payable during the period of such occupancy by the DIP Facility Lenders, calculated on a per diem basis.  Nothing herein shall require the DIP

31

Facility Lenders to assume any lease as a condition to the rights afforded to the DIP Facility Lenders in this paragraph.

18.     Automatic Stay. (a) Subject only to the provisions of the DIP Facility Agreement and without further order from the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Facility Lenders to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Facility Documents (including, without limitation and without prior notice, the right to freeze monies or balances in the Debtors' accounts or set off monies or balances of the Debtors in accounts maintained by the DIP Facility Lenders, Prepetition Bank or any other financial institution maintaining any of the Debtors' deposits, the right to charge default rate of interest and to terminate commitments); provided, however, that prior to the exercise of any enforcement or liquidation remedies against the DIP Collateral (other than those specifically set forth in the parenthetical included in the preceding portion of this sentence), the DIP Facility Lenders shall be required to give five (5) business days prior written notice to the Debtors, counsel to the Debtors, the Committee's counsel (if appointed), and the US Trustee; provided, further, that during such five (5) business day period the US Borrower's and Canadian Borrower's authority to use Cash Collateral (subject to the Budgets) shall not terminate. Notwithstanding the occurrence of an Event of Default or termination of the Commitments under the DIP Facility Agreement or anything herein, all of the rights, remedies, benefits and protections provided to the Prepetition Secured Parties under the Prepetition Credit Documents and the DIP Facility Lenders under the DIP Facility Documents and this Interim Order shall survive the Termination Date (as defined in the DIP Facility Agreement). Upon receiving notice of the exercise of remedies by the DIP

32

Facility Lenders, the Debtors, and/or the Committee shall be entitled to seek an expedited hearing following the occurrence of an Event of Default; provided, however, that the only issue to be determined at such hearing is whether an Event of Default has occurred and is continuing. Upon expiration of such five (5) business day period, the Debtors' authority to use Cash Collateral shall terminate without further order of the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

(b) Immediately following the giving of notice by the DIP Facility Lenders, subject to the terms and conditions set forth in the DIP Facility Agreement, of the occurrence of an Event of Default (except as otherwise ordered by this Bankruptcy Court): (i) the Debtors shall to deliver and cause the delivery of the proceeds of DIP Collateral, in accordance with this Interim Order and the DIP Facility Agreement to the DIP Facility Lenders for application to the DIP Obligations pursuant to the DIP Facility Agreements, and (ii) the DIP Facility Lenders shall continue to apply such proceeds in accordance with the provisions of this Interim Order and the DIP Facility Agreement; (iii) the Debtors shall have no right to seek to use any of such proceeds, nor any other Cash Collateral other than towards the satisfaction of post-petition employee obligations incurred in accordance with the Budgets, the Prepetition Obligations, the DIP Obligations, obligations arising as a result of the Adequate Protection Liens and the Carve-Out; and (iv) any obligation otherwise imposed on the applicable DIP Facility Lenders to provide any loan or advance to or for the benefit of Debtors pursuant to the DIP Facility shall be immediately suspended.

33

(c)     If the Debtors or Committee do not contest the right of the DIP Facility Lenders to exercise their remedies based upon whether an Event of Default has occurred within such time period, or if the Debtors or Committee do timely contest the occurrence of an Event of Default and this Bankruptcy Court after notice and hearing declines to stay the enforcement thereof, the automatic stay, as to the DIP Facility Lenders shall automatically terminate at the end of such notice period.

(d)     If the DIP Facility Lenders shall exercise any of their rights and remedies upon the occurrence of an Event of Default, the DIP Facility Lenders, subject to the terms and conditions set forth in the DIP Facility Agreement, upon notice to the Debtors and Committee, may retain one or more agents to sell, lease, or otherwise dispose of the DIP Collateral. In any exercise of their rights and remedies upon an Event of Default, the DIP Facility Lenders, subject to the terms and conditions set forth in the DIP Facility Agreement, are authorized to proceed under or pursuant to the DIP Facility Agreement.

(e)     Subject to the rights, if any, of the holders of any Prepetition Permitted Liens and the Carve Out, or as may be otherwise ordered by the Court, all proceeds realized from any of the foregoing shall be turned over to the DIP Facility Lenders for application to the DIP Obligations pursuant to the DIP Facility Agreement and this Interim Order and, following payment in full, in cash, of the DIP Obligations, to the Prepetition Agent for application to the Prepetition Obligations, to the extent outstanding, and following payment in full, in cash, of the Prepetition Obligations, to the Debtors for distribution pursuant to a further order of the Court.

19.     Modification of Automatic Stay. The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Facility Agreement so, as necessary, to (1) permit the applicable Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations under the DIP Facility Agreement, the DIP Facility, and this Interim Order, as applicable, and (2) authorize the Prepetition Secured Parties to retain and apply payments hereunder.

20.     Credit Bid. The Prepetition Agent shall have the unqualified right to credit bid up to the full amount of any Prepetition Obligations in any sale of the DIP Collateral securing any of the Prepetition Obligations (including Adequate Protection Obligations) or Prepetition Collateral, as applicable, under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code. The Debtors, on behalf of themselves and their estates, stipulate and agree that any sale of all or part of the Prepetition Collateral that does not include an unqualified right to credit bid up to the full amount of the Prepetition Obligations would not result in the Prepetition Agent and the Prepetition Secured Parties receiving the indubitable equivalent of their claims and interest.

21.     DIP Credit Bid. The DIP Facility Lenders shall have the right to credit bid the obligations arising under the DIP Facility under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a Chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

35

22. Nullifying Prepetition Restrictions on Postpetition Lien Grants. Notwithstanding anything to the contrary contained in any prepetition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, any provision that restricts, limits or impairs in any way any Debtor's ability or right to grant liens or security interests upon any of the Collateral (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the DIP Facility Documents or this Interim Order or otherwise enter into and comply with all of the terms, conditions and provisions thereof (all such provisions being collectively referred to as the "Restrictive Clauses") shall not be effective and shall be unenforceable against any such Debtor and the DIP Facility Lenders to the maximum extent permitted under the Bankruptcy Code and other applicable law, but only with respect to the entry of this Interim Order, and, therefore, shall not adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to the DIP Facility Lenders or granted to the Prepetition Secured Parties hereunder, to the maximum extent permitted under the Bankruptcy Code and other applicable law. Such Restrictive Clauses shall not, to the maximum extent permitted under the Bankruptcy Code and applicable law, render any contract or lease unable to be assumed and/or assigned by any Debtor (or by the DIP Facility Lenders pursuant to the provisions contained in this Interim Order), or in any way impair or limit the ability or right of any Debtor (or by the DIP Facility Lenders, on behalf of any Debtor, pursuant to the provisions contained in this Interim Order) to assume and/or assign any contract or lease under sections 365 or 1123 of the Bankruptcy Code.

23. Amendment to DIP Facility Documents. The DIP Facility Lenders, with the consent of the Borrowers, are authorized to amend and/or modify the DIP Facility

36

Documents without further order of the Court; provided that any such amendments or modifications must be in writing and served upon counsel for the Committee (if appointed at such time) and the US Trustee; provided, further that any amendments or modifications that would have the effect of shortening the maturity date of the DIP Facility, increasing the aggregate fees, or the rate or amount of interest payable, or otherwise materially adversely affecting the Debtors' rights or obligations, under the DIP Facility shall be done only pursuant to further order of the Court.

24. Binding Effect. The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Facility Lenders, Prepetition Secured Parties, the Debtors and each of the foregoing parties' respective successors and assigns, including any trustee hereafter appointed for the estate of any of the Debtors, whether in these Cases or in the event of the conversion of any of the Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Interim Order.

25. Survival. The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order (i) confirming any plan of reorganization in any of the Cases (and, to the extent not satisfied in full, in cash, the DIP Obligations shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge), (ii) converting any of the Cases to a chapter 7 case unless permitted under the DIP Facility Documents, or (iii) dismissing any of the Cases unless permitted under the DIP Facility Documents, and the terms and provisions of this Interim Order as well as the DIP Facility Superpriority Claims, the DIP Facility Liens, the adequate protection granted pursuant to this Interim Order and/or the DIP Facility Documents shall continue in full force and effect notwithstanding the entry of any such

37

order, and such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Facility Documents to the maximum extent permitted by law until all of the DIP Obligations is indefeasibly paid in full, in cash, and discharged.

26. <u>Access to the Debtors</u>. In accordance with the provisions of access in the DIP Facility Documents, the Debtors shall permit representatives, agents and/or employees of the DIP Facility Agents and their respective counsel to have reasonable access to their premises and records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with and provide to such representatives, agents and/or employees all such information as they may reasonably request.

27. <u>Authorization to Act</u>. Each of the Debtors is authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, mortgages and financing statements), and to pay interest, fees and all other amounts as provided under and subject to the terms of this Interim Order and the DIP Facility Documents, which may be reasonably required or necessary for the Debtors' full and timely performance under the DIP Facility and this Interim Order, including, without limitation:

(a) the execution of the DIP Facility Documents;

(b) the modification or amendment of the DIP Facility Agreement or any other DIP Facility Documents without further order of the Bankruptcy Court, in each case, in such form as the Debtors, and the DIP Facility Lenders may agree in accordance with and subject to the terms of the terms of the DIP Facility Documents; provided, however, that notice of any material modification or amendment (including any waiver of any Event of Default) shall be provided to counsel for the Committee, if appointed, and the US Trustee, each of

38

which will have five (5) days from the date of delivery of such notice within which to object in writing; provided further, however, that if such objection is timely provided, then such modification or amendment shall be permitted only pursuant to an order of the Bankruptcy Court; and

(c)     the non-refundable payments to the DIP Facility Lenders of the fees referred to in the DIP Facility Agreement, and reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable attorneys' and other professional fees and disbursements as provided in the DIP Facility Documents.

28.     Insurance Policies. Upon entry of this Interim Order, the Administrative Agents and DIP Facility Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral. Any insurance proceeds or other receipts from any source (excluding other authorized payments provided for herein) paid to any of the Prepetition Secured Parties shall be immediately delivered to the Debtors and subject to the DIP Facility Liens and provisions of the DIP Facility Agreement.

29.     Subsequent Reversal. If any or all of the provisions of this Interim Order or the DIP Facility Documents are hereafter modified, vacated, amended or stayed by subsequent order of the Bankruptcy Court or any other court: (i) such modification, vacatur, amendment or stay shall not affect the validity of any obligation of any Debtor or Guarantor to the DIP Facility Lenders or Prepetition Secured Parties (to the extent of adequate protection provided hereunder), or the validity, enforceability or priority of the DIP Facility Superpriority Claims, DIP Facility Liens, adequate protection or other grant authorized or created by this Interim Order and the DIP Facility Documents; and (ii) the DIP Obligations and adequate protection pursuant to this Interim

39

Order and the DIP Facility Documents shall be governed in all respects by the original provisions of this Interim Order and the DIP Facility Documents, and the validity of any such credit extended or security interest granted pursuant to this Interim Order and the DIP Facility Documents and use of Cash Collateral is and shall be protected by section 364(e) of the Bankruptcy Code.

30. <u>Effect of Dismissal of Cases</u>. If the Cases are dismissed, converted or substantively consolidated, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of these Cases shall affect the rights of the DIP Facility Lenders and the Prepetition Secured Parties (to the extent of adequate protection provided hereunder) under their respective documents or this Interim Order, and all of the respective rights and remedies thereunder of the DIP Facility Lenders and the Prepetition Secured Parties (to the extent of adequate protection provided hereunder) shall remain in full force and effect as if the Cases had not been dismissed, converted or substantively consolidated. If an order dismissing any of the Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the DIP Facility Liens and DIP Facility Superpriority Claim granted to and conferred upon the DIP Facility Lenders and the protections afforded to the DIP Facility Lenders pursuant to this Interim Order and the DIP Facility Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full, in cash (and that such DIP Facility Liens, DIP Facility Superpriority Claim and other protections shall, notwithstanding such dismissal, remain binding on all interested parties), (ii) the Adequate Protection granted to and conferred upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until such

40

adequate protection has been satisfied, (iii) the Bankruptcy Court may retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Facility Liens, Adequate Protection Liens, liens arising under the Prepetition Credit Documents, the DIP Facility Superpriority Claim and other adequate protection referred to herein, and (iv) any hearing on a motion to dismiss any of the Cases shall require at least twenty (20) days prior notice to the DIP Facility Lenders and the Prepetition Agent.

31.    Findings of Fact and Conclusions of Law. This Interim Order constitutes findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon the entry thereof.

32.    Controlling Effect of Interim Order. To the extent any provision of this Interim Order conflicts with any provision of the Motion, any prepetition agreement or any document executed in connection with the DIP Facility, the provisions of this Interim Order shall control.

33.    Termination of Commitments. The commitment of the DIP Facility Lenders shall terminate and all amounts owing under the DIP Facility shall be due and payable on the terms and conditions set forth in the DIP Facility Agreement.

34.    Final Hearing. A final hearing on the Motion shall be heard before the Bankruptcy Court on 5|12, **2011 at** 9:30 a **.m. (EDT)** at the United States Bankruptcy Court for the District of Delaware.

35.    Adequate Notice. The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rule 4001(c)(2). The Debtors shall promptly mail or fax copies of this Interim Order and notice of the Final Hearing to the Notice Parties and all landlords of the Debtors. Any party-in-interest objecting to the relief sought in the Final Order

41

shall submit any such objection in writing and file the same with the Bankruptcy Court (with a courtesy copy to chambers) and serve (so as to be received) such objection no later than 5|9 , **2011 at** $\underline{\ \ |2{:}00\ \ }$ **noon . (EDT)** on the following:

(a)   **Richards, Layton & Finger, P.A.,** One Rodney Square, Wilmington, Delaware 19801, Attn: Mark D. Collins, Collins@rlf.com, proposed counsel to Debtors and Debtors-in-Possession;

(b)   **Kirkland & Ellis LLP**, 300 North LaSalle, Chicago, IL 60654, Attn: David Eaton, david.eaton@kirkland.com, and 601 Lexington Avenue, New York, NY 10022, Attn: Leonard Klingbaum, leonard.klingbaum@kirkland.com, counsel to the DIP Facility Lenders; and

(c)   **Office of the United States Trustee for the District of Delaware**, 844 N. King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Juliet M. Sarkessian, Esq.).

Dated: April **20**, 2011
　　　　　Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

42

**Bell & Howell**
**US DIP BUDGET - DRAFT**
($000)

| Week Ending | 15-Apr EST | Post - Filing | | | | | | Anticipated Close --> | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 22-Apr FCST | 29-Apr FCST | 6-May FCST | 13-May FCST | 20-May FCST | 27-May FCST | 3-Jun FCST | Pre Close Notes |
| US | | | | | | | | | |
| PMA/SMA Collections | 3,733 | 2,202 | 2,202 | 2,090 | 3,881 | 1,216 | 1,216 | 1,203 | 14,010 5 |
| Other Collections | | | | | | | | | |
| Equipment/Clicks | 1,350 | 883 | 883 | 787 | 787 | 960 | 960 | 775 | 6,034 1.5 |
| Service/Logistics | 231 | 395 | 395 | 225 | 225 | 240 | 240 | 217 | 1,938 5 |
| Postal | 0 | 0 | 25 | 125 | 0 | 0 | 19 | 0 | 169 5 |
| BCC | 430 | 183 | 183 | 536 | 536 | 283 | 283 | 250 | 2,254 5 |
| Bowe | 0 | 0 | 388 | 0 | 0 | 0 | 0 | 0 | 388 5 |
| Total Other Collections | 2,011 | 1,461 | 1,874 | 1,674 | 1,549 | 1,482 | 1,501 | 1,242 | 10,782 |
| Total Collections | 5,744 | 3,663 | 4,076 | 3,764 | 5,430 | 2,698 | 2,716 | 2,446 | 24,793 |
| Disbursements: | | | | | | | | | |
| Payroll | | | | | | | | | |
| BBH | (4,000) | (300) | 0 | (4,000) | 0 | (4,000) | 0 | (4,000) | (12,300) 5 |
| Fringes | (630) | (224) | (185) | (448) | (215) | (231) | (185) | (422) | (1,910) 5 |
| BCC | (267) | 0 | (275) | 0 | (250) | 0 | (275) | 0 | (800) 5 |
| Total Payroll | (4,897) | (524) | (460) | (4,448) | (465) | (4,231) | (460) | (4,422) | (15,010) |
| Vendor Payments | | | | | | | | | |
| Durham & Wheeling Vendor payments | (1,016) | (615) | (694) | (444) | (569) | (444) | (523) | (408) | (3,698) 5 |
| BCC Vendor Payments | (16) | (148) | (148) | (144) | (144) | (140) | (140) | (57) | (921) 5 |
| Bowe Parts and Components Payments | (279) | (96) | (96) | (414) | (414) | (414) | (414) | (408) | (2,258) 5 |
| Total Vendor Payments | (1,311) | (859) | (938) | (1,003) | (1,128) | (998) | (1,077) | (873) | (6,877) |
| Other Payments | | | | | | | | | |
| Facility expense | (327) | 0 | (327) | 0 | (709) | 0 | (327) | 0 | (1,364) 5 |
| Sale and Use Taxes | (379) | (80) | (120) | 0 | (80) | (463) | 0 | 0 | (743) 5 |
| Travel & Entertainment | (206) | 0 | (226) | 0 | (237) | 0 | (226) | 0 | (690) 5 |
| Freight | (211) | 0 | (238) | 0 | (248) | 0 | (238) | 0 | (723) 5 |
| Professional Services | (268) | 0 | (155) | 0 | (574) | 0 | (155) | 0 | (884) 5 |

# Bell & Howell
**US DIP BUDGET - DRAFT**

($000)

| Week Ending | 15-Apr EST | Post - Filing 22-Apr FCST | 29-Apr FCST | 6-May FCST | 13-May FCST | 20-May FCST | 27-May FCST | Anticipated Close --> 3-Jun FCST | Total | Pre-Close Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| Insurance Payments | | 0 | 0 | (126) | 0 | 0 | 0 | (126) | (252) | 5 |
| Bank Fees | | 0 | 0 | 0 | (12) | 0 | 0 | 0 | (12) | 5 |
| Federal & State Tax payments | | 0 | (480) | 0 | 0 | 0 | 0 | 0 | (480) | 5 |
| All Other Corporate Payments | 0 | 0 | 0 | (750) | 0 | 0 | 400 | 0 | (350) | 6 |
| Miscellaneous Expenses | (163) | (29) | (29) | (174) | (174) | (29) | (29) | (140) | (605) | 5 |
| **Total Other Payments** | **(1,554)** | **(109)** | **(1,575)** | **(1,051)** | **(2,034)** | **(492)** | **(575)** | **(266)** | **(6,103)** | |
| | | | | | | | | | | |
| Restructuring Expenses | | | | | | | | | | |
| Deposits and Court Costs | | (58) | | (200) | | | (100) | | (458) | |
| Debtor's and Committee's Profesional Fees | | 0 | (391) | (60) | (330) | 0 | (441) | (100) | (1,261) | |
| Creditor's Counsel Fees | | 0 | (120) | (400) | 0 | (200) | (120) | (40) | (840) | |
| **Total Restructuring Expenses** | **0** | **(58)** | **(511)** | **(660)** | **(330)** | **(200)** | **(661)** | **(140)** | **(2,559)** | 8 |
| | | | | | | | | | | |
| **Total Disbursements US** | **(7,762)** | **(1,550)** | **(3,484)** | **(7,162)** | **(3,957)** | **(5,922)** | **(2,773)** | **(5,701)** | **(30,548)** | |
| | | | | | | | | | | |
| **Cash Source / (Use)** | **(2,018)** | **2,113** | **592** | **(3,398)** | **1,472** | **(3,224)** | **(56)** | **(3,255)** | **(5,755)** | |
| | | | | | | | | | | |
| Minimum Cash Balance | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | | |
| Beginning Cash Balance | 5,366 | 2,000 | 500 | 500 | 500 | 500 | 500 | 500 | 2,000 | |
| Cash Source / (Use) | (2,018) | 2,113 | 592 | (3,398) | 1,472 | (3,224) | (56) | (3,255) | (5,755) | |
| Borrowing / (Repayment) | (1,349) | (3,613) | (592) | 3,398 | (1,472) | 3,224 | 56 | 3,255 | 4,255 | |
| **Ending Cash Balance** | **2,000** | **500** | **500** | **500** | **500** | **500** | **500** | **500** | **500** | |

**DEBT SUMMARY**

**Pre-Petition Debt**

Beginning Balance

| | | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May | 27-May | 3-Jun | Total | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Term Loan | | 72,136 | | | | | | | | | |
| Revolver | | 34,000 | | | | | | | | | |
| Total Accrued Interest | | 14,857 | | | | | | | | | |
| **Total Beginning Balance** | | **120,993** | **119,644** | **115,981** | **111,905** | **108,141** | **102,711** | **100,014** | **97,297** | **119,644** | |
| Interest | 0% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| Borrowing/(Repayment) | | (1,349) | (3,663) | (4,076) | (3,764) | (5,430) | (2,698) | (2,716) | (2,446) | (24,793) | 2 |
| **Ending Balance** | | **119,644** | **115,981** | **111,905** | **108,141** | **102,711** | **100,014** | **97,297** | **94,851** | **94,851** | |

# Bell & Howell
## US DIP BUDGET - DRAFT
($000)

|  | 15-Apr EST | Post - Filing 22-Apr FCST | 29-Apr FCST | 6-May FCST | 13-May FCST | 20-May FCST | 27-May FCST | Anticipated Close --> 3-Jun FCST | Total Pre Close | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** |  |  |  |  |  |  |  |  |  |  |
| **Post-Petition Debt Roll Forward** |  |  |  |  |  |  |  |  |  |  |
| **Opening Balance** |  | 0 | 148 | 3,806 | 11,000 | 14,957 | 20,879 | 23,826 | 0 |  |
| Draw / (Pay down) |  | 50 | 3,484 | 7,162 | 3,957 | 5,922 | 2,773 | 5,701 | 29,048 | 3 |
| Lender Fees |  | 98 | 175 | 3 | 0 | 0 | 175 | 2 | 453 |  |
| Post-Petition Interest |  | 0 | 0 | 29 | 0 | 0 | 0 | 171 | 200 |  |
| **Ending Balance** |  | **148** | **3,806** | **11,000** | **14,957** | **20,879** | **23,826** | **29,701** | **29,701** |  |
| **Total Debt** |  |  |  |  |  |  |  |  |  |  |
| Pre-Petition Debt |  | 115,981 | 111,905 | 108,141 | 102,711 | 100,014 | 97,297 | 94,851 | 94,851 |  |
| Post-Petition Funding |  | 148 | 3,806 | 11,000 | 14,957 | 20,879 | 23,826 | 29,701 | 29,701 |  |
| **Total Debt** | 119,644 | 116,129 | 115,711 | 119,141 | 117,668 | 120,892 | 121,124 | 124,553 | 124,553 |  |
| Net Increase/(Decrease) in Debt |  | (3,515) | (417) | 3,429 | (1,472) | 3,224 | 231 | 3,429 | 4,909 |  |
| Cumulative Increase/(Decrease) in Debt |  | (3,515) | (3,933) | (503) | (1,976) | 1,248 | 1,480 | 4,909 | 4,909 |  |

# Bell & Howell

## US DIP BUDGET - DRAFT

($000)

| | Post - Filing | Anticipated Close --> |
|---|---|---|

**Notes**

1 Includes payments to US company for parts, components and software purchased by Canada Co.
2 Collections pay down the Pre-Petition Debt
3 Funds are borrowed from the DIP to make disbursements.
4 Includes PIK Interest of $7.3 million and unpaid cash interest of $7,544 million
5 Based on Company's forecast
6 Includes return of $400 thousand retainer from Chapman and Cutler and $750 thousand payment for retention bonuses to middle management
7 Included in the post-petition interest
8 Per Company projections plus UCC counsel

# Bell & Howell

## US Professional Fees

($000)

| US | <-- Filing Date 4/22/11 FCST | 4/29/11 FCST | 5/6/11 FCST | 5/13/11 FCST | 5/20/11 FCST | 5/27/11 FCST | 6/3/11 FCST |
|---|---|---|---|---|---|---|---|
| **PAYMENT:** (2) | | | | | | | |
| **Debtor's Counsels** | | | | | | | |
| Bk Counsel - Richards Layton | - | 100 | - | 150 | - | 75 | - |
| Counsel to the Board - Sperling & Slater | - | - | - | - | - | 20 | - |
| Debtors FA - Focus | - | - | 60 | - | - | 120 | - |
| Debtor Counsel - MWE | - | 125 | - | 60 | - | - | 40 |
| Oliver - Value Creations - Fees | - | 34 | - | - | - | 34 | - |
| Oliver - Value Creations - Expenses | - | 8 | - | - | - | 8 | - |
| PR - Bowe/BBH | - | 24 | - | - | - | 24 | - |
| IB - Lazard | - | - | - | - | - | - | - |
| **UCC Counsel** | | | | | | | |
| UCC Legal Counsel | - | 50 | - | 100 | - | 80 | - |
| UCC - FA | - | 50 | - | 20 | - | 80 | - |
| Total Debtor's and Committee's Professional Fees | - | 391 | 60 | 330 | - | 441 | 40 |
| **Creditor's Counsel** | | | | | | | |
| Lenders Counsel | - | 120 | 400 | - | 200 | 120 | - |
| Total Lenders Counsel Fees | - | 120 | 400 | - | 200 | 120 | - |

# Bell & Howell
## CANADA DIP BUDGET - DRAFT
($000)

DRAFT - CONFIDENTIAL - FOR DISCUSSION PURPOSES ONLY

| Week Ending | 15-Apr | 22-Apr | 29-Apr | 6-May | 13-May | 20-May | 27-May | 3-Jun | Total | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| | Post- Filing | | | | | | Anticipated Close --> | | | |
| **Canada** | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | | |
| Collections | 336 | 226 | 226 | 251 | 251 | 320 | 320 | 244 | 1,837 | 1 |
| **Operational Disbursements** | | | | | | | | | | |
| Payroll | (305) | 0 | 0 | (350) | 0 | (350) | 0 | (350) | (1,050) | 3 |
| Vendor Payments | (107) | (333) | (421) | (191) | (191) | (223) | (223) | (495) | (2,077) | 2 |
| Total Operational Disbursements | (412) | (333) | (421) | (541) | (191) | (573) | (223) | (845) | (3,127) | |
| **Restructuring Expenses** | | | | | | | | | | |
| Deposits and Court Costs | | (35) | | | | | | | (35) | |
| Debtor's and Committee's Professional Fees | 0 | 0 | (160) | (250) | 0 | 0 | (80) | 0 | (490) | |
| Lender's Counsel Fees | 0 | 0 | (40) | 0 | 0 | 0 | 0 | 0 | (40) | |
| Total Restructuring Expenses | 0 | (35) | (200) | (250) | 0 | 0 | (80) | 0 | (565) | 5 |
| **Total Disbursements** | (412) | (368) | (621) | (791) | (191) | (573) | (303) | (845) | (3,692) | |
| **Cash Source / (Use)** | (76) | (142) | (395) | (540) | 60 | (253) | 17 | (601) | (1,855) | |
| Min Cash Balance | | | | | | | | | | |
| **Beginning Cash Balance** | 1,076 | 1,000 | 832 | 463 | 200 | 200 | 200 | 200 | 1,000 | |
| Cash Source / (Use) | (76) | (142) | (395) | (540) | 60 | (253) | 17 | (601) | (1,855) | |
| Borrowing/(repayment) | | (26) | 26 | 277 | (60) | 253 | (17) | 601 | 1,055 | |
| **Ending Cash Balance** | 1,000 | 832 | 463 | 200 | 200 | 200 | 200 | 200 | 200 | |
| **Post - Petition Debt Canada** | | | | | | | | | | |
| Opening Balance | 0 | 0 | 0 | 76 | 355 | 295 | 548 | 582 | 0 | |
| Borrowings/(Pay down) | | (26) | 26 | 277 | (60) | 253 | (17) | 601 | 1,055 | 4 |
| Lender Fees | | 26 | 50 | 1 | 0 | 0 | 50 | 1 | 127 | 4 |
| Post-Petition Interest | | 0 | 0 | 1 | 0 | 0 | 1 | 5 | 6 | 4 |
| **Ending Balance** | 0 | 0 | 76 | 355 | 295 | 548 | 582 | 1,188 | 1,188 | |

# Bell & Howell
## CANADA DIP BUDGET - DRAFT
($000)

| Week Ending | | 15-Apr FCST | Post - Filling 22-Apr FCST | 29-Apr FCST | 6-May FCST | 13-May FCST | 20-May FCST | 27-May FCST | Anticipated Close --> 3-Jun FCST | Total | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Petition Debt | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** | |
| Post-Petition Debt | | 0 | 0 | 76 | 355 | 295 | 548 | 582 | 1,188 | **1,188** | |
| Total Debt | 0 | 0 | 0 | 76 | 355 | 295 | 548 | 582 | 1,188 | **1,188** | |
| | | | | | | | | | | | |
| Net Increase/(Decrease) in Debt | | 0 | 0 | 76 | 279 | (60) | 253 | 33 | 607 | **1,188** | |
| Cumulative Increase/(Decrease) in Debt in DIP Period | | 0 | 0 | 76 | 355 | 295 | 548 | 582 | 1,188 | **1,188** | |

Notes
1 Per company projections
2 Includes payments to US company for parts, components and software purchased by Canada Co.
3 Per Leader Wong
4 Except for close fee, lender fees and interest are non-cash and are not paid in this period
5 Per company projections plus lenders counsel

# Bell & Howell

## Canada Professional Fees

($000)

| | 4/22/11 FCST | 4/29/11 FCST | 5/6/11 FCST | 5/13/11 FCST | 5/20/11 FCST | 5/27/11 FCST | 6/3/11 FCST |
|---|---|---|---|---|---|---|---|
| | < -- Filing Date | | | | | | |
| Debtor's Counsel - Tory's | - | 100 | 100 | - | - | 50 | - |
| PWC Canada | - | 60 | 100 | - | - | 30 | - |
| PWC Counsel - Davies Ward Phillips | - | - | 50 | - | - | - | - |
| Total | - | 160 | 250 | - | - | 80 | - |
| | | | | | | | |
| Lender Counsel - Osler | - | 40 | - | - | - | - | - |
| Total Creditor Counsel Fees | - | 40 | - | - | - | - | - |